## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOE GANO, | ) | |
| | ) | |
| Plaintiff | ) | Case No. 07-271 |
| v. | ) | |
| | ) | |
| DONALD MARK EHART, and | ) | |
| SPREAD EAGLE, INC., a Delaware | ) | |
| Corporation formerly known as Red Eagle | ) | |
| Avionics, Inc., | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY
## JUDGMENT AND SUPPORTING BRIEF

COME NOW, Donald Mark Ehart (hereinafter "Ehart") and Spread Eagle, Inc., (hereinafter "Spread Eagle, Inc.") formerly known as Red Eagle Avionics, Inc., (hereinafter collectively "Defendants") through their undersigned counsel, hereby move this Honorable Court pursuant to Federal Rule of Civil Procedure 56 for an order entering judgment against Plaintiff, Joe Gano (hereinafter "Gano" or "Plaintiff"), as to all counts of the Complaint.

**CROSS & SIMON, LLC**
Richard H. Cross, Jr. (No. 3576)
Tara M. DiRocco (No. 4699)
913 North Market Street
11th Floor
Wilmington, Delaware  19801
302-777-4200
302-777-4224 (fax)
rcross@crosslaw.com
tdirocco@crosslaw.com
*Counsel for Defendants*

Dated: January 14, 2008

# TABLE OF CONTENTS

**Page**

Nature and Stage of the Proceedings ........................................................................1

Summary of Argument ...........................................................................................3

Statement of Facts.................................................................................................4

Argument .............................................................................................................8

    I.       Motion for Summary Judgment Standard.......................................8

    II.      Gano Lacks Standing to Assert Claims of Fraud or Mutual
            Mistake Against Defendants Ehart or Spread Eagle, Inc................9

              A.      Gano Was Not a Party To The January 3, 2006, Asset
                     Purchase of Red Eagle, Inc. .................................................9

              B.      Gano Was Not an Intended Third Party Beneficiary to
                     The January 3, 2006, Asset Purchase of Red Eagle, Inc....10

Conclusion ...........................................................................................................13

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (U.S. 1986)............................................................................8

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)..................................................................................8

Comrie v. Entersays Networks, Inc.,
    2004 WL 293337 (Del. Ch.) .................................................................9, 10

Eastman Kodak Co. v. Image Technical Servs.,
    504 U.S. 451 (1992)..................................................................................8

First Federal Sav. Bank v. CPM Energy Systems Corp.,
    1988 WL 116401 (Del. Super., 1988)........................................................8

Hynansky v. Vietri,
    2003 WL 21976031 (Del. Ch.) .................................................................8

Madison Realty Partners 7, LLC v. Ag ISA, LLC,
    2001 WL 406268 (Del. Ch.) .............................................................10, 12

Metcap Securities, LLC v. Pearl Senior Care, Inc.,
    2007 WL 1498989 (Del. Ch.) ...................................................................9

**Other Authorities**

Fed.R.Civ.P 56(c) .......................................................................................8

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed the instant Complaint on May 18, 2007, and Defendants filed an Answer on July 3, 2007. In the Complaint, Plaintiff alleges fraud and mutual mistake as the basis for rescission of the January 3, 2006 sale and purchase of the business assets of Red Eagle, Inc. (hereinafter the "Asset Purchase").[1]

Plaintiff avers in the Complaint that Ehart fraudulently misrepresented the 2005 net income of Red Eagle, Inc. prior to the Asset Purchase. Plaintiff also contends that both he and Ehart were mutually mistaken regarding the 2005 net income of Red Eagle, Inc. See Compl. ¶¶ 35-55 (Docket 1).

In the Complaint, Plaintiff seeks that the Court: (1) rescind the Asset Purchase of Red Eagle, Inc. pursuant to the Agreement for Sale of Business Assets, the Spread Eagle, Inc. Note and Mortgage, the Non-Competition Agreement, and the Assignment of Lease and Transfer of Ownership Interests, (hereinafter collectively the "Instruments"); (2) declare the Instruments null and void; (3) order Defendants to repay to Plaintiff $1,100,000, the amount paid at closing; (4) order Defendants repay to Plaintiff $52,069.40 paid on the Spread Eagle, Inc. Note and Mortgage through June 2006; (5) order Plaintiff to redeliver to Defendants Spread Eagle, Inc.'s business assets purchased from Defendants; (6) order additional relief necessary to effect a complete rescission of

---

[1] It is important to note that related litigation is pending in Delaware Chancery Court, C.A. No. 2379 VCS (hereinafter the "Chancery Court Litigation"). In the Chancery Court Litigation, David Cannavo (hereinafter "Cannavo") and Red Eagle Avionics, LLC (hereinafter "Red Eagle, LLC") filed suit against the identical parties that are defending the instant litigation. The Complaint in the Chancery Court Litigation was filed on August 29, 2006, approximately nine months prior to the start of the current action. Likewise, the Plaintiffs in the Chancery Court Litigation are attempting to rescind the Asset Purchase, based, *inter alia*, on fraud and mutual mistake. In the Chancery Court Litigation, Defendants filed a Counterclaim, in which Defendants seek monies Cannavo owes to Spread Eagle, Inc. pursuant to a Promissory Note secured by a Mortgage and Security Agreement (hereinafter the "Spread Eagle, Inc. Note and Mortgage") in which Cannavo is in default.

the Asset Purchase and restore the parties to the status quo immediately prior to the
January 3, 2006, sale and purchase, and; (7) award such other relief that is proper under
the circumstances including reasonable attorneys' fees and costs. See Compl. ¶¶ A-G
(Docket 1).

By way of clarification, Plaintiff's prayer for relief is identical to that in the
Chancery Court Litigation; however, the instant prayer for relief pertains only to
Cannavo, not Gano. Assuming *arguendo* that the Court orders recission of the Asset
Purchase, Gano is in no position to effectuate that relief. For example, Gano requests that
Ehart reimburse him $52,026.40. This is the amount Cannavo paid Ehart pursuant to the
Spread Eagle Inc. Note and Mortgage. Furthermore, if the Court grants the relief Gano
seeks, Gano is not capable of returning Spread Eagle, LLC's business assets to Ehart
because Gano has no ownership interest in them in the first place. See Compl. ¶¶ A-G
(Docket 1).

Through the instant submission, the Defendants respectfully move this Honorable
Court to enter summary judgment in their favor, dismissing the Plaintiff's Complaint in
its entirety, with prejudice.

2

## SUMMARY OF ARGUMENT

1.    Gano lacks standing to assert claims of fraud or mutual mistake against

Defendants Ehart or Spread Eagle, Inc.

2.    Gano was not party to the January 3, 2006, asset purchase of Red Eagle, Inc.

3.    Gano was not an intended third party beneficiary to the January 3, 2006, asset

purchase of Red Eagle, Inc.

## STATEMENT OF FACTS

Plaintiff, Gano is a resident of the State of Nevada, residing at 4332 Amberwood Road, Reno, Nevada 89519. Defendant, Ehart is a resident of the State of Delaware residing at 795 Union Church Road, Townsend, Delaware, 19734. Defendant, Spread Eagle, Inc. is a Delaware corporation with an address of 795 Union Church Road, Townsend, Delaware 19734. See Compl. ¶¶ 1-2 (Docket 1). Ehart and Spread Eagle, Inc. sold the assets of Red Eagle, Inc., to Cannavo and Red Eagle, LLC on January 3, 2006. See Compl. ¶ 15 (Docket 1).  Gano was not a party to the Asset Purchase.

The avionics industry suffered after September 11, 2001.  Because of the downturn in the industry and to spend more time with his family, Ehart, the sole officer and stockholder of Red Eagle, Inc., decided to sell his business. See A2 (Ehart Tr. at 35 ¶¶ 11-22)[2]. Cannavo expressed an interest in purchasing Red Eagle, Inc. Cannavo and Ehart are longtime associates arising from the aircraft avionics industry, whereby Red Eagle, Inc. performed routine maintenance and repairs on Cannavo's aircraft. See Compl. ¶ 8 (Docket 1). During the preliminary discussions, it was undecided whether the sale would be structured as a stock or asset purchase.

To facilitate the discussions, Ehart scheduled a meeting with Cannavo. Cannavo, along with Gano, met Ehart at his office located at Red Eagle, Inc. sometime in August 2005 (the "August 2005 Meeting"). Ehart and Gano had met on one or two prior occasions through their involvement in the aviation industry. See Compl. ¶ 9 (Docket 1).

At this stage in the negotiations, Ehart was unaware of Gano's role in the purchase of Red Eagle, Inc., or of any potential financial arrangements between Cannavo

---

[2] Citations to documents contained in Defendants' Appendix will be cited as A__ (Description).

4

and Gano. According to Gano, "I indicated that I would be either an equity investor or a

debt investor, but at that point we hadn't determined what my specific role would be."

See A11 (Gano Tr. at 6 ¶¶ 22-24). Ehart's knowledge of Gano's involvement in the

Asset Purchase was limited, as Ehart stated in his most recent deposition:

> Q:    What was your understanding of Mr. Gano's involvement in the
> entire transaction between that time period?
>
> A:    I didn't know what the agreement was. I didn't know what they
> were – I thought he [Gano] was just going to store his airplanes in
> there. He was there with Dave [Cannavo]. I am not sure what they
> were doing together.
>
> Q:    Did you think he [Gano] was involved in any way in the financing
> of the – of Mr. Cannavo's purchase?
>
> A:    I suspected, but I didn't know. I really didn't care.

See A5-6 (Ehart Tr. at 95 ¶¶ 18-24; 96 ¶¶ 1-4).

Gano and Ehart had no communication with each other after the August 2005

Meeting. Moreover, Ehart and Cannavo did not discuss Gano's involvement in the Asset

Purchase. Presumably, Ehart concluded that Gano decided not to partake in the Asset

Purchase after all. As far as Ehart was concerned, nothing was said or done to make him

think otherwise. All of Ehart's contact was with Cannavo. Gano testified about his lack

of communication with Ehart:

> Q:    Did you at any time – I know you said you had the meeting with
> Mr. Ehart in September. Did you talk to him at all in between
> September and the time of the asset purchase?
>
> A:    No.
>
> Q:    Mr. Ehart in his deposition testified that he had only met you
> person to person about two times. Would you say that that is
> accurate?
>
> A:    Yes.
>
> Q:    …did you talk to him [Ehart] through e-mail? Through the phone?
>
> A:    No.
>
> Q:    Did you have any communication with him?
>
> A:    Not directly.
>
> Q:    All your communication was through Mr. Cannavo?
>
> A:    Yes.

See A15-16 (Gano Tr. at 17 ¶¶ 15-24; 18 ¶¶ 1-8).

Gano was not an equity investor in Red Eagle, Inc. He simply loaned Cannavo

$1.1 million to purchase the assets of Red Eagle, Inc. Gano was not concerned with the

details of the transaction between Cannavo and Ehart:

> Q:    Did you attend the closing with Dave Roeberg and
>       Mr. Cannavo and Mr. Ehart?
> A:    No.
> Q:    Did you review the agreement of sale prior to the
>       purchase?
> A:    No.
> Q:    What about the settlement sheet?
> A:    No.

See A12 (Gano Tr. at 11 ¶¶ 16-23).

In the Complaint, Gano alleges that he personally asked Ehart how the business

was performing on four separate occasions; however, during his deposition, Gano

admitted that he never asked Ehart, and in fact, that he did not speak to Ehart after the

August 2005 Meeting. See Compl. ¶ 14 (Docket 1); See A14-15 (Gano Tr. at 16 ¶¶19-24;

17 ¶¶ 1-19). Ehart and Cannavo were present at the settlement, Gano was not. See A12

(Gano Tr. at 11 ¶¶ 16-18). Cannavo paid $1.0 million at settlement toward the $2.2

million purchase price. Spread Eagle, Inc. financed the remaining $1.2 million. See

Compl. ¶ 33 (Docket 1).

Unbeknownst to Ehart until the actual settlement, Cannavo borrowed the $1.0

million he paid to Ehart at closing from Gano. Cannavo executed a Promissory Note in

favor of Gano (hereinafter "Gano Note") for $1.1 million. To date, Ehart does not know

when the Gano Note was executed or even if the Gano Note was reduced to writing.

Ehart has not been provided with a copy of it.

6

Cannavo is in default on the Gano Note. According to Gano, Cannavo only made one or two payments.  See A13(Gano Tr. at 15, ¶¶ 12-13). Gano has done nothing to collect from Cannavo aside from sending him regular monthly statements. See A13-14 (Gano Tr. At 15 ¶¶ 18-24; 16 ¶¶ 1-3). Despite Cannavo's default, Gano continues to pay $3,500 per month in rent to Cannavo to store his Soviet Warbirds at the Red Eagle hangar. See A9-10 (Gano Tr. at 4 ¶¶ 16-24; 5 ¶¶ 1-5). Gano's only involvement with Red Eagle, LLC, is as a tenant and a creditor. He is not an employee nor does he have any ownership or management duties.

## ARGUMENT

### I.    MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that they moving party is entitled to judgment as a matter of law. Fed.R.Civ.P 56(c). It is the Court's function to determine whether the evidence presents a sufficient disagreement to require a trial or whether it is so one-sided that one party must prevail as a matter of law. First Federal Sav. Bank v. CPM Energy Systems Corp., 1988 WL 116401, *2 (Del.Super., 1988)(citing Anderson v. Liberty Lobby Inc., 477 U.S. 242 (U.S. 1986)). Attached hereto as Exhibit A. A party seeking summary judgment may obtain that relief if there are no material facts in dispute and he is entitled to judgment as a matter of law. See Hynansky v. Vietri, 2003 WL 21976031, at *2 (Del. Ch.). Attached hereto as Exhibit B.

The party seeking summary judgment bears the initial burden of establishing the lack of a genuinely disputed material fact by demonstrating that there is an "absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Summary judgment is appropriate when there is no genuine issue of material fact or, when drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court is to give the nonmoving party the benefit of all justifiable inferences and must resolve disputed issues of fact in favor of the non-movant. Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 456 (1992). As will be demonstrated below, there exists no genuine issues of material fact in this case

which would prevent this Honorable Court from entering summary judgment in favor of the Defendants.

## II.  GANO LACKS STANDING TO ASSERT CLAIMS OF FRAUD OR MUTUAL MISTAKE AGAINST DEFENDANTS EHART OR SPREAD EAGLE, INC.

### A. Gano Was Not a Party To The January 3, 2006, Asset Purchase Of Red Eagle, Inc.

Only parties to a contract may enforce the contract or seek remedies for breach of contact. "Well-settled within precepts of contract laws is recognition that non-parties to a contract ordinarily have no rights under it." Metcap Securities, LLC v. Pearl Senior Care, Inc., 2007 WL 1498989, at *7 (Del.Ch.). Attached hereto as Exhibit C. Strangers to a contract have no right to enforce it. See Comrie v. Enterasys Networks, Inc., 2004 WL 293337, at *2 (Del. Ch.). Attached hereto as Exhibit D.

Cannavo and Ehart, individually and as the principal of his solely held entity, were the only parties to the Asset Purchase. Only Cannavo and Ehart executed the Instruments necessary to effectuate the transfer of assets of Red Eagle, Inc. from Ehart to Cannavo. See Compl. (Docket 1). Neither Gano nor Cannavo claim that Gano was a party to the Asset Purchase, either individually or as part of an entity. Gano's involvement in the Asset Purchase was exclusively between him and Cannavo. Gano loaned Cannavo $1.1 million toward the purchase price. See Compl. (Docket 1).

Neither Gano nor Cannavo allege that Ehart was a party to the Gano Promissory Note, either individually or as part of an entity. Furthermore, nowhere in the Complaint does Gano claim to be a party to any contracts between Cannavo and Ehart. At no time did Gano have an ownership interest in Red Eagle, LLC, or in Red Eagle, Inc. Nor were any promises exchanged between Ehart and Gano. The real issue in this case is between

Gano and Cannavo, not between Gano and Ehart, yet Gano has not asserted any claims against Cannavo and is, in fact, represented by the same counsel as Cannavo.

### B. Gano Was Not An Intended Third Party Beneficiary To The January 3, 2006, Asset Purchase of Red Eagle, Inc.

As previously mentioned, a non-party to a contract has no legal right to enforce it or seek remedies for breach of contract. Comrie v. Enterasys Networks, Inc., 2004 WL 293337, at *2. An exception to this general principle occurs when an intended third-party beneficiary enforces a contact even though he is not a party. Madison Realty Partners 7, LLC v. Ag ISA, LLC, 2001 WL 406268, at *5 (Del. Ch.). Attached hereto as Exhibit E. To create third party beneficiary rights, three elements must be satisfied: "(1) the contracting parties must have intended[3] that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract." Id.

To have standing to enforce the Instruments executed as part of the Asset Purchase, Gano must establish that *both* Cannavo *and* Ehart intended for him to benefit. See Comrie v. Enterasys Networks, Inc., 2004 WL 293337, at *3. For purposes of summary judgment, it is only necessary to show that *either* Ehart or Cannavo lacked the intent to benefit Gano.

Gano simply cannot point to any facts to support the theory that he was an intended third-party beneficiary. Extensive fact discovery was conducted in the

---

[3] The authority is split as to whether both parties to the contract must have the requisite intent to benefit the third-party or if the intent of the promise individually will suffice. This Court addressed this issue and held that under Delaware law, "both parties must in some manner express an intent to benefit the third-party before third-party beneficiary status is found." Comrie v. Enterasys Networks, Inc., 2004 WL 293337, at *3.

Chancery Court Litigation, as well as in this case. Since the brief meeting in August 2005 to discuss the possible purchase of Red Eagle, Inc., in which Cannavo, Ehart, and Gano were present, Ehart has had no dealings with Gano. All Ehart's interactions regarding the sale of Red Eagle, Inc. were with Cannavo.

In fact, Ehart did not know with reasonable certainty that Gano planned to finance part of the purchase price for Cannavo until the actual settlement. Ehart was under the impression that Cannavo planned to pay cash for the balance of the purchase price beyond the $1.2 million Spread Eagle, Inc. Note and Mortgage. Surely, if Ehart was unaware that Gano continued to have involvement in the Asset Purchase after the August 2005 meeting, Ehart did not intend to benefit Gano. See A4-7 (Ehart Tr. at 65 ¶¶ 2-11; 95 ¶¶ 18-24; 96 ¶¶ 1-4, 14-24; 97 ¶¶ 1-5). Plaintiff's case fails on this element alone. Gano lacks standing to sue Ehart. He is neither a party nor an intended third party beneficiary.

Through discovery in this case and the related Chancery Court Litigation, it has been established that Cannavo has not only stopped paying Ehart on the Spread Eagle, Inc. Note but has stopped paying on the Gano Note as well.[4] If Gano is not being paid on the Promissory Note he executed with Cannavo, Gano should bring suit against Cannavo, not Ehart.

Because the first element, the intent to benefit Gano, is factually and legally devoid, it is not necessary to address the two remaining elements. However, Defendants will briefly address the second and third elements. For Gano to qualify as an intended third-party beneficiary and therefore, able to enforce the contract or seek remedies for breach, the benefit to Gano must have been intended as a gift or in satisfaction of a pre-

---

[4] Cannavo last paid Ehart in June 2006. Cannavo made only six payments to Ehart, totaling $52,069.40. Additionally Cannavo has only paid Gano once or twice and has not made a monthly payment to Gano since February 2006. See A13 (Gano Tr. at 15 ¶¶ 12-17).

11

existing obligation. <u>Madison Realty Partners 7, LLC v. Ag ISA, LLC,</u> 2001 WL 406268, at *5.

Gano's only conceivable benefit is the interest Cannavo owes him on the $1.1 million promissory note. A promissory note, by definition, is not a gift. Furthermore, the Gano Promissory Note cannot be considered a pre-existing obligation as the purpose of the Gano Promissory Note was to partially finance Cannavo's purchase of the business assets of Red Eagle, Inc. Upon information and belief, the Gano Promissory Note was executed contemporaneously with when Cannavo and Ehart executed the Instruments to transfer the assets of Red Eagle, Inc. Here, there was a future obligation only, but the obligation was not between Ehart and Gano; the obligation was between Cannavo and Gano.

Finally, for Gano to be an intended third-party beneficiary, the parties' intent to benefit Gano must have been a material reason they entered into the contract. <u>Id.</u> Certainly conferring any benefit to Gano was not a material reason Ehart sold his business to Cannavo.  Ehart was ignorant to Gano's specific involvement in the transaction.  It follows that if Ehart was unaware of Gano's involvement or at the very least, unaware of the extent of his involvement, a benefit to Gano was not a material reason for entering into the transaction.

Gano was not a party to the Asset Purchase nor was he an intended third party beneficiary. Gano does not have standing to enforce the Instruments Cannavo and Ehart signed as part of the Asset Purchase.

## CONCLUSION

The instant motion and the documents in support thereof clearly show that there is no genuine issue concerning the following facts: (1) Gano was not a party to the Asset Purchase; and (2) Gano was not an intended third party beneficiary. In view of the foregoing, and there existing no genuine issue of material facts that would prevent his Honorable Court from dismissing the claims discussed in the present motion, the entry of summary judgment in favor of the Defendants dismissing Gano's Complaint is warranted.

WHEREFORE the Defendants hereby request that this Honorable Court enter summary judgment dismissing Gano's Complaint and award them attorney's fees and costs incurred in defending Gano's frivolous and unwarranted action.

CROSS & SIMON, LLC

Richard H. Cross, Jr. (No. 3576)
Tara M. DiRocco (No. 4699)
913 North Market Street, 11th Floor
Wilmington, Delaware 19801
302-777-4200
302-777-4224 (fax)
rcross@crosslaw.com
tdirocco@crosslaw.com
*Counsel for Defendants*

Dated: January 14, 2008

Exhibit  A

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1988 WL 116401 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 1

▷First Federal Sav. Bank v. CPM Energy Systems Corp.
Del.Super.,1988.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.
FIRST FEDERAL SAVINGS BANK, a banking
corporation organized and existing under the laws of
the United States, Plaintiff,
v.
CPM ENERGY SYSTEMS CORPORATION, a
Delaware corporation, Robert D. Osborne, Phyllis
Osborne, Leonard L. Yowell, Barrett F. Kidner and
C.M. Kidner, Defendants.
Oct. 25, 1988.

On Motion of Plaintiff for Summary Judgment

Walter L. Pepperman, II, and Jeffrey S. Welch, of
Morris, Nichols, Arsht & Tunnell, for plaintiff.
Daniel F. Wolcott, Jr., and Laurie S. Silverstein, of
Potter, Anderson & Corroon, for defendants.

*ORDER*

TAYLOR, Judge.
**\*1** This 25th day of October, 1988:

This case is before the Court on motion for
summary judgment by First Federal Savings Bank
[First Federal] against CPM Energy Systems
Corporation [CPM], Robert D. Osborne, Phyllis
Osborne, Leonard L. Yowell, Barrett F. Kidner and
C.M. Kidner [individual defendants]. The issue
before the Court is whether First Federal is entitled to
summary judgment for CPM's alleged default on a
demand note and, hence, judgment for the amount of
the loan without having to litigate the affirmative
defense of fraud in the inducement raised by CPM.

The demand note was executed by CPM and was
guaranteed by the individual defendants. In addition,
CPM was required to pay periodic interest payments,
as well as costs incurred by First Federal in
attempting to collect and enforce the terms of the

note. It is alleged that First Federal demanded
payment and CPM refused to pay. Although CPM
does not dispute the loan, it has asserted the
affirmative defense of fraud in the inducement of the
loan agreement, alleging that the transaction involved
fraudulent representations made by First Federal to
CPM that following a pending merger between First
Federal and Oxford Financial Group, First Federal
would be in a position to loan CPM additional capital
and that the parties were entering into a "long term
relationship".

At argument of plaintiff's motion, the Court
addressed the effect of CPM's defense on First
Federal's motion in this Court and cited the parties to
*Artic Roofings, Inc. v. Travers,* Del.Supr., 32 A.2d
559 (1943) which states that absent "some unusual
circumstances, a claim for damages, resulting from
fraud on the part of the plaintiff, in inducing a
contract sued on, may be asserted by the defendant,
by way of counterclaim and recoupment in the same
action." *Id.* at 561. *Artic Roofings* makes clear that an
affirmative defense of fraud in the inducement can be
raised in a suit on a contract in this Court.

The Court provided First Federal the opportunity
to submit a memoranda distinguishing the rule set
forth in *Artic Roofings.* First Federal's memoranda
raises two arguments in response to the impact of
CPM's fraudulent misrepresentation defense. First
Federal contends that CPM's undisputed failure to
make the payment of interest accelerated the payment
under the terms of the note and that the holding of
*Artic Roofings* should not apply to the loan principal.
In support of this argument, First Federal cites, *In Re
Duncan,* D.Tenn., B.R. 13 (1980) and *Press v.
Marvalan Industries, Inc.,* D.N.Y., 222 F.Supp. 346
(1976). These cases state that breach of the terms of a
note may accelerate the entire debt. However, they do
not address the effect of the affirmative defense of
fraud in the inducement on a motion for summary
judgment for default on a note. Since, First Federal
has not cited any authority for the proposition that the
rule of *Artic Roofings* should be limited to loan
principal only, the Court will apply its holding.

**\*2** First Federal also argues that fraud in the
inducement does not entitle defendants to keep the
loan proceeds that are otherwise now due on account

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1988 WL 116401 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 2

of their default in paying any interest, citing *Salisbury v. Credit Service,* Del.Super., <u>199 A. 674 (1937)</u>. First Federal's reliance on *Salisbury* is misplaced. *Salisbury* addressed the ability of a plaintiff to recover money in an action of assumpsit when money had been received by the defendant from plaintiff in misreliance on a contract which cannot be enforced under the statute of frauds, <u>*Id.* at 680,</u> and does not address the effect of the affirmative defense of fraud in the inducement on a motion for summary judgment on the default of a demand note. In fact, no case cited by First Federal granted summary judgment in favor of the lender in the face of the defense asserted here.

In deciding this motion for summary judgment, it is not this Court's function to weigh the evidence and determine the truth of the matter, but to determine whether the evidence presents a sufficient disagreement to require a trial or whether it is so one-sided that one party must prevail as a matter of law. <u>*See, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)</u>. Given CPM's claim of fraud in the inducement of the loan and First Federal's failure to refute the rule set forth in *Artic Roofings,* this Court cannot say that this case is so one-sided that First Federal must prevail as a matter of law.

Based on the foregoing reasons, the motion of plaintiff for summary judgment is DENIED.

IT IS SO ORDERED.

Del.Super.,1988.
First Federal Sav. Bank v. CPM Energy Systems Corp.
Not Reported in A.2d, 1988 WL 116401 (Del.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2003 WL 21976031 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

▷Hyansky v. Vietri
Del.Ch.,2003.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.
HYNANSKY
v.
VIETRI
**No. 14645-NC.**

Submitted: March 6, 2003.
Aug. 7, 2003.

Dear Messrs. Spadaro and Vietri:NOBLE, Vice
Chancellor.

I.

*1 Plaintiff John Hynansky ("Hynansky") and
Defendant Albert A. Vietri ("Vietri") entered into a
business venture in 1988 to purchase and develop a parcel
of land in Delaware County, Pennsylvania (the "Parcel").
Because of zoning obstacles, the Parcel could not be
rezoned as the parties had intended and eventually it was
sold at a substantial loss. Hynansky brings this action to
obtain payment by Vietri of his initial capital
contribution, which Vietri never made, and Vietri's pro
rata share of the business venture's losses.

II.

During the closing on the acquisition of the Parcel on
January 9, 1989, Vietri and Hynansky executed a
    Hynansky
    Vietri

8. *Capital Accounts.*A separate capital account shall
be maintained for each Partner....[FN2]

FN2.*Id.* at 1-2.

Thus, even the most cursory review of the Agreement
would have revealed that it had been drafted to create a
partnership.    In    addition,    the    documents

document    (the    "Agreement")    [FN1]    that    purportedly
established "JHV Associates" (the "Partnership") and
provided in part:

FN1. Pl. Hynansky's Mot. for Summ. J. ("Pl.'s
Mot.") at Tab 1.

PARTNERSHIP AGREEMENT

JHV ASSOCIATES

THIS PARTNERSHIP AGREEMENT is made
effective as of January 9, 1989, by and between two
parties: John Hynansky and Albert Vietri, being
sometimes individually referred to herein as a "Partner"
and collectively as the "Partners".

1. *Formation.*A partnership (the "Partnership") is
hereby formed under and pursuant to the provisions of the
Delaware Uniform Partnership Law, 6 *Del.C.* §
1501*etseq.* (the "Delaware Act").

2. *Name.*The business of the Partnership shall be
conducted under the name "JHV Associates" ...

3. *Purpose.*The purpose of the Partnership is to own,
develop and lease real property in Delaware County,
Pennsylvania.

4. *Partners.*The Partners of the Partnership shall
consist of the parties hereto....

5. *Principal Office.*The principal office of the
Partnership shall be maintained....

6. *Term.* The Partnership shall continue for a term of
fifty (50) years from and after the date hereof, unless
earlier terminated pursuant to Section 17 hereof.

7. *Capital Contributions.*The initial capital of the
Partnership, contributed in cash by the Partners, is as
follows:

$34,555.15
$33,200.03

contemporaneously executed by Vietri to acquire the
Parcel and to finance its acquisition clearly indicated that
the acquiring entity was a partnership and that Vietri was
executing the closing documents, including, specifically,
the note and the mortgage, as a "Partner."[FN3]

FN3. Pl.'s Mot. at Tabs 4 and 5. Both the note
and the mortgage identify the borrower as "JHV
Associates, a Delaware general partnership."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21976031 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Although Vietri acknowledges that he signed the various documents, including the Agreement, and that he saw the term "Partner," he now asserts that he did not read the Agreement. Instead, he contends that he relied upon his attorney (who was also representing Hynansky and the Partnership) to implement the business arrangement in accordance with his understanding that the business would be conducted under some type of limited liability entity.[FN4]Vietri also maintains that he was not to become an equity participant in the venture until the Parcel had been successfully rezoned.[FN5]When this issue with the attorney, the attorney, according to Vietri, told him that he was receiving his equity interest at closing on the acquisition of the Parcel in order to avoid a subsequent transfer tax that otherwise would have been paid at the time Vietri became entitled to his equity interest.[FN6]Because of their inability to obtain a favorable rezoning, Hynansky and Vietri agreed to sell the Parcel in 1994 for a price significantly below the purchase price paid in 1989.[FN7]

FN4. The contract of sale for the Parcel, negotiated by Hynansky, identified the purchaser as "JHV Inc." Def. Vietri's Br. in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of his own Cross-Mot. for Summ. J. ("Def.'s Br."), Ex. 3 at 1.

FN5. Aff. of Albert A. Vietri ¶ 3.

FN6.*Id.* ¶ 5.

FN7. Interestingly, Vietri sent a memorandum to the realtor handling the sale of the Parcel and, in the course of approving the sale, noted that his approval was "per our partnership agreement." Pl.s' Mot. at Tab 10.

### III.

*2 Hynansky has moved for summary judgment.[FN8]His motion presents several issues. First, Hynansky asserts that the business venture was a Delaware general partnership known as JHV Associates. Second, Hynansky, assuming that the formation of a partnership will be confirmed, seeks dissolution of that partnership because it no longer has any useful purpose. Third, because Vietri never made any monetary contributions to the Partnership, Hynansky seeks payment by Vietri of his required capital contribution and reimbursement from Vietri of his proportionate share of

the Partnership's losses which Hynansky absorbed from Vietri's share of the venture.

FN8. Vietri has also moved for summary judgment and sought sanctions under Court of Chancery Rule 11 against Hynansky.

Vietri concedes that he and Hynansky both executed a "partnership agreement" -the Agreement, which clearly and unambiguously purported to establish a general partnership. Vietri, however, contends that he understood that the business venture would be conducted through a corporation or limited partnership and that his contribution to the venture would not be cash but, instead, would be his experience and expertise in the real estate business.[FN9]Vietri also asserts that he was not to become an equity participant unless and until he obtained the rezoning. Vietri recognizes that his efforts to tender such assertions implicate the parol evidence rule. He first argues that the parol evidence rule does not preclude other proof demonstrating that the parties did not intend for the signed document to be a contract. Second, he asserts that the parol evidence rule does not preclude a party from proving that material terms were omitted from the Agreement because of fraud or mutual mistake.

FN9. By 1988, Vietri had been engaged in real estate development or sales for almost two decades. Vietri Dep., Pl.'s Mot., Tab 2 at 9-10.

### IV.

The cross-motions for summary judgment are, of course, governed by the familiar standard of Court of Chancery Rule 56: a party seeking summary judgment may obtain that relief if there are no material facts in dispute and he is entitled to judgment as a matter of law.[FN10]Thus, "[i]n the face of a properly supported motion for summary judgment, the non-moving party must produce evidence that creates a triable issue of fact or suffer the entry of judgment against it."[FN11]The Court "may not weigh qualitatively or quantitatively the evidence adduced on the summary judgment record."[FN12]"Cross-motions for summary judgment are not the procedural equivalent of a stipulation for decision on a paper record."[FN13]

FN10.*See, e.g., Williams v. Geier,* 671 A.2d 1368, 1375 (Del.1996).

FN11.*In re Nantucket Island Assocs. Ltd. Partnership Unitholders Litig.,* 810 A.2d 351,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21976031 (Del.Ch.)
(Cite as: Not Reported in A.2d)

360 (Del. Ch.2002).

FN12.*Cerberus Int'l, Ltd. v. Apollo Management, L.P.,* 794 A.2d 1141, 1150 (Del.2002).

FN13.*Telxon Corp. v. Meyerson,* 802 A.2d 257, 262 (Del.2002).

## V.

### A. *The Parol Evidence Rule*

Initially, I undertake a brief review of the parol evidence rule, which the parties agree is critical to the resolution of this matter. "The parol evidence rule ... prevents the use of extrinsic evidence of an oral agreement to vary a fully integrated agreement that the parties have reduced to writing."[FN14] The rule is a principle of substantive law and is not a rule of evidence.[FN15] Because of the perceived harshness of the parol evidence rule, courts have a recognized number of exceptions to its preclusive operation.[FN16]

FN14.*Taylor v. Jones,* 2002 WL 31926612, at *3 (Del. Ch. Dec. 17, 2002). Vietri does not argue that the language of the Agreement is ambiguous. If the language of a contract is ambiguous, the interpreting court may resort to extrinsic evidence in order to ascertain the intent of the parties. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997).

FN15.*See id.;* 11 WILLISTON ON CONTRACTS, § 33:2, at 559-60 (4th ed.1999).

FN16.*See Engle v. Oney,* 1989 WL 44045, at *2 (Del. Ch. Apr. 25, 1989).

### B. *Existence of a Contract*

**\*3** The operation of the parol evidence rule is premised upon a showing of the existence of an enforceable written contract.[FN17] "[P]arol evidence may be available to show 'that the agreement was rendered invalid, void, or voidable by such causes as fraud, illegality, duress, mutual mistake, lack or failure of consideration, and incapacity.' " [FN18] Thus, "[i]t has long been accepted in Delaware that parol evidence is admissible to show conditions precedent which relate to the taking effect of a written instrument." [FN19] However,

this qualification of the parol evidence rule is restricted to demonstrating the failure to satisfy a condition to the obligations to perform of *both* parties. "Such evidence is not admissible to show that the duty of just one party is conditional, since this would be regarded as an attempt to vary the terms of the writing rather than to show that the agreement never took effect." [FN20]

FN17.11 WILLISTON ON CONTRACTS, § 33:17 (4th ed.1999); 3 E. Allan Farnsworth, FARNSWORTH ON CONTRACTS, § 7.4 (3d ed.1999).

FN18.*Rodgers v. Erickson Air-Crane Co.,* 2000 WL 1211157, at *4 (Del.Super.Aug. 17, 2000) (quoting 11 WILLISTON ON CONTRACTS, § 33:17 (4th ed.1992)).

FN19.*Engle,* 1989 WL 44045, at *2. As such, this "long accepted" rule is not truly an exception to the parol evidence rule, and has been more accurately referred to as a "qualification." *See, e.g.,* Farnsworth, *supra* note 17, § 7 .4 at 441.

FN20. Farnsworth, *supra* note 17, § 7.4 at 441.

In his First Affirmative Defense, Vietri asserts that "[t]he parties did not intend the document [the Agreement] to constitute a binding, legally effective agreement unless and until Vietri was successful in efforts he was to make on behalf of [Hynansky] to have [the Parcel] rezoned for office or commercial development."[FN21] Evidence that the Agreement was subject to an oral condition before it would take effect would be admissible under the rationale previously noted. A careful review of the record, including Vietri's affidavit, demonstrates, however, that Vietri has failed to proffer any cognizable evidence disputing the existence and enforceability of the Agreement. The relevant factual assertions of Vietri's affidavit, which I must accept as true for purposes of this motion for summary judgment, are:

FN21. Answer and Countercl. ¶ 5.

- Hynansky "told me to do what was necessary and he would pay all expenses attributed to [the rezoning]. He then said that if I accomplished this he would give me a piece of the corporation;"[FN22] and

FN22. Aff. of Albert A. Vietri ¶ 3.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21976031 (Del.Ch.)
(Cite as: Not Reported in A.2d)

- "When [the attorney] asked me what I was to contribute to the corporation, I told him that I was to attempt to get the property rezoned at Mr. Hynansky's expense and that if I succeeded, then and only then, would I receive any share."[FN23]

> FN23.*Id.* ¶ 4.

These factual contentions question the timing of the vesting of Vietri's interest in the business venture. They do not attack the existence of the Agreement and, thus, fail to come within the noted qualification to the application of the parol evidence rule. As such, and because Vietri has failed to bring forth any other facts that dispute the validity of the Agreement, I conclude that a contract, in the form of the Agreement, exists between Hynansky and Vietri.[FN24]

> FN24. At times, Vietri has contended that, because he is demonstrating that a condition (achieving the favorable rezoning of the Parcel) to the vesting of his equity stake in JHV Associates was never satisfied, no partnership was ever formed, and thus there is an oral condition to the enforceability of the Agreement, a contract which purports to create a partnership. In essence, Vietri attempts to merge the concepts of the enforceability of the Agreement and the existence of a partnership. Even assuming that the unfulfilled contingency to the vesting of Vietri's equity interest would preclude the conclusion that a partnership was created by the parties, I reject Vietri's argument. I note that

[t]he existence of a partnership is generally considered to be governed by the intention of the parties rather than the language employed to express such intention.... The mere existence of an agreement labeled "partnership agreement" and the characterization of those signing the agreement as partners does not conclusively prove the existence of a partnership, the intention of the parties being paramount.

*Acierno v. Brannar,* 1976 WL 3, at *4-5 (Del. Ch. Feb. 19, 1976). The existence of an agreement which purports to create a partnership is distinct from the existence of a partnership between the contracting parties. *See infra* pp. 17-20. Vietri's challenge to the existence of a partnership is not logically equivalent to questioning the existence of the Agreement and, therefore, does not permit him to circumvent the operation of the parol evidence rule. Thus, there is a "partnership agreement" between Hynansky and Vietri; because of the unique nature of a partnership, the existence of a partnership agreement does not conclusively establish a partnership.

### C. *Fully Integrated Agreement*

In order for the parol evidence rule to apply in all its splendor, one must first present a "fully integrated agreement." [FN25]The factors to be assessed in ascertaining whether a contract is fully integrated include: "whether the writing was carefully and formally drafted, whether the writing addresses the questions that would naturally arise out of the subject matter, and whether it expresses the final intentions of the parties."[FN26]Here, the Agreement was a formal document, evidencing the typical degree of care associated with establishing a relatively straightforward partnership arrangement. The questions, material for present purposes, of the nature of the business venture, and the parties' immediate rights in the venture, were clearly answered by explicit language creating a partnership, without any suggestion that it was anything other than a general partnership, and by the clear expression that Vietri became a partner upon execution of the Agreement without any suggestion that any other condition precedent, such as obtaining the rezoning, controlled the vesting.

> FN25.*Taylor,* 2002 WL 31926612, at *3.

> FN26.*Id.* (citing *Scott-Douglas Corp. v. Greyhound Corp.,* 304 A.2d 309, 316 (Del.Super.1973)).

*4 The intentions of the parties are best expressed by the language of the Agreement; Paragraph 21 provides:

21. *Entire Agreement/Amendments.*This Agreement contains the entire understanding between the parties with respect to the Partnership and supercedes all prior written and oral agreements between them. There are no representations, agreements, arrangements or understandings, oral or written, between the Partners relating to the subject matter of this Agreement which are not fully expressed herein. This Agreement may not be amended or modified except by written instrument executed by all of the Partners.[FN27]

> FN27. Pl.'s Mot., Tab 1 at 16-17. Vietri understood the purpose of an integration clause. Vietri Dep., Pl.'s Mot., Tab 2 at 199-200.

Thus, through the integration clause of Paragraph 21 of the Agreement, Hynansky and Vietri "clearly assented to the Agreement as their complete understanding as evidenced by the integration clause."[FN28]Indeed, the text of the Agreement demonstrates that it was the intention of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21976031 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 5

the parties to execute an integrated agreement. Accordingly, the Agreement is to be interpreted in light of the parol evidence rule and extrinsic evidence of an oral agreement contradicting the terms of the Agreement may not be considered, unless one of the exceptions to the application of the parol evidence rule is present.

> FN28.*Scott v. Land Lords, Inc.*, 616 A.2d 1214 (Del.1992) (TABLE) (ORDER ¶ 7) (unpublished order, text available at 1992 WL 276429 (Del. Sept. 22, 1992)).

Vietri maintains that, by seeking to impose a condition precedent on his ascension to partner status, he is not seeking to "vary" the Agreement. That, however, is exactly what he seeks. He asks for an interpretation of the Agreement that is the direct opposite of the Agreement's plain and unambiguous language and meaning. This integrated agreement, signed by both Hynansky and Vietri, clearly provided that Vietri became a general partner in a general partnership known as JHV Associates upon execution of that agreement. Vietri, however, wants to vary its meaning, through extrinsic evidence of an oral agreement or negotiations leading up to the execution of the Agreement, to reach a conclusion that he is not a general partner in JHV Associates and that JHV Associates was not formed as a general partnership. Deviation from the plain meaning of an integrated agreement, such as Vietri advocates here, is precisely the result that the parol evidence rule is designed to preclude. Therefore, this extrinsic evidence, in the form of oral agreements leading up to the execution of the Agreement that anything other than a general partnership was to be formed or that the vesting of Vietri's equity interest in JHV Associates was contingent upon the successful rezoning of the Parcel, is excluded unless one of the exceptions to the parol evidence rule applies.

## D. Fraud or Mutual Mistake

Even though the parol evidence rule generally prevents consideration of evidence of an oral agreement to vary the terms of a fully integrated agreement that has been reduced to writing, there are exceptions to this rule. One of these exceptions is "where fraud or misrepresentation is alleged."[FN29] Another is where mutual mistake occurred.[FN30]

> FN29.*Anglin v. Bergold*, 565 A.2d 279 (Del.1989) (TABLE) (ORDER ¶ 6) (unpublished order, text available at 1989 WL 88625 (Del. June 26, 1989)).

> FN30.*James River-Pennington Inc. v. CRSS Capital, Inc.*, 1995 WL 106554, at *7 (Del. Ch. Mar. 6, 1995); *Reeder v. Sanford Sch., Inc.*, 397 A.2d 139, 141 (Del.Super.1979).

*5 As part of any successful claim based on fraud or misrepresentation, there must be a showing that a false statement was made and that the complaining party's conduct was in justifiable reliance upon the misrepresentation.[FN31]

> FN31.*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983); *Steinman v. Levine*, 2002 WL 31761252, at *14 (Del. Ch. Nov. 27, 2002), *aff'd*, 822 A.2d 397 (Del.2003) (TABLE).

Here, Vietri cannot, under the standard of Court of Chancery Rule 56, demonstrate that he relied upon any misrepresentation of Hynansky. First, he saw the Agreement and, although he may not have read it, he concedes that he realized that he was signing the Agreement as a "Partner."[FN32] Thus, any reliance would not have been reasonable. Second, he contends that he relied upon the statement of the attorney who formed the Partnership and handled the closing on the Parcel-not upon any representation of Hynansky.[FN33] Vietri contends that his attorney misled him by telling him when he would "really" receive his partnership interest and that he would not have any personal liability. If the attorney misled him, Vietri has not provided a basis for attributing the attorney's statement to Hynansky. Indeed, Vietri emphasizes that the attorney was representing not only Hynansky and the business venture but also him.[FN34]

> FN32. Vietri states that he did not read the Agreement. Failure to read an agreement, however, is not a defense to its enforcement. *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del.1989). Moreover, although he asserted in his deposition that he was not "specifically aware" that the Agreement was a partnership agreement, he noted at the closing on January 9, 1989, that he was to receive a 49% allocation of the partnership interest. Vietri Dep., Pl.'s Mot., Tab 2 at 97-99. In addition, in his Answering Brief, he conceded that he understood that the Agreement was a partnership agreement. "I [Vietri] saw the word 'partner' on the page and asked [the attorney] why I should sign a form of partnership agreement."Def.'s Br. at 6.

Not Reported in A.2d                                                                     Page 6
Not Reported in A.2d, 2003 WL 21976031 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN33. Vietri Dep., Pl.'s Mot., Tab 2 at 188-91.

FN34. As Vietri phrased it: "Knowing that [the attorney] represented both Mr. Hynansky and I, I trusted him and felt that he would never put me in harm's way."Aff. of Albert A. Vietri ¶ 7.

Vietri also has failed to provide any basis for a conclusion that the Agreement was the product of mutual mistake. For summary judgment purposes, Vietri may have demonstrated that as he went to closing he did not anticipate that the business venture would be conducted as a general partnership. However, he signed the Agreement, after having had fair opportunity to review it and after having noted the word "Partner" in the Agreement. In addition, at about the same time, he signed loan closing documents as "Partner." To find mutual mistake in the face of this conduct would be to allow the disappointed party to assert mutual mistake whenever events did not unfold as anticipated. More specifically, there is no reason to believe that the mistake, if any, was mutual. Hynansky signed the Agreement; it clearly and unambiguously memorialized his understanding to establish a general partnership. In sum, the argued exceptions to the parol evidence rule are of no help to Vietri.

VI.

The previous issues, regarding the application and effect of the parol evidence rule upon certain evidence sought to be introduced by Vietri, are a subset of the more weighty dispute between the parties: whether a partnership was created. A "partnership" is defined by the relevant statutory authority [FN35] as "an association of two or more persons to carry on as co-owners a business for profit."[FN36]The creation of a partnership is a question of intent.[FN37]To prove the existence of a partnership, one must show the intent to divide the profits of the venture.[FN38]In demonstrating that a partnership exists, the acts, dealings, conduct, admissions and declarations of the purported partners, in addition to other direct evidence, may be utilized.[FN39] When the controversy is between two partners, as it is here, stricter proof of the intention to create a partnership is required.[FN40]

FN35. The Delaware Uniform Partnership Act, 6 *Del. C.* § 1501, *et seq.,* as in effect during all of the events material to this matter, was repealed in 1999 and replaced with the Delaware Revised Uniform Partnership Act, now codified at 6 *Del. C.* § 15-101, *et seq.* The effective date of the Delaware Revised Uniform Partnership Act was

January 1, 2002, and, accordingly, the prior law applies here.

FN36.6 *Del. C.* § 1506(a).

FN37.*Acierno,* 1976 WL 3, at *4:*see also *In re Estate of Fenimore,* 1999 WL 959204, at *5 (Del. Ch. Oct. 8, 1999) ("Nonetheless, one must show the existence of the partnership by a preponderance of the evidence, and to do so one may demonstrate an intention to share profits and losses, and may use acts, the dealings and conduct of the parties, and admissions of the parties to do so.").

FN38.*In re Estate of Fenimore,* 1999 WL 959204, at *5 (citing *Chaiken v. Employment Sec. Comm'n,* 274 A.2d 707, 710 (Del.Super.1971)); *Green v. Schagrin,* 1989 WL 89576, at *3 (Del.Super. June 16, 1989); *Gannett Co. v. Irwin,* 1985 WL 189242, at *1 (Del.Super.Aug. 9, 1985).

FN39.*Clothier v. McCloskey,* 1986 WL 15715, at *5 (Del. Ch. July 10, 1986), *aff'd,*541 A.2d 598 (Del.1988) (TABLE); *Brown v. Galvin,* 1979 WL 178470, at *3 (Del. Ch. Mar. 26, 1979); *Jones v. Purnell,* 62 A. 149, 150 (Del.Super.1905).

FN40.*In re Estate of Fenimore,* 1999 WL 959204, at *5:*Garber v. Whittaker,* 174 A. 34, 36 (Del.Super.1934).

*6 In support of his argument that a partnership was created, Hynansky principally relies upon the existence of the Agreement. The Agreement, as previously noted, unambiguously sought to create a Delaware general partnership named JHV Associates. However, because the fundamental inquiry in determining whether the parties created a general partnership is the intention of those parties, evidence in the form of a partnership agreement is strong but not conclusive proof of such an intention.[FN41]Indeed, "the entire agreement and all the attendant circumstances must be taken into consideration in reaching a determination that a partnership has actually materialized."[FN42]Thus, in determining whether Hynansky and Vietri intended to create a partnership, I must not confine my analysis solely to the terms of the Agreement.

FN41.*Acierno,* 1976 WL 3, at *4-5:*see also *Green,* 1989 WL 89576, at *3 ("The mere

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21976031 (Del.Ch.)
(Cite as: Not Reported in A.2d)

existence of an agreement does not conclusively prove the existence of a partnership."); _Chaiken. 274 A.2d at 709_ ("The mere existence of an agreement labeled 'partnership' agreement and the characterization of signatories as 'partners' does not conclusively prove the existence of a partnership. Rather, the intention of the parties, as explained by the wording of the agreement, is paramount.").

FN42._Acierno. 1976 WL 3, at *4:see also Chaiken. 274 A.2d at 710_ (noting that "the total circumstances of the case taken together indicate [an] employer-employee relationship" versus the existence of a partnership).

In light of the standard of review at this stage in the proceedings, the broad scope of the intensely factual review of "all the attendant circumstances" that I am obliged to undertake, and the stricter standard of proof applying to disputes between two partners as to the creation of a partnership, I deny Hynansky's motion for summary judgment upon the issue of whether a partnership exists. I note that Vietri has proffered evidence that Hynansky treated the assets, and in particular the losses, of JHV Associates as his own for tax purposes,[FN43] and that Hynansky identified JHV Associates as a corporation on the contract of sale for the Parcel.[FN44]Because any conclusion as to the parties' intent to form a partnership would require me to balance the conflicting evidence, I may not grant summary judgment on the question of whether JHV Associates is a Delaware general partnership. Furthermore, I deny Hynansky's motion for summary judgment upon all his other claims as they are premised upon a finding that JHV Associates is a general partnership existing between Hynansky and Vietri.

FN43. Specifically, Hynansky admittedly never sent a K-1 partnership tax form to Vietri for Vietri's share of any partnership's losses. Rather, Hynansky deducted on his personal income tax returns all of the losses of the partnership as losses suffered on personal, versus partnership, property. _See_ Hynansky Dep. at 190, 200-02.

FN44._See supra_ note 4.

### VII.

For the foregoing reasons, Hynansky's motion for summary judgment is denied. Vietri's motion for

summary judgment and his motion for sanctions are also denied.[FN45]

FN45. Vietri has not demonstrated that the actions of Hynansky or his attorneys in this matter were fraudulent, in bad faith or otherwise a basis for the imposition of sanctions.

IT IS SO ORDERED.

Del.Ch.,2003.
Hynansky v. Vietri
Not Reported in A.2d, 2003 WL 21976031 (Del.Ch.)

END OF DOCUMENT

# Exhibit C

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 1

**H** MetCap Securities LLC v. Pearl Senior Care, Inc.
Del.Ch.,2007.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
METCAP SECURITIES LLC, and North American
Senior Care, Inc. Plaintiffs,
v.
PEARL SENIOR CARE, INC.; PSC SUB Inc.;
Geary Property Holdings, LLC; and Beverly
Enterprises, Inc. Defendants.
**No. Civ.A. 2129-VCN.**

Submitted Jan. 25, 2007.
Decided May 16, 2007.

Joel E. Friedlander, and James G. McMillan, III, of
Bouchard    Margules    &    Friedlander,    P.A.,
Wilmington, Delaware; and Martin Stein, of Heller,
Horowitz & Feit, P.C., New York, New York, for
Plaintiffs.
Bruce E. Jameson, and Laina M. Herbert, of Prickett,
Jones & Elliott, P.A., Wilmington, Delaware; Joseph
F. Donley, of Dechert LLP, New York, New York;
and H. Joseph Escher, III, of Dechert LLP, San
Francisco, California, for Defendants.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

I. INTRODUCTION

*1 An entity with no assets of its own was
formed for the special purpose of a future transaction
with a for-profit nursing home chain. It engaged the
services of an investment banking advisory firm,
agreeing to pay it a success fee upon the completion
of any transaction with the target company. The
assetless entity, along with two other acquiring
entities, eventually entered into a merger agreement
with the target company. The merger agreement
contained a standard no-brokers' fee provision,
stating that no broker, finder, financial advisor, or
investment banker could expect to receive a fee for

work performed in connection with the merger. The
provision contained a parenthetical exception for the
investment banking advisor engaged by the assetless
entity.

Three months after the merger agreement was
signed, the parties agreed that the three acquiring
entities would be exchanged for three other acquiring
entities, who would assume the obligation to acquire
the target company from the original group of
acquirers. Reference to the financial advisor's success
fee remained intact. That would soon change as
efforts to finalize their agreement came to a close.

Late into the final evening of negotiation of the
last set of amendments to the merger agreement, the
two principals representing the original acquiring
entities, who had previously delivered their signature
pages to a fellow law partner, left the negotiations
and went home. They gave him no instructions,
limitations, or conditions on which to proceed during
the negotiations. A few hours later, another partner,
still negotiating the terms of the amendment, would
agree to delete the merger agreement's one reference
to the financial advisor's fee. The practical effect of
this amendment was that the obligation to pay the
success fee was neither assigned to nor assumed by
the second group of acquirers.

Both the investment banking advisory firm and
the assetless entity which had engaged its services
bring suit for reformation. The firm also brings suit
for fraud, unjust enrichment, and for damages under a
third-party beneficiary contract theory. Before the
Court is a motion to dismiss on behalf of the second
group of acquirers and the target corporation.

II. BACKGROUND [FN1]

> FN1. The Background is drawn from the
> Amended    Complaint    (sometimes,    the
> "Complaint")    and    those    documents
> referenced by the Amended Complaint.

Plaintiff North American Senior Care, Inc.
("NASC") is a Delaware corporation and special
purpose entity formed in connection with a
transaction with Defendant Beverly Enterprises, Inc.
("Beverly"), a Delaware corporation that operates

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

nursing home facilities throughout the United States.[FN2] On August 16, 2005, NASC, along with NASC Acquisition Corp. ("NASC Acquisition") and SBEV Property Holdings LLC ("SBEV"), entered into a merger agreement (the "Merger Agreement") with Beverly whereby it would be acquired in an all-cash deal of more than $2 billion.[FN3]

> FN2. Compl. ¶¶ 7, 11.

> FN3. *Id.* ¶ 8; Herbert Aff. Ex. C ("Merger Agreement").

Sometime prior to the Merger Agreement, NASC had engaged Plaintiff MetCap Securities LLC ("MetCap") to serve as its financial and business advisor in connection with a Beverly transaction. The five-page agreement (the "Advisor Contract"), which was only between NASC and MetCap, provided for an "investment advisory fee" to be paid to MetCap, along with expenses, upon the closing of any business combination transaction with Beverly.[FN4]

> FN4. *Id.* ¶ 9; Herbert Aff. Ex. B ("Advisor Contract"). Payment of the fee was guaranteed by SBEV. *See* Advisor Contract at 5. The Advisor Contract remained in force when the Beverly deal closed.

Although a court assessing a motion to dismiss typically only considers facts alleged in the complaint, it may also consider documents referred to in the complaint. *See In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 169 (Del.2006). Here, several documents are expressly or impliedly referenced in the Complaint: the Merger Agreement, the Advisor Contract, preliminary and final drafts of the Third Amendment to the Merger Agreement, and certain e-mails.

**\*2** The Merger Agreement, by Section 5.10, recited generally that no financial advisor's fees were owed, but it expressly referenced the MetCap fee:[FN5]

> FN5. Compl. ¶ 10.

No broker, finder, financial advisor, investment banker or other Person (other than Wachovia Securities and MetCap Securities LLC, the fees and expenses of which will be paid by Parent) is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission in connection with the Merger based upon arrangements made by or on behalf of Parent or Merger Sub.[FN6]

> FN6. The Merger Agreement referred to NASC as "Parent" and to NASC Acquisition as "Merger Sub."

NASC, however, was without assets of its own.[FN7] Thus, for several months before August 2005, Leonard Grunstein, a principal of SBEV and a partner at the law firm of Troutman Sanders LLP ("Troutman Sanders"), sought financing to fund the obligations that would be incurred as part of a transaction with Beverly.[FN8] He negotiated extensively with Ronald Silva of Fillmore Capital Partners ("Fillmore Capital") and its counsel, Joseph Heil of the law firm of Dechert LLP ("Dechert").[FN9] In the course of these negotiations, Silva and Heil were given drafts of the Merger Agreement; each draft included Section 5.10 and its reference that the MetCap fee was to be paid by NASC.[FN10]

> FN7. *Id.* ¶ 11.

> FN8. *Id.* ¶ 13.

> FN9. *Id.*

> FN10. *Id.* ¶ 14.

The Merger Agreement was amended on September 22, 2005, to reflect the equity that was to be secured to fund the acquisition of Beverly. Section 2.11 of this amendment (the "Second Amendment")[FN11] provided that Fillmore Capital would deliver an "Equity Commitment Letter" by November 18, 2005, detailing Fillmore Capital's commitment to purchase the "common stock and preferred stock of Parent [NASC] for at least $350 million to cause Parent ... to make the proceeds of such purchase available as consideration for the [Beverly] merger."[FN12] The Second Amendment did not alter, or even reference, NASC's obligation (as "Parent") to pay the MetCap fee as described in Section 5.10 of the Merger Agreement.[FN13]

> FN11. The First Amendment to the Merger Agreement is not pertinent to the dispute before the Court.

> FN12. *Id.* ¶ 15. The Equity Commitment Letter was signed by Silva and attached as Exhibit C to the Second Amendment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 3

FN13.*Id.* ¶¶ 15-16.

In mid-November, Silva announced that he had raised the $350 million in equity that was the subject of the Second Amendment. Shortly thereafter, on November 20, 2005, the parties executed another amendment (the "Third Amendment"), which would shift the obligation to purchase Beverly from the NASC, NASC Acquisition, and SBEV, entities all represented, at least to some extent, by Troutman Sanders, to Pearl Senior Care, Inc. ("Pearl"), PSC Sub Inc. ("PSC"), and Geary Property Holdings, LLC ("Geary"),[FN14] all created at Silva's behest and represented by Dechert.[FN15]Before the negotiations had culminated in the final version of the Third Amendment, however, Grunstein (for SBEV) and Mark Goldsmith, also a Troutman Sanders partner, (for NASC and NASC Acquisition) signed signature pages on November 18, 2005, and had them delivered to Lawrence Levinson, another attorney at Troutman Sanders, to be held in escrow.[FN16]The signature pages were eventually attached to the final version of the Third Amendment.

FN14.*Id.* ¶¶ 17-18.Silva is the president of Pearl and PSC, entities formed by Fillmore Capital. It should also be noted that the names of the substituted acquiring entities are taken from the Complaint. The Defendants maintain that Pearl and PSC have been incorrectly named in the Complaint and that their proper names are Pearl Senior Care, LLC and PSC Sub LLC.

FN15. The Complaint (¶ 17) states that shortly before execution of the Third Amendment, Grunstein suggested that the names of the original acquiring entities be changed from NASC, NASC Acquisition, and SBEV to Pearl, PSC, and Geary, respectively. The reasons for the requested change are not alleged and the effects of that change are not clear, but the Court notes that the parties appear to agree that the name changes are not pertinent to their dispute, which focuses primarily on the execution of the Third Amendment.

As a result of the Third Amendment, Fillmore Capital would not purchase the stock of NASC. As a consequence, perhaps not fully appreciated at the time, of this structural change, the pending dispute would evolve.

FN16.*Id.* ¶ 19.

**\*3** But negotiations were far from over. On November 20, 2005, various drafts of the Third Amendment were circulated throughout the day between, *inter alia*, Grunstein and Goldsmith (on behalf of the assignor acquiring entities) and Silva and Heil (on behalf of the assignee acquiring entities).[FN17] None of these drafts altered, much less referenced, Section 5.10 of the Merger Agreement. By 7:00 p.m. that evening, Beverly's Board of Directors had approved the latest draft of the Third Amendment-again, a draft that did not reference Section 5.10 or the MetCap fee. Around 10:00 p.m., Grunstein and Goldsmith, apparently believing that no further changes would be forthcoming, went home.

FN17.*Id.* ¶ 20.

But one of Grunstein and Goldsmith's other partners at Troutman Sanders, W. Brinkley Dickerson, stayed behind. At Heil's request, Dickerson, apparently without consulting with his partners, made the change to the Third Amendment that is at the center of the parties' dispute.[FN18]At 12:59 a.m. on November 21, 2005, a few hours after Grunstein and Goldsmith had left, Dickerson e-mailed Beverly's counsel at Covington & Burling LLP and copied several parties, including Grunstein (for SBEV) and Heil (for Silva and Pearl), but not Goldsmith (for NASC and NASC Acquisition).[FN19] Another draft had emerged. This time, a provision of the Merger Agreement-and perhaps a critical one for MetCap-was stricken. Section 3.9 of the Third Amendment deleted the parenthetical of Section 5.10, which concerned payment of the MetCap fee.[FN20] The obvious significance was that Pearl, as a party generally assuming NASC's duties under the Merger Agreement (an assignment made by the Third Amendment), would not have any even arguable contractual obligation to pay MetCap for its advisory services. The final version of the Third Amendment, which appeared around 4:00 a.m. on November 21, 2005, reflected this change, a change that MetCap and NASC would not discover until March 2006.

FN18.*Id.* ¶ 23.

FN19. Goldsmith e-mailed Dickerson earlier

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

that evening at 9:36 p.m., informing him that, although he was unsure if the Third Amendment had to be signed that evening, he had given Levinson, another colleague at Troutman Sanders, his signed signature pages on behalf of NASC and NASC Acquisition. *See* Herbert Aff. Ex. H.

FN20. Section 3.9 of the Third Amendment provided: "Section 5.10 of the Merger Agreement is amended by deleting the parenthetical contained therein."

In their Complaint, MetCap and NASC explain that "[w]hat happened was that defendants caused the new version of Section 3.9 to be drafted; and signature pages were removed from a prior version of the Third Amendment and attached to the new unauthorized version."[FN21] This occurred, of course, after Grunstein and Goldsmith had departed. They allege that Dickerson was only "deal counsel" to all the buyers in the transaction, collectively "coordinating everyone on the buyer's side,"[FN22] but that he lacked the authority to bind NASC, NASC Acquisition, or SBEV individually.[FN23]

FN21. Compl. ¶ 22.

FN22. *See* Tr. of Oral Arg. Jan. 27, 2007, at 44.

FN23. Compl. ¶ 23. It is not alleged that Troutman Sanders represented MetCap.

The Defendants' conduct with respect to the Third Amendment forms the basis for MetCap and NASC's claims. The Complaint makes no allegations of a separate agreement, such as an amendment to, or an assignment of, the Advisor Contract by which Pearl, PSC, or Geary, agreed expressly to assume NASC's obligation to pay MetCap.

The merger with Beverly closed on March 14, 2006.[FN24] Despite the work it performed in connection with the transaction, MetCap has yet to receive any portion of its advisory fee and now seeks recovery against Pearl, PSC, Geary, and Beverly.[FN25]

FN24. *Id.* ¶ 26.

FN25. Fillmore Capital reimbursed MetCap

$1.5 million for sums it had advanced in connection with the transaction. *Id.* ¶ 25. The Complaint does not address the status of MetCap's efforts, if any, to collect from SBEV under its guarantee of the Advisor Contract.

III. CONTENTIONS

*4 Seeking to recover an investment advisory fee it claims it is owed, MetCap, along with NASC, filed a four-count Amended Complaint. In Count One, MetCap alleges that the Defendants, with the exception of Beverly, defrauded it of its fee by failing to disclose that Section 3.9 of the Third Amendment had been changed to remove the reference in the Merger Agreement regarding payment of MetCap for its services. Because of the silence of the Defendants with respect to this late-hour change, MetCap, to its detriment, continued working. In Count Two, MetCap alleges that all of the Defendants were unjustly enriched by the work it performed in connection with the merger because they knew that, after adoption of the Third Amendment, NASC was no longer a party to the Merger Agreement and, in addition, had no assets of its own. Without relief, MetCap argues that the Defendants will have received the benefit of its work through NASC's assignment of developed contract rights without assuming a material obligation that should have come with it: compensating MetCap for its services. In Count Three, MetCap alleges that Pearl became and remains obligated to pay the fee because MetCap, as an intended third-party beneficiary of the Merger Agreement before the Third Amendment, never consented to the change caused by Section 3.9 of the Third Amendment.[FN26] Finally, both MetCap and NASC seek reformation of the Third Amendment because of its alleged failure to express the agreement between the parties that Pearl would assume NASC's obligation to pay MetCap's fee.

FN26. Section 3.9 of the Third Amendment, throughout this Memorandum Opinion, will be used to refer to the final version which deleted the parenthetical contained in Section 5.10 of the Merger Agreement. Before the final revisions, Section 3.9 addressed subject matter not related to the pending dispute.

Pearl, PSC, Geary, and Beverly have collectively responded by moving to dismiss this action under

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Court of Chancery Rule 12(b)(6).[FN27] They focus on two points: first, NASC's counsel consented to the addition of Section 3.9 of the Third Amendment; and, second, any right MetCap has to a fee is governed solely by the Advisor Contract it has with NASC, as there is neither an agreement between MetCap and any of the Defendants nor an agreement in which any of the Defendants assumed NASC's obligation under the Advisor Contract.

> FN27. They also challenge, under Court of Chancery Rule 9(b), the adequacy of the Plaintiffs' efforts to plead fraud and mistake with particularity.

## IV. ANALYSIS

### A. *The Applicable Standard*

A motion to dismiss under Court of Chancery Rule 12(b)(6) may be granted only if "it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief."[FN28]This is because, in considering such a motion, the Court is required to accept the well-pleaded facts alleged in the complaint as true and to view those facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the plaintiffs.[FN29]The Court is not, however, compelled to accept every strained interpretation of fact or every conclusory allegation unsupported by facts contained in the complaint.[FN30]

> FN28.*VLIW Tech., L.L.C. v. Hewlett-Packard Co.,* 840 A.2d 606, 610-11 (Del.2003) ("Accordingly, under Delaware's judicial system of notice pleading, a plaintiff ... need only allege facts that, if true, state a claim upon which relief can be granted."); *see Palese v. Del. State Lottery Office,* 2006 WL 1875915, at *2 (Del. Ch. June 29, 2006), *aff'd,*913 A.2d 570 (Del.2006) (TABLE); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (reminding that a court's role on such a motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof").

> FN29.*E.g., Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L .P.,* 829 A.2d 143, 148-49 (Del. Ch.2003). The Court may also consider documents integral to the complaint and incorporated by reference. *Id.* at 149.

> FN30.*In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d at 168.

### B. *The Complaint Fails to State a Claim for Fraud Against Pearl, PSC, or Geary*

MetCap's first claim is for fraud. The Complaint alleges that Pearl, PSC, and Geary defrauded MetCap when they: (1) inserted Section 3.9 of the Third Amendment at the last minute without the knowledge or authorization of either MetCap or NASC and (2) failed later to disclose this change.[FN31]The purpose and effect of the Defendants' conduct was, MetCap contends, to deprive it of its fee and to induce it to continue working on the merger.[FN32]

> FN31. Although Count One (the one alleging fraud) is brought only by MetCap against Pearl, PSC, and Geary, the parties appear to have joined issue as if both MetCap and NASC had asserted that claim. *See* Defs.' Opening Br. at 19 ("Plaintiffs have failed to allege ... that Defendants made any false statements."); Pls.' Ans. Br. at 33 ("Plaintiffs have a claim for fraud ..."); Defs.' Reply Br. at 13 ("[P]laintiffs' fraud claim is defeated by the imputation of Troutman Sanders' knowledge to Leonard Grunstein."). The Court, however, will address only the claims asserted in the Complaint. A fraud claim by NASC is not among them.

> FN32. Compl. ¶¶ 29-30.

*5 To state a common law fraud claim, MetCap must plead facts supporting an inference that: (1) Pearl, PSC, or Geary falsely represented or omitted facts that they had a duty to disclose; (2) they knew or believed that certain representations were false or made representations with a reckless indifference to the truth; (3) they intended to induce MetCap to act or refrain from acting; (4) MetCap acted in justifiable reliance on the representation; and (5) MetCap was injured by its reliance.[FN33]

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 6

> FN33.*See DCV Holdings, Inc. v. ConAgra, Inc.,* 889 A.2d 954, 958 (Del.2005); *see also Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983)* ("[F]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of facts, or by silence in the fact of a duty to speak. Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading.").

Metcap's claim for fraud fails because it depends upon the contention that the Defendants were knowingly silent as to the late-hour change to the Third Amendment and that there was a "duty to disclose" the change to MetCap.[FN34] Generally, a duty to disclose arises when there is a fiduciary or other similar relationship of trust between the parties or where the custom or course of dealing between the parties merits disclosure.[FN35] MetCap has failed to set forth any facts that would support any inference that the Defendants had some fiduciary or other obligation to disclose changes to the Merger Agreement to MetCap, which, of course, was not a party to the Merger Agreement. Where there is no fiduciary or contractual relationship, Delaware law generally does not impose a duty to speak.[FN36] Because MetCap makes no allegation that such a relationship existed between it and the Defendants or that it had engaged in a course of dealing with the Defendants entitling it to any particular disclosure, the Defendants owed no "duty to disclose" to MetCap and, accordingly, MetCap has not stated a claim for fraud against the Defendants.[FN37]

> FN34. MetCap does not allege any false representation.

> FN35.*See, e.g., Matthews Office Designs, Inc. v. Taub Invs.,* 1994 WL 267479, at *2 (Del. May 25, 1994).

> FN36.*See Nicolet, Inc. v. Nutt,* 525 A.2d 146, 150 (Del.1987).

> FN37. To the extent that MetCap might argue that the "duty to disclose" would arise out of its status as a third party beneficiary

to the Merger Agreement, see Part IV.D, *infra.*

## C. The Claim for Unjust Enrichment-It Survives in Part

MetCap also asserts a claim for unjust enrichment against all Defendants. It argues that it was the "procuring cause" of the Beverly acquisition and that, absent a recovery, the assignee Defendants and Beverly will have received the benefit of its services without the corresponding obligation to pay MetCap for those services.[FN38]

> FN38.*See* Compl. ¶¶ 33-34. The Complaint does not go much further than a broad brush allegation that MetCap was the "procuring cause" of the merger. For example, the Complaint notes MetCap's "substantial contribution and work in connection with the merger" and that it "conferred the benefit of its services directly upon defendants," but it makes no reference as to what exactly it performed for the Defendants.

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[FN39] In finding a party is entitled to an equitable remedy for unjust enrichment, courts look to several factors: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[FN40] Of cardinal significance is whether a contract already governs the parties' relationship. In short, if there is a contract between the complaining party and the party alleged to have been enriched unjustly, then the contract remains "the measure of [the] plaintiff's right."[FN41]

> FN39.*Schock v. Nash,* 732 A.2d 217, 232 (Del.1999).

> FN40.*Cantor Fitzgerald, L.P. v. Cantor,* 1998 WL 326686, at *6 (Del. Ch. June 16, 1998); *Khoury Factory Outlets, Inc. v. Snyder,* 1996 WL 74725, at *11 (Del. Ch. Jan. 8, 1996).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN41.*Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 942 (Del.1979); *ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995).*See, e.g., Bakerman v. Sidney Frank Importing Co., Inc.,* 2006 WL 3927242, at *18 (Del. Ch. Oct. 16, 2006) ("When the complaint alleges an express, enforceable contract that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed."); *Albert v. Alex Brown Mgmt. Servs ., Inc.,* 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) (dismissing an unjust enrichment claim "when the existence of a contractual relationship [was] not controverted").

There is, of course, no contract between MetCap and the Defendants. This fact, MetCap appears to assert, should itself be dispositive to the Court's analysis, leading it to conclude that the claim for unjust enrichment can withstand Defendants' motion to dismiss. The mere absence of a contract between the complaining party and the defendant, however, is not dispositive. Also crucial-but lacking here-is that some direct relationship be alleged between a defendant's enrichment and a plaintiff's impoverishment.

*6 Although the doctrine of unjust enrichment is one of "substantial flexibility," [FN42] it is axiomatic that there must be some relationship between the parties. A showing that the defendant was enriched unjustly by the plaintiff who acted *for* the defendant's benefit is essential. As one court cogently explained:

FN42.*Palese,* 2006 WL 1875915, at *5.

[T]o recover under a theory of quasi contract, a plaintiff must demonstrate that services were performed for the defendant resulting in its unjust enrichment. It is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendants, the plaintiff must look to that person for recovery.[FN43]

FN43.*Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc.,* 14 F.Supp.2d 331, 338 (S.D.N.Y.1998), *aff'd,* 173 F.3d 845 (2d Cir.1999).

With the focus on "for whom" MetCap's services were performed, the Complaint frames two discrete periods: (i) through execution of the Third Amendment and (ii) after the Third Amendment. Before the Third Amendment, MetCap's services, in accordance with the Advisor Contract, were performed for NASC; afterward, with NASC out of the transaction, the Defendants, or so it must be inferred from the Complaint, knew that MetCap was performing work, supporting the transaction, for their benefit.

The Complaint refers to the Advisor Contract between MetCap and NASC. That agreement evinces their understanding that MetCap would "act as [NASC's] financial and business advisor to assist [it] in proposed transactions involving Beverly Enterprises, Inc."[FN44] in exchange for NASC's "pay[ing] to [MetCap] an Investment Advisory Fee of Twenty Million Dollars ($20,000,000) ... [u]pon the closing of any ... Business Combination Transaction [with Beverly]."[FN45] Absent from the Advisor Contract, however, is any link to Pearl, PSC, Geary, or Beverly. It does not specify or even contemplate that advisory services would be provided to any party other than NASC.[FN46] Those services were not requested by any of the Defendants. The Advisor Contract does not reveal, and the Complaint does not allege, a relationship of agency between NASC and any one of the Defendants or that the Advisor Contract was amended to reflect a change in NASC's status as the sole recipient of MetCap's services. Furthermore, the Complaint makes no allegation that any of the Defendants expressly agreed to assume, either in whole or in part, NASC's obligation under the Advisor Contract to compensate MetCap.[FN47]

FN44. Advisor Contract at 1.

FN45.*Id.* at 2.

FN46. Particularly odd is MetCap's unjust enrichment claim against the target corporation in this transaction; the Advisor Contract makes plain that MetCap was advising the entity *acquiring* Beverly. See *id.* at 1-2.Under the agreement, that entity was, of course, NASC.

FN47. The Plaintiffs do contend that Pearl's duty to pay MetCap would have arisen under the parenthetical of Section 5.10 of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the Merger Agreement if it had not been revised at the last minute by the Third Amendment.

Because our law precludes the doctrine of unjust enrichment from being invoked "to circumvent basic contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it,"[FN48] the Court must conclude that MetCap's route to recovery for work performed (or benefit conferred) through the Third Amendment is defined by its contract with NASC and that its unjust enrichment claim to that extent must be dismissed.[FN49]

> FN48.*WSFS v. Chillibilly's Inc.*, 2005 WL 730060, at *19 (Del.Super.Mar. 30, 2005).*See also*RESTATEMENT (SECOND) OF RESTITUTION § 110 (1988) ("A person who has conferred a benefit on another as the performance of a contract with a third person is not entitled to restitution from the other *merely* because of the failure of performance by the third person.") (emphasis added). The parties engage in a minor debate about the guidance provided by Section 110 of the RESTATEMENT and how that guidance might be expanded by consideration of the tentative draft. Section 110 cannot be read as precluding *every* claim of unjust enrichment simply because there is an agreement between "A", who claims that "B" has been unjustly enriched at "A's" expense, and "C" (instead of "B"). To be fair, none of the Defendants, despite MetCap's characterization, has argued precisely this. The word "merely" in Section 110 serves as a reminder that something more is necessary to invoke the doctrine of unjust enrichment. The "more" that is required may be suggested by Section 29 of the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT (tentative draft No. 3, 2004) which provides in part:

A person who has conferred a benefit on a recipient as the performance of a contract with a third person is entitled to restitution from the recipient upon the failure of performance by the third person, but only as necessary to prevent unjust enrichment. In this context, the conclusion that a recipient would be unjustly enriched by the retention of a given benefit requires a determination that:

> (a) absent liability in restitution, the claimant will not be compensated for the performance in question, and the recipient will retain the benefit of the claimant's performance free of any liability to pay for it; (b) liability in restitution will not subject the recipient to an obligation from which it was understood by the parties that the recipient would be free; and (c) liability in restitution will not subject the recipient to a forced exchange.

The tentative draft is, of course, just that: tentative. More importantly, if literally applied, MetCap's claim would fail because it has not alleged that "absent liability in restitution," it would not be paid. It has alleged that NASC is unable to pay; it has not alleged that SBEV will not pay under its guarantee of the Advisor Contract. As for whether liability would be imposed on Pearl for "an obligation from which it was understood by the parties that [it] would be free," the analysis is less clear. When the Advisor Contract was executed, Pearl obviously was not involved in any way and no one believed that it would become obligated. At some point, especially during the period shortly after the Second Amendment when it was anticipated that Pearl would acquire the stock of NASC, it could be argued that Pearl (and NASC and MetCap) expected that Pearl would become obligated. Pearl, however, did not buy the stock of NASC and, thus, a transaction which never occurred cannot be the basis for imposing the liability upon Pearl. Moreover, no benefit was arguably conferred by MetCap on Pearl until the Third Amendment.

> FN49. The Court is not insensitive to MetCap's predicament. Both MetCap and NASC allege that NASC was an entity with no assets of its own and, thus, seeking recovery from it would be futile. *See* Compl. ¶ 11 (alleging further that "it was contemplated that NASC would meet its financial obligations ... by means of funds that it would raise"). But the inability of a party to a contract to fulfill an obligation thereunder cannot serve as a basis to conclude that other entities, who are not party to the contract, are liable for that obligation. *See WSFS*, 2005 WL 730060, at *19 ("A greater injustice would result if this Court were to ignore the lease agreement [between the parties] and award unjust enrichment damages ... WSFS was in the better position to protect itself by claiming other collateral, or in the alternative,

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

refusing to loan its funds ... Finding otherwise would be inequitable.").

Following the Third Amendment, MetCap's work was no longer for NASC; instead, the Court must infer from the Complaint that it was for the benefit of the Defendants, most likely for the benefit of Pearl. If, as alleged, Pearl knew of the services for its benefit, relied upon and benefited from those services, and understood that NASC could not (or would not) pay MetCap for those services, the Court cannot conclude "with reasonable certainty" that there is no set of facts that MetCap could prove to support its claim for unjust enrichment as to the benefits it conferred upon Pearl following the Third Amendment.[FN50]Thus, the motion to dismiss MetCap's unjust enrichment claim must be denied to that extent.[FN51]

> FN50. MetCap's claim of unjust enrichment against PSC, Geary, and Beverly do not survive the motion to dismiss. No non-conclusory facts are alleged to suggest in any fashion how any of these entities benefited from MetCap's services, contracted for by NASC and only arguably at some point benefiting Pearl.

> FN51. The Complaint provides little insight to the work of MetCap after the Third Amendment (or before the Third Amendment for that matter). How to establish appropriate compensation, assuming the MetCap is so entitled, may be a difficult task, but it is not one that the Court need confront now. Indeed, the Court, in this context, does not preclude any argument (if MetCap should choose to make one) as to when any particular benefit resulted.

D. *The Complaint Does Not State a Claim That MetCap Was a Third-Party Beneficiary of the Merger Agreement*

*7 Next, the Court considers MetCap's claim that it was a third-party beneficiary to the Merger Agreement, before the Third Amendment, and that, as such, the parties to the Merger Agreement could not vary or eliminate MetCap's right to a fee without its express consent because MetCap had acted in reliance upon its third-party rights.[FN52]For reasons set

forth, this claim does not survive the Defendants' motion to dismiss.

> FN52.*See* Compl. ¶¶ 12, 37-38. For MetCap to prevail, it must allege that (1) it was a third-party beneficiary of the Merger Agreement before the Third Amendment and (2) the terms of that agreement which benefited it could not be changed without its approval. The Merger Agreement, as amended by the Third Amendment, confers no rights, by its terms, upon MetCap.

Well-settled precepts of contract law is recognition that non-parties to a contract ordinarily have no rights under it.[FN53]Fixation with privity between parties, however, waned as modern commerce spawned increasingly sophisticated and complex relationships.[FN54]An exception emerged that an intended-but not incidental-third-party beneficiary might also have enforceable legal rights under a contract, even if it was not a party to that contract.

> FN53.*E.g., Comrie v. Enterasys Networks, Inc.,* 2004 WL 293337, at *2 (Del. Ch. Feb. 17, 2004) (citing *Insituform of N. Am., Inc. v. Chandler,* 534 A.2d 257, 268 (Del. Ch.1987)) (recognizing "the general rule that strangers to a contract ordinarily acquire no rights under it ...").

> FN54.*See Wilmington Housing Auth. v. Fid. & Deposit Co. of Md.,* 47 A.2d 524, 528 (Del.1946) (holding that a third-party beneficiary may recover on a contract made for his benefit and noting that "the exceptions grafted upon the English doctrine by our Delaware Courts have breached the imaginary barrier erected by the seal against the overwhelming force of justice and reason supporting the American doctrine, thereby opening the way for us to wipe out the last vestiges of an 'outworn, archaic' rule which is in conflict with the demands of modern-day business and social policy"); *see also*13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 37:1 (4th ed.2000) (noting that, while courts "recite[d] talismanically-and somewhat misleadingly-that 'strangers to a contract' have no rights under the contract, [i]n practice, the traditional common-law view proved too inflexible and harsh ... [and an] exception to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

this rule has grown up under our law....").

Delaware courts have often looked to *Insituform of North America, Inc. v. Chandler*[FN55] to determine whether a party is an intended third-party beneficiary under a contract. There, the Court explained that:

> FN55.534 A.2d 257 (Del. Ch.1987).

In order for third party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon third parties that was intended, but the conferring of a *beneficial* effect on such third party-whether it be a creditor of the promisee or an object of his or her generosity-should be a material part of the contract's purpose.[FN56]

> FN56.*Id.* at 270 (emphasis in original).

Thus, three elements are essential: (1) an *intent* between the contracting parties to benefit a third party through the contract, (2) the benefit being intended to serve as a gift or in satisfaction of a pre-existing obligation to the third party, and (3) a showing that benefiting the third party was a *material* aspect to the parties agreeing to contract.[FN57]

> FN57.*See Madison Realty Partners 7, LLC v. AG ISA, LLC,* 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

MetCap alleges that Section 5.10 of the Merger Agreement made it an intended beneficiary.[FN58]Merely alleging that it was an intended beneficiary is, of course, not sufficient to state a claim.[FN59]First, MetCap must allege facts demonstrating that both NASC *and* Beverly intended to benefit MetCap. It has not done so. The no-brokers' fee provision makes plain that Beverly is not liable for any broker, finder, banking, or advisory fee and, although it references the MetCap fee, it does so by clarifying that that fee is entirely the responsibility of NASC as the acquiring entity under the Merger Agreement before the Third Amendment. It is the Advisor Contract between the Plaintiffs that is the sole agreement defining the scope of MetCap's services, the party to whom those services were to be rendered, the consideration it was to receive for those services, and the party responsible for paying it for those services .[FN60]That the Merger Agreement, a document executed after the Advisor Contract, makes reference to NASC's pre-existing obligation to

MetCap does not make MetCap a third-party beneficiary to the Merger Agreement. The pertinent provision in the Merger Agreement recites that no one is entitled to any fee for financial advisor services and the parenthetical simply notes that MetCap is an exception and is entitled to payment of fees by NASC (defined as "Parent"). The parenthetical merely reconfirms NASC's obligation to MetCap under the Advisor Contract and defeats any argument that the Merger Agreement, by its statement that no such obligation exists, eliminated NASC's obligation to MetCap. If MetCap has no rights as a third-party beneficiary under the Merger Agreement before the Third Amendment, it would follow that it has no rights after the Third Amendment because there is no plausible argument that its rights are greater under the Merger Agreement after the Third Amendment than before the Third Amendment. Also, the financial advisor services rendered by MetCap-up to the time of the Third Amendment-were for NASC, which remains liable-if insolvent-for that obligation.

> FN58. Compl. ¶ 12. For the text of Section 5.10, see Part II, *supra.*

> FN59.*See Delmar News, Inc. v. Jacobs Oil Co.,* 584 A.2d 531, 534 (Del.Super.1990) ("[A]side from stating a legal conclusion, [merely alleging the status as an intended beneficiary] falls far short of establishing that [one] was an intended beneficiary of the ... contract.").

> FN60. Although the acquiring entities changed following execution of the Merger Agreement, no assignment or other agreement was executed to assign, transfer, or alter NASC's continuing and freestanding obligation to remunerate MetCap. NASC may have no assets to satisfy its obligation, but that is not a dilemma for this Court to resolve in MetCap's favor on a third-party beneficiary basis. *See Street Search Partners, L.P. v. Ricon Int'l, L.L.C.,* 2005 WL 1953094, at *3 (Del.Super.Aug. 1, 2005) ("The Third Party Beneficiary doctrine is not meant to rescue a sophisticated corporate entity from its contractual appraisal of a business risk.").

**\*8** Second, to survive the Defendants' motion to dismiss, MetCap must draw the Court's attention to

Not Reported in A.2d                                                                    Page 11
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

facts indicating that the parties intended for the parenthetical exception of the MetCap fee from the no-brokers' fee provision to be either a gift or a means of satisfying a pre-existing obligation. Neither is the case. Nowhere in the Complaint is it alleged that Beverly sought to confer a gift to MetCap, and the parenthetical exception language itself does not satisfy NASC's preexisting obligation, but merely restates that NASC alone is responsible for paying a fee it already was committed to paying.[FN61]

> FN61. The Court does not need to resolve whether payment of MetCap was material to the Merger Agreement. *See Instituform,* 534 A.2d at 270.*See also Madison Realty,* 2001 WL 406268, at *1, *5 (finding the engagement of third-party providers of "personnel, services, and infrastructure that [were] essential both to operate, and to acquire" a partnership's investment interests was not a material purpose of a partnership organized for "the limited purpose to purchase ... hold and otherwise manage ... equity or any debt securities [of the partnership]" and, thus, the third-parties were merely incidental beneficiaries with no more standing to sue for breach of the partnership agreement "than would the local utility company or the office supply store").

Moreover, even if MetCap had been a third party beneficiary of the Merger Agreement before the Third Amendment, its claim would, nonetheless, be dismissed. MetCap correctly notes that a contract benefiting a third party who has acted in reliance upon it cannot be amended to the detriment of the third party beneficiary without its consent.[FN62]MetCap, however, is confronted with the inescapable fact that the Third Amendment changed nothing regarding its rights. Before the Third Amendment, NASC was obligated to pay MetCap's fee. After the Third Amendment, NASC was obligated to pay MetCap's fee. Its right to seek to recover its fees from NASC has not changed. MetCap, instead, seeks to elevate its rights at the expense of entities which were not parties to the Merger Agreement at any time when it even arguably was expressly provided a benefit under the Merger Agreement.[FN63]

> FN62.*See*RESTATEMENT (SECOND) OF CONTRACTS § 311(3) (1981).

> FN63. Before the Third Amendment, the term "Parent" was defined as NASC. Thus, any reference to "Parent" prior to the Third Amendment meant NASC and only NASC. The Merger Agreement, by its terms, at no time in its history, ever expressly obligated any party other than NASC (assuming for these purposes that it did obligate NASC) to pay MetCap's fee.

In sum, MetCap has failed to allege a claim as a third-party beneficiary under the Merger Agreement.

*E. The Carefully Crafted Allegations of the Complaint Preclude Dismissal of NASC's Claim for Reformation; MetCap is Not so Fortunate*

Finally, both MetCap and NASC seek reformation of the Third Amendment to the Merger Agreement to reflect the parties' understanding, or so it is alleged, that Pearl was to assume all of NASC's obligations, including the obligation to pay MetCap. Specifically, they petition the Court to eliminate Section 3.9 of the Third Amendment, which deleted the parenthetical in Section 5.10 of the Merger Agreement. Under Delaware law, the Court may use its equitable power to "reform" a contract so that it expresses the "real agreement" [FN64] of the parties in three circumstances: mutual mistake, unilateral mistake, and fraud.[FN65] Count Four of the Complaint seeks reformation on the basis of unilateral mistake and fraud (or "knowing silence").[FN66]

> FN64.*Colvocoresses v. W.S. Wasserman Co.,* 28 A.2d 588, 589 (Del.Ch.1942) ("The very purpose of reformation by a Court of Equity is to make an erroneous instrument express correctly the real agreement between the parties; *no court can make a new contract for them.*") (emphasis added).

> FN65.*See e.g., Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1151 (Del.2002); *James River-Pennington, Inc. v. CRSS Capital, Inc.,* 1995 WL 106554, at *2 (Del. Ch. Mar. 6, 1995) ("Reformation is appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence.").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN66. Compl. ¶ 43.

MetCap and NASC first plead that reformation is necessary because the final draft of the Third Amendment did not comport with the prior understanding among the parties. The prior agreement to which the Plaintiffs cite is evidenced by the version of the Third Amendment that was circulated by e-mail at 9:04 p.m. on November 20, 2005.[FN67] In that version, Sections 1.1 and 1.2 made plain that NASC, NASC Acquisition, and SBEV were assigning all rights and obligations under the Merger Agreement and that Pearl, PSC, and Geary were assuming all of those rights and obligations. Significantly, no reference was made to Section 5.10 of the Merger Agreement or to the MetCap fee itself (*i.e.,* the parenthetical contained in Section 5.10. of the Merger Agreement remained intact).

> FN67. *Id.* ¶ 10. Dickerson sent the 9:04 p.m. e-mail. Recipients included Grunstein, Goldsmith, Heil, Silva, and Levinson. *See* Herbert Aff. Ex. I.

*9 MetCap and NASC assert that the agreement contained in the e-mail of 9:04 p.m. represents a specific prior agreement that differed materially from the version of the Third Amendment that appeared at 12:59 a.m. on November 21, 2005. Goldsmith and Grunstein had been involved in the negotiations all day on November 20, and no one had ever broached the subject of payment of MetCap's fee. They relied, so NASC alleges, on the course of conduct of negotiations among the parties that assured them that they would be consulted if any such changes were contemplated.

In *Cerberus International, Ltd. v. Apollo Management, L.P.,* the Supreme Court held that, regardless of whether mutual mistake or unilateral mistake is cited as the ground for reformation, "the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement."[FN68] Moreover, "[t]his understanding need only be complete as to the issue involved ... [i]t need not constitute a complete contract in and of itself."[FN69] Thus, the Court must determine here whether NASC has alleged facts demonstrating that the parties came to a "real agreement," not on all aspects of the merger itself, but on the more narrow issue of which entity was to pay MetCap.

> FN68. 794 A.2d 1141, 1151-52 (Del.2002).

> FN69. *Id.* at 1152.

The *Cerberus* case is instructive in two factual respects. First, the Court concluded that a rational fact finder could have concluded that the parties had reached a specific prior understanding with respect to the disposition of certain proceeds because one party had stipulated that the specific disposition was a condition to going forward and the other party had consented. Second, the Court determined that there was no evidence in the record that the parties altered this agreement in subsequent negotiations.[FN70]

> FN70. As explained in *Cerberus:*
> First, we turn to the element of the prior agreement. Cilurzo told Harris in writing that having the proceeds from the options and warrants go to MTI's stockholders was a condition to further negotiations, and Harris responded in his handwritten note on that writing: "This looks fine." *Absent any evidence that this term was eliminated in the negotiation process* (and there is none on this record), it is certainly a permissible inference that the parties had a prior agreement relative to the proceeds from the options and warrants.
> *Id.* at 1153 (internal citations omitted) (emphasis added).

By contrast, the revision to the Third Amendment did occur within the context of a negotiation process. After Grunstein and Goldsmith departed, Dickerson continued to represent NASC and other "acquiring entities" that night as "deal counsel." [FN71] With respect to the negotiation of the Third Amendment, Pearl, PSC, and Geary, were represented by Heil. Because the change to the Third Amendment occurred during the negotiations between these two groups, there was an obvious divergence from the key facts in *Cerberus.* When Goldsmith and Grunstein left, the negotiations had not concluded, and it is difficult to accept that, in these circumstances, a "real agreement" between parties had been reached while those parties were still in the fluid process of negotiating, drafting, and arriving at a common understanding.

> FN71. The definitional contours of "deal counsel," a term without well-defined, independent significance, present a recurring

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

conundrum. Indeed, it is not clear from the Complaint whether NASC seeks to describe a role for Dickerson that differs from Troutman Sanders generally. Whether an attorney representing others as "deal counsel" has exceeded the scope of his or her authority would, of course, depend upon the conduct and understanding of the parties whom he or she was representing. It would also be a question for this Court, one that could only be considered in light of, among other things, the nature of the parties' relationship and the existence of any limitation on that relationship.

It is not surprising that, in the context of negotiating complex transactional documents, parties (and their attorneys) routinely accept that those attorneys representing counterparties to a contract are acting with the requisite authority to bind their principals. Although a motion to dismiss provides the Court with a poor forum for considering the issue of apparent authority, especially because all reasonable inferences must be drawn in favor of the nonmoving party, the Court would eventually be guided by the general maxim within our law that "[i]f a third party relies on the agent's apparent authority in good faith and is justified in doing so by the surrounding circumstances, the principal is bound to the same extent as if actual authority had existed."*Old Guard Ins. Co. v. Jimmy's Grille, Inc.,* 2004 WL 2154286, at *3 (Del. Sept. 21, 2004) (citations omitted). For the moment, however, it is notable that MetCap and NASC have offered no allegation in their Complaint that Heil, as counsel to Pearl and its related entities during the negotiations, was aware of any limitation on Dickerson's authority whether as "deal counsel" or as a partner in Troutman Sanders for purposes of the Beverly transaction.

That NASC may now regret the outcome of Dickerson's efforts that evening is, of course, not cause to rewrite a contract negotiated by sophisticated counsel. The Complaint, however, alleges specifically that Dickerson had no authority to make the changes on behalf of NASC or SBEV because, again according to the Complaint, he was not separately representing NASC or SBEV.

*10 The Complaint, accordingly, may be read to allege that it had been agreed, perhaps through acquiescence, that the parenthetical of Section 5.10 of the Merger Agreement would not be changed (or was not to be the subject of further negotiation in the absence of Goldsmith and Grunstein) even though negotiation of other issues was continuing. That sufficiently alleges the prior understanding that is essential to a reformation claim. Thus, the Complaint alleges that the Third Amendment, as the result of a unilateral mistake attributable to Dickerson, did not reflect the parties' intent.[FN72]

> FN72. By Court of Chancery Rule 9(b), both mistake and fraud must be pled with particularity. The Complaint, with its detailed, although selective, recitation of certain events of the evening of November 20, satisfies that standard.

Unilateral mistake alone does not provide a basis for reformation. It must be coupled with "knowing silence."[FN73] Dickerson did not send Goldsmith, NASC's principal in the negotiations, the final version of the Third Amendment.[FN74] Therefore, Goldsmith (and, presumably, NASC) was unaware of the Third Amendment. Similarly, Pearl, its counsel, and related entities, did not supply the information to NASC either.[FN75] Thereafter, Pearl and its counsel remained silent about the changes.

> FN73. *See, e.g., Universal Compression, Inc. v. Tidewater, Inc.,* 2000 WL 1597895, at *7 (Del. Ch. Oct. 19, 2000) (referring to "knowledge and concealment").

> FN74. An e-mail that Goldsmith had sent to Dickerson before "signing off" of his computer that evening indicates that he had signed multiple copies of the signature pages for NASC and NASC Acquisition and that he had instructed Dickerson that the signature pages had been left with Levinson. *See* Herbert Aff. Ex. H. The Court notes that Dickerson e-mailed the offending change to Grunstein (but, for reasons that cannot be gleaned from the Complaint, not to Goldsmith) within hours.

> FN75. Heil and others affiliated with Pearl received a copy of Dickerson's e-mail transmitting the Third Amendment; that e-mail does not reflect that a copy was sent to Goldsmith.

Under agency law, the knowledge of an agent is generally imputed to his principal except when the

Not Reported in A.2d                                                                        Page 14
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

agent's own interests become adverse.[FN76]In the context of "dual agency," or where an agent acts in a role common to two principals, the rule is much the same. That is, notice to, or knowledge of, an agent will be considered to be notice to, or knowledge of, both principals except in a situation of divided loyalties or where the agent's own interests run adverse to one of the principals.[FN77]

> FN76.*Albert*, 2005 WL 2130607, at *11 ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); *Ambrose v. Thomas*, 1992 WL 208478, at *2 (Del.Super.Mar. 13, 1992) ("In Delaware, well settled agency law provides where an agent acquires knowledge in the course of his or her agency and has no personal interest in the transaction adverse to the interest of the principal, any knowledge of or notice to the agent is chargeable to the principal whether or not knowledge or notice is actually communicated to the principal. This rule promotes the underlying policy of holding accountable one who transacts his business through another for what the other does or does not do in conducting that business. The principal should bear the burden rather than a third party who has dealt with the agent to the third party's detriment.") (internal citations omitted).

> FN77.*See Holley v. Jackson*, 158 A.2d 803, 808 (Del. Ch.1959) ( "Ordinarily the knowledge of an agent is imputed to his principal ... [but] where an agent is interested in the result of a transaction adversely to the interest of his principal, the rule of imputed knowledge on the part of the principal no longer obtains.") (citations omitted).

Dickerson was representing NASC; that is not disputed. NASC seeks to limit his role to that of "deal counsel." The question, however, is whether Dickerson's knowledge of the revision to Section 5.10 of the Merger Agreement through the Third Amendment (a revision which Dickerson himself accomplished) can be attributed to NASC within the context of whatever attorney-client relationship may have existed between NASC and Troutman Sanders. The Complaint carefully and somewhat flimsily-but

sufficiently-alleges facts that would support an inference-one that must be given in the "plaintiff-friendly" confines of Court of Chancery Rule 12(b)(6)-that, during the evening of November 20, Dickerson was somehow conflicted because of his role as "deal counsel" and the payment of his fees by Pearl (or its related entities). In the appropriate factual setting, the knowledge of a conflicted agent may not be imputed to the principal. That, accordingly, precludes the Court from attributing Dickerson's knowledge to NASC.[FN78]

> FN78. It may turn out that Dickerson's conflict, if indeed there was one, was limited or minimal or was understood and accepted by NASC and, thus, would not preclude imputation of his knowledge to NASC. It may also be that Pearl was entitled to rely upon Dickerson's apparent authority or that it reasonably assumed that Dickerson would share any material information regarding the transaction with Goldsmith, his partner. Those are arguments-however tempting-that the Court may not reach at this stage of the proceedings because of the incomplete development of the factual background.

Accordingly, the Complaint states, perhaps only marginally, a claim for reformation of the Third Amendment for the benefit of NASC .[FN79]

> FN79. The Complaint was carefully drafted with respect to Dickerson's role. It alleges that he did not have the authority to bind NASC. It alleges that he was paid for some of his work by Pearl or its related entities. It alleges that he was "deal counsel," but it provides no basis for gaining a full understanding of Dickerson's role. Without an understanding of Dickerson's actual role, it is difficult for the Court, within the confines imposed by Court of Chancery Rule 12(b)(6), to determine whether or not Dickerson had the authority to do what he did or, more importantly, whether Dickerson's knowledge may be imputed to NASC. Because the Court must give NASC the benefit of any reasonable inference that can be drawn from the allegations of the Complaint, the Complaint must be read to suggest that Dickerson was somehow conflicted and that his conflicted status would make it improper or inequitable to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

attribute his conduct or his knowledge to NASC, even though the Complaint scrupulously avoids any such express allegation and that inference is far from the one most likely to be drawn from the allegations of the Complaint. Ultimately, Dickerson's role will be a factual matter, one informed by an understanding of the ethics of the practice of law, and, if NASC has no more to offer than what has been set forth in its Complaint, its claim for reformation might fail not only because it is fairly charged with Dickerson's knowledge, but also because it is bound by Dickerson's conduct. NASC's position must be something more than a whine that it did not like what its lawyer did during the final hours of negotiation of the Third Amendment. Parties to a transaction and their counsel must be able to rely-and to act accordingly-on the negotiating authority generally accorded transactional attorneys. This is especially true when the negotiations are ongoing and the principals have abandoned the negotiation field after leaving signature pages. Nothing in this Memorandum Opinion should be viewed as undercutting that dynamic. The result here is more the product of Court of Chancery Rule 12(b)(6) than it is of substantive law.

Also, the Court expresses no view as to whether the reformation sought by NASC would bring the substantive result-Pearl's obligation to pay MetCap-that it seeks.

On the other hand, MetCap's effort to obtain reformation fails. MetCap is a party neither to the Merger Agreement nor to the Third Amendment. Reformation is available, perhaps subject to certain exceptions not present here, only to parties to the contract.[FN80] As such, MetCap, as a matter of law, may not pursue a claim for reformation of the Third Amendment.

FN80. *See, e.g., Emmert v. Prade,* 711 A.2d 1217, 1219 (Del. Ch.1997); *Fritz v. Nationwide Mut. Ins. Co.,* 1990 WL 186448, at *3 (Del. Ch. Nov. 26. 1990); *but cf. Chase Manhattan Bank v. Iridium Africa Corp.,* 307 F.Supp.2d 608, 614 n.6 (D.Del.2004).

## V. CONCLUSION

*11 For the foregoing reasons, (i) Count One (Fraud) and Count Three (Third-Party Beneficiary) of the Amended Complaint will be dismissed; (ii) Count Two (Unjust Enrichment) of the Amended Complaint, except to the extent that it purports to assert a claim against Pearl based on benefits conferred after the Third Amendment to the Merger Agreement, will be dismissed; (iii) MetCap's claim for reformation presented in Count Four will be dismissed; and (iv) otherwise, Defendants' Motion to Dismiss will be denied. An implementing order will be entered.

Del.Ch.,2007.
MetCap Securities LLC v. Pearl Senior Care, Inc.
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit D

Westlaw.

Not Reported in A.2d                                                                              Page 1
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
**(Cite as: Not Reported in A.2d)**

**H**Comrie v. Enterasys Networks, Inc.
Del.Ch.,2004.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Michael COMRIE, Ian Cheong, Earle Comrie, Kay
Comrie, Leroy Dougherty, Cynthia A. Ott, Peter Ott,
Stephanie Sebastiano, Sally Seto, Afshin Shams, and
Julie M. Shams, Plaintiffs,
v.
ENTERASYS NETWORKS, INC., a Delaware
corporation, GNTS (Canada) Inc., an Ontario
corporation, and GlobalNetwork Technology
Services, Inc., a Delaware corporation, Defendants.
**No. Civ.A. 19254.**

Submitted Jan. 29, 2004.
Decided Feb. 17, 2004.

Vernon R. Proctor, Patricia Enerio, the Bayard Firm,
Wilmington, Delaware, for the Plaintiffs.
William M. Lafferty, Patricia Uhlenbrock, Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware;
Douglas H. Meal, Emily C. Shanahan, Ropes &
Gray, Boston, Massachusetts, for the Defendants.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 In an earlier opinion, the court held that the
defendants had breached a stock purchase agreement
by not providing an "equivalent substitute" for
options granted in accordance with that agreement.
The defendants were under a duty to provide such a
substitute pursuant to certain performance obligations
found in Exhibit 7.11 to that agreement, which
provides for the substitute if an IPO of
GlobalNetwork Technology Services, Inc. was not
undertaken.

Exhibit 7.11 also provides for a similar grant of
options to certain employees who are not signatories
to the stock purchase agreement and were not,
originally, plaintiffs in this action. A majority of
those employees now seek to recover against the
defendants based on the findings in the earlier
opinion. The court concludes that those employees,
as donee beneficiaries, have standing to bring such a
suit; however, certain of those employees are barred
from bringing suit because of releases signed by them
as part of a severance package.

II.

BIT Management, Inc. ("BIT") was an Ontario
corporation engaged in the information technology
consulting and software development industry. In
2000, Cabletron Systems, Inc. ("Cabletron"),[FN1] a
Delaware corporation headquartered in Rochester,
New Hampshire, engaged in a restructuring, through
which it created four subsidiaries: Aprisma
Management Technologies, Inc., Enterasys
Networks, Inc. ("Enterasys"), Riverstone Networks,
Inc., and GlobalNetwork Technology Services, Inc.
("GNTS"). Under this restructuring, Cabletron
planned to conduct an IPO for each operating
subsidiary by the end of 2001, followed by a spin-off
of the subsidiaries' remaining shares to Cabletron's
existing stockholders.

> FN1. Cabletron merged with its former
> wholly owned subsidiary, Enterasys
> Networks, Inc. on August 6, 2001. The
> surviving corporation, also called Enterasys
> Networks, Inc., along with GlobalNetwork
> Technology Services, Inc., both Delaware
> corporations, are the defendants in this
> action.

GNTS, in preparation for its IPO, sought to
purchase small service companies complementary to
its existing business in order to diversify its revenue
base. BIT was identified as a potential target and
negotiations between GNTS and BIT ensued in early
2000. The resultant Stock Purchase Agreement (the
"Agreement") among Cabletron, GNTS, GNTS
(Canada, Inc.),[FN2] BIT, and the holders of all of the
outstanding capital of the stock of BIT (the "BIT
Stockholders") (collectively, the "Parties") was
signed on August 23, 2000.

> FN2. GNTS (Canada, Inc.) was an

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

acquisition vehicle formed to aid the stock purchase.

The Agreement provides for an exchange of BIT stock for a combination of cash and options to purchase stock in GNTS. Specifically, section 7.11 of the Agreement requires Cabltetron to cause GNTS to adopt an option plan pursuant to terms set forth in Exhibit 7.11 attached to the Agreement. Exhibit 7.11 requires Cabletron to cause GNTS to "allocate options for 466,605 shares of GNTS stock ... to the employees of BIT."Of those shares, 55,814 were to be issued to each of the partners of BIT (the "Partners"),[FN3] with the balance of shares (up to 14,512 each) to be issued to 12 non-partner former employees of BIT [FN4] (the "Non-Partner Employees," together with the Partners, the "BIT Group").

> FN3. The partners of BIT were Ian Cheong, Michael Comrie, Leroy Dougherty, Peter Ott, and Afshin Shams. The Partners, together with Earle Comrie, Kay Comrie, Cynthia A. Ott, Stephanie Sebastiano, Sally Seto, and Julie M. Shams are the plaintiffs in this action (the "plaintiffs").

> FN4. The non-partner former employees are Carrie Brody, Wayne W. Cuervo, Peter Forsythe, Glen Julien, Elizabeth Kapuscinski, Jennifer Knabenschuh, Ernie Lim, Paul Matheson, Darwin Palma, Bonnie Planchart, Ramesh Rathnam, and Donald Swora.

To protect the BIT Group in the event the defendants decided not to go forward with the GNTS IPO, the Parties agreed upon a substitution provision, which is included in Exhibit 7.11. That provision states:

*2 In the event that [Cabletron] determines not to pursue its current intention to cause GNTS to undergo an initial public offering prior to December 31, 2001 or determines not to pursue its current intention to distribute the stock of GNTS to the shareholders of [Cabletron] (each a *"Trigger Event"*), within sixty (60) days of the Trigger Event, [Cabletron] shall either (i) *provide equivalent substitute or replacement awards on the same terms and conditions to the former employees of [BIT]*; or (ii) pay $4,620,000 in the aggregate for all Options then held by the Partners and former employees of [BIT].[FN5]

> FN5. Emphasis added.

Within a few days of the closing of the Agreement, GNTS issued to the BIT Group an aggregate of 466,605 GNTS stock options at an exercise price of $4.25. A Trigger Event occurred on July 16, 2001,[FN6] thus implicating the substitution provision. On August 23, 2001, Cabletron decided to provided the BIT Group with substitute or replacement options.[FN7]Cabletron issued these options based on the theory that the substitute or replacement options must be valued at the same amount as the original GNTS options at the date of *replacement.*[FN8]

> FN6.*Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 11 (Del. Ch.2003). The Intervenors and the defendants agreed by stipulation, for purposes of this action, to be bound by the factual and legal findings and conclusions set forth in the opinion. Further, they allowed reliance by both sides on all exhibits, trial testimony, and designated deposition testimony admitted at the trial in the underlying litigation. Stipulation Regarding Claims of Intervenors (Nov. 7, 2003) ("Stipulation").

> FN7. Stipulation at ¶ D(2).

> FN8.*Comrie,* 837 A.2d at 14.

The plaintiffs filed suit claiming that the substitute or replacement options were to be valued as the same amount as the GNTS options at the date of *issuance.*[FN9]The court found, in a September 4, 2003 opinion (the "September 4 Opinion"), that the plaintiffs were correct in their reading of the Agreement, and by not issuing options valued as the same amount as the GNTS options at the date of issuance, Cabletron had breached the Agreement.[FN10]

> FN9.*Id.*

> FN10.*Id.* at 17.

The court found damages in the amount of $2,190,620.[FN11]However, the plaintiffs only held 58.8% of the GNTS options, and were thus only entitled to an award of $1,309,991.[FN12]Because the Non-Partner Employees held the remainder of GNTS

Not Reported in A.2d                                                                                Page 3
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

options, the court reserved final judgment, stating, "[i]t is entirely plausible ... that the BIT employees who were not plaintiffs in this action are third-party beneficiaries to the Agreement, and are equally entitled to an award based on a breach of that Agreement."[FN13]

FN11. *See id.* at 21 (calculating damages).

FN12. *Id.*

FN13. *Id.*

Pursuant to the September 4 Opinion, an order dated October 7, 2003,[FN14] and Court of Chancery Rule 24,[FN15] ten of the Non-Partner Employees [FN16] included in the BIT Group (the "Intervenors") moved to intervene on October 21, 2003. A complaint in intervention was filed contemporaneously with the motion. The defendants' answer contains five affirmative defenses, two of which are addressed in the briefs. Specifically, the defendants contend that the Intervenors are not donee beneficiaries of the Agreement, and thus do not have standing to bring suit. Alternatively, the defendants argue that even if the Intervenors have standing, releases signed by certain of the Intervenors serve to bar their claims.

FN14. This order provided that "any Potential Beneficiary who files a timely and proper motion to intervene will be permitted to intervene pursuant to Chancery Court Rule 24(b)." The implication of guaranteeing intervention is that the defendants would not waive any potential defenses, including a standing defense.

FN15. Court of Chancery Rule 24(b) permits the court, in its discretion, to allow one to intervene in an action when a statute confers a conditional right to intervene, or when the applicant's claim and the main action have a question of law or fact in common. The application must be made according to the procedure set out in Court of Chancery Rule 24(c).

FN16. Brody and Planchart did not join in the motion to intervene.

III.

Parties to an agreement may enforce the contractual terms of that agreement.[FN17] As a general rule, a nonparty to a contract has no legal right to enforce it.[FN18] This general rule yields to the notion that intended third-party beneficiaries have an enforceable right under contracts conferring a benefit to them, even though they are not parties to those contracts.[FN19] The general rule does apply, however, to prevent mere incidental beneficiaries from claiming enforceable rights under a contract.[FN20]

FN17. *See Triple C Railcar Serv. v. City of Wilmington,* 630 A.2d 629, 633 (Del.1993) ("It is axiomatic that either party to an agreement may enforce its terms for breach thereof."); *Madison Realty Partners 7, LLC v. AG ISA, LLC,* 2001 WL 406268, at *4 (Del. Ch. Apr. 17, 2001) ("It is undisputed that Madison, as a signatory to the Partnership Agreement, has standing to sue for a breach of that Agreement.").

FN18. *See Insituform of N. Am., Inc. v. Chandler,* 534 A.2d 257, 268 (Del. Ch.1987) ("[T]he general rule [is] that strangers to a contract ordinarily acquire no rights under it ..."); *Stuchen v. Duty Free Int'l, Inc.,* 1996 WL 33167249, at *9 (Del.Super.Apr. 22, 1996) ("The general rule in this state is that a stranger or nonparty to a contract has no legal right to enforce it."); *see also Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378, 1386 (Del.Super.1990) ("Ordinarily, a stranger to a contract acquires no rights thereunder ...").

FN19. *See Insituform of N. Am., Inc.* 534 A.2d at 268 (noting that the general rule applies "unless it is the intention of the promisee to confer a benefit upon such third party"); *Stuchen,* 1996 WL 33167249, at *9 ("This principle holds sway unless the parties to the contract intended to confer a benefit upon an unrelated party, making them so-called third party beneficiaries.").*See generally*13 Richard A Lord, A Treatise on the Law of Contracts by Samuel Williston § 37:1 (4th ed 2000) ("Williston on Contracts") (discussing the rights of intended third-party beneficiaries).

FN20. *See Insituform of N. Am., Inc.,* 534

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 4
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
**(Cite as: Not Reported in A.2d)**

A.2d at 269 ("If, however, it was not the promisee's intention to confer direct benefits upon a third person, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then such third party beneficiary will be held to have no enforceable rights under the contract."); *see also* 9 Arthur Linton Corbin, Corbin on Contracts § 779C, at 36 (Interim ed. 1979) ("Corbin on Contracts") ("All others who may in some way be benefited by performance have no rights and are called incidental beneficiaries.").

**\*3** In *Insituform of North America, Inc. v. Chandler,* this court set out a test for whether or not one is an intended beneficiary under a contract:

In order for third party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon third parties that was intended, but the conferring of a *beneficial* effect on such third party-whether it be a creditor of the promisee or an object of his or her generosity-should be a material part of the contract's purpose.[FN21]

FN21.534 A.2d at 270.

Former Vice Chancellor Jacobs, in *Madison Realty Partners 7, LLC v. AG ISA, LLC,* summarized the elements included in this test:

To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.[FN22]

FN22.2001 WL 406268. at *5.

Thus for the Intervenors to have standing to bring suit based on the Agreement, they must show that the BIT Stockholders intended that the Non-Partner Employees benefit from the Agreement (i.e., receive the options), [FN23] that the benefit was intended as a gift from the BIT Stockholders to the Non-Partner Employees,[FN24] and that the conferral of that benefit is a material part of the Agreement's purpose.[FN25]

FN23. There is conflicting precedent as to whether the requisite intent must be of the parties to the contract or of the promisee individually. *Compare Triple C Railcar Service,* 630 A.2d at 633 ("Essential to a third party's right of enforceability is the *intention of the contracting parties* to view that party as either a donee or creditor beneficiary.") (emphasis added), and *Madison Realty Partners 7, LLC,* 2001 WL 406268. at *5 ("[T]he *contracting parties* must have intended that the third party beneficiary benefit from the contract) (emphasis added), with *Insituform of N. Am., Inc.,* 534 A.2d at 268 ("It is universally recognized that where it is the *intention of the promisee* to secure performance of the promised act for the benefit of another ...") (emphasis added), and *Guardian Constr. Co.,* 583 A.2d at 1386 ("[W]here it is the *intention of the promisee* to secure performance of the promised act for the benefit of another ...") (emphasis added). In applying Delaware law, the United States District Court for the District of Delaware addressed this conflict. The District Could held "that under Delaware law both parties must in some manner express an intent to benefit the third-party before third-party beneficiary status is found."*Am. Fin. Corp. v. Computer Scies. Corp.,* 558 F.Supp. 1182, 1185 (D.Del.1983).

Here, the defendants, as promisors, acknowledge that the intent element is satisfied as to them. Ans. Br. of Def's. Enterasys Networks, Inc. and GlobalNetwork Tech. Servs., Inc. to Intervenors' Claim for Relief, at 11 (Dec. 5, 2003) ("Ans.Br."). Thus regardless of which analysis is used, the only issue for the court to decide is the intent of the promisees, here BIT and the BIT Stockholders.

FN24. No allegations have been made that the BIT Stockholders had a preexisting obligation to the Intervenors. As such, the Intervenors must show that they are donee beneficiaries. *See Guardian Constr. Co.,* 583 A.2d at 1387 ("The only third parties who have legal rights are donees and creditors of the promisee.").

FN25. The Restatement (Second) of Contracts eliminates the distinction between creditor and donee beneficiaries. Instead, it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

tests only for whether one is an intended beneficiary. Specifically, it states:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) of Contracts § 302 (2004). Further, the introductory note to this chapter of the Restatement points to the "recognition of the power of promisor and promisee to create rights in a beneficiary by manifesting an intention to do so."While this test has not yet been adopted by the Delaware courts, the ALI's adoption of it is of note, and the standing of the Non-Partner Employee's under this test is even stronger.

The intent of the BIT Stockholders' to bestow rights on the Non-Partner Employees is plain from the face of the Agreement.[FN26]When a promised performance is rendered directly to the beneficiary, "it is presumed that the contract was for the beneficiary's benefit ."[FN27]Here, Exhibit 7.11 directs the defendants to grant options directly to the Non-Partner Employees. This differentiates the present facts from the facts considered in *Insituform,* where members of a board of directors argued that a stock-voting agreement, which none of the members had signed and which obligated the signatories to either abstain from voting their stock or to vote their stock in unanimity for existing members, created a right to "continued tenure" in the board members for the entire term of the stock-voting agreement.[FN28]Although the board members "surely were potentially benefited by performance of the promises"[FN29] contained in the stock-voting agreement, that benefit was incidental to that agreement. Here, the Agreement directs the defendants to issue performance directly to the Non-Partner Employees.

FN26. Since the BIT Stockholders owned all of the outstanding shares of the capital stock of BIT, the opinion addresses the intent of BIT and the BIT Stockholders simply as the intent of the BIT Stockholders.

FN27.Williston on Contracts, § 37:7, at 55. *See also id.* § 37:8, at 70 ("In the typical case, where the promisor has undertaken to render performance directly to the beneficiary, the intent to benefit the third party will be clearly manifested.").

FN28.534 A.2d at 268-70.

FN29.*Id.* at 269.

Further, even if one were to look beyond the face of the Agreement, an intent to benefit the Non-Partner Employees is clear. The Partners and Non-Partner Employees had set an expectation that "in the event of a sale or IPO [the Non-Partner Employees] would receive in the range of 10% to 15% of the value in cash and stock."[FN30]In deposition testimony designated by the defendants at trial, Mr. Comrie, the former managing partner of BIT, explained how this expectation was set:

FN30. DX 6.

*4 There was nothing particular that had occurred other than when we were hiring them, we had indicated to them that at some point down the road they may be able to share in the company. We had a profit sharing-an informal profit sharing plan and we had actually looked at ways in which we could make our employees, quote unquote, owners or part owners in the organization and we looked at employee-looked at devising some way that they could have some ownership in the company in the field that they were working in for themselves.[FN31]

FN31. Comrie Dep. at 95-96.

Exhibit 7.11 is a manifestation of intent to fulfill this expectation. Contrary to the defendants' assertion, "[a]ny benefit that accrued to the BIT employees as a result of the performance of the Stock Purchase Agreement" was not simply the product of the defendants' efforts.[FN32]The Intervenors have shown intention to benefit the Non-Partner Employees, thus meeting the first prong of the *Insituform* test.

FN32. Ans. Br. at 15.

Moreover, the Intervenors have clearly shown the BIT Stockholders' intent as donative. In order to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

Page 6

show *donative* intent, one must show that the promisee intended to make a gift of the promisor's performance to a third party.[FN33] The defendants claim that the options granted to the Non-Partner Employees were not the BIT Stockholders' to give-that the drafting of the option requirement into the Agreement did not cut into the consideration the BIT Stockholders would otherwise have been paid for their stock in BIT.[FN34] Findings in the September 4 Opinion, as the defendants' own brief points out, clearly prevent this argument. "GNTS had always represented to BIT that it was willing to pay at least 6 times and up to 7 times BIT's revenues, which resulted in a valuation between $8.8 million and $10.23 million, of which approximately $5.6 million was paid in cash."[FN35]As the defendants acknowledge, the remainder of the consideration was to be paid in options.[FN36] The options granted pursuant to Exhibit 7.11 represent the remainder of consideration to be paid. Exhibit 7.11, then, grants 40.2% of the options, which represents approximately 19% of the total consideration (i.e., the negotiated performance), to the Non-Partner Employees. This requirement is in line with the "set expectations" of the BIT Stockholders and Non-Partner Employees described in Mr. Comrie's deposition.[FN37]This is clear evidence of donative intent.[FN38]

> FN33.Williston on Contracts § 37:8. at 73; *see also* Corbin on Contracts § 774, at 5-6 ("The third person is a donee beneficiary if the promisee who buys the promise expresses an intention and purpose to confer a benefit upon him as a gift in the shape of the promised performance.").

> FN34. The defendants argue that the absence of a provision calling for a reversion to the Partners of that portion of options not exhausted by the grants to the Non-Partner Employees evidences lack of donative intent. While such a provision would evidence an intent, lack of such a provision does not suggest lack of such intent. Similarly, the Intervenors' argument that the lack of a "no third-party beneficiary" clause indicates an understanding that there were beneficiaries does not hold water.

> FN35.*Comrie*, 837 A.2d at 38 n.91,*reprinted in* Ans. Br. at 13.

> FN36. Ans. Br. at 14.

> FN37. Comrie Dep. at 95-96. The defendants argue that there can be no donative intent because Mr. Comrie pressed for an all-cash deal during negotiations. *See* Comrie Dep. at 77-79. However, there is no evidence that should Mr. Comrie have succeeded in obtaining an all-cash deal, he would not have passed on a similar percentage of compensation to the Non-Partner Employees. The only definitive evidence presented is that the Non-Partner Employees received a percentage of the expected value of the deal.

> FN38. The defendants argue that because the non-partner BIT Stockholders did not receive options, the logical route of this conclusion, in the absence of an agreement among the BIT Stockholders to share the value of options, is that the non-partner BIT Stockholders intended to donate a disproportionate percentage of consideration to the Non-Partner Employees. How the BIT Stockholders intended to divide that portion of consideration provided to the Partners, but not the non-partner BIT Stockholders, is outside the scope of this analysis. The analysis only requires a showing of intent that the Intervenors made a gift of the promisors' performance. Exhibit 7.11 clearly shows this.

Finally, the grant of options to the Non-Partner Employees is a material part of the purpose of the Agreement. Where the effect on a third party, "while a benefit to [that party] and intended, [is] merely a means through which the benefit that motivated the contract was sought to be achieved for the signatories," even if that third party is not merely incidental to the contract, that third party takes no rights under the contract.[FN39]Thus in order to gain rights under a contract, the beneficial effect to the third party must be material to the purpose of the contract.

> FN39.*Insituform*. 534 A.2d at 270.

**\*5** The defendants assert that the granting of options to the Non-Partner Employees was merely

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911

(Cite as: Not Reported in A.2d)

instrumental to achieving the BIT Shareholder's purpose of maximizing shareholder value. The e-mail relied upon by the defendants to show maximization of value as the sole purpose of the contract, however, does not lead to this conclusion. The defendants point to an e-mail sent by Mr. Shams to the BIT Partners in which Mr. Shams comments on a draft term sheet circulated among those partners.[FN40] In that e-mail, Mr. Shams states that he had "two intentions" when forming the company: being able to help run a company and financial reward. Based on this, the defendants assert that donating to the Non-Partner Employees a portion of the consideration would be at odds with the BIT Stockholders' purpose for entering into the Agreement. The conclusion simply does not flow from the premise. One cannot conclude the purpose of entering into the Agreement from a stated purpose of starting BIT in the first place. Further, in the e-mail, Mr. Shams implores the other Partners not to lose sight of the "effect that [the deal] would have on everyone involved, *including the employees.*"[FN41]

FN40. DX 17.

FN41. Id. (emphasis added).

The record shows, as discussed above, the purpose of the BIT Stockholders in entering into the contract included conferring a benefit to the employees. The option grant is material to that purpose and thus the third prong of the *Insituform* test is met.

The Intervenors, having met the test set out in *Insituform*, are donee beneficiaries of the Agreement and thus have standing to bring suit to enforce their rights under Exhibit 7.11 of that Agreement.

## IV.

Although the Intervenors have standing to enforce rights under the Agreement, the defendants allege several of the Intervenors signed, in conjunction with severance packages, releases preventing them from bringing claims they might otherwise have had.

In construing the releases, the court looks to the overall language of the releases to determine the parties' intent, which is controlling.[FN42] If the language of a release is clear, the court will give effect to that language. If the language is ambiguous,

" 'it must be construed most strongly against the party who drafted it.' "[FN43]

FN42. *See Corporate Prop. Assoc. v. Hallwood Group,* 817 A.2d 777, 779 (Del.2003); *Adams v. Jankouskas,* 452 A.2d 148, 156 (Del.1982).

FN43. *Corporate Property Assoc.,* 817 A.2d at 779 (quoting *Adams,* 452 A.2d at 156).

### A. Forsythe and Lim

There is no evidence that either intervenors Forsythe or Lim signed any release. They are thus entitled to damages in accordance with the calculations used in the September 4 Opinion to determine the plaintiffs' rights. Damages are to be calculated, however, on the basis of the October terminations of Forsythe and Lim and the effects of those terminations on the vesting schedule.

### B. Cuervo, Julien, Knabenschub, Swora

Intervenors Cuervo, Julien, Knabenschub, and Swora (the "Release Signatories") each signed identical releases. The pertinent language of the releases state:

FOR AND IN CONSIDERATION OF the special payments and benefits to be provided to me in connection with my separation of employment, as set forth in a Memorandum dated April 11, 2002 from Enterasys Networks, Inc., I ... hereby release and forever discharge Enterasys Networks, Inc. ("Enterasys") and its Affiliates ... and Cabletron Systems, Inc. ("Cabletron") and its subsidiaries and other affiliates and all of the respective past and present officers, directors, shareholders, members, managers, employees, agents, general and limited partners, joint venturers and representatives of any of the foregoing, the successors and assigns of Enterasys and its Affiliates and Cabletron and its subsidiaries and other affiliates, and all others connected with any of them (all collectively, the "Released"), both individually and in their official capacities, jointly and severally from any and all actions, causes of action, contracts, covenants, whether express or implied, claims, demands for damages, including disability, life or other insurance claims, indemnity benefits, costs, interest, loss or injury of every nature and kind whatsoever and howsoever arising whether statutory or otherwise,

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

which I may have had, may now have or may hereinafter have, *in any way relating to the hiring of, the employment by and the cessation of my employment by the Released parties.*[FN44]

> FN44. Emphasis added. The releases are in the Affidavit submitted to this court by Douglas H. Meal on December 5, 2003.

**\*6** The Release Signatories argue that because the releases initially refer to an April 11, 2002 memorandum, which provides terms for termination of employment, the language releasing claims relating to the "hiring of, and the employment by" should be construed narrowly. They base this argument on the premise that "Delaware law is clear that words of general application used in a release 'which generally follow a specific recital of the subject matter concerned are not to be given their broadest significance but will be restricted to the particular matter referenced to in the recital.' "[FN45]

> FN45.*E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage,* 744 A.2d 457, 460 (Del.1999) (quoting *Adams,* 452 A.2d at 156).

The releases here are different from previous releases considered by Delaware courts. In *E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage,* for example, the Delaware Supreme Court considered whether a general release of all claims, whether known or unknown, in a settlement agreement, following a preamble alluding to the action being settled, prevented a future claim for fraudulent inducement. The Supreme Court focused on whether a releasee should be held to "release a claim for fraud in the execution of the release itself," and decided it should not.[FN46]In *Adams v. Kankouskas,* the Delaware Supreme Court interpreted a general release narrowly. That court's opinion, however, was based on the fact that the general release followed a specific *release,* not a specific *recital.* The releases in this case contain no such bifurcation.

> FN46.*Id.* at 461.

Here, although stating that the releases are given in consideration of payments and benefits provided in the termination memorandum, the language of the releases specifically limits them to any action relating

to the hiring of, employment by, and cessation of employment of the signatory. In seeking standing to assert their rights, the Intervenors linked their right to the options directly to their employee relationship with the defendants. Further, the options vested according to a schedule that depended on the Intervenors' continued employment with Cabletron, GNTS, or "any of their Affiliates." Under the clear, unambiguous language of the releases, the Release Signatories released their rights to bring a claim under Exhibit 7.11.[FN47]

> FN47. The reliance of the Release Signatories on *Fischer v. Fischer,* 1999 WL 1032768 (Del. Ch. Nov. 4 1999), is misplaced. *Fischer* looked at the parties' intent to determine whether a separation agreement between former spouses served to bar one former spouse's breach of fiduciary suit against the other former spouse. The court held that a release designed to cover the division of marital property could not foreclose a derivative suit by one spouse as shareholder against another spouse as director. The court determined "the parties never intended the release to discharge a claim arising outside the marriage relationship."*Id.* at \*4. The claim in the current case is directly related to the subject matter of the release.

Further, the intention of the parties, which is controlling, is manifested by what each of the Release Signatories agreed to have removed from the releases. Each of the Release Signatories attempted to add handwritten language to his or her own release, stating "[e]xception to the above limited to Delaware litigation between sellers and buyers of BIT Management Inc initiated on or about Nov. 13, 2001."[FN48]The Release Signatories all authorized the removal of this language at the request of BIT. This explicit removal further shows that the parties' intent was not to include the Delaware litigation.[FN49]

> FN48. One of the releases contained the abbreviation "Inc.," and three did not. Swora's additional handwritten language did not contain the words "limited to."

> FN49. The Release Signatories seem to imply that their agreement to the removal of the additional language should not be valid because of estoppel, or alternatively because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
**(Cite as: Not Reported in A.2d)**

Page 9

it was achieved as a result of duress. The Intervenor's Reply Brief, states that "Enterasys' own human resources consultant, Robert McCormack ... expressly advised Cuervo, Julien, Knabenscbuh, and Swora to include the handwritten language in the releases."Intervenors Reply Br. In Support of Their Claims for Relief 11-12 n.3 (Dec. 19, 2003) ("Reply Br."). Other than a statement being made, the brief does not set forth other elements of estoppel.

Further, the Release Signatories argue that, should they not have agreed to the removal of language, they would have only been entitled to the "paltry two weeks pay required by applicable Ontario law."Reply Br. at 13. They essentially argue that there is duress because, had they not signed, they would not be entitled to the additional severance offered on top of what the Ontario legislature deemed appropriate. This is not a valid argument for duress.

The Release Signatories, because they have signed the releases, are estopped from bringing suit against the defendants under Exhibit 7.11 of the Agreement.

### C. *Rathnam*

*7 Intervenor Rathnam's release is substantially similar to those of the Release Signatories. It states:

IN CONSIDERATION of the payment to me of the amounts specified [in a separate letter] ... I, Ramesh Rathnam ... hereby release and forever discharge Global Network Technology Services, a subsidiary of Cabletron Systems, Inc. along with all parents, subsidiaries, affiliates and associated companies, and together with all respective officers, directors, employees, servants and agents and their successors and assigns (hereinafter collectively referred to as the "Releasee") jointly and severally from any and all actions, causes of action, contracts, covenants, whether express or implied, claims, demands for damages, including disability, life or other insurance claims, indemnity benefits, costs, interest, loss or injury of every nature and kind whatsoever and howsoever arising whether statutory or otherwise, which I may heretofore have had, may now have, or may hereinafter have, *in any way relating to the hiring of, the employment by and the cessation of the employment of the Releasor by the Releasee.*[FN50]

FN50. Emphasis added. This release is also included in the Meal Affidavit.

Although there is no attempted insertion and subsequent removal of additional language, as there is in the cases of the Release Signatories, the clear language of this release, for the same reasons discussed above, prevents Rathnam from bringing a claim against the defendants under the Agreement.

### D. *Matheson, Palma, Kapuscinski*

Although releases from intervenors Kapuscinski and Palma were submitted to the court, it is not clear from the record whether they signed those releases. Similarly, it is not clear whether intervenor Matheson, whose release mirrored that of Cuervo, Julien, Knabenschuh and Swora, agreed to accept the terms of the release without the proposed handwritten carve-out. Further factual development is required before the court can determine whether any of these intervenors released any claims they might otherwise have had.[FN51]

> FN51. In a February 9, 2004, letter to the court, counsel to the defendants indicated that it has initiated steps toward developing this record.

### V.

For the foregoing reason, judgment will be entered for intervenors Forsythe and Lim, and against the Release Signatories. The parties are instructed to present an order in conformity with the calculations used in the September 4 Opinion (while keeping in mind the termination dates of Forsythe and Lim and the resultant effect on the vesting schedule) within 30 days. The parties are further instructed to update this court within 30 days as to the status of the Matheson, Palma, and Kapuscinski claims.

Del.Ch.,2004.
Comrie v. Enterasys Networks, Inc.
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 406268 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 1

**C**Madison Realty Partners 7, LLC v. Ag ISA, LLC
Del.Ch.,2001.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
MADISON REALTY PARTNERS 7, LLC, a
Delaware Limited Liability Company, individually
and derivatively as a General Partner of ISA
Partnership Liquidity Investors, Madison Avenue
Investment Partners, LLC, a Delaware Limited
Liability Company, Investment Services of America,
LLC, a Delaware Limited Liability Company, and the
Madison Avenue Capital Group II, LLC, a Delaware
Limited Liability Company, Plaintiffs,
andISA PARTNERSHIP LIQUIDITY INVESTORS,
a Delaware General Partnership, Nominal Plaintiff,
v.
AG ISA, LLC, a Delaware Limited Liability
Company, and Angelo Gordon & Co., L.P., a
Delaware Limited Partnership, Defendants.
**No. CIV.A. 18094.**

Submitted: Jan. 12, 2001.
Decided: April 17, 2001.

David C. McBride, Richard H. Morse and Melanie K.
Sharp, Esquires, of Young, Conaway, Stargatt &
Taylor, Wilmington, Delaware; Attorneys for
Plaintiffs.
James F. Burnett, Esquire of Potter, Anderson &
Corroon LLP, Wilmington, Delaware; and Peter N.
Wang and Aimee E. Nassau, Esquires, of Friedman,
Wang Bleiberg, P.C., New York, New York;
Attorneys for Defendants.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.
   *1 A general partnership had two general
partners, one responsible for managing the
partnership, and the other for providing the capital
funding. In March 2000, the funding partner refused
to provide any further capital. The managing partner
claimed that that refusal was wrongful, because the
partnership agreement required 120 days advance
notice before funding could be terminated, and no

such notice had been given. The funding partner
contended that no such notice was required, because
the partnership agreement entitled the funding partner
to cease making capital contributions without notice
once its funding reached the $10 million level. The
managing partner brought this lawsuit against the
funding partner and others, asserting (*inter alia* )
claims for breaches of contract and fiduciary duty.
The funding partner and its co-defendant moved to
dismiss the complaint for failure to state a claim upon
which relief may be granted. This is the Opinion of
the Court on that motion.

I. BACKGROUND FACTS

   This factual background is taken from the well-
pled allegations of the complaint. ISA Partnership
Liquidity Investors (the "Partnership") is a Delaware
general partnership formed to purchase, hold, and
manage limited partnership interests and similar
securities ("Investment Interests"). The Partnership's
two general partners entered into a partnership
agreement (the "Partnership Agreement"), setting
forth the rules governing the Partnership. Madison
Realty Partners 7, LLC ("Madison"), is the primary
plaintiff and the managing general partner
responsible for managing the Partnership, including
selecting Investment Interests for the Partnership.
The primary defendant is AG ISA, LLC ("AGGP"),
which is the other (non-managing) general partner.
AGGP, which is a subsidiary of Angelo Gordon &
Co., L.P. ("Angelo Gordon"), a Delaware limited
liability company,[FN1] was also the exclusive provider
of capital to the Partnership. Under the Partnership
Agreement, AGGP was required to make such capital
contributions as Madison requested. The Partnership
Agreement provided, however, that AGGP could
cease making capital contributions upon 120 days
advance notice to Madison (the "120-Day notice
provision").

>    FN1. Angelo Gordon is a New York based
>    hedge fund with approximately $3 billion
>    under management.

   In connection with the formation of the
Partnership, Madison caused the Partnership to enter
into certain agreements with two affiliates,
Investment Services of America, LLC ("ISA") and

The Madison Avenue Capital Group II, LLC ("MACG II"). Those affiliates are Madison's co-plaintiffs in this lawsuit. These Agreements (the "Services Agreements") required ISA and MACG II to furnish the Partnership with personnel, services, and infrastructure that were essential both to operate, and to acquire Investment Interests for, the Partnership. As a condition of entering into the Services Agreements, ISA and MACG II required AGGP to agree to the 120-Day notice provision described above.

In September 1997, Madison Avenue Investment Partners, LLC ("MAIP"), which is a Madison affiliate, and defendant Angelo Gordon, which holds a controlling interest in AGGP, entered into an agreement (the "ISA Umbrella Agreement") in which Angelo Gordon undertook to cause AGGP to fulfill its obligations under the Partnership Agreement.[FN2]

> FN2. MAIP is a Madison affiliate. Madison, MAIP, ISA, MACG II and the Partnership are referred to collectively as the "plaintiffs." AGGP and Angelo Gordon are collectively referred to as the "defendants."

*2 During March 2000, affiliates of the plaintiffs and the defendants met to negotiate a possible investment, unrelated to the Partnership, in a MAIP affiliate. During those negotiations, the defendants demanded that the MAIP affiliates permit them to invest on terms that were unacceptable to the MAIP affiliates, and to which the MAIP affiliates refused to accede. According to the complaint, in an effort to exert wrongful pressure on MAIP's affiliates, Angelo Gordon responded by causing AGGP to threaten that it (AGGP) would immediately cease making capital contributions to the Partnership, despite the 120-Day notice requirement. From and after that point, AGGP refused to make capital contributions to the Partnership, and Angelo Gordon failed to cause AGGP to make the required capital contributions.

Although the plaintiffs claim that the 120-Day notice provision has no exceptions, the defendants assert that the Partnership Agreement permitted them to cease providing capital funding when their total contribution reached the $10 million level, as occurred here. That latter contention gives rise to a threshold issue, which is addressed in Part III A, *infra*, of this Opinion.

## II. THE PARTIES' CONTENTIONS AND THE APPLICABLE LAW

The complaint alleges eight claims. The first four are based on AGGP's refusal to make capital contributions without first having given the 120-Day notice allegedly required by the Partnership Agreement. That conduct is claimed to have violated AGGP's contractual duties under the Partnership Agreement (Count I), AGGP's fiduciary obligations to Madison (Count II), AGGP's fiduciary obligations to the Partnership (Count III), and AGGP's contractual duties to ISA and MACG II under the Services Agreements (Count IV).

The remaining four claims are asserted against Angelo Gordon. The plaintiffs claim that by failing to cause AGGP to fulfill its funding obligations under the Partnership Agreement, and/or by causing AGGP to cease contributing capital without giving the required 120 days notice, Angelo Gordon (1) breached the Umbrella Agreement (Count V), (2) aided and abetted AGGP's breach of fiduciary duty to Madison (Count VI) and to the Partnership (Count VII), and (3) tortiously interfered with the Services Agreements (Count VIII).

The defendants respond that none of these Counts states an actionable claim. Defendants urge that because Counts I, III, IV, V, VII and VIII are claims on behalf of the Partnership, they are expressly foreclosed by the Partnership Agreement, which prohibits either partner from commencing a lawsuit on behalf of the Partnership without the other partner's permission. For that reason, defendants urge, those Counts must be dismissed.

Alternatively, the defendants argue that Counts I and V fail to state a cognizable claim for breach of contract, because neither the Partnership Agreement nor the Umbrella Agreement confers any enforceable rights upon the plaintiffs as a group. Counts II and III are also claimed to be dismissable, because they are improper attempts to seek relief based on breach of fiduciary duty theories for conduct that is specifically addressed by the Partnership Agreement and is covered by the breach of contract claims alleged in the complaint. Under Delaware law, defendants argue, fiduciary duty claims cannot proceed where the underlying conduct is addressed by parallel breach of contract claims.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 3
Not Reported in A.2d, 2001 WL 406268 (Del.Ch.)
(Cite as: Not Reported in A.2d)

*3 The defendants further argue that Count IV must be dismissed, because the defendants were not parties to the Services Agreements, and therefore could not have breached them. Moreover, the defendants urge, the claims against Angelo Gordon for aiding and abetting AGGP's breaches of fiduciary duty fail as a matter of law, because the complaint alleges no cognizable underlying claim for breach of fiduciary duty. Lastly, the defendants contend that the complaint fails to state a legally sufficient claim for tortious interference with contract.

Under Court of Chancery Rule 12(b)(6), a complaint must be dismissed if the facts alleged in the complaint, when taken as true and considered in a light most favorable to the plaintiff, fail to state a cognizable legal claim that would entitle the plaintiff to the relief sought.[FN3] All eight claims alleged in the complaint are evaluated in light of that procedural standard.

FN3.*Solomon v. Pathe Communications Corp.*, Del.Supr., 672 A.2d 35, 38-39 (1996).

In this Opinion, the issues are analyzed in the following order: first, the Court considers the threshold issue of whether a written draft of the Partnership Agreement submitted by the defendants can be considered on this motion. Second, the Court addresses the question of the plaintiffs' standing to bring this action. Finally, the Court considers each of the defendants' specific arguments for dismissal.

III. ANALYSIS

A. May the Court Consider the Partnership Agreement in Deciding This Motion?

A threshold issue that must first be decided (because it could be outcome determinative) is whether a written, unsigned draft of the Partnership Agreement, submitted by the defendants but disputed by the plaintiffs, can be considered on this Rule 12(b)(6) dismissal motion. What appears to give rise to this issue is the (apparent) fact that no fully executed original or copy of the Partnership Agreement is available.

On a motion to dismiss, documents that are incorporated by reference into the complaint will normally be considered.[FN4] The question is whether the alleged unsigned copy of the Partnership Agreement submitted by the defendants was "incorporated by reference." The defendants argue that it was, because the document they submitted is the only available written evidence of the Partnership Agreement. Moreover, defendants urge, it would be inequitable to allow the plaintiffs to plead the Partnership Agreement in their complaint as a basis for asserting claims against the defendants, while at the same time prohibiting the defendants from relying on the same document to challenge the legal sufficiency of those claims. The plaintiffs concede that the Partnership Agreement, as executed, is integral to their claims, but they insist that the unsigned draft submitted by the defendants does not accurately reflect the Partnership Agreement as finally executed. Because the submitted draft does not accurately memorialize the Partnership Agreement actually agreed to by Madison and AGGP, the plaintiffs argue that it cannot be deemed "incorporated by reference" into the complaint, and therefore cannot be considered on this motion to dismiss.[FN5]

FN4.*In re Santa Fe Pacific Shareholder Litig.*, Del.Supr., 669 A.2d 59 (1995).

FN5.*In re Santa Fe Pacific Shareholder Litig.*, 669 A.2d at 69-70.

*4 On this issue, the plaintiffs are correct. In their complaint the plaintiffs allege certain terms of the Partnership Agreement, but they also dispute the defendants' contention that the submitted draft constitutes the definitive Partnership Agreement. Whether the defendants' draft constitutes the actual, definitive Partnership Agreement presents a fact dispute that cannot be resolved without an evidentiary hearing. But, we are not yet at that stage. Because the plaintiffs claim not to be relying on the submitted draft agreement, I must assume for purposes of this motion that the plaintiffs' pled version of the Partnership Agreement is the correct one. That is because at this procedural stage the Court is required to take the pled facts as true in deciding whether a legally valid claim is stated.[FN6] Accordingly, on this motion the Court will not take cognizance of the draft Partnership Agreement submitted by the defendants.[FN7]

FN6.*See Solomon*, Del.Supr., 672 A.2d at 38-39.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 406268 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN7. I recognize the potential inequity in allowing the plaintiffs to rely on their alleged version of the Partnership Agreement to support their claim that the defendants breached the 120-day provision, while simultaneously disregarding what is claimed to be the only written evidence of other asserted terms of the contract upon which the defendants rely in challenging the sufficiency of that claim. As stated, however, the procedural rules that apply at the pleading stage dictate that result. If at a later stage the Court finds that the plaintiffs' position is not forthright and that the draft Partnership Agreement is, in fact, the definitive Partnership Agreement, the defendants have remedies, including the imposition of appropriate sanctions by this Court.

**B. Do the Plaintiffs Have Standing To Commence This Litigation?**

The defendants next argue that the plaintiffs lack standing because the Partnership Agreement prohibits one partner from bringing a lawsuit on behalf of the Partnership without the consent of all (in this case, both) partners. Because AGGP never consented to the filing of this action, the defendants urge that Counts I, III, IV, V, VII and VIII must be dismissed. That argument, however, rests on terms that are claimed to exist in the draft Partnership Agreement which, as previously held, can not be considered in deciding this motion. Because it cannot be inferred from the complaint that the "consent-of-all-partners" provision is a term of the Partnership Agreement, the defendants' standing argument predicated on that provision must fail at this stage.

**C. Are the Non-Signatory Plaintiffs Third Party Beneficiaries of the Partnership and Umbrella Agreements?**

It is undisputed that Madison, as a signatory to the Partnership Agreement, has standing to sue for a breach of that Agreement. Similarly, MAIP, as a signatory to the Umbrella Agreement, has standing to sue for a breach of the Umbrella Agreement. For that reason, Counts I and V, which allege that AGGP breached the Partnership and Umbrella Agreements, cannot be dismissed. Remaining in dispute, however, is whether the complaint alleges facts from which it can be inferred that the *non-signatory* plaintiffs have standing to enforce those agreements as intended third party beneficiaries. I conclude that it does not.

The defendants argue that the non-signatory plaintiffs are not third-party beneficiaries. Rather, because they are at most incidental beneficiaries, Counts I and V fail to state cognizable breach of contract claims by the non-signatory plaintiffs. In addition, the defendants contend that because the complaint avers that some but not all of the plaintiffs were parties to the agreements, the plaintiffs as a group are not a protected class of beneficiaries having enforceable rights under the Partnership Agreement or the Umbrella Agreement. Therefore, defendants conclude, the plaintiffs cannot claim a breach of either contract.[FN8]

FN8. The defendants claim that both contract claims must be dismissed in their entirety because in order for a claim to be adequately pled, *all* of the plaintiffs must have a right to advance the claim. The defendants cite no case law supporting this contention, and because the plaintiffs which were signatories to the relevant documents have a clear right to assert a claim against the defendants for breach thereof, the claims will not be dismissed. For that reason, the only issue that the Court need address is whether the non-signatory plaintiffs have a legally cognizable claim to occupy third-party beneficiary status.

**\*5** The plaintiffs respond that although the non-signatory plaintiffs are not direct parties to the Agreements, they nonetheless have enforceable rights as third party beneficiaries. In addition (plaintiffs urge), Madison's claim for breach of the Partnership Agreement and MAIP's claim for breach of the Umbrella Agreement are not dismissable on this ground, since Madison and MAIP are parties to those agreements.

As a general matter, only a party to a contract has enforceable rights under, and may sue for breach of, that contract.[FN9] To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 2001 WL 406268 (Del.Ch.)
(Cite as: Not Reported in A.2d)

to benefit the third party must be a material part of the parties' purpose in entering into the contract.[FN10]

> FN9.*Insituform of N. Am., Inc. v. Chandler,* Del. Ch., 534 A.2d 257, 270 (1987) (holding that non-signatories to a contract have no rights under the contract, and thus no standing to assert claims under the contract).

> FN10.*See Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* Del.Supr., 583 A.2d 1378, 1386-87 (1990) ("[I]n order for third-party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third-party, whether it be creditor or donee, should be a material part of the contract's purpose").

In this context, Illustration 3 to Comment b to § 302 of the *Restatement (Second) of Contracts* is helpful in understanding the difference between an intended and an incidental beneficiary:

B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is ... a promise that B will pay C, D and E, they are intended beneficiaries...; if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries.[FN11]

> FN11.*Restatement (Second) of Contracts* § 302 cmt. b, illus. 3 (1979).

That analytical framework aids the Court's assessment of the third-party beneficiary status of the non-signatory plaintiffs under the Partnership and the Umbrella Agreements, respectively.

### 1. *The Partnership Agreement*

With respect to the contract claims based on the Partnership Agreement, I conclude that the non-signatory plaintiffs, ISA and MACG II, have not alleged facts showing that they occupied any status other than as incidental beneficiaries of that agreement. The complaint does not allege that those entities were intended third party beneficiaries, nor can that conclusion be inferred from the facts that are pled. The Partnership Agreement was entered into to create and establish the terms for governing the

Partnership, which "was organized with the limited purpose to purchase ... hold and otherwise manage and exercise all the rights of an owner of limited partnership interests and other similar equity or any debt securities ...."[FN12] It may be the case that all the parties knew that the Partnership would rely on the capital calls as a source of payment of monies owed to ISA and MACG II under the Services Agreements. But, that fact, without more, does not make ISA and MACG II third party beneficiaries under the Partnership Agreement. At best, those entities were expected creditors of the Partnership, and as such, they would have no more standing to sue AGGP for breach of the Partnership Agreement than would the local utility company or the office supply store. Under Delaware law, expected creditors of a partnership are incidental beneficiaries, and are not entitled to sue for breach of the Partnership Agreement.[FN13]

> FN12. Complaint, at ¶ 2.

> FN13.*Guardian Constr. Co.,* 583 A.2d at 1386-87;*Restatement (Second) of Contracts* § 302 cmt. b, illus. 3 (1979). The claim that MAIP is an intended beneficiary of the Partnership Agreement also fails. The complaint does not allege that MAIP was specifically intended to receive a benefit that resulted from the Partnership, nor does it identify any such benefit. For these reasons, ISA, MACG II and MAIP are not third party beneficiaries of the Partnership Agreement.

### 2. *The Umbrella Agreement*

*6 The Umbrella Agreement presents the same issue, *i.e.,* were Madison, ISA and MACG II intended third party beneficiaries of Angelo Gordon's promise to cause AGGP to make capital contributions to the Partnership? I find, for the reasons previously discussed, that they were not.

The parties to the Umbrella Agreement were MAIP and Angelo Gordon. That Agreement required Angelo Gordon to cause AGGP to fulfill its obligations under the Partnership Agreement, specifically, to make the required capital contributions. Madison, as the other general partner of the Partnership, would share in the proceeds of those contributions, and ISA and MACG II would receive some of those proceeds in the form of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 406268 (Del.Ch.)
(Cite as: Not Reported in A.2d)

payments under the Services Agreements. Those facts, however, do not elevate Madison, ISA and MACG II to a status other than incidental beneficiary.[FN14]Because Madison, ISA and MACG II are not intended third party beneficiaries of the Umbrella Agreement, they have no enforceable claims for breach of that contract.

> FN14.See *Restatement (Second) of Contracts* § 302 cmt. b, illus. 3 (1979).

**D. May the Plaintiffs Prosecute Breach of Fiduciary Duty Claims That Restate Their Claims For Breach of Contract?**

The plaintiffs next claim that AGGP's failure to make capital contributions without giving the 120-Day notice required by the Partnership Agreement was a breach of the fiduciary obligation that AGGP owed to both Madison (Count II) and to the Partnership (Count III).

The defendants contend that these breach of fiduciary duty claims amount to improper attempts to seek a recovery under alternative theories for AGGP's alleged breach of the Partnership Agreement. Those alternative theories, defendants say, cannot coexist with the breach of contract claims. The plaintiffs respond that the two sets of claims can coexist, because the fiduciary claims in Counts II and III are independent from the breach of contract claims. The issue presented is whether the breach of fiduciary duty claims asserted in Counts II and III can be maintained independently of the breach of contract claims alleged in Counts I and V. I conclude that they cannot.

In *Gale v. Bershad*,[FN15] this Court dismissed a breach of fiduciary duty claim in circumstances where the defendants' alleged wrongdoing was already addressed by a breach of contract claim. The *Bershad* Court held that "[t]o allow a fiduciary duty claim to coexist in parallel with [a contractual] claim, would undermine the primacy of contract law over fiduciary law in matters involving ... contractual rights and obligations."[FN16]In this case, the contract and fiduciary claims overlap completely since they are based on the same underlying conduct. Indeed, the complaint uses identical conduct as the basis for both legal claims.[FN17]As this Court has held, if the dispute "relate[s] to obligations 'expressly treated ...' by contract [, it] will be governed by contract

principles."[FN18]Here, the fiduciary claims relate to obligations that are expressly treated by the Partnership Agreement and are the subject of breach of contract claims in the complaint. Accordingly, the fiduciary claims alleged in Counts II and III must be dismissed.[FN19]

> FN15.Del. Ch., C.A. No. 15714, Jacobs, V.C. (Mar. 3, 1998).

> FN16.*Id.*

> FN17.*Compare* Complaint, at ¶ 17 (The refusal by [AGGP] to make Capital Contributions without providing the 120-Day Notice pursuant to the Partnership Agreement is a violation of the Partnership Agreement) with Complaint, at ¶ 20 (the refusal by [AGGP] to make Capital Contributions without providing the 120-Day Notice pursuant to the Partnership Agreement is a breach of the fiduciary obligations owed by [AGGP] to [Madison].

> FN18.*Moore Bus. Forms, Inc. v. Cordant Holdings, Corp.,* Del. Ch ., C.A. No. 13911, Jacobs, V.C., Mem. Op. at 11-12 (Nov. 2, 1995).

> FN19. The plaintiffs' claim against Angelo Gordon for aiding and abetting AGGP's breaches of fiduciary duty must also be dismissed because there is no legally sufficient underlying claim for breach of fiduciary duty against AGGP. *Moore Business Forms, Inc.,* at 12 (dismissing claim for aiding and abetting breach of fiduciary duty because "no cognizable breach of fiduciary duty is stated").

**E. Have the Plaintiffs Pled Adequate Claims For Tortious Interference?**

*1. Count VIII*

*7 Count VIII alleges that Angelo Gordon caused AGGP to cease making capital contributions without providing the 120-day notice in order to further Angelo Gordon's own goals and objectives. That conduct, plaintiffs claim, tortiously interfered with the Services Agreements between the Partnership and ISA and MACG. The defendants

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 406268 (Del.Ch.)
(Cite as: Not Reported in A.2d)

argue that those allegations do not state a legally sufficient claim for tortious interference.

To state a claim for tortious interference with contract, a plaintiff must plead facts that demonstrate the existence of: "(1) a valid contract, (2) about which defendant has knowledge, (3) an intentional act by defendant that is a significant factor in causing the breach of the [contract], (4) done without justification, and (5) which causes injury."[FN20] The defendants argue that the plaintiffs have not pled facts sufficient to demonstrate that (a) the defendants' conduct was a significant factor in causing the Partnership to breach the Services Agreements, and that (b) the defendants ceased contributing capital without justification.

> FN20.*Boyer v. Wilmington Materials, Inc.,* Del. Ch., C.A. No. 12549, Allen, C. (June 27, 1997).

The plaintiffs respond that they have adequately pled each and all of the elements of tortious interference. They argue specifically that the complaint can be fairly read to show that the Partnership relied on the continued capital contributions as a source from which to pay ISA and MACG II for conducting the Partnership's day-to-day operations under the Services Agreements. Because the Partnership lost its funding without the 120-day notice, it lacked sufficient time to search for an alternate funding source. As a result, the Partnership was unable to meet its payment requirements under the Services Agreements, and ISA and MACG II lost income. Those facts, the plaintiffs urge, establish that the cessation of capital contributions was a significant factor in causing that economic loss.[FN21]

> FN21.*See generally,* Complaint at ¶¶ 6, 9, 10, 13, 14, 15.

Moreover, the plaintiffs contend that they have pled facts establishing that the defendants' actions were without justification. The plaintiffs point to paragraphs 12 and 13 of the complaint, which allege that the defendants attempted to coerce MAIP's affiliates during the negotiations, and acted in retaliation for the affiliates' refusal to grant the defendants the investment terms they demanded.

I conclude that the complaint sufficiently alleges that the defendants' termination of capital contributions was a significant factor causing the Partnership to breach the Services Agreement. The complaint alleges that Angelo Gordon caused AGGP to advise Madison that it would cease making capital contributions, and that thereafter AGGP refused to make the capital contributions. The complaint further alleges that (i) AGGP was the exclusive provider of capital to the Partnership, (ii) AGGP's provision of capital and the 120-day notice provision were essential to enable the Partnership to pay for the services being rendered to it under the Services Agreements, (iii) the funding ceased, and (iv) as a result, the Partnership, ISA and MACG II lost the full benefits of the Services Agreements.

**\*8** The absence of "justification" for Angelo Gordon's refusal to require AGGP to continue making the capital contributions and to respect the 120-Day notice provision, is also adequately pled. The defendants' justification argument is that once AGGP had furnished $10 million of capital to the Partnership, it was legally entitled to cease making contributions, irrespective of the 120-day notice provision. This argument, however, is predicated upon the unsigned draft Partnership Agreement which the Court has found cannot be considered on this motion. If at a later stage it is determined that that provision was applicable and gave the defendants that termination right, the tortious interference claim against Angelo Gordon will ultimately fail. At this stage, however, the claim must be allowed to proceed.

Because the plaintiffs have pled legally sufficient tortious interference claims, the defendants motion to dismiss those claims is denied.

*2. Count IV*

In Count IV, the Partnership, ISA and MACG II seek money damages for AGGP's alleged breach of the Partnership Agreement. The basis of their claim is that "[t]he failure of [AGGP] to make Capital Contributions without providing the 120-Day Notice pursuant to the Partnership Agreement has caused the Partnership to be in breach of its obligation to ISA and MACG II under the Services Agreements."[FN22] The plaintiffs characterize this claim as one for tortious interference with contract, and argue, for the reasons previously discussed, that it should not be dismissed.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 406268 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN22. Complaint, at ¶ 26.

The defendants characterize Count IV as a claim for breach of contract, and argue that (as thus characterized) the claim must fail as a matter of law for three reasons. First, the defendants contend that the complaint does not allege that AGGP or Angelo Gordon are parties to the Services Agreements; therefore, AGGP and Angelo Gordon cannot be held liable to the Partnership, ISA or MACG II for any breach of those Agreements. Second, ISA and MACG II are not alleged to be parties to the Partnership Agreement, for which reason their claims (which in essence are claims for breach of the Partnership Agreement) must fail as a matter of law. Third, the only possible wrongdoing alleged in Count IV involves an alleged breach of the Partnership Agreement by AGGP alone, but the plaintiffs' claim on that Count is directed against all "defendants." Defendants argue that the plaintiffs cannot seek a recovery from all of the defendants where only one of them is a party to the contract allegedly breached.

I find that Count IV is fairly characterized as a claim for tortious interference with contract, essentially identical to that alleged in Count VIII. The only difference is that the Count IV claim is directed against AGGP instead of Angelo Gordon. The analysis that governs Count VIII applies equally to Count IV, for which reason the defendants' motion to dismiss Count IV will be denied.

## IV. CONCLUSION

For the reasons discussed, the defendants' motion to dismiss is GRANTED as to those portions of Counts I and V that allege claims by the non-signatory plaintiffs for breach of the Partnership and Umbrella Agreements; and is also GRANTED as to the entirety of Counts II, III, VI and VII. The motion is DENIED as to the entirety of Counts IV and VIII, and as to those portions of Counts I and V that allege claims by the signatory plaintiffs. Counsel shall submit an implementing form of order.

Del.Ch.,2001.
Madison Realty Partners 7, LLC v. Ag ISA, LLC
Not Reported in A.2d, 2001 WL 406268 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOE GANO,                                          )
                                                   )
                    Plaintiff                      )        Case No. 07-271
v.                                                 )
                                                   )
DONALD MARK EHART, and                             )
SPREAD EAGLE, INC., a Delaware                     )
Corporation formerly known as Red Eagle            )
Avionics, Inc.,                                    )
                    Defendants.                    )

## APPENDIX TO DEFENDANTS' MOTION FOR
## SUMMARY JUDGMENT AND SUPPORTING BRIEF

**CROSS & SIMON, LLC**
Richard H. Cross, Jr. (No. 3576)
Tara M. DiRocco (No. 4699)
913 North Market Street
11th Floor
Wilmington, Delaware 19801
302-777-4200
302-777-4224 (fax)
rcross@crosslaw.com
tdirocco@crosslaw.com
*Counsel for Defendants*

Dated: January 14, 2008

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

Donald Mark Ehart Deposition Transcript, taken 7/5/2007..........................A1 – A2

Donald Mark Ehart Deposition Transcript, taken 10/25/2007.....................A3 – A7

Joseph Gano Deposition Transcript, taken 10/31/2007 .............................A8 – A16

1

1     IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2               IN AND FOR NEW CASTLE COUNTY

3

4   DAVID CANNAVO and RED EAGLE      :  C.A. No.: 2379-VCS

5   AVIONICS, LLC a Delaware Limited :

6   Liability Company,               :

7               Plaintiffs,          :

8   v.                               :

9   DONALD MARK EHART and            :

10  SPREAD EAGLE, INC., a Delaware   :

11  Corporation formerly known as    :

12  Red Eagle Avionics, Inc.,        :

13               Defendants.          :

14

15          Deposition of DONALD MARK EHART, taken

16  pursuant to notice before Tanya M. Congo, a Notary

17  Public and Certified Shorthand Reporter, at the

18  offices Fox Rothschild, LLP, 919 North Market Street,

19  Suite 1300, Wilmington, Delaware, on Thursday, July

20  5, 2007, beginning at approximately 10:10 a.m., there

21  being present:

22

23

24                                              A1

1    here.

2    BY MS. ROTHSTEIN:

3         Q.    And by involvement I mean incorporating

4    the company, being a shareholder in the company,

5    being an officer, being a director.

6         A.    I don't think so.  I can't recall any.

7         Q.    At some point in time did you make a

8    decision to sell the stock and/or assets of Red Eagle

9    Avionics, Inc.?

10        A.    Yes.

11        Q.    Okay.  When did you make that decision?

12        A.    Approximately after the 9/11 situation.

13        Q.    And what caused you to make that decision?

14        A.    Reality check, I think.  After that day it

15   seemed like my kids were a lot more important to me

16   than anything else.  I wanted to spend more time with

17   them.

18        Q.    Okay.  Other than from a personal point of

19   view, were there business reasons that caused you to

20   make the decision to want to sell the business, or

21   the stock or assets?

22        A.    No.

23        Q.    At that point in time when you made that

24   decision did you then start marketing the company or

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOE GANO,                           )
                                    )
                                    )
            Plaintiff,              )
                                    )        Civil Action
v.                                  )        No. 07-271
                                    )
DONALD MARK EHART and               )
SPREAD EAGLE, INC., a Delaware,)
corporation, formerly known as )
Eagle Avionics, Inc.,               )
                                    )
            Defendants.             )

   Deposition of DONALD MARK EHART taken pursuant to
notice at the law offices of Fox Rothschild LLP,
919 Market Street, Suite 1300, Wilmington, Delaware,
beginning at 9:17 a.m. on Thursday, October 25, 2007,
before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.


APPEARANCES:

        WENDY G. ROTHSTEIN, ESQ.
        Fox Rothschild LLP
          1250 South Broad Street
          Lansdale, Pennsylvania 19446-0431
               - and -
        TODD B. NURICK, ESQ.
        Nurick Law Group
          111 West Germantown Pike
          Plymouth Meeting, Pennsylvania  19462
          for the Plaintiff,

        TARA M. DiROCCO, ESQ.
        Cross & Simon, LLC
          913 North Market Street, 11th Floor
          Wilmington, Delaware  19801
          for the Defendants.
               WILCOX & FETZER, LTD.
        1330 King Street - Wilmington, Delaware  19801
                    (302) 655-0477
                  www.wilfet.com                    A3



WILCOX & FETZER LTD.
Registered Professional Reporters



Donald Mark Ehart

65

1    A.    Yes, to the mortgage on the building.

2    Q.    Now, at some point in time, did you -- well,

3    when you initially met Mr. Gano, did you believe that

4    he was going to be a co-investor with Mr. Canavo or

5    did you know from the beginning that he was going to

6    be loaning money to Mr. Canavo?

7    A.    I wasn't sure what those two had in mind.  Dave

8    told me he had property worth $7-1/2 million, so I

9    assumed he was doing it on his own.  I didn't know

10   until pretty much the settlement that he was borrowing

11   money from somebody else.

12   Q.    Well, you knew you met with Mr. Gano and

13   Mr. Canavo regarding the purchase of the business;

14   correct?

15   A.    Yes.

16   Q.    They were asking you information about the

17   business; correct?

18   A.    That's correct.

19   Q.    And they asked you to provide them with an

20   audited financial statement from an accountant for the

21   business; correct?

22   A.    They asked for -- oh, what did they ask for?

23   They asked for a lot of things, and I gave them

24   whatever they asked for.

Donald Mark Ehart

95

1   A.   Yes.

2           MS. ROTHSTEIN:   No other questions.

3           MS. DiROCCO:   I just have a few follow-up

4   questions.

5   BY MS. DiROCCO:

6   Q.   If you would look at Ehart 23, which is the

7   sales agreement, dated October 13th, '05.

8   A.   Okay.

9   Q.   In between the time that was signed and, if you

10  look at Ehart 24 --

11  A.   Right.

12  Q.   -- which is the agreement for sale, which was

13  executed --

14  A.   Yes.

15  Q.   -- when the business was sold, was executed

16  January of '06.

17  A.   Yes.

18  Q.   What was your understanding of Mr. Gano's

19  involvement in the entire transaction between that

20  time period?

21  A.   I didn't know what the agreement was.  I didn't

22  know what they were -- I thought he was just going to

23  store his airplanes in there.  He was there with Dave.

24  I am not sure what they were doing together.

1   Q.   Did you think that he was involved in any way

2   in the financing of the -- of Mr. Canavo's purchase?

3   A.   I suspected, but I didn't know.  I really

4   didn't care.

5   Q.   And how many payments did Mr. Canavo make on

6   the note?

7   A.   I think there was four or five, if I am not

8   mistaken.

9   Q.   Have you received any since the litigations

10  begun?

11  A.   No.

12        MS. DiROCCO:  I have nothing else.

13  BY MS. ROTHSTEIN:

14  Q.   Just a couple questions.  You suspected

15  Mr. Gano was involved because you knew that he was a

16  big customer of Mr. Canavo?

17  A.   Yes.

18  Q.   And you indicated you didn't care to really

19  know any more, you didn't care because you didn't

20  really care where you got the money, you just wanted

21  to get the money?

22  A.   No.  My dealings were with Mr. Canavo.  Like I

23  said, I might have talked to Joe twice in the 13 years

24  I was in business.  So I didn't have anything to say

Donald Mark Ehart

97

1  to Mr. Gano.  The deal wasn't with Mr. Gano.  My deal

2  was with Dave and myself, so --

3    Q.   As long as Mr. Canavo came up with the money,

4  that's all that mattered to you; correct?

5    A.   As long as he met his agreement, yes.

6         MS. ROTHSTEIN:  No other questions.

7         (Deposition concluded at 11:43 a.m.)

8         --   --   --   --

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

DAVID CANNAVO and RED EAGLE          )
AVIONICS, LLC, a Delaware            )
Limited Liability Company,
                                     )
            Plaintiff,               )
                                     ) Civil Action
v.                                   ) No. 2379-VCS
                                     )
DONALD MARK EHART and                )
SPREAD EAGLE, INC., a Delaware       )
Corporation formerly known as Red    )
Eagle Avionics, Inc.,                )
                                     )
            Defendants.              )

            Deposition of JOSEPH GANO taken pursuant
to notice at the law offices of Cross & Simon, LLC, 913
N. Market Street, 11th Floor, Wilmington, Delaware,
beginning at 10:10 a.m. on October 31, 2007, before
Vincent J. Bailey, Registered Professional Reporter and
Notary Public.

APPEARANCES:
        WENDY G. ROTHSTEIN, ESQ.
        FOX ROTHSCHILD LLP
            1250 South Broad Street
            Lansdale, Pennsylvania  19446-0431
                    - and -
        TODD B. NURICK, ESQ.
        NURICK LAW GROUP
            111 West Germantown Pike
            Plymouth Meeting, Pennsylvania   19642
            For the Plaintiffs

        TARA M. DiROCCO, ESQ.
        CROSS & SIMON, LLC
            913 N. Market Street - 11th Floor
            Wilmington, Delaware  19801
            For the Defendants

            WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com                    A8



WILCOX & FETZER LTD.
Registered Professional Reporters



Joseph Gano

4

1  purchase of an aircraft.

2      Q.    Have you had any other dealings with him?

3      A.    Consistently, I purchased several aircraft from

4  him.  He maintains the aircraft.  He has worked as my

5  supporter of the aircraft that I have and supporting the

6  aircraft business that these aircraft are involved in,

7  which include preparing certain aircraft for military use

8  and also air shows and air racing.

9            And in addition, he's created certain

10 modifications that help him sell aircraft modifications,

11 performance enhancements I help him sell.

12     Q.    Is that your current relationship with him?

13     A.    It is a business relationship, yeah.  We are, you

14 know, we are involved and he helps market the aircraft

15 for the services they provide.

16     Q.    When you were deposed before you stated that you

17 rented hangar space from Mr. Cannavo.  Is that still the

18 case?

19     A.    That's the case.

20     Q.    Okay.  Did you sign a lease with him?

21     A.    No.  It was verbal.

22     Q.    Okay.  What are the terms of the lease?

23     A.    $3,500 a month for about 3/10ths of the hangar.

24     Q.    Is there a termination date on the lease?



Joseph Gano

5

1    A.    No.  It is indeterminate.

2    Q.    Are you current on your monthly payments?

3    A.    Yes.

4    Q.    Primarily what do you use the space for?

5    A.    Aircraft storage.

6    Q.    Okay.  Now, going to your relationship with

7  Mr. Ehart, how long have you known Mr. Ehart?

8    A.    I met Mr. Ehart in, I believe the first time was

9  1996 I became aware of the facility.  Never had many

10  direct dealings with him, but he's provided avionics

11  support for my aircraft, probably even since before that

12  time, since 1993.  I believe he's, through Dave Cannavo

13  who is the primary agent, but much of the avionics work

14  on my aircraft has been done through Red Eagle over the

15  time.

16    Q.    When did you first come in contact with Mr. Ehart

17  regarding the subject of this litigation?

18    A.    August or September of 2005 we had a meeting.

19    Q.    Did you talk to him on the phone or through

20  e-mail prior to?

21    A.    No.  We had a meeting, personal meeting.

22    Q.    Who set up the meeting?

23    A.    Either him or Dave Cannavo.

24    Q.    You had no contact with him prior to the meeting?

Joseph Gano

6

1    A.    No.

2    Q.    How long would you say the meeting lasted?

3    A.    Anywhere from 45 minutes to an hour and a half,

4  spent some time.

5    Q.    What did you discuss during the meeting?

6    A.    We discussed the business operation.  We

7  discussed the fact that I was going to be an investor in

8  the business.  We discussed the fact that we were looking

9  for a facility on the field to, you know, enhance our war

10 bird operation.

11          In addition to the operations that the

12 facility had, we talked about the business operation that

13 he had, the basic economics.  He provided me with what he

14 presented was an audited financial statement.  We looked

15 at the facility and reviewed the basic business

16 operations with him.

17    Q.    In a 45 minute meeting?

18    A.    45 to hour and a half.  I included, hour and a

19 half would have included the tour of the building.

20    Q.    Did you relate to Mr. Ehart what type of investor

21 you were planning on becoming?

22    A.    I indicated that I would be either an equity

23 investor or a debt investor, but at that point we hadn't

24 determined what my specific role would be.



Joseph Gano

11

1  substantiate very reasonably closely that the expenses

2  were accurate.

3      Q.    What are you basing that on?  Based on the

4  statement of operations?

5      A.    Review of the statement of operations, on the

6  expense side.   The amount of parts that could be used.

7  This is with input from Dave who has his own facility,

8  Aeroenterprises, and is familiar with parts flow versus

9  labor flow.

10      Q.    Any time prior to the purchase did you talk to or

11  meet with Daniel Brousseau, who is the accountant who

12  prepared this?

13      A.    No.

14              MS. ROTHSTEIN:  You need to wait for her to

15  be done her question.

16      Q.    Did you attend the closing with Dave Roeberg and

17  Mr. Cannavo and Mr. Ehart?

18      A.    No.

19      Q.    Did you review the agreement of sale prior to the

20  purchase?

21      A.    No.

22      Q.    What about the settlement sheet?

23      A.    No.

24      Q.    If you look at the complaint, page 4, which is

Joseph Gano

15

Q.    What type?  What did you sign?

A.    Promissory note.

Q.    Okay.  Who prepared the note?

A.    Mr. Roeberg.

Q.    Okay.  Can you go over the terms of the loan?
Was he to make monthly payments?

A.    Monthly payments.

Q.    In what amount?

A.    I don't remember the exact amount.  10 percent
interest, and 12 and a half the second year, and there
was a two-year maturity on the note.

Q.    Did Mr. Cannavo make any payments on the note?

A.    One or two.

Q.    When was the last payment that he made?

A.    Probably February of 2006.

Q.    So is he currently in default?

A.    Yes.

Q.    Have you done anything to collect from
Mr. Cannavo?

A.    We provide him with monthly statements.  We have
had discussions about the resources available and there
are none.  We basically recognize the problem lies with
Mr. Ehart and we are trying to address that through this
process.

Joseph Gano

16

Q.    So did you give him any written notice of default or only verbal?

A.    Verbal.

Q.    Would you say that the payments stopped -- you said they stopped in February?

A.    I believe it was February.

Q.    Is that about the same time that you learned that Mr. Cannavo said the business wasn't doing as well as expected?

A.    We were beginning to see that the cash just wasn't there.

Q.    If this lawsuit doesn't work out in your favor, if Mr. Cannavo's lawsuit doesn't work out in his favor, do you intend to collect on the note from Mr. Cannavo?

A.    Most likely.

Q.    How would you go about doing that?

A.    Haven't addressed that yet.

Q.    I just need one minute.

        If we can look at Gano 1, page 3, paragraph 14, just to summarize what it says is between September '05 and December '05, Gano or Gano through Cannavo asked Ehart on four separate occasions about the results of the operations of the company. And that Mr. Ehart responded that they were doing, the company was doing as well as it

Joseph Gano

17

1    was based on the statement of operations for the first

2    six months of '05 or even a little bit better.

3                 Did you personally speak to Mr. Ehart about

4    that?

5        A.    No.

6        Q.    So here when it says Gano asked Ehart on four

7    occasions, you did not?

8        A.    I asked Dave Cannavo to ask and to be -- to

9    follow up to ensure that operations were still proceeding

10   as indicated in the first six months.  And on those

11   occasions Dave indicated to me that he did and he

12   indicated that Mr. Ehart's response was things were going

13   on as well as or better than they had during the first

14   six months.

15       Q.    Did you at any time -- I know you said you had

16   the meeting with Mr. Ehart in September.  Did you talk to

17   him at all in between September and the time of the asset

18   purchase?

19       A.    No.

20       Q.    Mr. Ehart in his deposition testified that he had

21   only met you person to person about two times.  Would you

22   say that that is accurate?

23       A.    Yes.

24       Q.    Have you, other than the meeting with him in

18

1    September of '05, have you -- I know you said you didn't

2    meet with him, but did you talk to him through e-mail?

3    Through the phone?

4        A.    No.

5        Q.    Did you have any communication with him?

6        A.    Not directly.

7        Q.    All your communication was through Mr. Cannavo?

8        A.    Yes.

9        Q.    Okay.  Do you have an ownership interest in any

10    businesses?

11        A.    Yes.

12        Q.    Can you give me the names of the businesses?

13        A.    Yes.  War Birds of Delaware, Delaware War

14    Birds.  Those are S. Corps.  MIGs of Delaware, Vipers

15    of Delaware, National Education Financial Services, an

16    S. Corp., National Education Servicing.

17        Q.    Do you have an accountant for, that does any work

18    for you in any of your businesses?

19        A.    Yes.

20        Q.    Do you have the same accountant or different

21    accountants?

22        A.    I have one accountant.

23        Q.    Who handles all of your businesses?

24        A.    Either that or I did do it.  I do a lot of my own