## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOE GANO,                                )
                                         )
       Plaintiff,                        )
                                         )
    v.                                   )     No.    1:07-cv-00271
                                         )
DONALD MARK EHART and                    )
SPREAD EAGLE, INC.,                      )
                                         )
       Defendants.                       )

### PLAINTIFF'S ANSWER TO DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

Plaintiff, Joe Gano, by and through his attorneys, Fox Rothschild LLP and Nurick Law

Group, submits this response in opposition to Defendants' Motion for Summary Judgment and

respectfully requests that Defendants' Motion be denied.

**FOX ROTHSCHILD LLP**

*/s/ Sophia Siddiqui (#4914)*
Sophia Siddiqui, Esquire (I.D. No. 4914)
919 N. Market Street, Suite 1300
Wilmington, DE 19899-2323
(302) 654-7444
(302) 656-8920 (facsimile)
     and
Wendy G. Rothstein, Esquire (PA I.D. No 37178)
1250 South Broad Street
P.O. Box 431
Lansdale, PA 19446-0431
(215) 699-6000
(215) 699-0231 (facsimile)
     and
**NURICK LAW GROUP**
Todd B. Nurick, Esquire (PA I.D. No. 78847)
111 West Germantown Pike
Plymouth Meeting, PA 19462
(610) 238-9000
(610) 238-9977 (facsimile)

Date: January 24, 2008

# TABLE OF CONTENTS

Table of Authorities ............................................................................. ii

Nature and Stage of the Proceedings ................................................ 1

Summary of the Argument ................................................................. 3

Statement of Facts ............................................................................. 5

Argument ............................................................................................ 22

    I.    Standard for Summary Judgment. .................................. 22

    II.   Defendants' Arguments Concerning Plaintiff's Alleged Lack Of Standing Is Without Merit. ...................................... 22

    III.  Plaintiff Is Entitled To Relief Because Of Defendants' Fraudulent Representations. ........................................... 25

    IV.  Plaintiff Is Entitled To Relief On The Basis Of Mutual Mistake. ............. 28

Conclusion ......................................................................................... 33

# TABLE OF AUTHORITIES

## Cases

Bartnicki v. Vopper, 200 F.3d 109 (3d Cir. 1999) .................................................... 22

Carrow v. Arnold, 2006 WL 3289582 (Del. Ch. 2006) ............................................. 25

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................ 22

Cerberus International Ltd. v. Apollo Management LP, 794 A.2d 1141 (Del. 2002) ........... 26

Comrie v. Enterasys Networks, Inc., 2004 WL 293337 (Del. Ch. 2004) ..................... 22-23

Crosse v. BCBSD, Inc., 836 A.2d 492 (Del. 2003) ................................................... 29

Darnell v. Myers, 1998 WL 294012 (Del. Ch. 1998) ............................................. 31-32

E.M. Fleischmann Lumber Corp. v. Resources Corp. Int'l, 105 F.Supp. 681 (D. Del. 1952) .. 26

Highlands Ins. Group, Inc. v. Halliburton Co., 852 A.2d 1 (Del. Ch. 2003) .................... 29

Home Ins. Co. v. Honaker, 480 A.2d 652 (Del. 1984) ............................................... 29

In re: Intel Corp. Microprocessor Antitrust Litigation, 496 F.Supp.2d 404 (D. Del. 2007) .... 29

Lang v. Koziarz, 1987 WL 15554 (Del. Ch. 1987) .................................................... 32

Madison Realty Partners 7, LLC v. AG ISA, LLC, 2001 WL 406268 (Del. Ch. 2001) .... 23-24

MetCap Securities, LLC v. Pearl Senior Care, Inc., 2007 WL 1498989 (Del. Ch. 2007) ...... 24

Williams v. White Oak Builders, Inc., 2006 WL 1668348 (Del. Ch. 2006) ................. 28, 31

Yatzus v. Appoquinimink School District, 458 F.Supp.2d 235 (D. Del. 2006) ................. 22

## Other Authorities

Federal Rule of Civil Procedure 56 ......................................................................... 22

Restatement (Second) of Contracts, § 154 ........................................................... 31-32

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff, Joe Gano ("Gano"), initiated this action on May 18, 2007, by filing a Complaint in the United States District Court for the District of Delaware. In his Complaint, Gano seeks damages, declaratory relief, restitution and/or rescission of a January 3, 2006 transaction in which Gano made payment to the Defendants, Donald Mark Ehart ("Ehart") and Spread Eagle, Inc. ("Spread Eagle"), in the amount of $1,100,000.00, in connection with the sale of Red Eagle Avionics, Inc. ("Red Eagle"), to David Cannavo ("Cannavo") and Red Eagle Avionics, LLC ("LLC"). Following the relevant transaction, Gano and Cannavo discovered that prior to the sale, Defendants had drastically overstated and misrepresented the income actually earned by Red Eagle in 2005, resulting in a significant overvaluation and overpayment for the business. Gano therefore brings this action on the basis of Defendants' fraudulent representations or, in the alternative, on the basis of mutual mistake.

Defendants filed an Answer to the Complaint on July 3, 2007. Pursuant to the Court's scheduling order of July 18, 2007, discovery in this case closed on October 31, 2007, and the parties concluded depositions by that date. On January 14, 2008, Defendants filed the instant Motion for Summary Judgment and Supporting Brief, to which Gano now responds.

It should be noted that the facts of this case are also the subject of a separate lawsuit filed by Cannavo and the LLC in the Court of Chancery for the State of Delaware in and for New Castle County, styled *David Cannavo and Red Eagle Avionics, LLC, a Delaware Limited Liability Company v. Donald Mark Ehart and Spread Eagle, Inc., a Delaware Corporation formerly known as Red Eagle Avionics, Inc.*, C.A. No. 2379-VCS (the "Chancery Court Action"). The Chancery Court Action is currently pending and proceeded to a non-jury trial

1

before the Honorable Leo E. Strine, Jr., for two days beginning on December 4, 2007.

Testimony in the Chancery Court Action is scheduled to conclude on February 4, 2008.

## SUMMARY OF THE ARGUMENT

This is a case of fraud and deception in its most basic form.  In the span of approximately three months, Defendants made at least four material misrepresentations to Gano in connection with the sale of a business known as Red Eagle Avionics, Inc.  First, in response to Gano's request for an audited financial statement regarding Red Eagle, Ehart provided a one page document which he presented was an audited statement.  It was not.  Second, Ehart altered the documentation provided to Gano by producing an incomplete document and removing the first page of a two page report which contained crucial disclosures about the inaccuracy of the stated financial information, and which also disclosed that the statement was not audited, as Gano had requested.  Ehart further covered up and concealed his fraud and the fact that he altered the documentation, by removing the number "2" from the second page of the statement provided to Gano.  Third, knowing that the financial statement provided to Gano for the first six months of 2005 was incorrect and contained inflated numbers, Ehart verbally represented that Red Eagle's financial condition in the second six months of 2005 was as good or better than the first six months of 2005.  Therefore, Ehart's statements further inflated his representations concerning the financial condition of Red Eagle for the entire year of 2005.  Finally, Ehart verbally represented that Red Eagle's financial condition in the second six months was as good or better than the first six months of 2005, even though he knew that Red Eagle was experiencing significant financial losses in the second six months of 2005.

Gano seeks damages, declaratory relief, restitution and/or rescission of his payment of $1,100,000.00 to Ehart in connection with the sale of his avionics business.  Gano's payment

was made as a result of the fraudulent representations by Ehart or at a minimum, as a result of a mutual mistake of the parties.

Now, Ehart and Spread Eagle have filed a Motion for Summary Judgment arguing that the fraud and mutual mistake Counts in the Complaint should be dismissed because Gano cannot state a cause of action for breach of contract, either as a party or a third-party beneficiary under the contract. Ehart might as well argue that the Complaint should be dismissed because Gano cannot state a cause of action for negligence, violation of the Uniform Trade Secrets Act, conversion, false imprisonment or some other cause of action that is not set forth in the Complaint. It is beyond comprehension to argue that a plaintiff cannot state a cause of action for fraud and mutual mistake, two distinct causes of action, simply because the plaintiff may not meet the elements of other unrelated and entirely different causes of action. That is what Ehart attempts to do here and, as a result, he falls well short of establishing his entitlement to Summary Judgment.

Ehart's Motion for Summary Judgment must be dismissed since:

1.     Defendants' argument concerning Plaintiff's alleged lack of standing is without merit because Plaintiff's causes of action for fraud and mutual mistake are not dependent upon his status as a party to or third party beneficiary of any contract.

2.     Plaintiff has satisfied all of the requisite elements of a claim for fraud.

3.     Plaintiff has satisfied all of the requisite elements of a claim for mutual mistake.

## STATEMENT OF FACTS

Sometime after September 11, 2001, Ehart decided to sell the business and assets of Red Eagle, Inc., at which time he valued the company at $2,500,000.00.[1] (See July 5, 2007 Ehart Deposition Transcript at pgs. 35, 68) (Attached as App. Ex. "A").[2] In order to both justify his value and market the business to unwary potential purchasers, Ehart retained a company named PBS Global, Inc. ("PBS Global"). (See Brown Dep. Ex. # 17) (Attached as App. Ex. "B"). On September 2, 2004, Ehart completed a Non-Exclusive Business Services Agreement with PBS Global, in which he set an asking price for the business in the amount of $2,436,000.00. Id. In that Agreement, Ehart and PBS Global specifically confirmed that it was the sole responsibility of Ehart to set the value of Red Eagle, Inc.: "I agree that the business consultant did not set the selling price of the business regardless of any business analysis performed. The desired asking price for the sale or capitalization of my business is $2,436,000.00." (See October 25, 2007 Ehart Deposition Transcript at pgs 43) (Attached as App. Ex. "E"). (See also Brown Dep. Ex. # 16) (Attached as App. Ex. "F"). On September 20, 2004, PBS Global accepted Ehart's application and agreed to market the business. (See App. Ex. "B").

PBS Global, with the full knowledge and understanding of Ehart, then retained R.S.I. & Associates, Inc. ("RSI") to prepare a business valuation for Red Eagle. (See Brown Dep. Ex. # 1 at pg. 1) (Attached as App. Ex. "G"). On September 30, 2004, PBS Global forwarded to RSI several documents including a Business Profile Summary and Financial Analysis Data, which set forth an appraised value for the business in the range of $2,645,733.00 to $2,487,953.00. (See Brown Dep. Ex. # 14) (Attached as App. Ex. "C"). (See also Brown Dep. Ex. # 18) (Attached as

---

[1] His stated reason was to spend more time with his children.
[2] All exhibits cited herein are included in the Appendix of Exhibits attached hereto and are cited as "App. Ex. ___."

App. Ex. "D"). The documents that PBS Global sent to RSI also stated that the business had a market value of $2,436,000.00, which was *identical* to the asking price set by Ehart. Id.

At the request of PBS Global and Ehart, Gerald W. Brown, Sr. ("Brown"), the President and Senior Analyst for RSI, then prepared a Business Valuation Report dated October 11, 2004, valuing Red Eagle, Inc. as of December 31, 2003. (See App. Ex. "G"). In the RSI Business Valuation Report, Brown promoted himself as a business valuation expert. Id. However, he has no specialized education beyond a high school degree along with some unrelated courses at a local community college. Moreover, Brown has had no training whatsoever in valuing businesses, accounting or finances of companies. (See App. Ex. "G" at pgs. 26-28). Furthermore, Brown prepared the report in a extremely short period of time. He primarily relied upon a questionnaire completed by Ehart, which Brown did not receive until October 6, 2004. (See App. Ex. "H" at pgs. 100-101). Brown subsequently completed the 33-page Business Valuation Report and forwarded same to Ehart a few days later, on October 11, 2004. (See App. Ex. "H" at pg. 58).

All of the data in the RSI Business Valuation Report regarding Red Eagle, Inc. came from Ehart or PBS Global and did not come from any independent investigation by Brown. (See App. Ex. "G"). (See also October 3, 2007 Deposition Transcript of Gerald W. Brown, Sr. at pgs. 72-76, 107-108, 110) (Attached as App. Ex. "H"). For example, Ehart told Brown that despite the fact that there had been minimal, if any, growth in the business during the prior years, Brown should assume a growth going forward of 10% per year for a 10-year period (i.e. 100% growth over the next 10 years). (See App. Ex. "H" at pg. 136). Brown accepted Ehart's estimated growth estimates even though the historical data did not support or even come close to supporting Ehart's estimated growth of the business. (See App. Ex. "H" at pg. 131). In addition,

6

although the business's annual pre-tax income from 1999 to 2003 actually ranged from

$12,893.00 to negative $59,487.00 (see App Ex. "H" at pgs. 122-123 and App. Ex. "G" at pg. 9),

Brown added an arbitrary and imaginary benchmark industry adjustment, which drastically

inflated the business's stated income to a range between $158,688.00 per year and $211,528.00

per year. (See App. Ex. "G" at pg. 9). Brown did not do any independent analysis or

investigation and relied solely upon Ehart's direction in adding the arbitrary benchmark and

industry adjustment. (See App. Ex. "H" at pgs. 107-108, 116-121). Significantly, Brown's

seemingly "independent" Business Valuation Report concluded that the business was worth

$2,298,300.00, which value was very close to Ehart's pre-determined asking price of

$2,436,000.00. (See App. Ex. "H" at pgs. 138-139). Brown also did nothing to verify the

accuracy of the sales information of Red Eagle, Inc., as stated by Ehart on the questionnaire.

(See App. Ex. "H" at pg. 101).

     Notably, the RSI report was for Ehart's use only. He was not to provide it to any third

parties. (See App. Ex. "H" at pgs. 53-56). Despite that limitation, Ehart voluntarily provided

copies to Gano and Cannavo, intending for them to rely upon the RSI report which was no more

than Ehart's report on RSI letterhead. (See App. Ex. "A" at pgs. 42-43).

     Next, Ehart contacted his accountant, Brousseau & Brousseau, P.A. ("Brousseau"), to

prepare financial documentation upon which a potential purchaser could rely in their

consideration of acquiring Red Eagle, Inc. (See Chancery Court Joint Pre-Trial Stipulation and

Order at pgs. 3-4) (Attached as App. Ex. "I"). Brousseau had been the accountants for both Red

Eagle, Inc. and Ehart personally for a number of years. (See App. Ex. "I" at pg. 3).

Additionally, Daniel Brousseau was a customer of Red Eagle, Inc., in that Ehart regularly

serviced Brousseau's airplane. (See App. Ex. "I" at pg. 3).

Brousseau offered various types of services to its customers including audits, reviews, compilation reports and preparation of tax returns. Brousseau advised Ehart as to the range of services that were available, which included on one end a detailed audit in which Brousseau would independently evaluate and verify the financial information of the company, and on the other end a simple compilation report in which Brousseau would merely summarize Defendants' own financial data without verifying its accuracy. Ehart requested the latter, a compilation report that would simply be a summary of Red Eagle's financial information in a format that looked like an audited financial statement. At no time did Ehart ever ask Brousseau to perform a complete audit of the books and records of Red Eagle. (See October 18, 2007 Daniel Brousseau Deposition Transcript at pgs. 56-66) (Attached as App. Ex. "J").

Brousseau subsequently prepared and supplied to Ehart a two-page Report, dated September 1, 2005, the first page consisting of a disclaimer page (hereinafter "the Disclaimer Page") and the second page consisting of a Statement of Operations for the Six Months Ended June 30, 2005 (the "June 30, 2005 Statement of Operations"). (See the two page September 1, 2005 Brousseau & Brousseau Report) (Attached as App. Ex. "K"). The June 30, 2005 "Statement of Operations reported a net income from operations of $115,496.00. Id. The Disclaimer Page would put any third party on notice that Brousseau had merely summarized Ehart's data:

> A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or any other form of assurance on it.
>
> Management has elected to omit substantially all financial statement disclosures. If the omitted disclosures were included in the financial statement, they might influence the user's conclusions about the

company's financial status.  Accordingly, this financial statement is not
designed for those who are not informed about such matters.

(App. Ex. "K").  While Ehart did not tell Brousseau why he wanted the Report, it was Brousseau

who specifically advised Ehart that Ehart was not to provide the Report to any third party or

potential purchaser.  It was made clear that it was for Ehart's use only.  (See App. Ex. "J" at pgs.

75-79).

In August 2005, after numerous failed attempts to sell the business, Ehart approached

Cannavo, a long-time customer, to discuss the potential sale of Red Eagle.  (See App. Ex. "A" at

pgs. 47-48).  Ehart knew that Gano and Cannavo were looking to purchase a hangar to store

Gano's planes.  Ehart also knew that Gano was a customer of Cannavo and that Cannavo worked

on Gano's planes.  In fact, Cannavo had Ehart perform repairs on both Cannavo's planes and

Gano's planes on multiple occasions.  (See App. Ex. "A" at pgs. 47-48).  From the very

beginning of their discussions concerning the sale of the business, Ehart knew that Cannavo and

Gano were interested in the purchase of the business assets and that both of them would be

involved in the transaction.  Ehart admits that he met with Gano and provided Gano with the one

page Red Eagle June 30, 2005 Statement of Operations and that he failed to provide Gano with

the all important Disclaimer Page.  (See App. Ex. "I" at pg. 4).

Cannavo testified regarding Ehart's knowledge of Gano's involvement as follows:

> Q.     And did Mr. Ehart know that Mr. Gano was financing part
> of the purchase price?
>
> A.     Yes.
>
> Q.     And did Mr. Ehart know that any information that he would
> have shared with you, that you were sharing that information with
> Mr. Gano?
>
> A.     Yes.

9

(July 26, 2007 Deposition of Cannavo at pg. 156) (Attached as App. Ex. "L").

Ehart's knowledge of Gano's involvement in the transaction is further substantiated by the following Chancery Court trial testimony of Gano:

> Q.    Now did you meet with Mr. Ehart regarding the potential purchase?
>
> A.    I met one time with Mr. Ehart.
>
> Q.    And approximately when did that take place?
>
> A.    I believe it was late September of 2005.
>
> Q.    Who else was present at the meeting?
>
> A.    Mr. Cannavo.
>
> Q.    Approximately how long did the meeting last?
>
> A.    Total time was approximately an hour and a half.
>
> Q.    And what was the purpose of that meeting?
>
> A.    To begin discussions for the purchase of Red Eagle.  And I was at the time looking at it as a possible investment along with Mr. Cannavo.
>
> Q.    Now, as of that point in time, what was it anticipated that your role would be in the transaction?
>
> A.    Possible, equity investor but it really hadn't been – it hadn't really been confirmed;  but the initial – initially, as we approached it, that I would take whatever position it required for Mr. Cannavo to obtain the – the business.

(December 4, 2007 Gano Chancery Court Trial Transcript at pgs. 175-176) (Attached as App. Ex. "M").

Gano further testified in his October 31, 2007 deposition as follows:

> Q.    When did you first come in contact with Mr. Ehart regarding the subject of this litigation?

A.      August or September 2005 we had a meeting.

Q.      Did you talk to him on the phone or through email prior to?

A.      No.  We had a meeting, personal meeting.

Q.      Who set up the meeting?

A.      Either him or Dave Cannavo.

Q.      You had no contact with him prior to the meeting?

A.      No.

Q.      How long would you say the meeting lasted?

A.      Anywhere from 45 minutes to an hour and a half, spent some time.

Q.      What did you discuss during the meeting?

A.      We discussed the business operation.  We discussed the fact I was going to be an investor in the business.  We discussed the fact that we were looking for a facility on the field to, you know, enhance our war bird operation.  …

Q.      Did you relate to Mr. Ehart what type of investor you were planning on becoming?

A.      I indicated I would be either an equity investor or a debt investor, but at that point we hadn't determined what my specific role would be.

(October 31, 2007 Deposition Transcript[3] of Gano at pgs. 5-6)  (Attached as App. Ex. "N").

Ehart further confirmed in his deposition testimony his knowledge of Gano's

involvement.

Q.      How many times did discussions take place between you and Dave Cannavo or you and Dave Cannavo and Joe Gano regarding the purchase of the assets or stock of the company prior to an agreement of sale actually being signed?...

---

[3] The Court Stenographer erroneously included the caption of the Chancery Court action on the cover page of the Deposition Transcript.  The Deposition was taken in this Federal Court action.

A.    I just remember the one meeting with Joe Gano and Dave Cannavo sitting down in my office.

Q.    Okay. Do you know when that was?

A.    I truly don't know. I know that's when I gave him the valuation report and anything else he wanted.

Q.    Now, prior to that meeting do you remember any discussions that took place between you and either – between you and Cannavo regarding the purchase of the business?

A.    They [Gano and Cannavo] were interested and wanted to set up a time to meet....

Q    Okay. Well, what, if anything, do you remember from that meeting other than you know that you met with Joe Gano and Dave Cannavo?

A.    What do I remember about it?

Q.    Right.

A.    That they were just another couple of guys [Gano and Cannavo] interested in buying the business....

(See App. Ex. "A" at pgs. 44-45, 47).

Ehart further knew that Gano was involved in the financing of Cannavo's purchase because he knew that Gano was a big customer of Cannavo. However, Ehart didn't really care. (See App. Ex. "E" at pg. 96-97).

During the September 2005 meeting, Gano requested an *audited* financial statement for Red Eagle. (See App. Ex. "N" at pg. 7). In response, Ehart immediately provided both Gano and Cannavo with only the second page of the September 1, 2005 Brousseau Compilation Page, consisting of a one page unnumbered June 30, 2005 Statement of Operations, which indicated that Red Eagle's net income from operations for the six month period ending June 30, 2005, was $115,496.00. (See one page unnumbered June 30, 2005 Statement of Operations) (Attached as

App. Ex. "O"). (See also App. Ex. "N" at pg. 26). When Ehart handed Gano and Cannavo the June 30, 2005 Statement of Operations for Red Eagle, he did not provide them with the first page of the Compilation Report containing the disclaimers that originally accompanied the Statement of Operations. (See App. Ex. "M" at pg. 182). Notably, Ehart, despite his previous denials, on the eve of the Chancery Court trial, admitted that he did not provide the Disclaimer Page to Gano and Cannavo. (See App. Ex. "I" at pg. 4). Nor did Ehart inform Gano or Cannavo at the time that the Statement of Operations he handed to them was an incomplete document. (See App. Ex. "M" at pg. 182). Ehart provided Gano and Cannavo with this page despite his knowledge: (i) that the financial information contained therein had not been audited (which Plaintiffs had requested); (ii) that the information contained therein was inaccurate and unsubstantiated; (iii) that the document was not to be produced to or relied upon by a third party; and (iv) that it was never to be separated from the Disclaimer Page. (See App. Ex. "J" at pgs. 56-66). Ehart obviously removed the Disclaimer Page because he knew that any person who read the Disclaimer Page in conjunction with the Statement of Operations as of June 30, 2005, would know that the document was worthless. (See App. Ex. "J" at pg. 62).

After the September 2005 meeting, as part of the due diligence process, Gano asked Cannavo to follow-up with Ehart concerning the business operations of Red Eagle in the second half of 2005. (See App. Ex. "N" at pg. 17). On numerous occasions, Cannavo followed up with Ehart to inquire about the status of Red Eagle's finances. (See App. Ex. "M" at pgs. 43-44). On each occasion, Ehart stated that the business was doing well and that Red Eagle's income in the second half of 2005 should be equal to or slightly better than the first half of the year. Id. Cannavo relayed this information to Gano. Id.

Thus, Ehart represented to Gano and Cannavo that the net income for the business in the first six months of 2005 was the amount stated on the June 30, 2005 Statement of Operations, or $115,496.00. Ehart also represented to Gano and Cannavo that Red Eagle's income during the second six months of 2005 was at least as good as the first six months of 2005, and therefore, that Red Eagle's total net income for the entire year of 2005 was at least $230,992.00. As a result of Ehart's aforementioned representations concerning the income of Red Eagle, Gano loaned Cannavo $1,100,000.00 with the funds being wired for Ehart's benefit (see Affidavit of Gano at ¶ 8) (attached as App. Ex. "P"), and the LLC purchased the business from Ehart on January 3, 2006, for $2,200,000.00. (See January 3, 2006 Asset Purchase Agreement) (Attached as App. Ex. "Q"). Of the funds received from Gano, Ehart personally received $523,422.23, with the remaining funds used to pay mortgages and other obligations that Ehart owed. (See App. Ex. "E" at pg. 88).

In the months following the January 3, 2006 transactions, Cannavo and Gano discovered that the actual income of Red Eagle in 2005 was nowhere close to the income represented by Ehart prior to the sale. In March 2006, Gano and Cannavo learned about the complete Compilation Report prepared by Brousseau and that the first page, containing the essential disclaimers, had been removed from the June 30, 2005 Statement of Operations provided by Ehart during their meeting in September 2005. (See App. Ex. "L" at pg. 144).

The actual net income for Red Eagle for 2005 was actually much less than Ehart represented to Gano and Cannavo and therefore resulted in a drastic overpayment for the business. Plaintiff's unrebutted expert witness, Alfred T. Giuliano, reviewed Red Eagle's financial information and has determined that the actual net income from operations for Red Eagle for the entire year of 2005 was only $52,664.00 and not $230,992.00 as represented by

14

Ehart. (See December 17, 2007 expert report of Alfred T. Giuliano) (Attached as App. Ex. "R").

Hence, the actual value of the going concern of the business was only between $114,820.00 and

$263,320.00, which is much less than the purchase price and, therefore, resulted in an

overpayment to Ehart in the range of $886,580.00 to $1,035,180.00. Id.

It was an important part of the transaction that Ehart provide Gano and Cannavo with a

complete copy of the Compilation Report. Ehart testified:

> Q.    Was it important that Mr. Gano and Mr. Cannavo receive a
> copy of the first page, which is entitled "Compilation Report"?
>
> A.    Yeah. I guess. …
>
> Q.    Well, as part of the transaction, was it important that as part
> of the due diligence that you provide a copy of the Compilation
> Report dated September 1, 2005?
>
> A.    Yes.
>
> Q.    At this point, sitting here today, you indicated you do not
> know whether they did or did not receive a copy of that
> Compilation Report. Correct?
>
> A.    I can't verify one way or another.

(See App. Ex. "E" at pgs. 93-94). Ehart later admitted, on the eve of the Chancery Court trial,

that he had not provided a copy of the Compilation Report to Gano or Cannavo. (See App. Ex.

"I" at pg. 4).

Ehart agreed that if Gano did not receive a copy of the Compilation Report that it was a

mistake since it was the intention of all parties that they were to receive a copy of the

Compilation Report. Ehart testified:

> Q.    Would you agree it would have been a mistake if they did
> not receive a copy of the Compilation Report?
>
> A.    Yes.

> Q. Do you agree it was the intention of all parties that they were to have received a copy of this Compilation Report?
>
> A. Yes.

(See App. Ex. "E" at pgs. 94-95).

Based upon the aforementioned representations made by Ehart regarding the net income for the first six months of 2005 and then subsequently for the entire year 2005, Gano agreed to provide the loan of $1,100,000.00 and to wire that sum in connection with the purchase of Red Eagle's assets by Cannavo on January 3, 2006. (See App. Ex. "P" at ¶ 8). If Gano had been aware of Red Eagle's actual net income or that Ehart was misrepresenting the income of the company, he would not have made the $1,100,000.00 loan. (See App. Ex. "P" at ¶¶ 9-10).

Ehart, in his Motion for Summary Judgment, fails to address the misrepresentations of fact nor does he offer any explanations. Even if Ehart offers explanations, his explanations will lack credibility since Ehart has testified inconsistently in other court proceedings.

By way of background, on October 20, 1990, approximately two years prior to forming Red Eagle, Ehart married Mary Beth Ehart. (See App. Ex. "I" at pg. 6). The Eharts separated in April 1997 and were subsequently divorced on January 29, 1998. Id. On May 21, 1998, the Family Court issued its first child support Order, in which the Court directed Ehart to pay support for his three children in the amount of $1,425.00 per month. (See App. Ex. "E" at pg. 9).

In late 2001 or early 2002, Ehart filed a Petition to Modify his child support obligations for his three children (the "First Petition to Modify"), as a result of the negative effects that the events of September 11, 2001 allegedly had on his business. [4] (See App. Ex. "E" at pgs. 15-19). On May 6, 2002, following a hearing, the Family Court reduced Ehart's support obligations from $1,425.00 per month to $773.00 per month, based on the facts set forth in the First Petition to

Modify and Ehart's testimony regarding the poor financial condition of Red Eagle, Inc. (See April 11, 2003 Permanent Modification Support Order) (Attached as App. Ex. "S").

Ehart, still not satisfied with his drastically reduced child support obligations, continued to claim that his business was faltering so that he could pay less child support. Ehart filed another Petition to reduce his child support obligations (the "Second Petition to Modify"), again on the basis that the business was not doing well. On February 26, 2003, a hearing was held before the Honorable John Carrow, at which time both Ehart and his accountant testified concerning the business. Based upon the facts set forth in the second Petition to Modify and the testimony of both Ehart and his accountant, the Family Court further reduced Ehart's child support obligations from $773.00 per month to a mere $368.00 per month, effective January 1, 2002. (See App. Ex. "S").

Significantly, in the April 11, 2003 Decision, the Family Court opined, in relevant part, as follows:

> The attached child support calculations were based upon the parties' testimony, documentation and the Court's assessment.
>
> Regarding father's income, the Court finds credible his testimony that his specialty business (Red Eagle Avionics) that installs auto pilots and aircraft has suffered considerably since September 2001. Father does not have the level of business nor high profile clients…. *If his income improves, he must immediately inform mother in order that she may consider filing a Modification Petition*

(App. Ex. "S" at ¶ 8) (emphasis added). In addition, the Family Court directed the parties to "notify each other in writing of every change in circumstance which might materially affect the existing support order." Id. at ¶ 10. Thus, the Family Court, while finding a change in

---

[4] At the same time, he allegedly wanted to sell his business to spend more time with his children. (See App. Ex. "A" at pg. 35)

circumstances, established safeguards to ensure that the three children would be protected financially when Ehart's business improved.  Id.

Not long after he was successful (for a second time) in convincing the Family Court to drastically reduce his child support obligations based upon the financial condition of Red Eagle, Ehart then turned his attention towards *inflating* the value of his business to effectuate a sale of the business on terms that were extremely favorable to him.  In September 2004, Ehart determined that the business was worth $2,436,000.00.  (See App. Ex. "F").  Subsequently, on October 11, 2004, RSI prepared its Business Valuation Report, at Ehart's request.  (See App. Ex. "I" at pg. 6).  The RSI Business Valuation Report was prepared as of December 31, 2003, and concluded that the value of Red Eagle, Inc. was $2,298,300.00.  (See App. Ex. "G" and App. Ex. "I" at pg. 6).

Ehart admitted that he never notified Mary Beth Ehart or the Court that:  Red Eagle had obtained a significantly higher business valuation; that the business had been sold for $2.2 million; that he received over half a million dollars in cash as part of the sale of the business; that his income improved; and/or that he took back a Note for $1,200,000.00.  (See App. Ex. "E" at pgs. 23-25, 63-64, 89-90).  In failing to do so, Ehart ignored the Family Court's Order of April 11, 2003, which compelled Ehart to notify his ex-wife of any such change of circumstances regarding the business.  (See App. Ex. "S" and App. Ex. "E" at pgs. 23-24).  Thus, it can be assumed that:  (1) the circumstances regarding the business did not change and the business continued to have financial problems through the date of the sale of the business to Cannavo on January 3, 2006; or (2) Ehart was intentionally violating the Court Order.  Either scenario calls into question the credibility and character of Ehart.

Even after Ehart sold the assets of Red Eagle, he did not inform Mary Beth Ehart of his windfall and continued to pay support to his children in the amount of only $30 per week per child. (See App. Ex. "E" at pgs. 23-25, 63-64, 89-90). Mary Beth Ehart subsequently learned, only through speaking with her children, that Ehart sold the business and came into a substantial amount of money. (See August 13, 2007 Deposition Transcript of Mary Beth Ehart at pg. 29) (Attached as App. Ex. "T"). In April 2006, Mary Beth Ehart filed a Petition with the Family Court to increase the support payments for the three children. Despite the considerable profits he received from the sale of the business, Ehart contested his ex-wife's request for more reasonable child support payments for their three children. A mediation was held on July 25, 2006, following which Ehart agreed to increase his support payments to a $1,062.00 per month, effective July 25, 2006. Subsequently, a hearing was held before the Honorable Mary Much on May 31, 2007, during which time Ehart and his accountant testified. It is apparent from a plain reading of the Family Court's opinion that Ehart tried to utilize the claims filed by Cannavo in the Chancery Court action as a means to avoid paying his fair share of child support. In her Order, Judge Much, in part, summarized Ehart's pending litigation as follows:

> "Father operated Red Eagle Avionics out of the New Castle County Airport. Father testified that he elected to sell this company in January 2006 to spend more time with his children, with whom he currently enjoys two weekends per month visitation. The company sold for $2,200,000.00. The sale of this corporation encompassed a hanger, in which aircraft were housed to perform installation and repairs, adjacent parking, fencing and landscaping, machinery equipment, office furniture and equipment, vehicles, maintenance equipment, supplies, spare parts inventory, the Red Eagle Avionics name, the company's goodwill, the corporation's leases with tenants, and the customer lists. The sale excluded accounts receivable and cash on hand.
>
> The purchase price was to be paid as follows: $1,000,000.00 cash at time of sale and a $1,200,000.00 promissory note with interest accruing at the rate of 8.5% per annum, payable in equal monthly installments of $10,413.88 over a twenty year period. The sales price included: Hangar-

19

$1,870,000.00; Equipment-$200,000.00; Inventory-$30,000.00; Covenant not to compete-$100,000.00. The terms of the covenant prohibit Father from engaging in any competitive avionics business, whether as owner or employee, within a 150 mile radius of the New Castle County Airport. The covenant provides, however, that Father is permitted to engage in avionics employment if the new owner does not agree to hire him. Father has not sought any work as an avionics technician since he sold his business.

Father received $1,000,000.00 cash at the time of sale and 5 monthly payments of $10,413.88, totaling $52,069.40. He used a portion of the initial cash buy-out to pay off a commercial loan from Wachovia Bank in the amount of $445,901.21 and a $30,583,56 small business administration loan. The net proceeds of this sale to Father were $523,515.23. Of the net proceeds, Father deposited $200,000.00 into an investment account in ING for the payment of taxes and had full use of the remainder. According to Father's testimony, he has approximately $200.00 left in the ING account without having paid any of his tax liability therefrom and the residual amount from the sale has been dissipated. Father has spent over $500,000.00 in the past 16 months plus $52,069.40 representing the five monthly payments on the amortized payment plan.

Father is in litigation with the Purchaser of Red Eagle Avionics. He is being sued in the Court of Chancery for defrauding the Purchaser. The allegations in the complaint allege that Father overstated the net earnings of the company and that the Purchaser relied on this misstatement to his detriment in purchasing the company. Father's Statement of Operations for Red Eagle for the six months ended June 30, 2005 lists net income from operations of $115,496.00. The Purchaser alleges that this was a gross overstatement of income for that time period. The Purchaser further alleges that Father on multiple occasions throughout the end of 2006 and up until the sale of the business, did state that the business was performing in line with the June 30, 2005 statement of operations. Father admits that he listed June 30, 2005 net income from operations as set forth above but denies any allegations of fraud and has counterclaimed for specific performance under the contract.

(See Permanent Modification Support Order dated June 20, 2007) (Attached as App. Ex. "U").

Unlike the prior hearings regarding child support, and despite Ehart's best efforts to defeat any attempt to increase his support payments, the Family Court did not find Ehart's testimony convincing. Instead, Judge Much found that there was a change of circumstances and increased

Ehart's support obligations from $368.00 per month to $1,462.00 per month, effective May 1, 2006.  Id.  That Order is now under appeal by Ehart.

# ARGUMENT

## I.    Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, this Court may grant summary judgment only if there are no genuine issues as to any material fact and Defendants as the moving party are entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It is the moving party who bears the burden of proving that no genuine issue of material fact exists. Yatzus v. Appoquinimink School District, 458 F.Supp.2d 235, 242 (D. Del. 2006).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  Id.  In considering a motion for summary judgment, the Court must view all facts, and all inferences fairly drawn therefrom, in the light most favorable to the non-moving party.  Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir. 1999).  As more fully set forth below, Ehart has failed to meet his burden of proof.

## II.    Defendants' Arguments Concerning Plaintiff's Alleged Lack Of Standing Is Without Merit.

In their brief, Defendants go to great lengths to argue that Gano lacks standing to enforce or assert a claim for a breach of the January 3, 2006 Agreement of Sale, inasmuch as Gano was neither a party to, nor an intended third party beneficiary of, that contract.  Defendants mischaracterize the nature of Gano's claims in this case, as the Complaint plainly reveals that Gano is not asserting a claim for breach of contract.  Rather, Gano asserts causes of action for fraud and for mutual mistake, both of which are proper claims *even if* Gano was not expressly mentioned as a party to or beneficiary of the Agreement of Sale.

All of the cases cited in Defendants' Motion for Summary Judgment are inapposite. First, Defendants rely upon Comrie v. Enterasys Networks, Inc., 2004 WL 293337 (Del. Ch.

2004) (attached to Defendants' Motion for Summary Judgment and Supporting Brief as Exhibit "D"), in support of their argument that a non-party to a contract has no legal right to enforce it or seek remedies for breach of contract. (Defendants' Motion for Summary Judgment and Supporting Brief, at 10.) However, the claim asserted by the plaintiffs in Comrie was for breach of contract. By contrast, Gano is not asserting a claim for breach of contract in this case, nor is he seeking to enforce the terms of a contract or obtain remedies for its breach. Therefore, Comrie is simply inapplicable to the case at hand.

For similar reasons, Madison Realty Partners 7, LLC v. AG ISA, LLC, 2001 WL 406268 (Del. Ch. 2001) (attached to Defendants' Motion for Summary Judgment and Supporting Brief as Exhibit "E"), also fails to provide support for Defendants' argument that Gano lacks standing to pursue his claims in this case, and, in fact, Madison demonstrates that a plaintiff's alleged lack of standing to assert a claim for breach of contract will not prove fatal to his other causes of action. In Madison, a partnership agreement existed between Madison and AGGP, which AGGP allegedly breached by failing to make the requisite capital contributions. The lack of capital also affected two companies that had service agreements with the partnership, and who therefore joined Madison as a plaintiff against AGGP. The court, noting that only Madison had standing to assert a claim against AGGP for breach of the partnership agreement, granted the defendant's motion to dismiss the service providers' claim for breach of the partnership agreement, because they were not parties or intended third party beneficiaries to the contract. Id. at *5. Notably, however, the court in Madison did not dismiss the service providers' other claims against AGGP for tortious interference with the providers' separate service agreements with the partnership. Id. at *7-8. Thus, although the service providers lacked standing to assert a claim for breach of the

partnership agreement, that lack of standing did not effect their other claims against the defendant.

In the case at hand, by contrast, Gano is not asserting a claim against Defendants for breach of contract but rather, for fraud and mutual mistake. Thus, under <u>Madison</u>, Gano's claims are not dependent upon his standing as a party to or third party beneficiary of the January 3, 2006 Agreement of Sale. As such, his claims are proper and must not be dismissed.

Finally, Defendants rely upon <u>MetCap Securities, LLC v. Pearl Senior Care, Inc.</u>, 2007 WL 1498989 (Del. Ch. 2007) (attached to Defendants' Motion for Summary Judgment and Supporting Brief as Exhibit "C"), the facts of which are plainly distinguishable from those in the case at hand. There, the court held that a non-party to a contract could not assert a claim for fraud against one of the contracting parties because the plaintiff's claim was based solely on the defendant's alleged failure to disclose that a term in the contract had been changed prior to the execution of the agreement, which affected the plaintiff's expectation of payment as part of the transaction. The court in <u>MetCap</u> held that because the plaintiff and defendant were not in a fiduciary or contractual relationship, the defendant owed no duty to the plaintiff to disclose the changes to the contract. Thus, because the plaintiff did not allege any affirmative misrepresentation by the defendant, its claim for fraud failed as a matter of law. <u>Id.</u> at *5, n. 34. In the case at hand, by contrast, Gano's claim for fraud is not premised upon Defendants' non-disclosures, but rather, upon specific affirmative misrepresentations made by Ehart. Accordingly, <u>MetCap</u> is inapposite to the present case.

As set forth below, under Delaware law, claims for fraud and mutual mistake simply do not require Gano to prove standing to a contract in order to obtain the requested relief. Inasmuch

as the facts in the record of this case clearly establish a cause of action for fraud and/or mutual

mistake, Defendants' Motion for Summary Judgment must be denied.

**III.    Plaintiff Is Entitled To Relief Because Of Defendants' Fraudulent Representations.**

More than enough evidence exists for a finding that Gano is entitled to relief as a result of

the Defendants' fraudulent representations in this case.  In Delaware, the elements of a cause of

action for fraud are as follows:

1.    That the defendant made a false representation;

2.    That the defendant knew or believed that the representation was false, or

3.    made it with reckless indifference to the truth;

4.    That the defendant's false representation was intended to induce the plaintiff to act or refrain from acting;

5.    That the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and

6.    That the plaintiff was damaged by such reliance.

Carrow v. Arnold, 2006 WL 3289582, at *8 (Del. Ch. 2006) (Attached as Comp. Ex. "A").[5]

Notably absent from these elements is a requirement that plaintiff prove contractual standing or

privity with the defendant in order to recover under a claim for fraud.

All of the aforementioned elements of fraud are present in this case.  First, Defendants

clearly made material misrepresentations of fact.  During the parties' meeting in September

2005, Gano specifically asked Ehart for an audited financial statement for Red Eagle.  (See App.

Ex. "N" at pg. 7).  In response to Gano's request, Ehart immediately provided Gano and

Cannavo with what Ehart "presented was an audited financial statement," which had been

prepared by Defendants' accountant.  (See App. Ex. "N" at pgs 6-7).  The document that Ehart

---

[5] All unreported opinions cited by Plaintiff herein are included in the Compendium of Unreported Opinions attached hereto, and are cited as "Comp. Ex. __."

presented to Gano and Cannavo was a one page unnumbered document entitled "Red Eagle Avionics, Inc. Statement of Operations for the Six Months Ended June 30, 2005." (Id. See App. Ex. "O"). The Statement of Operations indicated that Red Eagle had a net income from operations of $115,496.00 for the first six months of 2005. (See App. Ex. "K" and App. Ex. "O"). Furthermore, on numerous occasions following the parties' initial meeting in September 2005, Cannavo followed up with Ehart, at Gano's request, to inquire about the status of Red Eagle's finances. (See App. Ex. "M" at pgs. 43-44). On each occasion, Ehart said that the business was doing well and that Red Eagle's income in the second half of 2005 should be equal to or slightly better than the first half of the year. (See App. Ex. "M" at pg. 44). "Where misrepresentations are made to one person, with the intention that they be communicated to another, and acted upon by such other, and as a fact such representations are communicated and acted upon to the prejudice of that other person, an action of deceit will lie." E.M. Fleischmann Lumber Corp. v. Resources Corp. Int'l, 105 F.Supp. 681, 687 (D. Del. 1952).

Based on the above representations, Defendants led Gano and Cannavo to believe that the net income for the business for the entire year of 2005 was at least $230,992.00. However, the actual Net Income from Operations for Red Eagle for 2005 was only $52,664.00. (See App. Ex. "R"). Hence, Defendants clearly misrepresented the income and value of Red Eagle.

Second, Defendants knew or believed that their representations were false, or, at the very least, made those representations with reckless indifference to the truth. The information concerning Red Eagle's finances and the accuracy of the June 30, 2005 Statement of Operations were within the exclusive control of Ehart, who was the sole officer and shareholder of Red Eagle prior to January 3, 2006. Although the Statement of Operations was only the second page of a two-page document prepared by Brousseau, Defendants never provided Gano with the first

page of the Compilation Report, which included the essential disclaimers stating that the report was not audited (as Gano had requested), and which further stated that "Management has elected to omit substantially all financial statement disclosures," which "might influence the user's conclusions about the company's financial status." (See App. Ex. "K" and App. Ex. "M" at pg. 182). Ehart never informed Gano or Cannavo that the Statement of Operations he handed them was an incomplete document. (See App. Ex. "M" at pg. 182). Nor have Defendants explained why the June 30, 2005 Statement of Operations provided by Ehart during the parties' meeting in August or September 2005, was missing the page "2" notation, which can be found on the original copy of the report prepared by Brousseau. (Compare App. Ex. "K" and App. Ex. "O"). This evidence clearly demonstrates that Defendants' misrepresentations of Red Eagle's income were intentional.

Third, Defendants' false representations were intended to induce Gano into acting. Defendants contend that "Ehart did not know with reasonable certainty that Gano planned to finance part of the purchase price for Cannavo until the actual settlement" and that Ehart believed that "Cannavo planned to pay cash for the balance of the purchase price." (Defendants' Motion for Summary Judgment and Supporting Brief, at 11.) However, Defendants' argument is factually incorrect, as Ehart was aware of Gano's involvement in the financing of the transaction. During the parties' initial meeting in August or September of 2005, Ehart, Cannavo and Gano discussed the operations and economics of the business, as well as the fact that Gano would be an investor in same. (See App. Ex. "N" at pg. 6). Gano indicated that he would be either an equity investor or a debt investor, but at that point, they had not yet decided which. Id. Thus, Ehart knew that Gano was financing part of the purchase price. (See App. Ex. "L" at pg. 156).

Finally, Gano's action was taken in justifiable reliance upon Defendants' misrepresentations, and as a direct result, Gano suffered damages. As discussed above, Gano specifically requested information concerning the financial condition of Red Eagle. He relied upon Defendants' misrepresentations concerning same in deciding to provide financing for the transaction. (See App. Ex. "P" at ¶ 8). Had Gano been aware of Defendants' misrepresentations and known about the actual income and value of Red Eagle, he would not have provided payment of the $1,100,000.00 to Defendants. (See App. Ex. "P" at ¶ 10). Having made a significant overpayment as a direct and proximate result of the Defendants' misrepresentations concerning the income of Red Eagle, Gano has suffered damages for which he is entitled to compensation.

For all of the foregoing reasons, Gano has satisfied all of the elements under a claim for fraud, and Defendants' Motion for Summary Judgment must be denied.

## IV.   Plaintiff Is Entitled To Relief On The Basis Of Mutual Mistake.

Under Delaware law, the elements of a claim based on a mutual mistake are: (1) that both parties were mistaken as to a basic assumption; (2) that the mistake materially affects the agreed upon exchange of performances; and (3) that the party adversely affected did not assume the risk of the mistake. Williams v. White Oak Builders, Inc., 2006 WL 1668348, *8 (Del. Ch. 2006) (Attached as Comp. Ex. "B"). In addition to the above, if the non-mistaken party has knowledge of the other party's mistake and he remains silent, then the mistaken party is entitled to the same relief as if there had been a mutual mistake. Cerberus International Ltd. v. Apollo Management LP, 794 A.2d 1141, 1151-52 (Del. 2002).

As with a claim for fraud, notably absent from the elements of a claim for mutual mistake is any requirement that the plaintiff prove standing to a contract or privity with the defendant. It

would be erroneous under the law to impose such a requirement.  As a general rule, although money paid due to a *mistake of law* is not recoverable in Delaware, "money paid under a *mistake of fact* may be recovered in equity under an unjust enrichment theory." Home Ins. Co. v. Honaker, 480 A.2d 652, 653 (Del. 1984) (emphasis added).[6]  Courts in Delaware therefore hold that "[r]estitution is an appropriate remedy where a party is unjustly enriched at the expense of another." Highlands Ins. Group, Inc. v. Halliburton Co., 852 A.2d 1, 7 (Del. Ch. 2003), citing Reynolds v. Slaughter, 541 F.2d 254, 256 (10th Cir. 1976) ("Where a plaintiff has paid money in the mistaken belief that an enforceable contract exists, the plaintiff is entitled to recover the money paid, as restitution.  To do otherwise would result in the unjust enrichment of the defendant.")  "Restitution is appropriate even when the party retaining the benefit is not a wrongdoer." Highlands, 852 A.2d at 8.

It would be illogical and improper to dismiss Gano's claim for mutual mistake in this case simply because Defendants claim that Gano was a non-party to the January 3, 2006 Agreement of Sale.  In Delaware, a court has jurisdiction to award the equitable relief of unjust enrichment "when it *cannot* hold the parties to a formal agreement," but where the court nevertheless "determines that the aggrieved party is entitled to relief for a benefit conferred on the other party." Crosse v. BCBSD, Inc., 836 A.2d 492, 497 (Del. 2003) (emphasis added).  Indeed, unjust enrichment applies only in circumstances in which the parties have *not* entered into an express contract.  In re: Intel Corp. Microprocessor Antitrust Litigation, 496 F.Supp.2d 404, 421 (D. Del. 2007).  Hence, Gano's alleged lack of contractual privity with the Defendants is no basis for the dismissal of Gano's claims for equitable relief, particularly where Gano is able to establish the necessary elements under a claim for mutual mistake.

---

[6] Gano's mistakes, as discussed more fully below, concerning the June 30, 2005 Statement of Operations and the income and value of Red Eagle, were mistakes of fact, and not mistakes of law.

Defendants do not and cannot dispute that Gano has satisfied each of the elements of a claim for mutual mistake. As discussed above, Defendants provided Gano only with a copy of the June 30, 2005 Statement of Operations, and there is no evidence in this case to refute Gano's testimony that prior to January 3, 2006, he never received the first page of the Compilation Report containing the important disclaimers from Brousseau. (See App. Ex. "M" at pg. 182). Defendants further represented that the business was doing well and that Red Eagle's income in the second half of 2005 should be equal to or slightly better than the first half of the year. (See App. Ex. "M" at pg. 44). Cannavo relayed this information to Gano. Hence, when Gano made the payment of $1,100,000.00 to Defendants on January 3, 2006, he was mistaken as to numerous facts, including the following:

1.      Based on the June 30, 2005 Statement of Operations, Gano believed that the net income from operations of Red Eagle for the first six months of 2005 was $115,496.00. In reality, those sales were significantly overstated.

2.      Based on the June 30, 2005 Statement of Operations and Defendants' representations that the second half of 2005 was at least as good as the first half of 2005, Gano believed that the amount of net income from operations of Red Eagle for the second half of 2005 was at least $115,496.00. In reality, Red Eagle sustained a loss in the second half of 2005 in the amount of $62,832.00.

3.      Based on the June 30, 2005 Statement of Operations and Defendants' representations that the second half of 2005 was at least as good as the first half of 2005, Gano believed that the amount of net income from operations of Red Eagle for the entire calendar year of 2005 was at least $230,000.00. In reality, the net income from operations for the entire calendar year of 2005 was only $52,664.00.

4.      Based on Defendants' representations, Gano believed he had been provided with audited financial statements for Red Eagle. However, the financial statements were not audited and were merely a summary of Defendants' financial records, as prepared by Defendants.

Ehart himself has conceded that as part of the transaction to purchase the assets of the business, it was important to the due diligence process for Cannavo and Gano to have a complete

copy of the Compilation Report dated September 1, 2005.  (See App. Ex. "E" at pg. 94).  Ehart

further agreed that it was the intention of all parties to the transaction that they were to have

received a copy of the Compilation Report.  Id. at 94-95.  Ehart has further testified that if Gano

and Cannavo did not receive a copy of the disclaimer page prior to January 3, 2006, it would

have been a mistake.  Id. at 94.  Thus, Gano's mistake concerning the income and value of Red

Eagle was a basic and central assumption of the relevant contract and materially affects the

agreed upon exchange of performances by the parties.

Furthermore, had Gano been aware of the actual facts as stated above, and was not

mistaken regarding same, he would not have provided payment of the $1,100,000.00 to

Defendants.  (See App. Ex. "P" at ¶ 9).  Hence, Gano has established the first two elements of a

claim for mutual mistake, i.e., that "the mistake concerns a basic assumption on which the

contract was made" and that "the mistake has a material effect on performance."  Williams, 2006

WL 1668348, at *8.

Moreover, Gano did not "bear the risk of the mistake" in the transaction.  Williams, 2006

WL 1668348, at *8.  Delaware has adopted Section 154 of the Restatement (Second) of

Contracts, which sets forth the following three circumstances under which a party is deemed to

have assumed the risk of mistake:

> (a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at
> the time the contract is made, that he has only limited knowledge with respect to
> the fact to which the mistake relates but treats his limited knowledge as sufficient,
> or (c) the risk is allocated to him by the Court on the ground that it is reasonable
> under the circumstances to do so.

Darnell v. Myers, 1998 WL 294012, at *7 (Del. Ch. 1998) (Attached as Comp. Ex. "C").  The

first scenario, in which there is an express agreement to accept the risk of any mistake

concerning the value of Red Eagle, clearly is not present here, as Defendants themselves concede that they had no express contract with Gano.

Gano also did not assume the risk of mistake under the second scenario because he was not "aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but he treats his limited knowledge as sufficient." Darnell, 1998 WL 294012, at *7. This principle applies "where the affected party _knew_ that there was an uncertainty as to a material fact, but entered into the contract without resolving or protecting against that uncertainty." Lang v. Koziarz, 1987 WL 15554, at *6 (Del. Ch. 1987) (Attached as Comp. Ex. "D") (emphasis added). Thus, where a plaintiff is warned prior to entering into a contract that certain information he was given is not reliable, and fails to properly investigate, a claim of mutual mistake will be denied. Id., citing Wright & Pierce v. Town of Wilmington, Mass., 290 F.2d 30 (1st Cir. 1961). By contrast, where there is no conscious ignorance of uncertain facts, a claim for rescission based on mutual mistake will not be barred. Id. Here, as discussed above, Defendants never informed Gano that the Statement of Operations they received was an incomplete document. (See App. Ex. "M" at pg. 182). Thus, Gano had no reason to believe that the financial information he received concerning the value and/or income of Red Eagle was incomplete, inaccurate or unreliable. Accordingly, Gano did not bear the risk of mistake in this case.

Finally, with respect to the third scenario set forth in Darnell and Section 154 of the Restatement, the risk of mistake should not be allocated to Gano because it is not reasonable under the circumstances to do so, for the reasons discussed at length herein.

Inasmuch as all of the elements of a claim for mutual mistake are satisfied in this case, Defendants' Motion for Summary Judgment must be denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiff, Joe Gano, respectfully requests that

Defendants' Motion for Summary Judgment be denied.

Respectfully submitted,


By:  _/s/ Sophia Siddiqui (#4914)_
    Sophia Siddiqui, Esquire (I.D. No. 4914)
    Fox Rothschild LLP
    919 N. Market Street, Suite 1300
    Wilmington, DE 19899-2323
    (302) 654-7444
    (302) 656-8920 (facsimile)

       and

    Wendy G. Rothstein, Esquire (PA I.D. No 37178)
    Fox Rothschild LLP
    1250 South Broad Street
    P.O. Box 431
    Lansdale, PA 19446-0431
    (215) 699-6000
    (215) 699-0231 (facsimile)

       and

    Todd B. Nuri ck, Esquire (PA I.D. No. 78847)
    Nurick  Law Group
    111 West Germantown Pike
    Pl ymouth Meeting, PA 19462
    (610) 238 -9000
    (610) 238 -9977 (facsimile)

Date:  January 24, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOE GANO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.    1:07-cv-00271 |
| | ) | |
| DONALD MARK EHART and | ) | |
| SPREAD EAGLE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Plaintiff's Answer to Defendants'

Motion for Summary Judgment and Supporting Brief filed through the ECF system, were served

electronically on January 24, 2008, to the following individuals:

Richard H. Cross, Jr.
Tara M. DiRocco
913 North Market Street, 11th Floor
Wilmington, DE 19801
*Attorneys for Defendants*

 */s/ Sophia Siddiqui (#4914)*
SOPHIA SIDDIQUI (#4914)
Fox Rothschild LLP
919 N. Market Street, Suite 1300
Wilmington, DE 19899-2323
(302) 654-7444
(302) 656-8920 (facsimile)

LN1 727766v1 01/24/08