# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOE GANO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No.     1:07-cv-00271 |
| | ) |
| DONALD MARK EHART and | ) |
| SPREAD EAGLE, INC., | ) |
| | ) |
| Defendants. | ) |

## COMPENDIUM OF UNREPORTED OPINIONS CITED IN PLAINTIFF'S ANSWER TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

**FOX ROTHSCHILD LLP**
Sophia Siddiqui, Esquire (I.D. No. 4914)
919 N. Market Street, Suite 1300
Wilmington, DE 19899-2323
(302) 654-7444
(302) 656-8920 (facsimile)

**FOX ROTHSCHILD LLP**
Wendy G. Rothstein, Esquire (PA I.D. No 37178)
1250 South Broad Street
P.O. Box 431
Lansdale, PA 19446-0431
(215) 699-6000
(215) 699-0231 (facsimile)

**NURICK LAW GROUP**
Todd B. Nurick, Esquire (PA I.D. No. 78847)
111 West Germantown Pike
Plymouth Meeting, PA 19462
(610) 238-9000
(610) 238-9977 (facsimile)

Date:  January 24, 2008

LN1 727742v1 01/24/08

## TABLE OF CONTENTS

A.    <u>Carrow v. Arnold</u>, 2006 WL 3289582 (Del. Ch. 2006)

B.    <u>Williams v. White Oak Builders, Inc.</u>, 2006 WL 1668348 (Del. Ch. 2006)

C.    <u>Darnell v. Myers</u>, 1998 WL 294012 (Del. Ch. 1998)

D.    <u>Lang v. Koziarz</u>, 1987 WL 15554 (Del. Ch. 1987)

*Exhibit "A"*

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
**(Cite as: 2006 WL 3289582 (Del.Ch.))**

Page 1

**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Harvey CARROW, Plaintiff,
v.
Lloyd F. ARNOLD, Defendant.
**Civil Action No. 182-K.**

Submitted June 5, 2006.
Decided Oct. 31, 2006.

**Background:** Vendor brought action against
purchaser seeking rescission of the parties' contact for
the sale of vendor's farm property, which contract,
vendor alleged, was fraudulently procured. Purchaser
counterclaimed, seeking specific performance,
declaratory relief, and attorney fees.

**Holdings:** The Court of Chancery, Kent County,
Parsons, Vice Chancellor, held that:

(1) the sale agreement was a final, integrated
contract;

(2) alleged oral representations that purchaser made
to vendor during negotiations were inadmissible
under the parol evidence rule;

(3) purchaser was entitled to specific performance
of the agreement; and

(4) purchaser was not entitled to attorney fees.
Claim denied; counterclaim granted.

**[1]** Evidence 🗝️400(2)
157k400(2) Most Cited Cases
Written contract between vendor and purchaser for
the sale of vendor's farm property was a final,
integrated contract, as required for application of the
parol evidence rule to bar the admission of oral
promises and representations inconsistent with the
terms of the contract, even though the contract did
not contain an integration clause stating that it was
intended to be the parties' final agreement; the
contract was formally drafted, typewritten, and
signed by the parties in the presence of a notary after
purchaser had one week to study the proposed
contract, final terms were negotiated before signing,
and the contract addressed issues that normally arise

in connection with the sale of land.

**[2]** Evidence 🗝️400(2)
157k400(2) Most Cited Cases
Alleged oral representations that purchaser made to
vendor during negotiations for the sale of vendor's
farm property were inadmissible under the parol
evidence rule, in vendor's action to rescind the
parties' contract for sale, where, if the alleged
representations were admitted for the purposes of
construing the parties' final, integrated contract, they
would be inconsistent with the terms of the contract.

**[3]** Evidence 🗝️450(8)
157k450(8) Most Cited Cases
Language in final, integrated contract between
vendor and purchaser for the sale of vendor's farm
property was not ambiguous, which language
included the phrase "for as long as the purchaser shall
own it" in association of certain rights retained by
purchaser with respect to the property, and therefore,
extrinsic evidence was not permitted to construe the
contract, despite vendor's contention that such
phrases as to purchaser's ownership were ambiguous
as to the duration of purchaser's ownership.

**[4]** Evidence 🗝️434(11)
157k434(11) Most Cited Cases
Purchaser did not fraudulently induce vendor into
entering into an agreement for the sale of vendor's
farm property, and thus, extrinsic evidence was not
admissible as to the alleged representations that were
made prior to the parties' final, integrated agreement,
despite vendor's contention that purchaser promised
him, among other things, that he could stay on the
property as long as he liked; alleged promises made
by purchaser preceding the contract were not false
statements of fact, and vendor had an opportunity to
bargain for provisions in the contract that seemed
inconsistent with the alleged promises, such that any
reliance on the alleged promises was unjustified.

**[5]** Specific Performance 🗝️65
358k65 Most Cited Cases
Purchaser was entitled to specific performance of
agreement of sale for the purchase of vendor's farm
property, where the agreement was a binding and
enforceable contract for the sale of land.

**[6]** Vendor and Purchaser 🗝️104
400k104 Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
**(Cite as: 2006 WL 3289582 (Del.Ch.))**

Purchaser was not entitled to an award of attorney fees in action brought by vendor seeking rescission of the parties' contract for the sale of vendor's farm property, even though purchaser was the prevailing party in the action, where vendor did not pursue the action vexatiously or in bad faith.
Daniel F. Wolcott, Jr., Esquire, Suzanne M. Hill, Esquire, Potter Anderson & Corroon Llp, Wilmington, Delaware, Attorneys for Plaintiff.

Steven Schwartz, Esquire, Schwartz & Schwartz, Dover, Delaware, Attorney for Defendant.

### MEMORANDUM OPINION

PARSONS, Vice Chancellor.

\*1 This is an action brought by Harvey Carrow ("Carrow") against Lloyd F. Arnold ("Arnold") to rescind a set of real estate contracts entered into on April 28, 2003 and May 6, 2003. The April 28 contract (the "Agreement of Sale" or "Agreement"), which underlies the present dispute, is for the sale of Carrow's farm, which he bought from his brother in 1961. Carrow, who was 73 years old when the Agreement was executed, alleges that Arnold used fraudulent and misleading statements to induce him to enter the contract and now seeks its rescission.

Arnold denies making any statements that were fraudulent or misleading. He maintains that the contract is fair and equitable and has counterclaimed for specific performance, declaratory relief and an award of attorneys' fees.

The Court held trial on the parties' claims on March 6-7, 2006. Based on the evidence produced at trial and the parties' post-trial submissions and arguments, the Court holds that Carrow failed to establish any basis to rescind the contract and concludes that Arnold is entitled to have the Agreement specifically enforced.

### I. BACKGROUND
#### A. The First Meeting
In mid-April, 2003, Arnold, Rodney Mitchell ("Mitchell"), and an intermediary, Al Moor ("Moor"), met with Carrow at his farm in Kent County. Moor, a long-time acquaintance of Carrow, had heard a rumor that Carrow was interested in selling his farm, which consists of approximately 223 acres and is located on Whitehall Neck Road near the towns of Leipsic and Smyrna.

Arnold and Mitchell are partners in a real estate

partnership. Pursuant to the terms of their partnership agreement, they share, 50/50, all profits and losses from their real estate investments. Their partnership agreement also requires them to sell any new parcel within three years of its purchase, unless both parties agree to retain it for a longer period. [FN1] Moor knew that Arnold and Mitchell were looking to buy real estate in the area, so he introduced them to Carrow. At their first meeting, Carrow gave Arnold and the other gentlemen a tour of his farm but expressed reservations about selling it. Indeed, Arnold offered Carrow $1.2 million for the farm, but Carrow declined. [FN2] During the meeting, Carrow showed Arnold a letter from the New Jersey Nature Conservancy offering to buy his farm for $1.5 million. During their discussions, Arnold told Carrow that if Carrow sold him the farm, he could continue to live on the farm and to till the land as long as Arnold owned it. [FN3] At the end of the meeting, Arnold asked Carrow to consider selling the farm and told him that he would come back to talk to him in approximately one week.

FN1. Pl.'s Ex. 17.

FN2. Trial Transcript ("Tr.") at 30 (Carrow).

FN3. Tr. at 397 (Moor). Carrow appears to dispute whether Arnold limited his statement to as long as he owned the property. Moor had a different recollection. Having observed Moor's demeanor and heard his testimony in the context of all of the evidence, however, I credit Moor's recollection. In this regard, I note that Moor ultimately received a finder's fee of $10,000 from Arnold. Nevertheless, I do not believe that payment undermined Moor's credibility.

#### B. The Second Meeting
Approximately a week later, Arnold and Mitchell returned to the farm and negotiated with Carrow over the terms and conditions of a sale. During these negotiations, Carrow again expressed reservations about selling the farm because he did not want to leave it. Carrow alleges that certain representations made by Arnold eventually induced him to sell the farm. For example, Carrow testified that Arnold assured him that "Nothing would ever change for you, nothing ..." and that Carrow could "go right on farming this farm the rest of your life...." [FN4] Carrow avers that Arnold assured him that he wanted to buy the land to use strictly as a hunting farm, and he understood this to mean that Arnold did not intend to develop the property or to transfer it any time in

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
(Cite as: 2006 WL 3289582 (Del.Ch.))

Page 3

the near future. [FN5] Carrow further testified that he would not have sold the farm without these representations. [FN6]

FN4. Tr. at 31.

FN5. Tr. at 43.

FN6. Tr. at 59-60.

*2 Arnold admits that during various stages of the negotiations he assured carrow that Carrow could continue to live on and farm the land and that Arnold would never develop it. [FN7] He also agrees that he told Carrow that he wanted the land for hunting purposes. [FN8] According to Arnold, however, he did not make the statement "nothing will ever change for you," until a week or so after the parties signed the Agreement, [FN9] and in making this and other assurances to Carrow, he always included the qualifier "as long as I own it." [FN10] After some back and forth bargaining, mostly over the price, Carrow agreed to sell the farm to Arnold for $1.4 million, not including the farm equipment.

FN7. Tr. at 154, 158, 221-23.

FN8. Tr. at 151.

FN9. Tr. at 218-20.

FN10. Tr. at 155-56, 220.

Within a few days of their second meeting, Arnold returned to the farm and left a draft of a written contract with Carrow. The parties dispute whether Arnold advised Carrow to seek the assistance of an attorney, but the record is clear that Arnold did not discourage Carrow from seeking an attorney's advice. [FN11] Carrow put the contract on a shelf and did not discuss it with anyone for approximately one week. Carrow testified that although he saw provisions in the draft agreement that he did not like, he did not pay too much attention to it and did not "look at [the agreement] like I should have." [FN12] Carrow did not seek the advice of an attorney, nor did he tell his adult children that he was selling the farm. He instead sought the assistance of his accountant, Ray Book ("Book").

FN11. Tr. at 73-74 (Carrow).

FN12. Tr. at 35 (Carrow).

C. The Execution of the Agreement of Sale

On April 28, 2003, Book, Carrow and Arnold met in Book's office to discuss the proposed contract. Before Arnold joined them, Carrow met with Book for about 20 or 30 minutes. Carrow expressed reservations about certain provisions in the contract, and the parties changed those provisions in response to Carrow's concerns. One notable change was to Section 14, which gives Carrow a right of first refusal if Arnold seeks to lease a tillable portion of the land. [FN13] This section further states that Carrow's right of first refusal is non-assignable and non-transferable and "will terminate (without liability to Seller [Carrow] on the part of Purchaser [Arnold] ) with regard to any part of the property when Purchaser no longer has title to it...." Carrow apparently was concerned about the price at which the land might be rented to him and bargained for a specific price. Thus, at the end of Section 14, the parties added and initialed the following handwritten sentence: "[t]he price of rental shall be $75/Ac[re] for the duration of Seller's desire to till land (Lease) unless Purchaser decides not to rent." Carrow bargained for this provision to lock in the $75/Acre rate. [FN14] The contract contains other handwritten modifications, which also are initialed by the parties, including the entirety of Section 21.

FN13. Pl.'s Ex. 3; Def.'s Ex. 3 (cited herein as "Agreement").

FN14. See Tr. at 395-97 (Moor). Moor, who owns and leases numerous farms in the area, testified that $75/Acre is a "very, very reasonable rate." Tr. at 397.

During the meeting at Book's office, Arnold assured Carrow that Carrow would be allowed to remain on the land and could continue to farm it. [FN15] On this point, Book testified as follows:

FN15. Tr. at 235 (Arnold).

*3 Q. Now, when you were there with Mr. Arnold and Mr. Carrow, was there any discussion between the three of you about Mr. Carrow's right to farm?
A. Yes.
Q. What was the discussion?
A. Well, the first part of the discussion was regarding the rent, and then at the end, Mr. Carrow said that he noticed a provision in the agreement that if it was sold, and Mr. Arnold said, "Harvey, you can farm that as long as you want to." [FN16]

FN16. Tr. at 172.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
(Cite as: 2006 WL 3289582 (Del.Ch.))

Page 4

Although Book inferred from Arnold's statement "that he was going to hang on to [the property]" [FN17] there is no convincing evidence that Arnold said or represented that he was not going to sell the farm. [FN18]

> FN17. *See* Tr. at 172.

> FN18. Carrow testified that Arnold told him that he would be dealing with Arnold the rest of his life, implying that he would not be selling the farm. Tr. at 43. Arnold, however, denies making that statement. Tr. at 220- 21. Furthermore, several provisions of the Agreement are inconsistent with Arnold's having made such a representation. Based on observing the witnesses and considering the evidence, I find that Arnold's recollection on this issue is more reliable.

Section 4 of the Agreement grants Carrow a life estate in the farmhouse and in the (approximately) two acres surrounding it. This provision further states that Carrow may, at his option, exchange his life estate for a fee simple interest in any one acre of Carrow's choosing. [FN19] At least two provisions in the Agreement are qualified by the statement "for as long as Purchaser shall own" the property or a similar location. [FN20] Section 5 of the Agreement states that Arnold may apply to Kent County for subdivision approval prior to final settlement, and reflects Carrow's agreement to sign such application forms as the County reasonably requires. At the conclusion of the meeting, the parties signed the Agreement and Arnold gave Carrow a $200,000 deposit.

> FN19. In a second agreement dated May 6, 2003, Carrow exercised his option under Section 4 of the Agreement of Sale and elected to trade his two-acre life estate for the one-acre fee simple. Carrow is also seeking rescission of the May 6 agreement. Because the validity of this second contract is directly linked to the validity of the Agreement of Sale, I will not separately analyze the May 6 contract.

> FN20. *See* Agreement ¶ ¶ 6, 14.

Within days of executing the Agreement, Arnold and Mitchell began to have the land surveyed for subdivision. [FN21] On May 16, Mitchell submitted plans to the Kent County Department of Planning

Services to have the land approved for residential development. [FN22] Arnold and Mitchell testified that they never had any intention to actually develop the land, but submitted the plans to the County because the land would be more valuable if approved for residential development. [FN23] Consistent with this testimony, Arnold and Mitchell tried to enter into a transaction whereby they would sell the land for less than its appraised value to the Delaware Chapter of The Nature Conservancy (the "Conservancy"), a nonprofit organization dedicated to preserving undeveloped land. Since part of the transaction would be considered a charitable contribution, the higher the appraised value of the land, the higher the tax deduction Arnold and Mitchell would receive.

> FN21. Pl.'s Ex. 7 is a set of engineering overlays done for Arnold and Mitchell dated May 2, 2003, only four days after the parties signed the Agreement.

> FN22. Pl.'s Ex. 6; Def.'s Ex. 19.

> FN23. Tr. at 242 (Arnold); Tr. at 324 (Mitchell).

After learning that the Carrow farm was under a contract to be sold, the Conservancy had contacted Mitchell to see if it could purchase the farm. [FN24] During the negotiations with the Conservancy, Arnold bargained for contractual provisions that would allow Carrow to remain on the farm and continue to till it for as long as he wanted. [FN25] Eventually, the proposed transaction with the Conservancy fell apart, mostly because of tax difficulties.

> FN24. Tr. at 194-96.

> FN25. Tr. at 197-98, 203 (Arnold); Def.'s Exs. 6, 7.

By early May, Carrow was having reservations about selling his farm, so he called Arnold and told him that he wanted to return the deposit. [FN26] Arnold replied that Carrow could not back out of the deal. Carrow says that he began to reconsider the Agreement after he saw surveyors on various parts of the property. He asserts that he did not know that Arnold and Mitchell were professional real estate developers, and he thinks he sold the farm for substantially less than its true value. Arnold, on the other hand, argues that Carrow simply has seller's remorse and wants more money. On January 23, 2004, Carrow filed this suit to have the Agreement

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
(Cite as: 2006 WL 3289582 (Del.Ch.))

Page 5

rescinded, and Arnold later counterclaimed for specific performance.

FN26. Tr. at 53.

## D. The Parties' Contentions

*4 Carrow alleges that the Agreement was procured through fraud and misrepresentation. His allegation of fraud, however, consists entirely of the claim that Arnold made oral representations and promises before the execution of the written agreement and that such representations and promises have not been honored. Arnold denies Carrow's accusations of fraud and misrepresentation. In addition, Arnold contends that the Agreement of Sale is an integrated agreement and the parol evidence rule bars consideration of earlier representations or promises that he allegedly made.

These competing contentions raise several legal and factual issues. The first issue that must be resolved, however, is whether the Court is precluded from considering Arnold's oral representations because their consideration is barred by the parol evidence rule. I find that the parol evidence rule generally would bar admission of the oral representations, but the analysis cannot stop there. Carrow argues that parol evidence is admissible under one or both of two exceptions to the rule: (1) for instances where the contract language is ambiguous; and (2) when the contract is the product of fraud or misrepresentation. Having carefully considered the Agreement and all of the competing evidence of alleged fraud or misrepresentation, I have determined that neither exception applies in the circumstances of this case. Therefore, I deny Carrow's claim for rescission and grant Arnold's claim for specific enforcement.

## II. ANALYSIS
### A. The Parol Evidence Rule

When a written contract is intended to be the final expression of the parties' agreement, the parol evidence rule bars the introduction of evidence of prior or contemporaneous oral understandings that vary the written terms of the agreement. [FN27] As (then) Vice Chancellor (now) Justice Jacobs explained in Taylor v. Jones,

FN27. Taylor v. Jones, 2002 Del. Ch. LEXIS 152, at *10-11, 2002 WL 31926612 (Del.Ch.) (Dec. 17, 2002).

The parol evidence rule is a principle of substantive law that prevents the use of extrinsic evidence of an oral agreement to vary a fully

integrated agreement that the parties have reduced to writing. Where a written agreement is meant to be final and complete, it is a totally integrated contract. If a written agreement is final and incomplete, it is a partially integrated contract.... The parol evidence rule prevents the consideration of oral evidence that would contradict either total or partial [sic] integrated agreements. [FN28]

FN28. Id. at *3 (emphasis in original, internal quotations and citations omitted).

Thus, to apply the parol evidence rule, the Court first must decide whether the parties written contract was intended to be the final expression of their agreement, and second whether the alleged oral representations would contradict the written terms of the agreement. [FN29]

FN29. Taylor, 2002 Del. Ch. LEXIS 152, at *10-11, 2002 WL 31926612 (Del.Ch.); Restatement (Second) of Contracts ("Restatement (Second)") § § 209, 210 (1979).

### 1. Integration

[1] When determining whether a written contract is the final expression of the parties' agreement, a court should consider the facts and circumstances surrounding the execution of the instrument. [FN30] Some of the factors a court should consider are: the intent of the parties, where such intent is discernible; the language of the contract itself and whether it contains an integration clause; whether the instrument was carefully and formally drafted; the amount of time the parties had to consider the terms of the contract; whether the parties bargained over specific terms; and whether the contract addresses questions that naturally arise out of the subject matter. [FN31]

FN30. Restatement (Second) § 210 cmt. b ("a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties"); see Johnson v. Reno, 1996 U.S. Dist. LEXIS 5347, at *21-22 (D.D.C. Apr. 17, 1996) (in assessing the intent of the parties, the Court will consider the conduct and language of the parties and the surrounding circumstances); Nysingh v. Warren, 94 Idaho 384, 488 P.2d 355, 385 (Idaho 1971) ("Whether a particular subject of negotiation is embodied in the writing depends on the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
(Cite as: 2006 WL 3289582 (Del.Ch.))

Page 6

intent of the parties, revealed by their conduct and language, and by the surrounding circumstances. Mere existence of a document does not establish integration.").

FN31. See *Taylor,* 2002 Del. Ch. LEXIS 152, at *12-13, 2002 WL 31926612 (Del.Ch.) (discussing several of the factors used to determine whether a contract is totally integrated).

*5 The Agreement of Sale is a final, integrated contract. The written contract does not contain an integration clause stating that it is intended to be the parties' final agreement. Such a clause would create a presumption of integration. [FN32] The absence of an integration clause, however, does not necessarily mean that the parties did not intend the contract to be the final and complete expression of their agreement. Although lacking an integration clause, the Agreement of Sale is a formally drafted instrument. It is typewritten, and Carrow and Arnold had their signatures witnessed by a notary. Having the contract witnessed reflects a certain solemnity which shows that the parties acted deliberately and intended to be legally bound to the contract *as written.* [FN33]

FN32. *Johnson,* 1996 U.S. Dist. LEXIS 5347, at *22; *See Telecom Int'l Am., Ltd. v. AT & T Corp.,* 280 F.3d 175 (2d Cir.2001) (applying New Jersey law).

FN33. *Cf. Homer Nat'l Bank v. Springlake Farms, Inc.,* 616 So.2d 255, 257 (La.Ct.App.1993) ("the very purpose of the parol evidence rule would be defeated if a signatory to an unambiguous, notarized writing could be permitted to contradict the terms of the agreement by parol evidence of his subjective intent, especially where the alleged misrepresentation could have been resolved by a simple reading of the document.").

Furthermore, Carrow had approximately a week to study the proposed contract. Nothing prevented Carrow from reviewing the draft agreement with an attorney or discussing the sale with his family. Instead, Carrow chose to consult only his accountant about the agreement. At the meeting with Arnold in Book's office, Carrow and his accountant bargained over, and achieved concessions on, several specific terms in the final Agreement. If, as Carrow contends, the written contract was inconsistent with oral

promises and representations Arnold had made earlier, Carrow had ample opportunity and motive to raise these issues with Arnold before signing the Agreement. He did not.

In addition, the written Agreement addresses issues that normally arise in connection with the sale of land. For example, Carrow bargained for a clause requiring Arnold to carry insurance on the farmhouse after settlement, presumably for the duration of Carrow's life estate, and a provision clarifying that Arnold would pay the settlement costs. [FN34] The Agreement also contains terms addressing zoning, risk of loss, marketability of title and liability for environmental contamination. [FN35]

FN34. Agreement ¶ 4.

FN35. Agreement ¶ ¶ 7, 9, 11 and 18.

Based on these facts, and because Carrow presented no evidence tending to show that the contract he signed was not intended to be the final and complete agreement of the parties, I find that the Agreement of Sale is a final, integrated contract. Because it is a final, integrated contract, the parol evidence rule bars the admission of oral promises and representations that are inconsistent with its written terms, unless an exception to the rule applies in this case.

### 2. Consistency

[2] As Carrow seeks to construe them in this litigation, Arnold's prior oral representations are inconsistent with the written terms of the Agreement. Carrow alleges that, during his negotiations, Arnold told him that "nothing would ever change for him." It is unclear how this statement should be interpreted since certain changes inevitably will occur when a person sells a 223 acre farm and receives $1.4 million in return. The parties agree that Arnold promised to grant Carrow a life estate in the *farmhouse* and its immediately surrounding acreage, and the Agreement provides for this life estate in Section 4.

*6 Similarly, if the statement that "nothing would ever change" was intended by the parties to include a life estate or some other interest in the *tillable* portion of the farm, the parties could and should have so provided in their contract. Reading such an interest into the Agreement, however, would be inconsistent with Section 14, which provides Carrow with a right of first refusal *if Arnold decides to rent* the premises for farming purposes. Indeed, the handwritten modification to Section 14, for which Carrow bargained, ends with the phrase "unless Purchaser

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
(Cite as: 2006 WL 3289582 (Del.Ch.))

Page 7

decides not to rent." Arnold's reservation of the right not to rent the land for farming purposes in the formal Agreement overrides any alleged representation by Arnold giving Carrow an inconsistent, unqualified right to continue farming the land. [FN36] Carrow's claim of such a right also conflicts with other language in Section 14. For example, with regard to the tillable portion of the land, Section 14 says *"if Purchaser shall decide to lease the premises or any portion thereof for farming purposes (and not solely for hunting uses), Purchaser shall give Seller written notice of any such lease proposal...."* [FN37] Carrow admitted seeing this language in Section 14. [FN38] He and Arnold explicitly negotiated over the Section, but did not change it to reflect Carrow's purported understanding. The Court will not now do what the parties could have, but did not, do.

> FN36. Indeed, Carrow's accountant, Book, told Carrow that under Section 14 Carrow's right of first refusal would terminate when Arnold sold the property. Tr. at 176 (Book).

> FN37. Emphasis added.

> FN38. Tr. at 50.

Carrow also complains of engineers surveying the farm for development within days after he signed the Agreement. He argues that Arnold told him that the land would never be developed and that Arnold was buying the land for hunting purposes. Section 5 of the Agreement, however, gives Arnold the right to apply for subdivision approval even before final settlement under the Agreement of Sale. In Section 5, Carrow agrees to sign any subdivision application forms or other instruments as required for the application. The admission of an alleged oral promise never to subdivide the land for development purposes obviously would be inconsistent with this provision.

To summarize, the Court finds that the Agreement of Sale is a final, integrated contract and was intended by the parties to be the final and complete expression of their agreement. The Court further finds that the alleged oral representations Arnold made to Carrow during their negotiations, if admitted for purposes of construing their contract, would be inconsistent with the written terms of their final Agreement. Thus, in the absence of an exception such as ambiguity or fraud, the parol evidence rule precludes the admission of Carrow's evidence of alleged oral modifications.

### 3. Ambiguity

[3] Carrow argues that the Agreement is ambiguous and that extrinsic evidence should be admitted to clarify the alleged ambiguity. This argument is unconvincing because I find the Agreement to be unambiguous in all relevant aspects. Delaware courts give clear and unambiguous contract language its ordinary and usual meaning. [FN39] "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." [FN40] To avoid repeating points made elsewhere in this opinion, I will not discuss each argument for ambiguity advanced by Carrow. The following is fairly representative.

> FN39. *Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 739 (Del.2006) (internal citations and quotations omitted).

> FN40. *Id.*

*7 Carrow argues that the phrase "as long as Purchaser shall own it" is ambiguous as to the length of time that it represents. [FN41] Carrow claims to have understood this phrase as implying that his rights to remain on the farm would last into the foreseeable future. [FN42] Otherwise, Carrow argues, rights such as those granted in Section 6 of the Agreement would be rendered useless. Section 6 states:

> FN41. Letter from Daniel J. Wolcott, Jr., on behalf of Harvey Carrow, to the Court (May 10, 2006).

> FN42. Pl.'s Post-Trial Reply Br. at 5.

There is currently on the property a fenced-in horse pasture, approximately one acre in size, with access from a lot belonging to one of Seller's children. For so long as Purchaser shall own any part of that horse pasture, it is agreed that Seller will have the exclusive use and enjoyment during his lifetime of that part of the fenced in horse pasture provided that he can secure access to and from it through his child's lot which [sic] to which it is adjacent. Seller's rights will terminate (without liability to Seller on the part of Purchaser) with regard to any part of the horse pasture when Purchaser no longer has title to that part of it....

Without endorsing Section 6 as a model of drafting clarity, I find the challenged language unambiguous. A contract is only ambiguous if its language is susceptible to two competing reasonable interpretations. [FN43] Further, determining whether

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

a contract is ambiguous involves a question for the court to determine as a matter of law. [FN44] I consider Carrow's interpretation unreasonable. Reasonably interpreted, Section 6 means that for as long as Arnold owns part of the horse pasture, Carrow has a right to use that part (providing he has ingress and egress through the adjacent lot). It contains no guarantee as to how long Arnold will own the farm and expressly states that Carrow's rights terminate (without liability) when Arnold transfers his interest. Section 6 is not rendered ambiguous by the fact that Carrow regrets not having bargained for a guarantee that Arnold would not transfer the property for some period of time. Merely disliking the implications of a contractual provision does not render it ambiguous.

> FN43. *Lorillard Tobacco*, 903 A.2d at 739 (internal citations and quotations omitted).

> FN44. *Cantera v. Marriott Senior Living Servs., Inc.*, 1999 Del. Ch. LEXIS 26, at *8, 1999 WL 118823 (Del.Ch.) (Feb. 18, 1999).

In a similar vein, Carrow argues that if the phrase "as long as Purchaser shall own it" means that Arnold could immediately sell the lot, this would conflict with the following statement of intent in Section 7:

> Purchaser intends to occupy the premises for agricultural uses, and any zoning ordinance or other restriction that will prevent such use of the property shall be deemed a defect in title.

Section 7, Carrow contends, contemplates at least one growing season, and therefore supports a second reasonable interpretation of "as long as Purchaser shall own it" to mean that Arnold would not sell the farm in the foreseeable future. Again, I do not think Carrow's interpretation of the phrase in question is reasonable. A stated intention to use a farm for agricultural purposes in the context of securing an assurance that such use would not conflict with any zoning ordinance or other restrictions is entirely consistent with the Purchaser's preservation of the right to sell the property at any time. Because I find the disputed language unambiguous, it must be given its ordinary meaning. [FN45] The ordinary meaning of the phrase "as long as Purchaser shall own it" places no restriction on the length of time that ultimately may turn out to be.

> FN45. *Lorillard Tobacco*, 903 A.2d at 739.

**4. The fraud exception to the parol evidence rule**

*8 [4] Carrow argues that parol evidence should be

admitted because Arnold fraudulently induced Carrow to enter the Agreement. Courts have long recognized that "where fraud or misrepresentation is alleged, evidence of oral promises or representations which are made prior to the written agreement will be admitted." [FN46] To successfully allege fraudulent misrepresentation, a plaintiff must show that: (1) the defendant made a false representation, usually one of fact; (2) the defendant knew or believed that the representation was false, or made it with reckless indifference to the truth; (3) the defendant's false representation was intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) the plaintiff was damaged by such reliance. [FN47]

> FN46. *Anglin v. Bergold*, 565 A.2d 279 (table), 1989 Del. LEXIS 236, at *5-6, 1989 WL 88625 (Del.Supr.) (Del. June 26, 1989).

> FN47. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983).

Carrow alleges that Arnold committed fraud by making the following promises and representations: (1) that Carrow could remain on the land and continue to farm it; (2) that if Carrow sold his farm to Arnold, nothing would change for him; (3) that Arnold intended to use the farm for agricultural and hunting purposes, which Carrow understood to mean that he did not intend to transfer the property for a long time; and (4) that Arnold would not develop or build on the land. Even assuming that Arnold promised each of these things, Carrow's arguments suffer from two serious flaws. First, these promises preceded the execution of the written contract and are not false statements of fact. Second, Carrow knew that there were provisions in the proposed Agreement that he did not like because they seemed inconsistent with the alleged oral promises. He had the opportunity to, and actually did, bargain for specific terms ameliorating some of those concerns, but not others. Thus, any reliance Carrow placed on the prior oral representations was unjustified.

Prior oral promises usually do not constitute "false representation[s] of fact" that would satisfy the first element of fraudulent misrepresentation. "[A] viable claim of fraud concerning a contract must allege misrepresentations of present facts (rather than merely of future intent) that were collateral to the contract and which induced the allegedly defrauded party to enter into the contract." [FN48] All of the four statements Carrow characterizes as fraudulent

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
(Cite as: 2006 WL 3289582 (Del.Ch.))

are either promises or statements of future intent. The problem with allowing a party to use promises and statements of intention to invoke the fraud exception to the parol evidence rule is that the very point of the rule is to *exclude* such things. Parties exchange various representations and supposed offers during negotiations, and reasonable misunderstandings can, and do, occur. By putting their understandings into a written contract, the parties highlight the points on which they have reached agreement and in some cases, the points on which they still diverge. The presumption embodied in the parol evidence rule is that the final written contract reflects the positions and compromises upon which the parties finally reached agreement. If the only showing required to invoke the fraud exception to the parol evidence rule were inconsistent prior oral statements, such oral statements would often (usually) be admitted, and the exception would swallow the rule. [FN49]

> FN48. *Orix Credit Alliance, Inc. v. R.E. Hable Co.,* 256 A.2d 114, 115 (N.Y.App.Div.1998).

> FN49. See *Hercules & Co. v. Shama Rest. Corp.,* 613 A.2d 916, 929- 33 (D.C.1992) (discussing how courts should approach with care the fraud exception to the parol evidence rule).

*9 I say that prior oral promises "usually" will not suffice to invoke the fraud exception to the parol evidence rule because one can imagine cases where such promises could amount to fraud. For example, a promisor could make an oral promise knowing that, either because of exigencies of time or circumstance, the promisee will not notice or understand if the promise is omitted or changed in the final written agreement, or perhaps that other terms that should have been excluded were, nonetheless, included. The present case, however, does not involve that type of sharp practice. Arnold and Carrow negotiated for various terms, such as Carrow retaining a life estate in the farmhouse and its surrounding acreage, and the final Agreement includes this term and others for which Carrow bargained. Carrow had sufficient time to inspect the written instrument and seek the advice of professionals. In fact, the parties sat down together, with Carrow's accountant, discussed various provisions in the Agreement, made changes to some of them and left others as originally written. Carrow had ample opportunity and motive to call attention to any fraudulent inclusion or exclusion of terms, but failed to do so.

An oral promise also may amount to fraud when the promisor makes a promise with no intention of keeping it. "It is ordinarily reasonable for the promisee to infer from the making of a promise that the promisor intends to perform it. If, therefore, the promise is made with the intention of not performing it, this implied assertion is false and is a misrepresentation." [FN50] In this case, Carrow has not shown that Arnold made any of the alleged promises or representations knowing they were false or with an intention to deceive Carrow. For example, I find from the evidence that Arnold meant what he said when he told Carrow that "nothing will ever change for you." That is, around the time of the sale, Arnold believed that he, as the new owner or through agreement with any subsequent owner, could ensure that Carrow would be able to continue living on the property and probably farming it, as well. This inference is corroborated by the fact that, after the Conservancy approached Arnold about acquiring the property, Arnold bargained with them for a provision that would allow Carrow to remain on the property and continue to farm the land. Thus, I find that Arnold did not misrepresent his intentions when he assured Carrow that nothing would change for him.

> FN50. Restatement (Second) § 171 cmt. b. See also *Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906, 908 (N.Y.1957) ("While mere promissory statements as to what will be done in the future are not actionable ... if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact upon which an action for rescission may be predicated.").

I also find that Arnold did not misrepresent his intentions when he promised not to develop the property. Section 5 of the Agreement of Sale specifically allows Arnold to apply to the County for subdivision approval, and Carrow agreed to sign any paperwork the County reasonably requires. Other than filing the preliminary plans, Arnold made no attempt to develop the property. Indeed, Carrow's own expert testified that the property was outside Kent County's so-called "Growth Zone," which consists of areas that have access to County sewer services or will have such access in the future. [FN51] Carrow's accountant testified that, from what Carrow had told him over the years, he understood that the land was not suitable for development because of its proximity to the marsh and its infestation with flies and bugs. [FN52] Carrow has

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
(Cite as: 2006 WL 3289582 (Del.Ch.))

Page 10

made no showing that Arnold thought otherwise.

FN51. Tr. at 281.

FN52. Tr. at 171 (Book).

*10 Carrow's reliance on cases such as *Anglin v. Bergold* [FN53] does not support a conclusion that this case falls within the fraud exception to the parol evidence rule. In *Anglin*, the plaintiff (Bergold) sued Anglin over a contract for the sale of an airplane. The two men had been part of a small company that owned and operated a two-engine aircraft, and Anglin maintained the airplane. When the company began to fail, Bergold bought out the other stockholders and acquired the aircraft. All of the stockholders signed a release of all claims relating to the aircraft. Anglin supplied Bergold with aircraft maintenance logs that materially misrepresented the maintenance that had been done on the aircraft and its condition. In fact, the airplane was not airworthy. Anglin appealed the trial court's judgment against him arguing, among other things, that the court erred in admitting evidence that the inspection manual was fraudulent because an "absence of warranties" clause in the release and the parol evidence rule precluded consideration of such evidence. The Delaware Supreme Court affirmed, holding that the material was admissible because of the "well recognized" exception to the parol evidence rule for fraud or misrepresentations made before the written agreement. [FN54]

FN53. 1989 Del. LEXIS 236 (Del. June 26, 1989).

FN54. *Id.* at *5-6.

*Anglin* is distinguishable from this case because the misrepresentations at issue in *Anglin* were of fact. In contrast, Arnold's representations were either (at best) promises, *e.g.*, that Carrow could remain on the land and continue to farm it, or statements of intention, *e.g.*, that Arnold intended to use the farm for agricultural and hunting purposes. Determining whether such statements were fraudulent or actionable misrepresentations requires a subjective examination of the speaker's intent and state of mind. For the reasons previously stated, I have found that Arnold did not misrepresent his intentions to Carrow.

Carrow also argues that the discrepancy between the purchase price specified in the Agreement of Sale for his farm, and its value, is an indicia of fraud. Both parties presented experts who opined on the farm's value. Carrow's expert, George M. Records, Jr., valued the farm at about $2.5 million. Arnold's expert, Philip J. McGinnis, valued it at about $1.36 million. I find that Records' methodology, and in particular his use of comparable sales of properties that had been approved for subdivision or development, renders his opinion less reliable than McGinnis's. Much of the discrepancy in appraised value appears to derive from Records' implicit assumption that the property is suitable for development. As discussed above, that assumption is speculative at best. Thus, it is not clear from the evidence presented that at the time the parties entered into the Agreement of Sale there was a material difference between the purchase price and the value of the property. I therefore find unpersuasive Carrow's argument that the $1.4 million price evidences "inequitable or oppressive conduct such as fraud or duress that would support rescission." [FN55]

FN55. Pl.'s Post-Trial Reply Br. at 7-8.

*11 I also question Carrow's reliance on Arnold's alleged misrepresentations. It is unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement. "Fraudulent inducement is not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation." [FN56] Because Carrow had such an opportunity, any reliance he placed on prior, inconsistent, oral promises or representations was unreasonable.

FN56. 17A Am.Jur.2d Contracts § 214 (2006).

**B. Specific Performance**

[5] Arnold has counterclaimed seeking an order of specific performance of the Agreement of Sale. Barring an applicable defense, a purchaser of land is entitled to have an enforceable contract for the sale of land specifically enforced. [FN57] Apart from the unsuccessful arguments discussed above, Carrow has not presented any persuasive defense to Arnold's counterclaim for specific performance. Therefore, the Court grants Arnold's request for specific performance of the Agreement.

FN57. *Smith v. Dixon*, 1988 Del. Ch. LEXIS 137, at *3, 1988 WL 109024 (Del.Ch.) (Del. Ch.1988).

**C. Attorneys' Fees**

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)
(Cite as: 2006 WL 3289582 (Del.Ch.))

Page 11

[6] Arnold has petitioned the Court for attorneys' fees. Under the American Rule, parties bear their own attorneys' fees except where it appears that a party, or its counsel, has proceeded in bad faith, acted vexatiously, or relied on misrepresentations of fact or law in connection with advancing a claim in litigation. [FN58] Based on my review of the evidence and arguments in this case, I do not believe that Carrow has proceeded vexatiously or in bad faith. Furthermore, I find that Arnold's failure to communicate his position as carefully and precisely as he could have during the negotiations that preceded the Agreement contributed to the misunderstandings that gave rise to this litigation. Therefore, Arnold's petition for an award of attorneys' fees is denied.

FN58. *Norman v. U.S. MobilComm, Inc.*, 2006 Del. Ch. LEXIS 81, at * 6, 2006 WL 1229115 (Del.Ch.) (Apr. 28, 2006); *McNeil v. McNeil*, 798 A.2d 503, 514 (Del.2002); *Rice v. Herrigan-Ferro*, 2004 WL 1587563, at *1 (Del.Ch. July 12, 2004).

### III. CONCLUSION

The parties have entered a binding contract, represented by a written instrument, for the sale of Carrow's farm to Arnold. The parol evidence rule bars the admission of the oral statements and representations Carrow alleges Arnold made during the course of negotiations because those alleged representations are inconsistent with the express written terms of the Agreement. Carrow has not shown that the contract is ambiguous, nor has he proved that the fraud exception to the parol evidence rule applies in this case. For these reasons, I deny Carrow's claim for rescission of the Agreement of Sale. Further, because the real estate in dispute is unique and Carrow has thus far refused to perform his obligations under the Agreement, I conclude that Arnold is entitled to have the Agreement specifically enforced.

Arnold's counsel shall prepare and file promptly, after notice to Carrow, a proposed form of final judgment implementing this opinion.

Not Reported in A.2d, 2006 WL 3289582 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

*Exhibit "B"*

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
**(Cite as: 2006 WL 1668348 (Del.Ch.))**

H

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Luellen WILLIAMS
v.
WHITE OAK BUILDERS, INC., et al.
No. Civ.A. 17556.

Submitted Feb. 7, 2006.
Decided June 6, 2006.

Dear Counsel:

PARSONS, Vice Chancellor.

*1 This is an action for specific performance of an
alleged covenant or rescission of a contract for the
sale of a townhouse. Specifically, plaintiff Luellen
Williams requests specific performance of a covenant
to fix a water problem in the basement of her
townhouse made by defendant White Oak, Inc.
("White Oak"). In the alternative, Williams seeks
rescission of the "Sales Agreement" she entered into
with defendant Capano Builders, Inc. ("Capano
Builders") for her townhouse on the grounds of
intentional    misrepresentation,    negligent
misrepresentation or mutual mistake. Finally,
Williams    asserts    a    claim    of    negligent
misrepresentation against White Oak, Capano
Builders and White Oak Builders, Inc. ("White Oak
Builders"). [FN1]

> FN1. The Court will refer to the three
> defendants collectively as "Defendants."

These issues formed the basis of a multi-day trial
held on March 17, June 1 and June 2, 2005. On May
31, 2005, the Court, accompanied by Williams and
counsel, visited the townhouse and visually inspected
it and the surrounding property. With the agreement
of the parties, the Court made its observations part of
the official trial record. [FN2] This letter opinion
embodies the Court's post-trial findings of fact and
conclusions of law. For the reasons stated, the Court
concludes that Williams is not entitled to relief under
any of the theories she advanced and enters judgment

in favor of Defendants on all counts.

> FN2. Tr. at 614-23. Citations in this form
> ("Tr.") are to the trial transcript and indicate
> the page and, where it is not clear from the
> text, the witness testifying.

I. BACKGROUND
Williams is a Delaware resident who resides at 7
Richeson Drive in New Castle, Delaware. [FN3]
Defendants are all Delaware corporations. [FN4]

> FN3. Joint Pretrial Stip. & Order ¶ 1; PX 1.

> FN4. Joint Pretrial Stip. & Order ¶¶ 2-4.

A. The Townhouse
Williams entered into a contract to purchase a
townhouse at 7 Richeson Drive from Capano
Builders on September 13, 1996. [FN5] The
townhouse was one of 88 townhouses comprising the
Woodburne project. [FN6] The Woodburne project is
located in the Woodburne Subdivision, New Castle
Hundred, New Castle County, and recorded in the
Office of the Recorder of Deeds in and for New
Castle County in Microfilm No. 12658. [FN7]
Williams's house is the end unit of a seven unit
building. [FN8] On or about November 26, 1996,
Williams and M.J. Massa, a Capano Builders
superintendent, conducted a final walk through of the
townhouse. [FN9] The sale closed on November 27,
1996. [FN10] Williams, Pat Muzzi and others
attended the closing.

> FN5. *Id.* ¶ 5; PX 1.

> FN6. DX 1; DX 2.

> FN7. DX 1; DX 2; DX 6.

> FN8. Tr. at 35-36, 111 (Williams); Tr. at
> 363-64 (Csoltko). Williams's unit is located
> on lot three; the other units in her building
> are on lots four through nine. Tr. at 363-64
> (Csoltko); DX 2; DX 6.

> FN9. Tr. at 44, 47 (Williams); PX 2.

> FN10. Joint Pretrial Stip. & Order ¶ 6.

At the closing, Williams asked Muzzi why her yard

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

355559555555555555555555555955555

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
(Cite as: 2006 WL 1668348 (Del.Ch.))

was wet. [FN11] Muzzi told Williams that he would take care of the problem, but Williams wanted a written assurance to that effect. [FN12] Muzzi then made a telephone call; when he finished the call, he wrote on a document titled "White Oak, Inc. Walk Thru" (the "Walk Thru Checklist"), "[w]ater problem in basement to be resolved." [FN13]

FN11. Tr. at 45 (Williams).

FN12. Id.

FN13. PX 2 at 000167; Tr. at 45 (Williams). One witness speculated that Muzzi telephoned the late Anthony Marioni, but the witness did not have first-hand knowledge of the call. Tr. at 587 (Capano, Jr.) (testifying that it would have been consistent with "the normal chain of command" for Muzzi to call Marioni). Defendants' witnesses referred to Marioni as a "super foreman" of Capano Builders, i.e ., he supervised all of the other foreman during construction of the Woodburne project. Tr. at 557 (Capano); Tr. at 585 (Capano, Jr.).

The record contains conflicting evidence and testimony as to who Muzzi represented. At the closing, he signed the Walk Thru Checklist on a line that said "Builders [sic] Signature & Date when all items completed." [FN14] Williams testified that she "believed" Muzzi represented "[t]he builder," but "[a]s far as [she] kn[e]w, [she] actually never heard him say, you know, if he represented White Oak or Capano." [FN15] In contrast, Michael Capano, the head of White Oak Homes, LLC, but, at the time in question, a supervisor of the forepersons responsible for the Woodburne project, testified that all of the employees working on the Woodburne project "were White Oak Builders." [FN16] In further contrast, the President of all three Defendants, Frank J. Capano, Jr., testified that White Oak Builders had no involvement in the Woodburne project and that he could not remember whether White Oak was involved. [FN17] Finally, Capano, Jr., testified that Muzzi was authorized to sign on behalf of Capano Builders and did, in fact, sign the Walk Thru Checklist for Capano Builders. [FN18] Based in large part on this testimony of Capano, Jr., the Court concludes that Muzzi was, at the least, an agent of Capano Builders at the closing on Williams's townhouse.

FN14. PX 2; Tr. at 44 (Williams).

FN15. Tr. at 43, 42.

FN16. Tr. at 556.

FN17. Tr. at 574.

FN18. Tr. at 586, 594.

**B. The Water Problem**

*2 According to Williams, there is a water problem in her basement that has not been resolved. Water constantly flows into the sump pump pit in Williams's basement. [FN19] Williams's expert witness, Klas Haglid, testified that water flows into the basement at a consistent rate of three gallons per minute. [FN20] The water flows into the basement regardless of whether it has rained or snowed recently and even in periods of drought. [FN21] Consistent with Haglid's observation, the Court observed a steady flow of water into the sump pit when it made its visit on a dry day in late May 2005. [FN22]

FN19. Tr. at 99 (Williams). A sump pump is "a pump (as in a basement) to remove accumulations of liquid from a sump pit." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1182 (1987). See also Sump Pump, WIKIPEDIA, http:// en.wikipedia.org/wiki/Sump_pump ("[A] pump used for drainage that removes accumulated water from a sump pit. A sump pit, commonly found in the home basement, is simply a hole dug in the ground to collect water. The water may enter via perimeter drains funneling into the pit, or may arrive from natural ground water in the earth.").

FN20. Tr. at 247.

FN21. Tr. at 99-100 (Williams).

FN22. Tr. at 615. The Court could not comment on the rate of the flow of water. Id. ("I can't say that it was three gallons per minute. I don't have any way to gauge that.").

Williams's sump pump runs intermittently, but regularly to pump the water out of the basement. [FN23] The basement also has an interior French drain, [FN24] but water tends to sit in the trough instead of flowing into the sump pit. [FN25] The sump pump and French drain notwithstanding, there

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
(Cite as: 2006 WL 1668348 (Del.Ch.))

is a significant amount of moisture in Williams's basement. [FN26] All of this moisture has resulted in a moldy smell in Williams's basement. [FN27]

> FN23. PX 32 at 000058 (Haglid Engineering & Associates' Structural Inspection) (observing that the sump pump runs every other minute).

> FN24. "French drain refers to a ditch filled with gravel, rock or perforated pipe that redirects surface and ground water away from an area. They are commonly used to prevent ground and surface water from penetrating or damaging building foundations." *French drain*, WIKIPEDIA, http:// en.wikipedia.org/wiki/French_drain. In Williams's basement, the water collects in a perforated pipe in the ditch and then runs through another pipe into the sump pit. Tr. at 252-57 (Haglid). The French drain in Williams's basement runs along all four of the basement walls. Tr. at 255 (Haglid).

> FN25. Tr. at 101, 103 (Williams); Tr. at 252, 269 (Haglid). Haglid testified that the interior French drain is crippled because the pipe that takes water from the perimeter of the basement to the sump pit is filled with concrete. Tr. at 252, 256.

> FN26. Tr. at 247, 250 (Haglid) (testifying that the amount of moisture in Williams's townhouse is "extreme").

> FN27. Williams testified that some items she stored in her basement eventually became "mildewed." Tr. at 203. When the Court visited the townhouse, the basement smelled moldy. Tr. at 614 (the Court). From these observations and other evidence, the Court finds that the moisture in Williams's basement has caused the moldy smell.

Williams's basement also has flooded on occasion. [FN28] Because of the volume of water flowing into the sump pit, a brief loss of electricity will cause the sump pit to overflow.

> FN28. Tr. at 100 (Williams); PX 19; PX 33.

As early as 1997, Williams began complaining of a water problem in her basement to Capano Builders and New Castle County. [FN29] Defendants and their agents made numerous attempts to resolve Williams's concerns, [FN30] but were never able to do so to her satisfaction.

> FN29. Tr. at 56-57 (Williams); PX 6; PX 8.

> FN30. *See, e.g.,* Tr. at 84-87 (Williams) (describing attempts made to resolve water problem).

C. Haglid's Conclusions and Predictions

In 1999, Williams's expert witness, Haglid, [FN31] conducted a limited examination of Williams's townhouse. [FN32] Haglid limited his examination to a visual inspection of Williams's townhouse and property; he did not perform any destructive or invasive testing. [FN33] Haglid concluded that, to a reasonable degree of engineering certainty, the source of the water in the townhouse basement "is an elevated water table, and ... probably a spring." [FN34] Haglid further testified that "[g]iven the amount of water and also the unusual interior/exterior French drain ... to a reasonable degree of engineering certainty, the water was there when the original excavation took place, more likely than not...." [FN35] Haglid also predicted that the townhouse "basement and foundation will have chronic flooding and settlement problems." [FN36] Finally, he predicted that, within twenty years, "the condition of the home is going to be very poor and structurally unstable." [FN37]

> FN31. Haglid is a licensed Professional Engineer. PX 32 at 000070. The parties stipulated that he is qualified as an expert. Tr. at 243.

> FN32. PX 32 at 000057 ("[T]his evaluation is limited in scope, focusing on the basement water penetration problem.")

> FN33. *Id.*

> FN34. Tr. at 274; PX 32 at 000058.

> FN35. Tr. at 333.

> FN36. PX 32 at 000059.

> FN37. Tr. at 278.

D. Defendants' Expert Witness and Fact Witnesses

Gejza Joseph Csoltko, a licensed Professional Engineer, testified as an expert witness for Defendants. [FN38] Csoltko testified that it is necessary to conduct a physical study of the relevant

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
(Cite as: 2006 WL 1668348 (Del.Ch.))

Page 4

land to determine "with absolute certainty" the source of water in Williams's basement. [FN39] Csoltko suggested several methods of performing this physical study, all of which, in his opinion, are more reliable than a mere visual inspection. [FN40]

> FN38. The parties stipulated that Csoltko is qualified as an expert. Tr. at 347.

> FN39. Tr. at 406.

> FN40. Tr. at 407-08.

*3 Csoltko also testified as a fact witness for Defendants. He drafted the Record Major Subdivision Plan for the Woodburne project and visited the site at least once a week during construction. [FN41] According to Csoltko, the hole dug for the foundation of Williams's building was always dry when he was at the Woodburne project site. [FN42] Further, Csoltko never observed any water conditions in the vicinity of Williams's building that would have been a concern. [FN43]

> FN41. Tr. at 352, 362 (Csoltko).

> FN42. Tr. at 409.

> FN43. Tr. at 380.

The Woodburne project foreman, Lee Blevins, also testified as a fact witness for Defendants. Blevins went to the Woodburne project site on a daily basis. [FN44] He testified that the foundation hole was 'open' for approximately two weeks, i.e., from the time it was dug until the foundation and basement walls were built and the hole was backfilled. [FN45] During these two weeks, Blevins never saw any water in the hole other than rain water. [FN46] In fact, he testified that the area of the hole where Williams's townhouse is located was "completely dry." [FN47]

> FN44. Tr. at 463 (Blevins).

> FN45. Tr. at 475.

> FN46. Tr. at 477.

> FN47. Tr. at 500.

In addition to Csoltko and Blevins, two other witnesses familiar with the construction of the Woodburne project testified that they never saw any water in the hole dug for the foundation of Williams's

townhouse building. Michael J. Connor of Christiana Excavating Company was responsible for the infrastructure at the Woodburne project site. [FN48] He saw neither water in the hole [FN49] nor anything that would have alerted him to a water problem at the site. [FN50] And, Michael Capano testified that he never saw any water other than rain water in the foundation hole. [FN51]

> FN48. Tr. at 520 (Connor). "Infrastructure" includes sanitary sewers, storm sewers, water lines and some utilities. Tr. at 517 (Connor).

> FN49. Tr. at 537.

> FN50. Tr. at 538-40.

> FN51. Tr. at 559.

Finally, several of Defendants' witnesses testified that if they had seen anything that would have put them on notice of a water problem in the foundation hole, they would have notified the engineer in charge of the project (evidently, Csoltko) and New Castle County. [FN52] Similarly, if a New Castle County inspector had observed a water problem at the site, he would have notified the project engineer and halted the project until the problem was addressed. [FN53] None of the witnesses recalled such a water problem arising as to the foundation hole dug for Williams's townhouse. Further, Blevins and Connor testified that New Castle County inspectors approved the pouring of the foundation for Williams's townhouse building. [FN54]

> FN52. Tr. at 409-10 (Csoltko); Tr. at 540 (Connor).

> FN53. Tr. at 538-40 (Connor).

> FN54. Tr. at 501-02 (Blevins) (testifying that he has never supervised the pouring of a foundation over wet or muddy soil); Tr. at 538 (Connor) (testifying that New Castle County inspects the footing, the backfill and the waterproofing).

Based on the credible and factually consistent testimony of Defendants' fact witnesses, the Court finds that Defendants did not know of any water problem affecting Williams's townhouse through the time they backfilled the foundation hole. To the extent this finding is inconsistent with Haglid's expert opinion, the Court finds Haglid's opinion

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
(Cite as: 2006 WL 1668348 (Del.Ch.))

Page 5

unpersuasive in part because it did not involve any invasive or physical testing. [FN55]

> FN55. In support of his conclusion, Haglid also relied on the existence of the "unusual interior/exterior French drain," but he did not buttress this statement with any evidence of why such a combination is unusual. In contrast, Csoltko testified that New Castle County regulations have variously required interior or exterior French drains. Tr. at 386-87; 434-35. He further testified that he has inspected other houses with both interior and exterior French drains. Tr. at 435. Blevins testified that all of the townhouses in the Woodburne project have both an interior and an exterior French drain. Tr. at 480.

### E. Procedural history

Williams initiated this case in November 1999. As late as December 2002, the parties were engaged in discovery, but the case apparently sat idle in 2003. Following the elevation of Vice Chancellor Jacobs to the Supreme Court in July 2003, the case was reassigned. In response to a call of the calendar in 2004, the parties represented to the Court that the case was ready for trial. [FN56] In the Scheduling Order entered by the Court on November 3, 2004, the parties agreed that fact discovery was complete and that expert reports were complete and had been exchanged. [FN57]

> FN56. Status Report (Apr. 26, 2004).

> FN57. Scheduling Order ¶ ¶ 1-2 (Nov. 3, 2004).

### II. ANALYSIS
#### A. Specific Performance

*4 Williams requests specific performance of Muzzi's promise to fix the water problem in her basement. Assuming for purposes of argument that Williams has proven the existence of a contract with White Oak by clear and convincing evidence, [FN58] she still has failed to demonstrate that specific performance is appropriate under these circumstances.

> FN58. "[A] party seeking specific performance has the burden of proving the existence and terms of an enforceable contract by clear and convincing evidence." Donald J. Wolfe, Jr., & Michael A. Pittenger, CORPORATE & COMMERCIAL PRACTICE IN THE

DELAWARE COURT OF CHANCERY § 12-3 at 12-35 (citing cases).

"It is elementary that the remedy of specific performance is designed to take care of situations where the assessment of money damages is impracticable or somehow fails to do justice." [FN59] In other words, Williams must have demonstrated at trial that the remedy at law for the alleged breach, *i.e.*, damages, is inadequate. [FN60] She failed to prove that.

> FN59. *Equitable Trust Co. v. Gallagher*, 102 A.2d 538, 546 (Del.1954).

> FN60. *See* Wolfe & Pittenger § 12-3 at 12-36 ("The quintessential guidepost for availability of specific performance, therefore, is inadequacy of the remedy at law.").

"In order for a legal remedy to act as a bar to the equitable relief of specific performance, the legal remedy must be as complete, practical, and efficient to the ends of justice and its prompt administration as the equitable remedy, and also must be available to the plaintiff as a matter of right." [FN61] Williams wants the "water problem in [her] basement to be resolved." [FN62] Presumably, this means Williams wants to reduce the amount of moisture in her basement and ensure that her basement will not flood . [FN63] She likely could accomplish the former objective by having a qualified contractor fix her interior French drain; similarly, she likely could accomplish the latter objective by having a qualified contractor install a heavy duty sump pump with a battery backup [FN64] or a second sump pump. [FN65] To the extent that the water flowing into Williams's basement has caused any structural damage to her townhouse, a qualified contractor likely could fix that damage. Williams also may want to explore whether it is possible to redirect the flow of water around her townhouse so that water no longer flows into her basement. [FN66] To the extent this is possible, Williams has not proven that White Oak is the only entity who can do it. [FN67]

> FN61. *Id.* (internal citation omitted).

> FN62. PX 2.

> FN63. *See* Tr. at 35 (Williams) (expressing desire to "finish" basement but claiming she cannot because there is too much moisture in the basement), 101-02 (Williams)

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
(Cite as: 2006 WL 1668348 (Del.Ch.))

Page 6

(testifying that she is afraid to leave her home because her basement might flood if the electricity goes out and no one is there to restart the sump pump when the electricity is restored).

FN64. Tr. at 447 (Csoltko) (testifying to availability of back up systems).

FN65. Tr. at 596-97 (Capano, Jr.) (testifying that one way to deal with a high volume of water is to add a second sump pump).

FN66. Pl.'s Post-Trial Opening Br. ("POB") at 25.

FN67. Williams "suggests that it is impossible to fix [her water problem] per the opinion of her expert." POB at 4 n. 25. This admission provides a second justification for denying Williams's request for specific performance. If the Court were to enforce White Oak's promise to "resolve" the contractually undefined "water problem in basement," White Oak's obligations "would be so imprecise as to make judicial supervision impracticable." *Prestancia Mgmt. Group, Inc. v. Va. Heritage Found., Inc.*, 2005 WL 1364616, at *4 (Del.Ch. May 27, 2005); *see also Ryan v. Ocean Twelve, Inc.*, 316 A.2d 573, 575 (Del.Ch.1973) (dismissing a request for specific performance of a construction contract to fix various defects in a number of condominiums because "[i]t is an inescapable conclusion that in each case whether or not a defect is completed will depend greatly upon the eye and taste of a given Plaintiff.").

Williams has not proven either that there is anything unique about the services White Oak would provide with respect to her water problem or that there are not other contractors just as qualified that could perform this work. Williams also did not prove that an award of damages would be difficult to quantify. [FN68] As such, an award of damages for the cost of the necessary work would afford full relief. The availability of such an adequate remedy at law deprives this Court of the power to order specific performance. [FN69]

FN68. Williams argues that "[d]amages are insufficient in this case because the damage being done to Ms. Williams' home is continual in nature." POB at 25. The damages, to the extent there are any, are continual only because the water problem remains unabated. Damage would cease, however, as soon as a contractor fixed the water problem and any damage resulting therefrom. The cost of this fix would then constitute sufficient damages and complete relief, just like the requested specific performance.

FN69. *Robbins v. Tremont Medical, Inc.*, 1997 WL 30214, at *3 (Del.Ch. Jan.16, 1997) (reciting plaintiff's requests for specific performance of various contracts and stating these are "requests which this Court may not grant if plaintiff has an adequate remedy at law.").

In the Joint Pretrial Stipulation and Order, Williams states that she
  seeks equitable relief in the form of specific performance of Defendants' covenant to cure Plaintiff's water problem and an amount to be determined by the Court that would compensate Plaintiff for the damage to her house, including rot and mold, due to the presence of water in her home for over nine years and any other damages as the Court deems proper. [FN70]

FN70. Joint Pretrial Stip. & Order ¶ V.A.

Assuming that this language includes a request for damages in the event specific performance is unavailable and that Williams's request is timely even though she did not plead a claim for damages or seek leave of the Court to amend the Amended Complaint, [FN71] the Court must decline to award any damages. [FN72]

FN71. *See* Ct. Ch. R. 15(b) (providing that this Court "may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the Court that the admission of such evidence would prejudice the party in maintaining an action or defense upon the merits").

FN72. Defendants argue that this Court lacks jurisdiction over Williams's claim for breach of a covenant because it is a purely legal claim. Yet, Defendants ignore the clean-up doctrine. This Court

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
**(Cite as: 2006 WL 1668348 (Del.Ch.))**

unquestionably has jurisdiction over Williams's claim for equitable rescission of the Sales Agreement. *See* Wolfe & Pittenger § 12-4[a] at 12-52 (noting that the Court of Chancery has jurisdiction over claims for equitable rescission and that "equitable relief may also be required, thus necessitating equitable rescission, where the unwinding of a transaction calls for the restoration of unique, specific property from one party to another."). As such, equitable jurisdiction exists and this Court may exercise jurisdiction, and does so, over Williams's other purely legal claims. *See id.* § 12-10[b] at 12-103 ("It is well settled that when the Court of Chancery obtains jurisdiction over a controversy, it will decide the entire matter, and give complete relief. The 'clean-up' doctrine includes the authority to grant legal remedies to rectify the violation of legal rights where at least some part of the case involves equity.").

*5 It is well settled that a plaintiff "must prove [her] damages with a reasonable degree of precision...." [FN73] "Responsible estimates that lack mathematical uncertainty are permissible *so long as the Court has a basis to make a responsible estimate of damages.*" [FN74] Williams has not provided this Court with any basis from which it could make a responsible estimate of the cost to resolve the water problem or of the damages resulting from White Oak's failure to resolve the water problem.

> FN73. *Kronenberg v. Katz,* 872 A.2d 568, 609 (Del.Ch.2004) (internal citations omitted).

> FN74. *In re Fuqua Indus., Inc.,* 2005 WL 1138744, at *8 (Del.Ch. May 6, 2005) (internal citations omitted).

Williams's basement has flooded occasionally. [FN75] Williams testified that her backyard is "always wet." [FN76] She testified that she no longer stores some of her clothes in the basement because the ones she did store there "were mildewed." [FN77] She also complained of cracks in her walls. [FN78] Finally, Williams testified that she would like to have a deck built in her backyard, but has not because she thinks it is too wet. [FN79] In the aggregate, this testimony proves that Williams's basement is damp and there is occasionally excess water in her basement and backyard, but nothing more.

> FN75. Tr. at 100; PX 19; PX 33.

> FN76. Tr. at 210-11. The backyard was dry on the day of the Court's inspection. Tr. at 617.

> FN77. Tr. at 203.

> FN78. Tr. at 52, 55, 62, 72.

> FN79. Tr. at 207. Williams made no attempt to determine if a deck could be built in her backyard, the water notwithstanding. Tr. at 207.

This testimony does not prove the cost of compensating Williams for these problems or the cost to prevent their reoccurrence. There is nothing in the record concerning the price of, for example, a new interior French drain or a more reliable sump pump configuration. Likewise, there is nothing in the record quantifying the damage, if any, to chattel or to real property caused when Williams's basement has flooded. [FN80] There is no evidence of the cost to repair any structural damage to Williams's townhouse resulting from the water in her basement, assuming Williams proved any such damage. [FN81] And, there is absolutely no evidence of the cost of redirecting the flow of water away from Williams's townhouse.

> FN80. Williams proffered the testimony of a real estate expert but did not disclose her intention to Defendants to have this expert testify until two weeks before trial. Williams also did not provide any background on her proffered expert or any indication of the substance of the expert's testimony. Further, Williams initially filed this case in 1999; the parties engaged in discovery in 2001 and 2002. In May 2004, the parties informed the Court that the case was ready for trial and that fact and expert discovery was complete. Because of the long pendency of this case, the failure by Williams to comply with Court of Chancery Rule 26(e)(1), and the prejudice to Defendants of introducing a new expert and issue just before trial, the Court excluded this proposed testimony. *See generally* Pretrial Conference Tr.

> FN81. Csoltko testified that a crack in a foundation wall that is 3/16 of an inch or wider is considered a "structural crack." Tr.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
(Cite as: 2006 WL 1668348 (Del.Ch.))

at 416. In its view of the townhouse, the Court did not observe any cracks in the walls approaching this width. Tr. at 617 ("While we were in the house we were shown some cracks in the wall in the basement. However, those cracks really, you could see the cracks, but there was not significant separation, certainly nothing anywhere near 3/16ths of an inch...."), 619 ("We walked up to the first floor, and there was some cracking in the wall that was indicated to me.... Again, I could see the crack, but there wasn't any separation of the wall that you could easily measure."). Further, there is no evidence that these slight cracks resulted from the water in Williams's basement.

Because there is no evidence in the record that would allow the Court to determine the value of the damaged personal or real property, if any, the cost to reduce the amount of moisture and water in Williams's basement or the cost to prevent the flow of water into Williams's basement, the Court has no reliable basis on which to award damages. [FN82] "Delaware law does not permit the fact finder to supply a damages figure based on 'speculation or conjecture' where the plaintiff has failed to meet its burden of proof on damages." [FN83] Accordingly, the Court must deny Williams's claim for damages.

> FN82. Cf. *Acierno v. Goldstein*, 2005 WL 3111993, at *6 (Del.Ch. Nov.16, 2005) (declining to award damages for alleged trespass to timber where evidence proved only that there had been timber on the property, but nothing with respect to the value of that timber).

> FN83. *Id.* (citing *Henne v. Balick*, 146 A.2d 394, 396 (Del.1950) (further holding that proof of injury is insufficient, in and of itself, to allow an award of damages without some other evidence of the amount of damages)).

**B. Rescission of the Sales Agreement**
This Court "may rescind contracts for the sale of real property on the basis of fraud, misrepresentation, or mistake. But rescission is a remedy rarely granted, as it results in the abrogation or unmaking of an agreement and attempts to return the parties to the *status quo*." [FN84] As such, this Court "must feel a high degree of confidence in order to employ this extreme remedy." [FN85]

> FN84. *Liberto v. Bensinger*, 1999 Del. Ch. LEXIS 241, at *19, 1999 WL 1313662 (Del. Ch. Dec. 22, 1999) (internal quotation omitted).

> FN85. *Id.* (internal quotation omitted).

*1. Intentional misrepresentation*
A claim of intentional misrepresentation, or common law fraud, requires proof
*6 1) [of] the existence of a false representation, usually one of fact, made by the defendant; 2) [that] the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; 3) [that] the defendant had the intent to induce the plaintiff to act or refrain from acting; 4) [that] the plaintiff acted or did not act in justifiable reliance on the representation; and 5) [that] the plaintiff suffered damages as a result of such reliance. [FN86]

> FN86. *Kronenberg*, 872 A.2d at 585 n. 25 (internal citation omitted).

The representation need not be overt; deliberate concealment of material facts or silence in the face of a duty to speak also may constitute intentional misrepresentation. [FN87] To support rescission, the claimed misrepresentation must be one of material fact. [FN88]

> FN87. *Id.*

> FN88. Wolfe & Pittenger § 12-4[a] at 12-54 (citing cases).

Williams's claim for rescission based on an intentional misrepresentation by Capano Builders fails because she did not prove that Capano Builders knew that a representation was false or of facts that gave rise to an obligation to speak. In particular, Williams bases her claim for rescission on an allegation that her house had a serious and intractable water problem because, in the words of her expert, it was built where there is "an elevated water table, and ... probably a spring."

Williams presented no persuasive evidence, however, that Capano Builders knew of a serious water problem at the time the parties entered into the Sales Agreement. Further, the Court has already found that Capano Builders did not learn of such a water problem in connection with digging the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
(Cite as: 2006 WL 1668348 (Del.Ch.))

Page 9

foundation hole, constructing the foundation or backfilling the foundation hole, approximately two weeks after it was dug. [FN89]

> FN89. *See supra* § 1.D.

Williams argues that Muzzi's notation on the Walk Thru Checklist of a water problem in the basement when she asked about water in the backyard proves that Capano Builders knew about the water problem before settlement. [FN90] Accordingly, she argues that the representation in the Sales Agreement by Capano Builders that it knew of nothing that could materially and adversely affect the value of her property became false sometime before settlement. Therefore, Williams concludes, Capano Builders made a false representation by remaining silent.

> FN90. POB at 20.

Muzzi's notation and promise prove nothing more than Capano Builders knew that there was an issue regarding water in the basement of Williams's townhouse that would have to be addressed. [FN91] The promise does not prove, however, that Capano Builders knew that the flow of water would become a problem that they could not fix through normal corrective measures. To the extent a water "problem" existed at the time of settlement, the Court finds that Williams has not shown that Capano Builders knew that the nature of the problem was out of the ordinary. [FN92]

> FN91. Because the Court found that Muzzi was an agent of Capano Builders, *see supra* Section I.A., his knowledge is imputed to Capano Builders. *See In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 n. 22 (Del.Ch.2003) (noting general rule that the knowledge of an agent is imputed to its principal).

> FN92. Williams herself did not observe any water on the basement floor or walls or hear the sump pump running during the walk through despite spending several minutes in the basement. Tr. at 125-27 (Williams). Moreover, the evidence suggests that a large number of homes in New Castle County have water in their basements at some point. *See infra* n. 93. Consequently, a notation of a "[w]ater problem in basement to be resolved" on a checklist related to settlement does not imply a serious and intractable problem.

The mere existence of water in the basement of a home in New Castle County is not abnormal. [FN93] As such, the fact that the basement of Williams's townhouse had water in it at the time of closing did not render the statement in the Sales Agreement false. Nor did Capano Builders remain silent in the face of a duty to speak because there is no convincing evidence it knew that the water issue noted at settlement would become a serious problem. Similarly, Capano Builders did not, through Muzzi, make a misrepresentation at closing because there is no credible evidence that Capano Builders knew that the water problem would be so difficult to correct. [FN94] Based on the evidence in its entirety, the Court finds that the one notation of a "problem" on the Walk Thru Checklist is not sufficient to prove that Capano Builders knew of the problem as it ultimately came to exist. Rather, Muzzi disclosed, and promised to fix, what Capano Builders knew, *i.e.*, that the basement of Williams's townhouse, like many others in New Castle County, had water that needed to be pumped out.

> FN93. *See* Tr. at 577 (Capano, Jr.) (testifying that half of the homes Capano Builders built in New Castle County have sump pumps because they have "a water problem"); Tr. at 447-48 (Csoltko) (testifying to the existence of homes with a greater volume of water flowing into their basements than Williams where there is no problem as long as the water is pumped out of the basement).

> FN94. In *Alabi v. DHL Airways, Inc.*, the Delaware Superior Court held that "if the misrepresentation was fraudulent, it is not required to be material for the contract to be voidable." 583 A.2d 1358, 1362 (1990). In contrast, in *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC*, this Court noted that one of the elements of common law deceit is "misrepresentation of a *material* fact." 832 A.2d 116, 124 (2003) (emphasis added). Thus, there may be some uncertainty in the Delaware case law on this point. But any such uncertainty is immaterial for purposes of this case because the Court concludes that if Capano Builders misrepresented anything, it did not know it was doing so.

2. Negligent misrepresentation [FN95]

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
(Cite as: 2006 WL 1668348 (Del.Ch.))

FN95. Williams asserts a claim of negligent misrepresentation against all three Defendants, Am. Compl. at Count III, but does not seek any relief, damages or otherwise, from this claim. *See* Am. Compl. at 5 (requesting specific performance or, in the alternative, rescission of the sales agreement). The claim is therefore duplicative of Williams's request for rescission of the Sales Agreement based on, among other theories, negligent misrepresentation by Capano Builders. In any event, Williams failed to prove that *any* of the Defendants made a negligent misrepresentation. Moreover, Williams waived any claim for negligent misrepresentation distinct from her claim for rescission by not addressing it in her opening post-trial brief. *Emerald Partners v. Berlin,* 2003 WL 21003437, at *43 (Del.Ch. Apr.28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."); *In re IBP, Inc. S'holders Litig.,* 789 A.2d 14, 62 (Del.Ch.2001) (finding that a party waived an argument by not addressing it in its opening post-trial brief). For all of these reasons, the Court will not separately address Williams's claim for negligent misrepresentation against all three Defendants.

*7 A claim of negligent misrepresentation, or equitable fraud, requires proof of all of the elements of common law fraud except "that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly." [FN96] Perhaps in contrast to a claim of intentional misrepresentation or common law fraud, misrepresentation of a *material* fact "is undoubtedly an element of equitable fraud." [FN97]

FN96. *H-M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 144 (Del.Ch.2003) (internal quotation omitted).

FN97. *Mark Fox Group, Inc. v. E.I. du Pont de Nemours & Co.,* 2003 WL 21524886, at *5 n. 13 (Del.Ch. July 2, 2003).

Williams's claim for rescission on the ground of Capano Builders' negligent misrepresentation also must fail because Williams has not proven by a preponderance of the evidence that the water problem, as it currently exists, existed at the time of

the closing. There is credible evidence that the water problem existed in 1999 and 2005, but not on November 27, 1996, the day of the closing. In other words, Williams did not prove that Capano Builders made a misrepresentation of a material fact. [FN98]

FN98. This conclusion provides an independent basis on which to deny Williams's claim of intentional misrepresentation.

On March 18, 1999, New Castle County found Capano Builders in violation of Section 1224.0 of the BOCA National Building Code/1990 As Amended By New Castle County because "[t]he foundation walls have several areas where water is penetrating." [FN99] Similarly, Haglid observed the water problem in 1999 when he inspected Williams's townhouse. He testified that, "to a reasonable degree of certainty" and "more likely than not," the water problem existed before the foundation hole was dug. [FN100] In late May 2005, the Court conducted a site visit and noticed a steady flow of water into the sump pit and a moldy smell in Williams's basement.

FN99. PX 25.

FN100. Tr. at 333.

As to late 1996, all of Defendants' fact witnesses testified that they did not observe any water in the foundation hole, other than rain water, and that they did not observe anything that would cause them to be concerned that a water problem might exist. Williams herself did not observe any water in the basement of her townhouse during the walk through in November 1996. [FN101] The only contemporaneous evidence that a problem existed in November 1996, then, is Muzzi's notation on the Walk Thru Checklist. But, as previously discussed, this proves nothing more than there was water in Williams's basement at that time.

FN101. Tr. at 126; *see also supra* n. 92.

Ultimately, Williams, through her expert, asks this Court to adopt a *res ipsa loquitur* theory: because the water problem existed in September 1999 and May 2005, that same problem must have existed in November 1996. The only evidence for that proposition adduced by Williams is the opinion of her expert that the source of the water is an elevated water table or a spring that existed at the time of construction. Haglid formed his conclusion after one visit to Williams's townhouse three years after it was built and during which he made only a visual

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
**(Cite as: 2006 WL 1668348 (Del.Ch.))**

Page 11

inspection. [FN102] Csoltko testified that one must conduct a physical inspection to determine the exact source of a water problem. Having considered all of the evidence, the Court finds that Haglid's theory and testimony based on his visual inspection is insufficient to prove, by a *preponderance of the evidence,* let alone provide this Court with the high degree of confidence it needs to grant rescission, that the water problem he observed existed in 1996.

FN102. PX 32 at 000057.

**\*8** Haglid's testimony notwithstanding, [FN103] Williams did not prove that the water problem that forms the basis for her complaint existed at the time of closing. She proved that Capano Builders knew there was water in her basement at the time of closing and that sometime before 1999 a problem developed that involved a near constant flow of water into the sump pit in her basement. As such, Capano Builders could not have made a misrepresentation at the closing and Williams's claim for rescission because of a negligent misrepresentation fails. [FN104]

FN103. In its role as the fact finder, this Court is free to reject expert testimony even if it is uncontradicted. *See Powers v. Bayliner Marine Corp.,* 83 F.3d 789, 797-98 (6th Cir.1996); *Scullari v. United States,* 2000 U.S.App. LEXIS 3416, at \*6 (2d Cir. Feb. 24, 2000) ("[A] fact finder is always free to reject, in whole or part, expert testimony and arrive at an independent conclusion.").

FN104. Williams cites an alternative formulation of negligent misrepresentation that requires proof of 1) a pecuniary duty to provide accurate information, 2) the supplying of false information, 3) failure to exercise reasonable care in obtaining or communicating information and 4) a pecuniary loss caused by justifiable reliance upon the false representation. POB at 21. This formulation merely restates the elements of equitable fraud. Pursuant to this formulation, Williams's claim still fails because she failed to prove that Capano Builders supplied her with false information. Williams also argued that Capano Builders was negligent in not performing ground water testing before building Williams's townhouse. POB at 22. This argument fails because Williams did not prove that the applicable building code required such

testing. *See* Tr. at 408, 451-54 (Csoltko).

### 3. Mutual mistake of fact

A claim of rescission based on a mutual mistake of fact requires proof that 1) both parties were mistaken as to a basic assumption, 2) the mistake materially affects the agreed upon exchange of performances and 3) the party adversely affected did not assume the risk of the mistake. [FN105] The mistake "must be as to a fact which enters into, and forms the very basis of, the contract; it must be the essence of the agreement, the *sine qua non* or, as it is sometimes expressed, the efficient cause of the agreement." [FN106] Finally, Plaintiff must prove the elements of mutual mistake by "clear and convincing evidence; mere preponderance does not suffice ." [FN107]

FN105. *Liberto,* 1999 Del. LEXIS 241, at \*45, 1999 WL 1313662 (Del.Ch.).

FN106. Wolfe & Pittenger § 12-4[a] at 12-55 (internal quotation omitted) (citing cases).

FN107. *Liberto,* 1999 Del. Ch. LEXIS 241, at \*45, 1999 WL 1313662 (Del.Ch.) (internal citations omitted).

"In determining whether a mutual mistake of fact has occurred, the court will examine the facts as they existed at the time of the agreement." [FN108] Williams argues that the mutual mistake is the magnitude of the flow of water into the basement of her townhouse. [FN109] She thus had the burden of proving that this flow of water existed at the time she and Capano Builders entered into the Sales Agreement, *i.e.,* on September 13, 1996. For the reasons previously stated, Williams did not prove that an abnormal flow of water existed at that time. Assuming for the sake of argument that a claim of mutual mistake could lie if the water problem had developed by the time of closing on the Sales Agreement, Williams still would not be entitled to relief because she did not prove that the water problem existed at closing. As such, mutual mistake cannot provide a basis for rescission of the Sales Agreement.

FN108. 48 AM.JUR.3D *Proof of Facts* § 505 at § 6 (2005); *see also Darnell v. Myers,* 1998 Del. Ch. LEXIS 84, at \*21, 1998 WL 294012 (Del. Ch. May 27, 1998) (determining whether the parties were mutually mistaken "at the time they signed the contract of sale").

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)
(Cite as: 2006 WL 1668348 (Del.Ch.))

Page 12

FN109. POB at 23 ("[The evidence] establishe[s] that there is definitely a defect on the property. Mr. Haglid, an expert in this field, stated that he has never seen a flow of this magnitude into a home. Ms. Williams testified that she was not aware of the issue and assuming the Court finds that Defendants had no knowledge of the defect, the mistake would be mutual.") (internal citations omitted).

### III. WILLIAMS'S OTHER CLAIMS

Williams seeks damages for mental anguish she suffered because of the water in the basement of her townhouse. When a plaintiff has not established a right to recovery under any theory other than mental anguish, she can recover damages for proven mental anguish only when "the act causing such condition is intentional or willful, unreasonable ... [or] done with such gross carelessness or recklessness as to show an utter indifference to the consequences." [FN110] Williams has not shown any act taken by any of the Defendants with the requisite intent that caused her any mental anguish.

FN110. 25 C.J.S. *Damages* § 95 (2005) (citing cases).

Williams also seeks payment of the attorneys' fees she incurred in the prosecution of this action. In Delaware, "parties bear their own attorneys' fees pursuant to the American Rule." [FN111] Although exceptions to this rule exist in equity, including for bad faith conduct in litigation, Williams has not shown that any such exception applies here.

FN111. *Carlson v. Hallinan,* 2006 WL 771722, at *22 (Del.Ch. Mar.21, 2006) (internal citations omitted).

### IV. CONCLUSION

*9 Williams failed 1) to prove that she is entitled to specific performance, 2) to satisfy her burden of proof with respect to her claims for damages and 3) to satisfy her burden of proof with respect to her claim for rescission of the Sales Agreement. Williams also failed to establish any entitlement to damages for mental anguish or attorneys' fees. Judgment therefore is entered in favor of Defendants on all counts.

IT IS SO ORDERED.

Not Reported in A.2d, 2006 WL 1668348 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

*Exhibit "C"*

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 294012 (Del.Ch.)
**(Cite as: 1998 WL 294012 (Del.Ch.))**

Page 1

▷
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Jesse R. DARNELL and Barbara A. Darnell,
Plaintiffs,
v.
Magdalene H. MYERS, Defendant.
**No. 14859-NC.**

May 27, 1998.
Thomas C. Marconi of Losco & Marconi,
Wilmington, for Plaintiffs.

John F. Thomas, Jr. of Tighe, Cottrell & Logan,
Wilmington, for Defendant.

MEMORANDUM OPINION

STEELE, V.C.

*1 Plaintiffs instituted this litigation after they
discovered that the wooden foundation of the home
they purchased from defendant was almost
completely rotted, making the home uninhabitable.
Plaintiffs seek to rescind the contract of sale on the
grounds of negligent misrepresentation and mutual
mistake of the parties [FN1] and to have the parties
returned to the *status quo ante.* Defendant opposes
plaintiffs' claim for rescission and seeks, via
counterclaim, to collect damages for waste and to
collect the full amount plaintiffs owe on their
purchase money mortgage and note pursuant to the
documents' acceleration clauses. After trial and post-
trial briefing, I find that plaintiffs are not entitled to
the equitable remedy of rescission on the basis of
defendant's negligent misrepresentations because
plaintiffs failed to prove that they justifiably relied on
the misrepresentations. I find that the contract cannot
be rescinded on the basis of mutual mistake of the
parties because, under the circumstances of this
particular transaction, plaintiffs should bear the risk
of the parties' mistake. Defendant's counterclaim can
be transferred to the Superior Court pursuant to 10
*Del. C.* § 1902.

FN1. Although plaintiffs' complaint raised

five counts, they addressed only two of the
counts at trial and in their post-trial briefs.
The claims for fraudulent misrepresentation,
innocent misrepresentation and breach of the
covenant of good faith and fair dealing
apparently have been abandoned.

BACKGROUND
In the summer of 1995, Jesse and Barbara Darnell,
("plaintiffs") purchased a house on approximately
five acres of land in Townsend, Delaware from
Magdalene Myers ("defendant"), an eighty two-year-
old widow. Plaintiffs first learned that the house was
for sale in late April or early May of 1995, when they
saw the property's "For Sale" sign from the road.
Plaintiffs stopped by, unannounced, and defendant
invited them inside. During this initial meeting,
defendant told plaintiffs that she had been living in
the house for six years and that it was "in great
shape" and "solid."

Shortly after their initial visit, plaintiffs contacted
defendant's realtor, Sherrill Fulton, and told her that
they were considering purchasing the house. On May
8, 1995, plaintiffs received a copy of the Seller's
Disclosure of Real Property Condition Report ("the
Seller's Disclosure"). Section X of the Seller's
Disclosure, entitled "Basements and Crawl Spaces,"
contained Question 60, which asked whether
defendant Seller was aware of "any water leakage,
accumulation, or dampness within the basement or
crawl space." Defendant's response indicated that she
was not aware of any such condition. Question 61
asked whether there had been "any repairs or other
attempts to control any water or dampness problem in
the basement or crawl space." Defendant checked the
"no" box.

In late May of 1995, plaintiffs decided that they were
interested in purchasing the house, and they met
defendant in Fulton's office to negotiate the price and
terms of sale. Defendant brought with her to the
meeting an unsolicited, handwritten list of the
property's amenities. Most importantly for this action,
the list included the following notation: "[N]ew pump
in crawl space to remove whatever water comes in
when we have a hard rain." Although this statement
would seem to be in direct conflict with defendant's
responses to Questions 60 and 61 of the Seller's
Disclosure--that she was unaware of any "water
leakage, accumulation or dampness in the ... crawl

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 294012 (Del.Ch.)
(Cite as: 1998 WL 294012 (Del.Ch.))

space" and that there had not been any "repairs or other attempts to control any water or dampness problem in the ... crawl space--plaintiffs were not immediately concerned about the accuracy of the Seller's Disclosure. Instead, plaintiffs testified that they found defendant's handwritten notation to be reassuring. They understood defendant's notation to mean that water *only* penetrated the crawl space *after a hard rain* and that the penetration was not a problem because the sump pump prevented any accumulation. At this meeting, the parties agreed upon the price of $164,000.

**\*2** The parties' Agreement of Sale stated that plaintiffs would be permitted access to the property for any professional inspections they wished to have done before settlement. Although the contract also clearly stated that the sale was *not* contingent on the results of those inspections, plaintiffs and defendant candidly testified that they understood the contract to mean that plaintiffs could withdraw from the sale if any inspection yielded unsatisfactory results. Plaintiffs took advantage of their right to have the home inspected. [FN2] They hired Brandywine Home Inspections, Inc., on Fulton's suggestion, to perform the inspection. One or both plaintiffs accompanied the home inspector, Ronald M. Smith, at all times as he made the inspection and asked questions about the condition of the house.

> FN2. Plaintiffs also had termite, well water and septic system inspections.

As Smith inspected the crawl space, Jesse Darnell waited next to its entrance. Before Smith entered the crawl space, which had a dirt floor, he went out to his truck to put on hip waders. Jesse testified that Smith remained in the crawl space for approximately one minute. After his brief, and necessarily cursory, inspection, Smith advised Jesse that he saw a "moisture problem" in the crawl space that would have to be corrected. In an attempt to discern the magnitude of the problem, Jesse asked Smith what type of remedy might be required. Smith stated that plaintiffs should contact a waterproofing contractor and that the remedy would likely be to install a vapor barrier. Smith estimated the cost of the remedy to be approximately $2,500. Because plaintiffs were putting almost all of their money into the purchase of the home, Jesse asked if he could forgo the repair for a year or if the problem required immediate attention. Smith advised Jesse that the crawl space could be left in its current condition for another year.

Smith also prepared a written Building Analysis

Report *as he made his inspection.* Smith left the written report of his findings with plaintiffs, and both testified that they read the report. The report began with a summary of "major deficiencies," "important items" and "minor repairs." In keeping with Smith's oral advice to Jesse, the summary of Smith's findings stated that plaintiffs should consult a waterproofer "to correct water [and] moisture in crawl area," and that the estimated cost would be "$2,000 †." These notations were written in under the heading "major deficiencies." In the body of the report, under the heading "Structural," Smith noted that the floor framing was made of wood, and he wrote in the following notation: "correct moisture condition in crawl." Smith *did not check the box* on the form that stated: "No major structural defects noted--in normal condition for its age." Neither did he check any of the other boxes in that section, which would have indicated that there were *no* signs of water damage, *some* signs of water damage or *extensive* signs of water damage. In sum, the "Structural" section of the written report indicated the moisture as a "major deficiency," but it did not indicate the intensity of the water problem or whether the moisture had caused any actual damage to the structure of the house.

**\*3** In the next section of the report, under the heading "Basement (Or Lower Level)," Smith had a choice of checking a box that said "Conditions observed" or "Conditions not observed." He checked the latter box. Smith also indicated, by checking a box, that the crawl space was "Not readily accessible," and next to the box he wrote: "water and mud." Finally, Smith checked a box stating that the dampness in the crawl space was "Extensive," and he circled the box to draw attention to it. On the following page of the report, under the heading of "Insect Boring Activity and Rot," a pre-printed paragraph states: "If there is an inaccessible basement or crawl space, there is a possibility that past or present ... rot exists in this area. Since no visual inspection can be made, it is not possible to make a determination of this damage if it exists."

Immediately after the home inspection of June 8, 1995, when plaintiffs finished reading Smith's written report, the parties signed the Agreement of Sale. Plaintiffs armed with the arguably internally contradictory inspection report, nonetheless expressed no reservations about the structure of the house and made no attempt to renegotiate the purchase price based on Smith's oral and written reports. The parties agreed to go to settlement on August 25, 1995, approximately seventy-five days later. At settlement, plaintiffs tendered a $9,000

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 294012 (Del.Ch.)
**(Cite as: 1998 WL 294012 (Del.Ch.))**

Page 3

down payment and incurred additional settlement charges of $2,978.05. Plaintiffs testified that they did not discuss the condition of the crawl space with defendant, a waterproofer or any other person between the day they signed the contract of sale and the day of settlement. Defendant took a $155,000 purchase money mortgage and promissory note for the balance of the contract price. Under the terms of the note, plaintiffs agreed to pay defendant $929 .30 per month for 30 years. [FN3]

> FN3. The property was defendant's only major asset. Her only income, other than the $929.30 monthly payments that plaintiffs were to have made, is her monthly social security check.

Plaintiffs moved into the house the day after settlement. Shortly thereafter, they noticed, for the first time, a hump in the first floor. Plaintiffs pulled up the carpet and saw a problem with the floor underneath. Plaintiffs then went to the crawl space directly below the hump and found that the joists had rotted so extensively that they could be pulled out with plaintiffs' bare hands. Plaintiffs put in a temporary support beam and called Construction and Real Estate Services, a company that, among other things, performs home inspections. Rick Lemire, the company's President, performed another inspection of plaintiffs' property, including an extensive inspection of the crawl space. Lemire found the structural framing in the crawl space so severely deteriorated that three-quarters of the structural members were no longer capable of holding up the house. Lemire explained severe water penetration caused the deterioration, likely extending over a period of many years. Lemire suggested that plaintiffs leave the premises. They did so as soon as they were able to find alternate housing. Plaintiffs have not returned to live in the home since October of 1995.

*4 Shortly after leaving the house, plaintiffs instituted this action to rescind the Agreement of Sale. Since filing the action, plaintiffs have behaved as if the contract has already been rescinded. For example, plaintiffs have not made a single payment to defendant in satisfaction of the note and mortgage. Plaintiffs had all tax bills forwarded to defendant, and she has paid them. Plaintiffs had the electricity in the house turned off because they could not afford to pay an electricity bill at the vacant house in addition to the bill at their new residence. As a result, the sump pump stopped working, causing the crawl space to sustain additional damage that plaintiffs have taken no steps to repair. Finally, in the winter of 1996, the

house's heater failed and was left unrepaired, causing the pipes in the house to freeze and burst. This exercise of self-help in the extreme gave rise to defendant's counterclaim against plaintiffs for damages for waste and for the acceleration of their obligation to pay the $155,000 balance of the purchase price.

### CONTENTIONS OF THE PARTIES

Plaintiffs contend that the Agreement of Sale should be rescinded and that the parties should be returned to the *status quo ante*. Plaintiffs argue that rescission is justified because they were induced to purchase the property by defendant's negligent misrepresentations about its condition. Specifically, plaintiffs relied on defendant's statements that the house was "in great shape" and that the sump pump prevented the accumulation of water in the crawl space, which only entered after a hard rain. Furthermore, plaintiffs argue, their home inspector's advice tended to reinforce defendant's misrepresentations. Smith did not say that he could offer no opinion about the condition of the crawl space because the space was inaccessible; he offered an extensive opinion. Smith did not recommend that plaintiffs call a structural engineer to fix their problem; he recommended a waterproofer. He did not tell plaintiffs to look into the problem right away; he advised them that they could wait a year. He did not suggest that any repair to the crawl space would be invasive or extremely costly; he stated that plaintiffs needed to install a vapor barrier at an approximate cost of $2,500. Most importantly, plaintiffs explain, Smith's written report was insufficient to warn them that a structural problem might exist because they considered the written report in conjunction with Smith's oral report.

For many of the same reasons, plaintiffs alternatively contend that rescission is justified because both parties were mutually mistaken about a material fact upon which their contract was based, namely, the structural integrity of the property. Defendant testified that she never intended to sell plaintiffs an uninhabitable house. Indeed, she stated that had she known of the structural defect, she would have had the home repaired before selling it. Plaintiffs testified that they, too, were unaware of the home's structural defects. They testified that there was no way that they could have known that such a serious defect existed because Smith's oral advice was not sufficient to put plaintiffs on notice that the house contained a defect that might render it uninhabitable. Finally, plaintiffs argue that Smith's written report caused them no alarm because they considered it in conjunction with his oral report.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 294012 (Del.Ch.)
**(Cite as: 1998 WL 294012 (Del.Ch.))**

**\*5** Defendant admits that some of her representations were false, albeit unintentionally so, and that they relate specifically to the defective condition that made the house uninhabitable. Nevertheless, defendant argues the contract cannot be rescinded on the basis of negligent misrepresentation because plaintiffs have not proved the crucial element of justifiable reliance. To the extent plaintiffs contend that they did rely on her misrepresentations, defendant argues, that reliance was unreasonable in the face of the additional information plaintiffs received from defendant and from their home inspector. Similarly, defendant argues that the contract should not be rescinded on the basis of mutual mistake because plaintiffs had superior information and should bear the risk of their mistake.

### NEGLIGENT MISREPRESENTATION

Plaintiffs contend that they are entitled to rescind the contract of sale because defendant's negligent misrepresentations unfairly induced them to purchase the property. In order to sustain a claim for negligent misrepresentation under Delaware law, plaintiffs must prove (1) a pecuniary duty to provide accurate information, (2) the supplying of false information, (3) failure to exercise reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon the false information. [FN4] If plaintiffs fail to prove any of the four required elements, their claim for negligent misrepresentation must fail.

> FN4. *Ward v. Hildebrand,* Del. Ch., C.A. No. 13582, 1996 WL 422336 at \*4, Chandler, V.C. (July 8, 1996)(citing *Wolf v. Magness Constr. Co.,* Del. Ch., C.A. No. 13004, Chandler, V.C. (Sept. 11, 1995) Mem.Op. at 3.)

The first three elements of a negligent misrepresentation claim can be satisfied. As seller of the house, defendant had a duty to provide plaintiffs with accurate information. In addition to defendant's oral representation that the house was "in great shape" and "solid," she made written representations that (1) she was not aware of any "water leakage, accumulation, or dampness" in the crawl space and that (2) there had been no "attempts to control any water or dampness problem" in the crawl space. It is now clear that defendant did not exercise reasonable care in communicating to plaintiffs and that her written statements were false. That does not, however, end the inquiry. Despite "more liberal standards for issuing relief" in equity justifiable

reliance must still be proved. [FN5]

> FN5. See DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 2-3(b)(1)(ii) at 43 (1998) for an excellent discussion of "Fraud at Law and in Equity."

Plaintiffs cannot prove that reliance on these misrepresentations was justifiable because plaintiffs had additional information available to them before they signed the Agreement of Sale and before settlement. First, plaintiffs had defendant's handwritten statements to the contrary that water *did* penetrate the crawl space after a hard rain and that a new sump pump had been installed in 1993 to attempt to control the problem. This inconsistency alone should have put plaintiffs on notice that they could not rely on the Seller's Disclosure. There is, however, much more.

Plaintiffs contend that after receiving defendant's handwritten notes, they no longer relied on defendant's statements in the Seller's Disclosure that no water penetrated the crawl space. Instead, they relied on defendant's statement that the house was "in great shape" and on her modified written statement that any water that did penetrate the crawl space was entirely removed by the sump pump. I find, however, that plaintiffs could not have reasonably relied upon defendant's representations, even as modified, because plaintiffs also had available to them the written and oral representations of their home inspector, Smith.

**\*6** Plaintiffs argue that they should not be denied relief solely because they relied on other information *in addition to* defendant's misrepresentations. They argue that defendant's misrepresentations still had a significant impact upon their decision to purchase the home. Plaintiffs, however, have framed the issue incorrectly. The issue before me today is to what extent *any* reliance on defendant's misrepresentations was "justifiable ." After considering the totality of the information plaintiffs had available to them, I find any reliance they may have placed on defendant's misrepresentations, even the modified misrepresentation, was unreasonable.

Any reasonably prudent person would have been on notice that the sump pump was not removing all the water from the crawl space when they saw that Smith could not enter the space without hip waders. If the hip waders were not enough to indicate a problem,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 294012 (Del.Ch.)
**(Cite as: 1998 WL 294012 (Del.Ch.))**

plaintiffs should have been on notice that the sump pump was not removing all the water from the crawl space when they read Smith's written report, which stated that "water and mud" made the space "inaccessible." At the very least, plaintiffs should have been on notice that the sump pump was not removing all the water from the crawl space when Smith orally explained that the space had a "moisture problem."

Plaintiffs also should have suspected that the presence of water might cause a significant structural problem after they read Smith's written report. He noted that the entire structure of the house was made of wood and he did *not* check the box that said "[n]o major structural defects noted--in normal condition for its age." Both plaintiffs testified that they have known for some time that water can cause wood to rot. Although Smith made oral representations that the problem in the crawl space could be fixed, plaintiffs should have been on notice that his oral representations should be accepted with caution because they knew that Smith's "inspection" of the crawl space lasted only one minute. And plaintiffs certainly should have been on notice that Smith had no basis upon which to form *any* opinion at all about the condition of the crawl space-- and that his earlier, reassuring opinion should be disregarded--when Smith's written report disclaimed responsibility for inspecting the crawl space altogether while indicating the potential presence of rot. At the very least, plaintiffs should have been on notice that there was a *potential* problem caused by water penetration into the crawl space and should have looked into the matter further before signing the contract of sale or before relinquishing their contractual right to rescind based upon a failed inspection. Instead, they blithely went to settlement.

No case has been cited for the proposition that sellers of real property should be charged, as a matter of law, with knowledge of latent or unknown structural defects where they have offered prospective buyers unlimited access for inspection and a contractual right to rescind without penalty if defects are disclosed by an actual inspection. A purchaser who has an unfettered right to broad inspection of real property before settlement with the option to rescind where an inspection does reveal (or would reveal to any reasonably prudent person) evidence of a defect, cannot ignore the need for further inquiry in the face of that notice and consummate the sale, causing the seller to alter significantly her economic circumstances, *and then* ask equity to intervene and rescind the transaction on

the basis that the purchaser misjudged the severity of the problem or the enormity of the defect.

**\*7** Plaintiffs' claim for rescission based on defendant's negligent misrepresentation must fail because no reasonably prudent person under these circumstances would be justified in relying upon them.

### MUTUAL MISTAKE
Plaintiffs maintain that they are entitled to rescind the contract of sale because they and defendant were mutually mistaken in their belief that the home was structurally sound. The Delaware courts have adopted the Restatement (Second) of Contracts' approach to analyzing a claim for mutual mistake. [FN6] Section 152 of the Restatement provides:

> FN6. *Lang v. Koziarz,* Del. Ch., C.A. No. 1120-S, 1987 WL 15554 at *5, Berger, V.C. (Aug. 11, 1987).

"Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect onthe agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of a mistake under the rules stated in Section 154." [FN7]

> FN7. Restatement (Second) of Contracts § 152 (1981).

There can be no serious dispute that the first two elements of section 152 have been met. Plaintiffs and defendant testified that they thought the home was structurally sound at the time they signed the contract of sale. And I stated in an earlier Opinion in this case that "[t]he structural integrity of the house must be considered to be material *per se.*" [FN8] Thus, whether the contract should be rescinded based on a mutual mistake of the parties really turns on whether or not plaintiffs "bear the risk of a mistake under the rules stated in Section 154."

> FN8. *Darnell v. Myers,* Del. Ch., C.A. No. 14857-NC, 1996 WL 757231 at *3, Steele, V.C. (Dec. 6, 1996).

Section 154 states that a party may bear the risk of mistake under section 152 when:
"(a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the fact to which the mistake relates but

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 294012 (Del.Ch.)
(Cite as: 1998 WL 294012 (Del.Ch.))

treats his limited knowledge as sufficient, or (c) the risk is allocated to him by the Court on the ground that it is reasonable under the circumstances to do so." [FN9]

FN9. Restatement (Second) of Contracts § 154 (1981).

I find that, under the circumstances, plaintiffs bear the risk of mistake under all three subsections of section 154.

Both parties agree, contrary to the language in the contract, that plaintiffs had the right to cancel the contract of sale upon receipt of a home inspector's report indicating that the house was in an unsatisfactory condition. Thus, the contract provisions, offering a full inspection and right to rescind, actually allocated the risk of mistake to plaintiffs. Plaintiffs had a home inspection done, and they received both a written and an oral report from the inspector. Although the inspector's oral report "played down" the structural problems of the house, plaintiffs had reason to be skeptical of Smith's oral advice.

First, Jesse Darnell saw that Smith was unable to enter the crawl space without hip waders. Second, Jesse saw that Smith's entire examination of the crawl space took only one minute. Third, Smith's written report, which plaintiffs read, stated that the presence of "water and mud" made the crawl space "inaccessible" and that he could offer no opinion respecting its condition. The written report clearly stated that the entire structure of the house was made of wood, and both plaintiffs testified that they knew that water can cause wood to rot. Finally, the written report, despite a demarcated place for such an entry, did not indicate that the house had "[n]o major structural defects" or that the house was "in normal condition for its age."

*8 Clearly the home inspector did plaintiffs a disservice by offering any opinion at all, much less a reassuring opinion, concerning the condition of the crawl space when, by his own admission, he was unable to inspect the area and had no basis for such an opinion. Plaintiffs read the written report that disclosed Smith's level of knowledge. After reading that report, plaintiffs, at the very least, should have noticed the patent conflict between Smith's oral and written representations and should have looked into the matter further. Plaintiffs failed to look into the matter further before signing the contract of sale, and they failed to look into the matter further during the

two months before settlement. In short, plaintiffs had "only limited knowledge with respect to the fact to which the mistake relates," (whether water in the crawl space might cause a structural defect in the home) but "treat[ed their] limited knowledge as sufficient."

Thus, I find that, although the parties were mistaken as to a basic assumption upon which the contract of sale was made and that the assumption had a material effect on the agreed exchange of performances, plaintiffs are not entitled to have the contract rescinded because, under the circumstances, they acquired equal or superior knowledge about the condition of the home, exercised their contractual right to an inspection, followed through on the inspection and then, after being put on notice about serious problems, or the potential for them, inexplicably ignored them and went to settlement. Plaintiffs bear the risk of mistake "because it is reasonable under the circumstances [for them] to do so."

## CONCLUSION

Why plaintiffs chose to go forward with the purchase of defendant's home in the face of the numerous "red flags" outlined above is unclear. Barbara Darnell testified that this home had several features that were important to the family. The house had plenty of room for plaintiffs' three children, including several bedrooms and a new recreation room, and it sat on five acres of land. The house was also ideally located a short drive from Barbara Darnell's sister's home. As first-time home buyers, plaintiffs may also have felt fortunate that defendant agreed to provide a purchase money mortgage with a favorable market rate, freeing plaintiffs from the expenses and inconveniences of dealing with a bank. Thus, plaintiffs may have discounted the warning signs in Smith's written report. In fact, plaintiffs testified, incredibly, that after reading the written report they felt pleased because, in their minds, the inspection "went well" and came back "clean."

Plaintiffs have failed to prove that they are entitled, as a matter of equity, to have the Agreement of Sale rescinded on the basis of negligent misrepresentation or mutual mistake. Thus, there is no equitable bar to defendant's counterclaim, which seeks damages for waste and seeks to accelerate plaintiffs' payment of the mortgage and note.

*9 Defendant's mortgage foreclosure action, and requested attendant relief, is more appropriately pursued in the Superior Court. If defendant is indeed

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 7
Not Reported in A.2d, 1998 WL 294012 (Del.Ch.)
**(Cite as: 1998 WL 294012 (Del.Ch.))**

entitled to acceleration under the terms of the note and mortgage, the house may need to be sold to satisfy the obligation. Despite jurisdiction in this Court to address the counterclaim for foreclosure and waste, this jurisdiction should be exercised only in limited circumstances. The Court of Chancery has no administrative arm with expertise to process a post-hearing foreclosure, even if the merits of the action could be determined here. No equitable remedies apply in a foreclosure action and claim for attendant money damages. The Sheriff's office, responsible for conducting the sale, and an experienced Prothonotary's office, both of which work closely with the Superior Court, have the tools to process most effectively any required sale. Damages for waste related solely to the acts prompting foreclosure are also recoverable in the Superior Court. These claims, traditionally at law, can thus be more efficiently handled by the law court and its ancillary offices. Therefore, I exercise my authority under 10 *Del. C. § 1902* to allow defendant to transfer the counterclaim to the Superior Court. I decline to exercise continuing jurisdiction under the "clean-up" doctrine or under the theory of providing "complete justice" by providing full and final relief here for the good reasons stated.

IT IS SO ORDERED.

Not Reported in A.2d, 1998 WL 294012 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

*Exhibit "D"*

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15554 (Del.Ch.)
**(Cite as: 1987 WL 15554 (Del.Ch.))**

▷
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, Sussex County.
Kennard G. LANG, Jr. and Edith S. Lang, his wife, et
al., Plaintiffs,
v.
Lawrence E. KOZIARZ and Barbara J. Koziarz, his
wife, Robert M. Kauffman,
Edward Saulsbury, Ocean View Real Estate, Inc., a
Delaware corporation, Stanley
E. Marvel and D. Stephen Parsons, Defendants.

Submitted: March 20, 1987.
Decided: August 11, 1987.
Glenn E. Hitchens, Morris, James, Hitchens &
Williams, Dover, for plaintiffs.

T. Henley Graves, Fuqua & Graves, Georgetown, for
defendants Koziarz.

James D. Griffin, Griffin & Hackett, Georgetown,
for defendants, Kauffman, Saulsbury, Ocean View
and Marvel.

MEMORANDUM OPINION

Berger, Vice Chancellor.

**\*1** This is the decision after trial in a dispute over the
purchase of three adjoining, unimproved parcels of
land located on County Road 388 in Sussex County,
Delaware. Plaintiffs, Kennard G. Lang, Jr. and Edith
S. Lang (the 'Langs'), Vincent C. Emmell and Rita G.
Emmell (the 'Emmells'), and Charles W. Kilby and
Rita Kilby (the 'Kilbys'), are three unrelated couples
who purchased the parcels at approximately the same
time in the fall of 1983. Defendants are Lawrence E.
Koziarz and Barbara J. Koziarz (the 'Koziarzes'), the
sellers; Ocean View Real Estate, Inc. ('Ocean View'),
the sellers' agent; Robert M. Kauffman ('Kauffman')
and Edward Saulsbury ('Saulsbury'), realtors working
at Ocean View; and Stanley E. Marvel ('Marvel'), the
person who performed percolation ('perc') tests on
each of the parcels. The complaints in this
consolidated action seek rescission and damages on
theories of mistake, fraud, misrepresentation and/or

negligence because plaintiffs were unable to obtain
permits for the installation of conventional on-site
septic systems on the land in question.

The evidence presented at trial may be summarized
as follows. The Emmells live in Maryland and,
before this transaction, never owned real estate in
Delaware or property without a sewer system. They
needed a lot on which to put a mobile home and
contacted Saulsbury, telling him that it was urgent
that they find a piece of land because they had to
move as soon as possible. Saulsbury explained that
the parcel they selected was zoned for mobile homes,
but would need a septic system. He told the Emmells
that he would put language in the sales contract that
would make the sale subject to a satisfactory perc
test. Mrs. Emmell testified that she relied on
Saulsbury and thought that the perc test condition
would protect her. She claims that Saulsbury assured
her that, if the perc test were satisfactory, approval of
a sewer system would be a matter of form. On cross-
examination, Mr. Emmell acknowledged being told
that the laws relating to septic systems were changing
and that those changes were creating some problems.
However, she apparently was led to believe that a
septic permit would be issued nonetheless.

At Saulsbury's suggestion, Marvel was hired to
perform the perc test. The test results were
satisfactory, and the Emmells went to settlement on
October 27, 1983. Marvel filed an application for a
septic system permit for the Emmells on November
3, 1983. Approximately one month later, the
Emmells received word from the Delaware
Department of Natural Resources and Environmental
Control ('DNREC') that the application was denied.
The Emmells appealed that decision to the
Environmental Appeals Board, but Mrs. Emmell
admitted that she did not want to win on appeal
because, by the time of the hearing on appeal in the
spring of 1984, the Emmells had purchased another
property for their mobile home. The appeal to the
Environmental Appeals Board was later denied.

The Kilbys' experience was similar to that of the
Emmells. In 1983 they lived in Maryland, but had
vacationed in Delaware. They decided to buy a lot
on which to put a mobile home and went to Ocean
View after seeing a newspaper advertisement in late
August, 1983. Kauffman was the realtor who dealt
with the Kilbys. He showed them the Koziarzes'

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15554 (Del.Ch.)
(Cite as: 1987 WL 15554 (Del.Ch.))

Page 2

property, and on September 10, 1983 they signed a contract to purchase one of the parcels. Mrs. Kilby told Kauffman that she wanted a satisfactory perc test condition in the contract because she had heard about the need for a perc test over the years and understood that the test was necessary to install a septic system. Mrs. Kilby thought that nothing more was required to obtain a septic permit.

*2 As with the Emmells, Marvel performed the perc test, and, at settlement on October 29, 1983, the Kilbys were told that the perc test results were satisfactory. On March 3, 1984, the Kilbys received a letter from DNREC stating that their septic permit application was denied. The letter, written by Carol Webb ('Webb'), supervisor of the Sussex County Office of Division of Environmental Control, included the statement that Webb was unaware of a system that would be suitable given the water table on the Kilbys' property. Because of this statement, the Kilbys did not bother to appeal the decision denying the septic permit. The Kilbys then sold their mobile home and later bought another lot and another mobile home.

The Langs also are Maryland residents who had never owned property in Delaware before entering into the contract now in dispute. However, unlike the Emmells and Kilbys, the Langs were knowledgeable about the real estate business inasmuch as Mr. Lang had been a realtor for approximately ten years prior to 1983. The Langs dealt with Saulsbury and entered into a contract for the purchase of one of the Koziarzes' parcels on September 28, 1983. Mr. Lang inserted the perc test contingency language in the contract and believed that the contingency clause provided all the protection the Langs needed.

Marvel was hired to perform the perc test. The Langs never saw the results of that perc test, but were told that it was satisfactory prior to settlement in November, 1983. The Langs later hired Ormile Savage to perform a separate perc test and to apply for a septic permit. However, they did not do so until approximately one year after settlement because they had heard that the Emmells and Kilbys had been denied permits and that no system known to DNREC would be acceptable. In late February, 1985, the Langs received written notice that their application had been denied and, like the Kilbys, were told the lot was unsuitable for a septic system because of high ground water levels. The Langs did not appeal that decision to the Environmental Appeals Board.

The Koziarzes purchased the property now in dispute as one larger parcel in 1972. They had intended to build a home on the property, but later changed their minds. Sometime prior to 1983, the Koziarzes listed the property with Ocean View for sale as one parcel. They were unable to sell the property, and, in the spring of 1983, Kauffman suggested that the Koziarzes subdivide the property and attempt to sell it as several smaller parcels. The Koziarzes agreed and left it to Ocean View to determine how the property would be subdivided and marketed. They had no discussions with Kauffman about septic systems until plaintiffs' contracts were presented to the Koziarzes. At that time, the perc test contingency language was discussed briefly. Kauffman told the Koziarzes that the contingency language was standard and the Koziarzes then signed the contract.

Mr. Koziarz testified that he understood that a perc test involved drilling holes in the property, and it is fair to infer from his testimony that Mr. Koziarz also understood that the perc test contingency clause related to the buyers' interest in obtaining a septic system. Mr. Koziarz did not give any thought to the possible distinction between obtaining a satisfactory perc test and obtaining a septic permit. He did not discuss this issue or any other aspects of the contract with any of the plaintiffs.

*3 The events described above are largely undisputed. The more significant factual issues concern DNREC's septic system approval process and defendants' knowledge of that process and its implications. The following background about septic systems and perc tests was provided principally by Webb and Marvel. For a conventional septic system to operate properly, the land must drain at an appropriate rate and the water table must be at least a certain level below the surface. The DNREC regulations in effect in the fall of 1982 required at least a 48 inch water table and a permeability rate of 2-40 minutes per inch for approval of a conventional septic system.

The perc test determines both the permeability rate and the water table on the date that the perc test is performed. However, the water table generally is much lower during the dry summer months than in the rainy season in winter or spring. The perc tests on the parcels in question were performed in late September and the water table at that time was more than 48 inches deep. Marvel acknowledged that, after a rainy period several months later, the land was so saturated with water that he would not even have been able to perform a perc test. As a result, Marvel

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15554 (Del.Ch.)
(Cite as: 1987 WL 15554 (Del.Ch.))

Page 3

was not at all surprised that DNREC determined the seasonal high water table to be only 13 inches deep.

During the 1970s and early 1980s, it apparently was the practice for perc tests to be done during the dry season when it was more likely that a satisfactory water table reading would be obtained. Prior to 1982, a satisfactory perc test was tantamount to approval of a conventional septic system permit. In the summer of 1982, however, DNREC began performing site evaluations to determine the soil content and the seasonal high water table. Those site evaluations resulted in an increase in the number of denials of septic permits during the period from 1982 through 1985. While DNREC's new enforcement policy was not publicly announced until 1985, when new regulations were promulgated, Webb testified that DNREC performed at least 300 site investigations prior to the fall of 1983 and that those who were involved in the permit application process for any of those 300 parcels would have become aware of DNREC's increased scrutiny of the applications.

Marvel testified that he performed approximately 500 perc tests per year, but he disputed Webb's contention that Marvel must have been involved in a DNREC site evaluation prior to the fall of 1983. He stated that, until plaintiffs' permit applications were denied, he was not aware of any cases where there had been a satisfactory perc test but the septic permit application was denied. Kauffman's father, Charles Kauffman, a co-owner of Ocean View, did have first hand knowledge of this problem. He owned a property approximately 600 feet from plaintiffs' parcels, and, in March, 1983, a septic permit was denied for his property notwithstanding a satisfactory perc test. Charles Kauffman claimed never to have told anyone at Ocean View what happened with his property. Charles Kauffman's co-owner, Saulsbury and Kauffman all testified that they were unaware of Charles Kauffman's experience and were unaware of any other permit denials.

*4 Finally, two attorneys and an unrelated realtor testified as to the type of septic system contingency language generally used in real estate contracts during 1983. Elizabeth Stiff ('Stiff'), a realtor, testified that, in the contracts she wrote in 1983 and in those where she was the co-broker, the relevant language generally was the same as that used in plaintiffs' contracts. Stiff acknowledged that a satisfactory perc test did not guarantee that one would obtain a septic permit, but it was her understanding that permits were routinely granted under those circumstances. In late 1983, Stiff began

hearing rumors that DNREC was 'getting tougher,' but it was not until 1984 that she began to recommend language making the contract contingent upon obtaining a permit as opposed to a satisfactory perc test. The attorneys' testimony confirmed that the standard contract language in 1983 included only a perc test contingency.

Based on this evidence, plaintiffs claim they are entitled to rescind their contracts on several grounds. First, they argue that the realtors, as agents of the Koziarzes, made material misrepresentations to plaintiffs. They sold the parcels as mobile home lots and allowed plaintiffs to believe that the parcels would be fit for their intended use if the perc test results were satisfactory. Plaintiffs contend that Marvel surely must have known about DNREC's stepped up enforcement policy prior to the fall of 1983. In addition, Charles Kauffman had actual knowledge of a denial notwithstanding a satisfactory perc test, and Saulsbury and Kauffman at least knew that after a perc test was obtained an application still had to be made to DNREC. Under these circumstances, plaintiffs argue that they were given only half truths when they discussed the perc test contingency clause. The realtors knew that plaintiffs were going to use the lots for mobile homes and that plaintiffs would be unable to do so if they could not obtain septic system permits. The perc test contingency language was intended to address this concern, yet the realtors never told plaintiffs that the language chosen was inadequate to ensure the desired result--a septic system permit.

I find that the evidence does not support a claim of misrepresentation. Defendant realtors testified that they were unaware of any permit denials under the circumstances presented here. Their credibility is bolstered by the independent realtor's testimony to the same effect. Marvel's state of knowledge is open to some question inasmuch as he performed hundreds of perc tests and had significantly more contact with DNREC than did the realtors. However, he denied any knowledge of permit denials prior to the fall of 1983 and there was no competent evidence rebutting that testimony. Charles Kauffman knew of one denial on the lot he owned, but he testified that he assumed that it would be possible to get septic system approval notwithstanding the denial and he never told anyone in his office about the original denial. Thus, the evidence does not support a conclusion that defendants were aware of the new DNREC enforcement policy and the consequent risk that a septic permit could be denied where the perc test was satisfactory.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15554 (Del.Ch.)
(Cite as: 1987 WL 15554 (Del.Ch.))

*5 Plaintiffs have made claims for negligence and statutory consumer fraud violations. These too are unfounded. As to the negligence claim, there was no evidence to establish that, in the exercise of due care, defendants should have known of DNREC's new policy and the consequent risks that the septic permits would be denied. Indeed, the only evidence on this point suggests that the real estate community as a whole was unaware of DNREC's new policy and that DNREC did nothing to alert realtors or perc testers to its enforcement changes. Plaintiffs' statutory claims depend upon a finding that defendants concealed, suppressed or omitted a material fact in connection with the sale of the parcels. 6 Del. C. § 2513(a). For the reasons discussed in connection with plaintiffs' claim of misrepresentation, I find that defendants did not know of DNREC's enforcement policy and did not engage in any misrepresentation whether by commission or omission. Cf. Brandywine Volkswagen, Ltd. v. State, Dept. of Community Affairs & Economic Development, Del. Supr., 312 A.2d 632 (1973).

Plaintiffs also claim they are entitled to rescission based on mutual mistake, and I find that the evidence does support such a claim. A contract may be rescinded by the affected party in a case of mutual mistake where: (1) both parties were mistaken as to a basic assumption; (2) the mistake materially affects the agreed upon exchange of performances; and (3) the party adversely affected did not assume the risk of the mistake. Shore Builders, Inc. v. Dogwood, Inc., 616 F. Supp. 1004 (D. Del. 1985); Restatement (Second) of Contracts § 152 (1981). In this case, the parties mistakenly believed that the parcels were suitable for septic systems and, therefore, for mobile homes. I find the evidence of this mistake to be clear and convincing. Plaintiffs were looking for mobile home lots, the parcels were advertised as mobile home lots, and plaintiffs were advised before settlement that the perc tests were satisfactory. Plaintiffs understood that the perc test results meant that they would be able to install septic systems. Defendants, likewise, believed that they were selling property suitable for mobile homes. The realtors' past experience had been that septic permits were always granted where the perc test was satisfactory. Webb confirmed that, for many years prior to 1982, a satisfactory perc test was tantamount to approval of a septic permit. What no one realized at the time of these sales was that DNREC had changed its enforcement policy.

It is undisputed that plaintiffs' inability to obtain a septic permit materially affects the parties' agreements. However, defendants argue that no relief should be granted on several grounds. First, they say that plaintiffs did not properly plead mistake in their complaint and did not adequately prove such a claim in their own case at trial. As to the pleading issue, whether the complaint adequately stated the basis for plaintiffs' claim of mistake or not, the parties entered into a pre-trial stipulation expressly recognizing that Count I of the complaint claimed 'mistake and/or fraud or misrepresentation . . . .' Pre-Trial Stipulation and Order, ¶ 1. Later in the stipulation, the parties identify as an issue of law, whether fraud was alleged with sufficient particularity. However, the stipulation does not raise any question as to the sufficiency of plaintiffs' pleadings with respect to mistake. The stipulation, by its terms, was to control the subsequent course of the litigation unless modified to prevent manifest injustice. There is nothing in this record to indicate that defendants were surprised at trial by the claim of mistake, and I find, therefore, that it works no injustice to hold the parties to their pre-trial stipulation, including the claim of mistake identified therein.

*6 On the question of the adequacy of plaintiffs' evidence, I find that they made out a prima facie claim of mistake before resting their case. Plaintiffs all testified as to their purpose in buying the lots, their understanding of the perc test contingency, and the statements made by defendant realtors confirming plaintiffs' erroneous beliefs with respect to the perc tests. Defendant realtors testified to the fact that they were unaware of any permit denials after a satisfactory perc test, and Saulsbury acknowledged that he might have told the Emmels that the septic permit application would be nothing more than a formality. Finally, Webb testified that, as a matter of fact, a satisfactory perc test was tantamount to septic system approval prior to 1982 and that DNREC's new policy was not publicly announced at the time these contracts were executed. I find this evidence to be sufficient to establish a mutual mistake as to a fact material to the contracts.

Defendants next argue that plaintiffs assumed the risk of the mistake either by agreement or by conscious ignorance. The facts do not support a finding of either. If the parties believed that the property would pass a perc test and, based on this belief, plaintiffs went to settlement without having the perc tests performed, it would be appropriate to rule that plaintiffs had agreed to bear the risk of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15554 (Del.Ch.)
(Cite as: 1987 WL 15554 (Del.Ch.))

mistake. See Restatement (Second) of Contracts § 154, comment b (1981). Here, however, satisfactory perc tests were obtained, and the mistake was not with respect to whether the land would perc, but whether a septic permit could be obtained after a satisfactory perc test. The contracts do not expressly or impliedly shift the risk of this mistake to plaintiffs.

Where a contracting party is aware that he has limited knowledge as to the mistaken fact, but goes forward with the contract nonetheless, he may be deemed to have assumed the risk of the mistake due to his conscious ignorance. Restatement (Second) of Contracts § 154(b), comment c (1981). This principle applies where the affected party knew that there was an uncertainty as to a material fact, but entered into the contract without resolving or protecting against that uncertainty. For example, in Wright & Pierce v. Town of Wilmington, Mass., 290 F.2d 30 (1st Cir. 1961), plaintiff had contracted to prepare a tax map for the defendant town. Prior to contracting, plaintiff was given an estimate as to the number of parcels involved in the project, but was warned that the estimate was not reliable because the relevant town records were very poor. Under these circumstances, even though it turned out that the number of parcels was significantly higher than estimated, plaintiff's claim of mutual mistake was denied. See 3 Corbin Contracts § 598 (1960). In this case, there was no conscious ignorance because plaintiffs believed they had protected themselves against the uncertainty through the perc test contingency language. The evidence establishes that neither plaintiffs nor defendants were aware that there was any risk remaining after receipt of a satisfactory perc test.

*7 Another of defendants' arguments is that plaintiffs failed to establish that the parcels were unsuitable for septic systems. Only one of the three sets of plaintiffs appealed DNREC's denial of the permit application, and none of the plaintiffs sought approval for an alternative septic system under DNREC's 1985 regulations. I am satisfied from the evidence that, at the time the contracts were made, plaintiffs could not have obtained a permit for any type of septic system. See, e.g., Joint Exhibit D. Webb testified that, even under the 1985 regulations, a conventional septic system would not be approved for these lots. She did acknowledge the possibility that a more costly, non-conventional septic system could be installed under the new regulations. However, the mere possibility that plaintiffs could have obtained a more costly septic system one and one-half years after purchasing their lots does not change the fact that, at the time of

purchase, the lots were unusable. Accordingly, I see no basis to deny rescission on this ground.

Relying upon Pryor v. Aviola, Del. Super., 301 A.2d 306 (1973), defendants argue that the claim of mutual mistake is barred under the doctrine of merger by deed. Pryor recognizes the general rule that, once a property has been conveyed, the rights of the parties are determined by the covenants in the deed rather than by the agreement of sale. However, mistake is a recognized exception to the merger doctrine. See Reed v. Hassell, Del. Super., 340 A.2d 157, 160 (1975) (Stating the rule to be that 'the deed alone must be looked to for determination of the rights of the parties, in the absence of fraud or mistake . . ..'); 26 C.J.S. Deeds § 91c, cited with approval in Allied Builders, Inc. v. Heffron, Del. Supr., 397 A.2d 550, 553 (1979). Thus, the doctrine of merger by deed does not preclude plaintiff from seeking rescission based upon mutual mistake.

Finally, the Koziarzes argue that rescission should be denied because the status quo cannot be restored and because they would suffer economic hardship if forced to refund plaintiffs' money. When the Koziarzes' property was subdivided in 1983, four parcels were created. Plaintiffs purchased three of those parcels and John Barry purchased the fourth. Barry was fortunate to escape the problems faced by plaintiffs. His parcel included one small ridge of higher ground with a different soil content from that of the rest of his property and plaintiffs'. As a result, Barry was able to obtain septic system approval for his lot. The Koziarzes argue that, unless they regain title to Barry's lot as well as plaintiffs', the status quo will not be restored. The problem with this argument is that each of the parcels was sold separately in unrelated transactions. Thus, it does not seem appropriate to tie the parcels together for purposes of determining whether rescission is an available remedy.

The Koziarzes' assertion of economic hardship was not developed at all at trial. There is no evidence of the Koziarzes' present financial condition or of the 'hardship' that the Koziarzes say that they would suffer. Thus, this Court has no basis on which to evaluate the Koziarzes' claim that rescission would be inequitable in this case. Under other circumstances, this Court might not allow a further hearing on the relief to be awarded. However, in this case, the complaints were not filed until the spring of 1985, more than one year after plaintiffs learned that their parcels were not suitable for septic systems. Inasmuch as rescission is an equitable remedy, it

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1987 WL 15554 (Del.Ch.)
**(Cite as: 1987 WL 15554 (Del.Ch.))**

Page 6

seems appropriate for the Court to consider the question of economic hardship to the Koziarzes on a more complete record. Accordingly, a hearing will be scheduled to consider this matter and to allow plaintiffs to update their evidence of expenses incurred in connection with these transactions.

*8 IT IS SO ORDERED.

Not Reported in A.2d, 1987 WL 15554 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOE GANO,                              )
                                       )
      Plaintiff,                  )
                                       )
     v.                              )    No.    1:07-cv-00271
                                       )
DONALD MARK EHART and                  )
SPREAD EAGLE, INC.,                    )
                                       )
      Defendants.                 )

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Compendium of Unreported Opinions cited therein to Plaintiff's Answer to Defendants' Motion for Summary Judgment and Supporting Brief, filed through the ECF system, were served electronically on January 24, 2008, to the following individuals:

Richard H. Cross, Jr.
Tara M. DiRocco
913 North Market Street, 11th Floor
Wilmington, DE 19801
*Attorneys for Defendants*

        */s/ Sophia Siddiqui (#4914)*
        SOPHIA SIDDIQUI (#4914)
        Fox Rothschild LLP
        919 N. Market Street, Suite 1300
        Wilmington, DE 19899-2323
        (302) 654-7444
        (302) 656-8920 (facsimile)