# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| JOE GANO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.    1:07-cv-00271 |
| | ) | |
| DONALD MARK EHART and | ) | |
| SPREAD EAGLE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## APPENDIX TO PLAINTIFF'S OPPOSITION TO
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

**FOX ROTHSCHILD LLP**
Sophia Siddiqui, Esquire (I.D. No. 4914)
919 N. Market Street, Suite 1300
Wilmington, DE 19899-2323
(302) 654-7444
(302) 656-8920 (facsimile)

**FOX ROTHSCHILD LLP**
Wendy G. Rothstein, Esquire (PA I.D. No 37178)
1250 South Broad Street
P.O. Box 431
Lansdale, PA 19446-0431
(215) 699-6000
(215) 699-0231 (facsimile)

**NURICK LAW GROUP**
Todd B. Nurick, Esquire (PA I.D. No. 78847)
111 West Germantown Pike
Plymouth Meeting, PA 19462
(610) 238-9000
(610) 238-9977 (facsimile)

Date:  January 24, 2008

## TABLE OF CONTENTS

A.    Ehart July 5, 2007 Deposition Transcript, pgs. 15-19, 35, 42-43, 44-45, 47-48, 68

B.    Brown Dep. Exhibit 17

C.    Brown Dep. Exhibit 14

D.    Brown Dep. Exhibit 18

E.    Ehart October 25, 2007 Deposition Transcript, pgs. 9, 23-25, 44-45, 63-64, 88, 89-90, 93-94, 95-96

F.    Brown Dep. Exhibit 16

G.    Brown Dep. Exhibit 1

H.    Gerald W. Brown, Sr. October 3, 2007 Deposition Transcript, pgs. 53-56, 58, 72-76, 100-101, 107-108, 110, 116-121, 122-123, 131, 136, 138-139

I.    Chancery Court Joint Pre-Trial Stipulation and Order.

J.    Daniel Brousseau October 18, 2007 Deposition Transcript, pgs. 56-66, 75-79

K.    Two page September 1, 2005 Brousseau & Brousseau Report

L.    Cannavo July 26, 2007 Deposition Transcript, pgs. 144, 156

M.    December 4, 2007 Chancery Court Trial Transcript, pgs. 43-44, 175-176, 182

N.    Gano October 31, 2007 Deposition Transcript, pgs. 5-6, 7, 17, 26

O.    One page unnumbered June 30, 2005 Statement of Operations

P.    Affidavit of Joe Gano

Q.    January 3, 2006 Agreement for Sale of Business

R.    December 17, 2007 Alfred T. Giuliano Expert Report

S.    April 11, 2003 Permanent Modification Support Order

T.    Mary Beth Ehart August 13, 2007 Deposition Transcript, pg. 29

U.    June 20, 2007 Permanent Modification Support Order

EXHIBIT "A"

1

1        IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2                   IN AND FOR NEW CASTLE COUNTY

3

4    DAVID CANNAVO and RED EAGLE      : C.A. No.: 2379-VCS

5    AVIONICS, LLC a Delaware Limited :

6    Liability Company,               :

7              Plaintiffs,            :

8    v.                               :

9    DONALD MARK EHART and            :

10   SPREAD EAGLE, INC., a Delaware   :

11   Corporation formerly known as    :

12   Red Eagle Avionics, Inc.,        :

13             Defendants.            :

14

15        Deposition of DONALD MARK EHART, taken

16   pursuant to notice before Tanya M. Congo, a Notary

17   Public and Certified Shorthand Reporter, at the

18   offices Fox Rothschild, LLP, 919 North Market Street,

19   Suite 1300, Wilmington, Delaware, on Thursday, July

20   5, 2007, beginning at approximately 10:10 a.m., there

21   being present:

22

23

24

2

```
1    APPEARANCES:

2                    FOX ROTHSCHILD, LLP

3                    1250 South Broad Street, Suite 1000

4                    Lansdale, PA 19446-0431

5                    BY:  WENDY G. ROTHSTEIN, Esquire

6                    Attorney for Plaintiffs

7                    NURICK LAW GROUP

8                    111 West Germantown Pike

9                    Plymouth Meeting, PA 19462

10                   BY:  TODD B. NURICK, Esquire

11                   Attorney for Plaintiffs

12                   CROSS & SIMON, LLC

13                   913 North Market Street, 11th Floor

14                   Wilmington, DE 19899-1380

15                   BY:  RICHARD H. CROSS, Jr., Esquire

16                   Attorney for Defendants

17

18

19

20

21

22

23

24
```

15

```
1        Q.    Okay.  Other than that have you ever been

2   arrested?

3        A.    No.

4        Q.    Okay.  Did you ever have to appear in

5   court and plead guilty or non-guilty for anything?

6        A.    No.

7        Q.    So the questions is, have you ever been

8   convicted of a crime.  In court have they ever found

9   you guilty of a crime based upon either a trial or

10  hearing, or based upon you pleading guilty?

11       A.    I don't know, ma'am.  I'm sorry.  I truly

12  don't.

13       Q.    All right.  Have you lived anywhere other

14  than the state of Delaware and the state of Florida?

15       A.    Yes.

16       Q.    Okay.  What other states have you resided

17  in?

18       A.    Alabama.

19       Q.    When, approximately?

20       A.    It was in the eighties.

21       Q.    Anywhere else?

22       A.    No, I don't think so.

23       Q.    Have you ever been a plaintiff in a

24  lawsuit?
```

16

```
 1          A.    I don't understand.  Plaintiff?
 2          Q.    Have you ever filed a lawsuit against an
 3   individual, or a company, or a governmental entity,
 4   or anyone?
 5          A.    I don't think so.
 6          Q.    Other than this case and other than --
 7   well, let me back up.  In your domestic relations
 8   case, was that filed by yourself or by your ex-wife?
 9          A.    Once was me and I think the other times
10   was her.
11          Q.    Okay.  Other than that -- other than your
12   domestic relations case, other than this case, have
13   you been a defendant in any other lawsuit?  Has
14   anyone else sued you?
15          A.    Not that I recollect.
16          Q.    Other than your domestic relations case
17   have you testified in court in any other -- under any
18   other circumstances?
19          A.    I don't remember.
20          Q.    Mr. Ehart, what is your highest grade of
21   education?
22          A.    I went to college, technical college.
23          Q.    Okay.  And where?
24          A.    In Alabama.
```

Tanya M. Congo & Associates, Ltd. (302) 836-3713

17

1      Q.    Name of the place.

2      A.    Alabama Aviation and Technical College.

3      Q.    Did you receive a degree from there?

4      A.    I received a license.

5      Q.    What type of license did you receive?

6      A.    An Air Frame and Power Plant license.

7      Q.    Air Frame?

8      A.    And Power Plant.

9      Q.    And what does that entitle you do to?

10     A.    Aircraft maintenance.

11     Q.    And what was the name of the course that

12 you attended?  Was it a one-year course; a six-month

13 course; a two-year course?

14     A.    I believe it was eighteen months.

15     Q.    And did you complete the program?

16     A.    Yes.

17     Q.    And upon completion they issued the

18 license?

19     A.    Yes.

20     Q.    Do you have any other licenses other than

21 that license, or your driver's license?

22     A.    Yes.

23     Q.    What other licenses do you hold?

24     A.    I hold a pilot certificate.

18

1        Q.   Who is that issued by?

2        A.   The FAA.

3        Q.   Okay.  What other licenses?

4        A.   I hold a FCC license with a radar

5  endorsement.

6        Q.   Who is that issued by?  Is that issued by

7  the FAA?

8        A.   FCC, I believe.

9        Q.   FCC.  Okay.  What did you need to do to

10  obtain that license?

11       A.   I went to school after my mechanics

12  license.  I re-enrolled into the technical school.

13       Q.   And did you complete that program?

14       A.   Yes, ma'am.

15       Q.   And what does the FCC license entitle you

16  to do?

17       A.   Repair transmitters, radio transmitters.

18       Q.   Any other licenses you have?

19       A.   I had an ABC license.  I don't know if

20  that is still current.

21       Q.   And what is that?

22       A.   It entitles you to serve alcohol.

23       Q.   And did you let that expire or lapse?

24       A.   Yes.

19

1          Q.    Any other licenses?

2          A.    I had an IA certificate.  I don't know if

3     that's considered a license.  But that expired.

4          Q.    What was that?

5          A.    That entitles me to sign off major repairs

6     and alterations on aircraft.

7          Q.    Now when did that expire?

8          A.    March 31st.

9          Q.    What year?

10         A.    Every year.

11         Q.    And when did you let that expire?  This

12    past March 31st?

13         A.    Yes.

14         Q.    And why did you let it expire?

15         A.    Because I had no place to work out of

16    anymore.  I didn't meet the criteria in order to hold

17    it.

18         Q.    So you let that lapse on your own?

19         A.    Didn't want to, but yes.

20         Q.    Any licenses you've ever held ever been

21    suspended or revoked?

22         A.    Yes.

23         Q.    Which licenses have been suspended or

24    revoked?

35

1    here.

2    BY MS. ROTHSTEIN:

3        Q.    And by involvement I mean incorporating

4    the company, being a shareholder in the company,

5    being an officer, being a director.

6        A.    I don't think so.  I can't recall any.

7        Q.    At some point in time did you make a

8    decision to sell the stock and/or assets of Red Eagle

9    Avionics, Inc.?

10       A.    Yes.

11       Q.    Okay.  When did you make that decision?

12       A.    Approximately after the 9/11 situation.

13       Q.    And what caused you to make that decision?

14       A.    Reality check, I think.  After that day it

15   seemed like my kids were a lot more important to me

16   than anything else.  I wanted to spend more time with

17   them.

18       Q.    Okay.  Other than from a personal point of

19   view, were there business reasons that caused you to

20   make the decision to want to sell the business, or

21   the stock or assets?

22       A.    No.

23       Q.    At that point in time when you made that

24   decision did you then start marketing the company or

42

1       Q.   Okay.  And do you believe that it

2  accurately reflected the value of the business as of

3  12/31/2003?

4       A.   That was my belief.

5       Q.   Did you have any reason to question the

6  business valuation report?

7       A.   No.

8       Q.   Now, did you provide a copy of the

9  business valuation report -- which is marked Ehart

10  Number 1 and which is Bates stamped DC-3 to DC-47 --

11  did you provide a copy of that report to either Dave

12  Cannavo or Joe Gano?

13       A.   Yes.

14       Q.   Okay.  When did you provide it to them?

15       A.   I don't recall the date.

16       Q.   Was it before the business was sold in

17  January of 2006?

18       A.   Yes.

19       Q.   Okay.  Why did you provide them a copy of

20  that business valuation report?

21       A.   To show them what the business was worth.

22       Q.   Did you believe that in 2005, when you

23  were having discussions with Cannavo and Gano, that

24  that business was worth, in 2005, what was indicated

43

1    in 2003 in this report?

2          A.    I figured more.

3          Q.    And what was your basis for that?

4          A.    Appreciation of the hangar and stuff.

5          Q.    Were you intending to have Dave Cannavo

6    and Joe Gano rely upon this business valuation

7    report?

8                      MR. CROSS:   Objection.   Compound.

9    BY MS. ROTHSTEIN:

10         Q.    I'll break it down.   Were you intending to

11   have Dave Cannavo rely upon the business valuation

12   report in making a decision whether to purchase the

13   assets of Red Eagle Avionics, Inc.?

14         A.    Well, I assumed that they would take this

15   into consideration -- my tax returns that I gave

16   them; you know, the other paperwork I gave them; and

17   any information they got. I thought it would be a

18   part of their evaluation.

19         Q.    Now, did Dave Cannavo specifically ask you

20   for a copy of -- let me back up.  Did Dave Cannavo

21   ask you whether you ever had a business valuation

22   report prepared for the company?

23         A.    I don't recall whether he asked me if I

24   had one done.

Tanya M. Congo & Associates, Ltd. (302) 836-3713

44

1          Q.    Do you know whether you were the person

2    who brought up the subject that wanted it done and

3    then offered to provide a copy?

4          A.    I don't recall.

5          Q.    When did your discussions with Dave

6    Cannavo start regarding the idea of either purchasing

7    the stock or assets of Red Eagle Avionics, Inc.?

8          A.    I don't recall the exact date.  I mean,

9    it's been casual conversation, as far as I was

10   concerned, for, you know, a year.

11         Q.    Okay.  Would it be fair to state that

12   there were some conversations in the summer of 2005?

13         A.    Yes.

14         Q.    Who initiated the conversations regarding

15   the concept of Dave Cannavo purchasing assets or

16   stock of the company?

17         A.    I think Dave initiated the -- I recall

18   early in the year, you know, telling him that the

19   business was for sale.  And I think he came back to

20   me.  This is the way I remember it but, you know, I

21   can't be a hundred percent sure.

22         Q.    How many times did discussions take place

23   between you and Dave Cannavo or you and Dave Cannavo

24   and Joe Gano regarding the purchase of the assets or

45

1   stock of the company prior to an agreement of sale

2   actually be signed?

3                   MR. CROSS:  Objection.  Compound.

4                   THE WITNESS:  I just remember the one

5   meeting with Joe Gano and Dave Cannavo sitting down

6   in my office.

7   BY MS. ROTHSTEIN:

8       Q.    Okay.  Do you know when that was?

9       A.    I truly don't know.  I know that's when I

10  gave him the valuation report and anything else he

11  wanted.

12      Q.    Now, prior to that meeting do you remember

13  any discussions that took place between you and

14  either -- between you and Cannavo regarding the

15  purchase of the business?

16      A.    They were interested and wanted to set up

17  a time to meet.  That was --

18      Q.    Anything substantively discussed prior to

19  that meeting?

20      A.    I don't understand.

21      Q.    Anything discussed other than just when

22  you were going to meet?  Any details discussed prior

23  to the meeting?

24      A.    Not that I recall.  I mean --

46

1        Q.   How long did the meeting take place?

2        A.   An hour, maybe.

3        Q.   And other than you, Dave Cannavo, and Joe

4 Gano, was anyone else present at the meeting?

5        A.   No.

6        Q.   Did you take notes of the meeting?

7        A.   No, ma'am.

8        Q.   Okay.  What was said at the meeting?  What

9 did you say about the business?

10       A.   I don't recall.  I mean, it was casual

11 conversation.

12       Q.   Do you remember anything specifically that

13 they said?

14       A.   No.

15       Q.   Did they ask for any documentation from

16 you?

17       A.   I don't recall them asking for

18 documentation.  I told them they could have anything

19 they wanted but I don't recall them asking for

20 anything.

21       Q.   Okay.  When did you tell them they could

22 have anything they wanted?

23       A.   Just in casual conversation.  That's all I

24 remember.

47

1      Q.    What, if any, documentation did you

2   provide to them at that meeting?

3      A.    I don't recall.

4      Q.    Did you provide them with any

5   documentation at the meeting?

6      A.    Truly, I don't remember if it was then or

7   -- I just don't remember.  I can't give you a correct

8   answer.

9      Q.    Okay.  Well, what, if anything, do you

10  remember from that meeting other than you know that

11  you met with Joe Gano and Dave Cannavo?

12     A.    What do I remember about it?

13     Q.    Right.

14     A.    That they were just another couple of guys

15  interested in buying the business.  I've been through

16  meetings like that before with previous people that

17  wanted to buy it.  So, I just took it with a grain of

18  salt, to be honest.

19     Q.    Had you previously known Dave Cannavo?

20     A.    Yes.

21     Q.    How did you know Dave Cannavo?

22     A.    I used to work on his airplanes.

23     Q.    Okay.  So how long have you known him?

24     A.    I guess since we were in business, since

Tanya M. Congo & Associates, Ltd. (302) 836-3713

48

1    we started.

2         Q.    Did you consider him a personal

3    acquaintance?

4         A.    I considered him a customer.

5         Q.    Did you also consider him a friend?

6         A.    Yeah.  I mean, all my customers are

7    friends.

8         Q.    How long had you known Joe Gano?

9         A.    Not that long.

10        Q.    And how did you know Joe Gano?

11        A.    Through Dave Cannavo.

12        Q.    And how did you know him through Dave

13   Cannavo?

14        A.    He was a customer; wanted us to work on

15   his jets.

16        Q.    And did you, in fact, work on jets that

17   were owned by Joe Gano?

18        A.    I believe they were owned by Joe.  I'm not

19   a hundred percent sure because Dave had so many of

20   them.  I don't know which was Joe's and which wasn't.

21        Q.    Okay.  Did you have any discussions with

22   Dave Cannavo or Joe Gano at that meeting regarding

23   what you thought your business was worth?

24        A.    Yes.

Tanya M. Congo & Associates, Ltd. (302) 836-3713

68

1    didn't change my asking price.  I just wasn't sure of

2    the exact -- what it was worth until I got the --

3    well, I had a price in mind what I thought it was

4    worth and then once I got the evaluation is when I

5    decided that, okay, somewhere between 2 and 2.5 seems

6    to be --

7        Q.    Did you think the company was worth more

8    or less than the final number in the evaluation

9    report?

10       A.    Originally more, yes.

11       Q.    Okay.  So you thought it was worth more.

12   What did you think the company was worth prior to

13   your receipt of that valuation report?

14       A.    2.5.

15       Q.    Did FBO AvCenter, did you share with them

16   documentation?

17       A.    I believe I signed a non-disclosure

18   statement with them as well.

19       Q.    Okay.  And did they review books and

20   records?

21       A.    I'm assuming they did.  I don't recall.

22       Q.    Okay.  And why didn't that sale take

23   place?

24       A.    It wasn't enough money.

EXHIBIT "B"



# PBS Global, Inc.

1499 S. Harbor City Blvd., Suite 202, Melbourne, FL 32901
Phone: 321.435.5003 ex. 23   Fax: 321.988.0244
www.pbsglobalinc.com   E-mail: Adminassist1@PruBizServices.com
"Bringing Buyers and Sellers Together Worldwide"

September 20, 2004

Mark Ehart
Red Eagle Avionics
1 Dale's Way
New Castle, DE  19720

Dear Mark,

Welcome to PBS.  Our Board of Directors has reviewed and accepted your application, and would like to thank you for your confidence in our company.

If you have contracted for an independent third party valuation, please note that proper financial documentation of a minimum of one year tax return and/or financial statements, but preferably five years, is required.  If this documentation was given to your field analyst on site, then work will proceed forthwith.  If you were instructed to mail these in, however, please do so right away to the above address attention "valuation coordinators" or fax to 321.988.0247.  Successfully bringing a buyer and seller together based on existing market conditions or personal circumstances is often very time sensitive, so the necessity to send in financial documentation as soon as possible can not be stressed enough.  The process is time consuming and given the volume of work the valuation companies currently have due to extremely low interest rates, it may take up to 45 days from the time we receive all of the necessary financial documents to complete.

Please understand, however, that the time required to successfully complete a valuation does not prevent your business from being presented to our existing buyer network.  In addition to our Buyer/Seller Services Department presenting your business to our existing network of buyers, we have also prepared a confidential business portfolio of your business.  This portfolio will be used to market your business on various print ads, periodicals and web sites.

DEPOSITION
EXHIBIT 17

ME000953

All of our marketing is done as blind listings. This means that no names or exact locations are ever used to protect the confidentiality of our clients. Remember that selling a business is not like selling a house. It is nearly impossible to sell a business with only agent contact with the buyer. A savvy buyer will always want to discuss business facts directly with the existing owner. After all, no one knows your business better than you.

Our Buyer/Seller Services Department will not only talk to pre-qualified buyers, but also to potential buyers or investors who inquire about your business. All buyers and investors must sign a non-disclosure and non-circumvent agreement to protect your confidentiality and both our interests. When a match is made, we will notify you with the name and contact information of a potential buyer or investor, along with pertinent information about them before an introduction call is scheduled.

Your calls are always welcome. Our Client Services Department is here to answer any questions that may arise. They will keep in contact with you on a regular basis by phone, mail or e-mail.

Again, thank you for entrusting us with this major step in your personal and financial future.

Sincerely,

Debbie Kotula
Client Services

*It's not just your satisfaction we strive for; it's a Satisfied Customer, who will recommend us Without Reservation!!*

ME000954

EFiled: Nov 29 2007 11:48AM EST
Transaction ID 17454409
Case No. 2379-VCS

# EXHIBIT "C"

09/11/2007  14:26    3027774224                     CROSS & SIMON LLC              PAGE  02/03
09/11/2007  13:19    8137927__9                      INT MED PEDS OF              PAGE  02
09/07/2007  11:07    3027774224                     CROSS & SIMON LLC             PAGE  02/02

# RSI & ASSOCIATES
### I N C O R P O R A T E D
www.value-solutions.com

## AGREEMENT FOR CONSULTING SERVICES

AGREEMENT made on _____ September 4 _____, 2007 between ____ Mark Rhett ____, hereinafter referred to as Client, and RSI & Associates, Inc., is as follows:

**I - Moral Services**

Client hereby engages RSI & Associates, Inc. and RSI & Associates, Inc. hereby agrees to consult on matters related to:

Legal Company Name: Koi Perela Avionics, Inc. _____ more particularly described as follows:

Physical Address: 1 Dale's Way, New Castle DE 19720

**II - Purpose of the Consulting Assignment:**

RSI & Associates, Inc. agree to provide consulting services, authorized by Client, as (indicated and described) below:

| | | |
|---|---|---|
| ☐ Exit Solutions® | ☐ Business Valuation Report | ☐ CD Business Card/Portfolio |
| ☐ Future Solutions® | ☐ Business Evaluation | ☐ IPO/Reverse Merger Seminar |
| ☐ Venture Solutions® | ☐ Valuation Consultation | ☐ ESOP Seminar |
| ☐ ESOP Solutions® | ☐ Litigation Financial Statement | ☐ Litigation Support/Trial Consulting |
| ☐ IPO Solutions® | ☐ Formal Due Diligence Package | ☐ Expert Witness Testimony |
| ☐ Service Solutions® | ☐ Publivalued Company Portfolio | ☐ Merger/Acquisition Consulting |
| ☐ Formal Business Valuation | ☐ Formal Business OR Marketing Plan | ☐ Other _____ |

* Items may be combined to Related Package if Client operates within 90 days of the date of engagement.

**III - Compensation**

Client agrees to pay RSI & Associates, Inc. for consulting services authorized a fee of $3250/hr for Deposition & Expert Testimony (the minimum is $1500/hr for Trial Consulting, $150/hr for travel with all consumers paid) which is due and payable:

| | |
|---|---|
| ☐ At phase completing intervals | ☐ Submission of monthly statements |
| ☐ Upon acceptance of engagement | ☐ Submission of weekly statements |
| ☐ Upon completion of assignment | ☐ Upon delivery of report |

If the fee is to be paid for an hourly or daily basis, Consultant agrees to keep accurate time records and to furnish Client, upon request, copies of such time records. It is understood and agreed that the fee is not contingent upon and bears no relationship to the valuation (if applicable) or conclusion to be reported.

**IV - Retainer**

Consultant representing RSI & Associates, Inc. acknowledges receipt of $2500 Retainer (remitted in firm information Mr. Brown as ____ based on the month Additional Retainer of $2500 unless hereinafter plans for Delaware), as a retainer, herein to be credited against the compensation designated in Article III and V of this Agreement, and made payable to RSI.

**V - Expenses**

Client agrees to pay all reasonable consulting expenses incurred, including travel expenses, expeditionary [per] costs and reasonable subsistence costs incurred by RSI & Associates, Inc. and/or its representatives. Client agrees to pay expense upon submission of an itemized statement therefore. Expenses related to this consulting assignment [X are not ] are included in the compensation defined in Article III of this agreement.

**VI - Consulting Time Estimate**

RSI & Associates, Inc. agree to use its best efforts to complete the assignment by nn days from the date of acknowledgment of this instrument. Said completion date is an estimate and does not give you consideration to any beyond the control of RSI & Associates, Inc., such as lack of specific necessary data, illness [of Client or assigned analyst], acts of war, and/or Acts of God.

Approved by the Client or an Authorized Representative of the Client and an Authorized Consultant representing RSI & Associates, Inc., on the date and year first above written, subject to approval set forth.

Consultant: _____        Client: _____

Firm Name: _____        Mark Rhett

RSI & Associates, Inc.                         Koi Perela Avionics, Inc.
Wells Fargo Bank Building                       1 Dale's Way
9000 South Padre Island Drive, Suite #250        New Castle, DE 19720
Corpus Christi, TX 78412
Office 361/994-8096 or 800/255-9086
Fax 361/994-8054 or 877/255-9096

©2007 RSI & Associates, Inc.
All Rights Reserved



DEPOSITION EXHIBIT
14

 

# PBS Global, Inc.

1499 S. Harbor City Blvd., Suite 202                                         321-435-5003 Ext. 22
Melbourne, FL 32901                                                  Valuations@prubizservices.com

No 1579-60

**Business Address:**   Red Eagle Avionics
                        1 Dales Way
                        New Castle, DE 19720


**Valuation Address:**   1 Dales Way
                         New Castle, DE 19720
                         Cell: 302-530-3636


**Owner:** Mark Ehart


**Asking Price:** $2,436,000

☐   1120     ☑   1120 S      ☐   Partnership      ☐   Sole Proprietor      ☐ _____

☐   Business Profile

☑   Financial Analysis Data

☑   Business Evaluation Review

☐   Consultants Preliminary Evaluation

☐   Financial Statements

☐   Balance Sheets

☑   Tax Returns *(2003 - 1999)   Equip - list  Inclueded*

**Notes:**

In reason with asking price. Clean.


**Consultant:** Park

**Number of Pages** *28*           **GO FINAL** *9/30/04*           **TO** *RSI*
Including cover page

FHH NO. :                          Aug. 24 2004 11:41AM P8

## Business Profile Summ

*(Detailed input is encouraged, feel free to include additional pages as required)*

**Business Name:** RED EAGLE AVIONICS INC

**Owner's Name(s):** MARK EHART

**Business Address:** 1 DALES WAY NEW CASTLE DE 19720

**Mailing Address:** SAME
(for all correspondence)

**Web Site Address:** RED EAGLE AV @ AOL.COM    **E Mail:** SAME

### TELEPHONE NUMBERS

*(Please check which numbers PBS is permitted to use for contact)*

☐ **Business Phone:** (302) 325-2727      ☐ **Home:** (302) 376-7614

☑ **Cellular Phone:** (302) 530-3636      ☐ **Pager:** _____

☐ **Fax Machine:** (302) 328-2451       ☐ **Other:** _____

### HISTORY OF THE BUSINESS

**Principal Business Activity:** (e.g. manufacturing, clothing, automotive / retail or service? / type of service) AVIONICS INSTALLATION + REPAIR

**Date Business Started?** 01 / 01 / 1992    **Date Present Ownership Started?** 01 / 01 / 1992

**Please describe type of business, its main functions, and what you do:** INSTALLATION OF AUTOPILOTS, GPS, COMMUNICATIONS IN AIRCRAFT

MANUFACTURE NEW AIRCRAFT INSTRUMENT PANELS.

PERFORM PITOT/STATIC CERTIFICATIONS REQUIRED EVERY TWO YEARS

### BUSINESS STRUCTURE/OPERATIONS

**Is this Business a:** ☑ Sole Prop. ☐ Partnership ☐ Corp. ☐ Sub S ☐ LLC ☐ LLP?  *Check One*

**Is this Business a:** ☐ Franchise ☐ Chain ☑ Owner Operated ☐ Home Based ☐ Could it Be? ☐ Yes ☐ No
*Check Any*

**Can this business be relocated?**  ☑ Yes ☐ No

**Days/Hours of operation?** MON — FRI 8:30 - 5:00  SOME WEEKENDS

**List all relevant information that would be of interest to a potential buyer.** WE ARE A FAA CERTIFIED REPAIR STATION. Combined over 80 years Exp

## Business Profile Summary Continued

DESCRIPTION OF FACILITIES

The business is physically located on a(n): Airport (ILG)
- ☐ Interstate Hwy  ☐ State Hwy  ☐ County Rd  ☐ City St  ☐ Downtown  ☐ Residential

How many buildings are included? ONE    Total square footage: 15,000 Sq ft

☐ Building is owned. Is it to be included in the sale? ☒ Yes ☐ No

If property is included in valuation, the estimated Fair Market Value is: $_____

Land ☐ Building is leased. Is lease assumable? ☒ Yes ☐ No  Rent $ 550 /month for a term of 30

Additional features about the building/land: (e.g. acres, # floors, age, design)_____

How long has the business occupied the premises? 10 YEAR    Outgrown premises? ☐ Yes ☒ No

REVIEW OF MARKETING PRACTICES

**Please describe the business' products and/or services and indicate what percent of operations are represented by:**

| | Percent | Describe/Notes |
|---|---|---|
| Services | 100 % | |
| Retail | % | |
| Wholesale | % | |
| Manufacturing | % | |
| Other | % | |

Is the customer base: ☐ Local  ☐ Regional  ☒ National

Percentage of referral customers: 25%    Percentage of repeat customers: 75%

Local Competition: ☐ None  ☒ Very Little  ☐ Some  ☐ Much

Describe the nature and history of the business: _____
- Primary market(s): _____
- Estimated share of such market(s): _____
- And its principal competitor(s): _____
- Other: (Elaborate why customer would choose you over competition.) _____

What steps would a new owner take to increase sales or profit? Hire a sales rep
increase marketing dollars

DESCRIPTION OF PERSONNEL

Number of employees full time: 3    Number of employees part time: 3

Please breakdown number of employees by position (including owners)

Management 2  Sales 2  Production 3  Clerical 1  Other _____

Will the key employees remain? ☒ Yes ☐ No    Do they know about the sale? ☒ Yes ☐ No

Comments: _____

Page 2

FROM :    FAX NO. :    Aug. 24 2004 11:42AM P10

## Business Profile Summary Conti...

### LOCATION OF THE BUSINESS

Population of your city? _____    Population of your county? _____

Which region of the state are you located in?    (NE)  N   NW   W   SW   S   SE   E   Central

Your city is located  5  miles from  Wilmington DE  which is the nearest major city.

Nearby airports:  ILG - PHL

Nearby highways:  I95

Economy in this area is basically:  ☒ Strong    ☒ Growing    ☐ Stable    ☐ Weak

The economy of your area is based on: _____

### Sales Price, Terms, And Information

Asking Price: $  2,436,00

Profit Ratio: (compared with industry)  ☒ Excellent    ☐ Good    ☐ Average    ☐ Poor

Average value of the inventory:  5,000    Value of the assets:  1,712,200

Is all equipment and/or inventory necessary to operate the business included in the sale?  ☒ Yes  ☐ No

Will you finance part of the sale?  ☐ Yes  ☒ No    What percentage? _____

Reason for selling:  Other Business Interests

Are there any existing conditions that would interfere with a sale? Explain:  NO

How long will the owner remain for a smooth transition?  1 YEAR

Will you accept a non-competition agreement?  ☒ Yes  ☐ No

Conditions:  3 years / 100 miles

I understand that I am solely responsible for the contents of all three pages of this Business Summary as well as any supplemental information included and warrant that it all contains a complete, true, and accurate description of the Business and that no facts or information have been omitted that would cause the Business Summary to be false or misleading. Owner understands that PBS Global, Inc. will make no independent investigation of the Business and that PBS Global, Inc. has no obligation to verify or determine the completeness, truth, fairness, or accuracy of the Business Summary or the information contained herein. I understand, acknowledge, and authorize PBS Global, Inc. to rely solely upon this Business Summary in preparing the Business Portfolio and I further understand that all values and information reported therein will be based solely upon the Business Summary.

_____    9-2-04    _____
Owner    Date    Owner    Date

Page 3 of 3

  

# Financial Analysis Data

The information I, the Owner, have provided will be utilized in the preparation of the "Financial Analysis" of my business. The information below is a restatement of the financial data of my business. This information will not be shared with anyone not directly affiliated with PBS Global, Inc.

The information is based on:

☒ **Tax Return**    ☐ **Financial Statement**    ☐ **Estimate**    **For The Year** 2003

| | | |
|---|---|---|
| Gross Income: | 1,024,614 | B. Additional Income: 2,000 |
| Cost Of Goods Sold: | 578,606 | C. Taxable Profit: -792 |
| Gross Profit: | 446,008 | D. Interest Paid: 41,450 |
| A. Owner's Wages: | 25,000 | E. Depreciation: 18,028 |
| | | F. Amortization: 0 |

## Discretionary Expense Summary

| | | | |
|---|---|---|---|
| Advertising | | Office Expense | |
| Bad Debts | | Overcompensation | Family & Employees |
| Car & Truck | | Payments to Family | Not Employed |
| Commissions & Fees | | Pension Profit Share | |
| Contributions | | Personal Items Etc. | |
| Dues & Subscription | | Personal CC | |
| Educational Expense | | Increase COG | |
| Employee Benefits | | Rent Expense | |
| Gifts to Clients | | Repairs & Maintenance | |
| Insurance | | Supplies | |
| Legal & Professional | | Taxes & Licenses | |
| Meal, Enter., Travel | | Telephone | |
| Miscellaneous | | Unexpected Losses | |
| Non-Recurring Expenses | | Utilities | |
| | | Other | |

G. Total Discretionary Expenses: 192,881

Adjusted Earnings: (A+B+C+D+E+F+G): #1  278,567

Replacement Value of Owner's Labor: #2  15,600

## Assets

| | | | |
|---|---|---|---|
| Equipment | 160,200 | Leasehold Improvement | |
| Fixtures | 6,000 | Land | 1,500,000 |
| Inventory | 5,000 | Building | |
| Accounts Receivable | 30,000 | Intangibles Lic, Pat, CR, TM. | |
| Vehicles | 11,000 | Other | |

Total Assets: #3  1,712,200

I, the Owner, have released and reviewed all of the above information and do hereby certify that it is true and accurate to the best of my knowledge. I am giving indication of my understanding and hereby agree to hold PBS Global, Inc. harmless from any responsibility for verification of this information. I alone am responsible for setting the asking price of my business.

| | |
|---|---|
| Owner _____ Date | Owner _____ 9-2-04 Date |
| Business Name  Red Eagle Avionics | $ 2,436,000  Asking Price |

Rev Feb 04

# PBS Global Inc.

| Business Name: | | Business Consultant's Name: | Brian Rennelson |
|---|---|---|---|
| Owner's Name: | | Date: | |
| Asking Price: | | Source Of Data: | |
| | | Year Reviewed | |

| | | Gross Sales (Receipts/Income): | $1,024,614 |
| | | Cost Of Goods Sold (COGS): | $578,606 |
| | | Gross Profit: | $446,008 |

## Non-Recurring Exp. & Discretionary Exp

| Discretionary Exp | | Base Numbers | |
|---|---|---|---|
| Advertising | $0 | A. Additional Income | $2,000 |
| auto | $0 | B. Taxable Profit (Loss) | ($792) |
| car lease | $0 | C. Interest Paid: | $41,450 |
| computer expense | $0 | D. Depreciation+ amortization: | $18,028 |
| unnecessary wages | $0 | E. Discretionary Expenses: | $192,881 |
| | $0 | F. Wages Pd To Owner**: | $25,000 |
| ~~salary COGS**~~ | $140,000 | | |
| | $0 | | |
| wages | $0 | | |
| owners life insurance | $15,000 | | |
| Legal & Professional | $18,000 | #1 | Adjusted Profit $278,567 |
| owners medical | $3,600 | | |
| travel | $0 | #2 Replacement Value of Owner | |
| owners personal insurance | $5,000 | Labor/Services*** | $16,600 |
| Taxes & Licenses | $0 | | |
| fica | $0 | Excess Earnings for ROI | $262,967 |
| cell phone | $1,200 | | |
| Pension Profit Share | $0 | A. Return on Assets (5%) | $85,610 |
| owners vehicle | $4,800 | B. Excess Earnings | $262,967 |
| rent new owner will pay | $0 | C. Profit Ratio Base | $177,367 |
| meals | $61 | Assets | |
| / Lease Expense | $0 | Equipment | $160,200 |
| Repairs/Maintenance | $0 | Fixtures | $6,000 |
| Supplies | $0 | Inventory | $5,000 |
| personal fuel | $5,200 | Accounts Receivables | $30,000 |
| Telephone | $0 | Intangibles | $0 |
| Utilities | $0 | Vehicles | $11,000 |
| Other | $0 | Land | $0 |
| | | Building | $1,500,000 |
| Total Discretionary | $192,881 | Leasehold Improvements | $0 |
| | | Other | $0 |
| | | Other | $0 |
| | | #3 Total Assets | $1,712,200 |

| | | | Range of Values | ROI % |
|---|---|---|---|---|
| D. | Return On Investment | $1,314,835 | | 33% |
| E. | IRS Value | $1,898,557 | | |
| F. | Assets & Earnings | $2,462,751 | | |
| G. | SBA Value*** | $768,901 | | |
| H. | Average | $1,735,011 | | |
| ≥5 (<400k); x10(400k-800k); x15 (>800k) | | | High $788,901 | 14% |
| | | | Low $1,880,567 | |
| A. | Average | | Average $1,739,011 | 15% |

COMMENTS & EXPLANATIONS or ITEMIZATIONS:

* OVERCOMPENSATION refers to wages paid to employees or relatives GREATER than the market value of their labor and only the amount OVER the market value is ADDED to the profit as the OVERCOMPENSATION amount.  ** WAGES PD TO OWNERS include those itemized on financials or tax returns as Salary or Compensation TO Owners as well as wages shown as Management Fees or included in general payroll that were paid to the owner.  *** REPLACEMENT VALUE OF OWNER LABOR/SERVICES refers to the FAIR MARKET VALUE to to replace the ir owner(s) that would be necessary for a new owner of the business pay to him/herself another.

" owner built an airplane out of his shop

| Approach #1—Minimum Value Approach | |
|---|---|
| Assets | $1,712,200 |
| Adjusted Profit | $278,587 |
| =Assets+Adjusted Profit | $1,990,787 |

## Approach #2—3rd Party Valuation or Risk Assessment Approach



| Risk Status | High | | Medium | | Low |
|---|---|---|---|---|---|
| Multiple used | 1.000 | 1.550 | 2.110 | 2.660 | 3.550 & up |
| Excess Earnings (B) | $282,987 | | | | |
| Goodwill estimate | | | | | |
| (B) x Multple used | $282,987 | $407,699 | $354,860 | $775,753 | $933,533 |
| Total Asset Value | | | $1,712,200 | | |
| Fair Market Value Ranges | $1,975,167 | $2,119,799 | $2,267,060 | $2,487,953 | $2,645,733 & up |

Low: $282,987

## Approach #3—ROI (Return On Investment) Approach

| | | | | | |
|---|---|---|---|---|---|
| Desired Sale Price | $2,000,000 | $2,300,000 | $2,400,000 | $2,435,000 | $2,500,000 |
| Actual Business Sale | $470,000 | $770,000 | $870,000 | $905,000 | $970,000 |
| Return On Investment (Sale Price) | 13.1% | 11.4% | 11.0% | 10.8% | 10.5% |
| Actual | 56.0% | 34.2% | 30.2% | 28.0% | 27.1% |
| Number of Years to Recoup Invstmt | 7.6 | 8.7 | 9.1 | 9.3 | 9.5 |

$194,880



| | | High | Low |
|---|---|---|---|
| Value of Building, Land & Receivables | | | |
| Minimum ROI at | $1,530,000 | 29% | |
| Estimated appraised value | | | |
| Market value | | $2,545,733 | $2,487,963 |
| | | $2,496,000 | |
| Book Profit to earnings ratio | | | -0.1% |
| Minimum required for funding | | | 20% |
| Adjusted profit to earnings ratio | | | 27% |
| Valuation Fee | | | $11,000 |
| Balance due at close | | | $130,000 |
| Percentage | | | 5.34% |

 

### Capital Equipment List

| | | |
|---|---|---|
| 1 | 10,000 square foot Hangar | $1,500,000 |
| 1 | 5,000 square foot Office Area | |
| 1 | 1995 Chevy G20 Van    (33,000 miles) | 15,000 |
| 1 | 1200Y3 | 5000 ✓ |
| 1 | ATC601 | 15,000 ✓ |
| 1 | ATC600 | 5,000 ✓ |
| 1 | AM/FM – 1000A | 150 ✓ |
| 2 | NAV401L | 5,000 ✓ |
| 1 | Fluke 8012A | 500 ✓ |
| 1 | ASI 190B . | 1,000 ✓ |
| 2 | Scopes | 500 ✓ |
| 2 | Power Supplys | 2,000 ✓ |
| 1 | Surface mount De-solder/Solder Station | 1500 ✓ |
| 4 | Soldering Stations | 500 ✓ |
| 3 | Heat Guns | 500 ✓ |
| 1 | DPS 400 RVSM Static Box | 15,000 ✓ |
| 1 | Barfield Static Box | 2,000 ✓ |
| 2 | Bird Watt Meters | 500 ✓ |
| 1 | Headset Tester | 200 ✓ |
| 1 | WX PA Tester | 1,000 ✓ |
| 1 | NDB Updater | — |
| 1 | GPU | 2,000 ✓ |
| 3 | Computer Systems | 4,000 ✓ |
| 1 | Kingsley Wire Stamping Machine | 17,000 ✓ |
| 1 | Mobile Air Conditioner | 5,000 ✓ |
| 1 | Vac Pump | 500 ✓ |
| 2 | Engraving Machines | 2,000 ✓ |
| 1 | Aircraft Tug | 3,000 ✓ |
| 1 | 30 year lease | |
| 1 | Milling Machine | 2,700.00 ✓ |
| | Misc Sheet metal Equip | 2,000 ✓ |
| 1 | Radios + Parts | 50,000 ✓ |
| | Test harnesses | 400 ✓ |
| | furniture | 1,000 ✓ |
| | Kap 150 Test Set | 2,000 ✓ |
| | Orne 871 Gulfstream kit | 5000 ✓ |
| 5 | Handheld Transceiver | 1,500 ✓ |
| 6 | Phone Systems | 600 — ✓ |
| | KTS 150 Test set | 3200 |
| | | |
| | Furniture Fix 5 4 office spaces ✓ | |

EXHIBIT "D"



DEPOSITION
EXHIBIT

ME000951

EXHIBIT "E"

Gano v. Ehart, et al.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOE GANO,                          )
                                   )
                                   )
          Plaintiff,               )
                                   )        Civil Action
     v.                            )        No. 07-271
                                   )
DONALD MARK EHART and              )
SPREAD EAGLE, INC., a Delaware,    )
corporation, formerly known as     )
Eagle Avionics, Inc.,              )
                                   )
          Defendants.              )

     Deposition of DONALD MARK EHART taken pursuant to
notice at the law offices of Fox Rothschild LLP,
919 Market Street, Suite 1300, Wilmington, Delaware,
beginning at 9:17 a.m. on Thursday, October 25, 2007,
before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

          WENDY G. ROTHSTEIN, ESQ.
          Fox Rothschild LLP
             1250 South Broad Street
             Lansdale, Pennsylvania 19446-0431
                  - and -
          TODD B. NURICK, ESQ.
          Nurick Law Group
             111 West Germantown Pike
             Plymouth Meeting, Pennsylvania  19462
             for the Plaintiff,

          TARA M. DiROCCO, ESQ.
          Cross & Simon, LLC
             913 North Market Street, 11th Floor
             Wilmington, Delaware  19801
             for the Defendants.
                  WILCOX & FETZER, LTD.
          1330 King Street - Wilmington, Delaware  19801
                     (302) 655-0477
                     www.wilfet.com

Gano v. Ehart, et al.
Donald Mark Ehart

6

1    Q.   Where else do you own property?
2    A.   I think that's it.
3    Q.   Have you owned property within the last two
4    years other than the Townsend property and the
5    property in Tampa?
6    A.   Well, let's see. I own the hangar, if that's
7    where --
8    Q.   I'm sorry. You are correct. Other than the
9    hangar at the New Castle County Airport?
10   A.   Okay.
11   Q.   Other than that. I'm sorry. I wasn't trying
12   to be a trick question.
13   A.   No.
14   Q.   My question would be: Other than the hangar,
15   any property you sold within the last two years?
16   A.   No.
17   Q.   Any property you transferred title in the last
18   two years?
19   A.   No.
20   Q.   Now, when you sold the property to Mr. Canavo
21   or Red Eagle Avionics, LLC, you took back a mortgage
22   on the property?
23   A.   Can you elaborate a little bit? Did I take
24   back a mortgage?

7

1    Q.   Yes. Did Mr. Canavo or Red Eagle Avionics, LLC
2    sign a mortgage in favor of yourself or either Red
3    Eagle Avionics, Inc. to secure payment on a loan
4    obligation?
5    A.   Pardon my ignorance. I really don't understand
6    all this. What --
7    Q.   Let's back up. You sold the business Red
8    Eagle, the assets, to Dave Canavo or Red Eagle
9    Avionics, LLC; correct?
10   A.   Correct.
11   Q.   The purchase was $2,200,000?
12   A.   Correct.
13   Q.   It was entire $2,200,000 paid at settlement?
14   A.   No.
15   Q.   Some of the money was paid at settlement;
16   correct?
17   A.   Correct.
18   Q.   The remainder of the money was a promissory
19   note and mortgage signed?
20   A.   Correct.
21   Q.   And you now hold that mortgage on the hangar?
22   A.   I believe that's correct. I am not sure how --
23   Q.   Okay. Have you ever assigned or transferred
24   that mortgage to anyone else?

8

1    A.   No.
2    Q.   Do you still own that mortgage?
3    A.   I think so. With all this going on, I don't
4    know what I own anymore. It seems like he owns it.
5    Q.   Did you transfer it to anyone?
6    A.   No. It's still -- the original agreement is
7    still the original agreement.
8    Q.   The mortgage that was in Red Eagle Avionics,
9    Inc. is still -- they have not transferred that to
10   anyone?
11   A.   They have not transferred it? I don't know.
12   Q.   Have you transferred the mortgage?
13   A.   I have not transferred anything, nothing.
14   Q.   Okay. That's what I want to know.
15        Now, you were previously married to
16   Mary-Beth Ehart?
17   A.   That's correct.
18        MS. ROTHSTEIN: Let's make it easier.
19        (Ehart Exhibit No. 1 was marked for
20   identification.)
21   BY MS. ROTHSTEIN:
22   Q.   I am showing you a document which is marked as
23   Ehart No. 1 in this deposition. I am showing you
24   this. Is this a letter decision and order of Judge

9

1    Tumas, dated July 9, 1999?
2    A.   Okay.
3    Q.   Is that what this is?
4    A.   That's what it says.
5    Q.   Yes?
6    A.   Yes, yes.
7    Q.   Just, again, I want to go over some of the
8    things with you. It indicates in the second paragraph
9    you were divorced on January 29, 1998. Is that
10   correct?
11   A.   That we were divorced January 29th, 1998? Is
12   that what you are asking?
13   Q.   Yes. Is that correct?
14   A.   Yes.
15   Q.   And it further indicates at the bottom of that
16   paragraph that on May 21, 1998 with the consent of
17   everyone or the agreement of everyone that your child,
18   your initial child support obligations would be $1,425
19   a month; is that correct?
20   A.   That's correct.
21   Q.   Now, going to the last paragraph on the second
22   page -- let me back up. Do you remember actually
23   testifying in a hearing before Judge Tumas?
24   A.   Do I recall testifying? Yes. A little bit. I

3 (Pages 6 to 9)

Gano v. Ehart, et al.
Donald Mark Ehart

**14**

1    A.  I don't know what they do with these records.
2  Sorry.
3    Q.  Do you have copies of any Family Court records
4  at home?
5    A.  Not many.  Most of them were in Tenenbaum's
6  office and they have not been able to recover them.  I
7  have asked them on multiple occasions.
8    Q.  Did they indicate why they can't recover them?
9    A.  No.  They said they've looked.
10    Q.  So did you keep copies of all the support and
11  equitable distribution records in your home?
12    A.  No.
13    Q.  If you had those records, would you produce
14  them?
15    A.  Would I produce them where, for you?
16    Q.  Right, in this case.
17    A.  If Rick tells me to do it, I would.  But I
18  don't have any records.
19    Q.  Who did you talk to at Tenenbaum's office to
20  get copies of records?
21    A.  David Gagne and Danielle -- let's see.  I don't
22  recall.  I think there was another lady there, but I
23  forget her name.
24    Q.  What did they say to you?

**15**

1    A.  They said they were looking for them, but they
2  couldn't find them anywhere.
3    Q.  Did they indicate what happened to them?
4    A.  No.
5    (Ehart Exhibit No. 2 was marked for
6  identification.)
7  BY MS. ROTHSTEIN:
8    Q.  I am showing you a document that's been marked
9  Ehart No. 2, which at the top indicates "The Family
10  Court of the State of Delaware for New Castle County,
11  and it says, "Permanent Modification Support Order."
12  And if we go to page 3, it's dated April 11, 2003,
13  signed by a commissioner.  Do you agree with that?
14    A.  Yes.
15    Q.  And do you recall that in fact that there was a
16  permanent modification support order that was issued
17  in 2003 modifying your support obligations?
18    A.  Yes.
19    Q.  And in fact, your support obligations were
20  reduced initially from $1,425 to $773 a month?
21    A.  Yes.
22    Q.  Did you through an attorney file a petition to
23  reduce your support obligations?
24    A.  I believe we did.

**16**

1    Q.  And do you still have a copy of that petition
2  that you filed with the Court?
3    A.  No.
4    Q.  And in that petition, did you set forth the
5  reasons why you felt that your support obligations
6  should be reduced from $1,425 to $773 a month?
7    A.  No, I don't, I don't recall the reasons why.
8    Q.  But did your attorney in the petition set forth
9  the reasons why your support should be --
10    A.  I don't know.
11    Q.  -- reduced?
12    A.  I don't know.
13    Q.  The petition would show us that; correct?
14    A.  I don't know.
15    Q.  Let's back up, Mr. Ehart.  Okay?  Your attorney
16  filed a petition on your behalf; correct?
17    A.  Correct.
18    Q.  And the purpose of the petition was to reduce
19  your monthly support obligations; correct?
20    A.  Correct.
21    Q.  And did you -- I am not going to ask you what
22  you said to him, but -- did you discuss with your
23  attorney the reasons why you thought your support
24  obligations should be reduced?

**17**

1    A.  I am assuming I did.
2    Q.  And your attorney prepared a petition on your
3  behalf; correct?
4    A.  I am assuming he prepared --
5    Q.  Okay.  Can we agree you would have reviewed
6  that petition?
7    A.  No.
8    Q.  Do you know whether you reviewed the petition?
9    A.  Is it like one of these?  I don't know if I
10  reviewed the petition.  The only thing I really review
11  from the attorney's offices is their bills they send
12  me.  I have to trust the attorney to do what's right.
13    Q.  You were requesting the Court to reduce your
14  support obligations; correct?
15    A.  Correct.
16    Q.  You were making certain statements to the Court
17  in the petition; correct?
18    A.  Okay.  Correct.
19    Q.  You were accurate with those statements;
20  correct?
21    A.  Correct.
22    Q.  Okay.  As a result of that, the Court
23  eventually entered an order reducing your support
24  obligations; correct?

5 (Pages 14 to 17)

Gano v. Ehart, et al.
Donald Mark Ehart

**18**

1   A. Correct.
2   Q. So if we had a copy of the petition, it would
3   say whether your attorney listed reasons why you
4   wanted the support reduced; correct?
5   A. Correct.
6   Q. And at this point, do you know whether the
7   Family Court still have a copy of that petition that
8   your attorney filed?
9   A. I don't know.
10  Q. Now, if we look at Ehart 2, which is in front
11  of you.
12      MS. DiROCCO: Has this been produced
13  previously?
14      MS. ROTHSTEIN: It was in Mrs. Ehart's
15  deposition.
16      MS. DiROCCO: Okay.
17      MS. ROTHSTEIN: Yeah.
18  BY MS. ROTHSTEIN:
19  Q. The --
20  A. Page 2, you said?
21  Q. No. Look at Ehart No. 2.
22  A. Okay.
23  Q. That's the number of the exhibit. Okay. It
24  indicates three-quarters of the way down: "After

**19**

1   hearing on February 26th, 2003 The Honorable John
2   Carrow hereby finds and orders:" Do you remember
3   attending a hearing before The Honorable John Carrow?
4   A. Yes.
5   Q. Do you remember testifying at that hearing?
6   A. Yes.
7   Q. Did you in fact testify that the business Red
8   Eagle Avionics, Inc. was having trouble?
9   A. I don't recall saying it was having trouble.
10  Q. Do you remember testifying that -- well, let's
11  go to page 2, paragraph No. 8.
12  A. Okay.
13  Q. The third paragraph under 8: "Regarding
14  father's income, the Court finds credible his
15  testimony that his specialty business, Red Eagle
16  Avionics, that installs auto pilots in aircraft has
17  suffered considerably since September 2001."
18  A. Okay.
19  Q. "Father does not have the level of business nor
20  high profile clients, such as ICI, Zeneca and Hercules
21  he previously had." Do you see where that's indicated
22  in the judge's order?
23  A. Yes.
24  Q. Did you testify to that at hearing before the

**20**

1   Court on February 26th, 2003?
2   A. Obviously, I did; it's in here.
3   Q. So now do you remember testifying before the
4   Court?
5   A. I said I testified. I don't recall exactly
6   what I said. That's all.
7   Q. If there was a transcript of the hearing -- let
8   me back up. Do you understand what a transcript of a
9   hearing is?
10  A. I believe that's everything that's said at the
11  hearing; correct?
12  Q. If there was a tape -- do you understand what a
13  tape of a hearing is?
14  A. Yes.
15  Q. So if we would look at a transcript of the
16  February 26th, 2003 hearing or listen to a tape, then
17  we would either read or hear exactly what you
18  testified to in February of 2003; correct?
19  A. Correct.
20  Q. And we would know exactly what your testimony
21  was which caused this judge to enter an order to
22  reduce your support obligations now again to $368 a
23  month; correct?
24  A. Okay. Yes.

**21**

1   Q. Now, did you have anyone else testify on your
2   behalf at that hearing on February 26th, 2003?
3   A. I don't recall anybody else being there.
4   Q. Okay.
5   A. But can I read through this and I'll find out?
6   Q. Sure. Yes.
7   A. If you know something, you can save us all a
8   lot of time because I don't recall anybody being
9   there. Mary-Beth was there. My attorney was there.
10  No, I don't think anybody else was there. I could be
11  mistaken.
12  Q. Certainly, if someone else was there and
13  testified and if there was a transcript or a tape, we
14  would know either by listening to it or looking at it?
15  A. I am assuming, yes.
16  Q. And that's -- okay. Going back to the first
17  page of Ehart No. 2. Paragraph No. 2. Do you see
18  that the Court indicates it's finding a change of
19  circumstances?
20  A. Yes.
21  Q. And that would be the change of circumstances
22  regarding your business?
23  A. Okay.
24  Q. Yes?

6 (Pages 18 to 21)

Gano v. Ehart, et al.
Donald Mark Ehart

**22**

1    A. Yes.
2    Q. And as a result of that, the Court was now
3    reducing your support from, it was originally
4    reduced -- it originally went from $1,425 to $773 a
5    month and now down to $368 a month. Do you see that?
6    A. Yes.
7    Q. Were you in agreement with that reduction in
8    your support obligations?
9    A. Sure.
10   Q. And tell us today, sitting here today, why you
11   thought the Court should reduce your support
12   obligations from $1,425 a month down to $368 a month?
13   A. Tell you why I think that they did that?
14   Q. No, why you think you were entitled to that
15   reduction.
16       MS. DiROCCO: I believe it was 773 prior to
17   this.
18   Q. Yeah, it went from -- it went to an interim
19   reduction to $773 and then to $368.
20   A. Yes. So I don't know what it -- I don't know
21   why they took it down to that amount. That was the
22   judge's --
23   Q. Did you have any objection with your support
24   being reduced almost down to one quarter of the

**23**

1    original obligation?
2    A. No, I wouldn't object to lowered child support.
3    Q. And what was the basis you were -- what was
4    your basis for requesting that reduction in support?
5    Why did you think you should pay substantially less
6    support obligations in 2002?
7    A. I thought I should pay more of a fair amount.
8    I thought I was paying way too much before.
9    Q. And that was based on the success of your
10   business at that point in time?
11   A. Yes, I guess.
12   Q. Now, going back to the second page of the Court
13   order, paragraph No. 8. Do you see where it says, "If
14   his income ..."?
15   A. Mm-hmm.
16   Q. "If his income improves, he must immediately
17   inform mother in order that she may consider filing a
18   modification petition." Did you ever notify Mary-Beth
19   Ehart that your income improved over what was
20   testified to at the February 26th, 2003 hearing?
21   A. No.
22   Q. Going to the next page, paragraph 10, where it
23   says, "The parties shall notify each other in writing
24   of every change in circumstance which might materially

**24**

1    affect the existing support order, including change in
2    health insurance coverage." Did you ever notify
3    Mrs. Ehart that there was a change in circumstances
4    which would materially affect the existing support
5    order?
6    A. No.
7    Q. Now, at some point in time in 2006, after your
8    business was sold to David Canavo, do you remember
9    that Mrs. Ehart filed a petition to increase your
10   support obligations?
11   A. Yes.
12       (Ehart Exhibit No. 3 was marked for
13   identification.)
14   BY MS. ROTHSTEIN:
15   Q. I am showing you what's been marked as Ehart
16   No. 3, which is a notice from the Family Court of a
17   hearing. Do you see that in the middle here?
18   A. Yes.
19   Q. It indicates that there is going to be a
20   hearing before a mediator, Jacqueline Richmond, on
21   July 25, 2006. Do you recall attending that
22   mediation?
23   A. Yes.
24   Q. And that mediation was held after Mrs. Ehart

**25**

1    had filed her petition to increase her support
2    payments?
3    A. Yes.
4        (Ehart Exhibit No. 4 was marked for
5    identification.)
6    BY MS. ROTHSTEIN:
7    Q. I hand you what's been marked as Ehart No. 4.
8    This is an interim modification consent order for
9    support, if you go to the third page, that was entered
10   on July 25, 2006. Yes?
11   A. Yes.
12   Q. If you'd go to that third page. Does your
13   signature appear on that third page?
14   A. Yes.
15   Q. Does also Mary-Beth Ehart's signature appear on
16   the third page?
17   A. Yes.
18   Q. Going back to the first page of Ehart No. 4, it
19   indicates: "After mediation on July 25, 2006." And
20   that's the mediation that you said you attended;
21   correct?
22   A. Yes.
23   Q. Do you remember how long the mediation was?
24   A. No.

7 (Pages 22 to 25)

Gano v. Ehart, et al.
Donald Mark Ehart

---

**42**

1  information," underneath that, the numbers, they don't
2  look like my handwriting.
3  "Other business interests" is not my
4  handwriting.
5  "... interfere with the sale," that doesn't
6  look like my handwriting under that one. But
7  everything below that, "How long will the owner
8  remain" is mine.
9  Q. So the asking price of $2,436,000, is that your
10  handwriting?
11  A. It doesn't look like my handwriting, no.
12  Q. Do you remember discussing that with the
13  representatives of the company?
14  A. I don't recall any -- no, not that number.
15  Q. Well, do you recall discussing another number?
16  A. I can't remember if I discussed any numbers
17  with him or not because he was -- I was working on
18  airplanes. I remember he was in the office with my
19  bookkeeper. I told him here's everything we had. He
20  had full access. He spent more time with my secretary
21  or the bookkeeper than he did with me. So, you know,
22  this doesn't even look like her old handwriting
23  either, so I am not sure.
24  Q. Do you remember at any point in time discussing

---

**43**

1  with someone an asking price?
2  A. Discussing with anybody an asking price?
3  Q. Well, in regard to this PBS Global --
4  A. I don't recall discussing an asking price with
5  him. I think that was his job, was to come in and
6  look at the business and, I guess, they were going to
7  do an evaluation to find how much the business was
8  worth. So I didn't discuss a number with him.
9  Q. At some point in time after the valuation was
10  done, did you determine an asking price?
11  A. After the evaluation was done, yeah. I mean, I
12  knew, roughly, what I wanted. And after the
13  evaluation came back, it was a little less than I
14  wanted, but.
15  Q. Well, was $2,436,000 consistent with what you
16  wanted for the business before the valuation was done?
17  A. Yeah, I guess.
18  Q. Now, on the same page there, page 3 of Ehart
19  No. 9 where it has "Value of Assets, $1,712,200," did
20  you provide that information to the consultant?
21  A. I didn't know. It's not my number. I didn't
22  write that number in, so.
23  Q. It's not your handwriting. But did you provide
24  the information to the consultant regarding the value

---

**44**

1  of the assets?
2  A. I provided him with anything he wanted.
3  Q. So you provided him with the documentation that
4  he used to come up with this number?
5  A. Yes. Anything he needed, documentation,
6  whatever, Dome books, taxes, whatever he needed, he
7  had complete access to.
8  Q. Looking at the last paragraph on page 3 where
9  it says, "I understand that I am solely responsible
10  for the contents of all three pages of this business
11  summary as well as any supplemental information
12  included and warrant that it contains a complete, true
13  and accurate description of the business and that no
14  facts or information have been omitted that would
15  cause the business summary to be false or misleading."
16  Do you see that there?
17  A. Yes.
18  Q. And you signed underneath that statement?
19  A. Yes, ma'am.
20  Q. It further indicates: "Owner understands that
21  PBS Global, Inc. will make no independent
22  investigations of business and that PBS Global, Inc.
23  has no obligation to verify or determine the
24  completeness, truth, fairness or accuracy of the

---

**45**

1  business summary or the information contained herein."
2  Do you see that?
3  A. Yes.
4  Q. Do you agree that -- well, let me back up.
5  Well, do you agree that PBS Global was not auditing or
6  checking the truthfulness of your books and records?
7  A. I am not sure what they did. I didn't -- I
8  signed this. But I didn't read that little bit there.
9  Q. Do you know whether they were checking to see
10  if your information was accurate?
11  A. I don't know what they -- I know they were
12  looking at my books. I don't know how much detail
13  they went into it.
14  Q. You certainly know they were relying upon your
15  books and records in preparing this business summary?
16  A. Well, if I am not mistaken, they weren't
17  totally just relying on those books. I think they
18  were rely -- let's see. I am trying to remember,
19  there's been so many things done.
20  Yeah, I don't know what they used to
21  determine it. That's not my expertise.
22  Q. Do you recall at some point in time meeting
23  with a Gerald Brown at RSI & Associates?
24  A. No.

---

12 (Pages 42 to 45)

Gano v. Ehart, et al.
Donald Mark Ehart

**46**

1    Q. Do you recall that a business valuation was
2  prepared by RSI & Associates?
3    A. Yes.
4    Q. And did you receive a copy of that business
5  valuation?
6    A. Yes.
7    Q. And do you remember talking on the phone to
8  Mr. Brown or anyone from his company or meeting with
9  them?
10    A. I never met with him. I never met the guy. So
11  that I couldn't -- I don't know if I had phone -- I
12  might have called and asked him a question after I got
13  the report, but I have never met him.
14    Q. Do you remember what information you provided
15  to him and what information he would have compiled on
16  his own?
17    A. No.
18    Q. Do you agree that Mr. Brown would be in the
19  better position to know what information you provided
20  to him back in 2004?
21    A. Yeah, I believe he's definitely in a better
22  position.
23    Q. Do you have any reason to believe that he would
24  be untruthful regarding what occurred in 2004 and the

**47**

1  information that was provided to him?
2    A. No.
3      (Ehart Exhibit No. 10 was marked for
4  identification.)
5  BY MS. ROTHSTEIN:
6    Q. I am showing you a document that's been marked
7  as Ehart No. 10, which is a financial analysis data
8  with a chart that's really a one-page chart, but
9  broken up in a number of pages. It's a financial
10  analysis data prepared by PBS. Do you remember seeing
11  this document?
12    A. I signed it, so I am assuming that I have seen
13  it at one time or another.
14    Q. So that is your signature at the bottom of the
15  page above --
16    A. Yes, it is.
17    Q. Let me finish. That's your signature above the
18  name "Owner"?
19    A. Yes.
20    Q. That's your signature above the asking price of
21  "$2,436,000"?
22    A. Yes.
23    Q. Now, is any of the information contained on the
24  financial analysis data written in your handwriting?

**48**

1    A. No.
2    Q. Do you know whether this was filled out prior
3  to you signing it?
4    A. Yeah, I am sure it was.
5    Q. And you met with the representative and you
6  answered his questions regarding your business?
7    A. I answered questions that he had asked, yes.
8    Q. And you discussed with him the value of the
9  assets, including the value of the land and the
10  building?
11    A. I don't recall what we discussed.
12      (Ehart Exhibit No. 11 was marked for
13  identification.)
14  BY MS. ROTHSTEIN:
15    Q. I am showing you what's been marked as Ehart
16  Exhibit No. 11. I'll represent to you that this was
17  also Brown No. 18 that was produced in the Canavo
18  state court case, where Gerald Brown, your expert,
19  testified, and that it came from his file. Do you
20  know where he would have gotten a copy of this
21  document, which is basically, a chart which shows
22  various values regarding your business?
23    A. I can't even read this. Can anybody see this?
24  I need glasses. I don't recognize this. Is that what

**49**

1  you are asking me?
2    Q. Yeah. Have you ever seen that before?
3    A. No.
4    Q. Okay.
5    A. Not that I recollect. I can't see it now.
6    Q. My question is: Do you know where Mr. Brown
7  would have received that document from, where he would
8  have obtained it?
9    A. Do I know where he would obtain this
10  information that I can't read?
11    Q. Right.
12    A. No.
13      MS. DiROCCO: Are you asking about the
14  information in the document or the document itself?
15      MS. ROTHSTEIN: I am asking where Mr. Brown
16  got the document.
17  BY MS. ROTHSTEIN:
18    Q. Do you know where he got the document from?
19    A. No.
20    Q. Okay. That's what I am asking.
21    A. All right.
22    Q. Mr. Brown would be in a better position to know
23  where he got that document from?
24    A. Is this a trick question? Am I supposed to

13 (Pages 46 to 49)

Gano v. Ehart, et al.
Donald Mark Ehart

|  | 62 |
|---|---|
| 1 | thereafter when you received a copy of that report; |
| 2 | correct? |
| 3 | A.  Yes. |
| 4 | Q.  Certainly, when you signed various paperwork |
| 5 | with PBS Global, you signed indicating that there was |
| 6 | an asking price of $2,436,000; correct? |
| 7 | A.  Okay. |
| 8 | Q.  Now, the question I have is:  If you'd look at |
| 9 | the chart which gives us the chronology or the |
| 10 | time-line.  At any point in time between April 11, |
| 11 | 2003 when the Court reduced your support obligation |
| 12 | down to $368 a month and up until the time that your |
| 13 | wife filed the petition to modify sometime before July |
| 14 | 25, 2006, did you ever bring to either the Court's |
| 15 | attention or Mrs. Ehart's attention the fact that you |
| 16 | thought your business was worth $2,298,300 or actually |
| 17 | more, as you indicated? |
| 18 | A.  Can you rephrase that question? |
| 19 | Q.  Sure. |
| 20 | A.  It was so long I lost it. |
| 21 | Q.  Sure.  You received the business valuation |
| 22 | from -- |
| 23 | A.  Yes. |
| 24 | Q.  You received the business valuation from RSI & |

|  | 63 |
|---|---|
| 1 | Associates; correct? |
| 2 | A.  Correct. |
| 3 | Q.  The valuation of $2,298,000; correct? |
| 4 | A.  Correct. |
| 5 | Q.  Did you bring that -- did you send a copy of |
| 6 | that valuation to Mrs. Ehart? |
| 7 | A.  No. |
| 8 | Q.  Did you notify the Court and advise the Court |
| 9 | that you received this business valuation? |
| 10 | A.  No. |
| 11 | Q.  Did you notify the Court that in fact there was |
| 12 | a change in circumstances regarding your business that |
| 13 | your business was worth more than you previously |
| 14 | thought when you obtained your support reduction? |
| 15 | A.  No. |
| 16 | Q.  Why not? |
| 17 | A.  Why didn't I tell the Court that my business |
| 18 | was evaluated for 2 point -- that didn't -- was I |
| 19 | supposed to?  That didn't change any circumstances. |
| 20 | Just because what it was worth doesn't mean that it |
| 21 | changed my income. |
| 22 | Q.  So the fact that your business was now worth |
| 23 | more than you thought it was worth back when you |
| 24 | obtained a reduction in support, you didn't think you |

|  | 64 |
|---|---|
| 1 | needed to notify the Court of that? |
| 2 | A.  No. |
| 3 | Q.  When you testified in May of 2007 before the |
| 4 | Court, did you testify about the fact that you had |
| 5 | this business valuation done in 2004? |
| 6 | A.  I don't recall. |
| 7 | Q.  Certainly, the transcript or the tape would |
| 8 | accurately reflect whether you testified regarding |
| 9 | those valuations? |
| 10 | A.  Yes. |
| 11 | Q.  When is the first time you met Joseph Gano? |
| 12 | A.  I don't recall when I met him.  I truly only |
| 13 | think I've met him twice.  If you put him in a |
| 14 | line-up, I couldn't pick him out. |
| 15 | Q.  You are aware of the fact that he provided a |
| 16 | loan to Mr. Canavo to purchase the assets of Red Eagle |
| 17 | Avionics, Inc.? |
| 18 | A.  Yes. |
| 19 | Q.  Do you know the amount of that loan? |
| 20 | A.  I think the paperwork said it was a million. |
| 21 | Q.  And that money was paid at settlement? |
| 22 | A.  Yes. |
| 23 | Q.  Some of it went to you and some of it went to |
| 24 | pay off your obligations that you owed other parties? |

|  | 65 |
|---|---|
| 1 | A.  Yes, to the mortgage on the building. |
| 2 | Q.  Now, at some point in time, did you -- well, |
| 3 | when you initially met Mr. Gano, did you believe that |
| 4 | he was going to be a co-investor with Mr. Canavo or |
| 5 | did you know from the beginning that he was going to |
| 6 | be loaning money to Mr. Canavo? |
| 7 | A.  I wasn't sure what those two had in mind.  Dave |
| 8 | told me he had property worth $7-1/2 million, so I |
| 9 | assumed he was doing it on his own.  I didn't know |
| 10 | until pretty much the settlement that he was borrowing |
| 11 | money from somebody else. |
| 12 | Q.  Well, you knew you met with Mr. Gano and |
| 13 | Mr. Canavo regarding the purchase of the business; |
| 14 | correct? |
| 15 | A.  Yes. |
| 16 | Q.  They were asking you information about the |
| 17 | business; correct? |
| 18 | A.  That's correct. |
| 19 | Q.  And they asked you to provide them with an |
| 20 | audited financial statement from an accountant for the |
| 21 | business; correct? |
| 22 | A.  They asked for -- oh, what did they ask for? |
| 23 | They asked for a lot of things, and I gave them |
| 24 | whatever they asked for. |

17 (Pages 62 to 65)

Gano v. Ehart, et al.
Donald Mark Ehart

66

1  Q.  One of the things they asked for was an audited
2  financial statement from an accountant; correct?
3  A.  They asked for -- I, I think it was like a
4  P & L. Is that right? P & Ls? No. I don't know.
5  They asked for something. I don't know what they
6  asked for.
7  Q.  Okay. Well, they have indicated in their
8  depositions in another case and Mr. Gano has indicated
9  in the complaint in this case that he asked for an
10  audited financial statement.
11  A.  I don't recall them asking for an audited
12  financial statement. Okay.
13  Q.  You don't remember or they didn't ask for it?
14  A.  I don't remember exactly what they asked for.
15  Q.  Okay. But in response to whatever they asked
16  for, you provided them with some documentation;
17  correct?
18  A.  I provided them whatever they wanted.
19  Q.  Okay.
20  (Ehart Exhibit No. 20 was marked for
21  identification.)
22  BY MS. ROTHSTEIN:
23  Q.  I am showing you a document marked Ehart
24  Exhibit No. 20, which is entitled "Red Eagle Avionics,

67

1  Inc., Statement of Operations for the Six Months Ended
2  June 30, 2005."
3  A.  Yes.
4  Q.  Do you remember ever seeing that document?
5  A.  Yes.
6  Q.  Did you provide a copy of this document to
7  Joseph Gano?
8  A.  I don't know who gave him the copy. Either I
9  did or my secretary did. I don't recall who handed it
10  to -- and I don't think Joe Gano got anything. I
11  thought everything went right to Mr. Canavo.
12  Q.  Well, did you -- my question is: Did you
13  provide a copy of this document to Joseph Gano?
14  A.  I don't know.
15  Q.  Did you provide a copy of this document to Dave
16  Canavo?
17  A.  I don't know. I don't know who gave him the
18  copy.
19  Q.  Is there anything you could look at to refresh
20  your recollection whether it was you or someone else?
21  A.  No.
22  Q.  Both Mr. Gano and Mr. Canavo testified you
23  provided them with the one-page document, which is
24  Ehart No. 20. Are you able to dispute that?

68

1  A.  Yeah, I can dispute it because I am not sure
2  whether I gave it to them or the secretary gave it to
3  them.
4  Q.  But you agree it's possible that in fact that's
5  correct, that you are the one who gave it to them?
6  A.  Yeah, it's possible.
7  Q.  Had you previously made copies of Ehart No. 20
8  prior to giving it to Mr. Canavo and Mr. Ehart?
9  A.  Did I make copies? I don't know if I made
10  copies or not.
11  Q.  Do you remember if you made copies when they
12  were present with you or whether you had already made
13  copies?
14  A.  The best of my recollection was they weren't
15  even there when the document came through. I think it
16  came through the fax machine. That's why I don't
17  remember whether I took it off the fax and gave it to
18  them or the secretary took it off the fax and gave it
19  to them. I don't recall.
20  Q.  Now, the secretary that you are referring to
21  is?
22  A.  Jackie.
23  Q.  Jacqueline Anziano?
24  A.  Yes.

69

1  Q.  She was questioned at deposition in the Canavo
2  state court case, and she indicated that she did not
3  provide any documents to Mr. Canavo or Mr. Gano. Does
4  that refresh your recollection whether you would be
5  the person who would have provided this one-page
6  document to them?
7  A.  No.
8  Q.  You still don't remember?
9  A.  No, I don't remember. But she has given them
10  stuff. She had -- she gave them the tax returns. She
11  pulled them all out and made copies and gave them to
12  them.
13  Q.  How do you know that?
14  A.  Well, because I told her to pull them out, make
15  copies of them and go ahead and give them to Dave and
16  Dave's attorney and anybody else who wanted them.
17  Q.  Okay. Well, as to this specific document, she
18  testified that she did not provide a copy to
19  Mr. Canavo or Mr. Gano. Does that refresh your
20  recollection whether you were the one that gave them
21  this one-page document?
22  A.  No.
23  Q.  Now, who prepared the document which is marked
24  Ehart Exhibit No. 20?

18 (Pages 66 to 69)

Gano v. Ehart, et al.
Donald Mark Ehart

**86**

1    Q.  Additionally, it indicates in paragraph B that
2    "Purchaser" -- in this case, purchaser was Dave Canavo
3    or Red Eagle Avionics, LLC; correct?
4    A.  Correct.
5    Q.  And the "Purchaser delivers to corporation" --
6    and you agree that the corporation is Red Eagle
7    Avionics, Inc.?  Yes?
8    A.  Yes.
9    Q.  -- "delivers a promissory note in the amount of
10    $1,200,000."  Did you receive that promissory note?
11    A.  Yes.
12    Q.  And did you subsequently receive some monthly
13    payments in the amount of $10,413.88 on that
14    promissory note?
15    A.  Yes.
16    Q.  Now, looking at paragraph No. 6 on page 4,
17    "allocation of the Purchase Price."  Do you know who
18    determined the allocation of the purchase price?
19    A.  Well, Mr. Roeberg drew this up, so I am
20    assuming Dave and Mr. Roeberg.  I am assuming.  I
21    don't know for a fact who made them numbers.
22    Q.  Do you know whether your accountant had any
23    input as to the numbers to be inserted in paragraph 6
24    under "Allocation of Purchase Price"?

**87**

1    A.  I don't know.
2    Q.  Do you know whether -- do you know how anyone
3    determined what the allocation of the purchase price
4    should be?
5    A.  Do I know where these numbers came from is what
6    you are asking me?
7    Q.  Yes.
8    A.  No, I don't know.
9    Q.  Okay.  Do you know whether these numbers were
10    arrived at for tax reasons or to have beneficial tax
11    consequences or either you -- excuse me.  Do you know
12    whether these numbers were inserted here to have for
13    either you or Mr. Canavo beneficial tax treatment?
14    A.  No, I don't know.
15    Q.  You don't know one way or the other?
16    A.  I don't know who wrote those numbers, and I
17    don't know why they were written that way.
18    Q.  Did you ever have discussion with anyone
19    regarding what numbers to insert in paragraph No. 6?
20    A.  I don't recall having -- I don't think I was
21    involved in any of this.  I saw this paper at
22    settlement.
23    Q.  Okay.  Did you ever have any discussions with
24    Mr. Canavo or Mr. Gano or Mr. Roeberg or Mr. Brousseau

**88**

1    or anyone else as to the numbers that should be placed
2    in paragraph No. 6?
3    A.  No.
4    Q.  Do you know whether the hangar is worth
5    $1,870,000 as of January 3rd, 2006?
6    A.  No.
7    Q.  You don't know or it's not worth that?
8    A.  I don't know.
9        MS. ROTHSTEIN:  Take a break.
10        (Recess taken.)
11    BY MS. ROTHSTEIN:
12    Q.  Mr. Ehart, I may have indicated previously in a
13    question that Mr. Gano loaned a million dollars.
14    Actually, do you recall, it was actually $1,100,000
15    that he wired to the settlement?
16    A.  It could have been.
17    Q.  Okay.  Do you know whether of the funds from
18    the settlement that you would have received
19    $523,422.23?
20    A.  That sounds like what the check was, yes.
21    Q.  And the remainder of the funds would have been
22    funds that went to pay mortgages or any other
23    obligations you owed?
24    A.  Yes.

**89**

1    Q.  Did you also know whether of that, that
2    approximately $75,000 or $74,660 went to Mr. Canavo
3    for operating expenses for the company?
4    A.  I am not sure what he did with the money.  It
5    could have been.
6    Q.  Now, when the business sold on January 3, 2006,
7    did you notify the Family Court that the business had
8    sold?
9    A.  No.
10    Q.  Did you notify the Family Court that you
11    received in excess of half a million dollars from the
12    sale of the business?
13    A.  No.
14    Q.  Did you notify the Family Court that you
15    obtained a promissory note or promise to pay of
16    $1,200,000 from Red Eagle Avionics, Inc.?
17    A.  No.
18    Q.  After January 3, 2006, did you notify Mary-Beth
19    Ehart that the business had sold?
20    A.  I think we had a phone conversation that it had
21    sold.
22    Q.  Did you notify her that you received in excess
23    of a half a million dollars?
24    A.  No.

23  (Pages 86 to 89)

Gano v. Ehart, et al.
Donald Mark Ehart

**90**

1   Q.   Did you notify her that you took back a
2 promissory note or mortgage in the amount of
3 $1,200,000?
4   A.   No.
5   Q.   How much longer after the business sold did you
6 receive the petition for increase in support from
7 Mrs. Ehart?
8   A.   I think after I told her that I had sold the
9 business. It wasn't long after that, I believe I
10 received a notice.
11   Q.   And you received the notice that she had filed
12 a petition to increase the support payments?
13   A.   Yes.
14   Q.   And that petition set forth reasons why she
15 wanted the increase in support?
16   A.   I don't recall what it said in there.
17   Q.   Now, did you review any depositions prior to
18 coming here today?
19   A.   No.
20   Q.   Have you ever reviewed any of the other
21 depositions?
22   A.   No.
23   Q.   Going back to Exhibit 24, Ehart 24.
24   A.   Okay.

**91**

1   Q.   Go to what is marked page 17 at the bottom.
2   A.   12? Am I in the right exhibit?
3   Q.   There's two things there.
4   A.   Oh. Got ya. Okay.
5   Q.   Are those your signatures that appear on that
6 page?
7   A.   Yes.
8   Q.   You are signing on behalf of the company and
9 you are also signing in your individual capacity?
10   A.   Yes.
11   Q.   Going to page 5 of the agreement of sale.
12   A.   Okay.
13   Q.   Paragraph No. 7 entitled "Representations and
14 Warranties." You understood you were making certain
15 representations and warranties in the agreement of
16 sale?
17   A.   Yes.
18   Q.   If you'd go to paragraph J, which appears on
19 page 9.
20   A.   Okay.
21   Q.   Do you agree that you were representing and
22 warranting that all business records and customer
23 lists of the seller are in all material respects
24 complete and correct?

**92**

1   A.   Yes.
2   Q.   Looking at Exhibit -- going to Exhibit 18 now,
3 which is the Business Valuation Report.
4   A.   18.
5   Q.   If you'd go to page No. 4.
6   A.   Okay.
7   Q.   And do you agree that that's entitled
8 "Assumptions and Limiting Conditions"? Is that what
9 it's entitled? Is that the title?
10   A.   Oh, yes. Okay.
11   Q.   If you'd go to paragraph b., that RSI is
12 indicating there that they accepted the compiled
13 financial statements without testing their accuracy.
14 Do you see that there?
15   A.   Yes.
16   Q.   It's your understanding that RSI was going to
17 value the business based on the information that you
18 provided?
19   A.   Yes.
20   Q.   And going down to paragraph d., that they're
21 further indicating they relied on representations that
22 you made regarding the background and history of the
23 business. Correct?
24   A.   Okay.

**93**

1   Q.   And that they're not assuming any
2 responsibility for the accuracy of the information.
3 Again, they're relying on what you provided to them;
4 correct?
5   A.   Correct.
6   Q.   Now, just a couple more questions, and we'll
7 get you out of here.
8         Ehart 21. If you could look at that.
9   A.   Compilation --
10   Q.   Page 1, the Compilation Report, and page 2, the
11 Statement of Operations. I am going to direct your
12 attention to page 1, the Compilation Report.
13   A.   Okay.
14   Q.   You agree that it was important that Mr. Gano
15 and Mr. Canavo receive a copy of that Compilation
16 Report; correct?
17   A.   I agree that they -- un that by me again here.
18   Q.   Was it important that Mr. Gano and Mr. Canavo
19 receive a copy of the first page, which is entitled
20 "Compilation Report"?
21   A.   Yeah. I guess.
22   Q.   Is it important that they have received a copy
23 of the Compilation Report?
24   A.   Is it important to them? I don't know. I

24 (Pages 90 to 93)

Gano v. Ehart, et al.
Donald Mark Ehart

94

1  don't know if it's important --
2      Q.  Well, as part of the transaction, was it
3  important that as part of the due diligence that you
4  provide a copy of the Compilation Report, dated
5  September 1, 2005?
6      A.  Yes.
7      Q.  And at this point, sitting here today, you
8  indicated that you do not know whether they did or did
9  not receive a copy of that Compilation Report;
10 correct?
11     A.  I can't verify one way or the other.
12     Q.  If in fact they did not receive the first page
13 of the Compilation Report, would you agree that that
14 would be a mistake on the part of all parties?
15     A.  No.  If it was me and it says, "See a
16 Compilation Report," then they could ask me for
17 another one.  If it didn't come through the fax or if
18 they didn't get it or it dropped, I didn't --
19     Q.  Would you agree it would have been a mistake if
20 they did not receive a copy of the Compilation Report?
21     A.  Yes.
22     Q.  Do you agree it was the intention of all
23 parties that they were to have received a copy of this
24 Compilation Report?

95

1      A.  Yes.
2          MS. ROTHSTEIN:  No other questions.
3          MS. DiROCCO:  I just have a few follow-up
4  questions.
5  BY MS. DiROCCO:
6      Q.  If you would look at Ehart 23, which is the
7  sales agreement, dated October 13th, '05.
8      A.  Okay.
9      Q.  In between the time that was signed and, if you
10 look at Ehart 24 --
11     A.  Right.
12     Q.  -- which is the agreement for sale, which was
13 executed --
14     A.  Yes.
15     Q.  -- when the business was sold, was executed
16 January of '06.
17     A.  Yes.
18     Q.  What was your understanding of Mr. Gano's
19 involvement in the entire transaction between that
20 time period?
21     A.  I didn't know what the agreement was.  I didn't
22 know what they were -- I thought he was just going to
23 store his airplanes in there.  He was there with Dave.
24 I am not sure what they were doing together.

96

1      Q.  Did you think that he was involved in any way
2  in the financing of the -- of Mr. Canavo's purchase?
3      A.  I suspected, but I didn't know.  I really
4  didn't care.
5      Q.  And how many payments did Mr. Canavo make on
6  the note?
7      A.  I think there was four or five, if I am not
8  mistaken.
9      Q.  Have you received any since the litigations
10 begun?
11     A.  No.
12         MS. DiROCCO:  I have nothing else.
13 BY MS. ROTHSTEIN:
14     Q.  Just a couple questions.  You suspected
15 Mr. Gano was involved because you knew that he was a
16 big customer of Mr. Canavo?
17     A.  Yes.
18     Q.  And you indicated you didn't care to really
19 know any more, you didn't care because you didn't
20 really care where you got the money, you just wanted
21 to get the money?
22     A.  No.  My dealings were with Mr. Canavo.  Like I
23 said, I might have talked to Joe twice in the 13 years
24 I was in business.  So I didn't have anything to say

97

1  to Mr. Gano.  The deal wasn't with Mr. Gano.  My deal
2  was with Dave and myself, so --
3      Q.  As long as Mr. Canavo came up with the money,
4  that's all that mattered to you; correct?
5      A.  As long as he met his agreement, yes.
6          MS. ROTHSTEIN:  No other questions.
7          (Deposition concluded at 11:43 a.m.)
8          -- -- -- --

25  (Pages 94 to 97)

EXHIBIT "F"



**δ**

**x Rothschild LLP**
ATTORNEYS AT LAW

RECEIVED SEP 0 8 2004 

1250 South Broad Street, Suite 1000
Melbourne, FL 32940-0231
Tel 15.699.6099  Fax 15.699.6031
@foxrothschild.com

C O P Y

## Non-Exclusive Business Services Agreement

This Agreement (the Agreement) is made between PBS Global, Inc. (PBS) 2735 Center Place, Suite 104, Melbourne, FL 32940 and the owner (Owner) of the following business (Business):

_Red_ _____ _Dale's Way_ _New Castle_ _DE_ _19720_
Business Name          Street Address / City          State          Zip

In consideration of their respective obligations, PBS and Owner agree as Follows:

### 1. PBS AGREES:

(a) To prepare a description of the Business for the Owner to use in marketing the Business for sale (Portfolio), to make the Portfolio of the Business available to qualified persons/entities that have contacted PBS and have expressed an interest in purchasing a business, and to market in electronic/digital media that the Business is for sale (market).

(b) To hire at our discretion and pay for an independent Third-Party Valuation of the Business that offers an opinion with respect to the Fair Market Value of the Business (Business Valuation).

(c) PBS services shall continue until such time as Business sells or transfers ownership or a term of one year from agreement date, whichever comes first. If Business has not sold or transferred ownership by the one year anniversary date from signing of Agreement, services and marketing may be extended a second year at the Owner's discretion by notifying PBS, in writing within fourteen (14) days of agreement expiration date, to continue said services and marketing at no additional cost.

(d) To offer a complete 100% money back guarantee per the conditions of paragraph (4n) and (4o) below.

### 2. OWNER AGREES:

(a) To provide PBS with all relevant information concerning the Business, its operations, and financial performance (Business Summary). Owner is solely responsible for the content of the Business Summary and warrants that it contains a complete, true, and accurate description of the Business and that no facts or information have been omitted that would cause the Business Summary to be false or misleading. Owner understands that PBS will make no independent investigation of the Business and that PBS has no obligation to verify or determine the completeness, truth, fairness, or accuracy of the Business Summary or the information contained therein. Owner understands, acknowledges, and authorizes PBS to rely solely upon the Business Summary and related financial documents supplied by the Owner in preparing the Portfolio and the Business Valuation, and further understands that all values and ʲmation reported therein will be based solely upon these documents.

To update the Business Summary as necessary to ensure that the Business Summary remains a true, fair, and accurate description or the Business. If PBS provides Owner with a written request to update the Business Summary and Owner fails to respond in writing within thirty (30) days of PBS's request for an update, then PBS shall be entitled to terminate this Agreement.

(c) That upon receipt of the Business Valuation from PBS, Owner will promptly review the Business Valuation and will notify PBS in writing within fifteen (15) days in the event the Business Valuation contains any material errors or omissions. Owner further understands and agrees that the Business Valuation does not constitute an appraisal of the Business.

(d) That it shall be the sole responsibility of Owner to establish the terms, conditions, and price for the sale, if any, of the Business. Owner understands and agrees that PBS shall not establish any term or condition including without limitation, the value of the furniture, fixtures, equipment, or inventory of the Business.

(e) That within fifteen (15) days from the sale or removal of the business from the market, Owner will provide PBS with written notice to terminate the services.

(f) The fee set forth in paragraph 3(c) shall also be paid to PBS in the event of a sale or other such disposition that occurs during the twelve (12) months following the expiration of the Agreement to a party introduced to Owner by PBS or who inquired about purchasing the Business during the term of the Agreement or with whom any discussion or transmission of information about the Business occurred during the term of the Agreement.

### 3. CONSIDERATION:

(a) For acting as the role of intermediary with all of PBS's existing and future buyers, for marketing expenses incurred to obtain previous and future buyers, and business services as set forth in this agreement, Owner shall pay to PBS the sum of: $ _____ . Payment is due when this Agreement is executed.

(b) For hiring an independent firm to prepare a Valuation of the Business, Owner shall pay to PBS the sum of: $ _11,000_ , if Owner has accepted this option in Section 1(b) above. Payment is due when this Agreement is executed.

(c) For successful sale or transfer of the Business or portion thereof to a Buyer introduced through the efforts performed by PBS, Owner shall pay to PBS the sum of: $ _30,000_ . Funds will be dispersed at closing and received by PBS within two (2) business days. There will be no other charges to the Owner not specifically said forth in this agreement.

### 4. GENERAL TERMS:

(a) Upon acceptance of PBS's Services and as long as Owner pays for this Service per paragraph 3, PBS will work to market Owner's business and match with a qualified buyer per paragraph 1(a) above.

(b) Owner may terminate this Agreement without refund pursuant to section 3(a) and 3(b) above at any time upon providing fifteen (15) days written notice to PBS, provided Owner is not in negotiations with a Buyer introduced by PBS. Written notice to be mailed to PBS at 2735 Center Place, Suite 104, Melbourne, FL 32940.

The parties agree that venue and jurisdiction of any legal action regarding this Agreement shall be solely in Melbourne, Florida, _r_ Florida State law.

(d) The parties agree that any controversy, dispute, or questions arising out of the Payments, or in connection with any aspect of this Agreement or PBS's services under this Agreement shall be determined by alternative dispute resolution including mediation and/or arbitration to be conducted in Melbourne, Florida under the rules and regulations as promulgated by the American Arbitration Association (AAA). Any decision rendered by and through the AAA shall be binding upon both parties to this agreement and the costs of any arbitration shall be borne equally by the parties.

A Pennsylvania Limited Liability Partnership Owner's Initials _DEC_
_EF_



DEPOSITION EXHIBIT
_Brown 16_
_10-30-07 KF_

| California | Delaware | Florida | Nevada | New Jersey | New York | Pennsylvania |
|---|---|---|---|---|---|---|

MEO00955

(e)  In the event of a dispute in arbitration or litigation, Owner and PBS hereby waive, to the fullest extent permitted by law, any right to or claim of punitive or exemplary damages against the other and may recover only actual damages, and attorney's fees as stated herein.

(f)  All payments are due at PBS's principal place of business: 2735 Center Place, Suite 104, Melbourne, FL  32940.  In providing services to Owner under any portion of this Agreement or in otherwise seeking to enforce PBS's right to receive payment under this ~~ement~~, PBS may, at its sole discretion, assign or refer all or part of its rights and obligations under this Agreement to an ~~endent~~ third party including, but not limited to any collection agencies, attorneys, certified public accountants, consultants, and brokers regardless of whether such parties are associated or not associated with PBS.

(g)  This Agreement is binding upon PBS at the time this Agreement is accepted in writing by a duly authorized officer of PBS.  In accordance with Florida law, either party can rescind by written notice within three (3) days of the date of the agreement.

(h)  This Agreement is binding on and benefits the parties, their legal representatives, assigns, heirs, transferees, executors, administrators, and successors.

(i)  Owner and his successor, assigns, heirs, administrators, executors, and/or personal representatives agree to indemnify PBS, its directors, officers, agents, employees, shareholders, representatives, successors; and assigns against any and all costs (including attorney's fees), losses, liabilities, and damages of any kind arising out of or relating to PBS' use of any information contained in the Business Summary, Business Portfolio, or Business Valuation, the breach of any covenant contained herein by the Owner, or the breach of any representation or warranty made by the Owner during the attempted or actual sale of the Business.

(j)  By accepting the services offered by PBS, Owner agrees to the terms and conditions of this Agreement. This Agreement constitutes all of the terms and conditions of the entire agreement and expressly supersedes all oral and/or written communications relating to PBS's services.

(k)  Owner acknowledges that PBS has not made any oral or written representations, inducements, or promises that are not contained in this Agreement. Owner acknowledges that any oral or written representations, inducements, or promises made by any business consultant to PBS to owner are expressions of opinion only and are not binding on PBS unless expressly contained herein.

(l)  This Agreement may be modified only in writing and signed by the Owner or a duly authorized officer of PBS. Owner acknowledges that PBS's Business Consultant is not authorized to modify or change any term of this Agreement.

(m)  Other than the promises and warranties contained herein, PBS Disclaims Any Express or Implied Warranty Of Fitness For A Particular Purpose concerning the services provided under this Agreement.

(n)  Owner and PBS agree and understand that the money back guarantee is only applicable when the Owner has paid in full for services from PBS, in accordance with applicable addendum(s), which includes a Third-Party Valuation.  In the event Owner does not provide PBS with the financial documentation necessary to complete a Third-Party Valuation within the time specified in the Financial Document Reminder, the money back guarantee is no longer in effect

(o)  The money back guarantee when applicable per paragraph 4(n) above applies such that if the Owner has not been introduced to at least one (1) qualified buyer, investor, or capital funding source within one (1) year of signing this agreement, PBS will refund 100% of monies collected.  A qualified buyer, investor, and/or capital funding source is defined as those who represent to PBS that they are interested in the general type of business, general location and fair market value of Owner's Business.  Request for said Money Back Guarantee must be made in writing within ten (10) days following the expiration of the Agreement.

5.  DISCLOSURES:

(a)  I understand that PBS is providing a Business Portfolio, marketing, matching services and/or a Business Valuation as described herein and is not performing any real estate or brokerage services and that PBS will not participate in any commission related to or arising out of the proposed sale of the Business.                                                                    Owners Initials _____

(b)  I understand that PBS is not guaranteeing that it has an existing buyer for the Business nor can PBS guarantee or predict how long it will take to locate a buyer for the Business.              Owners Initials _____

(c)  I understand that it is up to the buyer and myself to agree to the terms and conditions of sale, and that I am ultimately responsible for the sale of the Business.                                          Owners Initials _____

(d)  I understand that I am free to choose any and all other methods and means available to procure a buyer for the Business in addition to using PBS's services. A buyer produced through other methods will NOT incur fees due to PBS contained in 3(c) above.                                        Owners Initials _____

(e)  I hereby state that the Business Consultant did not make any promises or guarantees with regard to the actual sale of the Business.                                                      Owners Initials _____

(f)  I agree that the Business Consultant did not set the selling price of the Business, regardless of any business analysis performed. The desired asking price for the sale or capitalization of my business is $ _2,436,000_                                                Owners Initials _____

I, _MARK FHART_ , certify that on _9_ _2_ _04_ I have carefully read the entire foregoing Agreement and that I am entering into this Agreement voluntarily, with full awareness of the terms and conditions contained herein. I am signing this Agreement personally, individually and as an authorized agent of the Business.

By signing this agreement, and/or credit card authorization below, the Owner acknowledges work by PBS shall commence immediately. PBS shall incur expenses related to said work; therefore, a written termination beyond the three (3) day rescind period does not constitute a monetary refund.

_____                    _____
Owner's Signature                                                      Owner's Signature

CREDIT CARD AUTHORIZATION:        VISA ____   MASTERCARD ____   AMEX ____   DISCOVER ____

Credit Card #: _____        Exp. Date: _____   Bank Name of Card: _____

Name On Card: _____   Billing Address: _____
Driver's License #: _____                      State Issued: _____   City ____   State ____   ZIP ____

Bi____ hone Number: _____   AMT Collected: $ _____   + Processing Fee:  $ _____
Amt to be Charged: $ _____   Cardholder Signature: _____   (Processing Fee = Visa, MasterCard & Discover @ 2.5%, AMEX @3.0%)
                                                                                          DATE: _____

Agreement Accepted By PBS Global, Inc. on _Sept 9_ , 200_7_ in Melbourne, Florida by _____

PBS Representative (print) _Bob A Rewriter_

ME000956



*For Board Review 9/7/04*
*Hold for consultant discussion with accountant*

# Payment Hold Addendum
## To the Non-Exclusive Business Services Agreement

The following Terms and Conditions are hereby incorporated and made part of the Non-Exclusive Business Services Agreement (Agreement) dated ___9/2___, 20_04_ by and between PBS Global, Inc., (PBS) and the undersigned owner (Owner) of the business (Business) described in the Agreement. All capitalized terms in this addendum and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

1. The signer of the check and/or credit card warrants funds presented to the issuing financial institution on the date as described below. At said due date, Owner shall make available sufficient funds to clear payment.

   Check #_____ or Credit Card _Amex_ in amount of $_11,000_, will be due and payable on _9/1/04_
   (Type)

### ***ATTACH CHECK TO ADDENDUM***

Following acceptance of said Agreement by a duly authorized officer, PBS hereby agrees to hold the check(s) and/or credit card as described in this document and will not present the check and/or credit card to the financial institution on which it is drawn until the date specified above. **In the event said Agreement is not approved, services will not commence and check will be returned to the Owner.**

2. Failure of the Owner to deliver any payment to PBS on or before due date shall constitute a forfeiture by the Owner of all or any part of the fee already paid and a release of PBS, its Directors, Officers, Agents, Employees, and Personal Representatives from any further liability or obligation.
3. The Owner understands that work on the Valuation and all other services commence immediately. Delivery of Valuation and/or Buyer introductions will not occur until payment for services is received in full.

_Red Eagle Avionics_    _Mark Ehart_    _[signature]_
Business Name    Owner's Printed Name    Owner's Signature

---

**CREDIT CARD AUTHORIZATION:**

Credit Card # _372~~~~043 27826 4157011004_  Type _Amex_    Exp. Date _1/05_

Name on Card _Mark Ehart / Red Eagle Avionics_ Billing Phone # _302-325-2727_

Drivers License #: _DE841178_    State Issued: _DE_

Billing Address _1 Dale's Way_    _New Castle_    _DE_    _19720_
Street    City    State    Zip

$ _11,000_    _[signature]_    _9-2-04_
Total Amount to be Charged    Cardholder Signature    Date

---

_Brian P. Redweiser_    _9/2/04_
PBS Representative (Print)    Date

Addendum accepted by PBS Global, Inc. on this _9th_ day of _September_, 20_04_, in Melbourne, Florida by _[signature]_

Rev Feb 04

RECEIVED SEP 08 2004

ME000957

EXHIBIT "G"

# Business Valuation Report

## Red Eagle Avionics, Inc.

As of: 12/31/03

Prepared For:

### PBS Global, Inc.

By: RSI & Associates, Inc.
Wells Fargo Bank Building
6000 South Padre Island Drive, Suite 250
Corpus Christi, TX 78412
www.value-solutions.com
361/994-8095
800/230-9086
Fax 361/994-8054
Toll-Free Fax 877/230-9086



Red Eagle Avionics, Inc.
Mark Ehart
1 Dale's Way
New Castle, DE 19720

Greetings Mark Ehart:

PBS Global, Inc. has asked me to determine the fair market value of Red Eagle Avionics, Inc. as of 12/31/03 for the purpose of a Buy/Sell.

The definition of fair market value is the price a business could expect to bring if it were exposed for sale on the open market for a reasonable amount of time, assuming an informed buyer and an informed seller, neither of which is acting under undue pressure or compulsion.

Based on the information contained in the following narrative report, in my opinion, the fair market value of Red Eagle Avionics, Inc. as of 12/31/03 is $2,298,300.

| Conclusions of Value | |
|---|---|
| Indicated Value | 2,298,300 |
| Times: 100.00% Interest Valued | 100.0% |
| Conclusion of Value of 100.00% Interest | 2,298,300 |
| | |
| Rounded | 2,298,300 |

My opinion of value is subject to the assumptions and limiting conditions set forth in this report.

Respectfully submitted,

Gerald W. Brown, Sr.
RSI & Associates, Inc.

1

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 3

ASSIGNMENT DEFINITION ....................................................................... 3
ASSUMPTIONS AND LIMITING CONDITIONS ............................................. 4
Financial Analysis ....................................................................................... 5

ANALYSIS OF THE UNADJUSTED BALANCE SHEETS ................................. 5
Adjusted Balance Sheet ............................................................................ 7
ANALYSIS OF THE UNADJUSTED INCOME STATEMENTS .......................... 8
Adjusted Income Statements .................................................................. 9
COMPARATIVE INDUSTRY ANALYSIS ...................................................... 10

VALUATION METHODS REJECTED ................................................................... 11

Book Value Method ................................................................................... 11
Liquidation Value Method ........................................................................ 11
Adjusted Book Value Method ................................................................... 11
PUBLICLY-TRADED GUIDELINE COMPANIES METHODS .......................... 11
PRIVATELY-HELD GUIDELINE COMPANIES METHODS ............................ 11
Price to Earnings/Discretionary Cash Flow ............................................ 11
Percent of Revenues ................................................................................ 11
Price to Book Value ................................................................................. 11
Price to Total Assets ................................................................................ 12
DIVIDEND PAYING CAPACITY ................................................................. 12
VALUATION METHODS ACCEPTED ........................................................... 13

INCOME METHODS OF VALUATION ......................................................... 13
Selection of an Appropriate Discount/Capitalization Rate ...................... 13
Capitalization of Earnings Method .......................................................... 15
Discounted Future Earnings Method ....................................................... 16
Capitalization of Excess Earnings Method .............................................. 18
SUMMARY OF VALUATION METHODS ...................................................... 20

VALUE CONCLUSION ....................................................................................... 21

PROOF OF VALUATION ................................................................................... 22

HYPOTHETICAL TERMS OF SALE ........................................................... 22
PROJECTED ANNUAL POST-SALE CASH FLOW ....................................... 23
RETURN ON INVESTMENT ....................................................................... 24
CERTIFICATION OF ANALYST ...................................................................... 25

APPENDIX A: ANALYST'S QUALIFICATIONS ................................................ 26

APPENDIX B: GLOSSARY OF TERMS ............................................................ 29

# INTRODUCTION

## Assignment Definition

RSI & Associates, Inc. has been retained by PBS Global, Inc., on behalf of Red Eagle Avionics, Inc., its management and owners, to render the business appraisal services described below. The following information summarizes our assignment:

| | |
|---|---|
| Client Name | Mark Ebart |
| Business Name | Red Eagle Avionics, Inc. |
| Type of Entity | S Corporation |
| State of Incorporation/Organization | DE |
| Principle Business Location | 1 Dale's Way New Castle, DE 19720 |
| Business Interest Valued | 100.00% interest in the company's tangible and intangible assets |
| Standard of Value | Fair Market Value |
| Premise of Value | Marketable Controlling Interest |
| Effective Date of Appraisal | 12/31/03 |
| Purpose and Intended Use of Appraisal | Buy/Sell |

3

## Assumptions and Limiting Conditions

a.  This report is an appraisal report designed to give an opinion of fair market value. It is not an accounting report, and it should not be relied upon to disclose hidden assets or to verify financial reporting. It is an opinion of the value of a 100.00% interest in the company as of 12/31/03.

b.  I have accepted the compiled financial statements of Red Eagle Avionics, Inc. without testing their accuracy. The financial information used consisted of balance sheets, income statements, and/or federal tax returns. The accuracy of the financial statements is the sole responsibility of the management of Red Eagle Avionics, Inc..

c.  The values depicted in this report represent a 100.00% interest in the assets of the company in question. Due to the fact that most small to mid-sized businesses are purchased as an asset sale (both tangible and intangible assets), it was necessary to adjust and remove the liabilities of the company to determine its gross value.

d.  I have relied on representations made by the owner about the background and history of the business. The management of Red Eagle Avionics, Inc. has acknowledged to me that the information they provided was complete and accurate. However, I assume no responsibility for the accuracy of the information provided to me by the business's management.

e.  All facts and data as set forth in this report were obtained from sources considered to be reliable. However, I assume no liability for the accuracy of the information provided to me by others.

f.  This valuation report is based upon facts and conditions existing as of the date of valuation. I have not considered subsequent events. Unless specifically requested by the client and agreed upon by us, I have no obligation to update my report for such events and conditions.

g.  The estimate of value opined to in this report applies only to Red Eagle Avionics, Inc. as of 12/31/03. In addition, my estimate of value is valid only for the purpose of a buy/sell.

4

# Financial Analysis

## Analysis of the Unadjusted Balance Sheets

The schedule presented below shows the subject business's year-end balance sheets for the period between December 1999 and December 2003. For the year ended December 2003, the cash and cash equivalents were approximately 5.9% of the business's total assets. The remainder of the business's current assets are comprised as follows: accounts receivable are 12.3%, inventory is 12.7%, and other assets total 0.0% of total assets at December 2003. In total, current assets comprise 30.9% of the business's total assets. Fixed assets include all of the company's machinery, equipment, and vehicles. At the date of valuation, they made up approximately 69.1% of the business's total assets.

### Historical Balance Sheets

|  | Dec-99 | Dec-00 | Dec-01 | Dec-02 | Dec-03 |
|---|---|---|---|---|---|
| **Current Assets** |  |  |  |  |  |
| Cash & Equivalent | 106,794 | 40,073 | 45,375 | 60,938 | 38,190 |
| Net A/R Trade | 51,906 | 45,338 | 20,515 | 59,445 | 79,589 |
| Inventory | 28,200 | 28,200 | 86,500 | 82,500 | 82,000 |
| Other Current | 4,443 | 963 | 0 | 0 | 0 |
| Current Assets | 191,343 | 114,574 | 152,390 | 202,883 | 199,879 |
| **Other Assets** |  |  |  |  |  |
| Fixed Assets | 584,497 | 735,254 | 737,229 | 737,229 | 737,229 |
| (Accum. Depr.) | (191,685) | (222,173) | (251,121) | (272,339) | (290,367) |
| Land and Other Non-Depr. | 0 | 0 | 0 | 0 | 0 |
| Net Intangibles | 0 | 0 | 0 | 0 | 0 |
| Non-Oper. Assets | 139,264 | 151,581 | 117,914 | 82,062 | 0 |
| Total Assets | 723,418 | 779,236 | 756,412 | 749,835 | 646,741 |
| **Current Liabilities** |  |  |  |  |  |
| A/P - Trade | 40,551 | 41,994 | 28,341 | 53,901 | 12,765 |
| Tax Pay./Accurals | 0 | 0 | 0 | 0 | 0 |
| S.T. Notes Payable | 0 | 0 | 0 | 0 | 0 |
| Current Mat. L.T.D. | 0 | 0 | 0 | 0 | 0 |
| Other Current | 93,335 | 124,360 | 66,000 | 62,556 | 67,000 |
| Current Liabilities | 133,886 | 166,354 | 94,341 | 116,457 | 79,765 |
| **Other Liabilities** |  |  |  |  |  |
| Long Term Debt | 392,410 | 408,327 | 517,095 | 498,500 | 470,582 |
| Non-Oper. Liab.'s | 0 | 0 | 0 | 0 | 0 |
| Total Liabilities | 526,296 | 574,681 | 611,436 | 614,957 | 550,347 |
| **Liabilities & Equity** |  |  |  |  |  |
| Total Equity | 197,122 | 204,555 | 144,976 | 134,878 | 96,394 |
| Liabilities & Equity | 723,418 | 779,236 | 756,412 | 749,835 | 646,741 |

5

## Balance Sheet Percentages

| | Dec-99 | Dec-00 | Dec-01 | Dec-02 | Dec-03 |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| Cash & Equivalent | 14.8% | 6.1% | 6.0% | 8.1% | 5.9% |
| Net A/R Trade | 7.2% | 5.8% | 2.7% | 7.9% | 12.3% |
| Inventory | 3.9% | 3.6% | 11.4% | 11.0% | 12.7% |
| Other Current | 0.6% | 0.1% | 0.0% | 0.0% | 0.0% |
| Current Assets | 26.4% | 14.7% | 20.1% | 27.1% | 30.9% |
| **Other Assets** | | | | | |
| Fixed Assets | 80.8% | 94.4% | 97.5% | 98.3% | 114.0% |
| (Accum. Depr.) | -26.5% | -28.5% | -33.2% | -36.3% | -44.9% |
| Land and Other Non-Depr. | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Net Intangibles | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Non-Oper. Assets | 19.3% | 19.5% | 15.6% | 10.9% | 0.0% |
| Total Assets | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Current Liabilities** | | | | | |
| A/P - Trade | 5.6% | 5.4% | 3.7% | 7.2% | 2.0% |
| Tax Pay./Accruals | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| S.T. Notes Payable | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Current Mat. L.T.D. | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other Current | 12.9% | 16.0% | 8.7% | 8.3% | 10.4% |
| Current Liabilities | 18.5% | 21.3% | 12.5% | 15.5% | 12.3% |
| **Other Liabilities** | | | | | |
| Long Term Debt | 54.2% | 52.4% | 68.4% | 66.5% | 72.8% |
| Non-Oper. Liab.'s | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Total Liabilities | 72.8% | 73.7% | 80.8% | 82.0% | 85.1% |
| **Liabilities & Equity** | | | | | |
| Total Equity | 27.2% | 26.3% | 19.2% | 18.0% | 14.9% |
| Liabilities & Equity | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

6



## Adjusted Balance Sheet

As part of my analysis of the fair market value of Red Eagle Avionics, Inc., I adjusted the business's assets and liabilities to their estimated fair market values as of the 12/31/03 date of valuation. In addition, I have estimated the liquidation value of the tangible assets as of 12/31/03. The following schedule presents the business's book value, adjustments to book value, adjusted book value, and estimated liquidation value as of 12/31/03.

### Tangible Asset Analysis

| As of: 12/31/03 | Book Value | (+/-) | Adjusted Book Value | (%) | Liquidation Value |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| Cash & Equivalent | 38,190 | (38,190) | 0 | | 0 |
| Net A/R Trade | 79,689 | (49,689) | 30,000 | 60.0% | 18,000 |
| Inventory | 82,000 | (32,000) | 50,000 | 30.0% | 15,000 |
| Other Current | 0 | 0 | 0 | 100.0% | 0 |
| Current Assets | 199,879 | | 80,000 | | 33,000 |
| **Other Assets** | | | | | |
| Fixed Assets | 737,229 | 939,971 | 1,677,200 | 35.0% | 587,020 |
| (Accum. Depr.) | (290,367) | 290,367 | 0 | 100.0% | 0 |
| Lease Agreement | 0 | 25,000 | 25,000 | 25.0% | 6,250 |
| Net Intangibles | 0 | 0 | 0 | 100.0% | 0 |
| Non-Oper. Assets | 0 | 0 | 0 | 100.0% | 0 |
| Total Assets | 646,741 | | 1,782,200 | | 626,270 |
| **Current Liabilities** | | | | | |
| A/P – Trade | 12,765 | (12,765) | 0 | 100.0% | 0 |
| Tax Pay/Accruals | 0 | 0 | 0 | 100.0% | 0 |
| S.T. Notes Payable | 0 | 0 | 0 | 100.0% | 0 |
| Current Mat. L.T.D. | 0 | 0 | 0 | 100.0% | 0 |
| Other Current | 67,000 | (67,000) | 0 | 100.0% | 0 |
| Current Liabilities | 79,765 | | 0 | | 0 |
| **Other Liabilities** | | | | | |
| Long Term Debt | 470,582 | (470,582) | 0 | 100.0% | 0 |
| Non-Oper. Liab. | 0 | 0 | 0 | 100.0% | 0 |
| Total Liabilities | 550,347 | | 0 | | 0 |
| **Liabilities & Equity** | | | | | |
| Total Equity | 96,394 | 1,685,806 | 1,782,200 | (1,155,930) | 626,270 |
| Liab's & Equity | 646,741 | | 1,782,200 | | 626,270 |





## Analysis of the Unadjusted Income Statements

As part of my analysis of the fair market value of Red Eagle Avionics, Inc., I analyzed the business's unadjusted income statements for the years ended December 1999 through December 2003. The exhibit below presents the business's income statements for the period December 1999 through December 2003.

### Historical Income Statements

|  | Dec-99 | Dec-00 | Dec-01 | Dec-02 | Dec-03 |
|---|---|---|---|---|---|
| Total Revenue | 1,187,419 | 1,015,919 | 907,972 | 1,239,372 | 1,024,614 |
| Cost of Goods | 644,528 | 417,554 | 441,969 | 742,974 | 578,606 |
| Gross Profit | 542,891 | 598,365 | 466,003 | 496,398 | 446,008 |
|  |  |  |  |  |  |
| Operating Expense | 394,186 | 438,922 | 414,615 | 415,111 | 387,322 |
| Officer Salary | 78,000 | 81,000 | 36,000 | 22,500 | 0 |
| Depr./Amort. | 30,105 | 30,487 | 26,973 | 21,218 | 18,028 |
| Interest Expense | 28,264 | 39,852 | 47,902 | 42,893 | 41,450 |
| Operating Income | 12,336 | 8,104 | (59,487) | (5,324) | (792) |
|  |  |  |  |  |  |
| Non-Oper. Income | 557 | 874 | 0 | 0 | 0 |
| Non Oper. Expense | 0 | 0 | 0 | 0 | 0 |
| Pre-Tax Income | 12,893 | 8,978 | (59,487) | (5,324) | (792) |

### Income Statement Percentages

|  | Dec-99 | Dec-00 | Dec-01 | Dec-02 | Dec-03 |
|---|---|---|---|---|---|
| Total Revenue | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of Goods | 54.3% | 41.1% | 48.7% | 59.9% | 56.5% |
| Gross Profit | 45.7% | 58.9% | 51.3% | 40.1% | 43.5% |
|  |  |  |  |  |  |
| Operating Expense | 33.2% | 43.2% | 45.7% | 33.5% | 37.8% |
| Officer Salary | 6.6% | 8.0% | 4.0% | 1.8% | 0.0% |
| Depreciation | 2.5% | 3.0% | 3.0% | 1.7% | 1.8% |
| Interest Expense | 2.4% | 3.9% | 5.3% | 3.5% | 4.0% |
| Operating Income | 1.0% | 0.8% | -6.6% | -0.4% | -0.1% |
|  |  |  |  |  |  |
| Non-Oper. Income | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% |
| Non-Oper. Expense | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Pre-Tax Income | 1.1% | 0.9% | -6.6% | -0.4% | -0.1% |

8



Red Eagle Avionics, Inc.
Historic Income Statements



Red Eagle Avionics, Inc.
Historic Income Statement Comparison

## Adjusted Income Statements

In my analysis of the value of Red Eagle Avionics, Inc., I reviewed the business's historical income statements for the 5 year period ending 12/31/03. In order to determine the business's earnings capacity as of 12/31/03, it was necessary to adjust its income statements for non-operating revenues and expenses, unusually high or low expenses, discretionary expenses and expenses inconsistent with the company's industry operating standards. The following schedule shows the adjustments made to the business's income statements and the resulting adjusted net income for each of the periods in the analysis.

### Calculation of Adjusted Net Income

|  | Dec-99 | Dec-00 | Dec-01 | Dec-02 | Dec-03 |
|---|---|---|---|---|---|
| Pre-Tax Inc. | 12,893 | 8,978 | (59,487) | (5,324) | (792) |
| [1]Adjustments + or (-) |  |  |  |  |  |
| Officers' Comp. | 78,000 | 81,000 | 36,000 | 22,500 | 0 |
| Depreciation/Amort. | 30,105 | 30,487 | 26,973 | 21,218 | 18,028 |
| Non-Op. Expense | 0 | 0 | 0 | 0 | 0 |
| Cost of Goods Sold | 0 | 0 | 0 | 0 | 140,000 |
| Interest Expense | 28,264 | 39,852 | 47,902 | 42,893 | 41,450 |
| Mech Gate Install | 0 | 0 | 0 | 0 | 15,000 |
| Owner's Life | 0 | 0 | 0 | 0 | 18,000 |
| Owner's Medical | 0 | 0 | 0 | 0 | 3,800 |
| Cell Phone | 0 | 0 | 0 | 0 | 1,200 |
| Owner's Vehicle | 0 | 0 | 0 | 0 | 4,800 |
| Personal Fuel | 0 | 0 | 0 | 0 | 5,200 |
| Owner's Personal Insurance | 0 | 0 | 0 | 0 | 5,000 |
| [2]Benchmark / Industry Adjustments | 142,440 | 91,350 | 172,330 | 223,020 | 0 |
| Other | 0 | 0 | 0 | 0 | 81 |
| Total Deductions | 278,809 | 242,689 | 283,205 | 309,831 | 252,359 |
| Less: Deductions to Income: |  |  |  |  |  |
| [3]Fair Value Officers' Comp. | 100,429 | 86,069 | 77,030 | 104,779 | 86,797 |
| Non-Op. Income | 0 | 0 | 0 | 0 | 0 |
| Additional Income Not Shown | (12,000) | (12,000) | (12,000) | (12,000) | (12,000) |
| Other Revenue | 0 | 0 | 0 | 0 | 0 |
| Total Deductions | 88,429 | 74,069 | 65,030 | 92,779 | 74,797 |
| Adj. Pre-Tax Inc. | 203,273 | 177,598 | 158,688 | 211,528 | 176,770 |

[1] Adjustments are owner perks and non-reoccurring expenses reflective of information supplied by the client as Discretionary Expenses on the Financial Analysis Data form as well as information gathered from IRS Corporate Ratios, so as to reflect the client's Industry Standard.

[2] The Benchmark/Industry Adjustments are addbacks applied to prior and/or subsequent years, utilizing as a benchmark, the period adjusted on-site with the business owner as well as information gathered from IRS Corporate Ratios, so as to reflect the client's Industry Standard.

[3] Fair Value of Officers' Compensation is reflective of information supplied by client on the Financial Analysis Data form as well as information gathered from IRS Corporate Ratios, so as to reflect the client's Industry Standard. The net difference of Officers Compensation and Fair Officers' Compensation would result in an Overcompensation(+) or an Undercompensation (-) as seen on the Financial Analysis Data form.



Red Eagle Avionics, Inc.
Adjusted Income Statements



Red Eagle Avionics, Inc.
Adjusted Income Statement Comparison

# COMPARATIVE INDUSTRY ANALYSIS

The following schedule presents a comparative ratio analysis of Red Eagle Avionics, Inc. and similarly sized firms operating in the same industry. Five categories of ratios (liquidity, debt coverage, leverage, profitability, and miscellaneous) have been used to compare the operating results of Red Eagle Avionics, Inc. with that of the industry. The ratios of the subject company have been compared to the industry median quartile ratios as computed by IRS Corporate Ratios.

### Ratio Analysis & Comparison
### SIC Code: 7629, 7622 & 5065

| | Industry Norm | Historical Dec-99 | Historical Dec-00 | Historical Dec-01 | Historical Dec-02 | Dec-03 |
|---|---|---|---|---|---|---|
| **Liquidity Ratios :** | | | | | | |
| Current Ratio | 2.5 | 1.4 | 0.7 | 1.6 | 1.7 | 2.5 |
| Quick Ratio | 1.7 | 1.2 | 0.5 | 0.7 | 1.0 | 1.5 |
| Revenue/Receivables | 9.3 | 22.9 | 22.4 | 44.3 | 20.8 | 12.9 |
| COG/Inventory | 8.4 | 22.9 | 14.8 | 6.1 | 9.0 | 7.1 |
| COG/Payables | 9.6 | 16.9 | 9.9 | 15.6 | 13.8 | 45.3 |
| Rev./Working Capital | 6.6 | 20.7 | -19.6 | 15.6 | 14.3 | 8.5 |
| **Coverage Ratios :** | | | | | | |
| EBIT/Interest | 10.5 | 1.5 | 1.2 | -0.2 | 0.9 | 1.0 |
| NI+Non-Cash Exp. /Current L.T. Debt | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Leverage Ratios :** | | | | | | |
| Net Fixed/Tang. Worth | 0.8 | 2.0 | 2.5 | 3.4 | 3.4 | 4.6 |
| Debt/Tangible Worth | 1.1 | 2.7 | 2.8 | 4.2 | 4.6 | 5.7 |
| **Operating Ratios :** | | | | | | |
| EBT/Tangible Worth | 44.9% | 6.5% | 4.4% | -41.0% | -3.9% | -0.8% |
| EBT/Total Assets | 21.3% | 1.8% | 1.2% | -7.9% | -0.7% | -0.1% |
| Rev./Net Fixed Assets | 9.3 | 3.0 | 2.0 | 1.9 | 2.7 | 2.3 |
| Revenue/Total Assets | 2.6 | 1.6 | 1.3 | 1.2 | 1.7 | 1.6 |
| **Expense to Revenue Ratios:** | | | | | | |
| % Depr.,Amort./Rev. | 1.9% | 2.5% | 3.0% | 3.0% | 1.7% | 1.8% |
| % Ofis.' Comp./Rev. | 8.4% | 6.8% | 8.0% | 4.0% | 1.8% | 0.0% |

# VALUATION METHODS REJECTED

### Book Value Method

Book value is an accounting value that is calculated by subtracting total liabilities from total assets. Because the book value of a company does not consider the fair market value of a company's assets and liabilities or the fair market value of any intangible assets, it is not an accurate reflection of the business's fair market value as of the date of valuation. Therefore, although I considered Red Eagle Avionics, Inc.'s book value, I rejected it as an accurate indicator of the business's fair market value as of 12/31/03.

### Liquidation Value Method

Liquidation value is the value of the business's assets (minus liabilities) valued as if they were to be sold in an orderly, piecemeal manner. Although I considered the liquidation value of Red Eagle Avionics, Inc., I rejected the method as an accurate indicator of its fair market value as of 12/31/03 due to my opinion that the business was a going concern at that date.

### Adjusted Book Value Method

A business's adjusted book value is calculated by adjusting the company's assets and liabilities from their book value to their estimated fair market value as of the date of valuation. In a going concern business, fair market value usually is depreciated at replacement cost, or by what is referred to as value in-use. Like the book value method and the liquidation value method, the adjusted book value method does not consider the business's earnings capacity. The adjusted book method is used primarily to value holding companies or businesses that do not possess goodwill value. Because Red Eagle Avionics, Inc.'s value is derived primarily from its earnings flow, I rejected the adjusted book value method as an appropriate method to determine the business's fair market value.

## Publicly-Traded Guideline Companies Methods

In the valuation of Red Eagle Avionics, Inc., I considered using valuation ratios derived from publicly-traded guideline companies. However, I rejected using the public company guideline company method due to the disparity in the size, product mix, geographic location, and capital structure between the publicly-traded guideline companies and Red Eagle Avionics, Inc..

## Privately-Held Guideline Companies Methods

### Price to Earnings/Discretionary Cash Flow

In the valuation of Red Eagle Avionics, Inc., I considered price to discretionary cash flow ratios from private transactions data. However, I rejected using the method in valuing Red Eagle Avionics, Inc. because I do not believe that the results are indicative of the fair market value of Red Eagle Avionics, Inc. as of 12/31/03.

### Percent of Revenues

In the valuation of Red Eagle Avionics, Inc., I considered price to revenue ratios from private transactions data. However, I rejected using the method in valuing Red Eagle Avionics, Inc. because I do not believe that the results are indicative of the fair market value of Red Eagle Avionics, Inc. as of 12/31/03.

### Price to Book Value

In the valuation of Red Eagle Avionics, Inc., I considered using percentage of revenue ratios from private guideline company

11

transactions data. However, I rejected the method as appropriate in valuing Red Eagle Avionics, Inc. because I do not believe that the results are indicative of the fair market value of Red Eagle Avionics, Inc. as of 12/31/03.

### Price to Total Assets

In the valuation of Red Eagle Avionics, Inc., I considered using percentage of revenue ratios from private guideline company transactions data. However, I rejected the method as appropriate in valuing Red Eagle Avionics, Inc. because I do not believe that the results are indicative of the fair market value of Red Eagle Avionics, Inc. as of 12/31/03.

## Dividend Paying Capacity

Although I.R.S. Revenue Ruling 59-60 specifically mentions using the dividend paying capacity method in valuing a closely-held business for income tax purposes, it is rarely used by appraisers. Additionally, Revenue Ruling 59-60 states: "Where an actual or effective controlling interest in a corporation is to be valued, the dividend factor is not a material element, since the payment of such dividends is discretionary with the controlling stockholders." Therefore, although I considered the dividend paying capacity method, I rejected it as an appropriate method to use in valuing Red Eagle Avionics, Inc.

12

# VALUATION METHODS ACCEPTED

In determining the fair market value of Red Eagle Avionics, Inc. as of 12/31/03, it is my opinion that the primary method to be used is Capitalization of Excess Earnings.

## Income Methods of Valuation

### Selection of an Appropriate Discount/Capitalization Rate

Capitalization rates vary among particular types of businesses and from one period of time to another. Expressed as a percentage, the more speculative or the lower the expected growth rate in the business's income stream, the higher the capitalization rate; conversely, the less speculative or the higher the expected growth rate in the income stream, the lower the capitalization rate.

The two basic components of a capitalization rate are the discount rate and a growth factor. The discount rate may be broken down into the risk-free rate of return and a risk premium (financial and market).

The risk-free rate of return includes the investors' required rate of return for the riskless use of their funds and a factor for inflation. The rate of return earned on long-term U.S. Government bonds is considered a good proxy for the risk-free rate of return. As of the 12/31/03 date of valuation, the historical rate of return on a twenty-year U.S. Government Treasury Bond was 6.8%. Therefore, the risk-free rate of return is 6.8%.

The risk premium return is the additional rate of return required by investors in the market to compensate them for the additional risk in investing in a stock security as compared to a long-term U.S. Government security. In the Ibbotson Associates' Stocks, Bonds, Bills and Inflation Yearbook, it is shown that, between 1926 and 1993, the average total returns earned on large corporate stocks has been approximately 7.5% higher than the average total annual returns for long-term U.S. Government bonds. Therefore, in developing a discount rate, I added an equity risk premium of 7.5% to the risk-free rate of return.

In addition to the 7.5% risk premium, the same Ibbotson Associates' study indicates that the smallest stocks traded on the New York Stock Exchange (defined as the lower 20 percent) earned an additional 5.0% premium over the larger stocks traded on the exchange. This small stock premium was added to the risk-free rate of return and the equity risk premium.

Summing the risk-free rate of return with the equity and small stock risk premia equals the average total return required by investors to induce them to invest in the smallest stocks traded on the New York Stock Exchange. However, investing in the stock of a closely-held business involves additional elements of risk which must be compensated by offering a higher rate of return. The additional risk may be from specific risks associated with the industry or the company as compared to the entire marketplace. Although there is little empirical evidence to assist the appraiser in determining this subjective risk premium, I have considered the following factors:

1. The business's financial ratios.
2. The long-term outlook for the subject company's industry.
3. The depth of the subject company's management.
4. The degree of competition for the subject business's revenues.
5. The historical trend in the company's after-tax earnings.

After considering the aforementioned factors, it is my opinion that the subjective risk premium for Red Eagle Avionics, Inc. should be approximately 3.5%.

Summing the risk-free rate of return, the equity risk premium, the small stock premium, and the subjective risk premium equals a discount rate of 22.8%.

Because I have chosen to use a pre-tax base in my calculation of fair market value, a final step in building the discount rate is required. The sum of the aforementioned components equals the after-tax discount rate. In order to convert from a pre-tax to after-tax basis, it is necessary reduce the discount rate by a factor based on the marginal tax rate. I selected a conversion

13

factor of 3.3%.

Summing the risk-free rate of return, the equity risk premium, the small stock risk premium, the subjective risk premium, and the pre-tax adjustment equals an pre-tax discount rate of approximately 26.1%.

In order to calculate a capitalization rate, it is necessary to subtract the company's expected sustainable long-term growth in earnings from the discount rate. The company's average annual growth rate has been -3.4%. Based on the company's historical growth rate, the expected growth rate in the industry, and the client's perception of the future growth of the company and its market, it is my opinion that the business's long-term sustainable growth rate in earnings will be approximately 5.0%.

The result of subtracting the business's expected long-term growth rate in earnings from the discount rate is a capitalization rate of 21.1%. This capitalization rate is for the next year's earnings. To convert it to a current year's earnings capitalization rate, it is necessary to divide the capitalization rate by the sum of one plus the expected long-term growth rate in the business's earnings (5.0%). The result of the calculation is a capitalization rate of 20.1% that is applicable to the current year's earnings.

The following exhibit shows the components that make up the capitalization rate for Red Eagle Avionics, Inc. as of 12/31/03.

### Capitalization Rate Conclusions

| Build-Up Model | Rate |
|---|---|
| Risk-Free Rate | 6.8% |
| Equity Risk Premium | 7.6% |
| Risk Premium for Size | 5.0% |
| Other Risk Factors | 3.5% |
| Discount Rate (After-Tax) | 22.8% |
| Adjust To Pre-Tax Basis | 3.3% |
| Discount Rate (Pre-Tax) | 26.1% |
| Less: Sustainable Growth Rate | 5.0% |
| Capitalization Rate | 21.1% |
| Capitalization Rate (Current Year) | 20.1% |

14

## Capitalization of Earnings Method

### Conceptual Basis

The capitalization of earnings method values the business based on an expected stream of earnings (cash flow) capitalized by a risk-adjusted rate of return. A capitalization of earnings method is used primarily to value businesses whose earnings are expected to remain stable and whose value is based on its projected earnings stream. The steps involved in using the capitalization of earnings method are:

1. Determine the appropriate capitalization rate.

2. Estimate the business's pro-forma sustainable earnings.

3. Capitalize the sustainable earnings into an operating value.

4. Add/subtract non-operating assets and/or liabilities to determine the fair market value for the entire entity at the date of valuation.

### Income to be Capitalized

In order to estimate the business's fair market value using the capitalization of earnings method, it is necessary to determine Red Eagle Avionics, Inc.'s sustainable earnings base as of the date of valuation. The first step, adjusting the historical income statements for non-operating expenses and revenues, was completed in a previous section of this appraisal report. The second step, weighting the adjusted income statements and calculating the weighted-average earnings base, is presented in the following schedule.

### Capitalization of Earnings

| | Dec-99 | Dec-00 | Dec-01 | Dec-02 | Dec-03 |
|---|---|---|---|---|---|
| Adj. Pre-Tax Income | 203,273 | 177,598 | 158,686 | 211,528 | 176,770 |
| Weighting Factors | 1 | 2 | 3 | 4 | 5 |
| Weighted Earnings | 203,273 | 355,196 | 476,064 | 846,112 | 883,850 |

| | |
|---|---|
| Sum of Weighted Earnings | 2,764,495 |
| Sum of Weighting Factors | 15 |
| Weighted Average Pre-Tax Income | 184,300 |

### Summary and Indicated Value Estimate

The following exhibit summarizes the calculation of the business's fair market using the capitalization of earnings method.

### Capitalization of Earnings Conclusions

| | |
|---|---|
| Ongoing Ongoing Pre-Tax Earnings | 184,300 |
| Capitalization Rate | 20.1% |
| Operating Value | 916,915 |
| | |
| Add: Excess/Non-Operating Assets (Net) | 0 |
| Indicated Value | 916,915 |
| Rounded | 916,900 |

15



Cap of Earnings Projected Ongoing Pre-Tax Earnings

## Discounted Future Earnings Method

### Conceptual Basis

The discounted future earnings analysis is an income method to valuation wherein the total fair market value of the business entity is calculated by discounting projected future earnings back to the date of valuation. At the end of the projection period, a residual value is calculated and discounted to its present value at the date of valuation. After the business's non-operating assets and liabilities are added/deducted to the present value of all projected earnings, the result is the fair market value of the total business entity. The theory behind the discounted future earnings method is that an entity's value is equal to the present value of its expected future earnings. It is used primarily when a business's short-term projected earnings stream is not expected to equal its expected long-term growth rate and when a business's earnings and/or cash flows are the primary factors of value.

The steps involved in a discounted future earnings analysis are as follows:

1. Develop a risk adjusted discount rate.

2. Develop a pro-forma income statement of the projected earnings for the interim years until the business's activities are expected to stabilize.

3. Discount to the date of valuation the projected income stream by the discount rate.

4. Capitalize the Nth year's projected income into a residual value using the capitalization of earnings method.

5. Discount the residual value to its present value as of the date of valuation.

6. Sum the present values of the discounted cash flows and residual value.

7. Add/subtract non-operating assets and liabilities to derive the indicated total business entity value (prior to any discounts and/or premiums) as of the date of valuation.

### Selection of the Appropriate Discount Rate

The discount rate was calculated in the determination of the capitalization rate in the capitalization of earnings method. The after-tax discount rate was calculated to be 22.8% and the pre-tax discount rate was calculated to be 26.1%.

### Discount Rate Conclusions

| Build-Up Model | Rate |
|---|---|
| Risk-Free Rate | 6.8% |
| Equity Risk Premium | 7.5% |
| Risk Premium for Size | 5.0% |
| Other Risk Factors | 3.5% |
| Discount Rate (After-Tax) | 22.8% |
| Adjust To Pre-Tax Basis | 3.3% |
| Discount Rate (Pre-Tax) | 26.1% |

16

**Pro-Forma Base**

After the discount rate was determined, the second step was to develop a pro-forma income statement.

### Discounted Future Earnings
### Calculation of Pre-Tax Earnings Base

|  | Dec-99 | Dec-00 | Dec-01 | Dec-02 | Dec-03 |
|---|---|---|---|---|---|
| Adj. Pre-Tax Income | 203,273 | 177,598 | 158,688 | 211,528 | 176,770 |
| Weighting Factors | 1 | 2 | 3 | 4 | 5 |
| Weighted Earnings | 203,273 | 355,196 | 476,064 | 846,112 | 883,850 |

| | |
|---|---|
| Sum of Weighted Earnings | 2,764,495 |
| Sum of Weighting Factors | 15 |
| Weighted Average Pre-Tax Income | 184,300 |

**Future Earnings to be Discounted**

After the discount rate was determined, the second step in the analysis was to develop a pro-forma income statement. The following exhibit shows the business's estimated projected earnings for the 10 years after the 12/31/03 date of valuation discounted to their present values as of 12/31/03. In addition, the last year's projected earnings were capitalized into a residual value and discounted to its present value as of 12/31/03. Finally, the non-operating assets were added to the sum of the present values of the projected future earnings stream and residual value to calculate the business's fair market value as of 12/31/03.

### Discounted Future Earnings

| Year | Base Pre-Tax Inc. | Estimated Growth % | Forecasted Earnings | Discount Rate | Present Value |
|---|---|---|---|---|---|
| 1 | 184,300 | 10.0% | 202,730 | 28.1% | 160,769 |
| 2 | | 10.0% | 223,003 | 28.1% | 140,243 |
| 3 | | 10.0% | 245,303 | 28.1% | 122,337 |
| 4 | | 10.0% | 269,833 | 28.1% | 106,717 |
| 5 | | 10.0% | 296,816 | 28.1% | 93,092 |
| 6 | | 10.0% | 326,498 | 28.1% | 81,206 |
| 7 | | 10.0% | 359,148 | 28.1% | 70,838 |
| 8 | | 10.0% | 395,063 | 28.1% | 61,794 |
| 9 | | 10.0% | 434,569 | 28.1% | 53,904 |
| 10 | | 10.0% | 478,026 | 28.1% | 47,022 |

| | |
|---|---|
| Terminal Value | 233,995 |
| Operating Value | 1,171,917 |
| | |
| Add: Excess/Non-Operating Assets (Net) | 0 |
| Indicated Value | 1,171,917 |
| Rounded | 1,171,900 |

17



## Capitalization of Excess Earnings Method

### Conceptual Basis

The capitalization of excess earnings (or IRS Formula Approach) is a hybrid valuation method wherein the business's net tangible assets (i.e. adjusted book value) and intangible assets are valued independently. The tangible and intangible assets are then summed to calculate the business's fair market value as of the date of valuation.

### Value of the Tangible Assets

The tangible assets analysis was performed in the "Normalized Balance Sheet" section to this appraisal report. The estimated fair market value of the business's tangible assets as of 12/31/03 was calculated to be $1,782,200.

### Calculating Excess Earnings

In order to estimate the business's fair market value using the capitalization of excess earnings method, it is necessary to determine Red Eagle Avionics, Inc.'s excess earnings base as of the 12/31/03 date of valuation. The excess earnings base is calculated by determining the business's sustainable earnings base and deducting a fair return on its net operating tangible assets.

The first step, determining the business's sustainable earnings base, was performed by adjusting the historical income statements for non-operating expenses and revenues (completed in the "Normalized Income Statements" section to this appraisal report), weighting the adjusted income statements, and calculating the weighted-average earnings base. The calculation of the weighted-average earnings base is presented in the following schedule.

### Capitalization of Excess Earnings

#### Calculation of Pre-Tax Earnings Base

|  | Dec-99 | Dec-00 | Dec-01 | Dec-02 | Dec-03 |
|---|---|---|---|---|---|
| Adj. Pre-Tax Income | 203,273 | 177,596 | 158,686 | 211,528 | 176,770 |
| Weighting Factors | 1 | 2 | 3 | 4 | 5 |
| Weighted Earnings | 203,273 | 355,196 | 476,064 | 846,112 | 883,850 |

| | |
|---|---|
| Sum of Weighted Earnings | 2,764,495 |
| ÷ Sum of Weighting Factors | 15 |
| Weighted Average Pre-Tax Income | 184,300 |

The second step, deriving a fair return on the business's net operating tangible assets, was calculated by multiplying the business's adjusted net operating tangible assets with the estimated normal riskless return on assets.

| | |
|---|---|
| Adjusted Assets | 1,782,200 |
| | |
| Less: Non-Operating Assets | 0 |
| Less: Excess Assets | 0 |
| Adjusted Operating Assets | 1,782,200 |
| Multiplied By: | |
| Return on Assets | 4.2% |
| Return on Operating Assets | 74,852 |

18

The result was a deduction on $(74,852) from the business's sustainable earnings base to calculate an excess earnings base of $109,448 as of 12/31/03.

**Selection of Appropriate Capitalization Rate**

In order to develop an excess earnings capitalization rate for Red Eagle Avionics, Inc., I looked at the different factors that contribute to the persistence of the company's intangible assets. I primarily looked at the historical patterns of the persistence of the subject company's customer base, its market position, the consistency of its earnings, and the client's perception of the future of the company.

Based on my analysis of the above factors, it is my opinion that as of 12/31/03, the subject company's customer base had a persistence of approximately 6 years. By taking the reciprocal of the estimated years of persistence, an excess earnings capitalization rate of 16.7% is calculated.

**Calculation of Indicated Value**

The following exhibit summarizes the calculation of the business entity using the capitalization of excess earnings method.

### Capitalization of Excess Earnings Conclusions

| | |
|---|---|
| Weighted Average | 184,300 |
| Return on Operating Assets | (74,852) |
| Excess Earnings | 109,448 |
| Divided by Cap. Rate | 16.7% |
| Intangible Value | 655,377 |
| Add: Adj. Book Value | 1,782,200 |
| Total Entity Value | 2,437,577 |

19

# SUMMARY OF VALUATION METHODS

In my evaluation of the fair market value of Red Eagle Avionics, Inc. as of 12/31/03, I calculated and analyzed a variety of valuation methods. The following exhibit lists the various valuation methodologies and the weighting I assigned to each method.

### Conclusions of Value

| Valuation Methods | 12/31/03 | Weight |
|---|---|---|
| Book Value | 96,394 | 0.0 |
| Adjusted Book Value | 1,782,200 | 0.0 |
| Liquidation Value | 626,270 | 0.0 |
| Capitalization of Earnings | 916,900 | 5.0 |
| Capitalization of Excess Earnings | 2,437,600 | 90.0 |
| Discounted Future Earnings | 1,171,900 | 5.0 |
| | | |
| Total Entity Value | 2,298,280 | |
| | | |
| Rounded | 2,298,300 | |
| | | |
| | | |
| | | |
| Total Entity Value | 2,298,280 | 2,298,300 |

20



# VALUE CONCLUSION

Based on my analysis of Red Eagle Avionics, Inc. and all of the factors affecting its value, it is my opinion that the fair market value of a 100.00% interest in the business as of 12/31/03 is $2,298,300 and is calculated as follows:

| | |
|---|---|
| Indicated Value | 2,298,300 |
| Times: 100.00% Interest Valued | 100.0% |
| Conclusion of Value of 100.00% Interest | 2,298,300 |
| | |
| Rounded | 2,298,300 |

21

# PROOF OF VALUATION

To test the reasonableness of my opinion of Red Eagle Avionics, Inc.'s fair market value as of 12/31/03, I performed a proof of valuation analysis. This analysis includes assumptions regarding the cash down payment the terms of the purchase notes, and the business's projected cash flows. These assumptions are presented in the following exhibit.

## Hypothetical Terms of Sale

| Assumed Terms of Sale | Percent | Term (Years) | Contract Interest |
|---|---|---|---|
| Buyer Cash | 30.0% | | |
| 3rd Party Asset Loans | 40.0% | 15 | 6.0% |
| Seller Takeback Notes | 30.0% | 15 | 8.0% |
| Percent of Purchase Price | 100.0% | | |
| Assumed Purchase Price : | 2,296,800 | | |

Based on the purchase terms presented in the above exhibit, I analyzed Red Eagle Avionics, Inc.'s projected cash flows to ascertain whether or not they cover the hypothetical interest and principal payments. The buyer post-sale cash flow was calculated as follows:

1. The projected adjusted before-tax income was reduced by interest payments on purchase notes and any payments for a covenant-not-to-compete and/or an employee contract. The result of this adjustment was termed the business's "Post-Sale Adjusted Income."

2. The Post-Sale Adjusted Income was reduced by an income tax factor of 15.0%.

3. All non-cash expenses were added back.

4. The principal portion of all debt instruments is deducted.

The result of the above adjustments is termed the business's Simple Cash Flow. The business's annual projected post-sale cash flows are presented in the following exhibit.

22

### Projected Annual Post-Sale Cash Flow

| | Dec-04 | Dec-05 | Dec-06 | Dec-07 | Dec-08 | Dec-09 | Dec-10 | Dec-11 | Dec-12 | Dec-13 |
|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Tax Adj. Net Income | 197,301 | 211,005 | 225,775 | 341,579 | 268,490 | 276,884 | 298,946 | 316,881 | 338,827 | 362,546 |
| Seller Takeback Interest | 54,384 | 52,202 | 49,676 | 47,888 | 44,943 | 42,113 | 38,043 | 34,723 | 32,122 | 28,226 |
| 3rd Party Note Interest | 54,099 | 51,894 | 49,141 | 46,429 | 43,561 | 40,495 | 37,252 | 33,808 | 30,149 | 26,297 |
| Adjusted Post-Sale Income | 88,888 | 107,109 | 128,689 | 147,982 | 188,988 | 195,876 | 219,890 | 347,181 | 276,557 | 308,082 |
| Income Taxes | 13,826 | 18,066 | 18,909 | 22,139 | 25,490 | 29,096 | 32,948 | 37,070 | 41,484 | 46,208 |
| Post-Sale Net Income | 75,012 | 91,043 | 107,360 | 125,453 | 144,497 | 164,890 | 186,702 | 210,091 | 235,073 | 261,844 |
| Seller Takeback Principal | 24,907 | 26,867 | 29,096 | 31,610 | 34,127 | 38,959 | 40,027 | 43,345 | 46,945 | 80,842 |
| 3rd Party Note Principal | 38,394 | 41,400 | 43,953 | 46,854 | 49,543 | 62,887 | 85,841 | 88,388 | 62,942 | 68,625 |
| Other Long-Term Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Depr. & Non-Cash Addbacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Post-Sale Cash Flow | 11,711 | 22,776 | 34,511 | 47,279 | 60,827 | 78,324 | 60,834 | 107,427 | 126,186 | 144,177 |

Based on the above analysis, the projected cash flows are sufficient to pay the assumed interest and principle due on the hypothetical purchase notes and existing notes.



In addition to performing a post-sale cash flow analysis, a hypothetical return on investment was calculated. The following schedule presents this analysis.

### Return on Investment

| | Buyer Cash Investment | | | Contract Purchase Price | | |
|---|---|---|---|---|---|---|
| | Buyer Cash Down | Pre-Tax Post-Purch. Pmt. Cash Flow | ROI | Total Price | Pre-Tax Pre-Purch. Pmt Cash Flow | ROI |
| 1. | 689,490 | 25,037 | 3.6% | 2,296,300 | 197,201 | 8.6% |
| 2. | | 38,842 | 5.6% | | 211,005 | 9.2% |
| 3. | | 53,610 | 7.8% | | 225,775 | 9.8% |
| 4. | | 69,418 | 10.1% | | 241,579 | 10.5% |
| 5. | | 86,326 | 12.5% | | 258,490 | 11.2% |
| 6. | | 104,420 | 15.1% | | 276,584 | 12.0% |
| 7. | | 123,782 | 18.0% | | 295,945 | 12.9% |
| 8. | | 144,497 | 21.0% | | 316,661 | 13.8% |
| 9. | | 166,669 | 24.2% | | 338,827 | 14.7% |
| 10. | | 190,385 | 27.6% | | 362,545 | 15.8% |

Based on the projected cash flow analysis and the return on investment analysis, a fair market value of $2,296,300 for Red Eagle Avionics, Inc. as of 12/31/03 is reasonable.

24

# CERTIFICATION OF ANALYST

I certify that, to the best of my knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

3.  I have no present or prospective interest in the business that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

4.  My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report.

5.  My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with Uniform Standards of Professional Appraisal Practice and the Ethics & Standards of Business Appraisal Reports (P-243 & P-244) of the Institute of Business Appraisers (IBA).

6.  In preparation of this report, I have relied on the information supplied by the clients as well as the information gathered by the Business Consultant representing PBS Global, Inc. No one provided significant professional assistance to me beyond administrative support, and my signature is an indication of such.

25

# APPENDIX A: ANALYST'S QUALIFICATIONS

| | |
|---|---|
| **Name** | Gerald W. Brown, Sr. |
| **Title** | Vice President/Senior Analyst, RSI & Associates, Inc., Corpus Christi, Texas |
| **Specialties** | Business Valuations, Exit Strategy Consulting, Merger/Acquisition Consulting, Litigation Support, Trial Consulting, Expert Witness Testimony, Financial Forensic Analysis, Business Consulting, Seminar Instruction and Key Note Speaking |
| **Experience** | Over two decades of Business Management & Consulting |
| **Education** | Economics & Finance-Northern Virginia (NOVACC) |
| **Background** | Raised in South Texas. Proud to have served our country with distinction as a member of the Navy's Ceremonial Guard (Presidential Honor Guard) from 1982-1986 and temporarily assigned to the Pentagon as the classified courier, driver and body guard for the Deputy Under Secretary of Defense (Dr. Steve Bryan) from 1984-1986. Had numerous security clearances including Top Secret, NATO Top Secret, Code Word Level 2 and A Yankee White Security Clearance (required to be in the presence of the President of the United States). Professional career includes consulting with over 1200 Businesses on maters related to Exit Strategy, Operational Systems & Controls and Value Documentation. Speaks at various trade shows and has had articles published in more than 15 business trade magazines / publications. Currently resides in Corpus Christi, TX with his loving bride, together they have six children. |
| **Published Works** | Author and producer of the Seminar Series entitled 'Business Value Strategies.' Seminar circuit 1998-1999 |
| | Author of an article entitled 'Business Value and Exit Strategy. Strategy or no strategy: You gotta exit sooner or later.' Farm Connection January 2002 |
| | Author of an article entitled 'Business Value and Exit Strategy. What is your exit strategy?' Farm Connection February 2002 |
| | Author of an article entitled 'Business Value and Exit Strategy. What is my Business Worth?' Farm Connection March 2002 |
| | Author of an article entitled 'Business Value and Exit Strategy. What will I do about Capital Gains?' Farm Connection April 2002 |
| | Author of an article entitled 'No Exit? When the time comes to sell your business, will you be ready?' Published in Pool & Spa News April 5, 2002 |
| | Author of an article entitled 'Sale Killers...Selling your business? Here are common mistakes to avoid.' Published on www.poolspanews.com (online exclusive) April 2002 |
| | Author of an article entitled 'The Exit Strategy. In one way or another, business owners must step out of the game sometime. Here's how to do it gracefully.' Published in The Motion Systems Distributor May/June 2002 |
| | Author of an article entitled 'Business Value and Exit Strategy. Strategy or no strategy: You gotta exit sooner or later.' Appliance Service News June 2002 |
| | Author of an article entitled 'Business Value and Exit Strategy. What is your exit strategy?' Appliance Service News July 2002 |
| | Author of an article entitled 'Business Value and Exit Strategy. What is my Business Worth?' Appliance Service News August 2002 |

26

Author of an article entitled 'Business Value and Exit Strategy. What will I do about Capital Gains?' Appliance Service News  September 2002

Author of an article entitled 'Strategy or Not, You'll Exit Sooner or Later'  The Air Conditioning, Heating & Refrigeration News  January 2003

Author of an article entitled 'Business Value and Exit Strategy. What is your exit strategy?  Part 1' Restaurant Hospitality  March 2003

Author of an article entitled 'Business Value and Exit Strategy. What is your exit strategy?  Part 2' Restaurant Hospitality  April 2003

Author of an article entitled 'You Gotta Exit Sooner or Later' Floor Covering News  August 2003

Author of an article entitled 'Fire The Technician in You'  Published in Pool & Spa News  August, 2003

Author of an article entitled 'What's My Business Worth' Floor Covering News  March 2004

Author of an article entitled 'What to do about Post-Sale Tax Liability' Floor Covering News  April 2004

**Affiliations**      Member of the Institute of Business Appraisers

Member of the National Center for Employee Ownership

**Speaking**      Business Value Strategies - 8hr Seminar:

**Engagements**          December 1998, Dallas, Texas, Primary Speaker

January 1999, Dallas, Texas, Primary Speaker

February 1999, Houston, Texas, Primary Speaker

March 1999, Houston, Texas, Primary Speaker

April 1999, San Antonio, Texas, Primary Speaker

Valuing Your Engineering Practice - 1hr Key Note

June 1999, Corpus Christi, Texas

Time Management, The Key to a Valuable Employee - 1hr Key Note

August 1999, Corpus Christi, Texas

ESOP Solutions Seminar, A New Beginning - 8hr Seminar

January 2002, Phoenix, Arizona, Primary Speaker & Workshop Instructor

Strategy or No Strategy: You Gotta Exit Sooner or Later - 2hr Workshop

November 2003, New Orleans, Louisiana, Pool & Spa Expo, Trade Show Instructor

Successful Succession...Keeping your business in the family without killing one another  - 2hr Workshop

December 2004, Las Vegas, Nevada, IPSE, Trade Show Instructor

Pricing Your Business...What's it worth and What is your Exit Strategy? - 2hr Workshop

January 2005, Orlando, Florida, Pinch a Penny Franchise Expo, Trade Show Instructor

Successful Succession...Keeping your business in the family without killing one another  - 2hr Workshop

February 2005, Orlando, Florida, International Roofing Expo, Trade Show Instructor

Strategy or No Strategy: You Gotta Exit Sooner or Later - 2hr Workshop

February 2005, Orlando, Florida, International Roofing Expo, Trade Show Instructor

27

| Community Involvement | Deacon /Second Baptist Church, Corpus Christi, TX |
| | Drama Director/Second Baptist Church, Corpus Christi, TX |
| | History Committee/Second Baptist Church, Corpus Christi, TX |
| | Benevolence Committee/Second Baptist Church, Corpus Christi, TX |
| | Sunday School Teacher - Senior Adult Men/Second Baptist Church, Corpus Christi, TX |
| | Board Member/Wounded Christian Ministries, Corpus Christi, TX |
| | Volunteer/Nueces County Chapter of The Republican National Committee |

28

# APPENDIX B: GLOSSARY OF TERMS

This Glossary was developed jointly by representatives of the American Institute of CPAs, the American Society of Appraisers, the Canadian Institute of Chartered Business Valuators, the Institute of Business Appraisers, and the National Association of Certified Valuation Analysts.

**Adjusted Book Value** - the value that results after one or more asset or liability amounts are added, deleted, or changed from their respective financial statement amounts.

**Appraisal** - See Valuation.

**Appraisal Approach** - See Valuation Approach.

**Appraisal Date** - See Valuation Date.

**Appraisal Method** - See Valuation Method.

**Appraisal Procedure** - See Valuation Procedure.

**Asset (Asset-Based) Approach** - a general way of determining a value indication of a business, business ownership interest, or security by using one or more methods based on the value of the assets of that business net of liabilities.

**Benefit Stream** - any level of income, cash flow, or earnings generated by an asset, group of assets, or business enterprise. When the term is used, it should be supplemented by a definition of exactly what it means in the given valuation context.

**Beta** - a measure of systematic risk of a security; the tendency of a security's returns to correlate with swings in the broad market.

**Blockage Discount** - an amount or percentage deducted from the current market price of a publicly traded security to reflect the decrease in the per share value of a block of those securities that is of a size that could not be sold in a reasonable period of time given normal trading volume.

**Business** - see Business Enterprise.

**Business Enterprise** - a commercial, industrial, service, or investment entity, or a combination thereof, pursuing an economic activity.

**Business Valuation** - the act or process of determining the value of a business enterprise or ownership interest therein.

**Capital Asset Pricing Model (CAPM)** - a model in which the cost of capital for any security or portfolio of securities equals a risk-free rate plus a risk premium that is proportionate to the systematic risk of the security or portfolio.

**Capitalization** - a conversion of a single period stream of benefits into value.

**Capitalization Factor** - any multiple or divisor used to convert anticipated benefits into value.

**Capitalization Rate** - any divisor (usually expressed as a percentage) used to convert anticipated benefits into value.

**Capital Structure** - the composition of the invested capital of a business enterprise; the mix of debt and equity financing.

**Cash Flow** - cash that is generated over a period of time by an asset, group of assets, or business enterprise. It may be used in a general sense to encompass various levels of specifically defined cash flows. When the term is used, it should be

29

supplemented by a qualifier (for example, "discretionary" or "operating") and a definition of exactly what it means in the given valuation context.

**Control** - the power to direct the management and policies of a business enterprise.

**Control Premium** - an amount (expressed in either dollar or percentage form) by which the pro rata value of a controlling interest exceeds the pro rata value of a non-controlling interest in a business enterprise, that reflects the power of control.

**Cost Approach** - a general way of estimating a value indication of an individual asset by quantifying the amount of money that would be required to replace the future service capability of that asset.

**Cost of Capital** - the expected rate of return (discount rate) that the market requires in order to attract funds to a particular investment.

**Discount** - a reduction in value or the act of reducing value.

**Discount for Lack of Control** - an amount or percentage deducted from the pro rata share of value of one hundred percent (100%) of an equity interest in a business to reflect the absence of some or all of the powers of control.

**Discount for Lack of Marketability** - an amount or percentage deducted from the value of an ownership interest to reflect the relative absence of marketability.

**Discount Rate** - a rate of return (cost of capital) used to convert a monetary sum, payable or receivable in the future, into present value.

**Economic Life** - the period of time over which property may generate economic benefits.

**Effective Date** - See Valuation Date.

**Enterprise** - See Business Enterprise.

**Equity Net Cash Flows** - those cash flows available to pay out to equity holders (in the form of dividends) after funding operations of the business enterprise, making necessary capital investments, and reflecting increases or decreases in debt financing.

**Equity Risk Premium** - a rate of return in addition to a risk-free rate to compensate for investing in equity instruments because they have a higher degree of probable risk than risk-free instruments (a component of the cost of equity capital or equity discount rate).

**Excess Earnings** - that amount of anticipated benefits that exceeds a fair rate of return on the value of a selected asset base (often net tangible assets) used to generate those anticipated benefits.

**Excess Earnings Method** - a specific way of determining a value indication of a business, business ownership interest, or security determined as the sum of a) the value of the assets obtained by capitalizing excess earnings and b) the value of the selected asset base. Also frequently used to value intangible assets. See Excess Earnings.

**Fair Market Value** - the price, expressed in terms of cash equivalents, at which business would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.

**Forced Liquidation Value** - liquidation value at which the asset or assets are sold as quickly as possible, such as at an auction.

**Going Concern** - an ongoing operating business enterprise.

**Going Concern Value** - the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of Going Concern Value result from factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place.

**Goodwill** - that intangible asset arising as a result of name, reputation, customer loyalty, location, products, and similar factors not separately identified.

**Goodwill Value** - the value attributable to goodwill.

**Income (Income-Based) Approach** - a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that convert anticipated benefits into a present single amount.

**Intangible Assets** - non-physical assets (such as franchises, trademarks, patents, copyrights, goodwill, equities, mineral rights, securities and contracts as distinguished from physical assets) that grant rights, privileges, and have economic benefits for the owner.

**Invested Capital** - the sum of equity and debt in a business enterprise. Debt is typically a) long-term liabilities or b) the sum of short-term interest-bearing debt and long-term liabilities. When the term is used, it should be supplemented by a definition of exactly what it means in the given valuation context.

**Invested Capital Net Cash Flows** - those cash flows available to pay out to equity holders (in the form of dividends) and debt investors (in the form of principal and interest) after funding operations of the business enterprise and making necessary capital investments.

**Investment Risk** - the degree of uncertainty as to the realization of expected returns.

**Investment Value** - the value to a particular investor based on individual investment requirements and expectations. {NOTE: in Canada, the term used is "Value to the Owner"}

**Key Person Discount** - an amount or percentage deducted from the value of an ownership interest to reflect the reduction in value resulting from the actual or potential loss of a key person in a business enterprise.

**Levered Beta** - the beta reflecting a capital structure that includes debt.

**Liquidity** - the ability to quickly convert property to cash or pay a liability.

**Liquidation Value** - the net amount that can be realized if the business is terminated and the assets are sold piecemeal. Liquidation can be either "orderly" or "forced".

**Majority Control** - the degree of control provided by a majority position.

**Majority Interest** - an ownership interest greater than fifty percent (50%) of the voting interest in a business enterprise.

**Market (Market-Based) Approach** - a general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold.

**Marketability** - the ability to quickly convert property to cash at minimal cost.

**Marketability Discount** - See Discount for Lack of Marketability.

**Minority Discount** - a discount for lack of control applicable to a minority interest.

**Minority Interest** - an ownership interest less than fifty percent (50%) of the voting interest in a business enterprise.

**Net Book Value** - with respect to a business enterprise, the difference between total assets (net of accumulated depreciation, depletion, and amortization) and total liabilities of a business enterprise as they appear on the balance sheet (synonymous

31

with Shareholder's Equity); with respect to an intangible asset, the capitalized cost of an intangible asset less accumulated amortization as it appears on the books of account of the business enterprise.

Net Cash Flow - a form of cash flow. When the term is used, it should be supplemented by a qualifier (for example, "Equity" or "Invested Capital") and a definition of exactly what it means in the given valuation context.

Net Tangible Asset Value - the value of the business enterprise's tangible assets (excluding excess assets and non-operating assets) minus the value of its liabilities. {NOTE: in Canada, tangible assets also include identifiable intangible assets}

Non-Operating Assets - assets not necessary to ongoing operations of the business enterprise. {NOTE: in Canada, the term used is "Redundant Assets"}

Orderly Liquidation Value - liquidation value at which the asset or assets are sold over a reasonable period of time to maximize proceeds received.

Premise of Value - an assumption regarding the most likely set of transactional circumstances that may be applicable to the subject valuation; e.g. going concern, liquidation.

Portfolio Discount - an amount or percentage that may be deducted from the value of a business enterprise to reflect the fact that it owns dissimilar operations or assets that may not fit well together.

Rate of Return - an amount of income (loss) and/or change in value realized or anticipated on an investment, expressed as a percentage of that investment.

Redundant Assets - {NOTE: in Canada, see "Non-Operating Assets"}

Report Date - the date conclusions are transmitted to the client.

Replacement Cost New - the current cost of a similar new property having the nearest equivalent utility to the property being valued.

Reproduction Cost New - the current cost of an identical new property.

Residual Value - the prospective value as of the end of the discrete projection period in a discounted benefit streams model.

Risk-Free Rate - the rate of return available in the market on an investment free of default risk.

Risk Premium - a rate of return in addition to a risk-free rate to compensate the investor for accepting risk.

Rule of Thumb - a mathematical relationship between or among variables based on experience, observation, hearsay, or a combination of these, usually applicable to a specific industry.

Special Interest Purchasers - acquirers who believe they can enjoy post-acquisition economies of scale, synergies, or strategic advantages by combining the acquired business interest with their own.

Standard of Value - the identification of the type of value being utilized in a specific engagement; e.g. fair market value, fair value, investment value.

Sustaining Capital Reinvestment - the periodic capital outlay required to maintain operations at existing levels, net of the tax shield available from such outlays.

Systematic Risk - the risk that is common to all risky securities and cannot be eliminated through diversification. When using the capital asset pricing model, systematic risk is measured by beta.

Terminal Value - See Residual Value.

Unlevered Beta - the beta reflecting a capital structure without debt.

32

Unsystematic Risk - the portion of total risk specific to an individual security that can be avoided through diversification.

Valuation - the act or process of determining the value of a business, business ownership interest, security, or intangible asset.

Valuation Approach - a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more valuation methods.

Valuation Date - the specific point in time as of which the valuator's opinion of value applies (also referred to as "Effective Date" or "Appraisal Date").

Valuation Method - within approaches, a specific way to determine value.

Valuation Procedure - the act, manner, and technique of performing the steps of an appraisal method.

Valuation Ratio - a fraction in which a value or price serves as the numerator and financial, operating, or physical data serve as the denominator.

Value to the Owner - {NOTE: in Canada, see Investment Value}

Weighted Average Cost of Capital (WACC) - the cost of capital (discount rate) determined by the weighted average, at market value, of the cost of all financing sources in the business enterprise's capital structure.

33

EXHIBIT "H"



WILCOX & FETZER LTD.

In the Matter Of:

# Cannavo and Red Eagle Avionics, LLC
# v.
# Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics

---

Transcript of:

Gerald W. Brown, Sr.

October 3, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
## Gerald W. Brown, Sr.

**50**

1  A. That's why I was saying be more specific.
2  Q. All right.
3  A. Business valuation probably constitutes -- I
4  would be guessing. 70 percent. Probably 70 percent.
5  Q. Your best estimate is --
6  A. 60 to 70 percent of the gross revenue comes
7  from valuations.
8      But keep in mind that the business
9  consulting, the exit strategy consulting, that goes in
10  line with business valuation. They get somewhat tied
11  together, so it's kind of convoluted there.
12     Also, the merger-acquisition consulting,
13  also it depends on who you are doing the valuation for
14  as to whether or not you're going to also do some
15  merger-acquisition consulting.
16     And in this case, litigation support,
17  trial consulting and expert witness, once again,
18  there's valuation involved. So it also gets kind of
19  convoluted.
20     As for financial forensic analysis, we do
21  that virtually on every business valuation so, once
22  again, it gets convoluted. So for me to give you a
23  specific percentage as it relates to valuation, I have
24  a tough time doing that.

**51**

1  Q. I understand.
2      How about your time? I'm not asking for
3  gross revenue. I'm asking on a typical week can you
4  break down your time as to doing keynote speaking and
5  seminars as compared to doing business valuations?
6  A. As you can see from my C.V., I might have two
7  to four speaking engagements, maybe six a year. So
8  obviously most -- preparing for that is negligible.
9      So when you look at the difference between
10  that, we're looking at 2 percent of my time, 5 percent
11  of my time speaking.
12  Q. So is the majority of your time spent regarding
13  business valuations, you personally?
14  A. Once again, I can't, I can't give you that
15  exact, for the same reason that so many things cross
16  over into the other areas. I mean, I'm providing --
17  valuation isn't just a document that just provides
18  numbers. I mean, there's consulting involved.
19  There's financial forensics involved. There's usually
20  always exit strategy consulting involved because our
21  firm is somewhat different because 95 percent of the
22  valuations that we do are for buy/sell prospectuses
23  for either people that are looking to sell their
24  company and need a valuation for their own personal

**52**

1  use to determine what's a good marketing price, what
2  is a good range, what are the different valuation
3  methodologies that somebody might look at value so
4  that they can educate themselves and do the important
5  thing and become an informed seller because that's
6  probably one of the biggest areas where deals fall
7  apart, is because they just don't -- they're not an
8  informed seller. They're a business owner. They
9  don't understand the economics of selling a company.
10  Q. When would you do a business valuation other
11  than in relationship to a buy/sell?
12  A. Actually, in the industry, if you spoke with
13  anybody else in the industry, they would say that
14  their practice is made up of probably only 5 percent
15  buy/sell valuations and the rest of them are for
16  limited liability partnerships, write-down values, tax
17  strategy, divorces, economic damage, those types of
18  valuations.
19     We're actually a rarity that our primary
20  focus is merger-acquisition-type work.
21  Q. Is there a difference in how you prepare a
22  business valuation depending on the purpose of the
23  valuation?
24  A. Yes, there is.

**53**

1  Q. What's the difference between a business
2  valuation that's prepared for a buy/sell as compared
3  to one of those other reasons that you mentioned?
4  A. Obviously, this valuation was not prepared to
5  ever end up in a venue like this. It doesn't have
6  many of the justifications for some of the adjustments
7  made, doesn't have the explanation. It's primarily
8  for the seller's use so that he can establish a good
9  marketing range for his company and understand how
10  value is determined and also go through the
11  adjustments and recast process to determine the perks
12  of ownership, the non-recurring expenses and the
13  discretionary items that he might be running through
14  the company that are an economic benefit to himself so
15  that you can get to a number that determines economic
16  benefit so then you can equate value.
17  Q. The information that you reference that's not
18  in this business valuation, is that information
19  contained somewhere else?
20  A. What we're talking about is different levels.
21  What you're referring to probably is more what we
22  refer to as an audit level valuation where you
23  actually go on site and tear the books apart and prove
24  up the numbers and that's more for tax purposes.

14 (Pages 50 to 53)

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
## Gerald W. Brown, Sr.

**54**

1     That's why any time you reference 5960,
2 which obviously everybody in the industry uses the IRS
3 ruling as a basis or a foundation for valuation, it
4 becomes much more of an issue when you're writing down
5 the value of a company so that somebody can avoid
6 paying tax in its value or gifting it, if you will.
7     So, yes, the valuation — that
8 information, what we're talking about is additional
9 due diligence. A lot more information is gathered,
10 put into the valuation, including a complete write-up
11 on the company's history, a complete write-up on its
12 staff, a complete write-up on the industry.
13     So this is a buy/sell, this is a buy/sell
14 prospectus type of valuation. This is to be used for
15 marketing the company for sale, not in the marketing
16 process but as part of the supporting documentation to
17 start that process.
18    Q. Is it appropriate for a prospective buyer to
19 rely upon this type of valuation?
20    A. It's not appropriate for a seller to hand it to
21 a buyer in my opinion.
22    Q. And why is that?
23    A. Because it's not a marketing document. I mean,
24 it's not -- it creates argument. It also would

**55**

1 require, as stated in the document, that the buyer is
2 going to have to do additional due diligence to prove
3 up the document. As you can -- I mean if you look at
4 the assumptions and limiting conditions, it's designed
5 to give an opinion about value of fair market. It's
6 not an accounting report. It should not be relied
7 upon to disclose hidden assets or to verify financial
8 reporting. It is an opinion of value.
9     It states that "I have accepted the
10 compiled financial statements of" this company
11 "without testing their accuracy. The financial
12 information used consisted of the balance sheets,
13 income statements, and/or federal tax returns. The
14 accuracy of the financial statements is the sole
15 responsibility of the management."
16     So the idea -- now, don't get me wrong.
17 Many business owners do when you get down to the
18 negotiating table or if in most cases the buyer needs
19 funding, he might give him this so he can take it to
20 the bank so that the bank can actually -- because this
21 document is used by the SBA to help secure funding to
22 purchase the company.
23    Q. When you prepared this business valuation
24 report which is Brown No. 1, who did you intend the

**56**

1 recipient to be?
2    A. Obviously who we sent it to, actually the owner
3 of the company and the shareholders.
4    Q. Did you intend it to be relied upon by any
5 prospective purchaser of the company?
6    A. I think, I think I just read the --
7    Q. I'm asking you. Don't read anything.
8     I'm asking if you intended Brown No. 1 to
9 be relied upon by a prospective purchaser of a
10 company?
11    A. No.
12    Q. Have you ever heard of the publication
13 Practitioner's Publishing Company Guide to Business
14 Valuations?
15    A. I have.
16    Q. And what is that?
17    A. It's one of the many guides out there for
18 valuing companies.
19    Q. Do you use it or rely upon it?
20    A. I do not.
21    Q. Any special reason?
22    A. It's one of the many guides that are available
23 and it's just not one that I rely on.
24     (Brown Deposition Exhibit No. 12 was

**57**

1 marked for identification.)
2 BY MS. ROTHSTEIN:
3    Q. I'm showing you what is Brown No. 12, which is
4 a page out of that guide book and it has a number of
5 business valuation designations.
6     Have you ever seen these type of
7 designations before?
8    A. Many of them, yes.
9    Q. Do you have any of those -- I'm not going to go
10 through each one -- do you have any of the
11 designations that appear on Brown No. 12?
12    A. I do not.
13    Q. I want to go back to your report which is Brown
14 No. 1. That's the thick one there (indicating), if
15 you could get that out.
16     Can you tell me the date this report was
17 prepared?
18    A. Obviously the value is as of -- the date of the
19 appraisal, the effective value is 12-31-03.
20    Q. I understand that. But when did you prepare
21 the report?
22    A. I don't have the accompanying letter that
23 attended the report.
24    Q. I do.

15 (Pages 54 to 57)

Gerald W. Brown, Sr.

58

1              (Brown Deposition Exhibit No. 13 was

2      marked for identification.)

3              (Discussion off the record.)

4      BY MS. ROTHSTEIN:

5        Q.    I'm handing you Brown 13, which is a letter

6      dated October 11, 2004 from RSI & Associates signed by

7      yourself to Mark Ehart.

8                Is this a copy of a letter that you sent

9      to him on October 11, 2004?

10       A.    That is correct.

11       Q.    And with that, did you send to him the business

12     valuation report which we have marked as Brown No. 1?

13       A.    Exactly, that is correct.

14       Q.    So would it be fair to state that your report

15     was prepared, that your report would have been dated

16     on or before October 11, 2004?

17       A.    That is correct.

18       Q.    Do you know when your report was actually

19     prepared?

20       A.    It would have been -- when you say that, it

21     would have been prepared up until that point.  It was

22     compiled, printed, reviewed and signed as of that

23     date.

24       Q.    As of October 11, 2004?.

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
Gerald W. Brown, Sr.

70

1    Q.  Had you provided any opinion of value for any
2    subsequent time period such as for 2004, 2005, 2006 or
3    2007?
4    A.  No, I have not.  But I do believe that -- I
5    don't know if it was your client or not.  I had one or
6    two conversations with a potential buyer as it relates
7    to this company in probably '04 and they evidently had
8    seen the valuation and had questions about it.
9    Q.  Do you --
10   A.  Which isn't unusual.
11   Q.  Do you have the name of the person you spoke
12   to?
13   A.  I do not.  And since, since it's a supportive
14   portion of what we do, we actually don't record it and
15   we don't charge for it.  That's the primary reason we
16   don't record it, because we can't charge for it.
17   Q.  Well, have you arrived at any opinion for value
18   for Red Eagle Avionics subsequent to the time period
19   of December 31, 2003?
20   A.  No.
21   Q.  Has anyone asked you to provide an update of
22   your 12-31-03 report?
23   A.  Have not.
24   Q.  Has anyone asked you to provide an opinion of

71

1    value or do any research to give an opinion of value
2    for any time period subsequent to December 31, 2003?
3    A.  No.
4    Q.  Have you on your own undertaken any review to
5    update your number subsequent to December 31, 2003?
6    A.  I have not.
7    Q.  Have you reviewed any data regarding the
8    business subsequent to the preparation of your report
9    with an effective date of 12-31-2003?
10   A.  When you say, "data," can you be more specific?
11   Q.  Have you reviewed any financial data subsequent
12   to your preparation of the report in October '04 for a
13   December '03 valuation date?
14   A.  I have, I have reviewed financial information
15   that has been provided to me in the form of the
16   exhibits that we talked about earlier.
17   Q.  The exhibits to the amended complaint?
18   A.  That's correct, as well as I remember I
19   received the '05 tax return.
20   Q.  Have you made any determination whether there
21   are any inaccuracies in your report based on any of
22   the subsequent information you reviewed?
23   A.  No.
24   Q.  Now going back to your report, looking at page

72

1    1, you indicate in there that again you have been
2    retained by PBS Global, Inc., correct?
3    A.  That is correct.
4    Q.  Going to page 3, again you indicate that RSI &
5    Associates has been retained by PBS Global on behalf
6    of Red Eagle Avionics, Inc. to prepare the business
7    appraisal services, correct?
8    A.  That is correct.
9    Q.  I'm going to direct your attention to page 4,
10   Assumptions and Limiting Conditions.
11       You agree that this is an important part
12   of your report, correct?
13   A.  I do.
14   Q.  And when someone looks at your report, they
15   must review these assumptions and limiting conditions
16   for your report to be valid?
17   A.  Absolutely, especially an outsider like a
18   potential buyer.  He would be crazy not to review this
19   document.
20   Q.  Looking at paragraph a, "This report is an
21   appraisal report designed to give an opinion of fair
22   market value.  It is not an accounting report, and it
23   should not be relied upon to disclose hidden assets or
24   to verify financial reporting."

73

1        Are you vouching for the accuracy of any
2    of the accounting or financial information contained
3    in this report?
4    A.  That statement right there is saying that I'm
5    not.
6    Q.  Now, paragraph b, "I have accepted the compiled
7    financial statements of Red Eagle Avionics, Inc.
8    without testing their accuracy."
9        Further down, "The accuracy of the
10   financial statements is the sole responsibility of the
11   management of Red Eagle Avionics, Inc."
12       Do you know whether the financial
13   information you have utilized in your report that you
14   received from either PBS Global or Red Eagle or
15   Mr. Ehart, whether that information is accurate or
16   inaccurate?
17   A.  To the best of my knowledge, it's accurate.
18   What we utilized -- you're referring to do this
19   report?
20   Q.  Yes.
21   A.  What we utilized was tax returns, filed
22   documents.
23       Now, obviously we took those tax returns
24   and made the necessary recast and adjustment to add

19 (Pages 70 to 73)

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
## Gerald W. Brown, Sr.

**74**

1  back discretionary expenses, non-recurring expenses
2  and perks of ownership to determine the true economic
3  benefit to the owner, as well as the interest and
4  depreciation to come up with the adjusted EBITDA.
5  Q. Now, you're assuming that the information
6  contained in the tax returns are correct?
7  A. Sure.
8  Q. And you're also assuming that there's not any
9  misstatements in the tax returns?
10  A. Yes. That would be correct.
11  Q. And also you indicate that the accuracy of the
12  financial statements is the responsibility of Red
13  Eagle as opposed to yourself, correct?
14  A. That is correct.
15  Q. And going down to paragraph d, you're relying
16  on representations made by the owner about the
17  background and history of the business.
18    Did you meet or speak with Mr. Ehart
19  regarding this business?
20  A. We had a couple of different telephone
21  interviews, that's correct.
22  Q. Do you have notes of those telephone
23  interviews?
24  A. Once again, that would have been part of that

**75**

1  work product that was sent back. So the purpose for
2  the interview is to do two things. Part of the
3  buildup of the capitalization rate that we do is a
4  subjective risk of this opportunity. So we have to
5  determine what that level of risk is, so we have a
6  detailed questionnaire that we go through and he has
7  to fill out. And then we review it with him and that
8  helps establish what the various factors might
9  determine that subjective risk.
10    In addition, also not only the current
11  path of the company, the future of the company and at
12  the same time if a potential buyer or somebody came in
13  and invested more money or brought more opportunity to
14  the table, what else could the company do?
15    So those are the types of discussions that
16  took place.
17  Q. You're assuming that the information that's
18  been provided to you is accurate, correct?
19  A. That's exactly what it states.
20  Q. And you're assuming that anything that
21  Mr. Ehart told you it was truthful, correct?
22  A. That is correct.
23  Q. Do you know whether there's been any
24  misrepresentations made to you regarding the finances

**76**

1  of the company by Mr. Ehart?
2  A. Not as far as I can see.
3  Q. My question is: Do you know whether there have
4  been any misrepresentations?
5  A. No.
6  Q. And certainly in your assumptions and limiting
7  conditions you're giving a disclaimer that you're not
8  vouching, in essence, for the accuracy of the
9  information provided to you, correct?
10  A. That is correct.
11  Q. And if we go to paragraph e, "I assume no
12  liability for the accuracy of the information provided
13  to me by others," the others in this instance is PBS
14  Global and Mr. Ehart, correct?
15  A. That is correct.
16  Q. Okay. Did Mr. Ehart provide you with an
17  opinion of what he thought his company was worth?
18  A. No. We actually prefer not to know what he
19  might think or what anybody else might.
20  Q. Did he tell you what he wanted to sell the
21  company for, how much?
22  A. He did not.
23  Q. Did PBS tell you how much they thought the
24  company was worth?

**77**

1  A. I believe their asking price or what range that
2  they were looking to sell the company for was probably
3  in their documents.
4  Q. Okay. And what was that range or asking price?
5  A. From reviewing the file when this all started,
6  I think it was 2.5.
7  Q. Well, do you have that with you? Why don't you
8  look at it and tell us what it is?
9    MR. NURICK: Off the record.
10    (Discussion off the record.)
11    THE WITNESS: 2,436,000.
12  BY MS. ROTHSTEIN:
13  Q. And what document did you look at to tell us
14  what that number is?
15  A. The assignment sheet from PBS Global.
16  Q. So what are they saying to you?
17    MS. ROTHSTEIN: Well, actually, let's make
18  copies. We're going to make that a part of the
19  record.
20    Why don't we take a five-minute break and
21  we can make copies of that?
22    (A brief recess was taken.)
23    MS. ROTHSTEIN: We're looking through the
24  documents that were in Mr. Brown's file. There was

20 (Pages 74 to 77)

Gerald W. Brown, Sr.

100

1    Q.    I'm asking you a new question.

2           Under approach number 3, desired sale

3    price, does it indicate $2,436,000?

4    A.    It does.

5    Q.    Okay.  If you go farther down, and it's tough

6    to read, but next to market value does it say

7    $2,436,000?

8    A.    That's correct.

9           (Brown Deposition Exhibit No. 19 was

10   marked for identification.)

11   BY MS. ROTHSTEIN:

12   Q.    I'm showing you a one-page document marked

13   Brown No. 19, also Bates stamped ME965.

14           Is this a fax cover sheet from your

15   company to Mark Ehart on October 5, 2004?

16   A.    That is correct.

17   Q.    And you're asking him to complete a valuation

18   questionnaire?

19   A.    That is correct.

20   Q.    Do you, in fact, send him the valuation

21   questionnaire at that point in time?

22   A.    It's behind this fax and also as you can see

23   the conference call is scheduled for the following day

24   at 9:00 in the morning.

Gerald W. Brown, Sr.

101

1                    (Brown Deposition Exhibit No. 20 was

2     marked for identification.)

3     BY MS. ROTHSTEIN:

4       Q.    I show you what's been marked as Brown No. 20.

5     It's also Bates stamped ME966 to ME969.

6                    Is this a copy of the valuation client

7     questionnaire that was filled out by Mr. Ehart on

8     behalf of Red Eagle Avionics, Inc.?

9       A.    That is correct, as far as I can tell.

10      Q.    And it indicates that it would have been faxed

11    to you on October 6, 2004 at the top?

12      A.    That is correct.

13      Q.    Is that fax number that starts with 361-994 --

14      A.    8054, that's correct.

15      Q.    Is that your fax number?

16      A.    It is.

17      Q.    Now, if we go to the second page, enter monthly

18    sales income, Mr. Ehart is providing you with a

19    monthly sales income for 2003 here?

20      A.    That is correct.

21      Q.    Did you do anything to verify the accuracy?

22      A.    No.

23      Q.    In going to page --

24      A.    He actually -- this was probably it looks like

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
## Gerald W. Brown, Sr.

|  | 106 |
|---|---|
| 1 | company. Is that correct? |
| 2 | A. That's correct. |
| 3 | Q. And they're the adjustments that you actually |
| 4 | make, correct? |
| 5 | A. That is correct. |
| 6 | Q. Did anyone else in your company participate in |
| 7 | those adjustments? |
| 8 | A. No. Just analyst level analysis. |
| 9 | Q. Did any other analyst work on this other than |
| 10 | yourself? |
| 11 | A. No. |
| 12 | Q. And is there anywhere in your report that |
| 13 | explains the adjustments that you made? |
| 14 | A. Anywhere in the report? |
| 15 | Q. Right. |
| 16 | A. No. |
| 17 | Q. Do you have any notes in existence today that |
| 18 | show the adjustments that you made? |
| 19 | A. Yeah. For the assets, you can go to either the |
| 20 | financial analysis data sheet, which is part of 14, |
| 21 | Brown 14, or to the spreadsheet that we referenced, |
| 22 | the business evaluation review. |
| 23 | Q. Now, are they identical? |
| 24 | A. Yes. |

|  | 107 |
|---|---|
| 1 | Q. Okay. So the numbers that appear, your |
| 2 | adjustments -- |
| 3 | A. Those two documents are identical. My |
| 4 | adjustments have slightly been modified through the |
| 5 | conversation with the business owner. He increased |
| 6 | the value of the inventory $45,000. |
| 7 | Q. All right. |
| 8 | A. And he also placed a value on the lease |
| 9 | agreement of $25,000. So after my interview with the |
| 10 | client, going over the financial information that we |
| 11 | provided, that we have been provided, as well as the |
| 12 | analysis that was prepared there in the field, then we |
| 13 | come up with the adjusted book value number per the |
| 14 | client's assumption of value. |
| 15 | Q. So the majority of your adjustments is based |
| 16 | upon the information that is contained in the |
| 17 | financial analysis data that's provided to you by PBS |
| 18 | Global? |
| 19 | A. That is correct. |
| 20 | Q. Did you look to any other source of information |
| 21 | for your adjustments other than the financial analysis |
| 22 | data or the interview with Mr. Ehart? |
| 23 | A. No. |
| 24 | Q. There's no books or treatises or anything that |

|  | 108 |
|---|---|
| 1 | you would look at? |
| 2 | A. No. |
| 3 | Q. And are there any notes regarding your |
| 4 | adjustments other than what appears in Brown No. 14? |
| 5 | A. No. |
| 6 | Q. And, in fact, the information in Brown No. 14, |
| 7 | that's someone else's notes, either PBS Global or |
| 8 | Mr. Ehart, correct? |
| 9 | A. That is correct. |
| 10 | Q. Now, when we take the book value that appears |
| 11 | in the tax return -- correct? |
| 12 | A. That's correct. |
| 13 | Q. We then have the adjustments positive or |
| 14 | negative in the second column, correct? |
| 15 | A. That's correct. |
| 16 | Q. And then we come up with an adjusted book |
| 17 | value, correct? |
| 18 | A. That's correct. |
| 19 | Q. And the adjusted book value you come up with is |
| 20 | $1,782,200, correct? |
| 21 | A. That's correct. |
| 22 | Q. And that's the total assets, correct? |
| 23 | A. That's referenced as the tangible assets of the |
| 24 | transaction. That does not include the intangible or |

|  | 109 |
|---|---|
| 1 | goodwill of the business. |
| 2 | Q. And if we look at Brown No. 14 and if we go to |
| 3 | the financial analysis data sheet, there there's a |
| 4 | total of assets of $1,712,200 and you came up with |
| 5 | $1,782,200 or $70,000 more than Mr. Ehart and PBS came |
| 6 | up with, correct? |
| 7 | A. That is correct. |
| 8 | Q. And the difference of the 70,000 is what? |
| 9 | A. $45,000 in inventory and $25,000 for the lease |
| 10 | agreement. |
| 11 | Q. And that's something that you came up with or |
| 12 | Mr. Ehart and PBS? |
| 13 | A. Mr. Ehart. |
| 14 | Q. So you have the original total of assets of |
| 15 | $1,712,200 that PBS came up with, correct? |
| 16 | A. And actually in the interview we required that |
| 17 | the client confirm the information, all of it. So, in |
| 18 | other words, we went through the assets with him and |
| 19 | he agreed that, yes, that's what I intended; no, I |
| 20 | didn't sleep on it and think of something else; that |
| 21 | this is all of it, except we undervalued the inventory |
| 22 | by $45,000 and also for some reason we forgot to put |
| 23 | some type of value on the lease agreement. |
| 24 | So those two items change it. So, in |

28 (Pages 106 to 109)

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
## Gerald W. Brown, Sr.

**110**

1   other words, in the interview process is when that
2   changed.
3    Q. So Mr. Ehart agrees that the value of the total
4   assets is 1,712,200, correct, at one point in time?
5    A. That's correct.
6    Q. And they meets with you and then you realize
7   that he wants you to add another $70,000 to the value
8   of the assets, 25,000 for the lease agreement and the
9   45,000 for the inventory?
10   A. That is correct.
11    Q. And then when you add that together, that's the
12   $1,782,200, which is the adjusted book value, correct?
13   A. That is correct.
14    Q. So your adjustments in here are merely a
15   recitation of what Mr. Ehart has provided to you. Is
16   that correct?
17   A. That is correct.
18    Q. And the number of $1,782,200, that number you
19   then subsequently utilize in the report, correct?
20   A. That is correct.
21    Q. Where does that number get used subsequently in
22   the report?
23   A. It depends on which formula. Primarily in the
24   excess earnings formula, which is a hybrid that

**111**

1   includes both a determination of the intangible, the
2   goodwill, plus the value of the assets. That's one of
3   the formulas.
4     And then obviously it's referenced in the
5   back as adjusted book value, but there's no weight
6   applied.
7    Q. But if this number is wrong, then your
8   subsequent value conclusions that rely upon this
9   number are also wrong?
10   A. You're correct.
11    Q. And if this number is too high, if this number
12   is overstated, then the subsequent value conclusions
13   are going to be overstated, correct?
14   A. That would be the case.
15    Q. And, conversely, if the number is understated,
16   then your subsequent value conclusions are going to be
17   understated?
18   A. And, once again, it's always an opinion of
19   value.
20    Q. And in this instance the opinion of the total
21   assets is of Mr. Ehart's, correct?
22   A. That is correct.
23    Q. And you're using that then to subsequently use
24   that number in your other calculations later on?

**112**

1   A. That's correct.
2    Q. Now, going to page 8 of your report -- let me
3   back up to page 7.
4     Did you do any valuation of the hanger or
5   any of the assets?
6   A. No.
7    Q. Are you qualified to value the hangar or the
8   assets?
9   A. No.
10    Q. Going to page 8, this is the historical data
11   regarding the company?
12   A. It's the historical income statement or the
13   historical income reflective of what was found on the
14   tax return, gross revenue, cost of goods, net income.
15    Q. I'm sorry. I'm going to go back for one other
16   thing.
17     For page 7, the adjustments and the
18   analysis on page 7, do you have any work papers other
19   than what appears in Brown No. 14?
20   A. It would have been sent back to PBS, as
21   previously stated.
22    Q. But right now is there any in your possession?
23   A. (Witness shakes head).
24    Q. No?

**113**

1   A. No. No.
2    Q. Going to page 8, now this all came from the
3   company records, correct?
4   A. That is correct.
5    Q. And do you know if this was prepared on a cash
6   or accrual basis?
7   A. I believe the tax returns were prepared on a
8   modified or hybrid approach but cash.
9    Q. But this data, what's this data prepared on?
10   A. It's prepared based upon -- well, he's got it
11   down as accrual on the tax return, so it would be
12   based -- hang on. Let me see. Let me see because I'm
13   looking at '05. Hang on just a second.
14     He states accrual in the tax return. It
15   is accrual.
16    Q. But the data on page 8 is historical data that
17   came from Mr. Ehart, correct?
18   A. It's from the tax returns.
19    Q. Are you able to verify the accuracy of any of
20   that information?
21   A. The accuracy of what appears from the tax
22   return to here or the accuracy of what appears on the
23   tax return?
24    Q. What appears on the tax returns.

**29 (Pages 110 to 113)**

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
Gerald W. Brown, Sr.

114

1    A.  No.
2    Q.  Do you know what the sources of Mr. Ehart's
3  revenue was?
4    A.  I don't have those notes, no.
5    Q.  Do you know how that revenue was recorded at
6  all at the company?
7    A.  No, except from what I have learned, Dome
8  books, through this whole discussion, but I didn't
9  know at the time.
10   Q.  You learned that in the course of this
11 litigation?
12   A.  That is correct.  During our discussion with
13 him one of the questions we ask on the questionnaire
14 is about financial information.  And the way that we
15 go about that is, first of all, whether or not it's
16 all up to date and all his filings are properly filed
17 and he has a relationship with a CPA and the nature of
18 that relationship and his internal books and so on.
19       So in that discussion he would have told
20 us that he utilized just a general ledger type program
21 and did not have software, per se.  I think he
22 indicated that he had QuickBooks but it wasn't
23 reliable.  It wasn't -- they used it only to track
24 like receivables or something like that and they

115

1  didn't use it for anything else.
2    Q.  Looking at page 8, what is the type of growth
3  we see from '99 to 2003 regarding the total revenue of
4  the company?
5    A.  It's pretty much flat.
6    Q.  In fact, has there been any growth?
7    A.  Well, '02 showed growth and then it fell back
8  down to about average.
9    Q.  So if we look from '99 and compare 2003, has
10 there been any growth?
11   A.  Well, that's not how it's done.  I mean, you
12 can't just jump from '99 to 2003 and state that there
13 hasn't been any growth.  I mean, you do have a year
14 that there was -- the highest year was '02, although
15 the growth is somewhat insignificant.  It's pretty
16 much flat.  It's averaged out at about a million one.
17   Q.  Directing your attention to page 9, looking at
18 the first line Pre-Tax Income, that came from the tax
19 returns of Red Eagle?
20   A.  That's the reported taxable profit from the tax
21 return.
22   Q.  And you agree that for 2001, 2002 and 2003 it
23 showed a loss?
24   A.  That is correct.

116

1    Q.  And for '99 and 2000, it showed minimum income,
2  correct?
3    A.  That is correct.
4    Q.  What is a benchmark adjustment?
5    A.  A benchmark adjustment is when you normalize
6  one specific period as we did in '03 or as was done in
7  '03.  We normalize that year by doing a recast to
8  determine what the normal operating percentages are
9  versus what the may be reporting.  And then we apply
10 those operating percentages as a normalization to the
11 other periods through a benchmark adjustment.
12       Instead of going through and doing an
13 audit level valuation where you attack the expenses in
14 every period and determine what the add-backs are, you
15 assume that the adjusted period has been now
16 normalized and this is normal operating percentages.
17   Q.  Where do you get the information for your
18 conclusion regarding the benchmark adjustments for '99
19 to 2002?
20   A.  Through that normalization.
21   Q.  Do you look at a book?  Do you look at a
22 treatise?  Do you look at a guide?  Do you talk to
23 Mr. Ehart?  Where do you get the information?
24   A.  Okay.  '03 is the year that has been

117

1  normalized.  What that means is we started off with a
2  negative; we added back the depreciation.  There was
3  an adjustment to cost of goods and then the interest
4  was added back, as well as some various non-recurring
5  expenses in owner perks.
6        Then we subtract out what is a reasonable
7  and fair salary for an owner-operator of the company.
8  That's down there at the bottom where it says less
9  deductions to income.
10       And we come up with an adjusted pretax
11 income down at the bottom.  That becomes a normalized
12 statement.  So, in other words, now you determine what
13 the profitability of the opportunity is based upon the
14 percentage of income to gross revenue, so that
15 normalizes it.
16   Q.  Do you have any work papers from any of this
17 still in existence today?
18   A.  No.  As I stated before, all of this was sent
19 back to PBS Global.
20   Q.  Would there have been work papers at one point
21 in time?
22   A.  Sure.
23   Q.  And what information that you received from
24 Mr. Ehart do you rely upon to come up with your

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
Gerald W. Brown, Sr.

| 118 | 120 |
|---|---|
| 1    benchmark or industry adjustments?<br>2    A. For the normalization? We fall back upon<br>3   obviously the field analysis that was done there in<br>4   the field, the financial analysis data sheet and these<br>5   adjustments right here (indicating).<br>6    Q. So if we look at 1999, the benchmark/industry<br>7   adjustment of $142,440, did that information come from<br>8   Mr. Ehart?<br>9    A. That is a normalization. Once again, as part<br>10 of my analysis I normalize one year.<br>11      See, let's go back a second. We'll go<br>12 back to page --<br>13    Q. My question is: Are you using the information<br>14 that Mr. Ehart gave you in that financial analysis<br>15 data and those documents that are in Brown 14 to<br>16 arrive at this number for the benchmark industry<br>17 adjustment?<br>18    A. Okay. Let's go to page 8.<br>19    Q. I have a question that I just asked you.<br>20      Are you relying --<br>21    A. But you interrupted me.<br>22    Q. I'm withdrawing that other question.<br>23      My question is: To arrive at your<br>24 benchmark industry adjustment for '99, 2000, 2001 and | 1    A. And obviously Mr. Ehart. They usually are<br>2   going to go after the most recent year.<br>3    Q. And as a result, do you rely on any other<br>4   information other than the information that's given to<br>5   you by PBS or Mr. Ehart to make that benchmark<br>6   industry adjustment?<br>7    A. We actually compare the adjustments and do a<br>8   sanity check to compare it to the industry standard<br>9   and norm. In other words, we do an analysis of his<br>10 industry's SIC code to determine his normal operating<br>11 percentages, what should they be, and then we compare<br>12 that with the post-adjusted numbers to make sure that<br>13 they're in line.<br>14      Do you understand what I said?<br>15    Q. Yes.<br>16    A. Okay. And then that being said, if you look at<br>17 page -- it's the second graph after page 9. The<br>18 second graph after page 9, you can see the industry is<br>19 to the far left. He actually after normalization is<br>20 still operating slightly below the industry norm.<br>21      So that's kind of a sanity check for us<br>22 that we trust at least the information to the point of<br>23 moving forward.<br>24    Q. Going back to page 9, after these adjustments |

| 119 | 121 |
|---|---|
| 1   2002, are you relying upon the data that's contained<br>2   in Brown 14 and specifically the financial analysis<br>3   data and the other things that Mr. Ehart provided to<br>4   you?<br>5    A. I relied upon that information, as well as<br>6   through the interview with him to normalize 2003.<br>7   Once I normalized 2003, I used those percentages to<br>8   determine what the benchmark is.<br>9    Q. How do you pick the year to normalize?<br>10    A. That is chosen by the representative and the<br>11 client. Usually the idea is to do the most recent<br>12 year because his memory to try to normalize a year --<br>13 like if he had chosen his best year in gross revenue<br>14 or his best year in income, he couldn't remember what<br>15 to add back in '99. He wouldn't remember what he<br>16 expensed. But he possibly can remember what he might<br>17 have expensed in '03 as a perk of ownership or<br>18 non-recurring expenses, like replacing the gate for<br>19 $15,000 which should have been a capital improvement.<br>20      So the idea is to normalize the most<br>21 recent year because his recollection is going to be<br>22 better.<br>23    Q. All right. And 2003 was the year that was<br>24 selected by PBS Global? | 1   are made -- do you agree these adjustments are<br>2   subjective?<br>3    A. Yes. And, in fact, every assignment is<br>4   different. Some business owners are much more<br>5   analytical, just like personalities, where they want a<br>6   very specific number and they come up with it. Others<br>7   say you know, I probably spend a hundred dollars a<br>8   week in gas for me and my wife and my family and that<br>9   just goes into our cars and we don't really use that<br>10 in the business. Well, that's $5200 a year and that<br>11 number gets used.<br>12      Every business owner is different.<br>13    Q. So obviously the benchmark industry adjustment<br>14 and your total deductions are strongly, if not 100<br>15 percent influenced by the business owner, in this case<br>16 Mr. Ehart?<br>17    A. Yes. It's going to be subjective and also from<br>18 a buyer's perspective if I were looking at this and<br>19 saw even numbers, I would say this is definitely an<br>20 estimate in each one of these add-backs and I need to<br>21 do some research to prove this up. I mean, if it's an<br>22 exact number, then you can find something to pinpoint,<br>23 but if you can see that it's quite obvious that, you<br>24 know, a round $15,000 for a mechanical gate, life |

31 (Pages 118 to 121)

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
Gerald W. Brown, Sr.

122

1  insurance, well, about $18,000 a year, I mean those
2  are -- you know, it's up to the business owner to
3  provide this information and whether or not he
4  wants to say well, it was actually $17,472 for life
5  insurance. That would be -- that would tell the
6  potential buyer that it's a little less subjective.
7      It's always going to be subjective because
8  the next argument is whether or not that truly is a
9  perk of ownership or is it an operating expense of the
10  company? That becomes another argument.
11     So it's always subjective.
12  Q.  So after these adjustments are done, we go to
13  pretax income in 1999 from $12,893 to adjustable
14  pretax of 203,273, correct?
15  A.  That's correct.
16  Q.  And for 2000 we go from the pretax of 8,978 to
17  the adjusted pretax of 177,598, correct?
18  A.  Understood, yes.
19  Q.  2001, we go from a negative 59,487 for pretax
20  to a positive 158,688 after the adjustments, correct?
21  A.  Yes.
22  Q.  2002, a negative $5,324 pretax income to a
23  positive $211,528 after this adjustment, correct?
24  A.  That is correct.

123

1  Q.  And, finally, in 2003 we go from a negative
2  pretax of $792 to after these adjustments a pretax of
3  a positive $176,770, correct?
4  A.  That is correct.
5  Q.  Now, you later on average these five numbers
6  out to come up with an average income for the company
7  to use in your formulas, correct?
8  A.  That is correct.
9  Q.  And that's approximately $184,000, correct?
10  A.  It's a weighted average process, that's
11  correct.
12  Q.  Now, with these adjustments that are reported
13  on page 9, do you agree that the higher the
14  adjustments, the higher the ultimate value conclusion?
15  A.  Yes.
16  Q.  So that if the adjustments are overstated, your
17  value conclusion is overstated?
18  A.  That would be the case.
19  Q.  Now, going to page 10 of your report, you're
20  now comparing Red Eagle to the industry?
21  A.  It's actually this is a custom SIC analysis.
22  Q.  Page 10, what is this?
23  A.  This is a custom SIC analysis where we do
24  analyze what areas are the income-producing areas of

124

1  the company. And then we equate the percentage of
2  revenue being generated in that particular area and
3  that particular SIC code group gets that weight.
4      So this becomes a custom SIC analysis for
5  this particular company.
6  Q.  What does SIC stand for?
7  A.  Standard industrial classification.
8  Q.  So are you comparing the historical data for
9  the company compared to the industry norm here?
10  A.  That is correct. And most of it is balance
11  sheet related.
12  Q.  And how has the company performed compared to
13  the industry for 1999 through 2003?
14  A.  In most areas for the balance sheet anyways it
15  actually performs better than the industry, which also
16  makes -- when you look at his balance sheet or at
17  least when we did when we did the analysis, he has a
18  strong balance sheet as it relates to collections and
19  cash. So it performs at or above -- the only problem
20  in this scenario -- you know, we do a historical
21  analysis, but 99 percent of the small businesses out
22  there do not operate under GAAP and since they don't
23  operate under GAAP, they're doing what's necessary to
24  avoid paying tax.

125

1      As a business, as a business owner,
2  there's certain expenses that you can expense through
3  the company legally as a perk of ownership and so on.
4  And that being said, those types of expenses wouldn't
5  be incurred or shown if you were more a publicly
6  traded company working from GAAP.
7      So that's why this analysis, although it's
8  historic, it doesn't provide a really good, accurate
9  depiction of the company itself unless you do an
10  analysis of an adjusted company.
11  Q.  Based on the information that's on page 10, did
12  the operating and coverage ratios indicate that Red
13  Eagle underperformed compared to the industry norm?
14  A.  Yes.
15  Q.  And did the leverage ratios show that Red Eagle
16  is more leveraged, therefore more risky than the
17  industry norm?
18  A.  Yes.
19  Q.  And the codes you're using there, what
20  industries are they for?
21  A.  7629 and 7622 are specialized electronic and
22  aviation repair type business and then 5065 is more of
23  a wholesale level, wholesale of selling parts and
24  equipment.

32 (Pages 122 to 125)

130

1  value conclusion?
2     A.  That is correct.
3     Q.  So if your risk premium is wrong, then your
4  ultimate value conclusion is also going to be wrong?
5     A.  That is correct.
6     Q.  And that's your subjective opinion that based
7  on the risky nature of this company that's the premium
8  someone is going to want, an investor, to buy this
9  company?
10     A.  What goes into that, determining what that's
11  going to be is the discussion about the depth of
12  management, the post-sale exit strategy, the
13  competence of the key personnel, the stability of the
14  industry as a whole, the diversification of the
15  product line, the diversification of the customer
16  base, the concentration of the customer base, the
17  diversity of the suppliers, as well as the stability
18  of the relationship between them.  There's a lot of
19  factors, including location, that was a major factor,
20  the stability of the earnings historically, as well as
21  the margins and the financial records and reporting.
22     Q.  And that's the information that Mr. Ehart
23  provided to you in the questionnaire?
24     A.  That is correct.

131

1     Q.  Now, if we go to page 14 in your report, you're
2  saying that the company's average annual growth rate
3  has been negative 3.4 percent?
4     A.  That's correct.
5     Q.  And then you're coming to an opinion of value
6  that the long-term sustainable growth rate will be
7  approximately 5 percent?
8     A.  That's correct.
9     Q.  Where is the historical data to support that?
10     A.  The historical data?
11     Q.  Right.
12     A.  The data that went into that was obviously part
13  of the discussion with the business owner and also
14  what's going on in the market, the area and the
15  industry as a whole.  So in his interpretation he felt
16  the growth would easily, could easily sustain 10
17  percent or more if someone were to -- he was a little
18  burned out.  He had had enough.
19        So if somebody came in there with fire in
20  their belly, very similar to I guess your client who
21  has other things that he could bring to the table to
22  exploit the existing customer base and the customer
23  name, the business's name and so on, that the growth
24  could easily be in excess of 10 percent.

132

1     We agreed upon just doing a sustainable
2  growth of 5 percent.
3     Q.  And, again though, you're making this
4  assumption based on a generic purchaser, not any
5  particular specialized purchaser?
6     A.  Yeah.  Hypothetical.
7     Q.  Now, going to page 15, this is the
8  capitalization of earnings method.  This is one method
9  that you utilized to come up with a value?
10     A.  That is correct.
11     Q.  And in that method that's typically used when
12  the earnings are expected to remain stable?
13     A.  That is correct.
14     Q.  And historically had the earnings remained
15  stable?
16     A.  Yes, they had.
17     Q.  And they were stable because they were negative
18  or close to negative, correct?
19     A.  Yes.  They remained -- well, you're talking
20  about historical reported, but the adjusted had
21  remained about the same, that's correct.
22     Q.  Going down to the capitalization of earnings
23  conclusions, the ongoing pretax earnings, the 184,300,
24  that's the average of the five numbers that appear on

133

1  page 9 after you made your adjustments?
2     A.  Actually, go back to page 15 and right there
3  capitalization of earnings where you can see the
4  weight factors that were considered, the most recent
5  year got the highest weight and the year furthest from
6  the most recent year got the lowest weight, so it's a
7  weight factor of 15 and that's where the 184,300 came
8  from.
9     Q.  That's how you arrived at that?
10     A.  Yes.
11     Q.  The top five numbers, you got them from page 9?
12     A.  That is correct.  Many would argue that 2001
13  should have gotten a zero weight factor because of
14  9-11.
15     Q.  So you take the pretax earnings of 184,300, you
16  then use a capitalization rate of 20.1 percent and
17  then you arrive at an operating value of $916,915,
18  correct?
19     A.  That's correct.
20     Q.  Now, obviously the capitalization rate, where
21  did you get that?
22     A.  That's the buildup that you were just referring
23  to a minute ago.  If you go to the previous page, page
24  14, where the risk-free, the equity risk premium, the

34 (Pages 130 to 133)

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
## Gerald W. Brown, Sr.

134

1  risk premium for size, the other risk factors,
2  subjective, the discount rate and less the sustainable
3  growth came up with the 20.1.
4  Q.  So if any of those rates are off, then your
5  capitalization rate is going to be off?
6  A.  That's correct.  And obviously the first three
7  come from the stocks, bonds, bills and inflation
8  yearbook.  You have no control over those.
9  Q.  The risk factor though comes from the client?
10  A.  The other risk factor actually comes from the
11  analysis and so does the sustainable growth through
12  the discussion with the client.
13       Now, the reason why this particular
14  formula that you're referring to, the capitalization
15  of earnings on page 15, it got very little weight and
16  the reason being is because in a similar situation if
17  he had owned the property, the way that we would have
18  approached this is we would have coded the real estate
19  and its improvements as a non-operating excess asset,
20  get it off to the side, and then determine what is the
21  value of the entity.  And then you would add the real
22  estate to the entity value, but before you do that you
23  have to subtract out what a reasonable rent for the
24  property would be.

135

1       But in this case he doesn't actually own
2  the real estate.  It becomes kind of a strange -- in
3  any other situation where the real estate is involved,
4  you would see an excess non-operating asset down there
5  at the bottom of the page, you would see a number.  So
6  in this case it's possible that you could have seen a
7  $1.5 million number to add to the value.  That's why
8  excess earnings, capitalization of excess earnings got
9  such a low --
10  Q.  Right.  You gave a 5 percent weight to that?
11  A.  Exactly.  Exactly.
12  Q.  But the higher the cap rate, the lower the
13  value; the lower the cap rate, the higher the value?
14  A.  Exactly.
15  Q.  So in this instance if your cap rate is off,
16  then your value conclusion under this approach is off,
17  correct?
18  A.  That is correct.
19  Q.  Going to page 17.  Now, this approach which
20  starts on page 16 is a discounted future earnings
21  approach.  This one assumes stable or unstable
22  earnings?
23  A.  This is, this is -- when you say, "unstable
24  earnings," it either goes one way, it either goes down

136

1  or it goes up.
2       In this scenario obviously we're looking
3  at it growing 10 percent a year, which is stable.
4  Q.  Okay.  If we look at page 17, you're now,
5  you're assuming a 10 percent appreciation each year
6  for the next ten years?
7  A.  I'm sorry?
8  Q.  Page 17.  You're assuming a 10 percent
9  appreciation for the next ten years?
10  A.  Appreciation?
11  Q.  Excuse me.
12       You're assuming a 10 percent estimated
13  growth for each of the next ten years?
14  A.  That is correct.
15  Q.  And this was consistent with what Mr. Ehart
16  told you that he thought that there would be a 10
17  percent estimated growth each year?
18  A.  Yes.
19  Q.  So can we assume that that came from Mr. Ehart?
20  A.  Yes.  In our discussions, yes.  That's correct.
21  Q.  Now, if you had used your 5 percent growth
22  which you referred to previously, do you agree that
23  that would substantially reduce your final value
24  conclusion?

137

1  A.  The 5 percent growth would almost match the
2  capitalization of earnings method exactly because, as
3  you see in this discount rate, the 5 percent
4  sustainable growth is not in that number.
5  Q.  And that would give us about a value of 916,000
6  as compared to a value of $1,782,200.
7  A.  And, once again -- yes.  You're correct.  But,
8  once again, the same thing in this particular formula.
9  The property is a clouded issue in this case because
10  the hangar is owned but the property is not.  And in
11  any other case if he owned the real estate, we would
12  have regarded that as an excess non-operating asset,
13  set aside, determined what a fair rent is for that,
14  take that off the income, determine the value of the
15  entity and then add it to that property.
16       So this particular method would be closer
17  probably to about $2 million in value instead of 1.1.
18  Q.  And on page 18 the return on assets of 4.2
19  percent, where did you come up with that number?
20  A.  That is like -- that is an average of the
21  treasury, return on the treasury for the past twenty
22  years or so.  So it's like a treasury -- it's a
23  riskless return on assets.
24  Q.  And depending on whether that number is higher

35  (Pages 134 to 137)

Cannavo and Red Eagle Avionics, LLC v. Ehart and Spread Eagle, Inc. f/k/a Red Eagle Avionics
Gerald W. Brown, Sr.

---

**138**

1　or lower, that's going to also influence your ultimate
2　value conclusion?
3　　A.　Yes, it would.
4　　Q.　Going to page 19, the capitalization of excess
5　earnings conclusions, you take that $184,300 and,
6　again, if that number is inflated, then your final
7　number is going to be inflated, correct?
8　　A.　That's correct.
9　　Q.　Okay.　And we have now a cap rate of 16.7
10　percent which is different than the other cap rate you
11　used of about 21 percent, correct?
12　　A.　That is correct.
13　　Q.　And where did you come up with that cap rate?
14　　A.　That's based upon the client's perception of
15　the persistence of the customer base.
16　　Q.　And that comes up with an intangible value of
17　$655,337, correct?
18　　A.　That is correct.
19　　Q.　You add in that adjusted book value of
20　$1,782,200 and that gives you then your total value of
21　$2,437,577 under the capitalization of excess earnings
22　approach, correct?
23　　A.　That is correct.
24　　Q.　And that is within pennies of the asking price

---

**139**

1　that Mr. Ehart wanted and that number that was
2　contained in the PBS Global analysis, correct?
3　　A.　Within pennies?　It looks like it's within a
4　couple of thousand dollars, yes.
5　　Q.　Within a couple thousand dollars.
6　　　Now, if we go to page 20, you then weight
7　the various approaches and you give 5 percent weight
8　to the capitalization of earnings approach, correct?
9　　A.　That is correct.
10　　Q.　You give 5 percent to the discounted future
11　earnings, correct?
12　　A.　That is correct.
13　　Q.　And you give the majority of the weight or 90
14　percent to this capitalization of earnings or the
15　$2,437,600, correct?
16　　A.　That is correct.
17　　Q.　And you then come up with after you do the
18　calculations -- which is just mathematical, correct?
19　　A.　That is correct.
20　　Q.　And you come up with your final value
21　conclusion of $2,298,300, correct?
22　　A.　Correct.
23　　Q.　That's a subjective opinion on your part which
24　approach to give the most weight to, correct?

---

**140**

1　　A.　It is.
2　　Q.　If you were wrong on that, then your ultimate
3　value conclusion is wrong?
4　　A.　Obviously.　And my motivation there would
5　obviously be the fact that it came with almost $1.8
6　million in assets, so you would want to give the
7　formula that would include the assets the highest
8　weight and the ones that don't include any of the
9　assets at all the lowest weight.
10　　　MS. ROTHSTEIN:　Let's take a few minutes
11　break.　We may be close to being done.
12　　　THE WITNESS:　Excellent.
13　　　(A brief recess was taken.)
14　　　MS. ROTHSTEIN:　We're done.
15　　　(Deposition concluded at 12:50 p.m.)

---

**141**

```
              INDEX
DEPONENT: GERALD W. BROWN, SR.      PAGE
   Examination by Ms. Rothstein    2
             EXHIBITS
BROWN DEPOSITION EXHIBITS          MARKED
 1 Business Valuation Report       14
 2 Curriculum Vitae of Gerald W.
   Brown, Sr.                      29

 3 Article from website            38

 4 Article from website            40

 5 Article from website            41

 6 Article from website            42

 7 Article from website            43

 8 Article from website            44

 9 Article from website            45

10 Article from website            47

11 Article from website            48

12 Document captioned "Business
   Valuation Designations"         56
13 Letter to Red Eagle Avionics, Inc. from
   Gerald W. Brown, Sr. dated
   October 11, 2004                58
14 Multipage document captioned "Agreement
   For Consulting Services"        79

15 1999 through 2003 tax returns for
   Red Eagle Avionics, Inc.        87
```

36 (Pages 138 to 141)

EXHIBIT "I"



GRANTED WITH MODIFICATIONS

~~EFiled: Dec 4 2007 9:22AM EST~~
~~Transaction ID 17640969~~
~~Case No. 2379-VCS~~

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

DAVID CANNAVO and RED EAGLE AVIONICS, LLC, :
a Delaware Limited Liability Company

                Plaintiffs,

           v.                          :         C.A. No.: 2379-VCS

DONALD MARK EHART and SPREAD EAGLE, INC., :
a Delaware Corporation formerly known as Red Eagle :
Avionics, Inc.

                Defendants.

## JOINT PRE-TRIAL STIPULATION AND ORDER

Pursuant to Court of Chancery Rule 16, and subject to the approval of the Court, the parties stipulate as follows:

### I.    NATURE OF THE ACTION

On August 29, 2006, David Cannavo and Red Eagle Avionics, LLC (hereinafter "Cannavo", "Red Eagle LLC" and/or "Plaintiffs") filed a Complaint in the Court of Chancery against Defendants, Donald Mark Ehart and Spread Eagle, Inc. (hereinafter "Ehart", "Spread Eagle" and/or "Defendants") for rescission and cancellation of instruments based upon fraud and mutual mistake. On October 17, 2006, Defendant filed an Answer.

On April 12, 2007, Plaintiffs filed a Motion to Amend the Verified Complaint to add additional facts that were discovered by Plaintiffs' counsel, Defendants did not object to Plaintiffs' Motion to Amend and on May 11, 2007, the Court granted Plaintiffs' Motion to Amend and on May 17, 2007, Plaintiffs filed their First Amended Verified Complaint. On June 22, 2007 Defendants filed an Answer to Plaintiffs' First Amended Verified Complaint.

On October 8, 2007, Plaintiffs filed a Motion to Amend to seek Court permission to file a Second Amended Complaint to add causes of action for breach of contract and unilateral mistake. Defendants filed an Answer in Opposition to the Motion on October 18, 2007. The Motion is currently pending before the Court. Discovery is complete.

## II.    FACTS WHICH ARE ADMITTED AND REQUIRE NO PROOF

1.    Red Eagle Avionics, Inc. (hereinafter "Red Eagle, Inc.") is a Delaware corporation, which was incorporated on March 10, 1992.

2.    The tax I.D. number for Red Eagle, Inc. is 51-0338642.

3.    Ehart was the President and Secretary of Red Eagle, Inc.

4.    On January 5, 2006, Red Eagle, Inc. filed a Certificate of Amendment with the State of Delaware changing its name to Spread Eagle, Inc.

5.    Red Eagle, LLC is a Delaware Limited Liability Company.

6.    Cannavo is a member of Red Eagle, LLC.

7.    Red Eagle, Inc. was engaged in the aircraft avionics installation and repair business at 1 Dales Way, New Castle, Delaware 19720.

8.    Red Eagle, Inc. utilized both Quick books and Dome books to record its financial information with primary reliance upon the Dome books.

9.    Red Eagle, Inc. was an S corporation and filed a Form 1120 S with the United States Internal Revenue Service.

10.    On February 1, 1994, Red Eagle, Inc. entered into a lease agreement (hereinafter "The Lease") with New Castle County to lease a 0.4696 acre parcel of land at New Castle County Airport for the purposes of erecting a hangar.

2

11.    Red Eagle, Inc. erected a 15,033 square foot one and part two story aircraft storage, repair and maintenance hangar.

12.    The initial term of The Lease between Red Eagle, Inc. and New Castle County was a twenty year term commencing on February 1, 1994 with two lessee renewal options of ten years each.

13.    New Castle County assigned its interest in the Lease to the Delaware River and Bay Authority ("DRBA") pursuant to an Assignment and Assumption of Leases dated June 30, 1995.

14.    The accounting firm of Brousseau & Brousseau performed accounting and tax services for both Ehart and Red Eagle, Inc.

15.    Daniel Brousseau was a principal in the accounting firm of Brousseau & Brousseau.

16.    Daniel Brousseau was a customer of Red Eagle, Inc.

17.    David Roeberg, Esquire is an attorney and principal at the law firm of Roeberg, Moore & Friedman, P.A.

18.    David Roeberg, Esquire was a customer of Red Eagle, Inc.

19.    Brousseau & Brousseau prepared tax returns and Compilation Reports for Red Eagle, Inc.

20.    On September 1, 2005, Brousseau & Brousseau prepared a two page Report for Red Eagle, Inc. for the first six months ended June 30, 2005 (hereinafter "The June 30, 2005 Report").

21.    The first page of the June 30, 2005 Report contained Disclaimers (hereinafter "The Disclaimer Page").

3

22.    The second page of the June 30, 2005 Report contained a Statement of Operations for the first six months ended June 30, 2005 (hereinafter "The June 30, 2005 Statement of Operations").

23.    For the first six months of 2005, Ehart exclusively made entries in the Dome books.

24.    For the second six months of 2005, Jacqueline Anziano exclusively made entries in the Dome books.

25.    Cannavo and Ehart had a longstanding business relationship, in that, Red Eagle, Inc. performed aircraft avionic installations and/or repairs on airplanes owned by Cannavo and/or his customers.

26.    In the late summer of 2005, Ehart approached Cannavo regarding a possible stock and/or asset sale of Red Eagle, Inc.

27.    In September 2005, Ehart provided Cannavo and Gano each with the one page Red Eagle, Inc.'s June 30, 2005 Statement of Operations.

28.    Prior to the sale on January 3, 2006, the Disclaimer Page dated September 1, 2005 was not provided to either Cannavo or Gano or their representatives.

29.    On September 28, 2005, Brousseau & Brousseau prepared a three page report covering the year ending December 31, 2004, consisting of the Disclaimer Page, Statement of Operations for year ending December 31, 2004, and EBITDA calculation for the year ending December 31, 2004.

30.    On January 3, 2006, Red Eagle, Inc., Ehart and Red Eagle, LLC executed an Agreement for the sale of business assets of Red Eagle, Inc. (hereinafter "The Sale Of The Assets")

4

31.    Closing on the Sale Of The Assets occurred on January 3, 2006 with the law firm of Roeberg, Moore & Friedman, P.A. acting as the settlement agent (hereinafter "The Closing").

32.    The contract purchase price for The Sale Of The Assets of Red Eagle, Inc. was $2,200,000.00.

33.    The settlement charges were $25,340.00 with a total amount due and owing from Red Eagle, LLC in the amount of $2,225,340.00.

34.    Red Eagle LLC funded the purchase of the assets of Red Eagle, Inc. through a $1,100,000.00 loan from Gano and a Note and Mortgage retained by Red Eagle, Inc. in the amount of $1,200,000.00.

35.    At closing, the following cash disbursements were made:

| | |
|---|---|
| $523,422.23 | To Ehart |
| $444,905.21 | To Wachovia Bank |
| $74,660.00 | To Cannavo |
| $30,583.56 | To Small Business Administration |
| $25,429.00 | For Settlement Charges |

36.    At the time of closing, Red Eagle, LLC executed a Note, Mortgage and Security Agreement in favor of Red Eagle, Inc. in the amount of $1,200,000.00. At the time of closing, Red Eagle, LLC and David Cannavo, personally, executed a Promissory Note in favor of Red Eagle, Inc. in the amount of $1,200,000.00.

37.    On January 3, 2006, Ehart and Red Eagle, Inc. executed a Non-Competition Agreement in favor of Red Eagle, LLC.

38.    On April 12, 2006, Brousseau & Brousseau prepared a Report for Red Eagle, Inc. which included a Disclaimer Page, Statement of Operations for the year ended December 31, 2005 with net income of $52,664.00 from operations and EBITDA calculation for the year ended December 31, 2005.

5

39.     Ehart married Mary Beth Ehart on October 20, 1990, separated in April 1997 and was divorced on January 29, 1998.

40.     On October 11, 2004, RSI & Associates, Inc. issued a Business Valuation Report for Red Eagle, Inc. which was prepared for PBS Global, Inc. (hereinafter the RSI Business Valuation Report").

41.     The RSI Business Valuation Report was prepared as of 12/31/2003 with a conclusion of value of $2,298,300.00.

42.     Ehart provided a copy of the RSI Business Valuation Report to Cannavo and Gano.

43.     Red Eagle LLC commenced making payments on the Mortgage and Note to Red Eagle, Inc. after the purchase of the business assets.

44.     Red Eagle LLC continued to make payments to Red Eagle, Inc. through June 2006.

45.     The total amount paid by Red Eagle LLC to Red Eagle, Inc. was $52,069.40.

## III.    ISSUES OF FACT TO BE ESTABLISHED AT TRIAL

A.     Plaintiffs**

Plaintiffs, David Cannavo and Red Eagle, LLC, submit that the following issues of fact will be established at trial (which Defendants dispute):

1.     Cannavo and Ehart were long time associates arising out of aircraft activities and aircraft business dealings.

2.     In late August or early September 2005, Ehart desired to sell Red Eagle Inc.'s business by selling the stock of the corporation.

6

3.    In late August or early September 2005, Ehart and Cannavo commenced discussions concerning Cannavo's purchase of the stock of the corporation.

4.    Early in the discussions, Cannavo, along with Gano, met with Ehart and requested an audited financial statement for Red Eagle Inc.

5.    Gano's interest was as either a potential equity investor or other financier.

6.    Ehart, in response to the request for an audited financial statement, presented both Cannavo and Gano with the one page June 30, 2005 Statement of Operations.

7.    Ehart knew that the June 30, 2005 Statement of Operations was inaccurate and unsubstantiated.

8.    Ehart further knew that the June 30, 2005 Statement of Operations was not to be produced to let alone be relied upon by a third party.

9.    The June 30, 2005 Statement of Operations indicated that the net income from operations for the first six months of 2005 was $115,496.00.

10.    The June 30, 2005 Statement of Operations was prepared, at the request of Ehart, by the accounting firm of Brousseau & Brousseau.

11.    Between September 2005 and December 2005, Cannavo, on his own and on behalf of Gano, asked Ehart on four separate occasions about the results of operations of Red Eagle, Inc. during the time period after June 30, 2005.

12.    On each occasion, Ehart represented to Cannavo that the net income from operations during the second half of 2005 for Red Eagle, Inc. was equal to or better than the first half of 2005 as shown on the June 30, 2005 Statement of Operations.

7

13.    Cannavo, based on Ehart's representations, doubled the net income from operations, assuming based upon the conversations discussed in paragraph 12 above that the second six months was going to be the same or better then the first six months.

14.    Small businesses can be valued by multiplying the net income from operations by a 5 to7 multiplier.

15.    Cannavo then multiplied the $230,000.00 by a multiplier of approximately five to six to place a valuation on the business component of approximately $1.2 million.

16.    Cannavo, based on his experience, valued the hangar at approximately $900,000.00.

17.    But for the representations made by Ehart both in writing and verbally, regarding the income generated by the company, Cannavo would not have purchased the assets of Red Eagle, Inc. or if he purchased the assets, it would have been for a substantially lower purchase price.

18.    On January 3, 2006, due to tax and legal reasons, instead of Ehart selling the stock in Red Eagle, Inc., Ehart and Cannavo agreed to an Asset Purchase Agreement.

19.    Ehart in late December 2005/early January 2006 was in a rush to close on the sale of assets.

20.    The Asset Purchase Agreement (hereinafter "The Agreement") did not include the corporation's cash, cash equivalents or liabilities.

21.    The Agreement provided for, among other things:

    a)    That Ehart was to physically maintain the corporation's books and records at the business premises for two years, with Red Eagle, LLC having the right of access and the right to copy any such records;

8

    b)      That representations were being made by Ehart and Red Eagle, Inc. that all of the sellers' business records were in all material respects complete and correct; and

    c)      That Red Eagle, Inc. was to immediately cease using the name "Red Eagle Avionics" and to cause its corporate name to be changed enabling the Red Eagle LLC to use the name Red Eagle Avionics in the LLC operation of Red Eagle Avionics business.

22.    Prior to closing, Cannavo and Gano decided that Gano would not be an equity investor.

23.    At the time of the closing on the business assets, Plaintiffs obtained a bridge loan from Gano to pay $1,100,000.00 of the purchase price.

24.    The bridge loan was necessitated by Ehart's threat that there was another potential purchaser.

25.    After closing on the business assets, Plaintiffs continued the business operation of Red Eagle LLC at 1 Dales Way, New Castle County Airport, as it had previously been conducted by Ehart.

26.    Shortly after the purchase of the assets, Plaintiffs discovered that the net income from operations received from the business was far less than represented by Ehart and stated on the June 30, 2005 Statement of Operations.

27.    Cannavo began to investigate the reasons for the discrepancy between the net income from operations actually received following the settlement date and the net income of operations previously represented by Ehart.

9

28.     Cannavo discovered a large discrepancy between Red Eagle Inc.'s actual bank deposits and the income as stated in the Statement of Operations.

29.     Upon further investigation, Cannavo learned from employees who previously worked for Defendants that the corporation had realized income of only approximately $50,000.00 a year as compared to the $230,000.00 a year as represented by Ehart.

30.     Continuing his investigation, Cannavo contacted the accounting firm of Brousseau & Brousseau (hereinafter "Brousseau").

31.     Brousseau advised Cannavo that the June 30, 2005 Statement of Operations was not a one page stand alone document.  Rather, it was accompanied by a September 1, 2005 Disclaimer Page.

32.     Cannavo immediately requested and received from Brousseau a copy of the September 1, 2005 Disclaimer Page.

33.     Cannavo, upon receipt and review of the September 1, 2005  Disclaimer Page, learned for the first time, that the June 30, 2005 Statement of Operations was not an audited financial statement nor had there been any review by Brousseau to verify the accuracy of any of the information provided by Ehart to Brousseau.

34.     Cannavo further learned, for the first time, that Brousseau did not audit or review the financial statement or the information presented by Ehart to Brousseau and that Brousseau was not expressing an opinion or any other form of assurance.

35.     Cannavo further learned, for the first time, that Ehart had elected to omit substantially all financial statement disclosures.

36.     Cannavo further learned, for the first time, that if the omitted disclosures were included in the financial statement, it would most likely influence the recipient's conclusion

10

regarding the company's financial status and that the financial statement was not intended to be distributed to third parties.

37.    Cannavo also obtained from Brousseau a copy of a 2005 year end Report prepared by Brousseau on April 12, 2006 (hereinafter "The 2005 Year End Report.

38.    The 2005 year end Report contained a Disclaimer Page identical to the one Ehart withheld from Cannavo and Gano.

39.    The 2005 Year End Report reflected a net income from operations of $52,664.00 which was substantially less than the net income that was previously represented by Ehart to Cannavo.

40.    The June 30, 2005 Statement of Operations that Ehart provided to Cannavo overstated the corporation's actual net income from operations for the period of time by approximately $90,000.00.

41.    Ehart, both in writing and verbally, intentionally and knowingly misrepresented to Cannavo the net income of operations of Red Eagle, Inc. during the first and last six months of 2005.

42.    During the last six months of 2005, Red Eagle, Inc. did not generate net income from operations of $115,496.00, as represented by Ehart.

43.    To the contrary, Red Eagle, Inc. was experiencing a net loss from operations during the last six months of 2005 in the amount of $62,832.00.

44.    In making the aforementioned misrepresentations, Ehart knew and intended that Cannavo would rely on them.

45.    In causing Plaintiffs to purchase the assets of Red Eagle, Inc. on January 3, 2006 for the price of $2,200,000.00, Cannavo justifiably relied upon Ehart's material

11

misrepresentations that Red Eagle, Inc. generated net income from operations of $115,496.00 for the first six months of 2006 and the same income during the second six months of 2006 for a total of approximately $230,000.00 for the calendar year 2005.

46.    However, the net income from operations of Red Eagle, Inc. for the calendar year 2005 was only $52,664.00 instead of approximately $230,000.00.

47.    If Cannavo had been aware that the net income operations of Red Eagle, Inc. as of June 30, 2005 was approximately $90,000.00 less than the amount shown on the June 30, 2005 Statement of Operations and as represented by Ehart, Plaintiffs would not have purchased the assets or at a minimum, would have paid substantially less than the $2,200,000.00 purchase price.

48.    If Cannavo had been aware that Red Eagle Avionics, Inc. sustained a loss from operations of $62,832.00 during the six months ended December 31, 2005 instead of generating a net income from operations of approximately $115,000.00 for that period as represented by Ehart, Plaintiffs would not have purchased the assets or at a minimum would have paid substantially less then the $2,200,000.00 purchase price.

49.    If Cannavo had been aware that the net income for operations of Red Eagle Avionics, Inc. for the year ended December 31, 2005 was $52,664.00 instead of approximately $230,000.00 as represented by Ehart, Cannavo would not have purchased the assets or at a minimum would not have paid the $2,200,000.00 purchase price.

50.    All of the business records and customer lists were not in all material respects complete and correct.

51.    As an example, the tax returns filed for the years 2003 through 2005 and the Compilation Reports for the same years did not match.

LN1 347122v2 11/16/07

52.     For two of the years, 2003 and 2005, the income for tax purposes was significantly lower than reported in the Compilation Reports.

53.     This was a result of the fact that Red Eagle Avionics, Inc.'s expenses in the tax returns were reported to be higher than the expenses reported in the Compilation Reports.

54.     Red Eagle, Inc.'s 2005 financial results based on the June 30, 2005 Statement of Operations and the 2005 Year End Report differed significantly between the first and second half of the year.

55.     Sales for the first half of the year were $663,452.00, while sales were only $455,717.00 in the second half despite the fact that Ehart represented to Cannavo that the sales were the same.

56.     Net income from operations was $115,496.00 in the first half compared to a loss of $62,832.00 in the second half despite the fact that Ehart represented that the net income was the same.

57.     There were inaccuracies in Red Eagle, Inc.'s accounting and record keeping.

58.     The inaccuracies caused an overstatement of income as of June 30, 2005.

59.     Red Eagle, Inc. maintained two bank accounts at Commerce Bank, one being identified as account number 305 and the other 297.

60.     Most of the activity was in account number 305.

61.     The Dome books were kept by Defendants on a cash basis as compared to many of the Statement of Operations and tax returns which were done on an accrual or hybrid accrual basis.

62.     The income recorded in the Dome book was inconsistent with Red Eagle, Inc.'s bank account deposit activity.

13

63.    The 2005 deposits into the bank accounts were significantly less than the receipts recorded in the Dome book.

64.    The bank deposits for both accounts were $38,949.00 less than the receipts reported in the Dome books for the full year of 2005 and $42,119.00 less for the first half of the year.

65.    The discrepancy in the 305 account alone was $61,216.00 for the entire 2005 and $64,379.00 for the first half of the year.

66.    This was a material inaccuracy in Red Eagle, Inc.'s records which was known by Ehart.

67.    Reported sales for the first six months of 2005 were overstated as compared to the bank deposits by $64,379.00.

68.    After recognizing the deposits in the 297 account, cash receipts were overstated by $42,119.00 for the first six months of 2005.

69.    Disbursements totaling $29,700.00 in the 297 account were not reflected in the Dome records.

70.    Both sales and net income were overstated on an accrual basis for the first six months by $50,537.00.

71.    As of December 31, 2005, accounts receivable were $22,500.00 or $42,482.00 less than the prior year end.

72.    There were numerous breaches of the representations and warranties made in the Agreement of Sale.

73.    Dome book receipts and therefore net income were overstated by $38,949.00 as compared to the bank deposits for 2005.

14

74.     For the first six months of 2005, this overstatement was $42,119.00.

75.     Withdrawals from the 297 account were not recorded in the Dome book totaling $29,700.00 in 2005 that would have reduced net income.

76.     Inventory was reduced and costs of goods sold was increased by $42,000.00 on the 2005 tax return in order to improperly reduce taxable income.

77.     Balance sheet accounts were not considered when preparing the 2005 Statement of Operations including accounts receivable that decreased.

78.     The statements by Ehart, that the financial results for the last half of 2005 were similar to the first half, were a material misrepresentation of fact.

79.     The June 30, 2005 Statement of Operations was prepared on a cash basis which was not disclosed to Cannavo. This method is not in accordance with GAAP.

80.     Red Eagle, Inc.'s records were incomplete and did not include bank reconciliations, trial balances or detailed schedules for balance sheet accounts including accounts receivable, accounts payable and inventory.

81.     The cash balances on the bank statements as of December 31, 2005 did not reconcile to the tax return.

82.     Financials were not prepared in accordance with accounting standards.

83.     A quasi-accrual method of accounting was used for federal tax purposes while the returns indicate use of the accrual method.

84.     Cannavo made a substantial overpayment based upon the actual net income for 2005.

85.     Net income from operations as reported in the 2005 Year End Report was $52,664.00.

LN1 347122v2 11/16/07

86.    Applying a 5.0 multiple, annual earnings from operations should have been valued at $263,320.00 or $886,680.00 less than the actual amount paid before any adjustments.

87.    After making an adjustment for the unrecorded withdrawals from the 297 account, the computed overpayment for the income to be generated by operations was $1,035,180.00.

88.    The sales reported in The 2005 Year End Report and the tax return are $78,000.00 less than the Dome book which appears to reflect the reduction in accounts receivable of $42,482.00 during the year and the correction of the duplication in cash of $38,949.00 that occurred primarily in the first half of the year.

89.    Based upon the material misrepresentations and the financial irregularities, Cannavo overpaid for the business between $886,680.00 to $1,110,592.00.

90.    Cannavo, as the purchaser of the business, did appropriate due diligence.

91.    Any amount of due diligence by Cannavo, short of a full audit, would not have enabled him to discover the accounting errors, inaccuracies, the fraud and misrepresentations.

92.    Due diligence is not intended to be an audit of the books and records.

93.    Due diligence is intended to allow a buyer such as Cannavo to review the expenses that may be discontinued or added to reflect the buyer's requirements for operating the business as well as synergies that may be achieved.

94.    Ehart's representations and warranties, contained in The Agreement, as to the accuracy of the accounting were intended to protect Cannavo.

95.    Due diligence did not require Cannavo to audit the Red Eagle Inc. Books and Records.

96.    Cannavo acted reasonable under the circumstances and justifiably relied upon the misrepresentations made by Ehart.

16

97.     Cannavo was damaged as a result of his justifiable reliance upon the verbal and written misrepresentations made by Ehart.

98.     The Compilation Reports would typically contain a Cover Page, Table of Contents, a Disclaimer page and be spiral bound.

99.     Cannavo and Joseph Gano (hereinafter "Gano") requested an audited financial statement from Ehart for Red Eagle, Inc.

100.    On May 21, 1998, the Family Court issued Orders requiring Ehart to pay child support for his three children in the amount of $1,425.00 a month.

101.    In 1999 during property division hearings, Ehart asserted that the fair market value of Red Eagle, Inc. was $69,116.00.

102.    On July 9, 1999, the Honorable Allison Whitmer Tumas determined that the value of Red Eagle, Inc. was $137,153.00 which was the book value of the company as of that date.

103.    In 2002, Ehart filed a Petition to Modify his support obligation due to his financial circumstances which resulted in an Interim Order dated May 6, 2002 reducing Ehart's child support obligations to $773.00 per month.

104.    Ehart filed a subsequent Petition to Modify his support obligations and on February 26, 2003, a hearing was held before the Honorable John Carrow.

105.    Ehart and his accountant testified at the February 26, 2003 hearing.

106.    On April 11, 2003, the Honorable John Carrow made a Finding of Change of Circumstances which warranted the support obligation being reduced to $368.00 a month effective January 1, 2002.

17

107.    After the sale of the assets of Red Eagle, Inc., Mary Beth Ehart filed a Petition to Modify the Support Obligation and on May 31, 2007, a hearing was held before the Honorable Mary Much.

108.    Ehart and his accountant testified at the May 31, 2007 hearing.

109.    The Honorable Mary Much found a Change of Circumstances effective May 1, 2006 and increased the support obligation to $1,462.00 a month.

** Defendants dispute these facts.

B.    <u>Defendants Donald Mark Ehart and Spread Eagle, Inc.</u>**

Defendants, Donald Mark Ehart and Spread Eagle, Inc., submit that the following issues of fact will be established at trial (which plaintiff disputes):

1.    For personal reasons, Ehart decided to sell Red Eagle Avionics, Inc., ("Red Eagle, Inc.") shortly after September 11, 2001.

2.    On or about September 2, 2004, Ehart retained PBS Global, Inc., ("PBS") to assist him in the sale of the Red Eagle, Inc.

3.    RSI & Associates, Inc., ("RSI") was hired by PBS to determine the fair market value of Red Eagle, Inc.

4.    A representative of PBS visited Red Eagle, Inc. to review its documentation and tour the premises.

5.    RSI relied on Red Eagle, Inc.'s tax returns for 1999, 2000, 2001, 2002, and 2003, a field analysis of Red Eagle, Inc. prepared by a PBS representative, a summary of Red Eagle, Inc. prepared by Ehart to determine the fair market value of Red Eagle, Inc. as of December 31, 2003.

LN1 347122v2 11/16/07

6.    RSI provided Ehart with the Business Valuation Report of REA on October 11, 2004, which determined the fair market value of REA as of December 31, 2003, to be $2,298,300.

7.    In August or September 2005, Ehart and Cannavo commenced informal discussions regarding the purchase of Red Eagle, Inc.

8.    Initially it was not determined whether the purchase would be structured as an asset purchase or stock purchase.

9.    Ehart asked Brousseau & Brousseau, P.A. ("Brousseau") to compile a profit-loss statement of operation for Red Eagle, Inc., for the first six months of 2005, to give to prospective purchasers.

10.    In response to Ehart's request, Brousseau prepared the Red Eagle Avionics, Inc., Statement of Operations for the Six Months Ending June 30, 2005, ("The June 30, 2005, Statement of Operations").

11.    In September 2005, Ehart met Cannavo and Gano in Ehart's office located at Red Eagle, Inc.

12.    Ehart was unaware of Gano's role in the transaction.

13.    During the meeting Ehart provided Cannavo and Gano with a copy of the Business Valuation Report of Red Eagle, Inc. prepared by RSI.

14.    Ehart gave Cannavo and Gano to have full access to all of the books and records of Red Eagle, Inc.

15.    Cannavo and/or Gano did not ask Ehart for an audited financial statement of Red Eagle, Inc. prior to the purchase.

19

16.     Cannavo and Gano are business owners and are familiar with the format of audited financial statements.

17.     The length of audited financial statements varies but they are always more than one page.

18.     Prior to the purchase, Cannavo and Gano were provided with the The June 30, 2005, Statement of Operations, prepared by Brousseau.

19.     It is clear on the face of The June 30, 2005, Statement of Operations that it is not an audited financial statement.

20.     The June 30, 2005, Statement of Operations, read "See Accompanying Compilation Report" at the bottom.

21.     Neither Cannavo nor Gano asked to see the Accompanying Compilation Report prior to the purchase.

22.     Ehart believed the net income from operations of $115,496 as shown on The June 30, 2005, Statement of Operations, was accurate.

23.     Ehart is not sophisticated in financial or accounting matters.

24.     It was suitable for a prospective purchaser to rely on The June 30, 2005, Statement of Operations, in addition to, not in place of, conducting a due diligence investigation.

25.     Prior to the purchase, Ehart made available to Cannavo and/or Gano any and all documentation of Red Eagle, Inc.

26.     The only documentation Cannavo relied on prior to the purchase was the Business Valuation Report, the 2003 and 2004 tax returns of Red Eagle, Inc., the Red Eagle, Inc., Lease with the Delaware River and Bay Authority, and a cursory review of Red Eagle, Inc.'s payable and receivable files.

27.    Cannavo did not hire an accountant or other financial professional to review the books and records of Red Eagle, Inc., prior to the purchase.

28.    Cannavo conducted effectively no due diligence prior to the purchase.

29.    When Cannavo asked Ehart how Red Eagle, Inc. was doing during the last six months of 2005, Ehart replied that it was going well and that it was same as it always has been.

30.    Ehart's statements that business was going as well in the second half of 2005 as it did during the first half of 2005 are accurate.

31.    The volume of business was the steady during the second half of 2005.

32.    No drastic changes were made to Red Eagle, Inc., during the second half of 2005.

33.    Cannavo owned aircraft prior to the purchase.

34.    Cannavo currently owns aircraft.

35.    Gano owned aircraft prior to the purchase.

36.    Gano currently owns aircraft.

37.    Cannavo's primary motivation for purchasing Red Eagle, Inc., was to store and maintain the aircraft he and Gano owned.

38.    After the purchase, Cannavo did not manage Red Eagle Avionics, LLC, ("Red Eagle, LLC") in the same manner as Ehart.

39.    Cannavo mismanaged Red Eagle, LLC.

40.    Cannavo terminated the lease of Hangar Six and William Stover, an avionics maintenance business, as of January 20, 2006, who paid $1,700 per month plus 50% of the utilities.

41.    Cannavo leased this hangar space to Gano to store his aircraft.

42.    Hangar Six referred business to Red Eagle, Inc. when Ehart was the owner.

21

43.    The referrals from Hangar Six ceased after Cannavo terminated its lease.

44.    In 2005, Hangar Six referred approximately $40,000 in business to Red Eagle, Inc.

45.    Hangar Six did not refer any business to Red Eagle, LLC, after January 2006.

46.    Cannavo did not network or solicit business for Red Eagle, LLC.

47.    When Ehart owned Red Eagle, Inc. he actively networked and solicited business for Red Eagle, Inc.

48.    Cannavo did not have a good rapport with customers like Ehart did.

49.    Cannavo did not have qualified technicians performing maintenance duties on the aircraft.

50.    Ehart was a very skilled troubleshooter and could easily diagnose problems with aircraft. As a result, customers would hire Red Eagle, Inc. to fix the problem that Ehart had diagnosed.

51.    Cannavo did not hire someone to take over Ehart's responsibilities, such as troubleshooting and bench work; as a result, customers of Red Eagle, Inc. ceased doing business with Red Eagle, LLC.

52.    Cannavo hired inexperienced employees such as Jason Barron.

53.    Red Eagle, LLC, was doing a lesser volume of work since Cannavo purchased it.

54.    Ehart was frequently present at Red Eagle, Inc. while he owned it.

55.    Cannavo is infrequently present at Red Eagle, LLC.

56.    Cannavo's absence caused a decline in the quality and volume of work performed.

22

57.    The assets of Red Eagle, Inc. were sold to Cannavo and Red Eagle, LLC, on January 3, 2006 ("The Asset Purchase").

58.    Cannavo's attorney for The Asset Purchase was David Roeberg, Esq. ("Roeberg")

59.    Roeberg is an attorney and a Certified Public Accountant.

60.    Roeberg determined the allocation of the $2.2 million purchase price as reflected on the Agreement for Sale of Business Assets: Hangar $1.87 million; Improvements $0; Good will $0; Equipment $200,000; Inventory $30,000; Covenant Not to Compete $100,000.

61.    Cannavo did not overpay for the Hangar, Equipment, Inventory, or Covenant Not to Compete.

62.    Cannavo attributed $0 of the purchase price toward good will.

63.    Cannavo's complaint is premised on a claim that he overpaid for good will.

64.    Cannavo and Roeberg knew the meaning of good will prior to the purchase.

65.    The Asset Purchase was partially funded through a Promissory Note and Mortgage held by Red Eagle, Inc. (hereinafter "Red Eagle Inc. Note and Mortgage) in the amount of $1.2 million.

66.    Cannavo began paying on the Red Eagle, Inc. Note and Mortgage in February 2006.

67.    Cannavo has not paid on the Red Eagle, Inc. Note and Mortgage since June 2006.

68.    Cannavo is in default as to the Red Eagle, Inc. Note and Mortgage.

69.    Red Eagle, Inc. has sent Cannavo formal written notice of default.

70.    The asset purchase was partially funded through a Promissory Note and Mortgage held by Gano in the amount of $1.1 million.

71.    Cannavo is in default as to the Promissory Note and Mortgage held by Gano.

23

72.   Gano has not attempted to collect past-due amounts from Cannavo.

73.   Gano has not given Cannavo formal written notice of default.

**Plaintiffs dispute these facts.

## IV.   ISSUES OF LAW TO BE DECIDED

A.   <u>Plaintiffs</u>

Plaintiffs submit that the following issues of law must be decided at trial:

1.   Whether Defendants misrepresented to Plaintiffs the net income from operations of Red Eagle, Inc. as of June 30, 2005?

2.   Whether Defendants misrepresented to Plaintiffs the net income from operations for the second half of 2005?

3.   Whether Defendants misrepresented that the June 30, 2005 Statement of Operations of Red Eagle, Inc. was an audited financial statement?

4.   Whether Defendants' conduct constituted fraud?

5.   Whether Plaintiffs are entitled to compensatory damages as a result of the fraud of Defendants?

6.   Whether Plaintiffs are entitled to rescission and cancellation of the Agreement for the purchase of the assets of Red Eagle, Inc. based upon the fraud of Defendants?

7.   Whether Plaintiffs and Defendants were mutually mistaken regarding the net income of operations from Red Eagle, Inc. for the calendar year 2005?

8.   Whether Plaintiffs and Defendants were mutually mistaken that the June 30, 2005 Statement of Operations was an audited financial statement?

9.   Whether Plaintiffs are entitled to rescission and cancellation of the Agreement for the purchase of the assets of Red Eagle, Inc. due to the mutual mistake of the parties?

24

10.    Whether Plaintiffs were unilaterally mistaken regarding the amount of net income from operations of Red Eagle Avionics, Inc. for the calendar year 2005?

11.    Whether Plaintiffs were unilaterally mistaken regarding the June 30, 2005 Statement of Operations being audited?

12.    Whether Plaintiffs are entitled to rescission and cancellation of the Agreement to Purchase the Assets of Red Eagle, Inc. based on their unilateral mistake?

13.    Whether all business records and customer lists of Defendants were complete and correct?

14.    Whether Defendants breached the warranty and representation contained in paragraph 7(j) of the Agreement of Sale since all business records were not complete and accurate?

15.    Whether Plaintiffs are entitled to compensatory damages as a result of Defendants' breach of the contract?

16.    Whether Plaintiffs are entitled to have declared the Agreement, the Promissory Note, the Mortgage and Security Agreement, the Non-Competition Agreement, and the Assignment of Lease Agreement and Transfer of Ownership of Improvements null and void?

17.    Whether Plaintiffs are entitled to have entered judgment in their favor and against the Defendants for compensatory damages?

18.    Whether Plaintiffs are entitled to have Defendants pay pre-judgment interest and post-judgment interest?

19.    Whether Plaintiffs are entitled to have Defendants ordered to repay the Plaintiffs the $1,100,000. paid at closing?

LN1 347122v2 11/16/07

20.    Whether Plaintiffs are entitled to have an Order compelling Defendants to repay Plaintiffs the sum of $52,069.40 paid on the Promissory Note through June 2006?

21.    Whether Plaintiffs are entitled to an Award of reasonable attorneys' fees and costs?

22.    Whether Plaintiffs are entitled to an Award of punitive damages?

B.    <u>Defendants Donald Mark Ehart and Spread Eagle, Inc.</u>

Defendants, Donald Mark Ehart and Spread Eagle, Inc., submit that the following issues of law must be established at trial:

1.    Whether Plaintiffs can prove the elements of fraud.

    a.    Was there a false representation of fact made by Defendants?

    b.    If so, did Defendants have knowledge or belief that the representation was false or did the Defendants make the representation with indifference to the truth?

    c.    Was Plaintiffs' reliance on the representation justifiable?

    d.    Did the Plaintiffs suffer damages as a result of the reliance?

2.    Whether Plaintiffs can prove the elements of mutual mistake by clear and convincing evidence.

    a.    Were both parties mistaken as to a basic assumption?

    b.    Did the mistake materially affect the agreed-upon exchange of performances?

    c.    Did Plaintiffs assume the risk of the mistake?

3.    Did Plaintiffs assume the risk of the mistake?

4.    Are Plaintiffs in default of the Note and Mortgage held by Defendants?

5.    Are Defendants entitled to the past due amounts and late fees from Plaintiffs in the amount of $196,806.78 pursuant to the Note and Mortgage held by Defendants?

26

    a.   July 2006 through December 2007

    b.   $10,413.06/month

    c.   $520.65 – 5% late fee

6.      Are Defendants entitled to the entire accelerated balance of the Note plus interest at the rate of 8.5% from July 2006 until payment is made in full?

7.      Are Defendants entitled to costs and reasonable attorney fees?

## V.    STATEMENT OF RELIEF SOUGHT BY EACH PARTY

    A.    <u>Plaintiffs</u>

    Plaintiffs hereby seek that the Court order the following relief:

1.      Rescind the sale and purchase of the Red Eagle, Inc.'s business assets on January 3, 2006 pursuant to the Agreement, the Promissory Note, the Mortgage and Security Agreement, the Non-Competition Agreement and the Assignment of Lease Agreement and Transfer of Ownership of Improvements.

2.      Declare that the Agreement, the Promissory Note, the Mortgage and Security Agreement, the Non-Competition Agreement and the Assignment of Lease Agreement and Transfer of Ownership of Improvements are null and void.

3.      Enter a judgment in favor of Plaintiffs and against Defendants for compensatory damages in an amount to be determined at trial.

4.      Order Defendants to pay pre-judgment interest and post-judgment interest.

5.      Order Defendants to repay the $1,100,000. paid at closing.

6.      Order Defendants to repay Plaintiffs the sum of $52,069.40 paid on the Promissory Note through June 2006.

LN1 347122v2 11/16/07

7.    Order that in exchange for Plaintiffs' receipt from Defendants of the $1 million paid to the corporation at the January 3, 2006 closing and the $52,069.40 paid by the LLC on the Promissory Note, Plaintiffs deliver to Defendants The Red Eagle, Inc.'s business assets purchased from Defendants.

8.    Order such other additional relief necessary and appropriate to affect a complete rescission of the January 3, 2006 sale and purchase of the Red Eagle, Inc.'s business assets and restore the parties to the status quo immediately prior to the January 3, 2006 sale and purchase.

9.    Award such other relief that may be just and proper under the circumstances including, but not limited to, reasonable attorneys' fees and costs.

B.    Defendants Donald Mark Ehart and Spread Eagle, Inc.

Defendants, Donald Mark Ehart and Spread Eagle, Inc., respectfully request that the Court enter an Order as follows:

1.    Plaintiffs' request for Rescission of the Agreement of Sale of Business Assets, the Promissory Note, the Mortgage and Security Agreement, the Non-Competition Agreement, and the Assignment of Lease and Transfer of Ownership of Improvements be denied.

2.    Judgment be entered in favor of Defendants and against Plaintiffs in the amount of $196,806.78 representing the past due balance, late fees, and interest of 8.5% on the Note from July 2006 through the date of judgment.

3.    Judgment be entered in favor of Defendants and against Plaintiffs for the accelerated balance of the Note plus interest at 8.5% from July 2006 through the date of judgment.

4.    Award such other relief that may be proper under the circumstances including, but not limited to, reasonable attorney fees and costs.

LN1 347122v2 11/16/07

## VI.    AMENDMENTS TO THE PLEADINGS.

On October 8, 2007, Plaintiffs filed a Motion for Leave of Court to Amend the First Amended Verified Complaint.  Defendants have filed an Answer in Opposition to the Motion. As of this date, that Motion is still pending.

## VII.    LIST OF WITNESSES

1.    <u>Plaintiffs' Witnesses</u>

Plaintiffs intend to call the following witnesses at trial:

a)    <u>Fact Witnesses</u>

(1)    David Cannavo

(2)    Joseph Gano

(3)    Donald Mark Ehart

(4)    David Roeberg, Esquire

(5)    Daniel Brousseau

(6)    Stacey Brousseau

(7)    Francis Brousseau

(8)    Mary Beth Ehart

(9)    Jacqueline Anziano

(10)    Jason Barron

(11)    Dale Wally

(12)    Joann Collier

b)    <u>Expert Witnesses</u>

(1)    Alfred T. Giuliano, CPA, CRA, CFE,
Giuliano Miller & Company, LLC

(2)    John J. Coyle, III, MAI, CRE,
Coyle, Lynch & Company

Plaintiffs, David Cannavo and Red Eagle, LLC, reserve the right to call any of the witnesses identified by the defendants.

2.   <u>Defendants, Donald Mark Ehart and Spread Eagle, Inc.</u>

a)   <u>Fact Witnesses</u>

(1)   David Cannavo

(2)   Joseph Gano

(3)   Donald Mark Ehart

(4)   Daniel Brousseau

(5)   Jacqueline Anziano

(6)   Jason Barron

(7)   Dale Walley

(8)   Joann Collier

(9)   Gerald W. Brown, Sr.

(10)   William A. Shaw

(11)   David Gregg

(12)   James Sitar

(13)   Gary Steinert

(14)   Donna Finnachario

(15)   David Roeberg, Esquire

b)   <u>Expert Witnesses</u>

(1)   Gerald W. Brown, Sr.

Defendants, Donald Mark Ehart and Spread Eagle, Inc., reserve the right to call any witnesses identified by any of the Plaintiffs.

30

## VIII.  EXHIBIT LISTS AND EVIDENTIARY ISSUES

A.    Exhibit Lists

The parties' joint exhibit list is attached as Exhibit "A".  Additional exhibits may be added by stipulation of the parties or as ordered by the Court.

Plaintiffs and Defendants expressly reserve the right to use any exhibits identified by each other.

B.    Evidentiary Issues

1.    The qualifications of Gerald Brown to present expert testimony.

2.    The admissability of the Expert Report of Gerald Brown.

## IX.  TRIAL TIME

The parties estimate that the trial will take 2 days to complete.

**FOX ROTHSCHILD LLP**

By:    /s/ Sophia Siddiqui, Esquire (#4914)
Sheldon K. Rennie, Esquire (I.D. No.3772)
Sophia Siddiqui, Esquire (I.D. No. 4914)
919 N. Market Street, Suite 1300
Wilmington, DE  19899-2323
(302)654-7444
(302) 656-8920 (facsimile)
and
Wendy G. Rothstein, Esquire
(PA. I.D. No. 37178)
1250 South Broad Street
P.O. Box 431
Lansdale, PA  19446-0431
(215)699-6000
(215)699-0231 (facsimile)

and

**CROSS & SIMON, LLC**

By:    /s/ Richard H. Cross (#3576)
913 N. Market Street, 11th Floor
P.O. Box 1380
Wilmington, Delaware 19899-1380
(302) 777-4200
Attorneys for Defendants
*Donald Mark Ehart and Spread Eagle, Inc.*

31

**NURICK LAW GROUP**

Todd B. Nurick, Esquire (PA I.D. No. 78847)
111 West Germantown Pike
Plymouth Meeting, PA   19462
(610)238-9000
(610)238-9977 (facsimile)

Attorneys for Plaintiffs
*David Cannavo and Red Eagle Avionics, LLC*

**SO ORDERED.**

_____

                                            V.C.

LN1 347122v2 11/16/07

This document constitutes a ruling of the court and should be treated as such

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Leo E Strine |
| **File & Serve Transaction ID:** | 17138385 |
| **Current Date:** | Dec 04, 2007 |
| **Case Number:** | 2379-VCS |
| **Case Name:** | Cannavo, David et al vs Donald Mark Ehart et al |

**Court Authorizer Comments:**

This order is granted subject to the rulings at the pre-trial conference.

/s/ Judge Leo E Strine

EXHIBIT "J"



**WILCOX & FETZER LTD.**

In the Matter Of:

# Gano

v.

# Ehart and Spread Eagle, Inc.

No. 07-271

---

Transcript of:

Daniel F. Brousseau

October 18, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Gano v. Ehart and Spread Eagle, Inc.
Daniel F. Brousseau

54

1  handful of months before.
2  Q.  It was certainly prior to December of 2005?
3  A.  I believe so, yes.
4  Q.  And your estimate is it was sometime in the
5  summer?
6  A.  It's a pure guess, but yes.
7  Q.  What were you told?
8  A.  That he had somebody that might purchase his
9  business and that was pretty much it.
10  Q.  Did he tell you that on the phone or in person?
11  A.  In person.  He might have told me on the phone
12  too, but I had gone in and out of there either picking
13  up some books from Donna or something, so it could
14  have been on the phone or in person but, you know, it
15  definitely took place.
16  Q.  At the time you learned were you still working
17  at Brousseau & Brousseau?
18  A.  I believe so, yes.
19  Q.  And were you still performing services for Red
20  Eagle Avionics, Inc.?
21  A.  Mm-hmm.
22  Q.  Yes?
23  A.  Yes.  I was doing very limited things, but I
24  was attempting to do as much as I could.

55

1  Q.  How many years has the accounting firm of
2  Brousseau & Brousseau been in existence
3  approximately??
4  A.  25, 27 years or so.
5  Q.  And you've been involved the entire time
6  period?
7  A.  Just until recently, yes.
8  Q.  Has Frances Brousseau been involved the entire
9  time period?
10  A.  Yes.
11  Q.  How many years has Staci Brousseau been
12  involved with Brousseau & Brousseau?
13  A.  She got out of college.  Maybe twelve,
14  thirteen, fourteen years.  When she got out of
15  college.  I don't know if she got out in '90 or '95.
16  College and high school?  How old is she?
17  We'll say a dozen years without me getting
18  my little fingers and toes out.
19  Q.  What were the type of services that Brousseau &
20  Brousseau provided?
21  A.  We just do mostly tax return services.  We
22  do -- we're a small my wife would hate me to say mom
23  and pop CPA firm, but we do small items and things
24  along those lines.

56

1  Q.  Did Brousseau & Brousseau provide audit
2  services?
3  A.  For?
4  Q.  Anyone.
5  A.  Oh, yes.  I have provided, I have provided
6  audit services.
7  Q.  What does an audit involve?
8  A.  Basically in just talking about an audit it
9  involves verifying certain items external to the
10  business to give them the validity, obtain certain
11  confirmations and assurances, whether it's from
12  bankers, lawyers, different representations, putting
13  the work in the form of generally accepted accounting
14  principles versus just things thrown together, trying
15  to do certain appropriate disclosures as provided by
16  the American Institute of CPA's.
17  So in a nutshell, you're pretty much
18  trying to put things in a standard, useful financial
19  format, trying to verify or get information from
20  external sources to give the financial statements
21  some, make them bona fide and believable.  And that's
22  almost textbook.  I taught auditing for ten or twelve
23  years, so I could get a better definition.
24  But pretty much that's what it is.

57

1  Q.  And how long does it take to do an audit?
2  A.  Anywhere from -- this is a stupid answer, but
3  from a couple of days to it could be months and months
4  and months because it could be for a small pizza shop
5  or it could be for DuPont.  It's not an answer that
6  you can just give because you have to do so many
7  outside verifications.
8  Q.  And the length of the audit, is it also
9  influenced by how cooperative the third parties'
10  resources are?
11  A.  Absolutely.
12  Resources you mean by help?
13  Q.  Right.
14  A.  Yes.
15  Q.  And is it also influenced by how responsive the
16  third parties are to your inquiries?
17  A.  Absolutely.  If they're not responsive, you
18  can't give an opinion.  You disclaim.
19  Q.  Does an audit require you to, in fact, verify
20  from third-party sources the information that is being
21  provided to you by the client?
22  A.  The information that can be verified by third-
23  party sources, the answer is yes.
24  Q.  And what's the type of information that can be

15  (Pages 54 to 57)

Gano v. Ehart and Spread Eagle, Inc.
Daniel F. Brousseau

<table>
<tr><td colspan="2">

**58**

1  verified by third-party sources?
2    A.  A lot of things, financial data from banks.
3  You can get -- say if they do certain purchases of
4  assets, you can send out letters of confirmations to
5  verify those. If we have accounts receivable, for
6  instance, we could get a listing of accounts
7  receivable and send letters out to those individuals
8  to ascertain that those numbers are the same as
9  they're shown on the client's records. The same with
10  payables, you would look at later bank records for any
11  contingencies. You would get confirmations from
12  lawyers for claims contingencies, assessments or
13  anything that could possibly be against them.
14      If we're working with pension plans, we
15  would go to actuaries and get actuarial evaluations.
16  And the same thing when we're working with
17  investments, we're going to want investment statements
18  and under certain now we got to say at risk rules and
19  stuff, 104 to 109. But that's just -- that was just
20  an illustration of something.
21      But there's a huge laundry list of items
22  that you can try to ascertain as much as you can from
23  outside sources as possible.
24    Q.  What's the ultimate opinion or conclusion that

</td><td colspan="2">

**60**

1    Q.  Is to test that?
2    A.  Yeah. To attest to it, yes.
3    Q.  And are you supposed to take on face value the
4  representations that are made to you by the client
5  regarding their finances?
6    A.  No, although you do get representation letters
7  to protect yourself, client rep letters.
8    Q.  But one of the purposes of the audit is to test
9  the financial information that's being presented to
10  you to see if it's accurate?
11    A.  Absolutely.
12    Q.  And that testing is done through contacting
13  third-party sources?
14    A.  That's one of the reasons, yes, or one of the
15  procedures.
16    Q.  Now, what is a review?
17    A.  A review is obviously not an audit or a
18  compilation. It's much less in scope than an audit.
19      The goal of a review is to take the
20  client's records and put them in a format that adheres
21  to generally accepted accounting principles, plus and
22  including financial disclosures as promulgated by the
23  American Institute of CPA's. And you do not verify
24  things on the outside like you do in an audit. It's

</td></tr>
<tr><td colspan="2">

**59**

1  you give in an audit?
2    A.  Well, you obviously could give three
3  conclusions in an audit. One would be no conclusion.
4  You could obviously put a disclaimer that, A, you
5  couldn't get the information to give the opinion and
6  you did mention if somebody was uncooperative,
7  certainly you couldn't get the information.
8      B, if you can get the information except
9  for certain items, you could give a qualified report
10  that everything seems to be in conformity except that
11  we couldn't confirm accounts receivable for whatever
12  reasons.
13      And then you would give a clean report,
14  which is, which is that based on our review of
15  procedures and et cetera, the financial statements
16  seem to be fairly stated under generally accepted
17  accounting principles and that's the three.
18      If there's any new ones, they just came
19  out. But basically that's what your goal would be,
20  would be to give the opinion.
21    Q.  In an audit are you accepting as true the
22  financial statements or the financial accounting of
23  the client?
24    A.  No. That's the whole purpose of the audit.

</td><td colspan="2">

**61**

1  much less in scope than an audit. It's almost like
2  you say we're taking the financial statements, trying
3  to clean them up, make them look like an industry
4  standard so that they're comparable to another, to
5  other users of it.
6    Q.  What is a compilation?
7    A.  A compilation is merely taking -- we provide no
8  assurances in a compilation. It's merely taking
9  client records and putting them in a format and giving
10  them back to the client. I mean, it's just a way of
11  giving financial statements with no assurances for
12  management use.
13    Q.  Why would someone have you prepare a
14  compilation as compared to a review or an audit?
15    A.  A couple of major reasons would be they would
16  just like to know how they're doing internally and
17  there's a drastic difference in price and there may be
18  no reason to do anything other than, you know, you and
19  your partners wanting to know how we did last year.
20    Q.  Is a compilation ever intended to be produced
21  to someone other than the client?
22    A.  Yeah.
23    Q.  And specifically what do you do when you
24  prepare a compilation?

</td></tr>
</table>

16 (Pages 58 to 61)

Gano v. Ehart and Spread Eagle, Inc.
Daniel F. Brousseau

**62**

1    A. We pretty much -- one pretty much takes the
2   client's records and you do not test them. You do not
3   verify their worthiness. You just put them in a
4   format that looks like a financial statement and you
5   may or may not do disclosures. And you also write a
6   letter, a compilation letter that says, you know,
7   there's no assurances on this because there is no
8   assurance.
9        I mean, you know, face it, a compilation
10   is pretty worthless except for the owner.
11   Q. Why is it worthless except for the owner?
12   A. Because it's merely giving them back a snapshot
13   of what their business did without verifying things on
14   the outside.
15   Q. So you're basically summarizing the data they
16   give you?
17   A. Exactly.
18   Q. Do you test the accuracy of any of the data?
19   A. No.
20   Q. Do you verify if any of the data is accurate?
21   A. No.
22   Q. When you do the compilation alone is there any
23   way for you to know if any of that information is
24   accurate or reliable?

**63**

1    A. Based on doing a compilation? No, not really.
2   Q. Are you able to verify the accuracy of the
3   company's financial records without performing an
4   audit?
5   A. In my opinion, no.
6   Q. And why is that?
7   A. Because the information provided to the
8   accountant may not be real.
9   Q. And the only way to test that is to do the
10   audit which would involve going to the third party
11   sources?
12   A. Sure. That would be the procedure I would want
13   to do, yes. For -- sorry. You didn't ask me any more
14   questions. I was going to say, for instance, if
15   you've got your own little bakery shop and you gave me
16   your QuickBooks, but I would just put them in the form
17   of financial statements for your use, have you look at
18   them.
19        Now, I will let you know that if things
20   look unbelievable, then we wouldn't, we wouldn't do
21   it. For instance, if all of a sudden let's pretend
22   you had a million dollars in gross income and you had
23   salaries of two million, I might think this doesn't
24   look right, you know. So at that point we would ask

**64**

1   for more information or just decline from doing it.
2   Q. Have you ever declined to do a compilation --
3   let me finish -- based on what you observed in the
4   client's records?
5   A. Yes.
6   Q. Now, is it your practice to explain to the
7   clients the type of service you provide such as an
8   audit, a review, versus a compilation?
9   A. Yes.
10   Q. And why do you do that?
11   A. We do that merely so we can outline the
12   services that we're providing. It's hard to answer
13   why we do it. We do it because -- I don't know. I
14   guess when you go to the doctor and have your knee
15   scoped, you don't want him to operate on your brain.
16   I mean, you explain to him what your services are.
17        And there's a vast difference between
18   those three type of services. They're really not,
19   they're not the same. They shouldn't be considered
20   the same and there's a huge difference in the services
21   and the results could be identical, you know, but
22   still there's a big difference in the service.
23   Q. Now, am I correct that you want to make sure
24   that the client understands what they're receiving

**65**

1   whether you're actually auditing as compared to doing
2   a compilation?
3   A. Yes.
4   Q. Now, from a cost perspective, is there a
5   substantial difference between the costs for an audit
6   as compared to the cost for a compilation?
7   A. Yes.
8   Q. Now, how long did Brousseau & Brousseau do work
9   for either Mr. Ehart or Red Eagle Avionics, Inc.?
10   A. (Pause.)
11   Q. Approximately.
12   A. Maybe seven or eight years. That really is
13   just an approximate. I'm not positive.
14   Q. It's my understanding that you had avionics
15   work done by Red Eagle, correct?
16   A. Yes.
17   Q. Which came first? Did they do work for you
18   first or you performed accounting work for them first?
19   A. I had avionics work done first.
20   Q. And then subsequent to that you --
21   A. That's how I met them.
22   Q. What type of services do Brousseau & Brousseau
23   perform for either Mr. Ehart or Red Eagle Avionics,
24   Inc.?

17  (Pages 62 to 65)

Gano v. Ehart and Spread Eagle, Inc.
Daniel F. Brousseau

66

1    A.  Tax return services.
2    Q.  At any point in time did Brousseau & Brousseau
3    or yourself ever do any auditing of the books and
4    records of Red Eagle Avionics, Inc.?
5    A.  No.
6    Q.  At any point in time did you or Brousseau &
7    Brousseau ever do any review of the books and records
8    of Red Eagle Avionics, Inc.?
9    A.  No.
10   Q.  Did Brousseau & Brousseau or yourself prepare
11   compilation reports for Red Eagle Avionics, Inc.?
12   A.  On a few occasions, yes.
13   Q.  Do you know who requested the preparation of
14   those compilation reports?
15   A.  Mark did.
16   Q.  And did you discuss with Mr. Ehart what a
17   compilation was?
18   A.  Yes.
19   Q.  And did you advise him that in the compilation
20   you were not verifying the accuracy or validity or
21   reliability of any of the company financial
22   information?
23   A.  Yes.
24   Q.  And did he acknowledge to you that he

67

1    understood that?
2    A.  I believe he did acknowledge it.  He appeared
3    to understand what I was saying, yes.
4    Q.  And after you explained to him what a
5    compilation report was, did he then proceed to request
6    compilation reports from you?
7    A.  Yeah.  We did a couple, two or three
8    compilation reports for him, yes.
9    Q.  And do you specifically remember why
10   compilation reports were prepared for Mr. Ehart?
11   A.  I don't know the purpose of them other than he
12   had changed bookkeepers and he wanted to, you know, he
13   wanted them in the form of a financial statement.  I
14   think once, and I'm not sure, he might have -- I don't
15   know if he was getting life insurance at one time.
16   That might have been a while ago.
17          And we told him and, you know, he knew
18   that they were for management, we were preparing them
19   for management use, et cetera.
20   Q.  How did he know that they were prepared for
21   management use only?
22   A.  Because I told him.
23   Q.  And did you tell him why it was important that
24   they be for management use only?

68

1    A.  I told him because there's no disclosures and
2    that there's no verification on those numbers.  These
3    are just your numbers given back to you on a pretty,
4    pretty piece of paper.
5    Q.  Did he know that, in fact, these compilations
6    were really worthless like you described them?
7    A.  I hate to say what he knew or didn't know, so I
8    honestly think that he probably -- I don't know.
9          The reason I answer I don't know is
10   because years ago we used to do a compilation for a
11   client and it was very clear it was a compilation.
12   And she always said, "Thanks for doing the audit for
13   me."  I said, "We're not doing an audit.  It's a
14   compilation."
15          I know it's not answering your question,
16   but I believe he knew, but I couldn't attest to it.  I
17   really don't know that.
18   Q.  Did you tell, at any point in time did you ever
19   tell Mr. Ehart that you were auditing his books and
20   records?
21   A.  No.
22   Q.  And, in fact, to the contrary, did you advise
23   him that you were not auditing the books and records?
24   A.  Yeah.  I told him we're doing a compilation.

69

1    Q.  Did you tell him that you were verifying any
2    accuracy or reliability or validity of any of his
3    financial information?
4    A.  No.
5    Q.  And to the contrary, did you tell him that you
6    were just compiling the information as compared to
7    testing it or verifying the accuracy?
8    A.  Yes.
9    Q.  Now, your daughter testified in a deposition in
10   the Cannavo state court lawsuit regarding the practice
11   and procedure regarding these compilation reports.
12          Would she be familiar with them based on
13   her working at the company?
14   A.  I would hope, but she's -- I do the audit work.
15   I would hope she would, but she certainly has
16   knowledge.  But since I wasn't sitting there, I don't
17   know what came out of her mouth.  I mean, I'm harsh on
18   my daughter.
19   Q.  We won't tell her that.
20          Would she be familiar with what they look
21   like just from, you know, physically what they look
22   like?
23   A.  Oh, yes.
24   Q.  And she had indicated that the compilation

18 (Pages 66 to 69)

Gano v. Ehart and Spread Eagle, Inc.
Daniel F. Brousseau

74

1  Mr. Ehart.
2  A.  Okay.
3  Q.  And it actually shows that your deposition was
4  October 30, 2006.
5      Have you ever seen this document before?
6  A.  Yes, I have seen this before.
7  Q.  What is this document?
8  A.  This is just a compilation report of an income
9  statement.
10  Q.  And what --
11  A.  Very limited.
12  Q.  What's the date of this document?
13  A.  September 1st, '05.
14  Q.  And do you know whether the cover sheet, the
15  index page, the table of contents accompanied this
16  two-page report?
17  A.  There's no question in my mind that there was
18  none with this since it was just a one-page statement
19  of operations.  This, this I would be pretty sure was
20  provided as I'm looking at it.
21  Q.  Now, how do you know that?
22  A.  I'm guessing, but I would think that's a very
23  strong guess.
24  Q.  And why would you know that you wouldn't have

75

1  your things that you customarily provide -- let me
2  back up.
3      How do you know that this was provided in
4  this format as compared to the customary format that's
5  followed by your company?
6  A.  Because it's a one-page statement of
7  operations.  There's no other financials or anything
8  with it, so there would be no reason to put an index
9  for one page.
10  Q.  How about how this would have been bound when
11  it was sent to the client?
12  A.  This most likely wasn't bound because it was
13  just for Mark's use.  He asked me to do it, asked them
14  to do it.  And I'm clearly guessing on this.
15  Q.  Okay.  Do you recall Mr. Ehart requesting you
16  to prepare this document?
17  A.  Yeah.
18  Q.  What do you remember him asking you?
19  A.  He asked if I could give him an income
20  statement for six months.
21  Q.  Did he tell you why he needed the income
22  statement for six months?
23  A.  No.
24  Q.  Did he tell you whether he was going to provide

76

1  a copy of this income statement to anyone?
2  A.  Nope.  I even have things that are notated as
3  being estimates and everything else, but no.
4  Q.  At the time that you prepared this do you know
5  whether you knew that Mr. Ehart was having discussions
6  with Mr. Cannavo regarding his possible purchase of
7  either the stock or the assets of Red Eagle?
8  A.  I don't know, I cannot recall if he was having
9  discussions with Cannavo at this time, but I knew he
10  was trying to sell the business at that time because
11  he had, you know, he actively wanted to sell the
12  business.
13  Q.  Now, was it your intention for Mr. Ehart to
14  provide this two-page document to prospective
15  purchasers?
16  A.  Nope.
17  Q.  Why not?
18  A.  Because I told him this was a very limited
19  report for his purposes only that shows what he did
20  for the six months.
21  Q.  Did you ever subsequently learn that he
22  provided one of the pages of this document to
23  Mr. Cannavo or Mr. Gano?
24  A.  I don't believe so.  I don't know what he did

77

1  with the document.
2  Q.  Is it intended that these two pages remain
3  affixed to each other for someone to understand what
4  this document is?
5  A.  Yeah.
6  Q.  If someone received page 2 of the document
7  without page 1, is there any way for them to know what
8  type of review you did regarding the sales and
9  expenses?
10  A.  Only on the bottom it says, "See Accompanying
11  Compilation Report."
12  Q.  Other than that, is there someone to know that
13  you didn't test the veracity or reliability or
14  accuracy of the financial information?
15  A.  Well, that pretty much spells out it's a
16  compilation report because it says it right there, so
17  I would have to -- you know, it flat-out says it's a
18  compilation report.
19  Q.  Well, are you assuming that someone would know
20  what a compilation report was?
21  A.  I can't assume anything like that.
22  Q.  When you're making your statement there, you're
23  assuming that the person would know what a compilation
24  report is?

20  (Pages 74 to 77)

Gano v. Ehart and Spread Eagle, Inc.
Daniel F. Brousseau

78

1  A. Well, I mean you can't assume anybody knows
2  anything. I mean, we affix a compilation report. We
3  gave a document that says read the compilation report
4  and I can't do much more than that.
5  Q. Well, if someone just received the second page,
6  other than the "See Accompanying Compilation Report"
7  at the bottom, is there anything there to indicate
8  that you didn't test the accuracy or reliability or
9  dependability of any of the financial information
10  contained in that six-month statement of operations?
11  A. In my opinion, the words see the compilation
12  report clearly depicts that this is a compilation and
13  if somebody saw that, they should have questioned what
14  are they looking at.
15  Q. Now, is it proper for someone to present the
16  second page, the six months ended June 30, 2005 to a
17  prospective purchaser without presenting the first
18  page?
19  A. I would not think so.
20  Q. And that's because the disclaimers that your
21  company is making or the generally accepted
22  disclaimers are contained in the first page?
23  A. It's because this is a two-page document and
24  they would be taking it and not -- they would be

79

1  providing a partial document. You know, that's like
2  altering it.
3  Q. I didn't hear you.
4  A. That would be almost like altering it, you
5  know, not -- it's almost like, you know, taking
6  Whiteout and putting new numbers in.
7  Q. Now, would it be proper for someone to
8  represent to a prospective purchaser that page 2 alone
9  was an audit of their finances for the six-month
10  period?
11  A. No.
12  Q. And why not?
13  A. Because it's not an audit. That would be a
14  lie.
15  Q. And based upon your experience with Mr. Ehart,
16  he knew that it was not an audit, correct?
17  A. Right.
18  Q. And was the document I've presented to you as
19  Brousseau No. 4, either the first page or the second
20  page, intended by you to be relied upon by anyone
21  other than Mr. Ehart?
22  A. No.
23  Q. What did you do to prepare what has been marked
24  as Brousseau No. 4? And I may have said Ehart No. 4

80

1  before. I mean Brousseau No. 4.
2  A. Is that page 2?
3  Q. Either page. To prepare the second page.
4  A. All we did was took his Dome book and put it in
5  the form of an income statement and included interest
6  and depreciation. So these are his numbers from his
7  Dome book given back to him.
8  Q. And did you test the accuracy or reliability of
9  any of the information he gave you to prepare this
10  six-month statement of operations?
11  A. No.
12  Q. Would I be correct in order to have tested any
13  of the financial information he gave to you, you would
14  have had to have done an audit?
15  A. Yeah.
16  MS. ROTHSTEIN: Actually, can we take a
17  two-minute break?
18  (A brief recess was taken.)
19  BY MS. ROTHSTEIN:
20  Q. Mr. Brousseau, I'm going to ask you questions
21  again about this exhibit that we have marked as
22  Brousseau No. 4.
23  A. Okay.
24  Q. I'm a little confused. Is the compilation

81

1  report both pages or just the first page?
2  A. The report is the first page.
3  Q. What then is the second page?
4  A. The second page is a statement of operations.
5  See, a report is never numbers. A report is basically
6  a report and it's saying, it's saying what this is.
7  For instance, if this was an audit, this
8  would say this is an audit and all that and then
9  obviously we would have more stuff there, but this
10  (indicating) is the report and this (indicating) is
11  the financial statement that's embodied in the report.
12  But, no, it's not a report. It's a
13  financial statement.
14  Q. Okay. So just so I understand this, the
15  compilation report is what is page 1 of Brousseau
16  No. 4?
17  A. Yes.
18  Q. And the second page or the Red Eagle Avionics,
19  Inc. statement of operations for the six months ending
20  June 30, 2005 is a financial statement?
21  A. Yes. It's an income statement.
22  Q. And, in essence, the income statement is
23  attached to the compilation report?
24  A. Yes.

21  (Pages 78 to 81)

EXHIBIT "K"

BROUSSEAU & BROUSSEAU, P.A.
CERTIFIED PUBLIC ACCOUNTANTS
5708 LIMESTONE ROAD
WILMINGTON, DELAWARE 19808

(302) 234-1976

FRANCES L. BROUSSEAU, CPA
STACI L. SCHLESINGER, CPA

DANIEL F. BROUSSEAU, CPA

MEMBER
AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS

## COMPILATION REPORT



Mr. Mark Ehart, President
Red Eagle Avionics, Inc.
1 Dales Way
New Castle, DE 19720

We have compiled the accompanying statement of operations of Red Eagle Avionics, Inc.
(an S corporation) for the year ended June 30, 2005, in accordance with Statements on
Standards for Accounting and Review Services issued by the American Institute of
Certified Public Accountants in the United States of America.

A compilation is limited to presenting in the form of financial statements information that
is the representation of management.  We have not audited or reviewed the
accompanying financial statement and, accordingly, do not express an opinion or any
other form of assurance on it.

Management has elected to omit substantially all financial statement disclosures.  If the
omitted disclosures were included in the financial statement, they might influence the
user's conclusions about the company's financial status.  Accordingly, this financial
statement is not designed for those who are not informed about such matters.

*Brousseau & Brousseau, P.A.*

Wilmington, Delaware
September 1, 2005

1

RED EAGLE AVIONICS, INC.
STATEMENT OF OPERATIONS
FOR THE SIX MONTHS ENDED JUNE 30, 2005

| | | | |
|---|---|---:|---:|
| SALES | | | $ 663,452 |
| | | | |
| COST OF SALES | | | |
| Materials | $ | 352,400 | |
| Freight | | 3,028 | |
| Subcontract | | 14,490 | |
| | | | |
| TOTAL COST OF GOODS SOLD | | | 369,918 |
| | | | |
| GROSS MARGIN | | | 293,534 |
| | | | |
| EXPENSES | | | |
| Advertising | | 1,000 | |
| Automotive | | 8,063 | |
| Bank Fees | | 2,442 | |
| Depreciation (Estimated) | | 8,933 | |
| Dues and Subscriptions | | 1,316 | |
| Employee Benefits | | 1,882 | |
| Insurance | | 27,370 | |
| Interest Expense (Estimated) | | 18,802 | |
| Licenses and Taxes | | 6,945 | |
| Office Expense | | 2,495 | |
| Rent | | 8,076 | |
| Repairs | | 2,057 | |
| Supplies | | 1,289 | |
| Test Equipment | | 2,864 | |
| Trash Removal | | 650 | |
| Telephone | | 3,458 | |
| Travel and Entertainment | | 3,000 | |
| Utilities | | 9,091 | |
| Wages | | 68,305 | |
| | | | |
| TOTAL OPERATING EXPENSES | | | 178,038 |
| | | | |
| NET INCOME FROM OPERATIONS | | | $ 115,496 |

See Accompanying Compilation Report

2

EXHIBIT "L"

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

DAVID CANNAVO and RED EAGLE            )
AVIONICS, LLC, a Delaware Limited      )
Liability Company,                     )
                                       )   Civil Action
            Plaintiffs,                )   No. 2379-VCS
                                       )
v.                                     )
                                       )
DONALD MARK EHART and SPREAD EAGLE,    )
INC., a Delaware Corporation           )
formerly known as Red Eagle            )
Avionics, Inc.,                        )
                                       )
            Defendants.                )

            Deposition of DAVID CANNAVO, taken pursuant
to notice at the law offices of Cross & Simon, 913 North
Market Street, 11th Floor, Wilmington, Delaware,
beginning at 9:45 a.m. on Thursday, July 26, 2007,
before Anne L. Adams, Registered Professional Reporter
and Notary Public.

APPEARANCES:

        WENDY G. ROTHSTEIN, ESQ.
        FOX ROTHSCHILD, LLP
        1250 South Broad Street, Suite 1000
        Lansdale, Pennsylvania  19446-0431
        For the Defendants.
                and
        TODD B. NURICK, ESQ.
        NURICK LAW GROUP
        111 West Germantown Pike
        Plymouth Meeting, Pennsylvania  19462
        For the Plaintiffs,

        RICHARD H. CROSS, JR., ESQ.
        CROSS & SIMON, LLC
        913 North Market Street, 11th Floor
        Wilmington, Delaware  19899-1380
        For the Defendants.

              WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
    (302) 655-0477      www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

COPY

David Cannavo

144

1     Q.   Was there a compilation report attached to this

2  statement of operations?

3     A.   No.

4     Q.   Did you ask for it?

5     A.   I did not.

6     Q.   Does this say that it is an audited statement of

7  operations?

8     A.   It does note say that on here, no.

9     Q.   Now, the first page of this exhibit appears to

10  be a letter which says compilation report, correct?

11     A.   Yes.

12     Q.   When was the first time you saw that?

13     A.   About March of '06.

14     Q.   And when did you see it or how did you see it?

15     A.   The first time I saw it it was faxed to me by

16  Brousseau & Brousseau's office.

17     Q.   Why did they fax that to you?

18     A.   Because, at that point, I had asked them for

19  this document for the second half of the year ending

20  December 31st.  And they sent me both this document, the

21  one for the entire year or second half the year,

22  whichever, and the letter.  They sent me three pages.

23     Q.   And after you saw the second one, you realized

24  that there was a compilation report which is similar to

156

1    900,000 current market real value.  I knew that the

2    equipment and other hard assets, if you will, were in

3    the neighborhood of about $200,000, give or take, you

4    know, the cars and the test equipment and all that kind

5    of stuff.  The rest of the valuation for the entire deal

6    came from $230,000 times five for the value of the

7    business, the income it was going to generate.

8       Q.   You testified regarding the personal income tax

9    returns for 2004 and 2003.  Did Mr. Ehart tell you why

10   he left certain personal expense information off his tax

11   returns?

12      A.   He didn't tell me why, no.

13      Q.   And did Mr. Ehart know that Mr. Gano was

14   financing part of the purchase price?

15      A.   Yes.

16      Q.   And did Mr. Ehart know that any information that

17   he would have shared with you, that you were sharing

18   that information with Mr. Gano?

19      A.   Yes.

20           MS. ROTHSTEIN:  No other questions.

21           MR. CROSS:  Subject to recalling him if the

22   court orders it, I think we are done for today.

23           MS. ROTHSTEIN:  He will want to read and

24   sign.



# EXHIBIT "M"

Trial Transcript - Vol. I - 12-4-07 - Cannavo v Ehart - Del. Chanc. 2379-VCS

SHEET 1    PAGE 1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DAVID CANNAVO and RED EAGLE          :
AVIONICS, LLC, a Delaware            :
Limited Liability Company            :
                                     :
          Plaintiffs                 :
                                     :
     vs.                             :    Civil Action
                                     :    No. 2379-VCS
DONALD MARK EHART and SPREAD         :
EAGLE, INC., a Delaware              :
Corporation formerly known as        :
Red Eagle Avionics, Inc.             :
                                     :
          Defendants                 :

                    Chancery Courtroom No. 12A
                    New Castle County Courthouse
                    Wilmington, Delaware
                    Tuesday, December 4, 2007
                    9:00 a.m.

BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

                    - - -

          TRIAL TRANSCRIPT - VOLUME I

                    - - -

- - - - - - - - - - - - - - - - - - - - - - - - - - -

          CHANCERY COURT REPORTERS
     500 North King Street - Suite 11400
       Wilmington, Delaware 19801-3759
              (302) 255-0525

---

PAGE 2                                                    2

 1   APPEARANCES:
 2
 3        SHELDON K. RENNIE, ESQ.
          Fox Rothschild LLP
 4            -and-
          WENDY G. ROTHSTEIN, ESQ.
 5        of the Pennsylvania Bar
          Fox Rothschild LLP
 6            -and-
          TODD B. NURICK, ESQ.
 7        of the Pennsylvania Bar
          Nurick Law Group
 8            For Plaintiffs
 9
          RICHARD H. CROSS, ESQ.
10        TARA M. DiROCCO, ESQ.
          Cross & Simon, LLC
11            For Defendants
12
13                    - - -
14
15
16
17
18
19
20
21
22
23
24

---

PAGE 3                                                    3

 1             MS. ROTHSTEIN:  Good morning, Your
 2   Honor.
 3             THE COURT:  Good morning, everyone.
 4   You may proceed.  Good morning,
 5   Mr. Rennie.
 6             MR. RENNIE:  Sheldon Rennie on behalf
 7   of the plaintiffs.  With me at counsel table is
 8   Wendy Rothstein; the client, Dave Cannavo, and
 9   Todd Nurick.
10             MR. CROSS:  Good morning, Your Honor.
11   I guess, for the record, Richard Cross on behalf of
12   Spread Eagle, and Mark Ehart along with Tara DiRocco.
13             THE COURT:  You may proceed.
14             MR. CROSS:  Your Honor, before we
15   begin, counsel talked yesterday about sequestering the
16   witnesses.  I had asked that the witnesses be
17   sequestered.
18             THE COURT:  Sure.
19             MS. ROTHSTEIN:  Your Honor,
20   Wendy Rothstein.  May I call my first witness,
21   Mr. Cannavo?
22             THE COURT:  Yes, you may.
23             DAVID PAUL CANNAVO, having been first
24   duly sworn, was examined and testified as follows:

---

PAGE 4                                                    4

          D. P. Cannavo - Direct
          DIRECT EXAMINATION
 1
 2   BY MS. ROTHSTEIN:
 3        Q.   Good morning, Mr. Cannavo.
 4             Mr. Cannavo, what is your educational
 5   background?
 6        A.   I graduated high school in '73, did
 7   two years of business administration,
 8   University of Delaware and Widener.
 9        Q.   And what, if any, training do you have
10   in the aviation industry?
11        A.   I've been training all my life in the
12   aviation industry.  I held airline transport pilot
13   with ten different type ratings.  They all require
14   constant yearly training and upgrades.  Also air frame
15   and power plant mechanic with inspection
16   authorization, which also requires bi-annual upgrades.
17        Q.   How many years have you actually
18   worked in the aviation industry?
19        A.   Forty-five.
20        Q.   And briefly, what are the type of
21   positions you've held in the aviation industry?
22        A.   When I was a kid, I did pretty much
23   everything, from sweeping floors and cleaning
24   airplanes, and then moved up to maintaining airplanes.

Chancery Court Reporters

Trial Transcript - Vol. I - 12-4-07 - Cannavo v Ehart - Del. Chanc. 2379-VCS

SHEET 6    PAGE 41

41

D. P. Cannavo - Direct

1  these pages are the result of that.
2      Q.    Did you then have follow-up
3  discussions between you and Mr. Gano regarding the
4  information contained in this document?
5      A.    Yes.
6      Q.    And that occurred prior to the
7  decision to proceed with the purchase of the assets?
8      A.    Yes.
9      Q.    Now, directing your attention to the
10  customer referenced, Pat Welsch. Why did you confer
11  with that customer?
12      A.    I've known Mr. Welsch since 1991 or
13  so, when he bought his first business jet. He bought
14  it through us, and we did all the crew and maintenance
15  on it with Aero Taxi, Inc., the company I owned before
16  until 1995.
17          After I sold that company, I continued
18  to be his primary pilot. So I had a long-term
19  relationship with Mr. Welsch.
20      Q.    And what specific input did you seek
21  from Mr. Welsch?
22      A.    I had asked Mr. Welsch -- I had given
23  him a verbal overview of what we were proposing to do,
24  as far as buying this company. And I had asked him

PAGE 42

42

D. P. Cannavo - Direct

1  for his opinion on how I should value the
2  intangible -- the business, if you will -- as opposed
3  to the hard assets, the hangar and the equipment.
4      Q.    Did he provide you with input or any
5  formula to utilize to come up with a value?
6      A.    His opinion was that a business like
7  this should be valued between five and seven times.
8      MR. CROSS:  Objection. Hearsay, Your
9  Honor. Mr. Welsch isn't a witness in this case. He's
10  not an expert that's been identified. I'm not sure
11  how they can bring this in.
12      THE COURT:  The question, though, I
13  think -- what's the nonhearsay purpose for it,
14  Miss Rothstein?
15      MS. ROTHSTEIN:  Your Honor, it's not
16  offered for the truth. It's the state of mind for
17  this witness as to how he was proceeding and the
18  formula he was using to value this business.
19      MR. CROSS:  That's fine, Your Honor.
20  BY MS. ROTHSTEIN:
21      Q.    What if any formula did he provide to
22  you?
23      A.    Mr. Welsch said that a business of
24  this type should be valued at approximately five to

PAGE 43

43

D. P. Cannavo - Direct

1  seven times net income.
2      Q.    Now, did you then follow up during
3  this time period from September 2005 to January 2005?
4  Is that the time period that all these activities were
5  taking place that you just testified to?
6      A.    Yes.
7      Q.    Did you follow-up with Mr. Ehart
8  regarding the finances of the company during this time
9  period?
10      A.    Yes.
11      Q.    And what did you do to follow up with
12  Mr. Ehart?
13      A.    I spoke to him several times asking
14  him how the business was going, what jobs he had
15  lining up for the future. You know, what he thought
16  the end amount of income for the year would be.
17      Q.    Now, why were you making these
18  inquiries of Mr. Ehart?
19      A.    Because, again, the audited financial
20  statement only went up to June of 2005 -- the end of
21  June. I wanted to make sure that it wasn't a business
22  cycle thing, or business was progressing as it had in
23  the first six months for the second six months.
24      Q.    And what was the response you received

PAGE 44

44

D. P. Cannavo - Direct

1  from Mr. Ehart when you followed up regarding how the
2  business was doing in the second half of 2005?
3      A.    Every time I asked him, he said it was
4  doing well, they were busy and that the income for the
5  second half of the year should be equal to or slightly
6  better than the first half of the year.
7      Q.    This was during the time period that
8  you and Mr. Ehart were having discussions about you
9  personally purchasing the assets?
10      A.    Yes.
11      Q.    Now, based upon your discussion with
12  Mr. Welsch, did you in fact utilize that formula to
13  gauge for yourself what the value of the going concern
14  of the business part of the assets would be?
15      A.    Yes, I did. I took -- the low end
16  being somewhat conservative, I took the five times
17  number and projected it out.
18      Q.    I direct your attention to the Joint
19  Exhibit binder No. 1, Exhibit 11.
20      A.    Okay.
21      Q.    What information from that document
22  did you utilize to take the first step of valuing the
23  business part of the assets?
24      A.    Going down the list, I took the

Chancery Court Reporters

Trial Transcript - Vol. I - 12-4-07 - Cannavo v Ehart - Del. Chanc. 2379-VCS

PAGE 173                                                  173

J. Gano - Direct

1  you for the work that was done?
2       A.       The charges came through Mr. Cannavo,
3  but yes.
4       Q.       At any point in time did you have any
5  issue with any of the charges or the quality of work
6  that was performed when your aircraft was at Red
7  Eagle?
8       A.       No.
9       Q.       Could you describe to the Court what
10 type of factors that you look at in -- in deciding
11 where to let someone take your aircraft to be
12 repaired?
13      A.       Safety is one of the critical issues,
14 professionalism, the capacity to do the work at a
15 reasonable price, to do it in a reasonable time frame
16 and -- and but primarily to do it safely, since so
17 much is involved in the -- in these high-performance
18 aircraft.
19      Q.       What -- what are the type of things
20 that were done to your aircraft that -- that -- that
21 involve safety that were done at Red Eagle when
22 Mr. Ehart owned the company?
23      A.       Work on the pitot static systems, work
24 on the avionics systems, the -- basically the

PAGE 174                                                  174

J. Gano - Direct

1  instruments that would allow you to fly an instrument
2  approach in bad weather.
3       Q.       Now, what, if anything, did you do to
4  determine if that facility had the capability of doing
5  those type of -- of -- of work on your aircraft?
6       A.       One, I relied on Mr. Cannavo's
7  judgment and, two, I was aware that Red Eagle was a
8  facility that had been extant on the field for as long
9  as I've been flying aircraft out of the field as far
10 as I knew.  And in the maintenance area and my
11 experience, people are quick to complain and reluctant
12 to praise.  I've never heard any complaints about Red
13 Eagle.
14      Q.       Now, did there become a point in time
15 when you learned that Mr. Ehart was interested in
16 selling the assets of Red Eagle Avionics, Inc.?
17      A.       I believe it was late August, early
18 September of 2005.
19      Q.       And in what context did you learn
20 about that potential sale?
21      A.       In order to support my operations
22 and -- and for Dave to continue to grow his business,
23 we had both had discussions about the need to expand
24 our facilities -- or his facility at Wilmington.  And

PAGE 175                                                  175

J. Gano - Direct

1  I encouraged that, because I wanted -- as we were
2  looking to build our operation, I was looking for more
3  support than what he was able to give me with the --
4  his facility, the facilities he had at the time.
5       Q.       Now, what, if anything, did you learn
6  was the opportunity that presented itself regarding
7  Red Eagle Avionics?
8       A.       It looked like it would offer that
9  opportunity, for Dave to continue to expand his
10 business and to provide the enhanced service that I
11 would -- was looking for.
12      Q.       And what was that enhanced service you
13 were looking for?
14      A.       More -- more space for the aircraft,
15 more capability to do heavy maintenance on the field
16 where we needed it, and the ability to have a
17 presence, because the military subcontractors were all
18 looking for a presence.  They would -- would literally
19 do due diligence with you and include site visits to
20 ensure that, you know, we were capable of maintaining
21 and sustaining operations that they'd be looking for.
22      Q.       Now, did you meet with Mr. Ehart
23 regarding the potential purchase?
24      A.       I met one time with Mr. Ehart.

PAGE 176                                                  176

J. Gano - Direct

1       Q.       And approximately when did that take
2  place?
3       A.       I believe it was late September of
4  2005.
5       Q.       Who else was present at the meeting?
6       A.       Mr. Cannavo.
7       Q.       Approximately how long did the meeting
8  last?
9       A.       Total time was probably about an hour
10 and a half.
11      Q.       And what was the purpose of that
12 meeting?
13      A.       To begin discussions for the purchase
14 of Red Eagle.  And I was at the time looking at it as
15 a possible investment along with Mr. Cannavo.
16      Q.       Now, as of that point in time, what
17 was it anticipated that your role would be in the
18 transaction?
19      A.       Possible equity investor, but it
20 hadn't really been -- it hadn't really been confirmed;
21 but the initial -- initially as we approached it, that
22 I would take whatever position it required for
23 Mr. Cannavo to obtain the -- the business.
24      Q.       And what was your specific interest

Chancery Court Reporters

Trial Transcript - Vol. I - 12-4-07 - Cannavo v Ehart - Del. Chanc. 2379-VCS

181

J. Gano - Direct

1  based on that, we just doubled them to see what a full
2  year would look like.
3      Q.      Now --
4      A.      I'm sorry. Just add to that. But
5  going ahead, once we took it over, we also built into
6  that assumptions about my operations, which would
7  include a higher rent as we moved aircraft over there
8  and also the higher fuel consumption that would be
9  involved based on the fact that the jets would burn a
10 lot of fuel and that we built those into the pro
11 formas going forward.
12     Q.      Now, what, if anything, did you do to
13 follow up to see how the business was operating during
14 the second half of 2005 as compared to the first half
15 of 2005?
16     A.      I asked Mr. Cannavo on several
17 occasions to, when he was communicating with
18 Mr. Ehart, to ensure that the business operations
19 were -- were operating as the -- consistently with the
20 first half.
21     Q.      And what did you learn?
22     A.      On each occasion Mr. Cannavo came back
23 and informed me that he had spoken with Mr. Ehart and
24 Mr. Ehart had assured him that yes, in fact,

182

J. Gano - Direct

1  operations were running in -- in a very consistent
2  manner with the first half of the year.
3      Q.      Now, directing your attention to the
4  joint exhibit binder in front of you and specifically
5  page No. -- Exhibit No. 12, could you look at that,
6  please?
7      Prior to this lawsuit or specifically
8  prior to the sale in January of 2006, did you ever see
9  that document before?
10     A.      No.
11     Q.      Was -- was that document ever attached
12 to the document that -- that Mr. Ehart provided to you
13 at the meeting in September 2005?
14     A.      No. He only handed us one sheet.
15     Q.      Did at any point in time Mr. Ehart
16 indicate to you that the document that he gave you was
17 incomplete, that there was another document that was
18 attached to it?
19     A.      No.
20     Q.      Now, what was your initial role when
21 you and Mr. Cannavo met with Mr. Ehart?
22     A.      Once again, I was looking to assist
23 Dave to expand his operations on the field so that he
24 would be able to better support me, his client. But

183

J. Gano - Direct

1  my role would -- would have been whatever it required
2  to enable Dave to acquire the business, including an
3  equity position.
4      Q.      And -- so what type of financial
5  information were you looking for when you met with
6  Mr. Ehart?
7      A.      I was looking to Dave to provide the
8  sort of operations analysis because of his background.
9  But what I was specifically interested in was the
10 income statement, which would give me a sense of what
11 the cash flows would be and how they -- how they would
12 adjust as we moved forward based on the addition of --
13 of my -- my use of the facility.
14     Q.      Now, have you ever had any previous
15 experience in seeing audited financial statements?
16     A.      Yes.
17     Q.      And traditionally how many pages is
18 the entire audit report?
19     A.      Audited statements for small companies
20 can run to -- you know, anywhere from probably 10 or
21 15 to 40 pages, and public -- you know, public
22 corporations run into the -- over a hundred pages.
23     Q.      Now, in reviewing audited financial
24 statements, traditionally are there summary sheets

184

J. Gano - Direct

1  that contain the information contained in the report?
2      A.      Yes.
3      Q.      And knowing that you received one page
4  from Mr. Ehart, what would draw you to conclude that
5  that was an audited financial statement or came from
6  an audited financial statement?
7      A.      My specific request from -- to
8  Mr. Ehart to -- to provide a -- an audited financial
9  statement and his response, which was specifically "My
10 accountant," who I assumed was a CPA, "provided this."
11 "prepared this" was the word he used.
12     Q.      Now, after you saw the page 1 now --
13 the first page you did not get after the sale -- what
14 did you determine as to whether or not you received an
15 audited financial statement?
16     A.      It was clear it wasn't.
17     Q.      And why is that?
18     A.      It's -- this is a disclaimer, which
19 says that -- it just said that the -- that the
20 accountant had nothing to do with preparing the
21 numbers. He just took the numbers that Mr. Ehart gave
22 him and -- and put them in a financial format.
23     Q.      Going back to Joint Exhibit No. 11, if
24 you could go to that, at the bottom where it indicates

EXHIBIT "N"

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

```
DAVID CANNAVO and RED EAGLE        )
AVIONICS, LLC, a Delaware          )
Limited Liability Company,         )
                                   )
            Plaintiff,             )
                                   ) Civil Action
v.                                 ) No. 2379-VCS
                                   )
DONALD MARK EHART and              )
SPREAD EAGLE, INC., a Delaware     )
Corporation formerly known as Red  )
Eagle Avionics, Inc.,              )
                                   )
            Defendants.            )
```

Deposition of JOSEPH GANO taken pursuant
to notice at the law offices of Cross & Simon, LLC, 913
N. Market Street, 11th Floor, Wilmington, Delaware,
beginning at 10:10 a.m. on October 31, 2007, before
Vincent J. Bailey, Registered Professional Reporter and
Notary Public.

APPEARANCES:
        WENDY G. ROTHSTEIN, ESQ.
        FOX ROTHSCHILD LLP
          1250 South Broad Street
          Lansdale, Pennsylvania  19446-0431
              - and -
        TODD B. NURICK, ESQ.
        NURICK LAW GROUP
          111 West Germantown Pike
          Plymouth Meeting, Pennsylvania  19642
          For the Plaintiffs

        TARA M. DiROCCO, ESQ.
        CROSS & SIMON, LLC
          913 N. Market Street - 11th Floor
          Wilmington, Delaware  19801
          For the Defendants

                WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Joseph Gano

5

1      A.    No.  It is indeterminate.

2      Q.    Are you current on your monthly payments?

3      A.    Yes.

4      Q.    Primarily what do you use the space for?

5      A.    Aircraft storage.

6      Q.    Okay.  Now, going to your relationship with

7   Mr. Ehart, how long have you known Mr. Ehart?

8      A.    I met Mr. Ehart in, I believe the first time was

9   1996 I became aware of the facility.  Never had many

10  direct dealings with him, but he's provided avionics

11  support for my aircraft, probably even since before that

12  time, since 1993.  I believe he's, through Dave Cannavo

13  who is the primary agent, but much of the avionics work

14  on my aircraft has been done through Red Eagle over the

15  time.

16     Q.    When did you first come in contact with Mr. Ehart

17  regarding the subject of this litigation?

18     A.    August or September of 2005 we had a meeting.

19     Q.    Did you talk to him on the phone or through

20  e-mail prior to?

21     A.    No.  We had a meeting, personal meeting.

22     Q.    Who set up the meeting?

23     A.    Either him or Dave Cannavo.

24     Q.    You had no contact with him prior to the meeting?

Joseph Gano

6

1    A.    No.

2    Q.    How long would you say the meeting lasted?

3    A.    Anywhere from 45 minutes to an hour and a half,

4  spent some time.

5    Q.    What did you discuss during the meeting?

6    A.    We discussed the business operation.  We

7  discussed the fact that I was going to be an investor in

8  the business.  We discussed the fact that we were looking

9  for a facility on the field to, you know, enhance our war

10  bird operation.

11         In addition to the operations that the

12  facility had, we talked about the business operation that

13  he had, the basic economics.  He provided me with what he

14  presented was an audited financial statement.  We looked

15  at the facility and reviewed the basic business

16  operations with him.

17    Q.    In a 45 minute meeting?

18    A.    45 to hour and a half.  I included, hour and a

19  half would have included the tour of the building.

20    Q.    Did you relate to Mr. Ehart what type of investor

21  you were planning on becoming?

22    A.    I indicated that I would be either an equity

23  investor or a debt investor, but at that point we hadn't

24  determined what my specific role would be.



Joseph Gano

7

1    Q.   I'm going to mark this as Gano 2.

2         (Gano Deposition Exhibit No. 2 marked for

3  identification.)

4  BY MS. DiROCCO:

5    Q.   Mr. Ehart, I have Gano 2 in front of you.  The

6  first page of that is entitled "Compilation Report"?

7    A.   That's correct.

8    Q.   The second page is the statement of operation for

9  the six months ended June 30?

10   A.   That's correct.

11   Q.   Is this what Mr. Ehart presented to you during

12  your meeting?

13   A.   No.

14   Q.   Did he present to you any part of this?

15   A.   He presented us with page 2 only.  I specifically

16  asked for an audited financial statement.  He had within

17  his reach this document, page 2, and he handed it to me

18  and said this was prepared by my accountant.

19   Q.   Did he specifically say this is an audited --

20   A.   No, he did not.  But I inferred from that, with

21  some element trust, that that's what he meant.  I assumed

22  that the accountant was a CPA and apparently it is true

23  that he is a CPA.  But the compilation report, the cover

24  report with the disclaimer from the accountant was not --

Joseph Gano

17

1  was based on the statement of operations for the first

2  six months of '05 or even a little bit better.

3           Did you personally speak to Mr. Ehart about

4  that?

5      A.   No.

6      Q.   So here when it says Gano asked Ehart on four

7  occasions, you did not?

8      A.   I asked Dave Cannavo to ask and to be -- to

9  follow up to ensure that operations were still proceeding

10  as indicated in the first six months.  And on those

11  occasions Dave indicated to me that he did and he

12  indicated that Mr. Ehart's response was things were going

13  on as well as or better than they had during the first

14  six months.

15     Q.   Did you at any time -- I know you said you had

16  the meeting with Mr. Ehart in September.  Did you talk to

17  him at all in between September and the time of the asset

18  purchase?

19     A.   No.

20     Q.   Mr. Ehart in his deposition testified that he had

21  only met you person to person about two times.  Would you

22  say that that is accurate?

23     A.   Yes.

24     Q.   Have you, other than the meeting with him in



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Joseph Gano

26

A.    We send him a monthly statement.

Q.    What type of things are contained in the monthly statement?

A.    The summary of the interest that, and penalties that is owed as of the end of the month.

Q.    So it advises him of the increased costs as a result of the default?

A.    Yes.

Q.    Directing your attention to Gano Number 2, if you could look at the second page of that document, did you believe that the actual numbers that are reported on this document were audited?

A.    Yes.

Q.    What was your basis for that belief?

A.    I asked Mr. Ehart directly do you have audited financial statements that you can give us.  Mr. Ehart reached down, he had somewhere within his reach this page, page 2, and he handed it to me and a copy to Dave and said this was prepared by my accountant.

Q.    Did you believe that the conclusions that are indicated on page 2 of Gano Number 2, that those financial conclusions were a result of an audit?

A.    Yes.

Q.    Now, did you believe that there may have been



EXHIBIT "O"

RED EAGLE AVIONICS, INC.
STATEMENT OF OPERATIONS
FOR THE SIX MONTHS ENDED JUNE 30, 2005

| | | | |
|---|---|---:|---:|
| SALES | | | $ 663,452 |
| | | | |
| COST OF SALES | | | |
| Materials | | $ 352,400 | |
| Freight | | 3,028 | |
| Subcontract | | 14,490 | |
| | | | |
| TOTAL COST OF GOODS SOLD | | | 369,918 |
| | | | |
| GROSS MARGIN | | | 293,534 |
| | | | |
| EXPENSES | | | |
| Advertising | | 1,000 | |
| Automotive | | 8,063 | |
| Bank Fees | | 2,442 | |
| Depreciation (Estimated) | | 8,933 | |
| Dues and Subscriptions | | 1,316 | |
| Employee Benefits | | 1,882 | |
| Insurance | | 27,370 | |
| Interest Expense (Estimated) | | 18,802 | |
| Licenses and Taxes | | 6,945 | |
| Office Expense | | 2,495 | |
| Rent | | 8,076 | |
| Repairs | | 2,057 | |
| Supplies | | 1,289 | |
| Test Equipment | | 2,864 | |
| Trash Removal | | 650 | |
| Telephone | | 3,458 | |
| Travel and Entertainment | | 3,000 | |
| Utilities | | 9,051 | |
| Wages | | 68,305 | |
| | | | |
| TOTAL OPERATING EXPENSES | | | 178,038 |
| | | | |
| NET INCOME FROM OPERATIONS | | | $ 115,496 |

See Accompanying Compilation Report

"A"

EXHIBIT "P"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOE GANO,                                    )
                                             )
       Plaintiff,                       )
                                             )
    v.                                   )    No.    1:07-cv-00271
                                             )
DONALD MARK EHART and                        )
SPREAD EAGLE, INC.,                          )
                                             )
       Defendants.                      )

## <u>AFFIDAVIT OF JOE GANO</u>

Joe Gano hereby deposes and says under penalty of perjury that the following statements are true and correct:

1.    I am over eighteen years of age and am competent to testify as to the matters set forth in this Affidavit based upon my personal knowledge.

2.    I am providing this Affidavit in opposition to Defendants' Motion for Summary Judgment in the above-captioned action.

3.    In August or September 2005, in response to my request for an audited financial statement for Red Eagle Avionics, Inc. ("Red Eagle"), Donald Mark Ehart ("Ehart") immediately provided me with a one-page document entitled "Red Eagle Avionics, Inc. Statement of Operations for the Six Months Ended June 30, 2005," which Ehart stated was prepared by his Accountant.

4.    The aforementioned June 30, 2005 Statement of Operations indicated that Red Eagle had a net income from operations of $115,496.00 for the first six months of 2005.

5.    I was subsequently informed by David Cannavo ("Cannavo") that, on numerous occasions following the aforementioned meeting of August or September 2005, Ehart

1

represented that the business was doing well and that Red Eagle's income in the second half of 2005 should be equal to or slightly better than the first half of the year.

6.    Thus, based on their representations, Defendants led me to believe that the net income for Red Eagle in the first six months of 2005 was the amount stated on the June 30, 2005 Statement of Operations, or $115,496.00.

7.    Based on their representations, Defendants also led me to believe that Red Eagle's total net income for the entire year of 2005 was at least $230,992.00.

8.    Relying upon Defendants' aforementioned representations, I agreed to provide, and did provide, a loan in the form of a wire transaction in the amount of One Million One Hundred Thousand Dollars ($1,100,000.00), in connection with the purchase of Red Eagle's assets by Cannavo and Red Eagle Avionics, LLC on January 3, 2006.

9.    If I had been aware that Red Eagle's net income from operations was other than that as originally represented by Defendants, I would not have made the loan in the amount of $1,100,000.00 in connection with the aforementioned January 3, 2006 transaction.

10.    If I had known about the actual income and value of Red Eagle, I would not have made the loan in the amount of $1,100,000.00 in connection with the aforementioned January 3, 2006 transaction.

By:_____

Joe Gallo

Sworn and subscribed to
before me, a notary public,
this _22nd_ day of _January_, 2008.

_Barbara A. Lewis_

Notary Public
**BARBARA A. LEWIS**
**NOTARY PUBLIC**
**STATE OF DELAWARE**
My commission expires Sept. 30, 2009

2

LN1 724085v1 01/21/08

EXHIBIT "Q"





## RED EAGLE AVIONICS

## AGREEMENT FOR SALE OF BUSINESS ASSETS

THIS AGREEMENT FOR SALE OF BUSINESS ASSETS is made this 3rd day of January, 2006, by and between:

Red Eagle Avionics, Inc., a Delaware corporation (hereinafter referred to as the "Corporation") Tax I.D. No. 51-0338642, and Donald Mark Ehart (hereinafter referred to as "Ehart"). The Corporation and Ehart, jointly and severally, are hereinafter referred to as "Seller"

and

Red Eagle Avionics, LLC, a Delaware Limited Liability Company (hereinafter referred to as "Purchaser") Tax I.D. No. 03-0576592.

## RECITALS

A.    The Corporation is engaged in the aircraft avionics installation and repair business at 1 Dale's Way, New Castle, Delaware 19720 (hereinafter referred to as the "Business"):

B.    The Corporation owns the hangar at the aforesaid address (the "Hangar"), erected on a portion of 0.4696± acres of land leased by New Castle County (as Lessor) to the Corporation (as Lessee) pursuant to a lease dated February 1, 1994 (the "Lease"). New Castle County thereafter assigned its interest in the Lease as Lessor to the Delaware River and Bay Authority ("DRBA") pursuant to an Assignment and Assumption of Leases dated June 30, 1995 and recorded in the Office of the Recorder of Deeds in and for New Castle County, Delaware on October 25, 1995 in Book 2000, Page 285. A copy of the Lease is attached hereto as



1

Exhibit A.   The Corporation also owns other improvements installed by the Corporation on the leased premises surrounding the Hangar, including parking spaces, fencing, landscaping, etc., (hereinafter the "Improvements").   Certain portions of the Hangar are used by the Corporation in the operation of its Business. Other portions of the Hangar are leased by the Corporation to one or more tenants;

C.   Ehart is the sole stockholder of the Corporation;

D.   The Corporation desires to sell and Purchaser desires to purchase certain of the Corporation's business assets (hereinafter referred to as the "Business Assets") in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and conditions and mutual promises, understandings and agreements contained herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1.   <u>Sale of Business Assets</u>.   In reliance upon the representations, warranties and agreements and subject to the terms and conditions herein contained, the Corporation hereby sells, transfers, conveys, assigns and delivers to Purchaser, and Purchaser hereby purchases from the Corporation, all of the following Business Assets:

(a)   Equipment, including shop machinery equipment, office furniture and equipment, vehicles, maintenance equipment, supplies and all spare parts inventory and all other assets of the Corporation used in the Business, some of which are more particularly described on Exhibit B attached hereto and made a

2

part hereof;

    (b)    The Hangar and Improvements;

    (c)    The Corporation's Lease, as Lessee, with DRBA successor in interest to New Castle County, as Lessor;

    (d)    The Corporation's goodwill;

    (e)    The name, Red Eagle Avionics;

    (f)    Any leases that may exist with the Corporation's tenants, as set out more particularly on Exhibit C attached hereto and made a part hereof;

    (g)    All of the Corporation's customer lists, used in connection with the Business, which shall include the names and addresses of all customers which have transacted business with Seller.

2.    <u>Excluded Assets</u>.  Specifically excluded from the assets hereby purchased are:

    (a)    The Corporation's cash and cash equivalents;

    (b)    The Corporation's Accounts receivable;

    (c)    Any deposits, including utility deposits unless transferred to Purchaser, in which case Purchaser shall reimburse the Corporation.

3.    <u>The Purchase Price</u>.  The Purchase Price is Two Million Two Hundred Thousand Dollars ($2,200,000.00).

4.    <u>Payment of the Purchase Price</u>.  The purchase price is hereby paid by Purchaser to Seller as follows:

    (a)    One Million Dollars ($1,000,000.00) is hereby paid in cash

DC 0052

by wire transfer, certified check, or by attorney's check.

       (b)    Purchaser hereby delivers to the Corporation a Promissory Note ("Note") in the amount of One Million Two Hundred Thousand Dollars ($1,200,000.00). The Note is payable monthly with interest at 8.5% per annum, and is self-liquidating pursuant to a twenty year amortization schedule (240 months) with equal monthly payments for principal and interest of $10,413.88, in the form attached hereto.

       5.    <u>Security</u>.   The Note is secured by a first lien on the Leasehold Interest, the Hangar and the Improvements, by a mortgage executed by Purchaser, delivered to the Corporation and to be recorded in the New Castle County Recorder of Deeds' Office.

       6.    <u>Allocation of Purchase Price.</u>   The Purchase Price of $2,200,000.00 is hereby allocated as follows:

| | | |
|---|---|---|
| (a) | Hangar | $1,870,000.00 |
| (b) | Improvements | -0- |
| (c) | Good will | -0- |
| (d) | Equipment | 200,000.00 |
| (e) | Inventory | 30,000.00 |
| (f) | Covenant not to compete | 100,000.00 |
| | Total | $2,200,000.00 |

DC 0053

7.    <u>Adjustments for Ongoing Business Matters as Between</u> <u>Purchaser and Seller</u>.

(a)    Purchaser shall pay the Corporation separately for any prepaid expenses accepted by Purchaser;

(b)    Purchaser and the Corporation shall prorate and/or adjust as of the date hereof any lease payments, storage payments, utilities and other normal and usual reoccurring expenses of the business, such as rent, etc., payments received by the Corporation prior hereto, which requires Purchaser to provide goods or services hereafter, maintenance work in process or any other payments received by Purchaser hereafter for which the Corporation provided goods or services prior hereto; provided that Purchaser shall not be obligated to pay the Corporation until Purchaser has been paid.

(c)    All such prorations and adjustments shall actually be made between the Corporation and Purchaser after the date hereof, but as soon as practical.

7.    <u>Representations and Warranties of Seller</u>.    Seller, jointly and severally, represents and warrants to Purchaser as follows:

(a)    <u>Organization.</u>  The Corporation is duly organized, validly existing and in good standing under the laws of the State of Delaware and has full corporate power and authority and all governmental and other permits, licenses and authorizations necessary to own or lease and use its respective assets and to carry on its respective business as now conducted. Seller has delivered to Purchaser

5

a Good Standing Certificate.

(b)    <u>Ownership and Condition of Assets</u>.  The Corporation has good and marketable title to the Business Assets, Leasehold Interest and Improvements.  Seller hereby sells the Assets free and clear of all liens, claims, charges or security interests.  However, the Hangar and the Improvements are subject to the Lease.

The Corporation has made no previous assignment, transfer or sale of its interest in the Lease, nor is the Corporation in default or breach of any obligation or duty of Lessee arising under the Lease.

(c)    <u>The Corporation's Creditors</u>.  The Corporation shall pay all of its creditors either immediately or in due course and as soon as practicable. The Corporation has furnished to Purchaser a list of its creditors that it will pay and the amount owed to each. Purchaser is not accepting liability for any of the Corporation's obligations unless specifically agreed to and set out herein. Among the Corporation's debts which are being paid in full by the Corporation from the Corporation's proceeds of this sale are the following:

(i)    Commercial Loan from Wachovia Bank in the total amount, including accrued interest, of $445,905.21; To secure this loan, the Corporation granted a Leasehold Mortgage and Assignment of Leases to Wachovia Bank's predecessor in interest, First Union National Bank of Delaware, dated April 4, 2001 and recorded April 10, 2001 in the Office of the Recorder of Deeds in and for New Castle County, Delaware in Instrument #20010410-002505.  This lien is to be

6

satisfied of record after receipt of payment of the loan in full by Wachovia;

   (ii)   Small Business Administration Loan in the total amount, including accrued interest, of $30,583.56.

   (d)   <u>Availability of Other Property</u>.   Seller hereby makes available to Purchaser by leaving at the Business Premises any other tangible or intangible property used in the Business of Seller, including but not limited to, operating manuals, maintenance records, books, records, materials, manuals, plans, drawings, computer programs and software and other data relating to the Business unless specifically excluded pursuant to Paragraph 2 above.   With regard to the books and records of the Corporation, Seller will retain possession of such books and records, but physically maintain them at the Business premises for a period of two years following closing.   During this period of time, Purchaser will have access to those records and shall have the right to copy any of them.   Thereafter, Seller shall have the right to remove the books and records from the Business premises, but for the next three years, upon the request of Purchaser, Seller will provide Purchaser with reasonable access to and copies of the same.

   (e)   <u>Authorization</u>.   The execution, delivery and performance of this Agreement and Sale by the Corporation has been duly and validly authorized by the Corporation's Board of Directors and by all necessary stockholder action. Neither the execution and delivery nor performance of this Agreement by Seller constitutes a violation of, or results in a default, the acceleration of any obligation, or the imposition of any lien under, the certificate of Incorporation, By-Laws of the

7

Corporation, or any statute, law, rule or order applicable to Seller, or any contract, agreement, indenture, mortgage or other instrument to which Seller is a party or to which any of its assets are subject.

(f)    <u>Governmental Licenses.</u>    The Corporation operates its Business pursuant to a United States Department of Transportation Federal Aviation Administration Air Agency Certificate No. VRUR564L, empowering the Corporation to operate an approved repair station with certain ratings and limitations as specified in said Certificate.

(g)    <u>DRBA'S Approval.</u>    DRBA has provided its written consent to the Corporation's assignment of the Lease to Purchaser and Purchaser granting to the Corporation a mortgage and security agreement with respect to the Lease, the Hangar and leasehold improvements to secure Purchaser's Promissory Note to the Corporation.

(h)    <u>Other Approvals.</u>    With the exception of any approvals required by the Federal Aviation Administration in connection with Purchaser's acquisition of a similar aircraft repair station certificate, no governmental authorization, permit or approval is required on the part of Seller to enter into or perform this Agreement or to carry out the transactions completed hereby.

(i)    <u>Tax Matters.</u>    Seller has filed all Federal, State, and local tax returns which they are required to file, and has paid all taxes, interest, penalties, assessments and deficiencies, including but not limited to Federal Excise taxes, which have become due as shown in such returns or which have been claimed

8

to be due.  Seller is current in the payment of income, property, franchise, sales and withholding taxes and other employee benefits, taxes or imposts.  No examination by the Internal Revenue Service, or the Delaware Division of Revenue is presently being conducted or has been conducted for any year as to which the statute of limitations has not run.  Seller has received no notice of an examination from the Internal Revenue Service or the Delaware Division of Revenue.

(j)    Books and Records.    All business records and customer lists of Seller are in all material respects complete and correct.

(k)    Equipment, Hangar and Improvements.  All equipment, the Hangar, including its mechanical systems, and the Improvements sold hereunder are owned entirely by the Corporation and are in good operating condition.

(l)    Insurance Policies.  All theft, casualty, liability and other insurance policies insuring Seller and the property sold and purchased hereunder continue to be duly in force at the time of this Sale.  Seller is not in default with respect to any provisions of any such policy, nor has Seller failed to give any notice or present any material claim under any such policy in a due and timely fashion. Seller has provided Purchaser with a copy of each insurance policy (other than life) maintained by Seller.

(m)    Correspondence with Government Agencies.  Seller has not received any correspondence or other communications that affect the Assets or Seller's business from or addressed by it to any governmental agency or

9

DC 0058

instrumentality, whether state, local or federal, including but not limited to matters involving OSHA, the Environmental Protection Agency and/or the Federal Aviation Administration and/or the United States Department of Transportation, within the three year period ending as of the date hereof, relating to any violation, possible violation, potential violation or alleged violation of any applicable law, regulation or ordinance.

(n)    <u>Litigation and Investigations.</u>    Seller is not a party to or threatened with any litigation, suit, action, investigation, proceeding or controversy before any court, administrative agency or other governmental authority which might result in any material adverse change in the licenses, business operations, properties or assets of Seller or in its condition, financial or otherwise, or in any way involving this Agreement or the transactions contemplated hereby and, to the best of Seller's knowledge, is not subject to or in violation of or in default with respect to any judgment, order, writ, injunction, decree or rule of any court, administrative agency or governmental authority or under any regulation of any administrative agency or governmental authority. Seller has complied in all material respects, and is complying in all material respects, with all laws, rules, regulations and ordinances affecting its business.

8.    <u>Representations and Warranties of Purchaser.</u>

(a)    <u>Organization.</u>    Purchaser is a limited liability company duly organized and validly existing under the laws of the State of Delaware and has full power and authority to enter into and perform this Agreement. Purchaser has

DC 0059

delivered to Seller a Good Standing Certificate.

(b) <u>Authorization</u>.   The execution, delivery and performance of this Agreement by Purchaser have been duly authorized by Purchaser's sole member, David Cannavo.  Neither the execution and delivery nor the performance of this Agreement by Purchaser constitutes a violation of, or results in a default, the acceleration of any obligation, or the imposition of any lien under Purchaser's certificate of formation, Purchaser's operating agreement, any statute, law, rule or order applicable to Purchaser or any contract, agreement, indenture, mortgage or other instrument to which Purchaser is a party or to which any of its assets are subject. No governmental authorization, permit or approval is required on the part of Purchaser to enter into or perform this Agreement or to carry out the transactions contemplated hereby.

(c) <u>Validity</u>. This Agreement constitutes, and upon execution and delivery the Note, and all other documents executed in connection herewith, will constitute the valid and binding obligation of Purchaser enforceable against Purchaser in accordance with their respective terms, except to the extent limited by applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws of general application relating to or affecting the enforcement of creditors' rights.

(d) <u>Litigation</u>.   There is no litigation at law or in equity nor any proceeding before any governmental board or agency, not fully covered by insurance, pending or, to Purchaser's knowledge, threatened which will in any way

DC 0060

inhibit or prevent Purchaser from fulfilling and performing all of its obligations under this Agreement and the documents to be delivered hereunder.

9.    Non-competition Agreement.    Seller has, as part of this transaction, executed and delivered to Purchaser a non-competition agreement.

10.    Covenants.

(a)    At Purchaser's option, Seller shall cooperate in transferring the Corporation's State of Delaware Unemployment Compensation Rating to Purchaser and any other transferable license, permit, etc. necessary for Purchaser to conduct the business of Seller.

(b)    Seller shall pay all of its Employees regular wages, wage supplements, benefits, including any accrued but unused vacation pay, up to the date hereof. Seller and Purchaser shall cooperate in the form of notice to be given to Seller's employees regarding this transaction.

(c)    The Corporation shall immediately cease to use the name Red Eagle Avionics.  The Corporation shall execute all necessary documents to change its corporate name on the records of the Delaware Secretary of State to a name not similar in any respect to Red Eagle Avionics to be chosen by Seller, thereby enabling Purchaser to use the name Red Eagle Avionics in Purchaser's operation of the Business.

11.    Miscellaneous.

(a)    Indemnification by Seller For Third Party Claims.    For a period of three (3) years following Closing, Seller hereby agrees to indemnify and

DC 0061

hold Purchaser harmless against all loss and damage (including reasonable attorney's fees and other expenses incurred in investigation, litigating and settling any claims) of whatever nature suffered by Purchaser at any time, in connection with any claim made against Purchaser by a creditor of Seller.

(b)    Purchaser shall have the right to set off any amounts due and owing to it by Seller based on indemnification hereunder against any amounts otherwise owing by Purchaser to Seller under the Promissory Note in accordance with the following procedure.

(i)    Purchaser shall notify the Seller with reasonable promptness pursuant to the Notice provisions hereof (the "Notice") of any claim that has been asserted against Purchaser for which Purchaser is entitled to indemnification hereunder.  Upon receiving such notice, the Seller and Purchaser shall jointly determine if they can agree on a method of treating the claim and Purchaser's exposure thereon. If no such agreement is reached within sixty (60) days of the posting of notice, the dispute shall be submitted to binding arbitration as provided for herein. Purchaser shall not have the right to cease making payments due under the Note during the pendency of the claim and shall only have such right if ordered by the arbitrator.

(c)    Indemnification By Purchaser.  For a period of three (3) years following Closing, Purchaser shall indemnify and hold Seller harmless against all loss and damage (including reasonable attorney's fees and other expenses incurred in investigation, litigating and settling any claims) of whatever

DC 0062

nature suffered by Seller at any time, in connection with any claim made against Seller by a creditor of Purchaser.

(d)     <u>Miscellaneous</u>. The indemnification remedies provided herein by this section shall be in addition to any remedies available to either party provided by law for breach of any warranty or misrepresentation or in any promise under this agreement.

(e)     <u>Survival of Warranties</u>. All representations, warranties and agreements made by Seller and Purchaser in this Agreement, or pursuant thereto, shall survive these transactions.

(f)     <u>Successors</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assigns. All obligations of Seller shall be joint and several.

(g)     <u>Governing Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

(h)     <u>Cumulative Remedies</u>. No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each remedy shall be cumulative and shall be in addition to every other remedy provided herein or by law. The election of anyone or more remedies by Purchaser or Seller shall not constitute a waiver of a right to pursue other available remedies.

(i)     <u>Notice</u>. Any notice or other communications required or

DC 0063

permitted hereunder shall be sufficiently given only if sent by registered or certified mail, postage prepaid, addressed as follows or to such other address or addresses as may hereafter be furnished in writing by notice similarly given by one party to the other:

To Purchaser:

c/o David Cannavo
1 Dale's Way
New Castle, Delaware 19720

Copy to:

David Roeberg, Esquire
Roeberg, Moore & Friedman, P.A.
910 Gilpin Avenue
Wilmington, Delaware 19806

To Seller:

c/o Donald Mark Ehart
795 Union Church Road
Townsend, Delaware 19734

Copy to:

(j)  Modification.  This Agreement shall not be modified or amended except by written agreement of all parties hereto.  Any dispute between the parties regarding this Agreement shall not be decided on the basis of authorship.

(k)  Expenses.  Seller and Purchaser will each pay their own costs and expenses incident to the transactions contemplated hereby, including but not limited to the fees and expenses of their respective counsel and accountants.

(l)  Headings.  The headings of the paragraphs of this Agreement are inserted for convenience of reference only and shall not be considered a part hereof.

(m)  Further Assurances.  Each of the parties hereto shall

15

DC 0064

from time to time at the request of any other party hereto, and without further consideration, execute and deliver to such other party such further instruments of assignment, transfer, conveyance and confirmation and take such other action as such other party may reasonably request in order to fulfill more effectively the transactions hereby completed for the purposes of this Agreement.

(n)    Counterparts.    This Agreement may be executed in any number of counterparts with the same effect as if the signatures thereto and hereto were upon the same instrument, but all of such counterparts taken together shall be deemed to constitute one and the same instrument.

(o)    Time is of the Essence.    Time shall be of the essence in this Agreement.

(p)    Broker Fees.    Each party shall be solely responsible for the payment of any brokerage fees that it might be liable for and agrees to indemnify and hold each other harmless from the payment of any such fees. Seller and Purchaser each represent that it has not engaged any broker with respect to this transaction and that no broker is entitled to any fee or compensation with respect to this transaction.

(q)    Arbitration.    Any dispute which arises under this Agreement shall be decided through binding arbitration, conducted under the auspices of the American Arbitration Association.    Any such arbitration shall be conducted in accordance with the Rules of the American Arbitration Association, before a single arbitrator, in Wilmington, Delaware.    Arbitration shall be

DC 0065

commenced by either party giving written notice of a demand for arbitration to the other party, setting out party giving written notice of a demand for arbitration to the nature of the dispute which is alleged. All costs and expenses of the arbitration, including attorney's fees, shall be allocated among the parties according to the arbitrator's discretion. The arbitrator's award resulting from such arbitration shall be confirmed and entered as a final judgment in the Court of Chancery of the state of Delaware in and for New Castle County.

IN WITNESS WHEREOF, each of the parties hereto has fully executed this Agreement all as of the day and year first above written.

SELLER:
Red Eagle Avionics, Inc., a
Delaware Corporation

By: _____

Donald Mark Ehart, President and
Secretary

Date of Signature: _1-3-06_____

[Corporate Seal]

_____
Witness

_____(SEAL)
DONALD MARK EHART, Individually

Date of Signature: _1-3-06_____

*(Signatures continue on next page)*

17

PURCHASER:
Red Eagle Avionics, LLC, a
Delaware Limited Liability Company

By: _David Cannavo_

David Cannavo, Member

Date of Signature: _1-3-06_

18

DC 0067

EXHIBIT A


AGREEMENT


THIS AGREEMENT, made this first day of February 1994, by and between NEW CASTLE COUNTY, a political subdivision of the State of Delaware (hereinafter referred to as "Lessor") and RED EAGLE AVIONICS, INC., a corporation of the State of Delaware (hereinafter referred to as "Lessee").


W I T N E S S E T H


WHEREAS, Lessor is the owner of property constituting the New Castle County Airport (hereinafter referred to as "Airport"); and

WHEREAS, New Castle County Economic Development Corporation is the authorized agent for Lessor; and

WHEREAS, Lessee desires to lease certain land within the Airport; and

WHEREAS, Lessor and Lessee have agreed upon the terms of a lease for such land.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein the parties hereto agree, as follows:

1. <u>Demised Premises</u>. Lessor shall lease to Lessee, and Lessee shall lease from Lessor, a 0.4696 acre parcel of land at the Airport, as is more particularly described by the property description on Exhibit "A" attached hereto and made a part hereof.

2. <u>Term</u>. The initial term of this Agreement is twenty (20) years beginning on the day and year first above-mentioned. In addition to the initial term, Lessee is hereby granted two (2) renewal options of ten (10) years each. Each option may be exercised by Lessee by mailing written notice to the offices of the New Castle County Economic Development Corporation or such other place or places as may from time-to-time be designated by Lessor, not less than one hundred twenty (120) days prior to the expiration date of the then current term. Cancellation or termination of the initial term, or any applicable option term defeats Lessee's right to exercise any subsequent option(s).

1

DC 0068

3.    <u>Rent</u>.

A.    Lessee agrees to pay to Lessor annual rent in the sum of Eleven Thousand Five Hundred Dollars ($11,500) per acre during the first year of the initial term of this agreement. During the second through twentieth year of the initial term of this Agreement, at the inception of each annual period, the annual rent shall escalate by the percentage increase, on an annualized basis, equal to the most recent U. S. Department of Labor, Bureau of Labor Statistics, Philadelphia Regional Office's Consumer Price Index ("C.P.I.").

B.    Within one hundred and twenty (120) days prior to the commencement of the twentieth (20th) year of the initial term, the Lessor and Lessee each shall select an appraiser and have them determine an annual fair market rental value for the demised premises for the first year of the first option term. If the chosen appraisers cannot reach agreement on an annual fair market rental value for the demised premises within forty-five (45) days of selection, they shall within five (5) business days mutually agree upon a third appraiser, whose determination of an annual fair market rental value shall be final.    The Lessee shall pay, at its sole expense, the initial appraiser it selects and the third appraiser, if one should be necessary. During the second (2nd) through tenth (10th) years of the first option term, at the inception of each annual period, the annual rent shall escalate by the percentage increase equal to the then most recent annualized C.P.I.

C.    The same procedure set forth in Paragraph 3-B shall be followed in order to determine the annual rent for the first year of the second option term.    During the subsequent years of the second option term, at the inception of each annual period, the annual rent shall escalate by the percentage increase equal to the then most recent annualized C.P.I.

D.    Lessee also agrees to serve as a tiedown manager for twenty (20) available tiedown spots on the public aircraft parking ramp, as is more particularly described by the property description on Exhibit "B" attached hereto and made a part hereof.    Lessee further agrees to charge a minimum tiedown rent of Seventy-Five Dollars ($75) a month for each tiedown spot. Lessee will provide Lessor with a monthly report on the number of prior month's tiedown aircraft, with payment to Lessor representing twenty percent (20%) of the monthly gross revenue collected from tied-down aircraft on the public aircraft parking ramp.

4.    <u>Rent Payment</u>.    The rent due hereunder is payable monthly in an amount equal to one-twelfth (1/12) of the rent calculated pursuant to Paragraph 3 of this Agreement, in advance, on the first day of each month during the term of this

2

Agreement. Should this Agreement begin on a day other than the first of the month, the first rent payment shall be apportioned accordingly. Payments made after the fifth day of the month in which due shall be subject to a late fee of five percent (5%) of the total amount outstanding. All payments shall be made to the offices of the New Castle County Economic Development Corporation, or such other place or places as may from time to time be designated by the Lessor. As used in this Agreement, payment is considered to have been made on the date received by Lessor.

5. <u>Additional Fees</u>. Lessee shall pay such fees as specified in Section 3-1 of the New Castle County Code.

6. <u>Use of Premises</u>. Lessee shall use and occupy the Demised Premises for the purpose of operating and maintaining an airplane hangar and related uses. Additionally, Lessee shall operate and maintain public tiedowns for aircraft on a contractural basis with Lessor.

7. <u>Fuel Storage</u>. Lessee shall comply with all applicable federal, state, and local laws and regulations, and all rules of the Airport and the Local Board of Underwriters concerning the storage of petroleum products and the manner in c which the aircraft is fueled.

8. <u>Taxes</u>. Lessee shall pay all local, county, state and federal taxes with regard to demised premises for the duration of this Agreement and any and all renewals or extensions thereof.

9. <u>Net Lease</u>. This Agreement shall be without cost to the Lessor for the maintenance and/or improvement of the demised premises. It shall be the sole responsibility of Lessee to maintain, repair, and operate the entirety of the demised premises, and all improvements and facilities placed thereon, at Lessee's sole cost and expense. Lessee agrees that it shall keep the demised premises from falling out of repair or deteriorating and shall keep the demised premises in a condition comparable to other first class corporate facilities at the Airport.

10. <u>Trash, Garbage, Hazardous Substances, Etc</u>. Lessee shall provide for the complete and proper arrangement and the safe use and adequate sanitary handling and lawful disposal of materials, away from the Airport, of all trash, garbage, hazardous substances, and other refuse caused as a result of the operation of its business. Lessee shall provide and use suitable covered receptacles for all such garbage, trash, hazardous substances and other refuse. Lessee shall abide by all local, county, state and federal regulations which are applicable regarding the use, handling, and disposal of trash, garbage, and hazardous substances.

3

11. <u>Right of Ingress and Egress</u>. Lessor grants to Lessee the right of ingress to and egress from the demised premises subject to existing ordinances and regulations and to such other laws, rules, or policies which may hereafter have application at the Airport.

12. <u>Improvements/Alterations</u>.

(a) <u>Lessor's Approval</u>. Lessee shall make no alterations, additions or improvements to the demised premises without the prior written approval of Lessor, which approval shall not be unreasonably withheld. Any such alteration, addition, or improvement shall be constructed in accordance with all applicable federal, state, and local laws, and ordinances, including the New Castle County Building and Zoning Codes. Lessee shall be fully responsible for any damage to property or injury to person resulting from alterations, additions or improvements made by it to the demised premises, and shall hold Lessor harmless with respect thereof. All improvements erected on the demised premises by Lessee shall become the property of Lessor upon the expiration, cancellation or sooner termination of this Agreement.

(b) <u>Completion Documents</u>. On the completion date of any alterations, additions, or improvements, the Lessee shall deliver to Lessor each of the following:

(1) A certificate of completion by the architect who supervised the construction which shall state that all work has been completed in accordance with the approved plans and specifications;

(2) Any and all certificate(s) of occupancy, and any equivalent permit(s) or certificate(s) which may be required by any and all federal, state, county, and local governmental authorities; and

(3) A survey of the demised premises, showing the completed structure and showing that there are no encroachments by it on any adjoining premises in compliance with all laws.

(c) <u>Certificate of Title</u>. Within thirty (30) days after the completion date, Lessee shall deliver to Lessor the certificate of a duly licensed title company or its agency, currently dated, that the time for the filing of all mechanics', materialmens', and/or similar liens has expired, or, if such is not the case, that a search of the record shows that no liens or lis pendens then encumber the demised premises. If the latter information is furnished by such title company, or its agency,

4

then, within ninety (90) days thereafter Lessee shall deliver a further certificate of such title company that no liens or lis pendens then encumber the leased property.

(d) <u>Mechanics' Liens</u>. In the event that any mechanics', materialmens', and/or similar liens shall at anytime be filed against the demised premises or any improvements thereof by reason of work, labor, services or materials performed or furnished to Lessee or to anyone holding the demised premises through or under Lessee, Lessee shall forthwith cause the same to be discharged or recorded or bonded to the satisfaction of Lessor. If Lessee shall fail to cause such lien forthwith to be so discharged or bonded after being notified of the filing thereof, then, in addition to any other right or remedy of Lessor, Lessor may discharge the same by paying that amount so that any and all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in procuring the discharge of such lien, shall be due and payable by Lessee to Lessor within fifteen (15) days following Lessor's written demand for such sums.

(e) <u>Reversionary Interest Impairment</u>. All alterations and improvements made by Lessee, shall be at Lessee's sole cost and expense, and shall be made upon the credit of Lessee and Lessee's leasehold interest, and nothing herein contained shall be construed as a consent by the Lessor to any statutory or judgment lien being entered against the Lessor's reversionary fee simple title by reason of Lessee's alterations or improvements.

13. <u>Right to Have Improvements Removed</u>. Upon the termination of this Agreement, should any existing structure have, in the opinion of Lessor, no further practical economic value or utility, Lessor shall, at its sole option, be entitled to have the land demised herein returned to it clear of all improvements above and below ground level; <u>provided, however,</u> that Lessee shall have one hundred eighty (180) days after such termination in which to remove such improvements, and provided that such an occupancy for purposes of removal shall be subject to the last rent rates applicable hereunder. If Lessee fails to so remove said improvements, Lessor may thereafter remove said improvements at Lessee's expense. In the event that the demised premises, including all improvements, are not cleared to ground level, it is understood that said improvements, including, without limitation all remaining trade fixtures, machinery, and equipment shall revert to and become the property of Lessor.

14. <u>Utilities</u>. Lessee shall assume and pay all costs or charges for all utility services furnished to Lessee during the term hereof; <u>provided, however</u>, that Lessee shall have the right, subject to Lessor's approval of design and specifications, to connect to storm and sanitary sewers and water and

utility outlets at Lessee's own cost and expense, and Lessee shall pay for any and all service charges incurred therefor. If Lessee uses, operates, or maintains sewage, water, or any other utility service on the demised premises, Lessee shall assume and pay for necessary meters for measuring said service and all charges for providing such service. Where possible, Lessee shall be billed and pay the charge of the utility company directly to the utility company. Lessee will not place structures over sanitary sewers or water mains, and if such be on the demised premises, Lessor shall have the right to enter the demised premises for the purpose of inspecting, repairing, or replacing same. It is also understood that any electrical work performed by Lessee shall conform with any authority having jurisdiction thereof and shall meet with the requirements of the Delmarva Power & Light Company, its successors and assigns. It is further understood that any utilities may be transferred, sold, or assigned by the Lessor to a public or private contractor, in which event that contractor will have the rights of the Lessor with reference to the utility involved.

15. <u>Possession</u>. Lessee agrees that in the event of Lessor's inability to deliver possession of the demised premises on the execution date of this Agreement, Lessor shall not be liable for any damage caused thereby, nor shall this Agreement be deemed void or voidable. In the event that Lessor is unable to deliver possession on the execution date of this Agreement, the commencement date of this Agreement shall be postponed until such date upon which Lessor is able to deliver possession, the rent due hereunder shall be abated proportionately and the expiration date, as well as all other terms, covenants and conditions of this Agreement, shall remain unchanged.

16. <u>Signs</u>. Lessee may, upon the approval of Lessor, erect such sign(s) on the demised premises as shall be necessary to advertise business provided it complies with all applicable federal, state, and local laws and regulations, as well as rules of the Airport. Upon the termination of this Agreement, Lessee shall remove all signs erected by it and repair any damage caused thereby. Should Lessee violate any provision of this paragraph, Lessor may, at Lessee's expense, take whatever action is necessary to remedy the same and collect the expenses and costs thereof in addition to any and all rent due hereunder.

17. <u>Compliance With Laws</u>. Lessee shall comply with all applicable federal, state, and local laws, ordinances, and regulations, and all rules of the Airport and the Local Board of Underwriters concerning the use and occupancy of the demised premises. Lessor shall not permit the conduct of any business, trade, occupation, or other activity on the demised premises which would void or make voidable any policy of insurance held by Lessor thereon.

18. <u>Liability</u>. Lessor, its officers, agents, and employees, shall not be liable for any damage or injury to Lessee, its officers, agents, or employees, or to any third party coming upon the demised premises in connection with Lessee's use of the premises, or for any damage or injury to any goods, chattels, or other property of Lessee, its officers, agents, or employees where due to any cause, except where such cause is the result of the willful negligence of Lessor, its officers, agents or employees.

19. <u>Inspection</u>. Lessor, or its designee, shall have the right to enter the demised premises for the purpose of inspecting and completing such work as Lessor shall deem necessary for the safety or preservation of general Airport operations; <u>provided, however</u>, that such action will not interfere unreasonably with the conduct of Lessee's business.

20. <u>General Liability Insurance</u>. Lessee shall procure general liability insurance with a limit of no less than one million dollars ($1,000,000.00) for each occurrence. The policy shall name Lessor as an insured and shall be carried by insurers licensed to do business in the State of Delaware and of recognized responsibility satisfactory to Lessor. The policy shall expressly waive and bar any claim of subrogation against Lessor. Lessee shall furnish Lessor with evidence that such coverage has been procured and is being maintained. Said policy shall provide sixty (60) day notice of cancellation. Lessee shall notify Lessor in the event of any cancellation or renewal of such policy. Lessee shall notify Lessor in writing, as soon as practicable, of any claim, demand, or action arising out of an occurrence covered hereunder of which Lessee has knowledge.

21. <u>Worker's Compensation Insurance</u>. Lessee shall procure a worker's compensation insurance policy in an amount equal to or exceeding the statutory limits for Delaware and an Occupational Diseases Insurance policy of no less than $100,000/$500,000/$100,000. The policy shall be carried by insurers licensed to do business in the State of Delaware and of recognized responsibility satisfactory to Lessor. The policy shall expressly waive and bar any claim of subrogation against Lessor. Said policy shall provide sixty (60) day notice of cancellation. Lessee shall furnish Lessor with evidence that such coverage has been procured and is being maintained. Lessee shall notify Lessor in the event of any cancellation or renewal of such policy.

22. <u>Automobile Liability Insurance</u>. If Lessee shall own, lease, use or employ company vehicles at or on the demised premises, Lessee shall procure automobile liability insurance with a limit of no less than one million dollars ($1,000,000.00) for each occurrence. The policy shall name Lessor as an insured and shall be carried by insurers licensed to do business in the

7

State of Delaware and of recognized responsibility satisfactory
to Lessor.   The policy shall expressly waive and bar any claim
of subrogation against Lessor.   If applicable, Lessee shall fur-
nish Lessor with evidence that such coverage has been procured
and is being maintained.   Said policy shall provide sixty (60)
day notice of cancellation.   Lessee shall notify Lessor in the
event of any cancellation or renewal of such policy.   Lessee
shall notify Lessor in writing, as soon as practicable, of any
claim, demand, or action arising out of an occurrence covered
hereunder of which Lessee has knowledge.

23.   <u>Aviation Liability Insurance</u>.   Lessee shall
procure an aviation liability insurance policy with coverage of
not less than one millon dollars ($1,000,000).   The policy shall
name Lessor as an insured and shall be carried by insurers
licensed to do business in the State of Delaware and of recog-
nized responsibility.   Said policy shall provide thirty (30)
days notice of cancellation.   Lessee shall furnish Lessor with
evidence that such coverage has been procured and is being main-
tained.   Lessee shall notify Lessor in the event of any cancel-
lation or renewal of such policy.

24.   <u>Indemnification</u>.   Lessee, for itself, its succes-
sors and assigns, covenants and agrees to indemnify and hold
harmless Lessor, its officers, agents, employees, or designees,
from any and all damage, injury, claim, or liability arising
from Lessee's use and occupancy of the demised premises, except
where such is due to the willful negligence of Lessor, its of-
ficers, agents, or employees.   It is expressly understood and
agreed that the Lessee is and shall be deemed to be an independ-
ent contractor for purposes of this Agreement, and shall there-
fore be solely responsible to all parties for its respective
acts and/or omissions.

25.   <u>Cancellation/Termination</u>.   This Agreement shall
be subject to immediate cancellation by Lessor in the event
Lessee shall:

(a)   be in arrears in the payment of the whole or
any part of any amount due hereunder for a period of thirty (30)
days after receipt of written notice from Lessor or its designee
that such payments are due;

(b)   be in default in the performance of any
covenant, term or condition of this Agreement and such default
continues for a period of thirty (30) days after receipt from
Lessor, or its designee, of written notice of such default; and

(c)   file a voluntary petition in bankruptcy or
any petition for relief under any section of the bankruptcy laws
of the United States; make any assignment for the benefit of
creditors;   be the subject of an involuntary petition in

bankruptcy; have appointed a receiver, custodian or trustee for Lessee by any court; or sell any of its interests under any execution process or other legal process as ordered by any court.

In the event of breach of this Agreement by Lessee, but no sooner than ten days following the mailing of written notice to Lessee of such breach, Lessor may, in addition to all other remedies available at law or equity, recover possession of the demised premises and remove Lessee's effects without being deemed guilty of trespass. Notwithstanding the recovery of possession by Lessor as a result of Lessee's breach, Lessee shall remain liable to Lessor for all amounts owing under this Agreement payable to the expiration date of the then current term, or any subsequent term for which Lessee has exercised its option pursuant to Paragraph 2 of this Agreement. Failure of Lessor to recover the demised premises upon the default of Lessee shall not serve to bar or destroy the right of Lessor to recover the demised premises or to otherwise exercise any and all of its rights at law or equity by reason of any subsequent violation of the terms of this Agreement.

26. <u>No Waiver</u>. The failure of Lessor to insist upon the strict performance of any of the terms, conditions and covenants herein, shall not be deemed a waiver of any rights or remedies available to Lessor, and shall not be deemed a waiver of any subsequent breach or default in the terms, conditions and covenants herein contained.

27. <u>Eminent Domain</u>. If all or any part of the demised premises shall be taken by any public authority under the power of eminent domain, the term of this Agreement shall cease as to that portion taken, on the date of possession, and any unearned rent paid or credited in advance shall be refunded, and from that day Lessee shall have the right either to cancel this Agreement and declare it null and void, or to continue in possession of the remainder of the demised premises under the terms herein provided, except that the rent shall be reduced in proportion to the portion of the premises taken. Lessee shall notify Lessor within thirty (30) days after receipt of notice of any taking, of its intention to cancel this Agreement; otherwise, the Agreement shall continue in full force and effect on the same terms and conditions herein provided as to the portion of the demised premises not taken. Lessee shall not be entitled to receive any part of any award or awards that may be made to or received by the Lessor.

28. <u>Notice</u>. Any notice required herein shall be given by registered or certified mail, postage prepaid, addressed, if to Lessor, at: New Castle County Economic Development Corporation, First Federal Plaza, Suite 536, 704 King Street, Wilmington, Delaware 19801 or such other place or places as may from time-to-time be designated by Lessor; and if to

Lessee, at:  Red Eagle Avionics, Inc., 160 Old Churchmans Road, New Castle, Delaware 19720.  Notice is considered to have been given upon the date mailed.

29. <u>Holdover Tenancy</u>.  In the event that Lessee continues in possession of the demised premises beyond the expiration, cancellation or termination of this Agreement, or any renewals or extensions thereof, without Lessor's consent, such tenancy shall be presumed to be a tenancy from month-to-month and Lessee shall pay rent equal to twice the monthly rent then pertaining plus any other charges then owing, but nothing in this Paragraph shall be construed as consent by Lessor to such possession of the demised premises by Lessee beyond the term of this Agreement.

30. <u>Discrimination</u>.  Lessee shall use, occupy, operate, and maintain the demised premises in accordance with all federal, state and local statutes regarding discrimination, and in such capacity neither it, nor any person or organization using or occupying the demised premises, shall discriminate against any person by reason of race, creed, color, religion, sex, age or national origin.

31. <u>Right of Flight</u>.  Lessor reserves the right of flight for the passage of aircraft above the surface of the demised premises, together with the right to cause in such airspace such noise as may be inherent in the operation of aircraft now known or hereafter used, and Lessor reserves the right to use said air space for taking off from, landing at, or operating aircraft on said Airport.

32. <u>Instrument of Transfer</u>.  This Agreement is subject to the provisions of the "Instrument of Transfer" between the United States of America and the Levy Court of New Castle County, Delaware, dated April 29, 1949, and effective as of October 27, 1947, as the same is of record in the Office of the Recorder of Deeds in Wilmington, Delaware, in Deed Record C, Volume 49, page 75, with respect to the premises herein leased, and subject to the right of the United States of America to repossess the premises under any war powers act that may exist or that may hereafter been acted with reference to property such as is covered by this lease, with no recourse for just compensation from the United States of America for such taking of Lessee's interest in the premises.  In the event of such dispossession, Lessee may, at its election, terminate this lease by written notice to Lessor, but if Lessee elects not to terminate, then the rent payable to Lessor shall be abated during the period Lessee is dispossessed, and upon repossession of the property by the Lessor a corresponding extension of the term of the Agreement shall become effective.

33. <u>Federal Aviation Administration Sponsor's As-surances</u>. This Agreement is subject to the provisions of Chapter 14, Part 152, Appendix D, of the Code of Federal Regulations "Assurances" (14 CFR 152D) that are applicable to this activity. Lessee will not construct, erect, or alter any structure or other object in the approach areas of the runways of the Airport, or allow the growth of any tree, which would constitute an airport hazard. In addition, Lessee will not erect or permit the erection of any permanent structure or facility which would interfere materially with the use, operation, or future development of the Airport, in any portion of a runway approach area in which the Airport has acquired, or hereafter acquires, property interests.

34. <u>Paragraph Headings</u>. The paragraph headings contained herein are for convenience in reference only and are not intended to define or limit the scope of any of the provisions of this Agreement.

35. <u>Successors and Assigns</u>. All of the terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the successors, subtenants and assigns of the respective parties hereto, except that the option provisions of Paragraph 2 herein shall not inure to the benefit of the subtenants and assigns of Lessee.

36. <u>Integration</u>. This document, which includes Exhibit "A" and Exhibit "B," comprises the entire Agreement between the parties hereto relative to the subject matter hereof, and no earlier agreements, leases or other understandings entered into by either party or its predecessors or assignors in connection therewith shall be of any force or effect.

37. <u>Attorney's Fees</u>. In any action brought by Lessor for the enforcement of the obligations of the Lessee hereunder, Lessor shall be entitled to recover reasonable attorney's fees.

38. <u>Equal Employment Opportunity</u>. Lessee shall operate in accordance with all federal, state and local laws regarding equal employment opportunity and further agrees to adopt a policy statement regarding equal employment opportunity and post such statement in a prominent place at the demised premises.

39. <u>Laws of Delaware</u>. This Agreement shall be governed by the laws of the State of Delaware.

40. <u>No Assignment/Encumbrance</u>. Lessee shall not assign, transfer or otherwise encumber all or any portion of its interest in this Agreement except with the prior written consent of Lessor, which shall not be unreasonably withheld. If Lessee merges into, consolidates with, liquidates or sells all or a

11

substantial part of its assets to any person, corporation or other organization, such action shall constitute an assignment or transfer for purposes of this Agreement. Any such assignment, transfer or encumbrance, which has been approved in writing by Lessor, shall be subject to all the provisions of this Agreement and shall be only for the uses specified in Paragraph 6 hereof.

IN WITNESS WHEREOF, the parties hereto set their hands and seals caused the day and year first above mentioned.

Witness:

NEW CASTLE COUNTY

By: _____ (SEAL)
Dennis Greenhouse
County Executive

Attest:

RED EAGLE AVIONICS, INC.

By: _____ (SEAL)
Title: _____

12



EXHIBIT A

EXHIBIT B



# EQUIPMENT LIST

Hangar and Lease
1996 Chevy Van
1989 Prelude
Kinsley Wire Stamping Machine
KTS 150 Test Set
AM/FM 1000
1200 Y3 Pulse Generator
O-Scope
O-Scope
Digital Fluke Meter
ASI – 190B
ATC 600
ATC 401
ATC 401 (Not Calibrated)
Power Supplies
MBT Surface Mount Sobler Machine
ATC 601 Transponder Test Set
DPS 400 RVSM Pitot/Static Machine
IFR Pitot/Static Machine
Gulfstream Tool Kit
Used Radios and Equipment
S-Tec Breakout Box
Skin Mapping Machine
(2) Bird Watt Meters
Pitot/Static Adapter and Cart
Micro Fische Reader
Sheetmetal Equipment
Engraving Machines
A/C Tug
Compressor
Vacuum Pump
Ground Power Unit
Portable AC Unit
Books and Manuals
Office Furniture
Flight Simulator
Handheld Transceiver
Special Tooling
Phone System
Computers

**EXHIBIT C**


None

EXHIBIT "R"

 **GIULIANO, MILLER & COMPANY, LLC**
CERTIFIED PUBLIC ACCOUNTANTS AND CONSULTANTS

Wendy G. Rothstein, Esquire
Fox Rothschild LLP
1250 S. Broad Street
P.O. Box 431
Lansdale, PA 19446-0431

Todd Nurick, Esquire
Nurick Law Group
11 West Germantown Pike
Plymouth Meeting, PA 19462

December 17, 2007

Dear Counselors:

Enclosed please find my report on the accuracy of the accounting information provided to and relied upon by Joseph Gano ("Gano") to loan $1.1 million to David Cannavo ("Cannavo") to purchase certain assets of Red Eagle Avionics, Inc.

**Background**

On January 3, 2006, Red Eagle Avionics, LLC ("Red Eagle LLC") purchased business assets of Red Eagle Avionics, Inc. ("Red Eagle Inc"). The purchase price was $2.2 million with Gano providing an unsecured loan of $1.1 million. The stated interest rate on the note was 10% during the first year and 12.5% during the second year, with interest to be paid quarterly. All unpaid interest and principal would be due upon maturity, or two years from the date of the note.

The assets that Red Eagle LLC purchased included those listed below, and excluded cash, accounts receivable, and deposits:

- a land lease with the Delaware River Bay Authority, for land located at the New Castle County Airport
- improvements on the leased land including a hanger and parking,
- business equipment,
- inventory,
- customer lists,
- use of the name "Red Eagle Avionics", and
- Tenant leases.

Gano
December 17, 2007
Page 2 of 8

The main business of Red Eagle Inc. and its successor was providing avionic equipment sales and repair services; additionally space was rented for airplane tie-downs.

According to the Complaint ("Complaint"), Gano and Cannavo were presented with a one-page Statement of Operations from Red Eagle Inc. for the six months ended June 30, 2005 from the sole seller, Mark Ehart ("Ehart"). This statement was prepared by the accounting firm of Brousseau & Brousseau, PA ("Brousseau") and was relied upon by Cannavo to purchase the company and Gano to lend $1.1 million to Cannavo for the purchase. As noted on the statement, net income from operations was reported to be $115,496 for the first six months. It should be noted that a compilation report dated September 1, 2005 was also prepared by the accountants at that time, but not provided to Gano and Cannavo from Ehart. This compilation report included the standard wording that "A compilation report is limited to present in the form of financial statements information that is the representation of management" and that the financial statements are not audited or reviewed. A copy of the June 30, 2005 Statement of Operations and compilation report ("2005 Interim Report") are included in Exhibit #1.

As noted in paragraph 14 of the Complaint, Gano through Cannavo was told by Ehart on four occasions between September 2005 and December 2005 that net income from operations in the second half of 2005 was "equal to" or "a little better than" the net income from operations in the first half of 2005. These representations were relied upon by Gano and Cannavo and produced an expectation of net income for the year in the $230,000 range. After the purchase was consummated, Gano through Cannavo obtained a December 31, 2005 compilation report dated April 12, 2006 from Brousseau that included a Statement of Operations for the annual period and the accountants' report ("2005 Year-End Report"), Exhibit #2. As noted on the statement, net income from operations was only $52,664, an amount much less than represented by Ehart.

On page 9 paragraph (j) of the Agreement for Sale of Business Assets, the seller warrants that "All business records and customer lists of seller are in all material respects complete and correct". This is, in fact, incorrect, based on my findings that are detailed as follows:

**Financial Results**
Red Eagle Inc also had federal income tax returns prepared for years 2003 through 2005, and compilation reports for years 2003 and 2004 by Brousseau. These tax returns included a balance sheet, not part of the 2005 Interim and Year-End Reports.

Exhibit #3 compares the net income results as reported in the compilations versus the tax returns for years 2003 through 2005. For two of the years, 2003 and 2005, the income for tax purposes was significantly lower than reported in the compilations. This is because certain of Red Eagle Inc's expenses in the tax returns were reported to be higher than the expenses used for the compilations. Exhibit #4 compares the balance sheets as reported in the tax returns.

Daniel F. Brousseau, a principal of Brousseau, states in his October 30, 2006 deposition that the difference between the 2005 net income from operations of $52,664 on the compilation report and lesser amount of $10,664 shown the tax return is due to the inventory balance being reduced by $42,000 (page 52 of deposition). The reduction in the inventory balance results in an increase

2

Gano
December 17, 2007
Page 3 of 8

in cost of goods sold and a corresponding decrease in taxable income. Mr. Brousseau states that the purpose of the inventory adjustment was to "minimize the taxes as much as we {emphasis added} could." (Page 52 of deposition), and that regarding the adjustment, "The tax return is not as appropriate as the Compilation Report" (page 53 of deposition). This adjustment to reduce taxable income is an illegal tax avoidance strategy.

Mr. Brousseau states in his deposition [footnote a] that the 2003, 2004, and 2005 tax returns were prepared on a "modified accrual basis" (pages 22, 27, and 50 of deposition). The federal tax returns are checked as "accrual". Cash receipts and disbursements were recorded from the Dome Book, a single entry bookkeeping system used by Red Eagle Inc that summarized the receipts and disbursements into income and expense categories. Balance sheet amounts were provided verbally from Red Eagle Inc. No bank reconciliations, trial balances, nor detailed schedules of accounts receivable, inventory or accounts payable were provided to the accountants to support the verbal balance sheet amounts (page 24, 27, and 29 of deposition).

Regarding the 2005 Interim Report, Mr. Brousseau indicates that this statement was prepared from the Dome Book, on a cash basis (page 30 of deposition). In this instance, no amounts were provided from Red Eagle Inc for the balance sheet, and therefore, the balance sheet accounts were not taken into consideration for their effect on the Statement of Operations (page 29 of deposition).

## 2005 Statements of Operation
As shown on Exhibit #5 -- 2005 Statements of Operations, Red Eagle Inc's 2005 financial results, based on the 2005 Interim Report and the 2005 Year-End Report, differed significantly between the first and second half of the year.

Sales for the first half of the year were $663,452; 45.6% above sales of $455,717 in the second half. Net income from operations was $115,496 in the first half compared to a loss of $62,832 in the second half. The main source of the difference between the first and second half of the year is the $207,735 decline in sales.

This exhibit demonstrates the full year impact using Gano's and Cannavo's expectations that the first half of 2005 was representative of the whole year. If the second half had been similar to the first half, there would have been a $230,992 profit (column 4). [Note: This assumes that the first half results are doubled to arrive at the annual amount]. This is contrary to actual reported profits of only $52,664 per the 2005 Year-End Report, and profits of only $10,664 per the 2005 tax return.

## Bank Account Analysis
Inaccuracies in Red Eagle Inc's internal recordkeeping caused an overstatement of net income as of June 30, 2005. This is illustrated in Exhibits #6 and #7.

Red Eagle Inc maintained its bank accounts at Commerce Bank. There were two bank accounts, both in the name of Red Eagle Inc., #0660030305 ("305 Account") and a money market account

3

Gano
December 17, 2007
Page 4 of 8

#0660030297 ("297 Account"). Most of the activity was in the 305 Account. All checks were written on this account and almost all deposits were made to this account.

Since the Dome Book was on a cash basis, it should have been consistent with Red Eagle Inc's bank account deposit activity. However, as shown on the Exhibit #6, the 2005 deposits made into the bank accounts were significantly less than the receipts recorded in the Dome Book. The bank deposits for both accounts were $38,949 less than the receipts reported in the Dome Book for the full year of 2005, and $42,119 less for the first half of the year. Exhibit #6 reveals that this discrepancy in the 305 Account alone was $61,216 for full year of 2005, and $64,379 for the first half of the year. Brousseau recognized this in their workpapers (identified as DC 0495) with a notation "Diff BK w/Dome $65,837". This was a material inaccuracy in Red Eagle's records and would have been noticed had Red Eagle prepared bank reconciliations which are part of a complete accounting system. [Note: I compared the detailed cash receipts in the Dome Book to the bank statements for the first half of 2005 which revealed that VISA deposits were duplicated in the Dome Book that overstated cash].

Only two deposits, totaling $22,250, and one $5,000 transfer from the 305 Account were made into the 297 Account in 2005. Regarding disbursements in the 297 Account, frequent withdrawals in even hundred dollar increments ranging from $200 to $800 were made throughout 2005 as shown on Exhibit #7. These withdrawals totaled $29,700 in 2005. Although the deposits made to this account were recorded in the Dome Book, these withdrawals were not recorded. It is my opinion that these withdrawals were for expenses that did not reduce net income. Since the amounts recorded as owner's draw can be identified by specific checks and tie-into the $39,500 reduction in retained earnings as disclosed in the tax return (see Exhibit #4), these withdrawals must be for operational expenses.

To summarize, reported sales for the first six months of 2005 were overstated as compared to the 305 Account bank deposits by $64,379. After picking up the deposits in the 297 Account, cash receipts were overstated by $42,119 for the first six months of 2005. Disbursements totaling $29,700 in the Account 297 were not recorded.

### Balance Sheet Adjustments

Exhibit #4 identifies the changes in the tax return balance sheets between December 31, 2004 and 2005. Because Red Eagle Inc's records are incomplete, it is not possible to verify most of the account balances. The cash balances on the bank statements do not reconcile to the tax returns.

I obtained an internally generated June 30, 2005 Balance Sheet (Exhibit #8 – identified as DC 0379) dated 9/1/05, the same date as the 2005 Interim Report. The accounts receivable balance is $14,445 on this balance sheet. This amount is lower than the reported accounts receivable at December 31, 2004 (Exhibit #4) of $64,982, or a decrease of $50,537 during the first six months of 2005. Therefore, both sales and net income were overstated on an accrual basis for the six months by $50,537. At December 31, 2005, accounts receivable were $22,500, or $42,482 less than the prior year end.

4

Gano
December 17, 2007
Page 5 of 8

## Accounting Standards

Red Eagle Inc's compilation reports state that they were prepared "…in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants in the United States of America." This is not true.

Presenting compilation reports in accordance with the Statements on Standards for Accounting and Review Services ("SSARS") means that "If, in the course of a compilation or review engagement, the accountant becomes aware of material measurement departures from GAAP, he has three possible courses of action:
        a. persuade the client to revise the statements to conform with GAAP,
        b. refer to the departure in his report, or
        c. withdraw from the engagement. [footnote b]

Mr. Brousseau was aware that the statements were not prepared in accordance with generally accepted accounting principles ("GAAP"). He states that the modified accrual basis is not GAAP. "The only thing that is truly generally accepted accounting principles is accrual…" (page 49 of deposition). This statement indicates he was aware that the cash basis of accounting, used in the 2005 Interim Report, is also not GAAP. Brousseau goes on to state that compiled financial statements do not need to be prepared in accordance with GAAP (pages 31, 32 and 32 of deposition). Although SSARS No. 1 permits an accountant to compile financial statements prepared in conformity with a comprehensive basis of accounting other than GAAP, the departure must be clearly disclosed in the report as indicated by item b above. Also, the accountant should not refer to the schedules attached with the report as 'financial statements', but rather indicate the name of the specific schedules so as to not be misleading. However, Brousseau did not refer to the departure in the 2005 Interim Report or other compiled reports. The report referred to 'financial statements' rather than the specific schedules. At a minimum, the schedule presented should have been clearly marked with the notation "CASH BASIS".

Such disclosures are necessary for the users of the statements that rely upon them. A cash basis income statement presents a distorted picture of operations, since both the sales and expenses most likely do not match. The amounts reported can be controlled, for example, by delaying the deposit of cash receipts and accelerating payments. Therefore, users of financial statements are required to be informed of the basis used to prepare them.

## Breaches, Errors, and Inaccuracies

Breaches of the representations and warranties including a summary of the material accounting errors and inaccuracies included in Red Eagle Inc's records are as follows:
* Dome Book receipts and therefore net income were overstated by $38,949 as compared to the bank deposits for 2005. For the first six months of 2005, this overstatement was $42,119.
* Withdrawals from the 297 Account were not recorded to the Dome Book totaling $29,700 in 2005 that should have reduced net income.

5

Gano
December 17, 2007
Page 6 of 8

- Inventory was reduced and cost of goods sold was increased by $42,000 on the 2005 tax return in order to illegally reduce taxable income.
- Balance sheet accounts were not considered when preparing the 2005 Interim Report, including accounts receivable that decreased.
- Gano through Cannavo was informed by Ehart that the financial results for the last half of 2005 were similar to the first half results which was not accurate.
- The 2005 Interim Report was prepared based on a cash basis which was not disclosed to Gano and Cannavo. This method is not GAAP.
- The accountant's compilation report which accompanied the June 30, 2005 Statement of Operations was not provided to Gano and Cannavo from Ehart. This report disclosed that a compilation is limited to presenting information that is the representation of management which is not audited or reviewed.
- Red Eagle llc's records were incomplete and did not include bank reconciliations, trial balances, or detailed schedules for balance sheet accounts including accounts receivable, accounts payable, and inventory.
- The cash balances on the bank statements at December 31, 2005 do not reconcile to the tax return.
- Compilation reports noted were not prepared in accordance with accounting standards (GAAP).
- A "quasi-accrual" method of accounting was used for federal tax returns while the returns indicate use of the accrual method.

**Conclusion**

Red Eagle LLC purchased the business assets for $2.2 million. In his deposition, Cannavo testified that part of the value he attributed to the building. The balance of the value, or approximately $1.2 million was based on the income generated by operations:

> "based on that and the audited financial statement number of approximately $230,000 a year of income multiplied by five puts the value of the business, part of it, at about 1.2." (deposition pg. 67 lines 3 - 6).

Cannavo explains how he relied upon the 2005 Interim Report results as follows:

> "yes, I took the net income from operations, $115,400, whatever, doubled it for assuming that the second six months was going to be more or less the same, multiplied that by approximately five, between five and six--I took the conservative end and took five--to put a valuation on the business itself." (deposition pg. 154 lines 1-6).

Gano explains how he relied upon the 2005 Interim Report:

> "He {Ehart} represented that the financial statement was audited. That's what I asked for. I asked for an audited financial statement. He then handed me that and said, "This was prepared by my accountant," who I assumed was a CPA and since have become aware is a CPA." (Gano deposition p. 18 lines 15-19).

6

Gano
December 17, 2007
Page 7 of 8

"The representation of those supposedly audited first months financials indicated that that level of operations, by that I mean the business flow, the work flow, the number of hours worked, the parts expended, would generate $230,000 a year. The reality is that that level of business operation supports only about a break-even operation, maybe 50,000 to a hundred thousand a year, maximum" (Gano deposition p. 46 lines 2-9).

Exhibit #9 and #10 illustrate the impact of the overpayment made by relying on the financial information presented. Exhibit #9 is based upon what was expected using the 2005 Interim Report available to Gano and Cannavo at the time. Based on the reported net income for the first half of 2005 of $115,496, expected annual net income from operations was $230,992, before any adjustments. At a 5.0 multiple, Cannavo paid approximately $1,150,000 for annual net income from operations. However, after adjustments 1) to correct receipts for the double accounting of the VISA deposits in the first six months of 2005 to the actual amounts recorded on the bank statements, 2) reduce sales to reflect the change in the accounts receivable balance to report net income on the accrual basis, and 3) record 297 Account disbursements, the computed overpayment for income to be generated by operations is $1,110,592. This methodology for determining value was also utilized by Gano (Gano deposition p. 29 lines 7-24).

Exhibit #10 illustrates the overpayment had an adjustment been made to the purchase price for the actual results for 2005. Net income from operations as reported in the full year 2005 compilation report was $52,664. Applying the 5.0 multiple, annual earnings from operations should have been valued at $263,320 or $886,680 less than the amount paid, before any adjustments. After making an adjustment for the unrecorded withdrawals from the 297 Account, the computed overpayment for income to be generated by operations is $1,035,180. As noted on Exhibit #6, the sales reported in the 2005 Year-End Report and the tax return are $78,000 less than the Dome Book. This appears to reflect the reduction in accounts receivable of $42,482 during the year and the correction of the duplication in cash of $38,949 that occurred primarily in the first half of the year.

Exhibit #11 illustrates the impact of the material misstatements on Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"). EBITDA as reported was $143,231 for the first six months of 2005, or $286,462 annualized. After making adjustments for the material accounting inaccuracies as previously discussed and presented in Exhibits #9 and #10, EBITDA was only $31,676 for the first six months of 2005, or $63,352 annualized. For the year 2005, the adjusted EBITDA was only $80,068. In addition, reasonable officer's compensation should be deducted from EBITDA since Ehart did not receive a salary, but instead a draw that would reduce cash flow. Also, a reduction is normally made for cash expenditures for capital improvements. These reductions, which I did not compute, would further reduce EBITDA.

The lender, Gano, relied on the 2005 Interim Report amounts that included the material misrepresentations and inaccuracies. Profits and hence cash flow and therefore the value of the business as calculated by Gano were overstated. Gano's testimony quoted above demonstrates that he would not have accepted a significantly lesser income stream as it would have been insufficient to pay him the interest due in the first two years. To illustrate, annual interest expense (payable quarterly) would have been $110,000 in year one ($1.1 million at 10%) and

7

Gano
December 17, 2007
Page 8 of 8

$137,500 in year two ($1.1 million at 12.5%). These interest amounts would have been repaid from the cash flow represented for the first six months of 2005. As evidenced on Exhibit #11, there would not have been sufficient EBITDA to service the interest on Gano's loan, let alone provide for a repayment of principal. Furthermore, lenders require sufficient cash flow to not only service the loan but to ensure a cushion as a margin of safety.

Neither a lender nor a buyer conducting a due diligence examination would not have discovered the accounting errors and inaccuracies. Due diligence is not intended to be an audit of the books and records. It is intended to allow the buyer to review the expenses that may be discontinued or added to reflect the buyer's requirements for operating the business, as well as synergies that may be achieved. The seller makes representations and warranties as to the accuracy of the accounting that are intended to protect the buyer. Neither a lender nor a buyer is not and should not be expected to audit the cash (in this cash the Dome Book), nor the financial statements during the course of its due diligence analysis.

Respectfully submitted,

Alfred T. Giuliano, CPA, CFE, CIRA, CDBV

Footnote

[a] All references in this report to depositions refer to depositions taken in the case Cannavo and Red Eagle Avionics, LLC v. Donald Mark Ehart and Spread Eagle, Inc., the State of Delaware Chancery Court No. 2379-VCS).

[b] Clay, John R., Guy, Dan M., McMurrian, Howard P., Spradling, L. Scott, Practitioners Publishing Company, July 2006, Guide to Compilation and Review Engagements Volume 2, Section 609.8, page 6-11

# EXHIBIT #1

BROUSSEAU & BROUSSEAU, P.A.
CERTIFIED PUBLIC ACCOUNTANTS
5708 LIMESTONE ROAD
WILMINGTON, DELAWARE 19808

(302) 234-1976

FRANCES L. BROUSSEAU, CPA
STACI L. SCHLESINGER, CPA

DANIEL F. BROUSSEAU, CPA

MEMBER
AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS

**COMPILATION REPORT**



Mr. Mark Ehart, President
Red Eagle Avionics, Inc.
1 Dales Way
New Castle, DE 19720

We have compiled the accompanying statement of operations of Red Eagle Avionics, Inc.
(an S corporation) for the year ended June 30, 2005, in accordance with Statements on
Standards for Accounting and Review Services issued by the American Institute of
Certified Public Accountants in the United States of America.

A compilation is limited to presenting in the form of financial statements information that
is the representation of management. We have not audited or reviewed the
accompanying financial statement and, accordingly, do not express an opinion or any
other form of assurance on it.

Management has elected to omit substantially all financial statement disclosures. If the
omitted disclosures were included in the financial statement, they might influence the
user's conclusions about the company's financial status. Accordingly, this financial
statement is not designed for those who are not informed about such matters.

*Brousseau & Brousseau, P.A.*

Wilmington, Delaware
September 1, 2005

1

RED EAGLE AVIONICS, INC.
STATEMENT OF OPERATIONS
FOR THE SIX MONTHS ENDED JUNE 30, 2005

| | | |
|---|---:|---:|
| SALES | | $ 663,452 |
| | | |
| COST OF SALES | | |
| Materials | $ 352,400 | |
| Freight | 3,028 | |
| Subcontract | 14,490 | |
| | | |
| TOTAL COST OF GOODS SOLD | | 369,918 |
| | | |
| GROSS MARGIN | | 293,534 |
| | | |
| EXPENSES | | |
| Advertising | 1,000 | |
| Automotive | 8,063 | |
| Bank Fees | 2,442 | |
| Depreciation (Estimated) | 8,933 | |
| Dues and Subscriptions | 1,316 | |
| Employee Benefits | 1,882 | |
| Insurance | 27,370 | |
| Interest Expense (Estimated) | 18,802 | |
| Licenses and Taxes | 6,945 | |
| Office Expense | 2,495 | |
| Rent | 8,076 | |
| Repairs | 2,057 | |
| Supplies | 1,289 | |
| Test Equipment | 2,864 | |
| Trash Removal | 650 | |
| Telephone | 3,458 | |
| Travel and Entertainment | 3,000 | |
| Utilities | 9,091 | |
| Wages | 68,305 | |
| | | |
| TOTAL OPERATING EXPENSES | | 178,038 |
| | | |
| NET INCOME FROM OPERATIONS | | $ 115,496 |

See Accompanying Compilation Report

2

DC 0453

# EXHIBIT #2



# BROUSSEAU & BROUSSEAU, P.A.
### CERTIFIED PUBLIC ACCOUNTANTS
5708 LIMESTONE ROAD
WILMINGTON, DELAWARE 19808
302-234-1976

FRANCES L. BROUSSEAU, CPA
STACI L. SCHLESINGER, CPA
DANIEL F. BROUSSEAU, CPA

MEMBER
AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS

## COMPILATION REPORT

Red Eagle Avionics, Inc.
1 Dales Way
New Castle, DE 19720

We have compiled the accompanying statement of operations of Red Eagle Avionics, Inc. (an S corporation) for the year ended December 31, 2005, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants in the United States of America.

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or any other form of assurance on it.

Management has elected to omit substantially all financial statement disclosures. If the omitted disclosures were included in the financial statement, they might influence the user's conclusions about the company's financial status. Accordingly, this financial statement is not designed for those who are not informed about such matters.

*Brousseau & Brousseau, P.A.*

Wilmington, Delaware
April 12, 2006

DC 0458

RED EAGLE AVIONICS, INC.
STATEMENT OF OPERATIONS
FOR THE YEAR ENDED DECEMBER 31, 2005

| | | |
|---|---|---:|
| SALES | | $ 1,119,169 |
| | | |
| COST OF SALES | | |
| Materials | $ 708,598 | |
| Freight | 5,462 | |
| Subcontract | 13,330 | |
| | | |
| TOTAL COST OF GOODS SOLD | | 727,390 |
| | | |
| GROSS MARGIN | | 391,779 |
| | | |
| EXPENSES | | |
| Advertising | 1,000 | |
| Automotive | 12,097 | |
| Bank Fees | 4,513 | |
| Depreciation | 17,600 | |
| Dues and Subscriptions | 1,611 | |
| Employee Benefits | 2,600 | |
| Insurance | 50,528 | |
| Interest Expense | 39,504 | |
| Licenses and Taxes | 14,062 | |
| Office Expense | 7,846 | |
| Rent | 15,842 | |
| Repairs | 3,072 | |
| Supplies | 7,323 | |
| Trash Removal | 1,668 | |
| Telephone | 6,909 | |
| Travel and Entertainment | 3,000 | |
| Utilities | 14,849 | |
| Wages | 135,091 | |
| | | |
| TOTAL OPERATING EXPENSES | | 339,115 |
| | | |
| NET INCOME FROM OPERATIONS | | $ 52,664 |

See Accompanying Compilation Report

# EXHIBIT #3

# Red Eagle Avionics, Inc.
## Report and Tax Return Income

Exhibit 3

| | 2003 Report | 2003 Tax Return | 2003 Difference | 2004 Report | 2004 Tax Return | 2004 Difference | 2005 Report | 2005 Tax Return | 2005 Difference |
|---|---|---|---|---|---|---|---|---|---|
| Sales | $1,024,614 | $1,024,614 | - | $ 808,505 | $ 808,505 | - | $1,119,169 | $1,119,169 | - |
| Total Cost of Sales | 557,160 | 578,606 | (21,446) | 449,038 | 449,038 | - | 727,390 | 904,481 | (177,091) |
| Gross Margin | 467,454 | 446,008 | | 359,467 | 359,467 | | 391,779 | 214,688 | |
| % | 45.6% | 43.5% | | 44.5% | 44.5% | | 35.0% | 19.2% | |
| Operating Expenses: | | | | | | | | | |
| Advertising | 4,150 | 4,150 | - | 1,650 | 1,650 | - | 1,000 | 1,000 | |
| Automotive | 4,775 | 4,775 | - | 6,094 | 6,094 | - | 12,097 | 12,097 | |
| Bank Fees | - | - | - | 2,575 | 2,575 | - | 4,513 | 4,513 | |
| Depreciation | 18,000 | 18,028 | (28) | 17,600 | 17,600 | - | 17,600 | 17,600 | |
| Dues and Subscriptions | 849 | 849 | - | 560 | 560 | - | 1,611 | 1,611 | |
| Employee Benefits | - | 6,240 | (6,240) | 4,420 | 4,420 | - | 2,600 | 2,600 | |
| Freight | - | 9,054 | (9,054) | - | - | - | - | - | |
| Insurance | 60,835 | 54,595 | 6,240 | 49,201 | 49,201 | - | 50,528 | 50,528 | |
| Interest Expense | 36,000 | 41,450 | (5,450) | 39,804 | 39,804 | - | 39,504 | 39,504 | |
| Laundry | - | - | - | 3,031 | 3,031 | - | - | - | |
| Legal Fees | - | - | - | 2,000 | 2,000 | - | - | - | |
| Licenses and Taxes | 20,586 | 21,103 | (517) | 11,804 | 11,804 | - | 14,062 | 14,062 | |
| Office Expense | 5,269 | 5,565 | (296) | 3,549 | 3,549 | - | 7,846 | 7,846 | |
| Postage | 753 | 755 | (2) | 407 | 407 | - | - | - | |
| Rent | 13,114 | 13,114 | - | 17,245 | 17,245 | - | 15,842 | 15,842 | |
| Repairs | 14,789 | 14,789 | - | 9,929 | 9,929 | - | 3,072 | 3,072 | |
| Supplies | 624 | 624 | - | 3,786 | 3,786 | - | 7,323 | 7,323 | |
| Telephone | 1,732 | 1,732 | - | 1,737 | 1,737 | - | 1,668 | 1,668 | |
| Trash Removal | 7,185 | 7,185 | - | 7,301 | 7,301 | - | 6,909 | 6,909 | |
| Travel and Entertainment | 3,774 | 3,693 | 81 | 237 | 156 | 81 | 3,000 | 3,000 | |
| Utilities | 15,238 | 15,238 | - | 15,910 | 15,910 | - | 14,849 | 14,849 | |
| Wages | 223,861 | 223,861 | - | 138,174 | 138,174 | - | 135,091 | | 135,091 |
| Total Expenses | 431,534 | 446,800 | (15,266) | 337,014 | 336,933 | 81 | 339,115 | 204,024 | 135,091 |
| Net Income From Operations | $ 35,920 | $ (792) | $ 36,712 | $ 22,453 | $ 22,534 | $ (81) | $ 52,664 | $ 10,664 | $ 42,000 [a] |

[a] Due to reduction of inventory balance

# EXHIBIT #4

Red Eagle Avionics, Inc.
Balance Sheets

Exhibit 4

| | 12/31/2003 | 12/31/2004 | 12/31/2005 | 2004 vs. 2005 |
|---|---|---|---|---|
| Cash | $ 38,190 | $ 28,668 | $ 23,228 | $ (5,440) |
| Net Accounts Receivable | 79,689 | 64,982 | 22,500 | (42,482) |
| Inventories | 82,000 | 77,000 | 35,000 | (42,000) |
| Loans to Shareholders | - | - | - | |
| PP&E | 737,229 | 737,229 | 737,229 | - |
| Less: Accumulated Depreciation | (290,357) | (307,967) | (325,567) | (17,600) |
| Net PP&E | 446,862 | 429,262 | 411,662 | (17,600) |
| Total Assets | $ 646,741 | $ 599,912 | $ 492,390 | $ (107,522) |
| | | | | |
| AP | $ 12,765 | $ 12,800 | $ 2,200 | $ (10,600) |
| Other Current Liabilities | 67,000 | 67,000 | 67,000 | - |
| Long-Term Liabilities | 470,582 | 441,377 | 373,291 | (68,086) |
| Stock and Paid-in Capital | 25,100 | 25,100 | 25,100 | - |
| Retained Earnings | 79,696 | 62,037 | 33,201 | (28,836) |
| Less: Treasury Stock | (8,402) | (8,402) | (8,402) | - |
| Total Liabilities and Equity | $ 646,741 | $ 599,912 | $ 492,390 | $ (107,522) |

Retained Earnings Reconciliation:

| | |
|---|---|
| Balance at 1/1/05 | $ 62,037 |
| Pre-tax income 2005 | 10,664 |
| Owners Draw | (39,500) |
| Balance at 12/31/05 | $ 33,201 |

# EXHIBIT #5

**Red Eagle Avionics, Inc.**
**2005 Statements of Operations**

Exhibit 5

| | First Six Months of 2005 per Compilation Report | Last Six Months of 2005 based on Compilation Reports [a] | Difference First Six Months vs. Last Six Months | Full Year of 2005 Expectation based on First Six Months [b] | Full Year of 2005 per Compilation Report [c] | Difference 2005 Expectation vs. Compilation Report |
|---|---|---|---|---|---|---|
| Sales | $ 663,452 | $ 455,717 | $ (207,735) | $ 1,326,904 | $ 1,119,169 | $ (207,735) |
| | | | -45.6 % | | | -18.6% |
| Cost of Sales: | | | | | | |
| Materials | 352,400 | 356,198 | 3,798 | 704,800 | 708,598 | 3,798 |
| Freight | 3,038 | 2,434 | (594) | 6,056 | 5,462 | (594) |
| Subcontractors | 14,490 | (1,160) | (15,650) | 28,980 | 13,330 | (15,650) |
| Total Cost of Sales | 369,918 | 357,472 | (12,446) | 739,836 | 727,390 | (12,446) |
| Gross Margin | 293,534 | 98,245 | (195,289) | 587,068 | 391,779 | (195,289) |
| % | 44.2% | 21.6% | | 44.2% | 35.0% | |
| Operating Expenses: | | | | | | |
| Advertising | 1,000 | - | (1,000) | 2,000 | 1,000 | (1,000) |
| Automotive | 8,063 | 4,034 | (4,029) | 16,126 | 12,097 | (4,029) |
| Bank Fees | 2,442 | 2,071 | (371) | 4,884 | 4,513 | (371) |
| Depreciation [d] | 8,933 | 8,667 | (266) | 17,866 | 17,600 | (266) |
| Dues & Subscriptions | 1,316 | 295 | (1,021) | 2,632 | 1,611 | (1,021) |
| Employee Benefits | 1,882 | 718 | (1,164) | 3,764 | 2,600 | (1,164) |
| Insurance | 27,370 | 23,158 | (4,212) | 54,740 | 50,528 | (4,212) |
| Interest [d] | 18,802 | 20,702 | 1,900 | 37,604 | 39,504 | 1,900 |
| Licenses and Taxes | 6,945 | 7,117 | 172 | 13,890 | 14,062 | 172 |
| -Office expenses | 2,495 | 5,351 | 2,856 | 4,990 | 7,846 | 2,856 |
| Rent | 8,076 | 7,766 | (310) | 16,152 | 15,842 | (310) |
| Repairs | 2,057 | 1,015 | (1,042) | 4,114 | 3,072 | (1,042) |
| Supplies | 1,289 | 6,034 | 4,745 | 2,578 | 7,323 | 4,745 |
| Test equip. | 2,864 | - | (2,864) | 5,728 | - | (5,728) |
| Telephone | 650 | 1,018 | 368 | 1,300 | 1,668 | 368 |
| Trash Removal | 3,458 | 3,451 | (7) | 6,916 | 6,909 | (7) |
| Travel and entertainment | 3,000 | - | (3,000) | 6,000 | 3,000 | (3,000) |
| Utilities | 9,091 | 5,758 | (3,333) | 18,182 | 14,849 | (3,333) |
| Wages | 68,305 | 66,786 | (1,519) | 136,610 | 135,091 | (1,519) |
| Total Operating Expenses | 178,038 | 161,077 | (16,961) | 356,076 | 339,115 | (16,961) |
| Net Income from Operations | $ 115,496 | $ (62,832) | $ (178,328) | $ 230,992 | $ 52,664 | $ (178,328) |

[a] Difference between full year and first 6 months results per the compilation reports.

[b] June 30, 2005 actual results doubled.

[c] Provided after purchase date. Full year compilation report issued 4/12/06.

[d] Depreciation and interest were estimated by Brousseau for the 2005 Interim Statement.

# EXHIBIT #6

Red Eagle Avionics, Inc.
2005 Sales and Bank Deposits

Exhibit 6

| | Dome Report | Bank Deposits 305 Account | Bank Deposits 297 Account [a] | Bank Deposits TOTAL | Difference 305 Account Only | Difference Both Accounts |
|---|---|---|---|---|---|---|
| January | 92,864 | 84,876 | 5,000 | 89,876 | (7,988) | (2,988) |
| February | 58,346 | 50,878 | 1 | 50,879 | (7,468) | (7,467) |
| March | 155,899 | 155,494 | 1 | 155,495 | (405) | (404) |
| April | 178,328 | 157,875 | 1 | 157,876 | (20,453) | (20,452) |
| May | 113,920 | 82,754 | 17,253 | 100,007 | (31,166) | (13,913) |
| June | 62,638 | 65,739 | 4 | 65,743 | 3,101 | 3,105 |
| July | 69,201 | 70,399 | 3 | 70,402 | 1,198 | 1,201 |
| August | 93,433 | 96,038 | 2 | 96,040 | 2,605 | 2,607 |
| September | 99,349 | 99,928 | 1 | 99,929 | 579 | 580 |
| October | 53,262 | 53,290 | 1 | 53,291 | 28 | 29 |
| November | 45,570 | 46,384 | - | 46,384 | 814 | 814 |
| December | 174,359 | 172,298 | - | 172,298 | (2,061) | (2,061) |
| **Total** | 1,197,169 | 1,135,953 | 22,267 | 1,158,220 | (61,216) | (38,949) |
| Reported Sales-Compilation Report Variance | | | | | | |
| Reported Sales | 1,119,169 | | | | | |
| Variance | 78,000 | | | | | |

**Total 1st Half-Above**

| | Dome Report | Bank Deposits 305 Account | Bank Deposits 297 Account [a] | Bank Deposits TOTAL | Difference 305 Account Only | Difference Both Accounts |
|---|---|---|---|---|---|---|
| Reported Sales-Compilation Report | 661,995 | 597,616 | 22,260 | 619,876 | (64,379) | (42,119) |
| Reported Sales | 663,452 | | | | | |
| Variance | (1,457) | | | | | |

**Total 2nd Half-Above**

| | Dome Report | Bank Deposits 305 Account | Bank Deposits 297 Account [a] | Bank Deposits TOTAL | Difference 305 Account Only | Difference Both Accounts |
|---|---|---|---|---|---|---|
| Reported Sales-Compilation Report | 535,174 | 538,337 | 7 | 538,344 | 3,163 | 3,170 |
| Reported Sales | 455,717 | | | | | |
| Variance | 79,457 | | | | | |

[a] including interest

# EXHIBIT #7

Red Eagle Avionics, Inc.
Account #006000030297
2005 Withdrawals

Exhibit 7

| | |
|---|---|
| January | (2,500.00) |
| February | (4,000.00) |
| March | (3,300.00) |
| April | (2,300.00) |
| May | (3,000.00) |
| June | (3,800.00) |
| July | (1,700.00) |
| August | (5,200.00) |
| September | (1,000.00) |
| October | (2,900.00) |
| November | |
| December | |
| TOTAL | (29,700.00) |
| First Half of 2005 | (18,900.00) |
| Second Half of 2005 | (10,800.00) |

# EXHIBIT #8

11:49 AM
09/01/05
Accrual Basis

# RED EAGLE AVIONICS, INC.
## Balance Sheet
### As of June 30, 2005

|  | Jun 30, 05 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking - Commerce | 6,484.96 |
| Red Eagle Checking | -912.54 |
| **Total Checking/Savings** | 5,572.42 |
| **Accounts Receivable** | |
| Accounts Receivable | 14,445.84 |
| **Total Accounts Receivable** | 14,445.84 |
| **Other Current Assets** | |
| Undeposited Funds | 924,526.49 |
| **Total Other Current Assets** | 924,526.49 |
| **Total Current Assets** | 944,544.75 |
| **Fixed Assets** | |
| Equipment | 250.00 |
| **Total Fixed Assets** | 250.00 |
| **TOTAL ASSETS** | 944,794.75 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Long Term Liabilities** | |
| Automobile Loan | -9,596.01 |
| Hangar Loan | -247,322.24 |
| LOAN | -22,532.00 |
| **Total Long Term Liabilities** | -279,450.25 |
| **Total Liabilities** | -279,450.25 |
| **Equity** | |
| Opening Bal Equity | 3,085.71 |
| OWNERS DRAW | -125,405.50 |
| Retained Earnings | 685,602.24 |
| Net Income | 660,962.55 |
| **Total Equity** | 1,224,245.00 |
| **TOTAL LIABILITIES & EQUITY** | 944,794.75 |

DC 0379                Page 1

# EXHIBIT #9

Red Eagle Avionics, Inc.
2005 Expected Earnings from Operations

Exhibit 9

| | Six Months June 30, 2005 | Annualized (times 2) | Multiple | Value Attributed to Earnings | Amount Paid | Over-Paid |
|---|---|---|---|---|---|---|
| [a] Net Income As Reported | $ 115,496 | $ 230,992 | 5.0 | $ 1,154,960 | $ 1,150,000 | $ (4,960) |
| | | | | | | |
| [a] Net Income As Reported | $ 115,496 | $ 230,992 | | | | |
| [b] Less: Recorded Receipts not deposited | (42,119) | (84,238) | | | | |
| [c] Less: Unrecorded disbursements in 297 Account | (18,900) | (37,800) | | | | |
| [d] Less: Accounts Receivable Adjustment | (50,536) | (101,072) | | | | |
| Net Income As Adjusted | $ 3,941 | $ 7,882 | 5.0 | $ 39,408 | $ 1,150,000 | $ 1,110,592 |

Footnotes:

[a] - No overpayment computed, as this was the basis of determining the purchase price (difference due to rounding); Exhibit #1

[b] - Exhibit #6

[c] - Exhibit #7

[d] - Exhibit #4 (12/31/04 balance sheet) and Exhibit #8

# EXHIBIT #10

# EXHIBIT #11

Red Eagle Avionics, Inc.
2005 EBITDA

Exhibit 11

| | | Six Months 30-Jun-05 | Six Months Annualized | Twelve Mos 31-Dec-05 |
|---|---|---|---|---|
| **AS REPORTED** | | | | |
| [a] | Net Income | $  115,496 | $  230,992 | $  52,664 |
| [a] | Add: Interest | 18,802 | 37,604 | 39,504 |
| [a] | Add: Depreciation | 8,933 | 17,866 | 17,600 |
| | EBITDA | 143,231 | 286,462 | 109,768 |
| **AS ADJUSTED** | | | | |
| | EBITDA | 143,231 | 286,462 | 109,768 |
| [b] | Less: Recorded Receipts not deposited | (42,119) | (84,238) | 109,768 |
| [b] | Less: Unrecorded disbursements in 297 Account | (18,900) | (37,800) | (29,700) |
| [b] | Less: Accounts Receivable Adjustment | (50,536) | (101,072) | |
| [c] | EBITDA Adjusted | $  31,676 | $  63,352 | $  80,068 |

Footnotes:
[a]  Exhibits #1 and #2
[b]  Exhibits #9 and #10
[c]  Further reductions would typically be made for reasonable compensation for an owner, and capital expenditures which would reduce the EBITDA Adjusted dollar for dollar.

**ALFRED T. GIULIANO, CPA, CIRA, CFE, CDBV**
Giuliano, Miller & Company, LLC
750 Route 73 South, Suite 110
Marlton, New Jersey 08053
856-596-7000

## Curriculum Vitae

| | |
|---|---|
| **PROFESSIONAL LICENSING:** | **Certified Public Accountant (NJ)**<br>**Certified Insolvency and Restructuring Advisor (CIRA)**<br>**Certified Fraud Examiner (CFE)**<br>**Certified Distressed Business Valuator (CDBV)** |
| **EDUCATION:** | **Widener University** - Graduated May, 1978<br>Summa Cum Laude - BS in Accounting/Business Management |
| **EXPERIENCE:**<br>*1984 to Present* | **Member - Giuliano, Miller & Company, LLC (1981 to current)** |

I have been involved in over 1,000 asset bankruptcy and insolvency cases, rendering services to trustees, debtors-in-possession, unsecured creditors' committees, and secured and unsecured creditors. I have prepared business valuation reports and enterprise valuations, liquidation analyses, forecasts used in disclosure statements. I have prepared reports on preferences and fraudulent conveyances, reports on fraudulent activity, tax returns for the trustee, and have been involved in negotiating with secured and unsecured creditors in obtaining approval of proposed plans of reorganization. I have extensive experience testifying in bankruptcy and in other non-bankruptcy commercial civil litigation matters.

I am a Chapter 7 Panel Trustee for the District of Delaware. I have liquidated various bankruptcy assets including intellectual property, land and buildings, inventory, general intangibles and other personal property. I have sold companies as a going concern. I have also operated two companies in a Chapter 7 pursuant to 11 U.S.C. §721. I have been appointed as a State Court Receiver by three courts to manage the companies until they could be sold.

I have worked with businesses in many industries including the following: homebuilding, food processing, casino gaming, television, supermarket, computer, construction subcontracting, entertainment, wholesale, retail, and service. The accounting services rendered include the preparation of compiled, reviewed, and audited financial statements. I have also prepared forecasted and projected financial statements, including those used in obtaining of bank financing, private placement, and debtor-in-possession financing on both a senior and subordinated level.

*EXPERIENCE*
*1984 to Present*
*(Continued)*

I have assisted many companies in the reorganization process. These services included evaluating their operations and determining their breakeven sales level, selling or eliminating unprofitable business lines and/or sectors, implementing systems of cash management, and analyzing specific areas needed for cost control.

*PROFESSIONAL*
*ASSOCIATIONS:*

American Institute of Certified Public Accountants
New Jersey Society of Certified Public Accountants
National Association of Bankruptcy Trustees
Association of Insolvency and Restructuring Advisors
American Bankruptcy Institute
Former Committee Person - NJ Society of CPA Insolvency and
   Reorganization Subcommittee
The Association of Certified Fraud Examiners
New Jersey Trustees Association

*PUBLIC*
*SPEAKING:*

**Wharton School of Business – University of Pennsylvania** – Lecturer – Business opportunities in bankruptcy – the acquisition process of buying companies, assets, and claims.

**US Trustee – Department of Justice** – Annual trustee training seminar for Region III – Panelist – How to handle an operating company in bankruptcy.

**Atlantic/Cape Community College** – Accountants role in bankruptcy matters.

**Camden County Bar Association** - Debtor/Creditor Committee - Technology and the Forensic Accountant: Their application in the Bankruptcy and Reorganization Process.

**Burlington County Bar Association** - Concealment of Assets seminar.

**Various seminars to accounting professionals and clients** re: insolvency planning, accountants role in the bankruptcy process, and accounts receivable collection from bankrupt customers.

**Versis Corporation** re: the payment process when dealing with bankrupt general contractors or builders

*PROFESSIONAL*
*AND*
*COMMUNITY*
*INVOLVEMENT:*

**United States Department of Justice - Office of the United States Trustee** – Chapter 7 Panel Trustee for the District of Delaware (2003-Current)

**Supreme Court of New Jersey - New Jersey Lawyers Fund for Client Protection** – Member of Board of Trustees, Former Vice-Chairman (2001-

2005)

**Office of Attorney Ethics of the Supreme Court of New Jersey District IIIB** – Fee Arbitration Committee (2000-2001)

*PROFESSIONAL AND COMMUNITY INVOLVEMENT: (Continued)*

**Evesham Education Foundation** – Member of Board of Trustees, Treasurer (1995-Current)

**American Red Cross – Penn Jersey Region** – Member of the Board of Directors-Chair, Finance Committee (2000)

EXHIBIT "S"

FORM 222B
ORDER NO: 0034771

# THE FAMILY COURT OF THE STATE OF DELAWARE
## FOR NEW CASTLE COUNTY



## PERMANENT
## MODIFICATION
## SUPPORT ORDER

| PETITIONER / OBLIGOR | RESPONDENT | |
|---|---|---|
| D. M EHART | MARY-BETH EHART | FILE: CN97-11486 |
| | | PETITION:01-35186 |
| 795 UNION CHURCH ROAD | 112 CHEYENNE COURT | PET'N TYPE: SMODD |
| TOWNSEND, DE 19734 | NEWARK, DE 19702 | DCSE: |
| PHONE: (302) 376-7614 | PHONE: (302) 266-9229 | OS #: |
| ()    -    (WORK) | ()    -    (WORK) | NON-IV-D |

DB:01/08/1963 SS: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    DB:03/26/1964 SS: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

EMPL:                          EMPL:

ATTY:JOEL TENENBAUM          ATTY:ROBERT MCDONALD

IN THE INTEREST OF:
JACQUELINE P EHART                    DOB: 03/21/1992
MATTHEW J EHART                       DOB: 07/27/1994
SHANNON E EHART                       DOB: 08/10/1996

PRESENT AT HEARING:
Petitioner                    Present
Respondent                    Present
Petitioner's Attorney         Present
Respondent's Attorney         Present

After hearing on 02/26/2003, the Honorable JOHN CARROW
hereby finds and orders:

1   Obligor D. M EHART is currently under an Order of
    Support entered 5/21/98 to pay $1,425 current per month as modified by
    Interim Order dated 5/6/02 in the amount of $773 per month.

2   Upon a finding of a change of circumstance, the current support obligation is
    modified, effective 01/01/2002 to $   368.00 every month, based on:

    Delaware Child Support Calculation(s) dated 4/4/03, attached and
    incorporated herein by reference.

3   RETROACTIVE SUPPORT = $716 current/ month (11/1/01 - 12/31/01).
    The parties shall exchange documentation in order to calculate whether
    father has underpaid or overpaid his support obligation.

PAGE   2

PO¨  32B                    PETITIONER: D. M EHART                        PETITION: 01-35186
      NO: 0034771             RESPONDENT: MARY-BETH EHART                     FILE: CN97-11486

4   The total payment is $      368.00 every month payable to Obligee.
    Total includes:

    $   368.00 current support

5   The issuance of income attachment shall be stayed.
    Payments shall be made directly to Obligee.  Attachment,
    payable to DCSE, shall issue automatically upon the filing of a verified
    notice of default in payment for seven (7) working days.  Basis for stay:

6   Mother shall provide health insurance
    covering the child(ren) when/while available, to be secured by attachment, and
    shall provide the support recipient with all necessary documents to allow for
    use of the health insurance.

7   The first $350 of unreimbursable health care expense incurred in a calendar
    year is the responsibility of the support recipient.  Any such expense in
    excess of $350 is the responsibility of the parents as follows:
    Father 25%, Mother 75%.  Supporting documentation must accompany all
    requests for payment, and payment is to be made within a reasonable time
    thereafter.

8   DISCUSSION/ADDITIONAL TERMS AND CONDITIONS:
        The attached child support calculations were based upon the parties'
    testimony, documentation and the court's assessment.
        For the reasons set forth on the court record, the court declines to
    include private school tuition expenses in the support calculations as there
    does not appear to have been a clear agreement by father to place the children
    in private school as is required by the support formula.
        Regarding father's income, the court finds credible his testimony that his
    specialty business (Red Eagle Avionics) that installs auto pilots in aircraft
    has suffered considerably since September 2001.  Father does not have the
    level of business nor high profile clients (such as ICI Zeneca and Hercules)
    he previously had.  Notwithstanding the foregoing, father must do everything
    possible to maximize his earning hereafter consistent with his employment
    experience and education.  If his income improves, he must immediately inform
    mother in order that she may consider filing a modification petition.
    Pursuant to the court's directive at the 2/26/03 hearing mother submitted
    her 2002 Form W-2 and her three (3) recent paystubs from employment.
    Similarly, father provided his 2001 corporate tax return.  FATHER MUST PROVIDE
    MOTHER WITH A COPY OF HIS 2002 CORPORATE RETURN WITHIN FIVE (5) BUSINESS DAYS
    OF FILING SAME WITH THE IRS.

9   The parties shall report any changes of drivers license number, address
    (including incarceration or release from incarceration), telephone number,
    employer, employer address or telephone number to the Family Court Support
    Unit in New Castle County at (302) 255-0300.

PAGE    3

FO  `22B                    PETITIONER: D. M EHART                    PETITION: 01-35186
NO: 0034771                RESPONDENT: MARY-BETH EHART               FILE: CN97-11496

10    The parties shall notify each other in writing of every change in circumstance
      which might materially affect the existing Support Order, including change in
      health insurance coverage.  In addition, the parties shall exchange completed
      financial report forms every 12 months.

11    A Delaware Order to pay support remains in effect until the youngest child has
      reached 18 and is no longer enrolled in high school, or 19, whichever occurs
      first.

12    When the current support order is revoked pursuant to 13 Del.C.§517(a),
      payment shall continue in the total amount until any retroactive and/or past
      due support is paid.

13    Except for parties who fail to appear after proper notice, parties may appeal
      a final Order of a Commissioner by filing and serving written objections of
      such Order within ten (10) days of the Order.

_4/11/03_____                              _____
DATE WRITTEN ORDER ISSUED                            JUDGE/COMMISSIONER

cc:    File                    Petitioner                    Respondent
       DCSE Operations         Petitioner's Attorney         Respondent's Attorney
       DCSE Accounting         Vital Statistics

                                                     CFCDROB
                                                     04/11/2003

**THE FAMILY COURT OF THE STATE OF DELAWARE**
**CHILD SUPPORT CALCULATION**

F     ion No.  0135186
    No. CN97-11486                    *I*                    Period: 11/01/2001 To 12/31/2001
Ducess No.

|  |  | FATHER | MOTHER |
|---|---|---|---|
| 1 | A- Monthly Gross Earned Income . . . . . . . . . . . . . . . $ | 3000 ← | 4366 |
|  | B- Monthly Gross Other Income . . . . . . . . . . . . . . + |  |  |
|  | C- Monthly Earned Income Non-Taxable . . . . . . . . . . + |  |  |
|  | D- Monthly Self Employed Income . . . . . . . . . . . . + |  |  |
|  | E- TOTAL MONTHLY INCOME (Lines 1A+B+C+D;Taxes based on A,B,D)=$ | 3000 | 4366 |

| 2 | TAXES:   FEDERAL + FICA/MED + STATE + LOCAL + OTHER = |  |  |
|---|---|---|---|
|  |     FATHER     424         229        110                    -$ | 763 |  |
|  |     MOTHER     793         334        186      55            -$ |  | 1368 |

| 3 | Allowable Deductions: |  |  |
|---|---|---|---|
|  |     MEDICAL + PENSION  + UNION DUES + ALIMONY + OTHER = |  |  |
|  |     FATHER                                                  -$ |  |  |
|  |     MOTHER  102         130                                 -$ |  | 232 |
|  |                                          NET INCOME  =$ | 2237 | 2766 |

| | **NET INCOME AVAILABLE FOR PRIMARY SUPPORT** | | |
|---|---|---|---|
| 4 | PARENT'S SELF SUPPORT ALLOWANCE . . . . . . . . . . . . .-$ | 850 | 850 |
| 5 | NET INCOME AFTER SELF SUPPORT ALLOWANCE . . . . . . . . . | 1387 | 1916 |
| 6 | NUMBER OF DEPENDENT CHILDREN NOT IN THIS ACTION . . . . . |  |  |
| 7 | % ADJUSTMENT FOR SUPPORT OF OTHER CHILDREN . . . . . . . . | 100 % | 100 % | TOTAL |
| 8 | NET INCOME AVAILABLE FOR PRIMARY SUPPORT (Line 5 - Line 7) =$ | 1387 | 1916 =$ 3303 |
| 9 | SHARE OF TOTAL AVAILABLE NET INCOME  (Line 8 / Line 8 Total) | 42 % | 58 % |
| | **CHILD(REN)'S PRIMARY SUPPORT NEED** | | |
| 10 | NUMBER OF CHILDREN DUE SUPPORT IN THIS ACTION . . . . . . | .0 | 3 .0 | 3.0 |
| 11 | PRIMARY SUPPORT ALLOWANCE . . . . . . . . . . . . . . $ | | 920 $ 920 |
| 12 | CHILD CARE AND OTHER EXPENSES . . . . . . . . . . . . +$ | | +$ |
| 13 | TOTAL PRIMARY NEED (Line 11 + Line 12) . . . . . . . . . =$ | | 920 = 920 |
| 14 | PRIMARY SUPPORT OBLIGATION  (Line 9 X Line 13 Total) . . . =$ | 386 | 534 |
| | **STANDARD OF LIVING ADJUSTMENT (SOLA)** | | |
| 15 | NET AVAILABLE FOR SOLA (Line 8 - Line 14) . . . . . . . $ | 1001 | 1382 |
| 16 | SOLA PERCENTAGE . . . . . . . . . . . . . . . . . . . . | 33 % | 33 % | /Child |
| 17 | SOLA OBLIGATION (Line 15 X Line 16) . . . . . . . . . . $ | 330 | 456 $ 262 |
| | **TOTAL MONTHLY SUPPORT AMOUNT** | | |
| 18 | GROSS MONTHLY OBLIGATION (Line 14 + Line 17) . . . . . . =$ | 716 | 990 |
| 19 | PARENTING TIME ADJUSTMENT . . . . . . . . . . . -$ | | |
| 20 | AMOUNT RETAINED . . . . . . . . . . . . . . . . . -$ | | 990 |
| 21 | NET MONTHLY CHILD SUPPORT ORDER AMOUNT (Line 18 - 19 & 20) =$ | 716 | |

                                    CFCJCAR      04/04/2003

*Father; Form- W-2 for 2001 reports gross earnings of $36,000 ÷ 12 months =*
*$3,000 per month*

THE FAMILY COURT OF THE STATE OF DELAWARE
CHILD SUPPORT CALCULATION

P~ ion No.  0135186
No.  CN97-11486                    II                Period: 01/01/2002 To
Lucses No.

|  |  | FATHER | MOTHER |
|---|---|---|---|
| 1 | A- Monthly Gross Earned Income . . . . . . . . . . . . . . . . . $ | 1875 * | 4366 ** |
|  | B- Monthly Gross Other Income . . . . . . . . . . . . . . . . . + |  |  |
|  | C- Monthly Earned Income Non-Taxable . . . . . . . . . . . . + |  |  |
|  | D- Monthly Self Employed Income . . . . . . . . . . . . . . + |  |  |
|  | E- TOTAL MONTHLY INCOME (Lines 1A+B+C+D;Taxes based on A,B,D) =$ | 1875 | 4366 |

| 2 | TAXES:    FEDERAL + FICA/MED + STATE + LOCAL + OTHER = |  |  |
|---|---|---|---|
|  | FATHER     185       143        50 | -$  378 |  |
|  | MOTHER     752       334       186      55 |  | -$ 1327 |

| 3 | Allowable Deductions: |  |  |
|---|---|---|---|
|  | MEDICAL + PENSION  + UNION DUES + ALIMONY + OTHER = |  |  |
|  | FATHER | -$ |  |
|  | MOTHER   102 ***   130 *** |  | -$  232 |

|  |  | NET INCOME  =$ | 1497 | 2807 |
|---|---|---|---|---|

NET INCOME AVAILABLE FOR PRIMARY SUPPORT
| 4 | PARENT'S SELF SUPPORT ALLOWANCE . . . . . . . . . . . . . -$ | 850 | 850 |
|---|---|---|---|
| 5 | NET INCOME AFTER SELF SUPPORT ALLOWANCE | 647 | 1957 |
| 6 | NUMBER OF DEPENDENT CHILDREN NOT IN THIS ACTION . . . . . |  |  |
| 7 | % ADJUSTMENT FOR SUPPORT OF OTHER CHILDREN . . . . . . . | 100 % | 100 %   TOTAL |
| 8 | NET INCOME AVAILABLE FOR PRIMARY SUPPORT (Line 5 - Line 7) =$ | 647 | 1957 =$ 2604 |
| 9 | SHARE OF TOTAL AVAILABLE NET INCOME    (Line 8 / Line 8 Total) | 25 % | 75 % |

CHILD(REN)'S PRIMARY SUPPORT NEED
| 10 | NUMBER OF CHILDREN DUE SUPPORT IN THIS ACTION . . . . . . | .0 | .3 .0 | 3.0 |
|---|---|---|---|---|
| 11 | PRIMARY SUPPORT ALLOWANCE . . . . . . . . . . . . . . . $ |  | 920 $ | 920 |
| 12 | CHILD CARE AND OTHER EXPENSES . . . . . . . . . . . . +$ |  | +$ |  |
| 13 | TOTAL PRIMARY NEED (Line 11 + Line 12) . . . . . . . . =$ |  | 920 =$ | 920 |
| 14 | PRIMARY SUPPORT OBLIGATION  (Line 9 X Line 13 Total) . . . =$ | 230 | 690 |  |

STANDARD OF LIVING ADJUSTMENT (SOLA)
| 15 | NET AVAILABLE FOR SOLA (Line 8 - Line 14) . . . . . . . . $ | 417 | 1267 |  |
|---|---|---|---|---|
| 16 | SOLA PERCENTAGE . . . . . . . . . . . . . . . . . . . . | 33 % | 33 % | /Child |
| 17 | SOLA OBLIGATION (Line 15 X Line 16) . . . . . . . . . $ | 138 | 418 $ | 185 |

TOTAL MONTHLY SUPPORT AMOUNT
| 18 | GROSS MONTHLY OBLIGATION (Line 14 + Line 17) . . . . . =$ | 368 | 1108 |
|---|---|---|---|
| 19 | PARENTING TIME ADJUSTMENT . . . . . . . . . . . . . -$ |  |  |
| 20 | AMOUNT RETAINED . . . . . . . . . . . . . . . . . -$ |  | 1108 |

| 21 | NET MONTHLY CHILD SUPPORT ORDER AMOUNT (Line 18 - 19 & 20) =$ | 368 |  |
|---|---|---|---|

CFCJCAR      04/04/2003

* The best evidence of father's present earnings to her W-2 earnings
from 2002 in the amount of $22,580. See DISCUSSION paragraph for further
explication

** Stipulated figure based upon 40 hours/week @ $25/hour
+ $33/month average additional earnings at a gynecology office.

*** 3% Cap (.03 × 4333 gross monthly pay)

EXHIBIT "T"

1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2                IN AND FOR NEW CASTLE COUNTY

3    DAVID CANNAVO and RED EAGLE    : C.A. NO.:  2379-VCS

4    AVIONICS, LLC, a Delaware      :

5    Limited Liability Company,     :

6              Plaintiffs,          :

7    v.                             :

8    DONALD MARK EHART and          :

9    SPREAD EAGLE, INC., a Delaware:

10   Corporation formerly known as :

11   Red Eagle Avionics, Inc.,      :

12             Defendants.          :

13

14             Deposition of MARY BETH EHART, taken

15   pursuant to notice before Tanya M. Congo, a Notary

16   Public and Certified Shorthand Reporter, at the

17   offices Fox Rothschild, LLP, 919 North Market Street,

18   Suite 1300, Wilmington, Delaware, on Monday, August

19   13, 2007, beginning at approximately 9:40 a.m., there

20   being present:

21

22

23

24

Tanya M. Congo & Associates, Ltd.  (302) 836-3713

29

1    know who he sold it to?

2         A.    No.

3         Q.    Okay.  Do you know a person named Dave

4    Cannavo?

5         A.    No.

6         Q.    When did you learn that Mr. Ehart had sold

7    the business assets?

8         A.    I've got to think.  Actually he didn't

9    tell me initially.  The kids told me and then I asked

10   him.  So it had to be January -- after January 1st,

11   2006.

12        Q.    Well, what did he tell you when you asked

13   about whether he sold the business?

14        A.    He told me he sold the business.

15        Q.    Did he tell you any specifics of it?

16        A.    No.

17        Q.    Did he tell you what he sold?

18        A.    No.

19        Q.    Did he tell you how much money he

20   received?

21        A.    No.

22        Q.    Did he tell you the purchase price?

23        A.    No.

24        Q.    How would you describe your relationship

Tanya M. Congo & Associates, Ltd.  (302) 836-3713

EXHIBIT "U"

FORM 222B
ADER NO: 0112767





### THE FAMILY COURT OF THE STATE OF DELAWARE
FOR NEW CASTLE COUNTY

PERMANENT
MODIFICATION
SUPPORT ORDER

PETITIONER                  RESPONDENT / OBLIGOR
MARY-BETH EHART             DONALD M EHART              FILE: CN97-11486
                                                        PETITION:06-14991
407 JOHN VINEYARDS LANE     795 UNION CHURCH ROAD       PET'N TYPE: SMODO
NEW CASTLE, DE 19720        TOWNSEND, DE 19734          DCSE:
PHONE: (302) 221-0117       PHONE: (302) 376-7614       OS #:
       (302) 428-2952 (WORK)      ()      -    (WORK)   NON-IV-D

DB:03/26/1964 SS:           DB:01/08/1963 SS:

EMPL:                       EMPL:

ATTY:PATRICIA GARTHWAITE     ATTY:DAVID GAGNE

IN THE INTEREST OF:
JACQUELINE P EHART                      DOB: 03/21/1992
ATTHEW J EHART                         DOB: 07/27/1994
SHANNON E EHART                        DOB: 08/10/1996

PRESENT AT HEARING:
Petitioner                         Present
Respondent                         Present
Petitioner's Attorney              Present
Respondent's Attorney              Present

After hearing on 05/31/2007, the Honorable MARY MUCH
hereby finds and orders:

    1   Obligor DONALD M EHART is currently under an Order of
        Support entered 04/11/2003 to pay $368.00 current support every month.

    2   Upon a finding of a change of circumstance, the current support obligation is
        modified, effective 05/01/2006 to $ 1462.00 every month, based on:

        Delaware Child Support Calculation(s) dated 06/15/2007, attached and
        incorporated herein by reference.

    3   Obligor owes arrears/retroactive support of $7682.00 as of 06/30/2007,
        as established by this order, calculated as follows:
        [$20,468.00 owed ($1462.00 x 14 months) less $12,786.00 paid (3 months x $368.00
        per month plus 11 months x $1052.00)]

PAGE   2

FORM 222B                    PETITIONER: MARY-BETH EHART              PETITION: 08-14991
ORDER NO: 0112767            RESPONDENT: DONALD M EHART               FILE: CN97-11486

4   The total payment is $   1462.00 every month payable to Obligee.
    Total includes:

    $  1462.00 current support
    PAYMENT SHALL COMMENCE ON OR BEFORE 07/15/2007.

5   Income attachment is ordered against all of the obligor's income pursuant to
    13 Del.C.§513.  The currently applicable consumer credit protection limit
    when obligor is employed is 60%.

6   The issuance of income attachment shall not be stayed.
    Income attachment will be payable to DCSE.  Until the income attachment takes
    effect, or at any time full payment is not secured by income attachment,
    Obligor is to make payment to DCSE at P.O. Box 12831, Wilmington, DE 19850.

7   Mother shall provide health insurance
    covering the child(ren) when/while available, to be secured by attachment, and
    shall provide the support recipient with all necessary documents to allow for
    use of the health insurance.

8   The first $350 of unreimbursable health care expense incurred in a calendar
    year is the responsibility of the support recipient.  Any such expense in
    excess of $350 is the responsibility of the parents as follows:
    Father 58%, Mother 42%.  Supporting documentation must accompany all
    requests for payment, and payment is to be made within a reasonable time
    thereafter.  A petition for reimbursement should be filed no later than
    December 31 in the second year after the expenditure.

9   Petitioner is not seeking a finding of contempt.

10  See attached supplemental disposition.

11  The parties shall report any changes of drivers license number, address
    (including incarceration or release from incarceration), telephone number,
    employer, employer address or telephone number to the Family Court Support
    Unit in New Castle County at (302) 255-0300.

12  The parties shall notify each other in writing of every change in circumstance
    which might materially affect the existing Support Order, including change in
    health insurance coverage.  In addition, the parties shall exchange completed
    financial report forms every 12 months.

13  A Delaware Order to pay support remains in effect until the youngest child has
    reached 18 and is no longer enrolled in high school, or 19, whichever occurs
    first.

PAGE    3

FORM 222B
ORDER NO: 0112767

PETITIONER: MARY-BETH EHART
RESPONDENT: DONALD M EHART

PETITION: 06-24931
FILE: CN97-11486

14   When the current support order is revoked pursuant to 13 Del.C. §517(a),
     payment shall continue in the total amount until any retroactive and/or past
     due support is paid.

15   Except for parties who fail to appear after proper notice, parties may appeal
     a final Order of a Commissioner by filing and serving written objections of
     such Order within ten (10) days of the Order.

_6/20/07_
DATE WRITTEN ORDER ISSUED

JUDGE/COMMISSIONER

cc:  ✓ File                    ✓ Petitioner              ✓ Respondent
     _ DCSE Operations         ✓ Petitioner's Attorney   ✓ Respondent's Attorney
     ✓ DCSE Accounting         _ Vital Statistics

CFCMHAR
06/19/2007

<u>SUPPLEMENTAL DISPOSITION</u>

EHART v EHART
CN97-11486
06-14991

Both parties appeared with their respective counsel for hearing on the above-captioned petition for support modification. Mother is fully employed as an x-ray technician at Christiana Hospital. She has consistently worked the midnight shift since the parties' middle child, Matthew, was born in 1994. She testified that Father had earned approximately $38,000.00 the year before the parties separated and divorced in 1998. The three children of this marriage reside primarily with Mother.

Father maintains residences in both Florida and Delaware. He is currently employed as a caretaker of golf carts at the Eagle's Golf Course in Odessa, Florida earning $6.57 per hour for 20 to 24 hours per week. According to his 4/27/2007 pay stub, he has worked 56 hours this year. Father is an experienced avionics technician—an individual who installs and repairs communications systems in aircraft. He has been in this field for approximately 20 years. Father has operated avionics businesses since 1982. Until January 2006, Father had been the sole owner of Red Eagle Avionics, an avionics corporation in the business of installation and repair of radio/communications equipment on aircraft. At any given time, he employed up to 5 employees in his business. The Court determines that Father is grossly underemployed for child support purposes.

Father operated Red Eagle Avionics out of the New Castle County Airport. Father testified that he elected to sell this company in January 2006 to spend more time with his children, with whom he currently enjoys two weekends per month visitation. The company sold for $2,200,000.00. The sale of this corporation encompassed a hangar, in which aircraft were housed to perform installation and repairs, adjacent parking, fencing and landscaping, machinery equipment, office furniture and equipment, vehicles, maintenance equipment, supplies, spare parts inventory, the Red Eagle Avionics name, the company's goodwill, the corporation's leases with tenants, and the customer lists. The sale excluded accounts receivable and cash on hand.

The purchase price was to be paid as follows: $1,000,000.00 cash at time of sale and a $1,200,000.00 promissory note with interest accruing at the rate of 8.5% per annum, payable in equal monthly installments of $10,413.88 over a twenty year period. This sales price included: Hangar—$1,870,000.00; Equipment—$200,000.00; Inventory—$30,000.00; Covenant not to compete—$100,000.00. The terms of the covenant prohibit Father from engaging in any competitive avionics business, whether as owner or employee, within a 150 mile radius of the New Castle County Airport. The covenant provides, however, that Father is permitted to engage in avionics employment if the new owner does not agree to hire him. Father has not sought any work as an avionics technician since he sold his business.

Father received $1,000,000.00 cash at the time of sale and 5 monthly payments of $10,413.88, totaling $52,069.40. He used a portion of the initial cash buy-out to pay off a commercial loan from Wachovia Bank in the amount of $445,901.21 and a $30,553.56 small business administration loan. The net proceeds of this sale to Father were $523,515.23. Of the net proceeds, Father deposited $200,000.00 into an investment account in ING for the payment of taxes and had full use of the remainder. According to Father's testimony, he has approximately $200.00 left in the ING account without having paid any of his tax liability therefore and the residual amount from the sale has been dissipated. Father has spent over $500,000.00 in the past 16 months plus $52,069.40 representing the five monthly payments on the amortized payment plan.

Father is in litigation with the Purchaser of Red Eagle Avionics. He is being sued in the Court of Chancery for defrauding the Purchaser. The allegations in the complaint allege that Father overstated the net earnings of the company and that the Purchaser relied on this misstatement to his detriment in purchasing the company. Father's Statement of Operations for Red Eagle for the six months ended June 30, 2005 lists net income from operations of $115,496.00. The Purchaser alleges that this was a gross overstatement of income for that time period. This Purchaser further alleges that Father on multiple occasions throughout the end of 2005 and up

until the sale of the business, did state that the business was performing in line with the June 30, 2005 statement of operations. Father admits that he listed June 30, 2005 net income from operations as set forth above but denies any allegations of fraud and has counterclaimed for specific performance under the contract.

A review of Red Eagle Avionics' January 2006 Commerce Bank statement with canceled checks attached reveals that Father received $450,000.00 from the account that month. He withdrew $400,000.00 on January 6, 2006 and wrote a check to himself for $50,000.00 which was presented to Commerce on January 6, 2006 for payment. The Court has no information concerning Red Eagle Avionics' accounts receivable or expenses for the 2006 calendar year, as Father failed to produce documents, in the form of Red Eagle bank statements for the year 2006, to Mother despite an order of production by the Court. Perhaps the bank statements were under the name of Spread Eagle, Inc., as Father was required by the agreement of sale to relinquish the name Red Eagle following the purchase.

A review of Father's personal bank statements for calendar year 2006 reveals that Father deposited over $585,000.00 into that account in the first 11 months of that year. Father's withdrawals in the form of checks and teller machine withdrawals total over $529,000.00. These statements reveal that Father did fund the ING account in March 2006 with $200,000.00 and then began depleting that account by way of $20,000.00 monthly transfers from ING back into his personal savings account, beginning August 2006. There are numerous automatic teller withdrawals from Father's personal account from a -Dover Downs' ATM machine.

Father's 2004 and 2005 taxes reveal that Father took mortgage interest deductions of $22,814.00 and $19,058.00, respectively. On both of these returns Father claimed income of slightly more than his mortgage interest deductions alone. It is clear that Father is grossly underreporting his income available for child support.

Based on the foregoing, the Court concluded that not only is Father underemployed but he has failed to actively seek employment in his line of work. He will be attributed with the gross hourly earnings of an experienced avionics technician, $23.83/hour-per 2005 DOL Wage Surveys. In addition, Father had net proceeds of the sale of his business entity of $523,515.23, after the payment of the two loans plus additional unearned income of $52,069.40 (the five amortized monthly payments on the sale of the business referenced above). If this amount was invested in ING, at a rate of 4.5% per annum, Father would receive $25,901.00 additional income per year, which would be available for the support of his children. Therefore, the Court has attributed earnings to Father of $49,566.00 per year plus unearned income of $25,901.00. This amount is less than what Mother testified Father made during their marriage but significantly more that what Father testified he has earned in the past. These figures do not include income Father received in 2006 from his net accounts receivable, as Father failed to produce those documents to Mother.

The parties agreed that Father has paid support directly to Mother in the amount of $12,786.00 from May, 2006 through June, 2007 (3 payments of $366.00 plus 11 payments of $1,062.00). The Court has calculated Father's back support obligation from May 2006 forward. The Court declines to order payment on the back support obligation as prior arrears/back support amounts were never established by the Court. In fact, a Motion to Enter Judgment in the amount of $11,810.00 on Father's behalf was filed by Father's previous counsel in 2003; this was never ruled on. The parties may discuss the issue of arrears/back support and if need be, request a hearing on same under the previous petition–01-35186 and the above-captioned petition.

THE FAMILY COURT OF THE STATE OF DELAWARE
CHILD SUPPORT CALCULATION

Petition No. 0614991  EHART, MARY-BETH           VS. EHART, DONALD
File No.  CN97-11486
Dacses No.                                    Period: 05/01/2006 To 05/31/2007

|  |  | FATHER | MOTHER |
|---|---|---|---|
| Net Monthly Income |  |  |  |
| 1 A. Salary/Wages | $ | 4130 | 5587 |
| B. Self Employment | + |  |  |
| C. Other Taxable Income (including Alimony received) | + | 2158 |  |
| D. Non-Taxable Income | + |  |  |
| E. TOTAL MONTHLY INCOME | =$ | 6288 | 5587 |

2  TAXES:      FEDERAL + FICA/MED + STATE + LOCAL + OTHER =
       FATHER  1171      315        297                        -$ 1783
       MOTHER  996       427        255     70                         -$ 1748

3  Allowable Deductions:
          MEDICAL + PENSION + UNION DUES + ALIMONY + OTHER =
      FATHER                                                  -$
      MOTHER  119       168                                          -$ 287

|  |  | FATHER | MOTHER |
|---|---|---|---|
| NET INCOME | =$ | 4505 | 3552 |
| 4 NET INCOME AVAILABLE FOR PRIMARY SUPPORT |  |  |  |
| PARENT'S SELF SUPPORT ALLOWANCE | -$ | 970 | 970 |
| 5 NET INCOME AFTER SELF SUPPORT ALLOWANCE |  | 3535 | 2582 |
| 6 NUMBER OF DEPENDENT CHILDREN NOT IN THIS ACTION |  |  |  |
| 7 % ADJUSTMENT FOR SUPPORT OF OTHER CHILDREN |  | 100 % | 100 % |

|  |  | FATHER | MOTHER | TOTAL |
|---|---|---|---|---|
| 8 NET INCOME AVAILABLE FOR PRIMARY SUPPORT (Line 5 - Line 7) | =$ | 3535 | 2582 =$ | 6117 |
| 9 SHARE OF TOTAL AVAILABLE NET INCOME (Line 8 / Line 8 Total) |  | 58 % | 42 % |  |
| CHILD(REN)'S PRIMARY SUPPORT NEED |  |  |  |  |
| 10 NUMBER OF CHILDREN DUE SUPPORT IN THIS ACTION |  |  | 3 | 3 |
| 11 PRIMARY SUPPORT ALLOWANCE | $ |  | 990 $ | 990 |
| 12 CHILD CARE AND OTHER EXPENSES | +$ |  | +$ |  |
| 13 TOTAL PRIMARY NEED (Line 11 + Line 12) | =$ |  | 990 =$ | 990 |
| 14 PRIMARY SUPPORT OBLIGATION (Line 9 X Line 13 Total) | =$ | 574 | 416 |  |
| STANDARD OF LIVING ADJUSTMENT (SOLA) |  |  |  |  |
| 15 NET AVAILABLE FOR SOLA (Line 8 - Line 14) | $ | 2961 | 2166 |  |
| 16 SOLA PERCENTAGE |  | 30 % | 30 % |  |
| 17 SOLA OBLIGATION (Line 15 X Line 16) | $ | 888 | 650 $ | 513 /Child |
| TOTAL MONTHLY SUPPORT AMOUNT |  |  |  |  |
| 18 GROSS MONTHLY OBLIGATION (Line 14 + Line 17) | =$ | 1462 | 1066 |  |
| 19 PRIMARY/SOLA (Line 10 X per child SOLA + Line 11) | -$ |  | 2529 |  |
| 20 CHILD CARE/TUITION PAID BY EACH PARENT | -$ |  |  |  |
| 21 A. Parenting Time Percentage |  | % | % |  |
| B. Parenting Time Adjustment |  |  |  |  |
| (Line 21A X other parent's Line 19) | -$ |  |  |  |
| 22 A. Self Support Protection Percentage |  | 100 % | % |  |
| B. Self Support Protection (Line 5 X Line 22 - Line 21A) | $ | 3535 | % |  |
| 23 NET OBLIGATION (Line 18 - 19,20,21B, but not more than 22B) | =$ | 1462 | 0 |  |

                                                  CFCMMUC    06/15/2007

* Attribution of earnings of resp. Avionics tech. @ 23-84/hr x 40 hr/wk
** Interest income on proceeds of sale of business - Attribution
*** Based on 2005 - W-2 wages

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOE GANO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.    1:07-cv-00271 |
| | ) | |
| DONALD MARK EHART and | ) | |
| SPREAD EAGLE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Appendix to the Plaintiff's Answer to Defendants' Motion for Summary Judgment and Supporting Brief, filed through the ECF system, were served electronically on January 24, 2008, to the following individuals:

Richard H. Cross, Jr.
Tara M. DiRocco
913 North Market Street, 11th Floor
Wilmington, DE 19801
*Attorneys for Defendants*

*/s/ Sophia Siddiqui (#4914)*
SOPHIA SIDDIQUI (#4914)
Fox Rothschild LLP
919 N. Market Street, Suite 1300
Wilmington, DE 19899-2323
(302) 654-7444
(302) 656-8920 (facsimile)