## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOE GANO,                                              )
                                                       )
                    Plaintiff                          )          Case No. 07-271
v.                                                     )
                                                       )
DONALD MARK EHART, and                                 )
SPREAD EAGLE, INC., a Delaware                         )
Corporation formerly known as Red Eagle                )
Avionics, Inc.                                         )

## DEFENDANTS' REPLY BRIEF IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

COME NOW, Donald Mark Ehart ("Ehart") and Spread Eagle, Inc., ("Spread

Eagle, Inc.") formerly known as Red Eagle Avionics, Inc., (collectively "Defendants")

through their undersigned counsel, hereby move this Honorable Court pursuant to Federal

Rule of Civil Procedure 56 for an order entering judgment against Plaintiff, Joe Gano

("Gano" or "Plaintiff"), as to all counts of the Complaint.

**CROSS & SIMON, LLC**
Richard H. Cross, Jr. (No. 3576)
Tara M. DiRocco (No. 4699)
913 North Market Street
11th Floor
Wilmington, Delaware  19801
302-777-4200
302-777-4224 (fax)
rcross@crosslaw.com
tdirocco@crosslaw.com
*Counsel for Defendants*

Dated: February 4, 2008

**TABLE OF CONTENTS**

**Page**

Nature and Stage of the Proceedings ....................................................................1

Summary of the Argument...................................................................................2

Statement of Facts...............................................................................................3

Argument ...........................................................................................................4

      I.     Plaintiff Fails to Demonstrate that Gano Has Standing to Seek
            Rescission of the Asset Purchase Between Cannavo and Ehart ......4

Conclusion .........................................................................................................8

# TABLE OF AUTHORITIES

**Page**

Comrie v. Enterasys Networks, Inc.,
    *2004 WL 293337* ..............................................................................5

MetCap Securities, LLC v. Pearl Senior Care, Inc.,
    *2007 WL 1498989 (Del. Ch.)* ......................................................6

## NATURE AND STAGE OF THE PROCEEDINGS

Defendants herein incorporate by reference the *Nature and Stage of the Proceedings* found in Defendants' Motion for Summary Judgment and Supporting Brief dated January 14, 2008.  (Docket 42).

## SUMMARY OF THE ARGUMENT

In Plaintiff's Answer to Defendants' Motion for Summary Judgment and Supporting Brief, by going into depth about the elements of fraud and mutual mistake, Plaintiff attempts to skirt the issue of standing and distract the Court's attention away from the issues at hand. (Docket 44). The dispute lies between Cannavo and Ehart, not Gano and Ehart. A separate lawsuit between Cannavo and Ehart is pending before the Delaware Court of Chancery (the "Chancery Court litigation").[1]  In the Chancery Court litigation, there will be a full and complete adjudication of all the issues presented in the instant action. As previously noted, the Plaintiff in this action is represented by identical counsel that represents Cannavo in the Chancery Court litigation, and indeed almost identical Complaints were filed in both courts. A copy of the Complaint in the Chancery Court litigation, without Exhibits, is attached hereto as Exhibit A.[2]  Gano is merely being used as a straw-party to put additional financial and emotional strain on Ehart.

Furthermore, Plaintiff does not deny that Gano both lacks standing and is not a third-party beneficiary. See Pl. Ans. Mot. at 23–25. (Docket 44). Rather, Plaintiff states that "claims for fraud and mutual mistake simply do not require Gano to prove standing to a contract in order to obtain the requested relief [of rescission]." See Pl. Ans. Mot. at 24. (Docket 44). If the Chancery Court litigation is resolved in Cannavo's favor, the remedies sought in this case will be null and void, further demonstrating that this is not a valid cause of action.

---

[1] Trial in the Chancery Court litigation concluded on February 4, 2008. The Court's decision has been reserved pending post-trial briefing.
[2] Plaintiffs in the Chancery Court litigation subsequently amended the Complaint to include additional causes of action that are not included in the instant Complaint.

**STATEMENT OF FACTS**

Defendants herein incorporate by reference the *Statement of Facts* found in Defendants' Motion for Summary Judgment and Supporting Brief dated January 14, 2008. (Docket 42).

## **ARGUMENT**

I. **PLAINTIFF FAILS TO DEMONSTRATE THAT GANO HAS STANDING TO SEEK RESCISSION OF THE ASSET PURCHASE BETWEEN CANNAVO AND EHART**

Simply put, the Plaintiff has no standing to sue for the rescission of a deal in which he admittedly is neither a party nor an intended third-party beneficiary, regardless of the way in which Plaintiff styles the cause of action. It is difficult to fathom the rationale behind a third-party lender suing the seller because a mutual mistake of fact allegedly occurred between the buyer and seller or that the seller allegedly committed fraud. Furthermore, it is even more incredulous to think that a third-party lender may sue the seller because the buyer defaulted on his payment obligations to the third-party lender. Also, the third-party lender has not joined the buyer in this action nor has the third-party lender made any efforts to collect on the past due amounts from the buyer. See Compl. See Def. Mot. (Docket 42). Instead, the third-party lender, with identical counsel as the buyer in the Chancery Court litigation, filed the instant action against the seller based on diversity jurisdiction. See Compl. (Docket 1).

The relief that Plaintiff seeks is impossible for the Court to grant. See Compl. (Docket 1). Plaintiff seeks that the Court unwind the deal between Ehart and Cannavo, a deal in which the only role Plaintiff plays is that of a third-party lender. See Compl. (Docket 1). See Def. Mot. (Docket 42). For the Court to find in Plaintiff's favor and rescind the Asset Purchase between Ehart and Cannavo, the Court would be required to unwind a deal of which Plaintiff was not a part and where one party to the contract, Cannavo, is not even a party to the instant litigation. How would the Court begin to

4

fashion an Order forcing Ehart to return the assets to Cannavo, a non-party, and forcing

Cannavo to return monies paid to Ehart? See Compl. (Docket 1).

Contrary to Plaintiff's contentions, Defendants, in their Motion for Summary

Judgment and Supporting Brief, do not claim that Plaintiff filed an action for breach of

contract. (Docket 42). Defendants are aware of the allegations in the Complaint; the

Complaint speaks for itself. (Docket 1). Though not explicitly alleging breach of

contract, Plaintiff through the remedy of rescission, is nevertheless asking this Court to

enforce a contract. Strangers to a contract have no right to enforce it. See Comrie v.

Enterasys Networks, Inc., 2004 WL 293337, at *2 (Del.Ch.).

Defendants argued, and continue to argue, that Plaintiff has no standing to sue.

Plaintiff seeks a complete rescission of the January 3, 2006, Asset Purchase transaction.

See Compl. (Docket 1). Plaintiff does not seek money damages. See Compl. (Docket

1). The critical document executed as part of the Asset Purchase, and therefore, the

center of this litigation, is the Agreement for Sale of Business Assets ("Agreement for

Sale") executed by Ehart and Cannavo. (Attached hereto as Exhibit B). Notably absent

from the Agreement for Sale is any mention whatsoever of Plaintiff.

Although Plaintiff alleges that Defendants' case law is inapposite, it is important

to note that all of the cases Defendants located in which a plaintiff was successful in

rescinding or reforming a contract, the plaintiff and defendant were either parties or

intended third-party beneficiaries. See Def. Mot. (Docket 42). Defendants could not,

after a good faith effort, locate case law with similar facts to the instant action in which

the lender sues the seller to rescind the contract between the seller and buyer. Even if the

court finds that the third-party beneficiary case law does not apply per se, it surely applies by analogy.

The issue of standing is as applicable in a fraud or mutual mistake case as it is in a case for breach of contract. Although Plaintiff does not assert a claim for breach of contract per se, rescission is a remedy for breach of contract. Therefore, asking for rescission of the Asset Purchase brings into issue who is and is not a party to the contract. Gano, who is neither a party nor a third-party beneficiary, lacks the standing to sue Ehart for rescission of the deal.

Plaintiffs argue that the facts in MetCap Securities, LLC v. Pearl Senior Care, Inc., 2007 WL 1498989 (Del. Ch.), are clearly distinguishable from the facts of the instant action. See Pl. Ans. Mot. (Docket 44). Defendants disagree. In MetCap, the Court found that the Plaintiff is not a party to the contract. Although the Plaintiff is seeking reformation, instead of rescission, the Court states, "[r]eformation is available, perhaps subject to certain exceptions not present here, only to parties to the contract. As such, MetCap, as a matter of law, may not pursue a claim for reformation…" MetCap, 2007 WL 1498989, *10. Clearly MetCap is analogous in that the plaintiff is seeking to reform a contract to which it is a non-party, just as the Plaintiff here is seeking to rescind a contract to which he is a non-party. Id.

Plaintiff also incorrectly argues that Plaintiff is entitled to restitution damages under an unjust enrichment theory. See Pl. Ans. Mot., at 29. (Docket 44). However, what Plaintiff forgets to mention, is that Plaintiff does not make a claim for restitution damages in the Complaint. See Compl. (Docket 1). Plaintiff only makes a claim for complete rescission of the Asset Purchase between Ehart and Cannavo, making any unjust

enrichment argument completely irrelevant and inapplicable. <u>See</u> Compl. at 12, 13. (Docket 1).

Using Plaintiff's argument, anyone who reviewed the alleged fraudulent June 30, 2005 Statement of Operations and to whom Cannavo divulged the substance of his conversations with Ehart, has standing to rescind the deal between Cannavo and Ehart. So hypothetically, any bank who loaned Cannavo money to finance the Asset Purchase could sue Ehart for rescission. Clearly that is not the intent of the causes of action of fraud and mutual mistake.

**CONCLUSION**

The Defendants' Motion for Summary Judgment and Supporting Brief, along with Defendants' Reply Brief in Support of Motion of Summary Judgment, clearly show that there is no genuine issue concerning the following facts, pursuant to Federal Rule of Civil Procedure 56: (1) Gano was not a party to the Asset Purchase between Ehart and Cannavo; and (2) Gano was not an intended third-party beneficiary to the Asset Purchase between Ehart and Cannavo. In view of the foregoing, and there existing no genuine issue of material facts that would prevent his Honorable Court from dismissing the claims discussed in the present motion, the entry of summary judgment in favor of the Defendants dismissing Gano's Complaint in its entirety, with prejudice, is warranted.

WHEREFORE the Defendants hereby request that this Honorable Court enter summary judgment dismissing Gano's Complaint in its entirety, with prejudice, and award Defendants' attorney's fees and costs incurred in defending Gano's frivolous and unwarranted action.

Respectfully submitted,

BY: _____

Richard H. Cross, Jr. (No. 3576)
Tara M. DiRocco (No. 4699)
CROSS & SIMON, LLC
913 North Market Street, 11th Floor
Wilmington, Delaware  19801
302-777-4200
302-777-4224 (fax)
rcross@crosslaw.com
tdirocco@crosslaw.com
*Counsel for Defendants*

Dated: February 4, 2008

# Exhibit A

EFiled: May 17 2007 5:04PM EDT
Transaction ID 14920628
Case No. 2379-VCS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| DAVID CANNAVO and RED EAGLE AVIONICS, LLC, a Delaware Limited Liability Company, | ) ) ) ) | C. A. No. 2379-VCS |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DONALD MARK EHART and SPREAD EAGLE, INC., a Delaware Corporation formerly known as Red Eagle Avionics, Inc., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## FIRST AMENDED VERIFIED COMPLAINT
## FOR RESCISSION AND OTHER RELIEF

Plaintiffs, David Cannavo and Red Eagle Avionics, LLC, by and through their attorneys,

Fox Rothschild LLP, files the following Amended Complaint against Defendants:

### Parties

1.     Plaintiff, David Cannavo (hereinafter "Cannavo"), is a resident of the State of

Delaware residing at 1270 Caldwell Corner Road, Townsend, Delaware 19734.

2.     Plaintiff, Red Eagle Avionics, LLC (hereinafter the "LLC"), is a Delaware Limited

Liability Company organized on December 28, 2005, with its place of business at 1 Dale's Way, New

Castle, Delaware 19720, where since January 3, 2006 it has engaged in the business of aircraft

avionics sales and service.

3.     Cannavo is the sole member of the LLC.

4.    Defendant, Donald Mark Ehart (hereinafter "Ehart"), is a resident of the State of Delaware residing at 795 Union Church Road, Townsend, Delaware 19734.

5.    Defendant, Spread Eagle, Inc., formerly known as Red Eagle Avionics, Inc. (hereinafter the "Corporation"), is a Delaware Corporation with a current address at 795 Union Church Road, Townsend, Delaware 19734. After January 3, 2006, Red Eagle Avionics, Inc. changed its name to Spread Eagle, Inc.   For several years prior to January 3, 2006, the Corporation engaged in the business of aircraft avionics sales and service at 1 Dales Way, New Castle, Delaware 19720 under the name Red Eagle Avionics, Inc.

6.    Ehart is the sole officer and stockholder of the Corporation.

### Facts

7.    Cannavo and Ehart are long time associates arising out of aircraft activities and aircraft business dealings.

8.    In late August or early September, 2005, Ehart desired to sell the Red Eagle Avionics business by selling the stock of the Corporation.

9.    In late August or early September, 2005, Ehart and Cannavo commenced discussions concerning Cannavo's purchase of the stock of the Corporation.

10.    Early in the discussions, Ehart presented Cannavo with a Statement of Operations of Red Eagle Avionics, Inc. for the six months ended June 30, 2005, stating "Net Income From Operations" of $115,496.00 for the six months ended June 30, 2005.   A true and correct copy of the Statement of Operations is attached hereto as **Exhibit "A"**.

11.    On information and belief, the Statement of Operations of Red Eagle Avionics, Inc. for the six months ended June 30, 2005 was prepared by the accountant for the Corporation and

Ehart at that time, Brousseau & Brousseau, P.A., (the "Accountant") 5708 Limestone Road, Wilmington, Delaware 19808.

12.     Between September, 2005 and December, 2005, Cannavo asked Ehart on four occasions about the results of operations of Red Eagle Avionics, Inc. during the period after June 30, 2005. On each occasion, Ehart stated to Cannavo that the net income from operations during the second half of 2005 for the Corporation is equal to the first half of 2005 as shown on the Statement of Operations of Red Eagle Avionics, Inc. for the six months ended June 30, 2005 **(Exhibit "A")** or a little better than that. Based upon these representations, including without limitation, the information set forth in **Exhibit "A"**, Cannavo agreed to purchase the Corporation.

13.     On January 3, 2006, (the "Settlement Date") because of income tax reasons and legal reasons, instead of Ehart selling the business by selling the stock in the Corporation, a transaction was agreed to by Ehart and Cannavo, and concluded whereby the Corporation and Ehart, as Seller, sold to the LLC for the price of $2,200,000.00, the Corporation's business assets used in the operation of Red Eagle Avionics, Inc., but not the Corporation's cash, cash equivalents or liabilities, pursuant to an Agreement for Sale of Business Assets (hereinafter "Agreement"). A true and correct copy of the aforementioned Agreement is attached hereto as **Exhibit "B"**.

14.     The Agreement also provided for, among other things: (1) the Corporation and Ehart to physically maintain the Corporation's books and records at the business premises for two years, with the LLC having the right of access and the right to copy any such business records; (2) representations by Ehart and the Corporation that all of Seller's business records are in all material respects complete and correct; and (3) the Corporation to immediately cease using the name "Red

Eagle Avionics" and to cause its corporate name to be changed, enabling the LLC to use the name "Red Eagle Avionics" in the LLC's operation of the Red Eagle Avionics business.

15.    The Corporation's hangar, from which the Corporation conducted its business prior to the sale, located at the New Castle County Airport, and included in the sale, was erected on land owned or controlled by the Delaware River and Bay Authority ("DRBA").    Prior to January 3, 2006, said land was leased by DRBA to the Corporation pursuant to a Lease Agreement between the Corporation and the DRBA.  As part of the sale of the hangar by the Corporation to the LLC, the Corporation, with the consent of DRBA, on January 3, 2006 assigned its land lease to the LLC pursuant to an Assignment of Lease Agreement and Transfer of Ownership of Improvements, a copy of which is attached hereto as **Exhibit "C"**.

16.    On the Settlement Date, Ehart and the Corporation also executed a Non-Competition Agreement for a period of ten (10) years, a copy of which is attached hereto as **Exhibit "D"**.

17.    One Million Dollars ($1,000,000.00) of the $2,200,000.00 purchase price was paid by the LLC to the Corporation at the January 3, 2006 closing.  One Million Two Hundred Thousand Dollars ($1,200,000.00), the balance of the purchase price, was payable over a twenty year period with interest at 8.5% per annum, in equal monthly installments of $10,413.88.

18.    To secure payment of the aforesaid $1,200,000.00, at the January 3, 2006 closing the LLC (i) executed a Mortgage and Security Agreement in favor of the Corporation, granting a first mortgage lien on the hangar and a security interest in the DRBA lease, recorded in the New Castle County Recorder of Deeds (a copy of the Mortgage and Security Agreement, Recorder's Receipt and UCC-1 Financing Statements are attached hereto as **Exhibit "E"**), and (ii) executed and delivered to the Corporation a Promissory Note in the amount of $1,200,000.00 in accordance with the terms set

forth in the Agreement, dated January 3, 2006, guaranteed by Cannavo (a copy of the Promissory Note is attached hereto as **Exhibit "F"**).

19.     In the several months following the Settlement Date, Cannavo and the LLC ran the business with the same operations originally represented by Defendants in the Corporation's Statement of Operations. (**Exhibit "A"**). However, in the several months of operations following the Settlement Date, Cannavo and the LLC discovered that the net income from operations received from the business was far less than that represented by Ehart and stated on the Corporation's Statement of Operations.

20.     Cannavo began to investigate the reasons for the discrepancy between the net income from operations actually received in the months following the Settlement Date and the "Net Income From Operations" stated on the Corporation's Statement of Operations, and reviewed information found on computers that had been used by Ehart and the Corporation prior to the sale of those assets prior to the Settlement Date. At that time, Cannavo discovered a large discrepancy between the Corporation's actual bank deposits and the income as stated on the Corporation's Statement of Operations (**Exhibit "A"**).

21.     Upon further investigation, employees who previously worked for Defendants informed Cannavo that the Corporation had realized income of only approximately $50,000.00 per year.

22.     Continuing in his investigation, Cannavo contacted the Accountant who prepared the Corporation's Statement of Operations (**Exhibit "A"**).

23.    The Accountant informed Cannavo that he had produced and drafted the Corporation's Statement of Operations at Defendants' request but had placed an extensive disclaimer as the front page of the document.

24.    Cannavo had not been provided with the disclaimer mentioned by the Accountant prior to the January 3, 2006 Settlement Date. On the contrary, Cannavo had been advised by Ehart that the numbers expressed on the Corporation's Statement of Operations were valid.

25.    In early February, 2006, the Accountant provided Cannavo with a Statement of Operations of Red Eagle Avionics, Inc. for the year ended December 31, 2005, which stated Net Income From Operations for the year ended December 31, 2005 of $52,664.00. (A true and correct copy of the Net Income from Operations for the year ended December 31, 2005, is attached hereto as **Exhibit "G".**)

26.    The Statement of Operations of Red Eagle Avionics, Inc. for the six months ending June 30, 2005, which Ehart initially presented to Cannavo (**Exhibit "A"**), and the Statement of Operations of Red Eagle Avionics, Inc. for the year ended December 31, 2005 (**Exhibit "C"**), together state that Red Eagle Avionics, Inc. lost $62,832.00 during the six months ended December 31, 2005, instead of experiencing net income from operations of approximately $115,496.00, the same amount for the six months ended June 30, 2005, as represented by Ehart.

27.    In late February or early March, 2006, Cannavo reviewed the Corporation's books and records for the six months ended June 30, 2005, and discovered that cash receipts (sales) for the six month period ended June 30, 2005, was approximately $90,000.00 less than $663,452.00 in sales as shown on the Statement of Operations of Red Eagle Avionics, Inc. for the six months ended June 30, 2005.

## COUNT I

### Rescission and Cancellation of Instruments based on Fraud

28.    Plaintiffs incorporate by reference the averments contained in the preceding paragraphs as though they were fully set forth at length herein.

29.    In late August or early September, 2005, Ehart exhibited to Cannavo and provided a copy to Cannavo of a Statement of Operations of Red Eagle Avionics, Inc. for the six months ended June 30, 2005 (**Exhibit "A"**).

30.    The Statement of Operations of Red Eagle Avionics, Inc. for the six months ended June 30, 2005 (Exhibit A) stated a Net Income from Operations for the Red Eagle Avionics business of $115,496.00 for the six months ended June 30, 2005.

31.    The Statement of Operations for the six months ended June 30, 2005 (**Exhibit "A"**), and the representations by Ehart concerning same, overstated the Corporation's actual Net Income From Operations for that period of time by approximately $90,000.00.

32.    On four occasions between September, 2005 and December, 2005, Cannavo asked Ehart about Red Eagle Avionics, Inc.'s results of operations during the second half of 2005. On each occasion, Ehart told Cannavo that the Red Eagle Avionics business was earning the same Net Income From Operations as the first six months of 2005 as shown on **Exhibit "A"**, or a little better.

33.    Ehart, on each occasion, intentionally and knowingly materially misrepresented to Cannavo the Net Income From Operations of Red Eagle Avionics, Inc. during the last six months of 2005.

34.    During the last six months of 2005, the Corporation was not generating Net Income from Operations of $115,496.00. On the contrary, the Corporation was experiencing a net loss from operations during the last six months of 2005 in the amount of $62,832.00 by the end of such period.

35.    In making the aforementioned misrepresentations, Ehart knew and intended that Cannavo would rely on them.

36.    In causing the LLC to purchase the Red Eagle Avionics business on January 3, 2006 for the price of $2,200,000.00, Cannavo justifiably relied upon Ehart's material misrepresentations that Red Eagle Avionics, Inc. generated Net Income From Operations of $115,496.00 for the six months ended June 30, 2005 and approximately the same amount during the second six months of 2005, for a total of approximately $230,000.00 for calendar year 2005.

37.    However, the Net Income From Operations of Red Eagle Avionics, Inc. for calendar year 2005 as shown on Exhibit G was only $52,664.00, instead of approximately $230,000.00.

38.    If Cannavo had been aware that the Net Income From Operations of Red Eagle Avionics, Inc. for the six months ended June 30, 2005 was approximately $90,000.00 less than the amount shown on the Statement of Operations ($115,496.00) and as represented by Ehart, Plaintiffs would not have entered into the January 3, 2006 purchase.

39.    If Cannavo had been aware that Red Eagle Avionics, Inc. sustained a loss from operations of $62,832.00 during the six months ended December 31, 2005 instead of generating Net Income From Operations of approximately $115,000.00 for that period as represented by Ehart, Plaintiffs would not have entered into the January 3, 2006 purchase.

40.    If Cannavo had been aware that the Net Income From Operations of Red Eagle Avionics, Inc. for the year ended December 31, 2005 was $52,664.00 as shown on Exhibit G, instead

of approximately $230,000.00 as represented by Ehart, Plaintiffs would not have entered into the January 3, 2006 purchase.

41.     Plaintiffs stand ready, able and willing and hereby offer to redeliver possession of the Red Eagle Avionics business assets, together with any net income from operations earned by the LLC since January 3, 2006, to Defendants as part of a complete and full rescission of the January 3, 2006 sale.

42.     Plaintiffs have no adequate remedy at law. As a result of Ehart's misrepresentations, which were made both in his individual capacity and as a representative of the Corporation, Plaintiffs have suffered harm which cannot be adequately compensated by money damages alone.

## COUNT II

### Rescission and Cancellation of
### Instruments based on Mutual Mistake

43.     Plaintiffs incorporate by reference the averments contained in the preceding paragraphs as though they were fully set forth at length herein.

44.     When the LLC purchased the Red Eagle Avionics business assets on January 3, 2006, and the Corporation sold those assets, Ehart, the Corporation, Cannavo and the LLC were mistaken as to the following facts:

(a)     They understood that the amount of Net Income From Operations of Red Eagle Avionics, Inc. for calendar year 2005 was approximately $230,000.00. However, the actual amount of Net Income From Operations for that period was only $52,664.00;

(b)     They understood that the Net Income From Operations of Red Eagle Avionics, Inc. for the six months ended June 30, 2005 was $115,496.00. However, sales were

overstated on that statement by approximately $90,000.00, resulting in a reduction of Net Income from Operations in the same amount.

(c)    They understood that the Net Income From Operations of Red Eagle Avionics, Inc. for the six months ended December 31, 2005 was approximately $115,000.00. However, Red Eagle Avionics, Inc. sustained a loss for that period of $62,832.00.

45.    The aforesaid mistakes were material.

46.    If Plaintiffs and Defendants on January 3, 2006 were aware of the actual facts as stated above and not mistaken, Plaintiffs would not have entered into the January 3, 2006 purchase of the Red Eagle Avionics business assets.

47.    Plaintiffs stand ready, able and willing and hereby offer to redeliver possession of the Red Eagle Avionics business assets, together with any net income from operations earned by the LLC since January 3, 2006, to Defendants as part of a complete and full rescission of the January 3, 2006 sale.

48.    Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiffs respectfully request that the Court order the following relief:

A.    Rescind the sale and purchase of the Red Eagle Avionics business assets on January 3, 2006 pursuant to the Agreement, the Promissory Note, the Mortgage and Security Agreement, the Non-Competition Agreement, and the Assignment of Lease Agreement and Transfer of Ownership of Improvements;

B.    Declare that the Agreement, the Promissory Note, the Mortgage and Security Agreement, the Non-Competition Agreement, and the Assignment of Lease Agreement and Transfer of Ownership of Improvements are null and void;

C.    Order Defendants to repay to Plaintiffs the amount paid at closing, $1,000,000.00;

D.    Order Defendants to repay to Plaintiffs $52,069.40 paid on the Promissory Note through June, 2006;

E.    Order that in exchange for Plaintiffs' receipt from Defendants of the amount paid to the Corporation at the January 3, 2006 closing, $1,000,000.00, and $52,069.40 paid by the LLC on the Promissory Note, Plaintiffs deliver to Defendants the Red Eagle Avionics business assets purchased from Defendants;

F.    Order such other or additional relief necessary and appropriate to effect a complete rescission of the January 3, 2006 sale and purchase of the Red Eagle Avionics business assets and restore the parties to the status quo immediately prior to the January 3, 2006 sale and purchase;

G.    Award such further and other relief that may be just and proper under the circumstances, including but not limited to, reasonable attorneys' fees and costs.

**FOX ROTHSCHILD LLP**

By:    _/s/ Sheldon K. Rennie (3772)_____
       Gregory B. Williams, Esquire (I.D. No. 4195)
       Sheldon K. Rennie, Esquire (I.D. No. 3772)
       Sophia Siddiqui, Esquire (I.D. No. 4914)
       919 N. Market Street, Suite 1300
       Wilmington, DE 19899-2323
       (302) 654-7444
       (302) 656-8920 (facsimile)

-and-

Wendy G. Rothstein, Esquire (Adm. Pro Hac Vice)
1250 South Broad Street
P.O. Box 431
Lansdale, PA 19446-0431
(215) 699-6000
(215) 699-0231 (facsimile)

-and-

Todd B. Nurick, Esquire (Admitted Pro Hac Vice)
**NURICK LAW GROUP**
111 West Germantown Pike
Plymouth Meeting, PA 19462
(610) 238-9000
(610) 238-9977 (facsimile)

Attorneys for Plaintiffs,
*David Cannavo and Red Eagle Avionics, LLC*

Date: May 17, 2007

# Exhibit B

# RED EAGLE AVIONICS

## AGREEMENT FOR SALE OF BUSINESS ASSETS

THIS AGREEMENT FOR SALE OF BUSINESS ASSETS is made this 3rd day of January, 2006, by and between:

> Red Eagle Avionics, Inc., a Delaware corporation (hereinafter referred to as the "Corporation") Tax I.D. No. 51-0338642, and Donald Mark Ehart (hereinafter referred to as "Ehart"). The Corporation and Ehart, jointly and severally, are hereinafter referred to as "Seller"

and

> Red Eagle Avionics, LLC, a Delaware Limited Liability Company (hereinafter referred to as "Purchaser") Tax I.D. No. 03-0576592.

## RECITALS

A.    The Corporation is engaged in the aircraft avionics installation and repair business at 1 Dale's Way, New Castle, Delaware 19720 (hereinafter referred to as the "Business"):

B.    The Corporation owns the hangar at the aforesaid address (the "Hangar"), erected on a portion of 0.4696± acres of land leased by New Castle County (as Lessor) to the Corporation (as Lessee) pursuant to a lease dated February 1, 1994 (the "Lease"). New Castle County thereafter assigned its interest in the Lease as Lessor to the Delaware River and Bay Authority ("DRBA") pursuant to an Assignment and Assumption of Leases dated June 30, 1995 and recorded in the Office of the Recorder of Deeds in and for New Castle County, Delaware on October 25, 1995 in Book 2000, Page 285. A copy of the Lease is attached hereto as

1

Exhibit A.    The Corporation also owns other improvements installed by the Corporation on the leased premises surrounding the Hangar, including parking spaces, fencing, landscaping, etc., (hereinafter the "Improvements").    Certain portions of the Hangar are used by the Corporation in the operation of its Business. Other portions of the Hangar are leased by the Corporation to one or more tenants;

C.    Ehart is the sole stockholder of the Corporation;

D.    The Corporation desires to sell and Purchaser desires to purchase certain of the Corporation's business assets (hereinafter referred to as the "Business Assets") in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and conditions and mutual promises, understandings and agreements contained herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    <u>Sale of Business Assets</u>.    In reliance upon the representations, warranties and agreements and subject to the terms and conditions herein contained, the Corporation hereby sells, transfers, conveys, assigns and delivers to Purchaser, and Purchaser hereby purchases from the Corporation, all of the following Business Assets:

(a)    Equipment, including shop machinery equipment, office furniture and equipment, vehicles, maintenance equipment, supplies and all spare parts inventory and all other assets of the Corporation used in the Business, some of which are more particularly described on Exhibit B attached hereto and made a

2

part hereof;

        (b)     The Hangar and Improvements;

        (c)     The Corporation's Lease, as Lessee, with DRBA successor in interest to New Castle County, as Lessor;

        (d)     The Corporation's goodwill;

        (e)     The name, Red Eagle Avionics;

        (f)     Any leases that may exist with the Corporation's tenants, as set out more particularly on Exhibit C attached hereto and made a part hereof;

        (g)     All of the Corporation's customer lists, used in connection with the Business, which shall include the names and addresses of all customers which have transacted business with Seller.

        2.     <u>Excluded Assets</u>.  Specifically excluded from the assets hereby purchased are:

        (a)     The Corporation's cash and cash equivalents;

        (b)     The Corporation's Accounts receivable;

        (c)     Any deposits, including utility deposits unless transferred to Purchaser, in which case Purchaser shall reimburse the Corporation.

        3.     <u>The Purchase Price</u>.  The Purchase Price is Two Million Two Hundred Thousand Dollars ($2,200,000.00).

        4.     <u>Payment of the Purchase Price</u>.  The purchase price is hereby paid by Purchaser to Seller as follows:

        (a)     One Million Dollars ($1,000,000.00) is hereby paid in cash

by wire transfer, certified check, or by attorney's check.

        (b)    Purchaser hereby delivers to the Corporation a Promissory Note ("Note") in the amount of One Million Two Hundred Thousand Dollars ($1,200,000.00). The Note is payable monthly with interest at 8.5% per annum, and is self-liquidating pursuant to a twenty year amortization schedule (240 months) with equal monthly payments for principal and interest of $10,413.88, in the form attached hereto.

        5.    <u>Security</u>. The Note is secured by a first lien on the Leasehold Interest, the Hangar and the Improvements, by a mortgage executed by Purchaser, delivered to the Corporation and to be recorded in the New Castle County Recorder of Deeds' Office.

        6.    <u>Allocation of Purchase Price.</u>    The Purchase Price of $2,200,000.00 is hereby allocated as follows:

| | | |
|---|---|---|
| (a) | Hangar | $1,870,000.00 |
| (b) | Improvements | -0- |
| (c) | Good will | -0- |
| (d) | Equipment | 200,000.00 |
| (e) | Inventory | 30,000.00 |
| (f) | Covenant not to compete | 100,000.00 |
| | Total | $2,200,000.00 |

4

7.    <u>Adjustments for Ongoing Business Matters as Between Purchaser and Seller</u>.

(a)    Purchaser shall pay the Corporation separately for any prepaid expenses accepted by Purchaser;

(b)    Purchaser and the Corporation shall prorate and/or adjust as of the date hereof any lease payments, storage payments, utilities and other normal and usual reoccurring expenses of the business, such as rent, etc., payments received by the Corporation prior hereto, which requires Purchaser to provide goods or services hereafter, maintenance work in process or any other payments received by Purchaser hereafter for which the Corporation provided goods or services prior hereto;  provided that Purchaser shall not be obligated to pay the Corporation until Purchaser has been paid.

(c)    All such prorations and adjustments shall actually be made between the Corporation and Purchaser after the date hereof, but as soon as practical.

7.    <u>Representations and Warranties of Seller</u>.    Seller, jointly and severally, represents and warrants to Purchaser as follows:

(a)    <u>Organization.</u>  The Corporation is duly organized, validly existing and in good standing under the laws of the State of Delaware and has full corporate power and authority and all governmental and other permits, licenses and authorizations necessary to own or lease and use its respective assets and to carry on its respective business as now conducted. Seller has delivered to Purchaser

5

a Good Standing Certificate.

        (b)    <u>Ownership and Condition of Assets</u>. The Corporation has good and marketable title to the Business Assets, Leasehold Interest and Improvements. Seller hereby sells the Assets free and clear of all liens, claims, charges or security interests. However, the Hangar and the Improvements are subject to the Lease.

        The Corporation has made no previous assignment, transfer or sale of its interest in the Lease, nor is the Corporation in default or breach of any obligation or duty of Lessee arising under the Lease.

        (c)    <u>The Corporation's Creditors</u>.    The Corporation shall pay all of its creditors either immediately or in due course and as soon as practicable. The Corporation has furnished to Purchaser a list of its creditors that it will pay and the amount owed to each. Purchaser is not accepting liability for any of the Corporation's obligations unless specifically agreed to and set out herein. Among the Corporation's debts which are being paid in full by the Corporation from the Corporation's proceeds of this sale are the following:

        (i)    Commercial Loan from Wachovia Bank in the total amount, including accrued interest, of $445,905.21; To secure this loan, the Corporation granted a Leasehold Mortgage and Assignment of Leases to Wachovia Bank's predecessor in interest, First Union National Bank of Delaware, dated April 4, 2001 and recorded April 10, 2001 in the Office of the Recorder of Deeds in and for New Castle County, Delaware in Instrument #20010410-002505. This lien is to be

<div align="center">6</div>

satisfied of record after receipt of payment of the loan in full by Wachovia;

           (ii)    Small Business Administration Loan in the total amount, including accrued interest, of $30,583.56.

           (d)    <u>Availability of Other Property</u>.  Seller hereby makes available to Purchaser by leaving at the Business Premises any other tangible or intangible property used in the Business of Seller, including but not limited to, operating manuals, maintenance records, books, records, materials, manuals, plans, drawings, computer programs and software and other data relating to the Business unless specifically excluded pursuant to Paragraph 2 above.  With regard to the books and records of the Corporation, Seller will retain possession of such books and records, but physically maintain them at the Business premises for a period of two years following closing.  During this period of time, Purchaser will have access to those records and shall have the right to copy any of them.  Thereafter, Seller shall have the right to remove the books and records from the Business premises, but for the next three years, upon the request of Purchaser, Seller will provide Purchaser with reasonable access to and copies of the same.

           (e)    <u>Authorization</u>.  The execution, delivery and performance of this Agreement and Sale by the Corporation has been duly and validly authorized by the Corporation's Board of Directors and by all necessary stockholder action. Neither the execution and delivery nor performance of this Agreement by Seller constitutes a violation of, or results in a default, the acceleration of any obligation, or the imposition of any lien under, the certificate of Incorporation, By-Laws of the

Corporation, or any statute, law, rule or order applicable to Seller, or any contract, agreement, indenture, mortgage or other instrument to which Seller is a party or to which any of its assets are subject.

(f)    <u>Governmental Licenses.</u>    The Corporation operates its Business pursuant to a United States Department of Transportation Federal Aviation Administration Air Agency Certificate No. VRUR564L, empowering the Corporation to operate an approved repair station with certain ratings and limitations as specified in said Certificate.

(g)    <u>DRBA'S Approval.</u>    DRBA has provided its written consent to the Corporation's assignment of the Lease to Purchaser and Purchaser granting to the Corporation a mortgage and security agreement with respect to the Lease, the Hangar and leasehold improvements to secure Purchaser's Promissory Note to the Corporation.

(h)    <u>Other Approvals.</u>    With the exception of any approvals required by the Federal Aviation Administration in connection with Purchaser's acquisition of a similar aircraft repair station certificate, no governmental authorization, permit or approval is required on the part of Seller to enter into or perform this Agreement or to carry out the transactions completed hereby.

(i)    <u>Tax Matters.</u>    Seller has filed all Federal, State, and local tax returns which they are required to file, and has paid all taxes, interest, penalties, assessments and deficiencies, including but not limited to Federal Excise taxes, which have become due as shown in such returns or which have been claimed

8

to be due.  Seller is current in the payment of income, property, franchise, sales and withholding taxes and other employee benefits, taxes or imposts.  No examination by the Internal Revenue Service, or the Delaware Division of Revenue is presently being conducted or has been conducted for any year as to which the statute of limitations has not run.  Seller has received no notice of an examination from the Internal Revenue Service or the Delaware Division of Revenue.

(j)    Books and Records.    All business records and customer lists of Seller are in all material respects complete and correct.

(k)    Equipment, Hangar and Improvements.    All equipment, the Hangar, including its mechanical systems, and the Improvements sold hereunder are owned entirely by the Corporation and are in good operating condition.

(l)    Insurance Policies.    All theft, casualty, liability and other insurance policies insuring Seller and the property sold and purchased hereunder continue to be duly in force at the time of this Sale.  Seller is not in default with respect to any provisions of any such policy, nor has Seller failed to give any notice or present any material claim under any such policy in a due and timely fashion. Seller has provided Purchaser with a copy of each insurance policy (other than life) maintained by Seller.

(m)    Correspondence with Government Agencies.    Seller has not received any correspondence or other communications that affect the Assets or Seller's business from or addressed by it to any governmental agency or

9

instrumentality, whether state, local or federal, including but not limited to matters involving OSHA, the Environmental Protection Agency and/or the Federal Aviation Administration and/or the United States Department of Transportation, within the three year period ending as of the date hereof, relating to any violation, possible violation, potential violation or alleged violation of any applicable law, regulation or ordinance.

(n)    Litigation and Investigations.    Seller is not a party to or threatened with any litigation, suit, action, investigation, proceeding or controversy before any court, administrative agency or other governmental authority which might result in any material adverse change in the licenses, business operations, properties or assets of Seller or in its condition, financial or otherwise, or in any way involving this Agreement or the transactions contemplated hereby and, to the best of Seller's knowledge, is not subject to or in violation of or in default with respect to any judgment, order, writ, injunction, decree or rule of any court, administrative agency or governmental authority or under any regulation of any administrative agency or governmental authority.    Seller has complied in all material respects, and is complying in all material respects, with all laws, rules, regulations and ordinances affecting its business.

8.    Representations and Warranties of Purchaser.

(a)    Organization.    Purchaser is a limited liability company duly organized and validly existing under the laws of the State of Delaware and has full power and authority to enter into and perform this Agreement.    Purchaser has

10

delivered to Seller a Good Standing Certificate.

(b)    Authorization.    The execution, delivery and performance of this Agreement by Purchaser have been duly authorized by Purchaser's sole member, David Cannavo. Neither the execution and delivery nor the performance of this Agreement by Purchaser constitutes a violation of, or results in a default, the acceleration of any obligation, or the imposition of any lien under Purchaser's certificate of formation, Purchaser's operating agreement, any statute, law, rule or order applicable to Purchaser or any contract, agreement, indenture, mortgage or other instrument to which Purchaser is a party or to which any of its assets are subject. No governmental authorization, permit or approval is required on the part of Purchaser to enter into or perform this Agreement or to carry out the transactions contemplated hereby.

(c)    Validity.    This Agreement constitutes, and upon execution and delivery the Note, and all other documents executed in connection herewith, will constitute the valid and binding obligation of Purchaser enforceable against Purchaser in accordance with their respective terms, except to the extent limited by applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws of general application relating to or affecting the enforcement of creditors' rights.

(d)    Litigation.    There is no litigation at law or in equity nor any proceeding before any governmental board or agency, not fully covered by insurance, pending or, to Purchaser's knowledge, threatened which will in any way

11

inhibit or prevent Purchaser from fulfilling and performing all of its obligations under this Agreement and the documents to be delivered hereunder.

9.    Non-competition Agreement.    Seller has, as part of this transaction, executed and delivered to Purchaser a non-competition agreement.

10.    Covenants.

(a)    At Purchaser's option, Seller shall cooperate in transferring the Corporation's State of Delaware Unemployment Compensation Rating to Purchaser and any other transferable license, permit, etc. necessary for Purchaser to conduct the business of Seller.

(b)    Seller shall pay all of its Employees regular wages, wage supplements, benefits, including any accrued but unused vacation pay, up to the date hereof. Seller and Purchaser shall cooperate in the form of notice to be given to Seller's employees regarding this transaction.

(c)    The Corporation shall immediately cease to use the name Red Eagle Avionics.  The Corporation shall execute all necessary documents to change its corporate name on the records of the Delaware Secretary of State to a name not similar in any respect to Red Eagle Avionics to be chosen by Seller, thereby enabling Purchaser to use the name Red Eagle Avionics in Purchaser's operation of the Business.

11.    Miscellaneous.

(a)    Indemnification by Seller For Third Party Claims.    For a period of three (3) years following Closing, Seller hereby agrees to indemnify and

12

hold Purchaser harmless against all loss and damage (including reasonable attorney's fees and other expenses incurred in investigation, litigating and settling any claims) of whatever nature suffered by Purchaser at any time, in connection with any claim made against Purchaser by a creditor of Seller.

(b)     Purchaser shall have the right to set off any amounts due and owing to it by Seller based on indemnification hereunder against any amounts otherwise owing by Purchaser to Seller under the Promissory Note in accordance with the following procedure.

(i)     Purchaser shall notify the Seller with reasonable promptness pursuant to the Notice provisions hereof (the "Notice") of any claim that has been asserted against Purchaser for which Purchaser is entitled to indemnification hereunder. Upon receiving such notice, the Seller and Purchaser shall jointly determine if they can agree on a method of treating the claim and Purchaser's exposure thereon. If no such agreement is reached within sixty (60) days of the posting of notice, the dispute shall be submitted to binding arbitration as provided for herein. Purchaser shall not have the right to cease making payments due under the Note during the pendency of the claim and shall only have such right if ordered by the arbitrator.

(c)     <u>Indemnification By Purchaser</u>.  For a period of three (3) years following Closing, Purchaser shall indemnify and hold Seller harmless against all loss and damage (including reasonable attorney's fees and other expenses incurred in investigation, litigating and settling any claims) of whatever

13

nature suffered by Seller at any time, in connection with any claim made against Seller by a creditor of Purchaser.

(d) <u>Miscellaneous</u>. The indemnification remedies provided herein by this section shall be in addition to any remedies available to either party provided by law for breach of any warranty or misrepresentation or in any promise under this agreement.

(e) <u>Survival of Warranties</u>. All representations, warranties and agreements made by Seller and Purchaser in this Agreement, or pursuant thereto, shall survive these transactions.

(f) <u>Successors</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assigns. All obligations of Seller shall be joint and several.

(g) <u>Governing Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

(h) <u>Cumulative Remedies</u>. No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each remedy shall be cumulative and shall be in addition to every other remedy provided herein or by law. The election of anyone or more remedies by Purchaser or Seller shall not constitute a waiver of a right to pursue other available remedies.

(i) <u>Notice</u>. Any notice or other communications required or

14

permitted hereunder shall be sufficiently given only if sent by registered or certified mail, postage prepaid, addressed as follows or to such other address or addresses as may hereafter be furnished in writing by notice similarly given by one party to the other:

To Purchaser:                              To Seller:

c/o David Cannavo                          c/o Donald Mark Ehart
1 Dale's Way                               795 Union Church Road
New Castle, Delaware 19720                 Townsend, Delaware 19734


Copy to:                                   Copy to:

David Roeberg, Esquire
Roeberg, Moore & Friedman, P.A.
910 Gilpin Avenue
Wilmington, Delaware 19806


(j)    Modification. This Agreement shall not be modified or amended except by written agreement of all parties hereto. Any dispute between the parties regarding this Agreement shall not be decided on the basis of authorship.

(k)    Expenses. Seller and Purchaser will each pay their own costs and expenses incident to the transactions contemplated hereby, including but not limited to the fees and expenses of their respective counsel and accountants.

(l)    Headings. The headings of the paragraphs of this Agreement are inserted for convenience of reference only and shall not be considered a part hereof.

(m)    Further Assurances. Each of the parties hereto shall

15

from time to time at the request of any other party hereto, and without further consideration, execute and deliver to such other party such further instruments of assignment, transfer, conveyance and confirmation and take such other action as such other party may reasonably request in order to fulfill more effectively the transactions hereby completed for the purposes of this Agreement.

(n)    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts with the same effect as if the signatures thereto and hereto were upon the same instrument, but all of such counterparts taken together shall be deemed to constitute one and the same instrument.

(o)    <u>Time is of the Essence</u>.    Time shall be of the essence in this Agreement.

(p)    <u>Broker Fees</u>.    Each party shall be solely responsible for the payment of any brokerage fees that it might be liable for and agrees to indemnify and hold each other harmless from the payment of any such fees. Seller and Purchaser each represent that it has not engaged any broker with respect to this transaction and that no broker is entitled to any fee or compensation with respect to this transaction.

(q)    <u>Arbitration</u>.    Any dispute which arises under this Agreement shall be decided through binding arbitration, conducted under the auspices of the American Arbitration Association.    Any such arbitration shall be conducted in accordance with the Rules of the American Arbitration Association, before a single arbitrator, in Wilmington, Delaware.    Arbitration shall be

commenced by either party giving written notice of a demand for arbitration to the other party, setting out party giving written notice of a demand for arbitration to the nature of the dispute which is alleged. All costs and expenses of the arbitration, including attorney's fees, shall be allocated among the parties according to the arbitrator's discretion. The arbitrator's award resulting from such arbitration shall be confirmed and entered as a final judgment in the Court of Chancery of the state of Delaware in and for New Castle County.

IN WITNESS WHEREOF, each of the parties hereto has fully executed this Agreement all as of the day and year first above written.

SELLER:
Red Eagle Avionics, Inc., a
Delaware Corporation

By: _____

Donald Mark Ehart, President and
Secretary

Date of Signature: _1-3-06_

[Corporate Seal]

_____
Witness

_____ (SEAL)
DONALD MARK EHART, Individually

Date of Signature: _1-3-06_

*(Signatures continue on next page)*

17

PURCHASER:
Red Eagle Avionics, LLC, a
Delaware Limited Liability Company

By: _____
        David Cannavo, Member

Date of Signature:   $1 - 3 - 06$

# UNREPORTED CASES

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

H
Comrie v. Enterasys Networks, Inc.
Del.Ch.,2004.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Michael COMRIE, Ian Cheong, Earle Comrie, Kay
Comrie, Leroy Dougherty, Cynthia A. Ott, Peter
Ott, Stephanie Sebastiano, Sally Seto, Afshin
Shams, and Julie M. Shams, Plaintiffs,
v.
ENTERASYS NETWORKS, INC., a Delaware cor-
poration, GNTS (Canada) Inc., an Ontario corpora-
tion, and GlobalNetwork Technology Services,
Inc., a Delaware corporation, Defendants.
No. Civ.A. 19254.

Submitted Jan. 29, 2004.
Decided Feb. 17, 2004.

Vernon R. Proctor, Patricia Enerio, the Bayard
Firm, Wilmington, Delaware, for the Plaintiffs.
William M. Lafferty, Patricia Uhlenbrock, Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware;
Douglas H. Meal, Emily C. Shanahan, Ropes &
Gray, Boston, Massachusetts, for the Defendants.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 In an earlier opinion, the court held that the
defendants had breached a stock purchase agree-
ment by not providing an "equivalent substitute"
for options granted in accordance with that agree-
ment. The defendants were under a duty to provide
such a substitute pursuant to certain performance
obligations found in Exhibit 7.11 to that agreement,
which provides for the substitute if an IPO of Glob-
alNetwork Technology Services, Inc. was not un-
dertaken.

Exhibit 7.11 also provides for a similar grant of

options to certain employees who are not signator-
ies to the stock purchase agreement and were not,
originally, plaintiffs in this action. A majority of
those employees now seek to recover against the
defendants based on the findings in the earlier opin-
ion. The court concludes that those employees, as
donee beneficiaries, have standing to bring such a
suit; however, certain of those employees are
barred from bringing suit because of releases signed
by them as part of a severance package.

II.

BIT Management, Inc. ("BIT") was an Ontario
corporation engaged in the information technology
consulting and software development industry. In
2000, Cabletron Systems, Inc. ("Cabletron"),[FN1] a
Delaware corporation headquartered in Rochester,
New Hampshire, engaged in a restructuring,
through which it created four subsidiaries: Aprisma
Management Technologies, Inc., Enterasys Net-
works, Inc. ("Enterasys"), Riverstone Networks,
Inc., and GlobalNetwork Technology Services, Inc.
("GNTS"). Under this restructuring, Cabletron
planned to conduct an IPO for each operating subsi-
diary by the end of 2001, followed by a spin-off of
the subsidiaries' remaining shares to Cabletron's ex-
isting stockholders.

> FN1. Cabletron merged with its former
> wholly owned subsidiary, Enterasys Net-
> works, Inc. on August 6, 2001. The surviv-
> ing corporation, also called Enterasys Net-
> works, Inc., along with GlobalNetwork
> Technology Services, Inc., both Delaware
> corporations, are the defendants in this ac-
> tion.

GNTS, in preparation for its IPO, sought to
purchase small service companies complementary
to its existing business in order to diversify its rev-
enue base. BIT was identified as a potential target
and negotiations between GNTS and BIT ensued in
early 2000. The resultant Stock Purchase Agree-
ment (the "Agreement") among Cabletron, GNTS,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

GNTS (Canada, Inc.),[FN2] BIT, and the holders of all of the outstanding capital of the stock of BIT (the "BIT Stockholders") (collectively, the "Parties") was signed on August 23, 2000.

> FN2. GNTS (Canada, Inc.) was an acquisition vehicle formed to aid the stock purchase.

The Agreement provides for an exchange of BIT stock for a combination of cash and options to purchase stock in GNTS. Specifically, section 7.11 of the Agreement requires Cabltetron to cause GNTS to adopt an option plan pursuant to terms set forth in Exhibit 7.11 attached to the Agreement. Exhibit 7.11 requires Cabletron to cause GNTS to "allocate options for 466,605 shares of GNTS stock ... to the employees of BIT."Of those shares, 55,814 were to be issued to each of the partners of BIT (the "Partners"),[FN3] with the balance of shares (up to 14,512 each) to be issued to 12 non-partner former employees of BIT [FN4] (the "Non-Partner Employees," together with the Partners, the "BIT Group").

> FN3. The partners of BIT were Ian Cheong, Michael Comrie, Leroy Dougherty, Peter Ott, and Afshin Shams. The Partners, together with Earle Comrie, Kay Comrie, Cynthia A. Ott, Stephanie Sebastiano, Sally Seto, and Julie M. Shams are the plaintiffs in this action (the "plaintiffs").

> FN4. The non-partner former employees are Carrie Brody, Wayne W. Cuervo, Peter Forsythe, Glen Julien, Elizabeth Kapuscinski, Jennifer Knabenschuh, Ernie Lim, Paul Matheson, Darwin Palma, Bonnie Planchart, Ramesh Rathnam, and Donald Swora.

To protect the BIT Group in the event the defendants decided not to go forward with the GNTS IPO, the Parties agreed upon a substitution provision, which is included in Exhibit 7.11. That provision states:

**\*2** In the event that [Cabletron] determines not to pursue its current intention to cause GNTS to un-

dergo an initial public offering prior to December 31, 2001 or determines not to pursue its current intention to distribute the stock of GNTS to the shareholders of [Cabletron] (each a *"Trigger Event"* ), within sixty (60) days of the Trigger Event, [Cabletron] shall either (i) *provide equivalent substitute or replacement awards on the same terms and conditions to the former employees of [BIT];* or (ii) pay $4,620,000 in the aggregate for all Options then held by the Partners and former employees of [BIT].[FN5]

> FN5. Emphasis added.

Within a few days of the closing of the Agreement, GNTS issued to the BIT Group an aggregate of 466,605 GNTS stock options at an exercise price of $4.25. A Trigger Event occurred on July 16, 2001,[FN6] thus implicating the substitution provision. On August 23, 2001, Cabletron decided to provided the BIT Group with substitute or replacement options.[FN7]Cabletron issued these options based on the theory that the substitute or replacement options must be valued at the same amount as the original GNTS options at the date of *replacement.*[FN8]

> FN6.*Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 11 (Del. Ch.2003). The Intervenors and the defendants agreed by stipulation, for purposes of this action, to be bound by the factual and legal findings and conclusions set forth in the opinion. Further, they allowed reliance by both sides on all exhibits, trial testimony, and designated deposition testimony admitted at the trial in the underlying litigation. Stipulation Regarding Claims of Intervenors (Nov. 7, 2003) ("Stipulation").

> FN7. Stipulation at ¶ D(2).

> FN8.*Comrie,* 837 A.2d at 14.

The plaintiffs filed suit claiming that the substitute or replacement options were to be valued as the same amount as the GNTS options at the date of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 3
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

issuance.[FN9]The court found, in a September 4, 2003 opinion (the "September 4 Opinion"), that the plaintiffs were correct in their reading of the Agreement, and by not issuing options valued as the same amount as the GNTS options at the date of issuance, Cabletron had breached the Agreement.[FN10]

> FN9.*Id.*

> FN10.*Id.* at 17.

The court found damages in the amount of $2,190,620.[FN11]However, the plaintiffs only held 58.8% of the GNTS options, and were thus only entitled to an award of $1,309,991.[FN12]Because the Non-Partner Employees held the remainder of GNTS options, the court reserved final judgment, stating, "[i]t is entirely plausible ... that the BIT employees who were not plaintiffs in this action are third-party beneficiaries to the Agreement, and are equally entitled to an award based on a breach of that Agreement."[FN13]

> FN11.*See id.* at 21 (calculating damages).

> FN12.*Id.*

> FN13.*Id.*

Pursuant to the September 4 Opinion, an order dated October 7, 2003,[FN14] and Court of Chancery Rule 24,[FN15] ten of the Non-Partner Employees [FN16] included in the BIT Group (the "Intervenors") moved to intervene on October 21, 2003. A complaint in intervention was filed contemporaneously with the motion. The defendants' answer contains five affirmative defenses, two of which are addressed in the briefs. Specifically, the defendants contend that the Intervenors are not donee beneficiaries of the Agreement, and thus do not have standing to bring suit. Alternatively, the defendants argue that even if the Intervenors have standing, releases signed by certain of the Intervenors serve to bar their claims.

> FN14. This order provided that "any Potential Beneficiary who files a timely and proper motion to intervene will be permit-

ted to intervene pursuant to Chancery Court Rule 24(b)." The implication of guaranteeing intervention is that the defendants would not waive any potential defenses, including a standing defense.

> FN15.Court of Chancery Rule 24(b) permits the court, in its discretion, to allow one to intervene in an action when a statute confers a conditional right to intervene, or when the applicant's claim and the main action have a question of law or fact in common. The application must be made according to the procedure set out in Court of Chancery Rule 24(c).

> FN16. Brody and Planchart did not join in the motion to intervene.

### III.

Parties to an agreement may enforce the contractual terms of that agreement.[FN17] As a general rule, a nonparty to a contract has no legal right to enforce it.[FN18]This general rule yields to the notion that intended third-party beneficiaries have an enforceable right under contracts conferring a benefit to them, even though they are not parties to those contracts.[FN19] The general rule does apply, however, to prevent mere incidental beneficiaries from claiming enforceable rights under a contract.[FN20]

> FN17.*See Triple C Railcar Serv. v. City of Wilmington,* 630 A.2d 629, 633 (Del.1993) ("It is axiomatic that either party to an agreement may enforce its terms for breach thereof."); *Madison Realty Partners 7. LLC v. AG ISA, LLC,* 2001 WL 406268, at *4 (Del. Ch. Apr. 17, 2001) ("It is undisputed that Madison, as a signatory to the Partnership Agreement, has standing to sue for a breach of that Agreement.").

> FN18.*See Insituform of N. Am., Inc. v. Chandler,* 534 A.2d 257, 268 (Del. Ch.1987) ("[T]he general rule [is] that strangers to a contract ordinarily acquire

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
**(Cite as: Not Reported in A.2d)**

no rights under it ..."); *Stuchen v. Duty Free Int'l, Inc.,* 1996 WL 33167249, at *9 (Del.Super.Apr. 22, 1996) ("The general rule in this state is that a stranger or nonparty to a contract has no legal right to enforce it."); *see also Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378, 1386 (Del.Super.1990) ("Ordinarily, a stranger to a contract acquires no rights thereunder ...").

FN19.*See Insituform of N. Am., Inc.,* 534 A.2d at 268 (noting that the general rule applies "unless it is the intention of the promisee to confer a benefit upon such third party"); *Stuchen,* 1996 WL 33167249, at *9 ("This principle holds sway unless the parties to the contract intended to confer a benefit upon an unrelated party, making them so-called third party beneficiaries.").*See generally*13 Richard A Lord, A Treatise on the Law of Contracts by Samuel Williston § 37:1 (4th ed 2000) ("Williston on Contracts") (discussing the rights of intended third-party beneficiaries).

FN20.*See Insituform of N. Am., Inc.,* 534 A.2d at 269 ("If, however, it was not the promisee's intention to confer direct benefits upon a third person, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then such third party beneficiary will be held to have no enforceable rights under the contract."); *see also* 9 Arthur Linton Corbin, Corbin on Contracts § 779C, at 36 (Interim ed. 1979) ("Corbin on Contracts") ("All others who may in some way be benefited by performance have no rights and are called incidental beneficiaries.").

*\*3* In *Insituform of North America, Inc. v. Chandler,* this court set out a test for whether or not one is an intended beneficiary under a contract:
In order for third party beneficiary rights to be

created, not only is it necessary that performance of the contract confer a benefit upon third parties that was intended, but the conferring of a *beneficial* effect on such third party-whether it be a creditor of the promisee or an object of his or her generosity-should be a material part of the contract's purpose.FN21

FN21.534 A.2d at 270.

Former Vice Chancellor Jacobs, in *Madison Realty Partners 7, LLC v. AG ISA, LLC,* summarized the elements included in this test:
To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.FN22

FN22.2001 WL 406268, at *5.

Thus for the Intervenors to have standing to bring suit based on the Agreement, they must show that the BIT Stockholders intended that the Non-Partner Employees benefit from the Agreement (i.e., receive the options), FN23 that the benefit was intended as a gift from the BIT Stockholders to the Non-Partner Employees,FN24 and that the conferral of that benefit is a material part of the Agreement's purpose.FN25

FN23. There is conflicting precedent as to whether the requisite intent must be of the parties to the contract or of the promisee individually. *Compare Triple C Railcar Service,* 630 A.2d at 633 ("Essential to a third party's right of enforceability is the *intention of the contracting parties* to view that party as either a donee or creditor beneficiary.") (emphasis added), and *Madison Realty Partners 7, LLC,* 2001 WL 406268, at *5 ("[T]he *contracting parties* must have intended that the third party be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

neficiary benefit from the contract) (emphasis added), with *Insituform of N. Am., Inc.,* 534 A.2d at 268 ("It is universally recognized that where it is the *intention of the promisee* to secure performance of the promised act for the benefit of another ...") (emphasis added), and *Guardian Constr. Co.,* 583 A.2d at 1386 ("[W]here it is the *intention of the promisee* to secure performance of the promised act for the benefit of another ...") (emphasis added). In applying Delaware law, the United States District Court for the District of Delaware addressed this conflict. The District Could held "that under Delaware law both parties must in some manner express an intent to benefit the third-party before third-party beneficiary status is found."*Am. Fin. Corp. v. Computer Scies. Corp.,* 558 F.Supp. 1182, 1185 (D.Del.1983).

Here, the defendants, as promisors, acknowledge that the intent element is satisfied as to them. Ans. Br. of Def's. Enterasys Networks, Inc. and Global*Network* Tech. Servs., Inc. to Intervenors' Claim for Relief, at 11 (Dec. 5, 2003) ("Ans.Br."). Thus regardless of which analysis is used, the only issue for the court to decide is the intent of the promisees, here BIT and the BIT Stockholders.

> FN24. No allegations have been made that the BIT Stockholders had a preexisting obligation to the Intervenors. As such, the Intervenors must show that they are donee beneficiaries. *See Guardian Constr. Co.,* 583 A.2d at 1387 ("The only third parties who have legal rights are donees and creditors of the promisee.").

> FN25. The Restatement (Second) of Contracts eliminates the distinction between creditor and donee beneficiaries. Instead, it tests only for whether one is an intended beneficiary. Specifically, it states:
> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effec-

tuate the intention of the parties and either
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> (b) the circumstances indicate the promisee intends to give the beneficiary the benefit of the promised performance.
> Restatement (Second) of Contracts § 302 (2004). Further, the introductory note to this chapter of the Restatement points to the "recognition of the power of promisor and promisee to create rights in a beneficiary by manifesting an intention to do so."While this test has not yet been adopted by the Delaware courts, the ALI's adoption of it is of note, and the standing of the Non-Partner Employee's under this test is even stronger.

The intent of the BIT Stockholders' to bestow rights on the Non-Partner Employees is plain from the face of the Agreement.[FN26]When a promised performance is rendered directly to the beneficiary, "it is presumed that the contract was for the beneficiary's benefit ."[FN27]Here, Exhibit 7.11 directs the defendants to grant options directly to the Non-Partner Employees. This differentiates the present facts from the facts considered in *Insituform,* where members of a board of directors argued that a stock-voting agreement, which none of the members had signed and which obligated the signatories to either abstain from voting their stock or to vote their stock in unanimity for existing members, created a right to "continued tenure" in the board members for the entire term of the stock-voting agreement.[FN28]Although the board members "surely were potentially benefited by performance of the promises"[FN29] contained in the stock-voting agreement, that benefit was incidental to that agreement. Here, the Agreement directs the defendants to issue performance directly to the Non-Partner Employees.

> FN26. Since the BIT Stockholders owned all of the outstanding shares of the capital stock of BIT, the opinion addresses the intent of BIT and the BIT Stockholders simply as the intent of the BIT Stockholders.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

FN27.Williston on Contracts, § 37:7, at 55. *See also id.* § 37:8, at 70 ("In the typical case, where the promisor has undertaken to render performance directly to the beneficiary, the intent to benefit the third party will be clearly manifested.").

FN28.534 A.2d at 268-70.

FN29.*Id.* at 269.

Further, even if one were to look beyond the face of the Agreement, an intent to benefit the Non-Partner Employees is clear. The Partners and Non-Partner Employees had set an expectation that "in the event of a sale or IPO [the Non-Partner Employees] would receive in the range of 10% to 15% of the value in cash and stock."[FN30]In deposition testimony designated by the defendants at trial, Mr. Comrie, the former managing partner of BIT, explained how this expectation was set:

FN30. DX 6.

**\*4** There was nothing particular that had occurred other than when we were hiring them, we had indicated to them that at some point down the road they may be able to share in the company. We had a profit sharing-an informal profit sharing plan and we had actually looked at ways in which we could make our employees, quote unquote, owners or part owners in the organization and we looked at employee-looked at devising some way that they could have some ownership in the company in the field that they were working in for themselves. FN31

FN31. Comrie Dep. at 95-96.

Exhibit 7.11 is a manifestation of intent to fulfill this expectation. Contrary to the defendants' assertion, "[a]ny benefit that accrued to the BIT employees as a result of the performance of the Stock Purchase Agreement" was not simply the product of the defendants' efforts.[FN32]The Intervenors have shown intention to benefit the Non-Partner Employees, thus meeting the first prong of the *Insituform* test.

FN32. Ans. Br. at 15.

Moreover, the Intervenors have clearly shown the BIT Stockholders' intent as donative. In order to show *donative* intent, one must show that the promisee intended to make a gift of the promisor's performance to a third party.[FN33] The defendants claim that the options granted to the Non-Partner Employees were not the BIT Stockholders' to give-that the drafting of the option requirement into the Agreement did not cut into the consideration the BIT Stockholders would otherwise have been paid for their stock in BIT.[FN34] Findings in the September 4 Opinion, as the defendants' own brief points out, clearly prevent this argument. "GNTS had always represented to BIT that it was willing to pay at least 6 times and up to 7 times BIT's revenues, which resulted in a valuation between \$8.8 million and \$10.23 million, of which approximately \$5.6 million was paid in cash."[FN35]As the defendants acknowledge, the remainder of the consideration was to be paid in options.[FN36] The options granted pursuant to Exhibit 7.11 represent the remainder of consideration to be paid. Exhibit 7.11, then, grants 40.2% of the options, which represents approximately 19% of the total consideration (i.e., the negotiated performance), to the Non-Partner Employees. This requirement is in line with the "set expectations" of the BIT Stockholders and Non-Partner Employees described in Mr. Comrie's deposition.FN37This is clear evidence of donative intent.[FN38]

FN33.Williston on Contracts § 37:8, at 73; *see also* Corbin on Contracts § 774, at 5-6 ("The third person is a donee beneficiary if the promisee who buys the promise expresses an intention and purpose to confer a benefit upon him as a gift in the shape of the promised performance.").

FN34. The defendants argue that the absence of a provision calling for a reversion to the Partners of that portion of options not exhausted by the grants to the Non-Partner Employees evidences lack of donative intent. While such a provision would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence an intent, lack of such a provision does not suggest lack of such intent. Similarly, the Intervenors' argument that the lack of a "no third-party beneficiary" clause indicates an understanding that there were beneficiaries does not hold water.

FN35.*Comrie,* 837 A.2d at 38 n.91,*reprinted in* Ans. Br. at 13.

FN36. Ans. Br. at 14.

FN37. Comrie Dep. at 95-96. The defendants argue that there can be no donative intent because Mr. Comrie pressed for an all-cash deal during negotiations. *See* Comrie Dep. at 77-79. However, there is no evidence that should Mr. Comrie have succeeded in obtaining an all-cash deal, he would not have passed on a similar percentage of compensation to the Non-Partner Employees. The only definitive evidence presented is that the Non-Partner Employees received a percentage of the expected value of the deal.

FN38. The defendants argue that because the non-partner BIT Stockholders did not receive options, the logical route of this conclusion, in the absence of an agreement among the BIT Stockholders to share the value of options, is that the non-partner BIT Stockholders intended to donate a disproportionate percentage of consideration to the Non-Partner Employees. How the BIT Stockholders intended to divide that portion of consideration provided to the Partners, but not the non-partner BIT Stockholders, is outside the scope of this analysis. The analysis only requires a showing of intent that the Intervenors made a gift of the promisors' performance. Exhibit 7.11 clearly shows this.

Finally, the grant of options to the Non-Partner Employees is a material part of the purpose of the Agreement. Where the effect on a third party, "while a benefit to [that party] and intended, [is] merely a means through which the benefit that motivated the contract was sought to be achieved for the signatories," even if that third party is not merely incidental to the contract, that third party takes no rights under the contract.[FN39]Thus in order to gain rights under a contract, the beneficial effect to the third party must be material to the purpose of the contract.

FN39.*Insituform,* 534 A.2d at 270.

*5 The defendants assert that the granting of options to the Non-Partner Employees was merely instrumental to achieving the BIT Shareholder's purpose of maximizing shareholder value. The e-mail relied upon by the defendants to show maximization of value as the sole purpose of the contract, however, does not lead to this conclusion. The defendants point to an e-mail sent by Mr. Shams to the BIT Partners in which Mr. Shams comments on a draft term sheet circulated among those partners.FN40In that e-mail, Mr. Shams states that he had "two intentions" when forming the company: being able to help run a company and financial reward. Based on this, the defendants assert that donating to the Non-Partner Employees a portion of the consideration would be at odds with the BIT Stockholders' purpose for entering into the Agreement. The conclusion simply does not flow from the premise. One cannot conclude the purpose of entering into the Agreement from a stated purpose of starting BIT in the first place. Further, in the e-mail, Mr. Shams implores the other Partners not to lose sight of the "effect that [the deal] would have on everyone involved, *including the employees.*"[FN41]

FN40. DX 17.

FN41.Id. (emphasis added).

The record shows, as discussed above, the purpose of the BIT Stockholders in entering into the contract included conferring a benefit to the employees. The option grant is material to that purpose and thus the third prong of the *Insituform* test is met.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

Page 8

The Intervenors, having met the test set out in *Insituform,* are donee beneficiaries of the Agreement and thus have standing to bring suit to enforce their rights under Exhibit 7.11 of that Agreement.

IV.

Although the Intervenors have standing to enforce rights under the Agreement, the defendants allege several of the Intervenors signed, in conjunction with severance packages, releases preventing them from bringing claims they might otherwise have had.

In construing the releases, the court looks to the overall language of the releases to determine the parties' intent, which is controlling.[FN42]If the language of a release is clear, the court will give effect to that language. If the language is ambiguous, " 'it must be construed most strongly against the party who drafted it." ' [FN43]

> FN42.*See Corporate Prop. Assoc. v. Hallwood Group,* 817 A.2d 777, 779 (Del.2003); *Adams v. Jankouskas,* 452 A.2d 148, 156 (Del.1982).

> FN43.*Corporate Property Assoc.,* 817 A.2d at 779 (quoting *Adams,* 452 A.2d at 156).

A. *Forsythe and Lim*

There is no evidence that either intervenors Forsythe or Lim signed any release. They are thus entitled to damages in accordance with the calculations used in the September 4 Opinion to determine the plaintiffs' rights. Damages are to be calculated, however, on the basis of the October terminations of Forsythe and Lim and the effects of those terminations on the vesting schedule.

B. *Cuervo, Julien, Knabenschuh, Swora*

Intervenors Cuervo, Julien, Knabenschuh, and Swora (the "Release Signatories") each signed identical releases. The pertinent language of the releases state:

> FOR AND IN CONSIDERATION OF the special payments and benefits to be provided to me in connection with my separation of employment, as set forth in a Memorandum dated April 11, 2002 from Enterasys Networks, Inc., I ... hereby release and forever discharge Enterasys Networks, Inc. ("Enterasys") and its Affiliates ... and Cabletron Systems, Inc. ("Cabletron") and its subsidiaries and other affiliates and all of the respective past and present officers, directors, shareholders, members, managers, employees, agents, general and limited partners, joint venturers and representatives of any of the foregoing, the successors and assigns of Enterasys and its Affiliates and Cabletron and its subsidiaries and other affiliates, and all others connected with any of them (all collectively, the "Released"), both individually and in their official capacities, jointly and severally from any and all actions, causes of action, contracts, covenants, whether express or implied, claims, demands for damages, including disability, life or other insurance claims, indemnity benefits, costs, interest, loss or injury of every nature and kind whatsoever and howsoever arising whether statutory or otherwise, which I may have had, may now have or may hereinafter have, *in any way relating to the hiring of, the employment by and the cessation of my employment by the Released parties.*[FN44]

> FN44. Emphasis added. The releases are in the Affidavit submitted to this court by Douglas H. Meal on December 5, 2003.

*6 The Release Signatories argue that because the releases initially refer to an April 11, 2002 memorandum, which provides terms for termination of employment, the language releasing claims relating to the "hiring of, and the employment by" should be construed narrowly. They base this argument on the premise that "Delaware law is clear that words of general application used in a release 'which generally follow a specific recital of the subject matter concerned are not to be given their broadest significance but will be restricted to the particular matter referenced to in the recital." '

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                Page 9
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
**(Cite as: Not Reported in A.2d)**

FN45

FN45.*E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage,* 744 A.2d 457, 460 (Del.1999) (quoting *Adams,* 452 A.2d at 156).

The releases here are different from previous releases considered by Delaware courts. In *E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage,* for example, the Delaware Supreme Court considered whether a general release of all claims, whether known or unknown, in a settlement agreement, following a preamble alluding to the action being settled, prevented a future claim for fraudulent inducement. The Supreme Court focused on whether a releasee should be held to "release a claim for fraud in the execution of the release itself," and decided it should not.[FN46] In *Adams v. Kankouskas,* the Delaware Supreme Court interpreted a general release narrowly. That court's opinion, however, was based on the fact that the general release followed a specific *release,* not a specific *recital.* The releases in this case contain no such bifurcation.

FN46.*Id.* at 461.

Here, although stating that the releases are given in consideration of payments and benefits provided in the termination memorandum, the language of the releases specifically limits them to any action relating to the hiring of, employment by, and cessation of employment of the signatory. In seeking standing to assert their rights, the Intervenors linked their right to their options directly to their employee relationship with the defendants. Further, the options vested according to a schedule that depended on the Intervenors' continued employment with Cabletron, GNTS, or "any of their Affiliates." Under the clear, unambiguous language of the releases, the Release Signatories released their rights to bring a claim under Exhibit 7.11.[FN47]

FN47. The reliance of the Release Signatories on *Fischer v. Fischer,* 1999 WL 1032768 (Del. Ch. Nov. 4 1999), is misplaced. *Fischer* looked at the parties' intent

to determine whether a separation agreement between former spouses served to bar one former spouse's breach of fiduciary suit against the other former spouse. The court held that a release designed to cover the division of marital property could not foreclose a derivative suit by one spouse as shareholder against another spouse as director. The court determined "the parties never intended the release to discharge a claim arising outside the marriage relationship."*Id.* at *4. The claim in the current case is directly related to the subject matter of the release.

Further, the intention of the parties, which is controlling, is manifested by what each of the Release Signatories agreed to have removed from the releases. Each of the Release Signatories attempted to add handwritten language to his or her own release, stating "[e]xception to the above limited to Delaware litigation between sellers and buyers of BIT Management Inc initiated on or about Nov. 13, 2001."[FN48] The Release Signatories all authorized the removal of this language at the request of BIT. This explicit removal further shows that the parties' intent was not to include the Delaware litigation.FN49

FN48. One of the releases contained the abbreviation "Inc.," and three did not. Swora's additional handwritten language did not contain the words "limited to."

FN49. The Release Signatories seem to imply that their agreement to the removal of the additional language should not be valid because of estoppel, or alternatively because it was achieved as a result of duress. The Intervenor's Reply Brief, states that "Enterasys' own human resources consultant, Robert McCormack ... expressly advised Cuervo, Julien, Knabenscbuh, and Swora to include the handwritten language in the releases."Intervenors Reply Br. In Support of Their Claims for Relief 11-12 n.3 (Dec. 19, 2003) ("Reply Br."). Other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 10
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911
(Cite as: Not Reported in A.2d)

than a statement being made, the brief does not set forth other elements of estoppel.

Further, the Release Signatories argue that, should they not have agreed to the removal of language, they would have only been entitled to the "paltry two weeks pay required by applicable Ontario law."Reply Br. at 13. They essentially argue that there is duress because, had they not signed, they would not be entitled to the additional severance offered on top of what the Ontario legislature deemed appropriate. This is not a valid argument for duress.

The Release Signatories, because they have signed the releases, are estopped from bringing suit against the defendants under Exhibit 7.11 of the Agreement.

## C. *Rathnam*

*7 Intervenor Rathnam's release is substantially similar to those of the Release Signatories. It states:

IN CONSIDERATION of the payment to me of the amounts specified [in a separate letter] ... I, Ramesh Rathnam ... hereby release and forever discharge Global Network Technology Services, a subsidiary of Cabletron Systems, Inc. along with all parents, subsidiaries, affiliates and associated companies, and together with all respective officers, directors, employees, servants and agents and their successors and assigns (hereinafter collectively referred to as the "Releasee") jointly and severally from any and all actions, causes of action, contracts, covenants, whether express or implied, claims, demands for damages, including disability, life or other insurance claims, indemnity benefits, costs, interest, loss or injury of every nature and kind whatsoever and howsoever arising whether statutory or otherwise, which I may heretofore have had, may now have, or may hereinafter have, *in any way relating to the hiring of, the employment by and the cessation of the employment of the Releasor by the Releasee.*[FN50]

FN50. Emphasis added. This release is also included in the Meal Affidavit.

Although there is no attempted insertion and subsequent removal of additional language, as there is in the cases of the Release Signatories, the clear language of this release, for the same reasons discussed above, prevents Rathnam from bringing a claim against the defendants under the Agreement.

## D. *Matheson, Palma, Kapuscinski*

Although releases from intervenors Kapuscinski and Palma were submitted to the court, it is not clear from the record whether they signed those releases. Similarly, it is not clear whether intervenor Matheson, whose release mirrored that of Cuervo, Julien, Knabenschuh and Swora, agreed to accept the terms of the release without the proposed handwritten carve-out. Further factual development is required before the court can determine whether any of these intervenors released any claims they might otherwise have had.[FN51]

FN51. In a February 9, 2004, letter to the court, counsel to the defendants indicated that it has initiated steps toward developing this record.

## V.

For the foregoing reason, judgment will be entered for intervenors Forsythe and Lim, and against the Release Signatories. The parties are instructed to present an order in conformity with the calculations used in the September 4 Opinion (while keeping in mind the termination dates of Forsythe and Lim and the resultant effect on the vesting schedule) within 30 days. The parties are further instructed to update this court within 30 days as to the status of the Matheson, Palma, and Kapuscinski claims.

Del.Ch.,2004.
Comrie v. Enterasys Networks, Inc.
Not Reported in A.2d, 2004 WL 293337 (Del.Ch.), 29 Del. J. Corp. L. 911

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
MetCap Securities LLC v. Pearl Senior Care, Inc.
Del.Ch.,2007.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
METCAP SECURITIES LLC, and North American
Senior Care, Inc. Plaintiffs,
v.
PEARL SENIOR CARE, INC.; PSC SUB Inc.;
Geary Property Holdings, LLC; and Beverly Enter-
prises, Inc. Defendants.
**No. Civ.A. 2129-VCN.**

Submitted Jan. 25, 2007.
Decided May 16, 2007.

Joel E. Friedlander, and James G. McMillan, III, of
Bouchard Margules & Friedlander, P.A., Wilming-
ton, Delaware; and Martin Stein, of Heller, Horow-
itz & Feit, P.C., New York, New York, for Plaintiffs.
Bruce E. Jameson, and Laina M. Herbert, of Prick-
ett, Jones & Elliott, P.A., Wilmington, Delaware;
Joseph F. Donley, of Dechert LLP, New York, New
York; and H. Joseph Escher, III, of Dechert LLP,
San Francisco, California, for Defendants.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

I. INTRODUCTION

*1 An entity with no assets of its own was
formed for the special purpose of a future transac-
tion with a for-profit nursing home chain. It en-
gaged the services of an investment banking advis-
ory firm, agreeing to pay it a success fee upon the
completion of any transaction with the target com-
pany. The assetless entity, along with two other ac-
quiring entities, eventually entered into a merger
agreement with the target company. The merger

agreement contained a standard no-brokers' fee pro-
vision, stating that no broker, finder, financial ad-
visor, or investment banker could expect to receive
a fee for work performed in connection with the
merger. The provision contained a parenthetical ex-
ception for the investment banking advisor engaged
by the assetless entity.

Three months after the merger agreement was
signed, the parties agreed that the three acquiring
entities would be exchanged for three other acquir-
ing entities, who would assume the obligation to ac-
quire the target company from the original group of
acquirers. Reference to the financial advisor's suc-
cess fee remained intact. That would soon change
as efforts to finalize their agreement came to a close.

Late into the final evening of negotiation of the
last set of amendments to the merger agreement, the
two principals representing the original acquiring
entities, who had previously delivered their signa-
ture pages to a fellow law partner, left the negoti-
ations and went home. They gave him no instruc-
tions, limitations, or conditions on which to pro-
ceed during the negotiations. A few hours later, an-
other partner, still negotiating the terms of the
amendment, would agree to delete the merger
agreement's one reference to the financial advisor's
fee. The practical effect of this amendment was that
the obligation to pay the success fee was neither as-
signed to nor assumed by the second group of ac-
quirers.

Both the investment banking advisory firm and
the assetless entity which had engaged its services
bring suit for reformation. The firm also brings suit
for fraud, unjust enrichment, and for damages under
a third-party beneficiary contract theory. Before the
Court is a motion to dismiss on behalf of the second
group of acquirers and the target corporation.

II. BACKGROUND [FN1]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN1. The Background is drawn from the Amended Complaint (sometimes, the "Complaint") and those documents referenced by the Amended Complaint.

Plaintiff North American Senior Care, Inc. ("NASC") is a Delaware corporation and special purpose entity formed in connection with a transaction with Defendant Beverly Enterprises, Inc. ("Beverly"), a Delaware corporation that operates nursing home facilities throughout the United States.[FN2] On August 16, 2005, NASC, along with NASC Acquisition Corp. ("NASC Acquisition") and SBEV Property Holdings LLC ("SBEV"), entered into a merger agreement (the "Merger Agreement") with Beverly whereby it would be acquired in an all-cash deal of more than $2 billion.[FN3]

FN2. Compl. ¶¶ 7, 11.

FN3. *Id.* ¶ 8; Herbert Aff. Ex. C ("Merger Agreement").

Sometime prior to the Merger Agreement, NASC had engaged Plaintiff MetCap Securities LLC ("MetCap") to serve as its financial and business advisor in connection with a Beverly transaction. The five-page agreement (the "Advisor Contract"), which was only between NASC and MetCap, provided for an "investment advisory fee" to be paid to MetCap, along with expenses, upon the closing of any business combination transaction with Beverly.[FN4]

FN4. *Id.* ¶ 9; Herbert Aff. Ex. B ("Advisor Contract"). Payment of the fee was guaranteed by SBEV. *See* Advisor Contract at 5. The Advisor Contract remained in force when the Beverly deal closed.

Although a court assessing a motion to dismiss typically only considers facts alleged in the complaint, it may also consider documents referred to in the complaint. *See In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 169 (Del.2006). Here, several documents are expressly or impliedly referenced in the Complaint: the Merger Agreement, the Advisor Contract, preliminary and final

drafts of the Third Amendment to the Merger Agreement, and certain e-mails.

*2 The Merger Agreement, by Section 5.10, recited generally that no financial advisor's fees were owed, but it expressly referenced the MetCap fee: [FN5]

FN5. Compl. ¶ 10.

No broker, finder, financial advisor, investment banker or other Person (other than Wachovia Securities and MetCap Securities LLC, the fees and expenses of which will be paid by Parent) is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission in connection with the Merger based upon arrangements made by or on behalf of Parent or Merger Sub.[FN6]

FN6. The Merger Agreement referred to NASC as "Parent" and to NASC Acquisition as "Merger Sub."

NASC, however, was without assets of its own.[FN7] Thus, for several months before August 2005, Leonard Grunstein, a principal of SBEV and a partner at the law firm of Troutman Sanders LLP ("Troutman Sanders"), sought financing to fund the obligations that would be incurred as part of a transaction with Beverly.[FN8] He negotiated extensively with Ronald Silva of Fillmore Capital Partners ("Fillmore Capital") and its counsel, Joseph Heil of the law firm of Dechert LLP ("Dechert").[FN9] In the course of these negotiations, Silva and Heil were given drafts of the Merger Agreement; each draft included Section 5.10 and its reference that the MetCap fee was to be paid by NASC.[FN10]

FN7. *Id.* ¶ 11.

FN8. *Id.* ¶ 13.

FN9. *Id.*

FN10. *Id.* ¶ 14.

The Merger Agreement was amended on September 22, 2005, to reflect the equity that was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

to be secured to fund the acquisition of Beverly. Section 2.11 of this amendment (the "Second Amendment") [FN11] provided that Fillmore Capital would deliver an "Equity Commitment Letter" by November 18, 2005, detailing Fillmore Capital's commitment to purchase the "common stock and preferred stock of Parent [NASC] for at least $350 million to cause Parent ... to make the proceeds of such purchase available as consideration for the [Beverly] merger."[FN12] The Second Amendment did not alter, or even reference, NASC's obligation (as "Parent") to pay the MetCap fee as described in Section 5.10 of the Merger Agreement.[FN13]

> FN11. The First Amendment to the Merger Agreement is not pertinent to the dispute before the Court.

> FN12. *Id.* ¶ 15. The Equity Commitment Letter was signed by Silva and attached as Exhibit C to the Second Amendment.

> FN13. *Id.* ¶¶ 15-16.

In mid-November, Silva announced that he had raised the $350 million in equity that was the subject of the Second Amendment. Shortly thereafter, on November 20, 2005, the parties to the merger executed another amendment (the "Third Amendment"), which would shift the obligation to purchase Beverly from the NASC, NASC Acquisition, and SBEV, entities all represented, at least to some extent, by Troutman Sanders, to Pearl Senior Care, Inc. ("Pearl"), PSC Sub Inc. ("PSC"), and Geary Property Holdings, LLC ("Geary"),[FN14] all created at Silva's behest and represented by Dechert.[FN15] Before the negotiations had culminated in the final version of the Third Amendment, however, Grunstein (for SBEV) and Mark Goldsmith, also a Troutman Sanders partner, (for NASC and NASC Acquisition) signed signature pages on November 18, 2005, and had them delivered to Lawrence Levinson, another attorney at Troutman Sanders, to be held in escrow.[FN16] The signature pages were eventually attached to the final version of the Third Amendment.

> FN14. *Id.* ¶¶ 17-18. Silva is the president of

Pearl and PSC, entities formed by Fillmore Capital. It should also be noted that the names of the substituted acquiring entities are taken from the Complaint. The Defendants maintain that Pearl and PSC have been incorrectly named in the Complaint and that their proper names are Pearl Senior Care, LLC and PSC Sub LLC.

> FN15. The Complaint (¶ 17) states that shortly before execution of the Third Amendment, Grunstein suggested that the names of the original acquiring entities be changed from NASC, NASC Acquisition, and SBEV to Pearl, PSC, and Geary, respectively. The reasons for the requested change are not alleged and the effects of that change are not clear, but the Court notes that the parties appear to agree that the name changes are not pertinent to their dispute, which focuses primarily on the execution of the Third Amendment.

As a result of the Third Amendment, Fillmore Capital would not purchase the stock of NASC. As a consequence, perhaps not fully appreciated at the time, of this structural change, the pending dispute would evolve.

> FN16. *Id.* ¶ 19.

*3 But negotiations were far from over. On November 20, 2005, various drafts of the Third Amendment were circulated throughout the day between, *inter alia*, Grunstein and Goldsmith (on behalf of the assignor acquiring entities) and Silva and Heil (on behalf of the assignee acquiring entities).[FN17] None of these drafts altered, much less referenced, Section 5.10 of the Merger Agreement. By 7:00 p.m. that evening, Beverly's Board of Directors had approved the latest draft of the Third Amendment-again, a draft that did not reference Section 5.10 or the MetCap fee. Around 10:00 p.m., Grunstein and Goldsmith, apparently believing that no further changes would be forthcoming, went home.

> FN17. *Id.* ¶ 20.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

But one of Grunstein and Goldsmith's other partners at Troutman Sanders, W. Brinkley Dickerson, stayed behind. At Heil's request, Dickerson, apparently without consulting with his partners, made the change to the Third Amendment that is at the center of the parties' dispute.[FN18] At 12:59 a.m. on November 21, 2005, a few hours after Grunstein and Goldsmith had left, Dickerson e-mailed Beverly's counsel at Covington & Burling LLP and copied several parties, including Grunstein (for SBEV) and Heil (for Silva and Pearl), but not Goldsmith (for NASC and NASC Acquisition).[FN19] Another draft had emerged. This time, a provision of the Merger Agreement-and perhaps a critical one for MetCap-was stricken. Section 3.9 of the Third Amendment deleted the parenthetical of Section 5.10, which concerned payment of the MetCap fee.[FN20] The obvious significance was that Pearl, as a party generally assuming NASC's duties under the Merger Agreement (an assignment made by the Third Amendment), would not have any even arguable contractual obligation to pay MetCap for its advisory services. The final version of the Third Amendment, which appeared around 4:00 a.m. on November 21, 2005, reflected this change, a change that MetCap and NASC would not discover until March 2006.

> FN18.Id. ¶ 23.
>
> FN19. Goldsmith e-mailed Dickerson earlier that evening at 9:36 p.m., informing him that, although he was unsure if the Third Amendment had to be signed that evening, he had given Levinson, another colleague at Troutman Sanders, his signed signature pages on behalf of NASC and NASC Acquisition. See Herbert Aff. Ex. H.
>
> FN20. Section 3.9 of the Third Amendment provided: "Section 5.10 of the Merger Agreement is amended by deleting the parenthetical contained therein."

In their Complaint, MetCap and NASC explain that "[w]hat happened was that defendants caused

the new version of Section 3.9 to be drafted; and signature pages were removed from a prior version of the Third Amendment and attached to the new unauthorized version."[FN21] This occurred, of course, after Grunstein and Goldsmith had departed. They allege that Dickerson was only "deal counsel" to all the buyers in the transaction, collectively "coordinating and representing everyone on the buyer's side,"[FN22] but that he lacked the authority to bind NASC, NASC Acquisition, or SBEV individually.[FN23]

> FN21. Compl. ¶ 22.
>
> FN22.See Tr. of Oral Arg. Jan. 27, 2007, at 44.
>
> FN23. Compl. ¶ 23. It is not alleged that Troutman Sanders represented MetCap.

The Defendants' conduct with respect to the Third Amendment forms the basis for MetCap and NASC's claims. The Complaint makes no allegations of a separate agreement, such as an amendment to, or an assignment of, the Advisor Contract by which Pearl, PSC, or Geary, agreed expressly to assume NASC's obligation to pay MetCap.

The merger with Beverly closed on March 14, 2006.[FN24] Despite the work it performed in connection with the transaction, MetCap has yet to receive any portion of its advisory fee and now seeks recovery against Pearl, PSC, Geary, and Beverly.[FN25]

> FN24.Id. ¶ 26.
>
> FN25. Fillmore Capital reimbursed MetCap $1.5 million for sums it had advanced in connection with the transaction. Id. ¶ 25. The Complaint does not address the status of MetCap's efforts, if any, to collect from SBEV under its guarantee of the Advisor Contract.

## III. CONTENTIONS

*4 Seeking to recover an investment advisory fee it claims it is owed, MetCap, along with NASC,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 5

filed a four-count Amended Complaint. In Count One, MetCap alleges that the Defendants, with the exception of Beverly, defrauded it of its fee by failing to disclose that Section 3.9 of the Third Amendment had been changed to remove the reference in the Merger Agreement regarding payment of Met-Cap for its services. Because of the silence of the Defendants with respect to this late-hour change, MetCap, to its detriment, continued working. In Count Two, MetCap alleges that all of the Defendants were unjustly enriched by the work it performed in connection with the merger because they knew that, after adoption of the Third Amendment, NASC was no longer a party to the Merger Agreement and, in addition, had no assets of its own. Without relief, MetCap argues that the Defendants will have received the benefit of its work through NASC's assignment of developed contract rights without assuming a material obligation that should have come with it: compensating MetCap for its services. In Count Three, MetCap alleges that Pearl became and remains obligated to pay the fee because MetCap, as an intended third-party beneficiary of the Merger Agreement before the Third Amendment, never consented to the change caused by Section 3.9 of the Third Amendment.[FN26]Finally, both MetCap and NASC seek reformation of the Third Amendment because of its alleged failure to express the agreement between the parties that Pearl would assume NASC's obligation to pay Met-Cap's fee.

> FN26. Section 3.9 of the Third Amendment, throughout this Memorandum Opinion, will be used to refer to the final version which deleted the parenthetical contained in Section 5.10 of the Merger Agreement. Before the final revisions, Section 3.9 addressed subject matter not related to the pending dispute.

Pearl, PSC, Geary, and Beverly have collectively responded by moving to dismiss this action under Court of Chancery Rule 12(b)(6).[FN27] They focus on two points: first, NASC's counsel consented to the addition of Section 3.9 of the Third Amendment; and, second, any right MetCap has to

a fee is governed solely by the Advisor Contract it has with NASC, as there is neither an agreement between MetCap and any of the Defendants nor an agreement in which any of the Defendants assumed NASC's obligation under the Advisor Contract.

> FN27. They also challenge, under Court of Chancery Rule 9(b), the adequacy of the Plaintiffs' efforts to plead fraud and mistake with particularity.

## IV. ANALYSIS

### A. *The Applicable Standard*

A motion to dismiss under Court of Chancery Rule 12(b)(6) may be granted only if "it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief."[FN28]This is because, in considering such a motion, the Court is required to accept the well-pleaded facts alleged in the complaint as true and to view those facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the plaintiffs.[FN29]The Court is not, however, compelled to accept every strained interpretation of fact or every conclusory allegation unsupported by facts contained in the complaint.[FN30]

> FN28.*VLIW Tech., L.L.C. v. Hewlett-Packard Co.,* 840 A.2d 606, 610-11 (Del.2003) ("Accordingly, under Delaware's judicial system of notice pleading, a plaintiff ... need only allege facts that, if true, state a claim upon which relief can be granted."); *see Palese v. Del. State Lottery Office,* 2006 WL 1875915, at *2 (Del. Ch. June 29, 2006), *aff'd,*913 A.2d 570 (Del.2006) (TABLE); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (reminding that a court's role on such a motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 6

FN29.*E.g., Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L .P.,* 829 A.2d 143, 148-49 (Del. Ch.2003). The Court may also consider documents integral to the complaint and incorporated by reference. *Id.* at 149.

FN30.*In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d at 168.

## B. *The Complaint Fails to State a Claim for Fraud Against Pearl, PSC, or Geary*

MetCap's first claim is for fraud. The Complaint alleges that Pearl, PSC, and Geary defrauded MetCap when they: (1) inserted Section 3.9 of the Third Amendment at the last minute without the knowledge or authorization of either MetCap or NASC and (2) failed later to disclose this change.FN31The purpose and effect of the Defendants' conduct was, MetCap contends, to deprive it of its fee and to induce it to continue working on the merger.FN32

FN31. Although Count One (the one alleging fraud) is brought only by MetCap against Pearl, PSC, and Geary, the parties appear to have joined issue as if both Met-Cap and NASC had asserted that claim. *See* Defs.' Opening Br. at 19 ("Plaintiffs have failed to allege ... that Defendants made any false statements."); Pls.' Ans. Br. at 33 ("Plaintiffs have a claim for fraud ..."); Defs.' Reply Br. at 13 ("[P]laintiffs' fraud claim is defeated by the imputation of Troutman Sanders' knowledge to Leonard Grunstein."). The Court, however, will address only the claims asserted in the Complaint. A fraud claim by NASC is not among them.

FN32. Compl. ¶¶ 29-30.

*5 To state a common law fraud claim, MetCap must plead facts supporting an inference that: (1) Pearl, PSC, or Geary falsely represented or omitted facts that they had a duty to disclose; (2) they knew or believed that certain representations were false

or made representations with a reckless indifference to the truth; (3) they intended to induce MetCap to act or refrain from acting; (4) MetCap acted in justifiable reliance on the representation; and (5) Met-Cap was injured by its reliance.FN33

FN33.*See DCV Holdings, Inc. v. ConAgra, Inc.,* 889 A.2d 954, 958 (Del.2005); *see also Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983) ("[F]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of facts, or by silence in the fact of a duty to speak. Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading.").

Metcap's claim for fraud fails because it depends upon the contention that the Defendants were knowingly silent as to the late-hour change to the Third Amendment and that there was a "duty to disclose" the change to MetCap.FN34 Generally, a duty to disclose arises when there is a fiduciary or other similar relationship of trust between the parties or where the custom or course of dealing between the parties merits disclosure.FN35MetCap has failed to set forth any facts that would support any inference that the Defendants had some fiduciary or other obligation to disclose changes to the Merger Agreement to MetCap, which, of course, was not a party to the Merger Agreement. Where there is no fiduciary or contractual relationship, Delaware law generally does not impose a duty to speak.FN36Because MetCap makes no allegation that such a relationship existed between it and the Defendants or that it had engaged in a course of dealing with the Defendants entitling it to any particular disclosure, the Defendants owed no "duty to disclose" to MetCap and, accordingly, MetCap has not stated a claim for fraud against the Defendants.FN37

FN34. MetCap does not allege any false representation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN35.*See, e.g., Matthews Office Designs, Inc. v. Taub Invs.,* 1994 WL 267479, at *2 (Del. May 25, 1994).

FN36.*See Nicolet, Inc. v. Nutt,* 525 A.2d 146, 150 (Del.1987).

FN37. To the extent that MetCap might argue that the "duty to disclose" would arise out of its status as a third party beneficiary to the Merger Agreement, see Part IV.D, *infra.*

## C. *The Claim for Unjust Enrichment-It Survives in Part*

MetCap also asserts a claim for unjust enrichment against all Defendants. It argues that it was the "procuring cause" of the Beverly acquisition and that, absent a recovery, the assignee Defendants and Beverly will have received the benefit of its services without the corresponding obligation to pay MetCap for those services.FN38

FN38.*See* Compl. ¶¶ 33-34. The Complaint does not go much further than a broad brush allegation that MetCap was the "procuring cause" of the merger. For example, the Complaint notes MetCap's "substantial contribution and work in connection with the merger" and that it "conferred the benefit of its services directly upon defendants," but it makes no reference as to what exactly it performed for the Defendants.

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."FN39In finding a party is entitled to an equitable remedy for unjust enrichment, courts look to several factors: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.FN40Of cardinal significance is whether a contract already governs the parties' relationship. In

short, if there is a contract between the complaining party and the party alleged to have been enriched unjustly, then the contract remains "the measure of [the] plaintiff's right."FN41

FN39.*Schock v. Nash,* 732 A.2d 217, 232 (Del.1999).

FN40.*Cantor Fitzgerald, L.P. v. Cantor,* 1998 WL 326686, at *6 (Del. Ch. June 16, 1998); *Khoury Factory Outlets, Inc. v. Snyder,* 1996 WL 74725, at *11 (Del. Ch. Jan. 8, 1996).

FN41.*Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 942 (Del.1979); *ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995).*See, e.g., Bakerman v. Sidney Frank Importing Co., Inc.,* 2006 WL 3927242, at *18 (Del. Ch. Oct. 16, 2006) ("When the complaint alleges an express, enforceable contract that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed."); *Albert v. Alex Brown Mgmt. Servs ., Inc.,* 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) (dismissing an unjust enrichment claim "when the existence of a contractual relationship [was] not controverted").

There is, of course, no contract between MetCap and the Defendants. This fact, MetCap appears to assert, should itself be dispositive to the Court's analysis, leading it to conclude that the claim for unjust enrichment can withstand Defendants' motion to dismiss. The mere absence of a contract between the complaining party and the defendant, however, is not dispositive. Also crucial-but lacking here-is that some direct relationship be alleged between a defendant's enrichment and a plaintiff's impoverishment.

*6 Although the doctrine of unjust enrichment is one of "substantial flexibility," FN42 it is axiomatic that there must be some relationship between the parties. A showing that the defendant was enriched unjustly by the plaintiff who acted *for the*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 8

defendant's benefit is essential. As one court co-gently explained:

> FN42.*Palese,* 2006 WL 1875915, at *5.

[T]o recover under a theory of quasi contract, a plaintiff must demonstrate that services were per-formed for the defendant resulting in its unjust en-richment. It is not enough that the defendant re-ceived a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendants, the plaintiff must look to that person for recovery.[FN43]

> FN43.*Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc.,* 14 F.Supp.2d 331, 338 (S.D.N.Y.1998), *aff'd,* 173 F.3d 845 (2d Cir.1999).

With the focus on "for whom" MetCap's ser-vices were performed, the Complaint frames two discrete periods: (i) through execution of the Third Amendment and (ii) after the Third Amendment. Before the Third Amendment, MetCap's services, in accordance with the Advisor Contract, were per-formed for NASC; afterward, with NASC out of the transaction, the Defendants, or so it must be in-ferred from the Complaint, knew that MetCap was performing work, supporting the transaction, for their benefit.

The Complaint refers to the Advisor Contract between MetCap and NASC. That agreement evinces their understanding that MetCap would "act as [NASC's] financial and business advisor to assist [it] in proposed transactions involving Beverly En-terprises, Inc."[FN44] in exchange for NASC's "pay [ing] to [MetCap] an Investment Advisory Fee of Twenty Million Dollars ($20,000,000) ... [u]pon the closing of any ... Business Combination Transac-tion [with Beverly]."[FN45] Absent from the Advisor Contract, however, is any link to Pearl, PSC, Geary, or Beverly. It does not specify or even contemplate that advisory services would be provided to any party other than NASC.[FN46] Those services were not requested by any of the Defendants. The Ad-visor Contract does not reveal, and the Complaint does not allege, a relationship of agency between

NASC and any one of the Defendants or that the Advisor Contract was amended to reflect a change in NASC's status as the sole recipient of MetCap's services. Furthermore, the Complaint makes no al-legation that any of the Defendants expressly agreed to assume, either in whole or in part, NASC's obligation under the Advisor Contract to compensate MetCap.[FN47]

> FN44. Advisor Contract at 1.

> FN45.*Id.* at 2.

> FN46. Particularly odd is MetCap's unjust enrichment claim against the target corpor-ation in this transaction; the Advisor Con-tract makes plain that MetCap was ad-vising the entity *acquiring* Beverly. *See id.* at 1-2.Under the agreement, that entity was, of course, NASC.

> FN47. The Plaintiffs do contend that Pearl's duty to pay MetCap would have arisen under the parenthetical of Section 5.10 of the Merger Agreement if it had not been revised at the last minute by the Third Amendment.

Because our law precludes the doctrine of un-just enrichment from being invoked "to circumvent basic contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it,"[FN48] the Court must conclude that MetCap's route to recovery for work performed (or benefit conferred) through the Third Amendment is defined by its contract with NASC and that its unjust en-richment claim to that extent must be dismissed.[FN49]

> FN48.*WSFS v. Chillibilly's Inc.,* 2005 WL 730060, at *19 (Del.Super.Mar. 30, 2005).*See also*RESTATEMENT (SECOND) OF RESTITUTION § 110 (1988) ("A person who has conferred a be-nefit upon another as the performance of a contract with a third person is not entitled to restitution from the other *merely* be-cause of the failure of performance by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

third person.") (emphasis added). The parties engage in a minor debate about the guidance provided by Section 110 of the RESTATEMENT and how that guidance might be expanded by consideration of the tentative draft. Section 110 cannot be read as precluding *every* claim of unjust enrichment simply because there is an agreement between "A", who claims that "B" has been unjustly enriched at "A's" expense, and "C" (instead of "B"). To be fair, none of the Defendants, despite MetCap's characterization, has argued precisely this. The word "merely" in Section 110 serves as a reminder that something more is necessary to invoke the doctrine of unjust enrichment. The "more" that is required may be suggested by Section 29 of the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT (tentative draft No. 3, 2004) which provides in part:

A person who has conferred a benefit on a recipient as the performance of a contract with a third person is entitled to restitution from the recipient upon the failure of performance by the third person, but only as necessary to prevent unjust enrichment. In this context, the conclusion that a recipient would be unjustly enriched by the retention of a given benefit requires a determination that:
(a) absent liability in restitution, the claimant will not be compensated for the performance in question, and the recipient will retain the benefit of the claimant's performance free of any liability to pay for it; (b) liability in restitution will not subject the recipient to an obligation from which it was understood by the parties that the recipient would be free; and (c) liability in restitution will not subject the recipient to a forced exchange.

The tentative draft is, of course, just that: tentative. More importantly, if literally applied, Met-Cap's claim would fail because it has not alleged that "absent liability in restitution," it would not be paid. It has alleged that NASC is unable to pay; it has not alleged that SBEV will not pay under its guarantee of the Advisor Contract. As for whether liability would be imposed on Pearl for "an obliga-

tion from which it was understood by the parties that [it] would be free," the analysis is less clear. When the Advisor Contract was executed, Pearl obviously was not involved in any way and no one believed that it would become obligated. At some point, especially during the period shortly after the Second Amendment when it was anticipated that Pearl would acquire the stock of NASC, it could be argued that Pearl (and NASC and MetCap) expected that Pearl would become obligated. Pearl, however, did not buy the stock of NASC and, thus, a transaction which never occurred cannot be the basis for imposing the liability upon Pearl. Moreover, no benefit was arguably conferred by MetCap on Pearl until the Third Amendment.

> FN49. The Court is not insensitive to Met-Cap's predicament. Both MetCap and NASC allege that NASC was an entity with no assets of its own and, thus, seeking recovery from it would be futile. *See* Compl. ¶ 11 (alleging further that "it was contemplated that NASC would meet its financial obligations ... by means of funds that it would raise"). But the inability of a party to a contract to fulfill an obligation thereunder cannot serve as a basis to conclude that other entities, who are not party to the contract, are liable for that obligation. *See WSFS,* 2005 WL 730060, at *19 ("A greater injustice would result if this Court were to ignore the lease agreement [between the parties] and award unjust enrichment damages ... WSFS was in the better position to protect itself by claiming other collateral, or in the alternative, refusing to loan its funds ... Finding otherwise would be inequitable.").

Following the Third Amendment, MetCap's work was no longer for NASC; instead, the Court must infer from the Complaint that it was for the benefit of the Defendants, most likely for the benefit of Pearl. If, as alleged, Pearl knew of the services for its benefit, relied upon and benefited from those services, and understood that NASC could not (or would not) pay MetCap for those services, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Court cannot conclude "with reasonable certainty" that there is no set of facts that MetCap could prove to support its claim for unjust enrichment as to the benefits it conferred upon Pearl following the Third Amendment.[FN50]Thus, the motion to dismiss Met-Cap's unjust enrichment claim must be denied to that extent.[FN51]

> FN50. MetCap's claim of unjust enrich-ment against PSC, Geary, and Beverly do not survive the motion to dismiss. No non-conclusory facts are alleged to suggest in any fashion how any of these entities be-nefited from MetCap's services, contracted for by NASC and only arguably at some point benefiting Pearl.

> FN51. The Complaint provides little in-sight to the work of MetCap after the Third Amendment (or before the Third Amend-ment for that matter). How to establish ap-propriate compensation, assuming the Met-Cap is so entitled, may be a difficult task, but it is not one that the Court need con-front now. Indeed, the Court, in this con-text, does not preclude any argument (if MetCap should choose to make one) as to when any particular benefit resulted.

D. *The Complaint Does Not State a Claim That MetCap Was a Third-Party Beneficiary of the Mer-ger Agreement*

*7 Next, the Court considers MetCap's claim that it was a third-party beneficiary to the Merger Agreement, before the Third Amendment, and that, as such, the parties to the Merger Agreement could not vary or eliminate MetCap's right to a fee without its express consent because MetCap had ac-ted in reliance upon its third-party rights.[FN52]For reasons set forth, this claim does not survive the Defendants' motion to dismiss.

> FN52.*See* Compl. ¶¶ 12, 37-38. For Met-Cap to prevail, it must allege that (1) it was a third-party beneficiary of the Merger Agreement before the Third Amendment and (2) the terms of that agreement which

benefited it could not be changed without its approval. The Merger Agreement, as amended by the Third Amendment, confers no rights, by its terms, upon MetCap.

Well-settled within precepts of contract law is recognition that non-parties to a contract ordinarily have no rights under it.[FN53]Fixation with privity between parties, however, waned as modern com-merce spawned increasingly sophisticated and com-plex relationships.[FN54]An exception emerged that an intended-but not incidental-third-party benefi-ciary might also have enforceable legal rights under a contract, even if it was not a party to that contract.

> FN53.*E.g., Comrie v. Enterasys Networks, Inc.,* 2004 WL 293337, at *2 (Del. Ch. Feb. 17, 2004) (citing *Insituform of N. Am., Inc. v. Chandler,* 534 A.2d 257, 268 (Del. Ch.1987)) (recognizing "the general rule that strangers to a contract ordinarily acquire no rights under it ...").

> FN54.*See Wilmington Housing Auth. v. Fid. & Deposit Co. of Md.,* 47 A.2d 524, 528 (Del.1946) (holding that a third-party beneficiary may recover on a contract made for his benefit and noting that "the exceptions grafted upon the English doc-trine by our Delaware Courts have breached the imaginary barrier erected by the seal against the overwhelming force of justice and reason supporting the American doctrine, thereby opening the way for us to wipe out the last vestiges of an 'outworn, archaic' rule which is in conflict with the demands of modern-day business and so-cial policy"); *see also*13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 37:1 (4th ed.2000) (noting that, while courts "recite[d] talismanically-and some-what misleadingly-that 'strangers to a con-tract' have no rights under the contract, [i]n practice, the traditional common-law view proved too inflexible and harsh ... [and an] exception to this rule has grown up under our law....").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Delaware courts have often looked to *Insituform of North America, Inc. v. Chandler*[FN55] to determine whether a party is an intended third-party beneficiary under a contract. There, the Court explained that:

> FN55.534 A.2d 257 (Del. Ch.1987).

In order for third party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon third parties that was intended, but the conferring of a *beneficial* effect on such third party-whether it be a creditor of the promisee or an object of his or her generosity-should be a material part of the contract's purpose.FN56

> FN56.*Id.* at 270 (emphasis in original).

Thus, three elements are essential: (1) an *intent* between the contracting parties to benefit a third party through the contract, (2) the benefit being intended to serve as a gift or in satisfaction of a pre-existing obligation to the third party, and (3) a showing that benefiting the third party was a *material* aspect to the parties agreeing to contract.FN57

> FN57.*See Madison Realty Partners 7, LLC v. AG ISA, LLC,* 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

MetCap alleges that Section 5.10 of the Merger Agreement made it an intended beneficiary.FN58Merely alleging that it was an intended beneficiary is, of course, not sufficient to state a claim.FN59First, MetCap must allege facts demonstrating that both NASC *and* Beverly intended to benefit MetCap. It has not done so. The no-brokers' fee provision makes plain that Beverly is not liable for any broker, finder, banking, or advisory fee and, although it references the MetCap fee, it does so by clarifying that that fee is entirely the responsibility of NASC as the acquiring entity under the Merger Agreement before the Third Amendment. It is the Advisor Contract between the Plaintiffs that is the sole agreement defining the scope of MetCap's services, the party to whom those services were to be rendered, the considera-

tion it was to receive for those services, and the party responsible for paying it for those services .FN60That the Merger Agreement, a document executed after the Advisor Contract, makes reference to NASC's pre-existing obligation to MetCap does not make MetCap a third-party beneficiary to the Merger Agreement. The pertinent provision in the Merger Agreement recites that no one is entitled to any fee for financial advisor services and the parenthetical simply notes that MetCap is an exception and is entitled to payment of fees by NASC (defined as "Parent"). The parenthetical merely reconfirms NASC's obligation to MetCap under the Advisor Contract and defeats any argument that the Merger Agreement, by its statement that no such obligation exists, eliminated NASC's obligation to MetCap. If MetCap has no rights as a third-party beneficiary under the Merger Agreement before the Third Amendment, it would follow that it has no rights after the Third Amendment because there is no plausible argument that its rights are greater under the Merger Agreement after the Third Amendment than before the Third Amendment. Also, the financial advisor services rendered by MetCap-up to the time of the Third Amendment-were for NASC, which remains liable-if insolvent-for that obligation.

> FN58. Compl. ¶ 12. For the text of Section 5.10, see Part II, *supra.*

> FN59.*See Delmar News, Inc. v. Jacobs Oil Co.,* 584 A.2d 531, 534 (Del.Super.1990) ("[A]side from stating a legal conclusion, [merely alleging the status as an intended beneficiary] falls far short of establishing that [one] was an intended beneficiary of the ... contract.").

> FN60. Although the acquiring entities changed following execution of the Merger Agreement, no assignment or other agreement was executed to assign, transfer, or alter NASC's continuing and freestanding obligation to remunerate MetCap. NASC may have no assets to satisfy its obligation, but that is not a dilemma for this Court to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

resolve in MetCap's favor on a third-party beneficiary basis. *See Street Search Partners, L.P. v. Ricon Int'l, L.L.C.,* 2005 WL 1953094, at *3 (Del.Super.Aug. 1, 2005) ("The Third Party Beneficiary doctrine is not meant to rescue a sophisticated corporate entity from its contractual appraisal of a business risk.").

*8 Second, to survive the Defendants' motion to dismiss, MetCap must draw the Court's attention to facts indicating that the parties intended for the parenthetical exception of the MetCap fee from the no-brokers' fee provision to be either a gift or a means of satisfying a pre-existing obligation. Neither is the case. Nowhere in the Complaint is it alleged that Beverly sought to confer a gift to Met-Cap, and the parenthetical exception language itself does not satisfy NASC's preexisting obligation, but merely restates that NASC alone is responsible for paying a fee it already was committed to paying.FN61

> FN61. The Court does not need to resolve whether payment of MetCap was material to the Merger Agreement. *See Insituform,* 534 A.2d at 270.*See also Madison Realty,* 2001 WL 406268, at *1, *5 (finding the engagement of third-party providers of "personnel, services, and infrastructure that [were] essential both to operate, and to acquire" a partnership's investment interests was not a material purpose of a partnership organized for "the limited purpose to purchase ... hold and otherwise manage ... equity or any debt securities [of the partnership]" and, thus, the third-parties were merely incidental beneficiaries with no more standing to sue for breach of the partnership agreement "than would the local utility company or the office supply store").

Moreover, even if MetCap had been a third party beneficiary of the Merger Agreement before the Third Amendment, its claim would, nonetheless, be dismissed. MetCap correctly notes that a

contract benefiting a third party who has acted in reliance upon it cannot be amended to the detriment of the third party beneficiary without its consent.FN62MetCap, however, is confronted with the inescapable fact that the Third Amendment changed nothing regarding its rights. Before the Third Amendment, NASC was obligated to pay MetCap's fee. After the Third Amendment, NASC was obligated to pay MetCap's fee. Its right to seek to recover its fees from NASC has not changed. MetCap, instead, seeks to elevate its rights at the expense of entities which were not parties to the Merger Agreement at any time when it-even arguably-was expressly provided a benefit under the Merger Agreement.FN63

> FN62.*See*RESTATEMENT (SECOND) OF CONTRACTS § 311(3) (1981).

> FN63. Before the Third Amendment, the term "Parent" was defined as NASC. Thus, any reference to "Parent" prior to the Third Amendment meant NASC and only NASC. The Merger Agreement, by its terms, at no time in its history, ever expressly obligated any party other than NASC (assuming for these purposes that it did obligate NASC) to pay MetCap's fee.

In sum, MetCap has failed to allege a claim as a third-party beneficiary under the Merger Agreement.

E. *The Carefully Crafted Allegations of the Complaint Preclude Dismissal of NASC's Claim for Reformation; MetCap is Not so Fortunate*

Finally, both MetCap and NASC seek reformation of the Third Amendment to the Merger Agreement to reflect the parties' understanding, or so it is alleged, that Pearl was to assume all of NASC's obligations, including the obligation to pay MetCap. Specifically, they petition the Court to eliminate Section 3.9 of the Third Amendment, which deleted the parenthetical in Section 5.10 of the Merger Agreement. Under Delaware law, the Court may use its equitable power to "reform" a contract so

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 13

that it expresses the "real agreement" [FN64] of the parties in three circumstances: mutual mistake, unilateral mistake, and fraud.[FN65] Count Four of the Complaint seeks reformation on the basis of unilateral mistake and fraud (or "knowing silence").[FN66]

> FN64.*Colvocoresses v. W.S. Wasserman Co.,* 28 A.2d 588, 589 (Del. Ch.1942) ("The very purpose of reformation by a Court of Equity is to make an erroneous instrument express correctly the real agreement between the parties; *no court can make a new contract for them."*) (emphasis added).

> FN65.*See e.g., Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1151 (Del.2002); *James River-Pennington, Inc. v. CRSS Capital, Inc.,* 1995 WL 106554, at *2 (Del. Ch. Mar. 6, 1995) ("Reformation is appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence.").

> FN66. Compl. ¶ 43.

MetCap and NASC first plead that reformation is necessary because the final draft of the Third Amendment did not comport with the prior understanding among the parties. The prior agreement to which the Plaintiffs cite is evidenced by the version of the Third Amendment that was circulated by e-mail at 9:04 p.m. on November 20, 2005.[FN67]In that version, Sections 1.1 and 1.2 made plain that NASC, NASC Acquisition, and SBEV were assigning all rights and obligations under the Merger Agreement and that Pearl, PSC, and Geary were assuming all of those rights and obligations. Significantly, no reference was made to Section 5.10 of the Merger Agreement or to the MetCap fee itself (*i.e.,* the parenthetical contained in Section 5.10. of the Merger Agreement remained intact).

> FN67.*Id.* ¶ 10.Dickerson sent the 9:04 p.m. e-mail. Recipients included Grunstein, Goldsmith, Heil, Silva, and Levinson. *See*

Herbert Aff. Ex. I.

*9 MetCap and NASC assert that the agreement contained in the e-mail of 9:04 p.m. represents a specific prior agreement that differed materially from the version of the Third Amendment that appeared at 12:59 a.m. on November 21, 2005. Goldsmith and Grunstein had been involved in the negotiations all day on November 20, and no one had ever broached the subject of payment of MetCap's fee. They relied, so NASC alleges, on the course of conduct of negotiations among the parties that assured them that they would be consulted if any such changes were contemplated.

In *Cerberus International, Ltd. v. Apollo Management, L.P.,* the Supreme Court held that, regardless of whether mutual mistake or unilateral mistake is cited as the ground for reformation, "the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement."[FN68]Moreover, "[t]his understanding need only be complete as to the issue involved ... [i]t need not constitute a complete contract in and of itself."[FN69]Thus, the Court must determine here whether NASC has alleged facts demonstrating that the parties came to a "real agreement," not on all aspects of the merger itself, but on the more narrow issue of which entity was to pay MetCap.

> FN68.794 A.2d 1141, 1151-52 (Del.2002).

> FN69.*Id.* at 1152.

The *Cerberus* case is instructive in two factual respects. First, the Court concluded that a rational fact finder could have concluded that the parties had reached a specific prior understanding with respect to the disposition of certain proceeds because one party had stipulated that the specific disposition was a condition to going forward and the other party had consented. Second, the Court determined that there was no evidence in the record that the parties altered this agreement in subsequent negotiations.[FN70]

> FN70. As explained in *Cerberus:*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

First, we turn to the element of the prior agreement. Cilurzo told Harris in writing that having the proceeds from the options and warrants go to MTI's stockholders was a condition to further negotiations, and Harris responded in his handwritten note on that writing: "This looks fine." *Absent any evidence that this term was eliminated in the negotiation process* (and there is none on this record), it is certainly a permissible inference that the parties had a prior agreement relative to the proceeds from the options and warrants.

*Id.* at 1153 (internal citations omitted) (emphasis added).

By contrast, the revision to the Third Amendment did occur within the context of a negotiation process. After Grunstein and Goldsmith departed, Dickerson continued to represent NASC and other "acquiring entities" that night as "deal counsel." FN71 With respect to the negotiation of the Third Amendment, Pearl, PSC, and Geary, were represented by Heil. Because the change to the Third Amendment occurred during the negotiations between these two groups, there was an obvious divergence from the key facts in *Cerberus.* When Goldsmith and Grunstein left, the negotiations had not concluded, and it is difficult to accept that, in these circumstances, a "real agreement" between parties had been reached when those parties were still in the fluid process of negotiating, drafting, and arriving at a common understanding.

> FN71. The definitional contours of "deal counsel," a term without well-defined, independent significance, present a recurring conundrum. Indeed, it is not clear from the Complaint whether NASC seeks to describe a role for Dickerson that differs from Troutman Sanders generally. Whether an attorney representing others as "deal counsel" has exceeded the scope of his or her authority would, of course, depend upon the conduct and understanding of the parties whom he or she was representing. It would also be a question for this Court, one that could only be considered in light of, among other things, the nature of the

parties' relationship and the existence of any limitation on that relationship.

It is not surprising that, in the context of negotiating complex transactional documents, parties (and their attorneys) routinely accept that those attorneys representing counterparties to a contract are acting with the requisite authority to bind their principals. Although a motion to dismiss provides the Court with a poor forum for considering the issue of apparent authority, especially because all reasonable inferences must be drawn in favor of the nonmoving party, the Court would eventually be guided by the general maxim within our law that "[i]f a third party relies on the agent's apparent authority in good faith and is justified in doing so by the surrounding circumstances, the principal is bound to the same extent as if actual authority had existed." *Old Guard Ins. Co. v. Jimmy's Grille, Inc.,* 2004 WL 2154286, at *3 (Del. Sept. 21, 2004) (citations omitted). For the moment, however, it is notable that MetCap and NASC have offered no allegation in their Complaint that Heil, as counsel to Pearl and its related entities during the negotiations, was aware of any limitation on Dickerson's authority whether as "deal counsel" or as a partner in Troutman Sanders for purposes of the Beverly transaction.

That NASC may now regret the outcome of Dickerson's efforts that evening is, of course, not cause to rewrite a contract negotiated by sophisticated counsel. The Complaint, however, alleges specifically that Dickerson had no authority to make the changes on behalf of NASC or SBEV because, again according to the Complaint, he was not separately representing NASC or SBEV.

*10 The Complaint, accordingly, may be read to allege that it had been agreed, perhaps through acquiescence, that the parenthetical of Section 5.10 of the Merger Agreement would not be changed (or was not to be the subject of further negotiation in the absence of Goldsmith and Grunstein) even though negotiation of other issues was continuing. That sufficiently alleges the prior understanding that is essential to a reformation claim. Thus, the Complaint alleges that the Third Amendment, as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 15

the result of a unilateral mistake attributable to Dickerson, did not reflect the parties' intent.[FN72]

> FN72. By Court of Chancery Rule 9(b), both mistake and fraud must be pled with particularity. The Complaint, with its detailed, although selective, recitation of certain events of the evening of November 20, satisfies that standard.

Unilateral mistake alone does not provide a basis for reformation. It must be coupled with "knowing silence." [FN73]Dickerson did not send Goldsmith, NASC's principal in the negotiations, the final version of the Third Amendment.[FN74] Therefore, Goldsmith (and, presumably, NASC) was unaware of the Third Amendment. Similarly, Pearl, its counsel, and related entities, did not supply the information to NASC either.[FN75]Thereafter, Pearl and its counsel remained silent about the changes.

> FN73.See, e.g., Universal Compression, Inc. v. Tidewater, Inc., 2000 WL 1597895, at *7 (Del. Ch. Oct. 19, 2000) (referring to "knowledge and concealment").

> FN74. An e-mail that Goldsmith had sent to Dickerson before "signing off" of his computer that evening indicates that he had signed multiple copies of the signature pages for NASC and NASC Acquisition and that he had instructed Dickerson that the signature pages had been left with Levinson. See Herbert Aff. Ex. H. The Court notes that Dickerson e-mailed the offending change to Grunstein (but, for reasons that cannot be gleaned from the Complaint, not to Goldsmith) within hours.

> FN75. Heil and others affiliated with Pearl received a copy of Dickerson's e-mail transmitting the Third Amendment; that e-mail does not reflect that a copy was sent to Goldsmith.

Under agency law, the knowledge of an agent is generally imputed to his principal except when the agent's own interests become adverse.[FN76]In the context of "dual agency," or where an agent acts in a role common to two principals, the rule is much the same. That is, notice to, or knowledge of, an agent will be considered to be notice to, or knowledge of, both principals except in a situation of divided loyalties or where the agent's own interests run adverse to one of the principals.[FN77]

> FN76.Albert, 2005 WL 2130607, at *11 ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); Ambrose v. Thomas, 1992 WL 208478, at *2 (Del.Super.Mar. 13, 1992) ("In Delaware, well settled agency law provides where an agent acquires knowledge in the course of his or her agency and has no personal interest in the transaction adverse to the interest of the principal, any knowledge of or notice to the agent is chargeable to the principal whether or not knowledge or notice is actually communicated to the principal. This rule promotes the underlying policy of holding accountable one who transacts his business through another for what the other does or does not do in conducting that business. The principal should bear the burden rather than a third party who has dealt with the agent to the third party's detriment.") (internal citations omitted).

> FN77.See Holley v. Jackson, 158 A.2d 803, 808 (Del. Ch.1959) ( "Ordinarily the knowledge of an agent is imputed to his principal ... [but] where an agent is interested in the result of a transaction adversely to the interest of his principal, the rule of imputed knowledge on the part of the principal no longer obtains.") (citations omitted).

Dickerson was representing NASC; that is not disputed. NASC seeks to limit his role to that of "deal counsel." The question, however, is whether Dickerson's knowledge of the revision to Section

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 16

5.10 of the Merger Agreement through the Third Amendment (a revision which Dickerson himself accomplished) can be attributed to NASC within the context of whatever attorney-client relationship may have existed between NASC and Troutman Sanders. The Complaint carefully and somewhat flimsily-but sufficiently-alleges facts that would support an inference-one that must be given in the "plaintiff-friendly" confines of Court of Chancery Rule 12(b)(6)-that, during the evening of November 20, Dickerson was somehow conflicted because of his role as "deal counsel" and the payment of his fees by Pearl (or its related entities). In the appropriate factual setting, the knowledge of a conflicted agent may not be imputed to the principal. That, accordingly, precludes the Court from attributing Dickerson's knowledge to NASC.[FN78]

> FN78. It may turn out that Dickerson's conflict, if indeed there was one, was limited or minimal or was understood and accepted by NASC and, thus, would not preclude imputation of his knowledge to NASC. It may also be that Pearl was entitled to rely upon Dickerson's apparent authority or that it reasonably assumed that Dickerson would share any material information regarding the transaction with Goldsmith, his partner. Those are arguments-however tempting-that the Court may not reach at this stage of the proceedings because of the incomplete development of the factual background.

Accordingly, the Complaint states, perhaps only marginally, a claim for reformation of the Third Amendment for the benefit of NASC .[FN79]

> FN79. The Complaint was carefully drafted with respect to Dickerson's role. It alleges that he did not have the authority to bind NASC. It alleges that he was paid for some of his work by Pearl or its related entities. It alleges that he was "deal counsel," but it provides no basis for gaining a full understanding of Dickerson's role. Without an understanding of Dickerson's actual

role, it is difficult for the Court, within the confines imposed by Court of Chancery Rule 12(b)(6), to determine whether or not Dickerson had the authority to do what he did or, more importantly, whether Dickerson's knowledge may be imputed to NASC. Because the Court must give NASC the benefit of any reasonable inference that can be drawn from the allegations of the Complaint, the Complaint must be read to suggest that Dickerson was somehow conflicted and that his conflicted status would make it improper or inequitable to attribute his conduct or his knowledge to NASC, even though the Complaint scrupulously avoids any such express allegation and that inference is far from the one most likely to be drawn from the allegations of the Complaint. Ultimately, Dickerson's role will be a factual matter, one informed by an understanding of the ethics of the practice of law, and, if NASC has no more to offer than what has been set forth in its Complaint, its claim for reformation might fail not only because it is fairly charged with Dickerson's knowledge, but also because it is bound by Dickerson's conduct. NASC's position must be something more than a whine that it did not like what its lawyer did during the final hours of negotiation of the Third Amendment. Parties to a transaction and their counsel must be able to rely-and to act accordingly-on the negotiating authority generally accorded transactional attorneys. This is especially true when the negotiations are ongoing and the principals have abandoned the negotiation field after leaving signature pages. Nothing in this Memorandum Opinion should be viewed as undercutting that dynamic. The result here is more the product of Court of Chancery Rule 12(b)(6) than it is of substantive law.

Also, the Court expresses no view as to whether the reformation sought by NASC would bring the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 17
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

substantive result-Pearl's obligation to pay MetCap-
that it seeks.

On the other hand, MetCap's effort to obtain
reformation fails. MetCap is a party neither to the
Merger Agreement nor to the Third Amendment.
Reformation is available, perhaps subject to certain
exceptions not present here, only to parties to the
contract.[FN80] As such, MetCap, as a matter of law,
may not pursue a claim for reformation of the Third
Amendment.

> FN80. *See, e.g., Emmert v. Prade,* 711 A.2d
> 1217, 1219 (Del. Ch.1997); *Fritz v. Na-*
> *tionwide Mut. Ins. Co.,* 1990 WL 186448,
> at *3 (Del. Ch. Nov. 26, 1990); *but cf.*
> *Chase Manhattan Bank v. Iridium Africa*
> *Corp.,* 307 F.Supp.2d 608, 614 n.6
> (D.Del.2004).

### V. CONCLUSION

*11 For the foregoing reasons, (i) Count One
(Fraud) and Count Three (Third-Party Beneficiary)
of the Amended Complaint will be dismissed; (ii)
Count Two (Unjust Enrichment) of the Amended
Complaint, except to the extent that it purports to
assert a claim against Pearl based on benefits con-
ferred after the Third Amendment to the Merger
Agreement, will be dismissed; (iii) MetCap's claim
for reformation presented in Count Four will be dis-
missed; and (iv) otherwise, Defendants' Motion to
Dismiss will be denied. An implementing order will
be entered.

Del.Ch.,2007.
MetCap Securities LLC v. Pearl Senior Care, Inc.
Not Reported in A.2d, 2007 WL 1498989 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Tara M. DiRocco, hereby certify that on February 4, 2008 a true and correct copy of the *Defendants' Reply Brief in Support of Motion for Summary Judgment* was served upon the following individuals in the manner indicated.

| VIA E-FILING & FIRST CLASS MAIL | VIA E-FILING & FIRST CLASS MAIL |
|---|---|
| Sophia Siddiqui, Esquire<br>Fox Rothschild LLP<br>Citizens Bank Center<br>919 N. Market Street, Suite 1300<br>P.O. Box 2323<br>Wilmington, DE  19899-2323<br><br>**VIA E-FILING & FIRST CLASS MAIL**<br>Todd B. Nurick, Esquire<br>Nurick Law Group<br>111 West Germantown Pike<br>Plymouth Meeting, PA 19462 | Wendy G. Rothstein, Esquire<br>Fox Rothschild LLP<br>1250 South Broad Street<br>P.O. Box 431<br>Lansdale, PA  19446-0341 |

_____
Tara M. DiRocco (No. 4699)